UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

| | |
|---|---|
| JOHN W. JENTZ,<br>JUSTIN BECKER and AMBER BECKER,<br>ROBERT SCHMIDT,<br><br>    Plaintiffs,<br><br>  v.<br><br>CONAGRA FOODS, INC., et al.<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  No. 3:10-cv-00474-MJR-PMF<br>)<br>)  JURY TRIAL DEMANDED<br>)<br>)<br>)<br>) |

**CONAGRA FOODS, INC.'S MOTION FOR SUMMARY JUDGMENT ON *RES IPSA LOQUITUR*, NEGLIGENCE, CONSORTIUM, AND PREMISE LIABILITY COUNTS AGAINST CONAGRA AND STATEMENT OF MATERIAL FACTS**

ConAgra Foods, Inc. ("ConAgra"), by its undersigned counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, requests that this Court enter summary judgment in favor of ConAgra and against all Plaintiffs on all counts of *Res Ipsa Loquitur*,[1] Negligence,[2] Consortium,[3] and Premises Liability[4] against ConAgra. In support of its motion, ConAgra sets forth the following material facts that entitle it to summary judgment.

---

[1] These counts include: Count II of John Jentz's Fourth Amended Complaint; Counts III, IV of Justin Becker's Fifth Amended Complaint; Count II of Robert Schmidt's First Amended Complaint; Count II of Complaint of Intervenor NAICO in *Becker*.
[2] These counts include: Count I of John Jentz's Fourth Amended Complaint; Counts I, II, V, VI of Justin Becker's Fifth Amended Complaint; Count I of Robert Schmidt's First Amended Complaint; Count I of Complaint of Intervenor National American Insurance Company ["NAICO"] in *Becker*.
[3] These counts include: Counts II, IV, VI, VIII, X of Justin Becker's Fifth Amended Complaint.
[4] These counts include: Counts VII, VIII of Justin Becker's Fifth Amended Complaint; Count III of Complaint of NAICO in *Becker*.

## Statement of Material Facts

**Material Fact #1:** The flour mill at ConAgra's Chester, Illinois facility produces flour from wheat that is stored in bins within three adjacent grain elevators designated as Elevator A, Elevator B, and Elevator C. A by-product of the mills' flour production is "wheat middlings," which can be formed into pellets that are used as feed for livestock. *See Exhibit 1*: (a) Excerpt of deposition of Godfrey Friedt, pg. 97-98, lines 19-24, 1-19; and (b) Excerpt of deposition of Sean Belcher, pg. 21-22, lines 15-24, 1-24.

**Material Fact #2:** On March 12, 2010, ConAgra personnel noticed discolored pellets and an unusual odor emanating from pellet storage Bin C15 ("the bin"), which had a slightly elevated temperature, in Elevator C at the Chester facility. *See Exhibit 2*: (a) OSHA Statement of Sean Belcher, pg. 1; (b) Excerpt of deposition of Sean Belcher, pg. 61, lines 5-13; and (c) Excerpt of deposition of Scott Martin, pg. 14-15, lines 24, 1-20.

**Material Fact #3:** Elevated temperatures inside a bin that contains grain products is sometimes referred to as a "hot bin," which can be caused either deterioration of the product resulting from organic break-down, sometimes called "out-of-condition" product, or from a fire inside the bin. *See Exhibit 3*: (a) Excerpt of deposition of Gene Schwers dated August 3, 2011, pg. 56-57, lines 15-25, 1-9.

**Material Fact #4:** ConAgra contacted West Side on March 12, 2010, to inspect the bin's condition. *See Exhibit 4*: (a) Excerpt of deposition of Godfrey Friedt, pg. 33-34, lines 5-24, 1-9; and (b) Excerpt of deposition of Ron Sumner, pg. 9-10, lines 12-24, 1-10.

**Material Fact #5:** The only other known occurrence of a "hot bin" at a ConAgra facility similar to the Chester hot bin was in 1994 at a flour mill in Puerto Rico. *See Exhibit 5*: (a) Excerpt of deposition of Anthony Yount, pg. 35, lines 8-16.

**Material Fact #6:**   ConAgra hired an outside contractor to resolve the hot bin at the Puerto Rico facility.  *See Exhibit 6*: (a) Excerpt of deposition of Anthony Yount, pg. 40-41, lines 22-24, 1-19.

**Material Fact #7:**   The contractor brought in by ConAgra to resolve the Puerto Rico hot bin did so without any incident, injury, or explosion in a project that took several months to complete.  *See Exhibit 7*: (a) Excerpt of deposition of Anthony Yount, pg. 42-43, lines 22-24, 1-7 and pg. 38, lines 18-22.

