IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

| | |
|---|---|
| WILLIAM JENTZ, Special Guardian of the Person and Estate of JOHN W. JENTZ, a disabled adult<br><br>Plaintiff,<br><br>vs.<br><br>CONAGRA FOODS, INC., and WEST SIDE SALVAGE, INC., et al<br><br>Defendants. | No: 3:10-cv-00474-WDS-PMF |

## **EXPERT REPORT OF**

## **DR. ROBERT A. SCHROEDER**

## **NOVEMBER 14, 2011**



EXHIBIT 62A

J. None of the West Side or A&J personnel had basic PPE for handling burning or smoldering materials. At the minimum, they should have been wearing Nomex coveralls.


OPINION 7:
It was not the dumping of trucks, running of the dust collectors[9] or the operation of the legs that caused West Side Salvage to lose control of this "hot bin". It was West Side Salvage's actions and inactions on the afternoon of the 27th that led to the explosion and injuries of the workers. These missteps include:

- Failure to continuously monitor and analyze the oxygen, carbon monoxide and LEL within the bin. They were clueless in regard to the ever-developing explosive gases (primarily carbon monoxide: CO) associated with their opening of the side man-hole, use of an air lance and the application of water into the clearly smoldering nest of pellets.
- Opening of the man-hole sized access-way near the base of the bin. This provided a previously non-existing avenue for fresh air into an oxygen starved environment.
- The use of an air pressurized lance to create a tunnel that angled upward through the consolidated and quasi-fused pellets. The use of a pressurized air discharging device in an environment containing smoldering smoking fuel is unthinkable; Its tantamount to someone blowing on ash and coals in a what appears to be a dead or dying campfire. Place some dry wood and grass over the ash and blow. Voila!, the coals start to glow and the new fuel soon becomes ignited.
- The air lance created tunnel provided the perfect inlet for outside air to gain access to the previously oxygen starved confines of the bin. This misstep's impact was multiplied by the un-closed openings on the top of the bin.
- For at least two hours before the explosion, they introduced water into the bin from the side access man-hole, aeration fan opening and the roof. Intuitively, the application of water on a fire makes perfect sense. However, in a confined chamber with ample head space to collect by-products of combustion generated by a hot deep seated fuel, the addition of water onto the smoldering pellets served to create even more CO than from the free-smoldering process alone; CO that was effectively bottled in the bin.
- Directly associated with the application of water onto the smoldering pellets, West Side Salvage personnel had now taken on the role of firefighters, a role they clearly did not have the training, equipment or knowledge to undertake. By assuming this role, precious time was lost that would have allowed for the Chester Volunteer Fire Fighters to assume command and control of the scene and begin to assess the deteriorating conditions. Three hours is a lifetime in the emergency response and fire control world. It would have provided time the Chester Fire Department Chief Officers to seek greater knowledge on what to do with this now aggressively smoking silo.
- Failure to have a plan of action in place if conditions began to change for the worse while accomplishing the removal of the pellets. After lunch on the 27th, it was obvious to West Side Salvage that conditions within the bin had changed. They haphazardly began to try

---

[9] The openings between the 20 foot diameter by 120 foot high bins were approximately 6x8 inches. This small opening at the top of the bin #15, occasionally facilitating a different than ambient pressure (negative from the operating dust collector and pellet filter) from the adjoining bin, and measurably influencing an imbedded mass more than 60 feet below is highly unlikely.

to solve the problem, which only worsened the problem (see above). A simple plan of action, a known "best practice" plan of action for the obviously deteriorating condition would have been to seal it up and monitor[10]. The antidote being: seal it up and check back tomorrow...or in a week or two. For the problem may have resolved itself and the now aggressively smoldering fire may be out, at worst contained.
- They all left for lunch. No one stayed to monitor the apparent burning bin.

BASIS:
A. ConAgra personnel are NOT trained to be firefighters. Policy Number 19, <u>Fire Prevention Plan</u>, expects employees to fight incipient fires with fire extinguishers. If conditions dictated using more aggressive tactics, the fire department shall be notified. (ConAgra 002741, RAS008232)

B. Vendor/Contractor are expected to conduct their work in a manner that does not increase these hazards. Policy Number 09 (ConAgra 002617, RAS008108)

C. Transcribed Hiles interview of Mel Flistch taken on 17 June 2010. Q: "...has anyone from your own company told you what they think happened?" A: "Like maybe the, it fused up enough in there where it rolled, the hot air went up and sucked in some good clean air." p. 44, (ConAgra 003009, RAS008500)