**Material Fact #8:**   West Side advertises itself as having expertise, *inter alia,* in "elevator fires" and "when there is a fire or a potential for a fire."  *See Exhibit 8*: (a) Deposition Exhibit 12 (excerpt of West Side's website).

**Material Fact #9:**   Since 1980, West Side has worked on at least 131 "hot bins" or "core fires" in grain storage facilities.  *See Exhibit 9*: (a) Deposition Exhibit 131 (a list of 131 jobs West Side handled that involved hot bins and core fires).

**Material Fact #10:**  Most "hot bin" situations do not result in explosions. *See Exhibit 10*: (a) Excerpt of deposition of Gene Schwers dated August 3, 2011, pg. 121, lines 7-14.

**Material Fact #11:**  West Side has also worked on at least seven other jobs where explosions occurred while West Side's employees were present.  *See Exhibit 11*: (a) Excerpt of deposition of Gene Schwers dated September 28, 2011, pg. 55-56, lines 7-25, 1-2; and (b) Deposition Exhibit 130 (listing each of those explosions).

**Material Fact #12:**  No company in the United States, including West Side's two closest competitors, has more experience with "hot bins" resulting from out-of-condition bins or bin fires than West Side.  *See Exhibit 12*: (a) Excerpt of deposition of Gene Schwers dated August 3, 2011, pg. 92-93, lines 15-25, 1-5.

**Material Fact #13:** West Side's two closest competitors have not handled as many out-of-condition bins and bin fires as West Side over the past decade. *See Exhibit 13*: (a) Excerpt of deposition of Gene Schwers dated August 3, 2011, pg. 92-93, lines 15-25, 1-5.

**Material Fact #14:** West Side has responded to "hot bins," from bin fires or out-of-condition grain, for companies such as Bunge, ADM, Cargill, Perdue Farms, Foster Farms, and "pretty much any of the insurance companies in the industry." *See Exhibit 14*: (a) Excerpt of deposition of Gene Schwers dated August 3, 2011, pg. 87, lines 6-18.

**Material Fact #15:** West Side has 200 years of combined experience in salvage and recovery solutions, which extends to grain elevator fires and bins containing out-of-condition product. *See Exhibit 15*: (a) Excerpt of deposition of Gene Schwers dated August 3, 2011, pg. 94-95, lines 15-25, 1-9.

**Material Fact #16:** West Side's expertise includes being one of the most experienced companies in its field in determining whether there is a fire or a potential fire in grain storage facilities such as a grain bin. *See Exhibit 16*: (a) Excerpt of deposition of Gene Schwers dated August 3, 2011, pg. 95, lines 11-18.

**Material Fact #17:** Justin Becker was trained by West Side that hot bins could explode. *See Exhibit 17*: (a) Excerpt of deposition of Justin Becker, Vol. I, pg. 54, lines 13-20.

**Material Fact #18:** Justin Becker had worked on at least six other hot bin jobs before starting work on the bin at ConAgra's Chester, Illinois facility. *See Exhibit 18*: (a) Excerpt of deposition of Justin Becker, Vol. I, pg. 84, lines 5-10.

**Material Fact #19:** By April 23 or 24, several days prior to the explosion, Justin Becker had already determined that the bin West Side was working on at ConAgra's facility was

a "hot bin." *See Exhibit 19*: (a) Excerpt of deposition of Justin Becker, Vol. I, pg. 82-83, lines 11-25, 1-4.

**Material Fact #20:** Ron Sumner of West Side has 30-plus years of experience in the salvage industry and has been with West Side for over a decade. *See Exhibit 20*: (a) Excerpt of deposition of Gene Schwers dated August 3, 2011, pg. 95-96, lines 19-25, 1-12.

**Material Fact #21:** West Side holds out Ron Sumner has having sufficient training and experience to be able to determine whether there is a fire or an out-of-condition situation in a bin. *Exhibit 21*: (a) Excerpt of deposition of Gene Schwers dated August 3, 2011, pg. 95-96, lines 19-25, 1-12.