D. Transcribed Hiles interview of Mel Flistch taken on 17 June 2010. On the afternoon of the incident, Fristch spoke of the wind blowing 10-15 mph in the area they were working. They removed the man-hole cover on the side of bin #15 and proceeded to "dig" a hole through the pellets. This is where they used the air lance to tunnel through the pellets to an open space. He describes the product as being 5 feet thick and that they created the hole (tunnel) with an upward angle of 35-45 degrees. Once the hole was completed, Flistch commented that no smoke came out the hole. He also stated that they didn't observe any "flickers or nothing like that." p. 49, (ConAgra 003014, RAS008505)

E. "Applications of small amounts of water grain in a partially confined space, such as a grain silo, and in the presence of air can generate a water gas reaction" It goes on to warn against the unintended generation of CO, a combustible gas. **A-10-6.2 Incipient Fire-Fighting Techniques,** (f) Water Gas Reaction, NFPA 61 Fires and Dust Explosions in Agricultural and Food Products Facilities, 1999 edition. West Side was spraying water through the side access man-hole opening and into the seat of the smoldering mass; the smoke was primarily contained in the confines of the bin.

F. Warns against the use of water in a bin fire because of the likely generation of CO, "water gas". Chapter V, Controlling Fires in Grain Facilities, Concrete Bin Fires, Emergency Preplanning and Firefighting Manual...A guide for Grain Elevator Operators and Fire Officials... NGFA, 1987, p.42

---

[10] Minutes before the explosion, one of the West Side personnel began putting the side access man-hole cover back on. Someone recognized that the bin need to be sealed up...now!

G. In the procedures for extinguishing bin fires breakout section, it states "Seal all openings into the bin, ***particularly at the bottom and sides*** to reduce the supply of oxygen." (emphasis added) Chapter V, Controlling Fires in Grain Facilities, Concrete Bin Fires, Emergency Preplanning and Firefighting Manual...A guide for Grain Elevator Operators and Fire Officials... NGFA, 1987. p.44. On the afternoon of the 27th, West Side did just the opposite. They opened it up.

H. "Close all openings of the silo and turn off ventilation so that air entrainment into the silo is minimized."

I. "Measure the concentration of CO and $O_2$ at the top of the silo during the entire extinguishing and discharge operation."

J. "Important to remember! Do not open the silo during the firefighting operation. This will cause air entrainment which will increase the fire intensity and might cause dust and gas explosions and a severe fire situation." Warehousing and Storage: Silo Fires. Silo fires require special tactics and equipment. Industrial Fire Journal, 4th Quarter, 2010, p. 34-35

K. Experience as a firefighter and safety professional in recognizing ominous conditions during an operation (fire, rescue, safety) and what actions should be taken to overt the impeding change of risk. Experience operating in grain handling facilities that are under the threat of fire (grain out of condition), on fire or in the process of being extinguished, overhauled and salvaged.

OPINION 8
During the final minutes before the explosion the actions taken by the West Side and A&J would essentially "light the fuse" of the foreboding event.

BASIS
Between 1:00 to 1:30 pm, the top of bin #15 was observed issuing very light smoke visible from a few blocks away. The West Side and A&J had gone to Hardee's for lunch and not buttoned up the bin or left a watch. They observed this new condition on their way back from lunch. Schmidt stated that he had not seen anything like that at all during the previous week. Becker was sent to the top to put water on it. Schmidt wasn't concerned that there was a fire in the bin because there was smoke earlier and I put water on it and it went out, or the smoke dissipated, there was no smoke.[11]

The use of the air lance to tunnel through the compacted and to some degree pyrolized pellets drove air/oxygen into a mass that had been quietly smoldering for days. The potential was there (smoldering with possible nests of glowing pellets) but the means to transition them into a ready flaming state wasn't. Until the tunneling with the air lance commenced.

The closing up of the lower openings including the side man-hole access-way and the discharge chute in the tunnel. Flitsch, likely applied the mantra, "when things start to get out of control

---

[11] Schmidt deposition dated 17 Oct 2011, p. 245-248

with a "hot bin", is to seal it up" and order the openings closed. This is an effective step for a non-flaming smoldering condition that has been somewhat oxygen deficient; Bin #15 hadn't been oxygen deficient since after lunch. It was cooking.