**Material Fact #22:** On March 13, 2010, Ron Sumner visited the Chester facility and directly observed the bin from multiple locations, took temperature readings and measured the levels of, *inter alia*, oxygen and carbon monoxide ("CO") gas inside the bin, and offered ConAgra an assessment of the bin's condition. The concentration of oxygen at 17.4 was below the normal range of 19.5 to 23.5, and the concentration of CO at 500 was in excess of the safe level of 70 for an 8-hour work day, indicating to Ron Sumner that there was "decaying or breaking down" of the product. *See Exhibit 22*: (a) Deposition Exhibit 124 (photograph taken of Ron Sumner on top of Bin C15 on March 13, 2010); (b) Excerpt of deposition of Ron Sumner, pg. 13-14, lines 4-24, 1-15 and pg. 79, lines 15-21; and (c) Excerpt of deposition of Godfrey Friedt, pg. 191, lines 5-8.

**Material Fact #23:** During his visit to the Chester facility, Mr. Sumner made numerous representations about West Side's expertise in handling these types of situations, including examples "within the last year of major hot bins that (West Side) worked across

the U.S. and ones they were currently working, and his comments were that he is currently working on a bin that was way bigger than the one at Chester and way worse than the one at Chester. And the grain industry recognizes him as the expert." *See Exhibit 23*: (a) Excerpt of deposition of Mark Zimitsch, pg. 118-19, lines 14-24, 1-21.

**Material Fact #24:** Mr. Sumner told ConAgra to continue monitoring the bin's temperature and advised ConAgra that the bin was not an immediate emergency. *See Exhibit 24*: (a) Excerpt of deposition of Sean Belcher, pg. 293-94, lines 23-24, 1 and pg. 307, lines 8-18; (b) Excerpt of deposition of Alan Bindel, pg. 51, lines 10-13; and (c) Excerpt of deposition of Godfrey Friedt, pg. 213-14, lines 20-24, 1-5.

**Material Fact #25:** Ron Sumner also advised ConAgra that the bin was not something that needed to be taken care of immediately because "in his experience, sometimes these put themselves out, and he's seen a lot worse, and he handled a lot worse." *See Exhibit 25*: (a) Excerpt of deposition of Mark Zimitsch, pg. 96, lines 15-20.

**Material Fact #26:** After Mr. Sumner's visit on March 13, 2010, the temperature of the bin began to drop and the bin stopped smoking. *See Exhibit 26*: (a) Excerpt of deposition of Alan Bindel, pg. 71, lines 4-12; and (b) Excerpt of deposition of Ron Sumner, pg. 136, lines 8-22.

**Material Fact #27:** Ron Sumner asked ConAgra to report any "significant change in temperature readings" to him and, through April 1, 2010, the bin temperature remained constant until it began increasing around April 2, 2010. *See Exhibit 27*: (a) Excerpt of deposition of Mark Zimitsch, pg. 154, lines 1-19.

**Material Fact #28:** Shortly after noticing the change in the bin's temperature, ConAgra called West Side to advise of the change. At that time, ConAgra and West Side orally

agreed to a contract under which West Side would remove the out-of-condition contents of the bin. *See Exhibit 28*: (a) Excerpt of deposition of Godfrey Friedt, pg. 99-100, lines 21-24, 1-8; (b) Excerpt of deposition of Ron Sumner, pg. 26-27, lines 6-24, 1-7; and (c) Deposition Exhibit 22 (email from Godfrey Friedt).

**Material Fact #29:** After being advised of the bin's condition by Godfrey Friedt when West Side was hired, West Side waited two weeks before mobilizing to arrive at Chester. *See Exhibit 29*: (a) Excerpt of deposition of Ron Sumner, pg. 27-28, lines 17-24, 1-6; (b) Deposition Exhibit 11 (Recorded Statement of Ron Sumner), pg. 12-13; (c) Excerpt of deposition of Godfrey Friedt, pg. 99-100, lines 21-24, 1-8; and (d) Deposition Exhibit 22 (email from Godfrey Friedt).

**Material Fact #30:** On April 15, 2010, ConAgra sent a Work Order Contract to West Side for removing the contents of the bin at the Chester facility. Also included were ConAgra's Contractor Work Rules. *See Exhibit 30*: (a) Deposition Exhibit 87 (email from ConAgra to West Side attaching Work Order Contract and Contractor Work Rules).

**Material Fact #31:** On April 19, 2010, West Side employee Ken Langham executed the Work Order Contract and signed ConAgra's Work Rules. That same day West Side and its subcontractor, A&J, arrived at Chester, Illinois. *See Exhibit 31*: (a) Deposition Exhibit 119 (signed Work Order Contract); (b) Signed copy of Contractor Work Rules, Bates No. JENTZ/TRUENORTH 00738-741, 732; and (c) Excerpt of deposition of Justin Becker, Vol. I, pg. 82, lines 16-18.