Atop the bin, Schmidt recognized that conditions within the bin were changing for the worst...rapidly. The smoke color, density and rate of being issued from the bin #15 roof openings was changing. Schmidt radioed to Flitsch, "We needed to call the fire department in here because what we're doing right now isn't working we're not making any headway, we're getting a lot more smoke up here, and it's getting a lot worse than earlier."[12] It was Schmidt's decision to come off the top of the bin because the smoke was getting to thick. Becker took the man-lift down first, Schmidt followed.[13] While waiting for the man-lift, Schmidt call Jentz (aka Jungle) and told him to "get the fuck out of here because this is getting out of control, we got a lot of smoke coming out the top...we're making our way down... I'll meet you outside and he said with pleasure." He was working on a chunk that came down and was sitting in front of the hole. Schmidt deposition dated 17 Oct 2011 p. 308, 255-256

By closing up the lower openings, the likely glowing/flaming pellets quickly became oxygen starved...oxygen deficient. This condition in a confined space such as bin #15 is a set-up for a smoke explosion or backdraft. Contained heated gases (CO, other less dominate fire gases and excess pyrolyzates) building up within the chamber (bin) and not being diluted by incoming air; the lower openings were now closed or obstructed. When this cloud of heated combustible gases built up and descended towards the glowing/flaming pellets, it was just a matter of time. This bin was about to explode; ignition was inevitable.

Flitsch now alerted by Schmidt also recognized that the worsening conditions in bin #15 required the immediate help of the Chester Fire Department, **NOW!** Approximately 1 hour earlier, Flitsch had asked Friedt to call the Chester Fire chief and request that he stop by and see what we have, "assess the situation". This is a far different message than **CALL 911** or Get the fire trucks out here now...red lights and sirens...we need them **NOW!** Or the directive given to Friedt from Flitsch literally seconds before the explosion, "I need you to call the fire department right now" OSHA interview of Friedt dated 6/18/2010, p. 5, (ConAgra 003135, RAS008626)


OPINION 9:
The first explosion occurred initiated in bin #15. By-products of combustion predominated by CO were mixed with a newly accessed source of air. Ignition no doubt occurred when the smoldering pellets sloughed/shifted exposing glowing to now flaming product. This ignited the combustible gases bottled within bin #15. With ignition, the burning gases created on over pressurization of the bin, lifting its concrete deck from the top of the bin(s) and migrating laterally. As part of this lateral migration of burning gases, the flame front entered into a spout that was open to the top of the south leg. The flame front into and through the spout and leg was

---

[12] Schmidt testified that he was in communication with Flitsch every 15 to 20 minutes the afternoon of the incident. . Schmidt also stated that he had no idea what Mel was doing during the 2 hours before the incident. Schmidt deposition dated 17 Oct 2011,p. 308-309

[13] Schmidt he was caught in the man-lift when the initial and subsequent explosion occurred, he was able to cover himself with his jacket and shield himself from the ensuing flame front.

fuel by dust which is naturally found adhered to the side walls and internal components. The initial explosion originating in bin 15 was force full enough to readily dislodged the adhered dust. The flame front in the river leg progressed downward and blew open the leg's boot (enclosure) in the pit adjacent and common to the tunnel where the workers were removing product from bin #15.

BASIS:
A. My examination of the scene, formal education addressing fire and materials science, explosions (deflagrations and detonations), fuels, excess pyroyzates, occupational safety; experience conducting post-blast examinations and analysis of grain handling facilities. Experience as a firefighter and safety professional in recognizing ominous conditions during an operation (fire, rescue, safety); experience operating in grain handling facilities that are under the threat of fire (grain out of condition), on fire or in the process of being extinguished, overhauled and salvaged.

B. Schmidt observations from the man-lift.

C. Observations of those on the ground of a fire ball coming out of the door of the structure.


OPINION 10:
The most unconscionable act that led to the severe injuries suffered by Jentz and Becker was Flitsch directing them to reenter the building, go down into the tunnel and move their tools. This directive came from West Side Salvage's "hot bin" specialist not from ConAgra. Had Flitsch not told Jentz and Becker to go back into Annex C and its tunnel, but rather, go across the street because the fire department was responding, they wouldn't have suffered any injuries.

BASIS:
A. Transcribed Hiles interview of Mel Flitsch taken on 17 June 2010. "Justin and John went down to move our equipment that we were using in the basement. I say, put it up on the drag conveyer, put it underneath the drag conveyer, but just make it so the fire department's got easy access down there." p.16 (ConAgra 002981, RAS008472) Flitsch had declared an emergency. He had Friedt call the fire department, <u>NOW</u>. This most certainly was not the time to be directing personnel to reentering the structure containing the fire.

B. "Once employees have exited a building with open flames, they should not reenter the structure to fight the fire." Chapter V, Controlling Fires in Grain Facilities, Emergency Preplanning and Firefighting Manual...A guide for Grain Elevator Operators and Fire Officials... NGFA, 1987. p. 37. The emergency was declared and the fire department was on the phone. Flitsch still sent Jentz and Becker back in the building.

C. *Major Fire Emergencies* directive for Chester ConAgra personnel, part of the Emergency Action Plan. It identifies the 8 major parts..including warn others, sound the alarm and call the fire department. Evacuate non-essential personnel to previously selected place. (ConAgra 001922, RAS007413)