**Material Fact #32:** The decision to hire A&J as a subcontractor was made solely by West Side. *See Exhibit 32*: (a) Excerpt of deposition of Gene Schwers dated August 3, 2011, pg. 225, lines 1-4; (b) Excerpt of deposition of John Jentz, pg. 114-115, lines 25, 1-

3; (c) Excerpt of deposition of Ken Langham, pg. 51, 15-20; and (d) Excerpt of deposition of Godfrey Friedt, pg. 372, lines 10-17 and pg. 378, lines 16-20.

**Material Fact #33:** The Work Order Contract requires that West Side "be responsible for the acts and omissions of all his employees and all subcontractors…." *See Exhibit 33*: (a) Deposition Exhibit 126, ¶ 5(f).

**Material Fact #34:** The Work Order Contract also requires that "[a]ll damage or loss to any property caused in whole or in part by the Contractor (West Side), any subcontractor or any one directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable, shall be remedied by the Contractor without any cost, charge or expense to (ConAgra)." *See Exhibit 34*: (a) Deposition Exhibit 126, ¶ 7.

**Material Fact #35:** The Work Order Contract requires that West Side require its subcontractors to purchase and maintain $3 million in comprehensive general liability insurance. *See Exhibit 35*: (a) Deposition Exhibit 126 ¶ 10(d).

**Material Fact #36:** West Side never asked or required A&J to purchase or maintain at least $3 million in liability insurance at any time prior to beginning work at the Chester facility. *See Exhibit 36*: (a) Excerpt of deposition of Al Derner, pg. 75, lines 11-16; and (b) Excerpt of deposition of Ken Langham, pg. 80, lines 3-22.

**Material Fact #37:** A&J did not have at least $3 million in comprehensive general liability insurance prior to beginning work at the Chester facility. Instead, A&J had only $1 million in liability insurance. *See Exhibit 37*: (a) Document produced in A&J's First Supplemental Response to ConAgra's First Request for Production of Documents, Bates No. A&J 000195-A (Catlin Specialty Insurance Company declaration page).

**Material Fact #38:** Upon arriving to begin work on April 20, 2010, ConAgra gave West Side and A&J's employees a safety briefing which covered ConAgra's general safety rules, the emergency evacuation plan, and Contractor Work Rules.  *See Exhibit 38*: (a) Excerpt of deposition of Mel Flitsch, pg. 21-22, lines 2-24, 1-5; and (b) Excerpt of deposition of Sean Belcher, pg. 362-63, lines 21-24, 1-11.

**Material Fact #39:** ConAgra's Contractor Work Rules require, *inter alia*, that the contractor give a copy of the Contractor Work Rules to all of its employees and subcontractors who are expected to work at the facility, that the contractors and subcontractors conduct their work in a manner that does not increase known risk of fire or explosion hazards, and that the contractor and its subcontractors employ and use only trained and qualified persons on the premises.  *See Exhibit 39*: (a) Deposition Exhibit 87 (email from ConAgra to West Side).

**Material Fact #40:** West Side's foreman Mel Flitsch had all of the information he believed he needed to safely perform the removal of the product from the bin.  *See Exhibit 40*: (a) Excerpt of deposition of Mel Flitsch, pg. 89-90, lines 19-24, 1-18.

**Material Fact #41:** On April 20, 2010, both West Side and A&J observed that the condition in the bin had improved.  The bin was not smoking and the air in the bin was so clear that West Side's foreman, Mel Flitsch, could see the top of the product from the opening on the bin's roof.  *See Exhibit 41*: (a) Excerpt of deposition of Justin Becker, Vol. I, pg. 173, lines 6-14 and pg. 196, lines 2-10; and (b) Excerpt of deposition of Mel Flitsch, pg. 25, lines 6-18, pg. 75, lines 7-12 and pg. 105, lines 2-5.

**Material Fact #42:** The period of time where the product remained in the bin, between when the bin was first inspected by West Side on March 13, 2010, and when the

contractors first began removing the product on April 20, 2010, did not cause or contribute to cause the explosion of the bin. *See Exhibit 42*: (a) Excerpt of report of Dr. Robert Schroeder, Opinion 4.

**Material Fact #43:** Once they arrived, West Side and A&J took control of the bin and project. ConAgra provided access to equipment when requested but allowed West Side and A&J to do their jobs without interference. *See Exhibit 43*: (a) Excerpt of deposition of John Jentz, pg. 123, lines 1-12; (b) Excerpt of deposition of Sean Belcher, pg. 210, lines 5-10; (c) Excerpt of deposition of Adam Nanez, pg. 76, lines 9-23; (d) Excerpt of deposition of Robert Schmidt, pg. 150, lines 11-20; and (e) Excerpt of report of Dr. William Field, pg. 4, ¶ 9.

**Material Fact #44:** After their arrival, West Side and A&J determined the plan of action for emptying the bin, they opened and accessed the bin, they determined the manner for removal of the pellets, and they determined which tools to use. *See Exhibit 44*: (a) Excerpt of deposition of John Jentz, pg. 123, lines 1-12; (b) Excerpt of deposition of Godfrey Friedt, pg. 73-74, lines 24, 1-5, pg. 350-51, lines 23-24, 1-18 and pg. 372, lines 10-17; (c) Excerpt of deposition of Sean Belcher, pg. 245, lines 17-23 and pg. 257-58, lines 20-24, 1; and (d) Excerpt of deposition of Alan Bindel, pg. 264-65, lines 9-24, 1-18.

**Material Fact #45:** At the request of West Side and A&J, ConAgra provided West Side and A&J access to electrical hook-ups, access to water hoses, and access to a tool that ConAgra sometimes used to remove pellets. *See Exhibit 45*: (a) Excerpt of deposition of Mel Flitsch, pg. 89-90, lines 19-24, 1-18; (b) Excerpt of deposition of Justin Becker, Vol. I, pg. 146, lines 1-11; (c) Excerpt of deposition of Sean Belcher, pg. 336-37, lines 20-24, 1-5; (d) Excerpt of deposition of Kevin Herring, pg. 97, lines 5-10; (e) Excerpt of

deposition of Justin Becker, Vol. I, pg. 150, lines 17-23; and (f) Excerpt of deposition of Alan Bindel, pg. 153-54, lines 14-24, 1-2.

**Material Fact #46:** Other than the assistance requested by West Side and A&J for access to electrical outlets, water, and a tool, ConAgra never gave direction to West Side or A&J about how to go about performing their work. *See Exhibit 46*: (a) Excerpt of deposition of Sean Belcher, pg. 210, lines 5-10; (b) Excerpt of deposition of Adam Nanez, pg. 76, lines 9-23; (c) Excerpt of deposition of Robert Schmidt, pg. 204-05, lines 9-25, 1-16; and (d) Excerpt of deposition of Justin Becker, Vol. I, pg. 161, lines 6-9.

**Material Fact #47:** No ConAgra employees worked on removing pellets from the bin during the time West Side and A&J were working on the bin. *See Exhibit 47*: (a) Excerpt of deposition of Sean Belcher, pg. 210, lines 5-10; and (b) Excerpt of deposition of Jerry Clifton, pg. 63, lines 10-14.

**Material Fact #48:** On April 27, the day of the explosion, the contractors opened the manhole-sized access portal on the bottom front of Bin C15 and began probing a tunnel through the material inside the bin using an air wand (also called an "air lance") that blows a stream of pressurized air. This was the first time the contractors had used the air wand. *See Exhibit 48*: (a) Excerpt of report of Dr. Robert Schroeder, Opinion 7; and (b) Excerpt of deposition of Adam Nanez, pg. 157-58, lines 14-25, 1-8.

**Material Fact #49:** The use of the air lance to blow pressurized air into the pellet mass introduced oxygen into the previously oxygen-starved bin that transitioned the smoldering pellets into flames. *See Exhibit 49*: (a) Excerpt of report of Dr. Robert Schroeder, Opinions 7 and 8.

**Material Fact #50:** On April 27, the contractors observed glowing embers in chunks of material they removed from the bin, but they did not tell ConAgra that they observed these embers. *See Exhibit 50*: (a) Excerpt of deposition of Robert Schmidt, pg. 224-30, lines 4-16, 1-25, 1-25, 1-25, 1-25, 1-25, 1.

**Material Fact #51:** On April 27, A&J's operation of the bin whip caused chunks of pellets containing glowing embers to break off and fall to the bottom of the bin where John Jentz observed the glowing embers and told Robert Schmidt about them. *See Exhibit 51*: (a) Excerpt of deposition of Robert Schmidt, pg. 224-25, lines 4-25, 1-11 and pg. 230, lines 4-7.

**Material Fact #52:** Plaintiff's expert Dr. Russell Ogle believes that West Side and A&J's activities on April 27 exposed more "smoldering surface" in the bin which in turn increased the rate of combustion inside the bin. *See Exhibit 52*: (a) Excerpt of deposition of Dr. Russell Ogle, pg. 224-25, lines 19-24, 1-19.

**Material Fact #53:** On April 27, West Side's employees Mel Flitsch and Adam Nanez observed red or glowing embers in chunks of pellets that the contractors had removed from the bins. *See Exhibit 53*: (a) Excerpt of deposition of Adam Nanez, pg. 136-38, lines 1-25, 1-25, 1-19.

**Material Fact #54:** On the morning of April 27, the contractors also observed smoke filling the bin, but they applied water and left for lunch without telling ConAgra about what they had seen or done. *See Exhibit 54*: (a) Excerpt of deposition of Robert Schmidt, pg. 228, lines 5-18 and pg. 239, lines 7-25.

**Material Fact #55:** After lunch on April 27, Justin Becker observed smoke coming from the roof of the bin for the first time and all five employees of West Side and A&J

discussed the fact that there was smoke coming from the bin. *See Exhibit 55*: (a) Excerpt of deposition of Justin Becker, Vol. I, pg. 248-49, lines 22-25, 1-13.

**Material Fact #56:** After lunch on April 27, Justin Becker and Robert Schmidt observed the build-up of smoke inside the bin when they attempted to look into the bin from the roof opening, but they could not see more than a foot into the bin. *See Exhibit 56*: (a) Excerpt of deposition of Justin Becker, Vol. I, pg. 253-54, lines 18-25, 1-11.

**Material Fact #57:** Mel Flitsch knew that smoke was coming out of the bin on the afternoon of April 27. *See Exhibit 57*: (a) Excerpt of deposition of Mel Flitsch, pg. 45-46, lines 22-24, 1-16.

**Material Fact #58:** Mel Flitsch of West Side requested that ConAgra provide water hoses to the contractors but he did not explain why he wanted them. *See Exhibit 58*: (a) Excerpt of deposition of Sean Belcher, pg. 336-37, lines 20-24, 1-5.

**Material Fact #59:** On April 27, West Side and A&J applied water to the bin from openings on the top and the side during the morning and for up to two hours prior to the explosion. *See Exhibit 59*: (a) Excerpt of report of Dr. Robert Schroeder, Opinion 7; and (b) Excerpt of deposition of Robert Schmidt, pg. 224-31, lines 4-25, 1-25, 1-25, 1-25, 1-25, 1-25, 1-2.

**Material Fact #60:** Applying water to the bin on April 27, 2010 was a decision made by the contractors, specifically Mel Flitsch and Robert Schmidt, and was conducted by the contractors. *See Exhibit 60*: (a) Excerpt of deposition of Mel Flitsch, pg. 125-26, lines 21-24, 1-18.

**Material Fact #61:** The contractors' decision to apply water to the out-of-condition contents of the bin increased the levels of explosive carbon monoxide gas and smoke

inside the bin more than they would have been without the application of water. *See Exhibit 61*: (a) Excerpt of report of Dr. Robert Schroeder, Opinion 7.

**Material Fact #62:** The build-up of explosive carbon monoxide gas and smoke inside the bin caused the cloud of combustible gases and smoke to descend toward the glowing embers within the pellets that were exposed by the activities of the contractors using the bin whip and the tunneling through the pellet mass with the pressurized stream of air from the air wand. The exposed embers provided the ignition source to the descending carbon monoxide gas and smoke that caused the explosion within bin C15. *See Exhibit 62*: (a) Excerpt of report of Dr. Robert Schroeder, Opinion 7, 8, and 9.

**Material Fact #63:** West Side knew that improperly placed water on a hot spot increases carbon monoxide gas which may result in an explosion. *See Exhibit 63*: (a) Excerpt of deposition of Gene Schwers dated September 28, 2011, pg. 99, lines 13-20.

**Material Fact #64:** West Side knew that sealing the top of a hot bin that is smoking causes levels of explosive carbon monoxide gas to build up, since it is not venting out, and risks reaching an ignition source inside the bin. *See Exhibit 64*: (a) Excerpt of deposition of Gene Schwers dated August 3, 2011, pg. 119-20, lines 13-25, 1-18.

**Material Fact #65:** Plaintiffs' expert agrees that dust in the bin was not a contributing cause to the initial explosion. *See Exhibit 65*: (a) Excerpt of deposition of Dr. Russell Ogle, pg. 235, lines 12-14; and (b) Excerpt of report of Dr. Robert Schroeder, Opinion 9.

**Material Fact #66:** On April 27, during the afternoon, West Side and A&J asked ConAgra to call the Fire Department in order to visit the Chester facility and assess the bin. *See Exhibit 66*: (a) Excerpt of the deposition of Godfrey Friedt, pg. 106-07, lines 23-24, 1-12.

**Material Fact #67:** After being asked to call the Fire Department, ConAgra called the Fire Department and relayed West Side's request to have the Fire Department walk around the bin and assess the situation. *See Exhibit 67*: (a) Excerpt of deposition of Godfrey Friedt, pg. 108-09, lines 11-24, 1-9.

**Material Fact #68:** The Chief of the Chester Fire Department responded to West Side's request to assess the situation by telling ConAgra's employee that the Chief was unavailable to visit due to a Boy Scout meeting, but that the Chief would send someone else to visit the facility in his place. However, no one from the fire department arrived before the explosion occurred, approximately one hour later. *See Exhibit 68*: (a) Excerpt of deposition of Godfrey Friedt, pg. 109-10, lines 20-24, 1-13.

**Material Fact #69:** After being asked by West Side's foreman Mel Flitsch to call the Fire Department a second time at approximately 4 p.m. on April 27, 2010, this time demanding that the Fire Department come to the Chester facility, ConAgra promptly called the Fire Department as requested. *See Exhibit 69*: (a) Excerpt of deposition of Godfrey Friedt, pg. 120-22, lines 4-24, 1-24, 1-13.

**Material Fact #70:** On April 27, just before the explosion, West Side's foreman Mel Flitsch and A&J's foreman Robert Schmidt ordered the contractors to evacuate the elevator. *See Exhibit 70*: (a) Excerpt of deposition of Mel Flitsch, pg. 142-45, lines 23-24, 1-24, 1-24, 1-6 and pg. 172, lines 13-19; and (b) Excerpt of deposition of Robert Schmidt, pg. 255-56, lines 14-25, 1-2.

**Material Fact #71:** After this evacuation, without conferring with ConAgra or anyone else, West Side's foreman Mel Flitsch ordered John Jentz and Justin Becker to go back into the tunnel of the elevator to move tools they had been using. *See Exhibit 71*: (a)

Excerpt of deposition of Mel Flitsch, pg.142-45, lines 23-24, 1-24, 1-24, 1-6 and pg. 178-79, lines 19-24, 1-2.

**Material Fact #72:** John Jentz and Justin Becker's injuries would have been avoided if West Side's foreman Mel Flitsch had not ordered them back into the elevator after it was evacuated. *See Exhibit 72*: (a) Excerpt of deposition of Mel Flitsch, pg.142-45, lines 23-24, 1-24, 1-24, 1-6 and pg. 172, lines 3-12; (b) Excerpt of report of Dr. Robert Schroeder, Opinion 10; (c) Excerpt of report of Dr. William Field, pg. 6, ¶ 13; (d) Excerpt of report of Dr. Russell Ogle, pg. 27; and (e) Excerpt of deposition of Dr. William Field, pg. 115-17, lines 7-24, 1-24, 1-3.

**Material Fact #73:** As a result of the explosion on April 27, 2010, in addition to the Plaintiffs' injuries, ConAgra incurred damages totaling $3,805,740.51, which represents the cost of repairing Elevator C at the Chester facility so that it is again usable. *See Exhibit 73:* (a) Excerpt of deposition of Dean Hoerning, pg. 22-23, lines 18-25, 1-15 and pg. 27, lines 11-24.

**Material Fact #74:** Prior to the contractors' arrival, ConAgra employees occasionally referred to the bin's condition as a "fire," but those employees did so simply as a generic description of the bin's condition and those employees did not actually observe any fire in the bin. *See Exhibit 74*: (a) Excerpt of deposition of Godfrey Friedt, pg. 50, lines 9-18; (b) Excerpt of deposition of Alan Bindel, pg. 46, lines 6-21; (c) Excerpt of deposition of Sean Belcher, pg. 51-52, lines 19-24, 1; and (d) Excerpt of deposition of Brian Dunekacke, pg. 106-07, lines 21-24, 1-8.

ConAgra incorporates its Memorandum in Support of Motion for Summary Judgment on *Res Ipsa Loquitur*, Negligence and Premise Liability counts against ConAgra and the attached exhibits just as if they were explicitly set forth herein.[5]

WHEREFORE, ConAgra requests that this Court enter summary judgment in its favor and against all Plaintiffs on all counts of *Res Ipsa Loquitur*, Negligence, and Premises Liability against ConAgra, and for such other relief as this Court deems just and proper.

Respectfully submitted,

HUSCH BLACKWELL LLP

By: /s/ Joseph C. Orlet
Joseph C. Orlet, IL# 06197026
Brandan P. Mueller, IL# 06275562
190 Carondelet Plaza, Suite 600
St. Louis, Missouri 63105
314-480-1500 (Telephone)
314-480-1505 (Facsimile)

PATTON & RYAN LLC
John W. Patton, Jr.
David F. Ryan
David W. Gray
330 N. Wabash Ave., Suite 2900
Chicago, IL 60611
312-261-5160
312-261-5161 Facsimile

**ATTORNEYS FOR DEFENDANT CONAGRA FOODS, INC.**

---

[5] For the same reasons set forth in this Motion and separately-filed Memorandum, ConAgra is entitled to summary judgment on all negligence-based counts asserted against it by means of cross-claim or counterclaim by any co-defendant in this case. These counts include: Count I of West Side's Cross-claim for Indemnification/Contribution Against ConAgra and A&J in *Jentz*; A&J's First Amended Counterclaim Against ConAgra in *Jentz*; Count I of A&J's Cross-claim Against ConAgra in *Becker*; Count I of Complaint of Intervenor National American Insurance Company ["NAICO"] in *Becker*; A&J's Counterclaim Against ConAgra in *Schmidt*; West Side's Cross-claim for Contribution Against ConAgra in *Schmidt*; Count II of A&J's Cross-claim Against ConAgra in *Becker*; and West Side's Cross-claim for Contribution Against ConAgra in *Schmidt*.

## CERTIFICATE OF SERVICE

      I hereby certify that on January 20th, 2012, a copy of the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Brad L. Badgley
BRAD L. BADGLEY, P.C.
26 Public Square
Belleville, IL 62220
618-235-1000
bbadg@aol.com

Colin H. Dunn
Kevin P. Durkin
CLIFFORD LAW OFFICES, P.C.
120 North LaSalle St., 31st Floor
Suite 3100
Chicago, IL 60602
312-899-9090
Fax: 312-251-1160
chd@cliffordlaw.com
kpd@cliffordlaw.com

Gerald L. Maschka
John M. Riedy
MASCHKA, RIEDY & RIES, PLLP
P.O. Box 7
Mankato, MN 56002--0007
507-625-6600
Fax: 507-625-4002
jerry_maschka@mrr-law.com
jack_riedy@mrr-law.com

**ATTORNEYS FOR PLAINTIFFS JOHN W. JENTZ AND/OR ROBERT SCHMIDT**

Marc A. Taxman
Sean P. Murray
Todd P. Klein
Angelica Jimenez
ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD.
161 North Clark Street – 21st Floor
Chicago, IL 60601
(312) 372-3822
(312) 372-3833 (fax)
mtaxman@anesilaw.com
smurray@anesilaw.com
tklein@anesilaw.com
ajimenez@anesilaw.com

Matthew J. Petrzelka
PETRZELKA & BREITBACH PLC
1000 42nd Street SE, Suite A
Cedar Rapids, IA 52403
(319) 365-3787
(319) 365-3788 (fax)
mpetrzelka@petrzelkabreitbach.com

**ATTORNEYS FOR PLAINTIFFS JUSTIN BECKER and AMBER BECKER**

John G. Schultz
Jason B. Moore
FRANKE SCHULTZ & MULLEN, P.C.
8900 Ward Parkway
Kansas City, MO  64114
816-421-7100
Fax: 816-421-7915
jschultz@fsmlawfirm.com
jmoore@fsmlawfirm.com

**ATTORNEYS FOR THIRD-PARTY DEFENDANT WEST SIDE SALVAGE, INC.**

Storrs W. Downey
BRYCE DOWNEY & LENKOV LLC
200 N. LaSalle
Suite 2700
Chicago, IL 60601
312-377-1501 (telephone)
312-377-1502 (facsimile)
sdowney@brycedowney.com

Stephen L. Beimdiek
Sarah J. Hugg
LASHLY & BAER, PC.
714 Locust Street
St. Louis, MO 63101
314-621-2939 (telephone)
314-621-6844 (facsimile)
sbeim@lashlybaer.com
shugg@lashlybaer.com

**ATTORNEYS FOR THIRD-PARTY DEFENDANT A & J BIN CLEANING, LLC**

Richard C. Wuestling
M. Adina Johnson
WUESTLING & JAMES, L.C.
720 Olive Street, Suite 2020
St. Louis, MO 63101
(314) 421-6500
(314) 421-5556 (fax)
wuestling@wuestlingandjames.com
johnson@wuestlingandjames.com

**ATTORNEYS FOR INTERVENOR NATIONAL AMERICAN INSURANCE COMPANY**

/s/ Joseph C. Orlet