IN THE DISTRICT OF THE UNITED STATES OF AMERICA
FOR THE SOUTHERN DISTRICT OF ILLINOIS

_____
                                  )
**JOHN W. JENTZ; JUSTIN BECKER**   )
**and AMBER BECKER; and ROBERT**   )
**SCHMIDT,**                       )
                                  )
                 Plaintiff(s),    )
                                  )
     vs.                          )     Case No. **10-CV-0474-MJR**
                                  )
**CONAGRA FOODS, INC., et al.,**   )
                                  )
                 Defendant(s).    )
_____ )


**MOTIONS**

BE IT REMEMBERED AND CERTIFIED that heretofore on **3/29/2012**,

the same being one of the regular judicial days in and for the

United States District Court for the Southern District of

Illinois, Honorable Michael J. Reagan, United States District

Judge, presiding, the following proceedings were recorded by

mechanical stenography; transcript produced by computer.


*REPORTED BY*:  **Molly N. Clayton, RPR**, Official Reporter for
United States District Court, SDIL, 750 Missouri Ave., East St.
Louis, Illinois 62201, (618)482-9226,
                  *molly_clayton@ilsd.uscourts.gov*

1                              **APPEARANCES**:

2   *FOR PLAINTIFF JENTZ:*
         **Kevin P. Durkin** of Clifford Law Offices. P.C, 120 North
3   LaSalle St., 31st Floor, Suite 3100, Chicago, IL 60602 **and Brad**
    **L. Badgley** of Heiligenstein & Badgley, 26 Public Square,
4   Belleville, IL 62220 **and Colin H. Dunn** of Clifford Law Offices.
    P.C, 120 North LaSalle St., 31st Floor, Suite 3100, Chicago, IL
5   60602

6

7   *FOR PLAINTIFF(s) BECKER*:
         **Marc A. Taxman** of Anesi Ozmon Rodin Novak & Kohen, Ltd, 161
    North Clark St, 21st Floor, Chicago, IL 60601
8

9   *FOR PLAINTIFF SCHMIDT*:
         **Kevin P. Durkin** of Clifford Law Offices. P.C, 120 North
10  LaSalle St., 31st Floor, Suite 3100, Chicago, IL 60602

11

12  *FOR DEFENDANT CONAGRA*:
         **Joseph C. Orlet, Eric Orlet and Brandan P. Mueller** of Husch
    Blackwell, et al, 190 Carondelet Plaza, Suite 600, St. Louis,
13  MO 63105 **and John A. Ouska** of Patton & Ryan, 330 North Wabash
    Avenue, Suite 2900, Chicago, IL 60611
14

15  *FOR DEFENDANT WEST SIDE*:
         **Jason B. Moore** of Franke Schultz & Mullen PC, 8900 Ward
16  Parkway, Kansas City, MO 64114

17

18  *FOR DEFENDANT A&J*:
         **Sarah J. Hugg** of Lashly & Baer PC, 714 Locust Street, St.
    Louis, MO 63101 **and Barry C. Brotine** of BryceDowney, 200 North
19  LaSalle Street, Suite 2700, Chicago, IL 60601

20

21  *FOR INTERVENOR NAICO*:
         **M. Adina Johnson** of Wuestling & James, 720 Olive Street,
    Suite 2020, St. Louis, MO 63101
22

23

24

25

## **MISCELLANEOUS**

|                        | **PAGE** |
|------------------------|------|
| *Document 186*         | *4*  |
| *Document 188*         | *19* |
| *Document 189*         | *35* |
| *Document 191*         | *62* |
| *192*                  | *76* |
| *Document 193*         | *77* |
| *Document 196 and 218* | *97* |
| *Document 195*         | *99* |

1          *THE COURT:*  Those of you in the back are welcome to

2     sit in the jury box if you want to.  You can see and hear a

3     little better up there.

4          This is John W. Jentz, Justin Becker, Amber Becker,

5     and Robert Schmidt, Case No. 10-cv-474, and it is set on the

6     Court's docket for argument regarding pending motions.

7          Counsel, I can report to you that I have read

8     everything.  I have done some independent research and welcome

9     your argument this morning.  But by and large, I intend to rule

10    from the bench today on this.

11         So let's go in order.  Whoever speaks, please make

12    certain that you do identify yourself so that the court

13    reporter can get your names down.  As you know, there are a lot

14    of counsel in this case.

15         Okay.  First motion this morning is Document 186.  It

16    is a motion pursuant to Federal Rule of Civil Procedure 56 in

17    which Defendant/Third-Party Plaintiff ConAgra moves for summary

18    judgment against Third-Party Defendant West Side Salvage.

19         So on behalf of ConAgra, Mr. Orlet.

20         *MR. ORLET:*  Your Honor, we are going to have Mr. Ouska

21    handle this one.

22         *THE COURT:*  Okay.

23         *MR. OUSKA:*  Good morning, Judge.  John Ouska,

24    O-U-S-K-A, on behalf of ConAgra.  This is our motion relative

25    to the summary judgment related to the waiver of the *Kotecki*

1  protection.

2        I'll be brief, Judge.  I believe that, as you said,

3  you have read all the briefs.  We assert that there was a work

4  order contract executed by West Side Salvage on April 19th

5  2010.  Although that contract was not returned to ConAgra, it

6  was, in fact, signed by representative of West Side and

7  pursuant to that contract, they began work and did, in fact,

8  work at the ConAgra plant in Chester, Illinois, which was the

9  subject of this case.  They performed work for approximately

10 one week.

11       One of the issues in the case is whether or not -- the

12 threshold question, as I see it, Judge, is whether or not there

13 was a contract.  We believe that there was a contract.  The

14 contract appeared in written form, was signed by a Mr. Langham,

15 L-A-N-G-H-A-M, of West Side.  The contract was signed before

16 any work was performed.

17       Pursuant to that contract, they did, in fact, perform

18 work leading up to the April 27th explosion.  With regard -- so

19 the threshold question is whether or not there is a contract.

20 We believe and assert that there was, in fact, was a contract.

21       I also -- the next issue, as I see it, Judge, is

22 whether or not that pursuant to that contract there was a

23 waiver of the *Kotecki* protection.  In the indemnity clause,

24 which is Paragraph 9, it states, in part, that the indemnity

25 against all losses and claims, including all -- any and all

1    expenses.  That's what the indemnity clause contains.  Those

2    are the provisions in that indemnity clause.

3         That is strikingly similar to that indemnity clause

4    cited in the *Braye* case, which is an Illinois Supreme Court

5    case, B-R-A-Y-E, *Braye* case, which in that -- in that

6    particular case, the Court held that *Kotecki* protection could,

7    in fact, be waived.  And in that case, the indemnity provision

8    indicated as follows, at Page 204 of that decision, "for all

9    loss that may result."  Again, we assert that that language is

10   similar and almost identical to the language in the indemnity

11   clause in this particular case, the contract between West Side

12   and ConAgra.

13        In addition, Judge, and finally, I would like to

14   indicate that there was also a case cited in the breach of

15   contract indemnity, a motion for summary judgment that

16   Mr. Orlet and his firm pointed out.  That case is *Carlton at*

17   *the Lake*, and I think that that also is instructive.  In that

18   particular case, it indicates that a party named in a contract

19   made by his acts and conduct indicate his assent to the terms

20   and conditions of the contract and be bound by the provisions

21   thereto, even if a party did not sign it.

22        We assert that a party did, in fact, sign it.  But

23   nonetheless, even if there was no signature, by virtue of the

24   fact that they acted, that they went ahead and performed work

25   for seven days at ConAgra, in conjunction with this contract

1    that was signed by one of their people, Mr. Langham, one of

2    West Side's people, we assert that there was, in fact, a

3    contract and that they, in fact, assented to that contract, the

4    provisions thereunder, based upon the work that they did.

5             Again, and in closing, Judge, I would say that based

6    upon the language in the indemnity clause, which says,

7    indemnity against all losses and claims, including any and all

8    expenses, that that language is similar to that set out in

9    *Braye*, which is the Illinois Supreme Court case that says that

10   *Kotecki* protection can, in fact, be waived.  And based upon

11   that and for all the arguments asserted in our brief, Judge,

12   we'd ask that the -- our motion be granted.  Thank you.

13            *THE COURT:*  Thank you.

14            For West Side.

15            *MR. MOORE:*  Good morning, Judge.  Jason Moore on

16   behalf of West Side Salvage, may it please the Court.  I

17   apologize in advance.  I've been dealing with a cold or

18   something, so if I am difficult to hear, please let me know.

19   But I am glad that in hearing you say that you have read

20   everything, so hopefully I don't have to do a whole lot of

21   talking on this, and I do intend to be brief.

22            Your Honor, the motion for summary judgment filed by

23   ConAgra on the *Kotecki* issue should be denied because, at a

24   minimum, there is an issue of fact as to whether there was a

25   contract in place.  Without a contract, there is no indemnity

1    provision, and without the indemnity provision, there can be no

2    waiver of the *Kotecki* protection.

3         Therefore, the issue of whether the indemnity clause

4    was in place is material, and it precludes summary judgment in

5    favor of ConAgra on this issue.  Now, there is, in fact, an

6    issue, a genuine issue of fact as to whether there was a

7    contract in place at the time.  It's undisputed, it is

8    uncontroverted that the contract was not signed by both parties

9    until almost a month after the accident.

10        *THE COURT:*  Does it have to be signed by both parties?

11        *MR. MOORE:*  Under Illinois law, yes, it does, and we

12   have cited cases in our -- in our brief that says when a

13   contract has mutual obligations, it is a mutual agreement that

14   it does have to be signed by both parties.  I know that in one

15   of the briefings submitted by ConAgra there was some other

16   cases.  There was a *Fields* case and another case.

17        The *Fields* case was a federal case interpreting Iowa

18   law.  The other case cited by them was a federal case citing

19   California law, neither of which would be controlling here.  We

20   have cited Illinois case law in our brief that says that it

21   does have to be signed by both parties.

22        *THE COURT:*  And I read those cases, and I know your

23   position.  Let me ask you this:  How did you get down here

24   today?  Did you take an airplane?

25        *MR. MOORE:*  I took an airplane, yeah, earlier this

1   week.

2           *THE COURT:*  Okay.  Did you rent a car?

3           *MR. MOORE:*  I did not.

4           *THE COURT:*  Okay.  When you signed up for the

5   airplane, did the -- did the airlines countersign the ticket,

6   or if you had rented the car, did the car rental people

7   countersign the car rental agreement?

8           *MR. MOORE:*  I can't answer that.

9           *THE COURT:*  I can tell you whenever I rent a car, you

10  know, I sign it.  It is take it or leave it.  We have a

11  contract.  So I'm wondering about the requirement that both

12  sides sign when, in fact, someone has started performance

13  earlier.

14          *MR. MOORE:*  That kind of leads into the next issue,

15  that to the extent that the argument is that because we had

16  received the contract and then later showed up to the site and

17  commenced work, the cases hold that for a *Kotecki* waiver,

18  there's got to be intent.  There's got to be an intent to

19  actually bargain away that protection.

20          And I think even assuming arguendo that -- and we deny

21  this, but even if you want to say that our arrival on to the

22  site somehow accepted an offer by ConAgra to do the work, there

23  is no evidence in this case that there was any meeting of the

24  minds as to the provisions in the written contract, namely, the

25  indemnity provision.  At most, there would be an acceptance of

1    an offer for West Side Salvage to come and remove the pellets

2    from the hot bin.  There is no meeting of the minds as to the

3    waiver of the *Kotecki* provision, and the cases are clear that

4    at the very basis of that is an intent to bargain that away.

5        THE COURT:  So looking at this procedurally, let's say

6    I buy your argument and determine that there is a genuine issue

7    of fact that a jury has to decide.  What jury is going to

8    decide this?

9        Is it going to be the jury that decides the personal

10   injury claim, or do I sever it, wait until, in fact, it becomes

11   ripe, in terms of there is actually a transfer of liability to

12   West Side, and then it becomes ripe as an issue?

13       MR. MOORE:  You mean a transfer of liability to

14   ConAgra?

15       THE COURT:  No.  Let's say -- let's say, in this case,

16   you are a third-party defendant, right?

17       MR. MOORE:  In one of the cases, yes, the Becker case.

18       THE COURT:  And let's say, for whatever reason,

19   lightening strikes, and there is no transfer of liability to

20   ConAgra, therefore they can't pass anything on to you.  Okay.

21   In that circumstance, it doesn't matter whether there is a

22   *Kotecki* waiver or not, right?

23       MR. MOORE:  That would be true.

24       THE COURT:  So, procedurally, how do you think this

25   case plays out in terms of the contract?  Do I sever it and

1    then have another jury decide it later?  Do I concern myself

2    about confusing the jury with these multiple plaintiffs,

3    multiple parties, multiple theories for the personal injury,

4    and then ask them to decide a contract action at the same time?

5              MR. MOORE:  That's certainly a valid and good

6    question, and I don't know that I'm prepared to answer that

7    from a logistical standpoint.  I just -- the very -- the reason

8    I'm here today is to oppose the motion for summary judgment.

9              THE COURT:  Sure.

10             MR. MOORE:  And I don't mean to dismiss your question,

11   but I don't know.

12             THE COURT:  Yeah.

13             MR. MOORE:  That's going to be your call,and I

14   would --

15             THE COURT:  Sure.  Sure --

16             MR. MOORE:  -- I would like some time.

17             THE COURT:  -- is you get to be an advocate.  I have

18   to be fair --

19             MR. MOORE:  Right.

20             THE COURT:  -- right?

21             And so I have to sit back and look at this whole

22   picture, how it is going to play out.

23             MR. MOORE:  And I appreciate that -- I would need some

24   time to think about that, and hopefully that's a decision that

25   we could come to collectively, if necessary.  But I'll -- I

 1   will defer to what we have said already in our response and

 2   just reiterate that, at a minimum, there is an issue of fact as

 3   to whether there was a contract in place.  And without the

 4   contract, there is no indemnity provision.  And without the

 5   indemnity provision, there is no waiver of the *Kotecki*

 6   protection.

 7        *THE COURT:*  Sure.  And, of course, as a practical

 8   matter, having done what all of you are doing for a long

 9   portion of my life, I recognize this decision is important for

10   similar purposes, right?

11        *MR. MOORE:*  Yeah.  I would imagine that any decision

12   today is important for similar purposes.

13        *THE COURT:*  Right.  This decision, in particular, I

14   think is.  Okay.  Great.

15        The plaintiff does and does not have a dog in this

16   fight, but do you have any position?

17        *MR. DURKIN:*  Your Honor, Kevin Durkin, no position.

18        *THE COURT:*  Okay.  All right.  How about your position

19   on ultimately trying the case, having the contract case in the

20   middle of the personal injury case?

21        *MR. TAXMAN:*  If I may, your Honor, because --

22        *COURT REPORTER:*  May I have your name, please?

23        *MR. TAXMAN:*  My name is Marc Taxman.

24        The issue you raised with regard to the contribution

25   action is germane to the *Becker* case, and I would like to see

1    that resolved in this action.  I don't know how much extra it

2    would actually add.

3        There is a 4/19 contract signed by Mr. Langham.  There

4    is the May 26th contract signed by both sides.  They are

5    identical, if therein lies the question of fact.  That's really

6    the nature and extent of the evidence.  I don't think there

7    would be that much more on it.

8        I'd like to have an answer on that.  And I don't have

9    a dog in that fight, but if *Kotecki* is waived, it is very

10   significant to the *Becker* case because of the contribution

11   action.

12       THE COURT:  Sure.  Well, right now it is in the case

13   and nobody has filed a motion to sever so...

14       MR. TAXMAN:  Excellent.

15       THE COURT:  If somebody files a motion to sever, I'll

16   consider it, but right now it is part of the case, and it's

17   part of everything being tried.

18       Okay.  Pursuant to Rule 56 of the Federal Rules of

19   Civil Procedure, Defendant/Third-Party Plaintiff ConAgra moves

20   the Court to enter summary judgment in its favor against

21   Third-Party Defendant West Side Salvage on the basis that West

22   Side waiving protection is limiting its liability for

23   contribution under Kotecki versus Cyclops Welding, 585 N.E.2d

24   1023, a 1992 Illinois Supreme Court case.

25       This consolidated action arises from a grain bin

1    explosion that occurred at ConAgra's facility in Chester,

2    Illinois, on April 27th 2010.  Plaintiff Justin Becker, an

3    employee of West Side, was injured in the accident while he and

4    two employees of A&J Bin Cleaning, John Jentz and Robert

5    Schmidt, were removing grain material from a "hot" bin.

6         Justin Becker and his wife, Amber, are suing both

7    ConAgra and A&J under theories of negligence and *res ipsa*.  In

8    turn, ConAgra is suing West Side Salvage by way of a

9    third-party claim under theories of common law indemnification,

10   negligence, contribution, and breach of contract.

11        As an employee, Plaintiff Justin Becker cannot sue

12   West Side Salvage directly.  His exclusive remedy is pursuant

13   to the Illinois Workers' Compensation Act, found at 820 ILCS

14   305/11.  Under *Kotecki*, West Side Salvage, as a third-party

15   defendant employer, may be liable to third parties, such as

16   ConAgra, in a contribution action, but the amount of their

17   contribution is limited to the amount of their workers'

18   compensation exposure or liability.

19        ConAgra asserts that West Side's liability is not

20   capped under the Workers' Compensation Act because West Side

21   waived any protection under *Kotecki* when it executed the

22   contract with ConAgra, which includes an indemnity clause.

23   ConAgra provides a work order contract, dated April 19th 2010,

24   which, under Paragraph 9, provides for indemnification.

25        Indemnity, according to Playskool, Inc. versus Benson,

1    <u>Inc</u>., 497 N.E.2d 1199, at Page 1203, a 1986 Illinois appellate

2    court case, is a common law doctrine which shifts the entire

3    responsibility from one tortfeasor, who has been compelled to

4    pay his loss, to another tortfeasor, who is truly culpable.

5    Indemnity can be express, arising out of the agreement of the

6    parties, implied by operation of law, or implied by the courts

7    based upon the theory of active-passive negligence.

8         Under <u>Estate of Willis versus Kiferbaum</u>,

9    K-I-F-E-R-B-A-U-M, a construction corporation, the appellate

10   court, in 2005, at 830 N.E.2d 636, instructed that an employer

11   can waive the *Kotecki* affirmative defense by entering into an

12   agreement prior to the commencement of litigation to assume

13   full liability for damages commensurate with its relative

14   degree of fault.  "In essence, a party who agrees to waive

15   *Kotecki* as an affirmative defense voluntarily assumes

16   contribution liability in excess of limitations provided under

17   the Compensation Act."

18        In that case, the Court of Appeals found that the

19   subcontractor had waived his *Kotecki* cap as to the contractor's

20   claim for contribution.

21        <u>Braye versus Archer-Daniels-Midland</u>, 676 N.E.2d 1295,

22   a 1997 Supreme Court case, held "that an employer may enter

23   into a valid and enforceable contractual agreement to waive the

24   *Kotecki* limitation on the employer's contribution liability.

25   The Court agreed that neither the Workers' Compensation Act nor

1    their decision in *Kotecki* prohibits an employer from entering

2    into an agreement prior to the commencement of litigation to

3    assume full liability for damages commensurate with its

4    relative degree of fault.

5         According to ConAgra, by way of the indemnity clause

6    in the contract, West Side agreed to assume full liability for

7    damages stemming from its own fault and agreed to indemnify

8    ConAgra for all losses and claims arising from any act or

9    omission of the contractor, its agents, service -- servants,

10   employees, or representatives in the execution or guarding of

11   the work.  In short, ConAgra maintains that West Side intended

12   to assume unlimited liability and, as such, waived any

13   protections under the *Kotecki* cap.

14        West Side responded by submitting that there is no

15   evidence that it entered into the work order contract of

16   April 2010 any time prior to the accident.  West Side asserts

17   that there was no fully executed final expression of the

18   parties in the written work order contract until nearly a month

19   after the accident.

20        Additionally, West Side maintains that there is no

21   evidence that it bargained away it's *Kotecki* protection because

22   it only signed the contract because ConAgra demanded it for

23   payment.

24        Lastly, West Side asserts that the indemnity clause

25   does not constitute a waiver because it lacks the specific

1   language regarding limitations of workers' compensation acts

2   that Illinois, according to West Side, requires before a waiver

3   can be found.

4            Clearly, the first order of business is to determine

5   whether the contract signed April 19th 2010, found at Document

6   186, Exhibit A, is fully executed.  The contract contains only

7   one signatory, Ken Langham, the director of salvage operations

8   for West Side.  Justin Becker, West Side's employee, testified

9   that they arrived on the 19th and started work on the 20th.

10  That's from his deposition, at Doc. 186, Exhibit B, Page 82,

11  Line 17 to 18.

12           There is representation to the Court that Langham

13  signed the contract before work began.  West Side provides a

14  copy of a second contract signed by its president on May 25th

15  2010, and by ConAgra's director of engineering on May 26th

16  2010.  And that's at Document 236, Exhibit A.  According to

17  West Side, this is a fully executed contract that governed the

18  parties' relationship.

19           Interestingly, my review is that that's exactly the

20  same contract as the April.  April and May are exactly the

21  same.  One has the ConAgra signature and one does not.  It

22  seems to me a jury might find it persuasive that the initial

23  contract was the parties' agreement, and the signature later by

24  ConAgra was merely a formality.

25           Cathy Rihanek, R-I-H-A-N-E-K, ConAgra's supervisor of

1   administration, testified that she sent an e-mail to West Side

2   on April 15th 2010, attaching a work order contract.  That's

3   Document 236, Exhibit B, her deposition, Page 22, Lines 8 to

4   12.

5          She stated she did not receive a response from West

6   Side.  To her knowledge, no one returned a signed contract to

7   her in response to this e-mail.  She stated that she sent the

8   work order contract for the removal of the pellets to West Side

9   on May 25th 2010, almost a month after the explosion, because

10  ConAgra needed a signed contract and did not have one.  She

11  testified that in order to get paid, there had to be a signed

12  contract on file.

13         As to the April 15th contract, Rihanek testified that

14  she had never seen the contract signed by Kevin Langham -- Ken

15  Langham and could not say that the document was ever received

16  by ConAgra.  She stated that if she had received the document,

17  she would have printed it off, given it to Dean Hoerning,

18  H-O-E-R-N-I-N-G, for signature and then e-mailed it back to

19  West Side.

20         Gene Schwers, S-C-H-W-E-R-S, testified that Rihanek

21  telephoned him and told him she could not pay him because she

22  had no contract, Document 236, Exhibit C, Schwers' deposition,

23  Page 173, Lines 5 through 9.  Schwers looked for the contract

24  and called Rihanek back to tell her he did not have a contract.

25  Rihanek then faxed Schwers the contract, and he promptly signed

1    it and returned it to her.

2         West Side argues that only one signatory to the April

3    contract existed, and, in fact, that is correct.  It was signed

4    by Ken Langham.  The May contract was signed by both Ken

5    Langham and ConAgra.

6         After considering all of this and reviewing the burden

7    of proof in this matter, the Court cannot find that summary

8    judgment is appropriate in this particular case at this time

9    because there is a genuine issue of material fact as to whether

10   the April contract was intended by the parties to be a fully

11   integrated final expression of their agreement and govern their

12   relationship.

13     That is not to say that at trial sufficient evidence might

14   lead the Court to conclude that.  There certainly is

15   significant evidence for the position that ConAgra takes that

16   there is a waiver, but I cannot find that as a matter of law at

17   this juncture.  As a result, Document 186 is denied at this

18   time.

19     Next, we have Document 188.  In this motion, Defendant West

20   Side Salvage moves for summary judgment on John Jentz's and

21   Robert Schmidt's claims for punitive damages to Count 6 of

22   Plaintiff Jentz's Fourth Amended Complaint and Count 6 of

23   Plaintiff Schmidt's First Amended Complaint.

24     So for West Side.

25         *MR. MOORE:*  Thank you, your Honor.

1          *THE COURT:*  How do you spell your last name?

2          *MR. MOORE:*  Moore, M-O-O-R-E.

3          *THE COURT:*  Gotcha.

4          *MR. MOORE:*  May it please the Court.

5          *THE COURT:*  You are one and one right -- you are one

6     for -- one and zero.

7          *MR. MOORE:*  Hopefully, I can keep it up.

8          *THE COURT:*  Some people would say, I'm satisfied; I'm

9     going to sit down, Judge.  But go right ahead.  We have a

10    saying down here:  Pigs get fed and hogs get slaughtered.

11         *MR. MOORE:*  Well, I don't want to be a hog.

12         *THE COURT:*  I'm just kidding, so the record is clear.

13    Some people look at this stuff and think I'm serious.

14         *MR. MOORE:*  Judge, West Side Salvage's motion for

15    summary judgment on Plaintiff Jentz and Schmidt's putative

16    damage claims should be granted because, based on the

17    uncontroverted facts of this case, West Side Salvage is

18    entitled to judgment as a matter of law.

19         Plaintiffs have not sufficiently pled nor can they

20    demonstrate that West Side Salvage acted willfully,

21    outrageously due to evil motive or with reckless indifference

22    to the rights of others so as to warrant the new position of

23    punitive damages.

24         Briefly, as the Court is aware, punitive damages are

25    not favored in Illinois.  The purpose of punitive damages is to

1    punish and to deter both generally and specifically.  And they

2    will generally only be awarded when the defendant's conduct is

3    willful or outrageous due to evil motive or reckless

4    indifference to the rights of others.  The question of whether

5    the facts of a particular case justify punitive damages is one

6    that is proper for the Court's decision, hence the filing of

7    our motion for summary judgment.

8         The first -- the first reason that our summary

9    judgment should be granted is because the plaintiffs'

10   allegations of punitive damages fail to state a claim upon

11   which relief can be granted.  I would direct the Court's

12   attention to the *Adkins* case, which is cited in our motion.

13        The *Adkins* case makes clear that an order to

14   sufficiently plead willful and wanton misconduct under Illinois

15   law, a plaintiff must allege facts that show either deliberate

16   intention to harm or utter indifference to or conscious

17   disregard for the plaintiffs' welfare.  And if, quote, without

18   considering the conclusions that are pleaded, there are not

19   sufficient allegations of fact to state a cause of action, a

20   motion to dismiss will properly be granted no matter how many

21   conclusions may have been stated and regardless of whether they

22   inform the defendant in a general way of the nature of the

23   claim against him."

24        We are clearly aware in a general sense that the

25   plaintiffs are pursuing punitive damages.  However, the problem

1    is the same problem the *Adkins* case talked about, and that

2    there are -- there are insufficient factual allegations pleaded

3    in the -- in the complaints.

4         Count 4 of Plaintiff Jentz's complaint and Count 4 --

5    strike that.

6         Count 4 of Plaintiff Jentz's fourth amended complaint

7    and Count 4 of Plaintiff Schmidt's first amended complaint,

8    they both set forth the same operative alleged acts and

9    omissions of West Side Salvage, the only difference being that

10   they add the phrase "willful and wanton," and then they add a

11   characterization of the acts as with a conscious disregard for

12   and an utter indifference to the safety of individuals lawfully

13   on the premises like plaintiffs.

14        Our position is that these conclusory labels and

15   statements are not enough to state a claim for punitive

16   damages.  The law requires more.  And I would just, again,

17   direct the Court's attention to *Adkins*, which I have already

18   referenced, and also there is the *Burke* case and the *Campbell*

19   case.

20        In the *Campbell* case, the Court held plaintiff may not

21   merely re-allege a negligent count and add a conclusory

22   statement that the defendant's actions amounted to willful and

23   wanton misconduct.  That is exactly what the plaintiffs are

24   doing here.  They have merely re-alleged a negligent count and

25   added conclusory statements that the acts and omissions were

1    willful and wanton.

2         The plaintiffs respond to our motion in writing, and

3    they really don't address the pleading insufficiencies, rather

4    they focus on the certain evidence that they claim will allow a

5    jury to find punitive damages.

6         *THE COURT:*  And I notice that, and I'm wondering if

7    they did that because you couched this as a summary judgment,

8    but isn't, really, 12(b)(6) an issue when you are attacking the

9    allegations they are making in the complaints as opposed to the

10   substance?

11        *MR. MOORE:*  You know, the argument that I just

12   finished making, I guess, technically speaking, would be a

13   motion to dismiss argument.  The reason that we phrased our

14   argument, or our motion, as a motion for summary judgment, I

15   think is because it necessarily brings in things beyond the

16   pleadings with regard to the second argument.

17        Either way, I -- our position is that we are entitled

18   to judgment as a matter of law.  There are two reasons:  One,

19   insufficient pleadings; and, two, just lack of evidence to show

20   the willful and wanton conduct that would be necessary for

21   punitive damages.

22        *THE COURT:*  But if they haven't pled the willful and

23   wanton conduct to the requisite degree, how can you say they

24   haven't shown it?  Don't they have to plead it first, and you

25   attack it and say, well, that's not true.

1          *MR. MOORE:*  They have pled it, but they have done it

2     insufficiently.  They have put us on notice that they are

3     seeking punitive damage, but for the reasons that -- that we've

4     stated, those blanket conclusions and allegations are not

5     enough to even state a claim.

6          And, moreover, your Honor, to the -- to the other

7     argument, none of the evidence in this case actually suggests

8     that any sort of evil intent or reckless indifference to the

9     rights of others.  Melvin Flitsch, with regard to his decision

10    to send those guys back in the tunnel, he testified that nobody

11    ever dreamt it was going to blow up, "it" being the bin.

12    Plaintiffs' own experts, Rus Ogle and William Field, they both

13    confirmed the absence of any sort of evil motive or intent

14    behind Mr. Flitsch's decision to send the guys back into the

15    tunnel.  I believe we have cited and quoted portions of the

16    testimony that I'm talking about in the writing.

17          In their response and in hindsight, the plaintiffs

18    point out the problems with Melvin Flitsch sending the guys

19    back into the tunnel, but they do not, however, create an issue

20    of fact as to whether he knew the bin was about to blow up and

21    decided to send the guys back in anyway.  Plaintiffs, in their

22    response, contend that, quote, a reasonable jury could easily

23    find that West Side Salvage had knowledge of the escalating

24    danger and failed to tell A&J and plaintiffs about the same,

25    and that this demonstrates a reckless disregard for their

1    safety.

2           Your Honor, whether a jury can find that West Side

3    Salvage had knowledge of the "escalating danger" is irrelevant.

4    It is beyond the scope of the pleadings and does not affect

5    West Side Salvage's entitlement to summary judgment.  If you

6    look at the actual allegation set forth in Count 4 and Count 6,

7    it is that West Side Salvage failed to warn individuals on the

8    premises of the dangerous condition of the existing fire and

9    the potential fire and explosion hazard.  So the allegation is

10   not that we failed to inform someone of escalating danger, it's

11   that we had failed to inform someone of existing fire and

12   potential hazards.

13          Nothing cited in the plaintiffs' response creates an

14   issue of fact or would allow a jury to find that West Side

15   Salvage knew of an existing fire of which it could have warned

16   individuals on the premises.  They cite certain what I would

17   call "changing conditions" in their response, namely,

18   temperature and other things that were apparently -- well, that

19   they claim was passed on to West Side Salvage.

20          The only thing that they offer support on in terms of

21   being passed on to West Side Salvage was temperature.  The

22   other things, the smoke, the observations of smoke and melting

23   gaskets and so forth, there is no -- there is no support to say

24   that any of that was actually passed on to -- passed on to West

25   Side Salvage.  We are only dealing with temperature.

```
 1              But -- but, again, there is no evidence as to when
 2     these temperature readings were relayed by ConAgra's Godfrey
 3     Friedt to West Side Salvage in relation to the crews arrival at
 4     the facility.  And I think that goes to whether and what extent
 5     West Side Salvage had knowledge, which goes to the issue of
 6     recklessness or absence thereof.  Furthermore, the plaintiffs
 7     admit in the response that West Side Salvage had advised Al
 8     Derner of A&J that the bin had been warming up.
 9              In closing, your Honor, there is no evidence that any
10     of the alleged acts or omissions of West Side Salvage were done
11     recklessly or with any sort of evil intent or motive so as to
12     warrant the imposition of punitive damages.
13              THE COURT:  Thank you, Mr. Moore.
14              MR. DUNN:  Good morning, Judge, Colin Dunn on behalf
15     of Plaintiffs Jentz and Schmidt.
16              THE COURT:  Mr. Dunn.
17              MR. DUNN:  May it please the Court.  Just on the issue
18     of pleading issue, your Honor, as you pointed out, this is a
19     summary judgment motion.  We did, though, in our response cite
20     the Sole [ph] case that talks about the fact that simply
21     because allegations of willful and wanton conduct mirror the
22     negligence allegations doesn't mean that they're infirm.  The
23     Court looks at the substance of the allegations.
24              But I'll point out that this is, obviously, federal
25     court.  It is a notice pleading requirement.  I think Mr. --
```

1    counsel for West Side just indicated that they were put on

2    notice that we were making a punitive damage claim, so I think

3    that puts us past the --

4         THE COURT:  Is there a higher requirement even in

5    federal court to plead punitive damages?

6         MR. DUNN:  Your Honor, I think the cases suggest that,

7    and we have cited them in our footnote one to the response that

8    we don't even need to plead punitive damages.  The Seventh

9    Circuit has indicated that if the evidence will support it and

10   the jury awards it, that that's sufficient under Rule 54(c).

11   In the case that we've cited here, *Costello*, at least the

12   Seventh Circuit indicated, it is not clear whether or not we

13   need to prove or plead punitive damages or willful and wanton

14   conduct in our complaint to sustain a verdict in support for

15   punitive damages.

16        THE COURT:  It is not required under Rule 9.  Rule 9

17   requires an elevated level of pleading in fraud or mistake,

18   correct.  It does not mention punitive damages, correct.

19        MR. DUNN:  As far as the evidentiary goes, your Honor,

20   our theory here is twofold.  One is that important information

21   was never passed on to Al Derner and A&J regarding the

22   condition of the bin.  There is a dispute in the evidence as to

23   whether or not West Side was ever told that information about

24   the condition of the bin.

25        I think Mr. Friedt has testified that he was keeping

1    West Side informed during the several weeks that they were

2    looking for another contractor about the condition of the bin;

3    the different temperature readings that we have cited to you in

4    our various briefs; this melting gasket; etc., that he was

5    keeping them fully informed.  That's Mr. Friedt's testimony.

6    Obviously, West Side's testimony is that we were never told

7    that information, and because of that, there is no dispute that

8    A&J was never told of the condition.  It is West Side's

9    position that we were never told that.

10          So our theory, number one, is that had that

11   information been passed along to West Side, that it should have

12   been passed to A&J, and it would have affected A&J's decision

13   to participate in this project down in Chester.

14          The other aspect of the case, the punitive case

15   against West Side, is sending Mr. Jentz back into a burning

16   building, essentially, here.  We know that Mr. Flitsch, the day

17   before the explosion, had pleaded with Mr. Friedt to call the

18   fire department because of his concern about the condition of

19   the bin.  Mr. Flitsch was certainly concerned about the

20   condition of the bin while he was there the day before, the day

21   of, and knowing the danger of the bin, he ordered Mr. Jentz to

22   go back into the bin.

23          And we've cited the cases in Illinois that discuss the

24   standard.  And it is just simply the failure to use ordinary

25   care against an impending danger qualifies as willful and

1    wanton conduct.  And a reasonable jury could look at the

2    evidence in this case and say that that standard has been met.

3         We don't need to prove any evil intent by Mr. Flitsch,

4    and we don't argue that he intended to hurt Mr. Jentz.  But

5    certainly we can show, the evidence shows, that he was aware of

6    an impending danger in the bin and he failed to use ordinary

7    care by ordering Mr. Jentz to go back into the bin.

8         So on those reasons, your Honor, we would ask that the

9    Court deny West Side's motion for summary judgment as to the

10   punitive damages claim filed by Mr. Jentz and Mr. Schmidt.

11   Thank you.

12        *THE COURT:*  Mr. Dunn, the docket sheet in this case,

13   which is 46 pages long now, has you listed as representing

14   Justin Becker also.  That's incorrect.

15        *MR. DUNN:*  That's incorrect.

16        *THE COURT:*  You wish, but no.

17        *MR. DUNN:*  That's incorrect.

18        *THE COURT:*  We will fix that.

19        *MR. DUNN:*  Thank you.

20        *THE COURT:*  Okay.  Pursuant to Federal Rule of Civil

21   Procedure 56, Defendant West Side Salvage moves for summary

22   judgment on John Jentz's and Robert Schmidt's claims for

23   punitive damages.

24        In this case, those plaintiffs, of course, can sue

25   West Side directly as they were not employees.  West Side

1  submits that, based on the allegations in Jentz's Fourth

2  Amended Complaint and Schmidt's First Amended Complaint as well

3  as the facts developed through discovery, Jentz and Schmidt

4  cannot show evidence to create an issue of fact as to whether

5  West Side acted willfully or outrageously due to evil motive or

6  reckless indifference to the rights of the plaintiffs.

7        Further, they attack the language in the pleadings by

8  indicating that the punitive damage claim has not been pled

9  with the requisite specificity.  So I'm going to treat the

10  motion at Document 188 as not only a motion for summary

11  judgment but as a motion under Rule 12(b)(6) under the Federal

12  Rules of Civil Procedure.

13        According to West Side, the allegations against it can

14  be summed up as (1) West Side failed to properly remove the

15  grain bin -- the grain from the bin so as to cause or

16  contribute to causing the explosion; (2) West Side asked

17  Plaintiffs to go into the tunnel prior to the explosion.  West

18  Side maintains, however, that there is no evidence that it

19  acted with malice or conscious disregard for plaintiffs'

20  rights.

21        Plaintiffs jointly respond that the evidence in the

22  case demonstrates that West Side and its managerial employees

23  acted with utter indifference and conscious disregard for the

24  plaintiffs' safety.  They assert that there is evidence that

25  West Side knew of the escalating dangerous condition of the bin

1    prior to the explosion and failed to provide that information

2    to plaintiffs' employer, A&J Bin Cleaning, when hiring it to

3    work on the product.

4         Additionally, according to the plaintiffs, West Side's

5    foreman, Mel Flitsch, F-L-I-T-S-C-H, ordered Jentz back into

6    the bin tunnel after he deemed the situation so dangerous that

7    he asked ConAgra to call the fire department to the screen.

8         Plaintiff maintains that a reasonable jury can find

9    that West Side demonstrated an utter indifference and conscious

10   disregard for the plaintiffs' safety, which they contend would

11   impose punitive damages and be justified.

12        Whether punitive damages can be awarded for a

13   particular case is a question of law.  But whether the conduct

14   was sufficiently willful or wanton to justify the imposition of

15   punitive damages is a fact question for jury to decide.  That

16   comes from Medow versus Flavin, 782 N.E.2d 733, a 2002

17   appellate court case, which cites Schmidt versus Ameritech

18   Illinois, 768 N.E.2d 303, a 2002 Supreme Court case from

19   Illinois.

20        Illinois law does disfavor the award of punitive

21   damages.  As the Court of Appeals indicated in Gambino versus

22   Boulevard Mortgage Corporation, 922 N.E.2d 380, 423, in 2009,

23   the Court indicated that the purposes of punitive damages

24   include:  (1) to act as retribution against the defendant; (2)

25   to deter the defendant from committing similar wrongs in the

1     future; and (3) to deter others from committing similar

2     conduct.  And that court then cited Gomez versus The Finishing

3     Company, an Illinois Supreme Court case at 369 861 N.E.2d 189.

4            The *Gambino* court went on to say that such damages as

5     the punitive damages will be awarded only where the defendant's

6     conduct is willful or outrageous due to evil motive or a

7     reckless indifference to the rights of others.  Because

8     punitive damages are not favored in the law they are only

9     available in cases where the wrongful act complained of is

10    characterized by wantonness, malice, oppression, willfulness,

11    or other circumstances in aggravation.

12           The Court believes that west -- that plaintiffs have

13    provided sufficient evidence to withstand West Side's motion

14    for summary judgment on punitive damages, and in the

15    alternative, the Court's recasting it as a 12(b)(6) motion.

16           West Side was hired to remove pellets from the grain

17    bin at issue.  West Side subcontracted with A&J to operate the

18    bin whip that knocks material off the sides of the bin.  In

19    early March 2010, well over a month before the April 27

20    explosion, a ConAgra employee alerted his superiors that he

21    smelled a burning odor from one of the grain bins.  ConAgra's

22    director of elevator operators, Godfrey Friedt, F-R-I-E-D-T,

23    traveled to the Chester site that day and was informed that

24    there was a hot bin.  That is Doc. 231, Exhibit 1, from

25    Friedt's depo, at Page 33.

1          There he met with Ronald Sumner, the executive vice

2     president of West Side, among others, to decide how to handle

3     it.  Sumner checked oxygen and carbon monoxide levels in the

4     bin and determined that "there was roughly something going on

5     in that bin that was not a good situation."  That's from

6     Doc. 231, Exhibit 2, Sumner's depo, at Page 13.

7          "Sumner testified that he thought the bin needed

8     attention fairly quickly and referred to the situation as 'a

9     ticking time bomb' because it was decaying and most of the time

10    only became worse."

11         Friedt testified that he did not recall Sumner making

12    that comment.  According to Friedt, Sumner wanted to be kept

13    informed as to any changes in the temperature readings in the

14    bin.  "If there was a change as to -- as to that -- Ron had

15    asked I had conversations with Ron about that."  Friedt

16    testified that Sumner had asked if there were any changes in

17    temperatures and if -- there are several occasions where I

18    called him and let him know.

19         Plaintiffs assert that West Side failed to communicate

20    this information to them or to A&J.  According to Allan Derner,

21    A&J's owner, he never spoke with Sumner prior to the explosion,

22    and all his information came from his own employee, Schmidt.

23         Mel Flitsch testified that on the day before the

24    explosion, he asked Friedt to have the fire department come

25    out.  Prior to the explosion, Flitsch saw smoke coming out of

1   the grain bin, turned on the garden hose in the bin, and put

2   another water hose in the aeration for a little bit.  The bins

3   are about 120 to 140 feet tall.  When they could not get the

4   water where they needed it or in the volume needed, Flitsch

5   told Friedt to call the fire department.

6        Jentz testified that Flitsch told him that the fire

7   department had been called and that he should go in and get the

8   tools he had left in the tunnel under the grain bin:  pitch

9   forks, spades, a drill, and few other things.

10        At about the same time that Friedt was calling the

11   fire department, Flitsch told Jentz and Becker to waste no time

12   and move their tools in case the fire department needed to get

13   in the basement so the fire department personnel would not be

14   tripping over the equipment.  Flitsch said "it was pretty

15   obvious there was a bad situation in the bin, but nobody ever

16   dreamt it was going to blow up."  While Jentz was in the

17   tunnel, and while Schmidt was taking the elevator down, the

18   explosion occurred.

19        Gene Schwers, the president of West Side, testified

20   that A&J employees like Jentz and Schmidt would have to follow

21   Flitsch's directions because he was above them in the chain of

22   command.  That's Exhibit 7, Schwers' deposition, Page 225.

23        In conclusion, the Court finds that it is a jury

24   question of whether West Side failed to communicate the

25   seriousness of the situation, that is, the ticking time bomb to

1    A&J.   A jury must decide whether West Side's conduct was

2    willful or outrageous due to reckless indifference to

3    plaintiffs' rights and whether West Side's conduct was

4    characterized by wantonness, willfulness, or other

5    circumstances of aggravation.

6          So summary judgment on punitive damages should be

7    denied.  And the Court believes that the pleadings in this case

8    put the Defendant West Side on sufficient notice of the

9    allegation of punitive damages.  To the extent that the Court

10   has recast or included a 12(b)(6) motion as part of the

11   Doc. 188, that is also denied.

12         Next, we have Document 189 in which under Rule 56 of

13   the Federal Rules of Civil Procedure, ConAgra moves for summary

14   judgment against all plaintiffs on the counts of *res ipsa*

15   *loquitur*, negligence, consortium, and premises liability.

16   Mr. Moore -- no, I'm sorry, Mr. Orlet.  This is ConAgra.

17         *MR. ORLET:*  Thank you, Judge.  Good morning.

18         *THE COURT:*  Good morning.

19         *MR. ORLET:*  ConAgra's motions seek judgment as to

20   Count 1 of the Jentz latest complaint, and Counts 1, 2, 4, and

21   -- I'm sorry -- 1, 2, 5, and 6 of the Becker complaint.  And

22   first of all, the -- ConAgra's entitled to summary judgment on

23   the negligence and premises liability counts for the following

24   reasons, for five separate reasons, as a matter of fact.

25         Under Restatement 414, ConAgra did not owe a duty to

1     the plaintiffs sufficient to support a general negligence or

2     premises liability claims because ConAgra did not have the

3     requisite amount of control over the job in order for there to

4     be a legal duty to attach.

5           Secondly, the plaintiffs assume the risk associated

6     with the work in the -- in the hot bin or with the hot bin.

7           Third, the condition of the bin was open and obvious

8     to the plaintiffs.

9           Fourth, ConAgra's actions were not the proximate cause

10    of the plaintiffs' injuries.

11          And then I'll address a response -- a defense that is

12    raised by Becker plaintiffs as they cite to the deliberate

13    encounter exception to -- of Restatement 343, which does not

14    apply in this instance.

15          So, first of all, ConAgra did not owe a duty to

16    these -- to these plaintiffs because they are independent

17    contractors and under restatement of torts second 414, there

18    must be a -- the requisite amount of control over the job site

19    for a landowner such as ConAgra to -- to have a duty imposed on

20    it.

21          Under 414, a principal who hires an independent

22    contractor must have -- in order to have liability under 414,

23    there must be control over the operative details of the

24    contractor's work.  And in this case, it's clear that ConAgra

25    did not have the -- that requisite control over the -- over the

1   contractor's work.

2          *MR. ORLET:*  Am I on (speaking of ELMO)?

3          *COURT REPORTER:*  The judge controls that.

4          *MR. ORLET:*  Oh, okay.

5          *THE COURT:*  There you go.

6          *MR. ORLET:*  Thank you, Judge.

7          And this is the -- the standard, as set forth in that

8   *Calderon* case, that we cite in our papers.  And it notes that

9   there is only this narrow exception, which says that -- which

10  applies only when the landowner has -- retains control over the

11  operative details of the contract.

12         If you look at the testimony in this case, it is clear

13  that from the time that the crews showed up out at Chester and

14  began its work on the 20th, that they -- that the two sets of

15  contractors, the general contractor, West Side, and its

16  subcontractor, A&J, they were the ones who were operating, who

17  were setting forth how the job was going to be done.

18         And if you look at Mr. Jentz's depo, for example, he

19  says that right from the beginning, that the contractors got

20  together on their own, no one from ConAgra was present.  And

21  they had this meeting where they decided that they were going

22  to come up with a game plan on how they were going to address

23  this hot bin situation.  And no one from ConAgra was there to

24  tell them, to help them come up with this game plan that they

25  had.  They were the ones who -- who decided how to do that.

1          And, Judge, that makes sense because as you will see,

2     it's clear that one of the situations that is very critical in

3     this case is the difference in the amount of -- or the

4     experience in expertise relating to hot bins between ConAgra

5     and West Side and even A&J.

6          ConAgra has, in its -- as far back as anyone can

7     remember, has had one incident where there was a hot bin

8     situation, and that was in the 1990s in Puerto Rico.  And what

9     happened in that case was that ConAgra went out and they --

10    this hot bin situation went apparently on for -- Mr. Ogle cites

11    to ConAgra's head of safety, Mr. Yount, and says that that went

12    on for almost a year.  And at some point during that time, they

13    called in a contractor that resolved that.  ConAgra called in a

14    contractor who resolved that.

15         So ConAgra has just this one experience many years

16    ago.  And so what did they do?  Well, they called in the expert

17    in this.  And if you go to the Web site of the -- of West Side,

18    it says that they are, in fact, experts in when there is a fire

19    or a potential for a fire.  So we hired the right folks.

20         And, in fact, it is interesting, even other large

21    companies like -- well, Mr. Sumner said that they are hired,

22    West Side is hired, by other large companies, such as Bunge,

23    ADM, and Cargill, a number of very large companies and -- and

24    just about all of the insurance companies who testified.

25         And, in fact, they produced a document in this -- in

1    this case that sets forth some of that experience, and it shows

2    all of the situations where they have been out addressing

3    either bin fires or hot bins or similar situations over the

4    years.  And I believe -- and I could be correct on this, but I

5    believe there is 131 of those.  So they have -- they have --

6    between the -- and, in fact, on their Web site, they talk about

7    the years and years, the decades of experience that they have

8    among the West Side employees.

9         And so it made sense that, in fact, that ConAgra is

10   going to hire this company.  The testimony is there is no one

11   in the country who handles as many of these types of

12   situations, hot bins, or out-of-condition bins, or grain or bin

13   fires as West Side.  So, you know, that background is important

14   because one of the things that the plaintiffs do in this case,

15   is they talk about why didn't ConAgra do all of these things.

16   Why didn't they tell West Side to do this, this, and this?

17        Now, an important distinction to understand in this

18   case, Judge, is going to be the expertise of ConAgra versus the

19   expertise of West Side.  ConAgra is very much an expert in

20   taking actions necessary to lessen the chance of a grain dust

21   explosion.  They spend an enormous amount of time and energy

22   doing that because they handle so much grain, and so they are

23   experts in that.

24        But this -- but a hot bin situation, when you -- when

25   you -- when you've only had one other one, and in that

1    instance, you didn't try and deal with it yourself, you brought

2    in an expert, an expert contractor.  That's what they did here.

3         So there's -- so it's important that, you know, one of

4    the two entities between West Side and ConAgra, one is an

5    expert in grain dust and prevention of grain dust explosions.

6    The other is an expert in dealing with a hot bin situation.  So

7    that is -- that's very important.  And this -- all of this

8    experience shows the -- all of these prior jobs that they have

9    shows the experience that they have in that.

10        And, in fact, the plaintiffs' own expert, one of their

11   experts, Dr. Field, has testified that he keeps West Side's

12   number on his desk, and he provides that to people who need

13   these types of services.  He says he -- that West Side is the

14   only company that he provides to people who call him needing

15   these types of services.  So West Side is the recognized expert

16   in the United States on this.  And --

17        THE COURT:  That's a great argument to the jury, but

18   what about ConAgra retaining any control such that --

19        MR. ORLET:  Well --

20        THE COURT:  -- potential exposure.

21        MR. ORLET:  -- so when -- so when they got out there

22   they had their meeting on how to do this, and ConAgra was not

23   there.  And then, in fact, Mr. Field, he talks about, well, you

24   know, what was the pecking order out there?  Who was

25   controlling who, who was supervising whom?

1          And Mr. Field's report says that Mr. Jentz and

2     Mr. Schmidt were actually taking their -- were being supervised

3     by Mr. Flitsch, and as were the West Side employees.  So

4     Mr. Flitsch is the -- is the gentleman who is out there running

5     the show, and he is deciding how the job is going to be done.

6     He -- so, you know, for example, the testimony in the case is

7     that when it came to selecting tools, no one from ConAgra told

8     them how to do that.  When it came to monitoring the

9     temperatures and the carbon monoxide levels, they did that

10    without input from ConAgra.  They did -- they did it

11    themselves.

12          They developed a plan for emptying the pellets.  And

13    they decided when to use water and when to use this air lance

14    that they used and -- and which they used on the day of the

15    accident, in which our expert, Dr. Shroeder, says that that --

16    that sped up the combustion process, which contributed to the

17    explosion.  So they are making the key decisions.  And then

18    when it comes to the day of the -- the day of the explosion --

19    so they have this entire week where they are doing that and

20    where they are making the decision on how they are going to

21    take the material out of the bin.

22          Then when it comes to the day of the explosion, it

23    is -- it is Mr. Flitsch, who is going to ConAgra, saying, Well,

24    maybe we should call the fire department in the morning and

25    have a "consultation," is I believe the term he used.  And when

1  he does that, they make the call.  Then -- and the fire

2  department doesn't -- you know, says they can't consult.  We

3  will get into all that later.

4        But, again, it is Mr. Flitsch who is saying, We need

5  the fire department to consult, and later it is Mr. Flitsch who

6  says, We need the fire department out here now.  And the phone

7  call was made.  So it's -- so the facts demonstrate that --

8  that ConAgra has no -- is not playing any role in how the

9  details of the work are being done, which is the operative

10  issue under the -- under the law that we saw earlier.

11        And then -- in fact, and then when it comes to the key

12  issue about sending, you know, sending the -- Mr. Jentz and

13  Mr. Becker back down into the tunnel, again it is Mr. Friedt

14  who -- I mean, Mr. Flitsch who does that.  And as his own

15  testimony shows, he did that without -- ConAgra had no input on

16  that as well.

17        So what the facts show in this case are that at no

18  time on the operative details of what they were doing during

19  that week, and particularly on the day of the incident, did --

20  was ConAgra controlling how they were doing it.  And because --

21  and that it makes sense because of the difference in the amount

22  of expertise between the two parties.

23        So because of that, because they didn't control the --

24  ConAgra did not control the operative details of how the job

25  was done, there was, in fact, no duty owed to the plaintiffs by

1   ConAgra because the details of how it was being done, the job

2   was being done, was being controlled by Mr. Flitsch.

3           And we also set forth that the plaintiffs assume the

4   risk and, essentially, you know, we also argue that the danger,

5   the hazard, was open and obvious.  And I think that that

6   testimony is very clear, that the plaintiffs knew of the danger

7   and elected to assume the risk.

8           So, for example, when you look at the testimony of

9   Mr. Jentz, again, Mr. Jentz had prior testimony -- had prior

10  experience with hot bins, at least three or four.  So his

11  experience was he had been out on prior jobs that involved hot

12  bins.  In fact, I believe it was the one just before this one

13  he was on, was a hot bin, and there was -- it was a corn bin,

14  and there were embers involved in that one as well.

15          So he was experienced with this sort of situation.

16  And, in fact, he had been trained, Mr. Jentz had been trained,

17  in how to deal with hot bins, that they were dangerous and

18  that -- and that -- that a hot bin can cause a grain dust

19  explosion.  So he had been -- and he also knew, as he notes

20  there, that combustible gases could be present as well, and

21  that that could cause an explosion.  So Mr. Jentz was aware of

22  the hazards, and he -- during the time that he was out there

23  because he had worked on prior jobs and had been trained.

24          Similarly, Mr. Schmidt had been trained on potential

25  ignition sources and he knew that a hot bin, in fact, could

1    explode.

2         Similarly, Mr. Becker, he had prior experience with

3    hot bins.  He had been on numerous jobs involving hot bins.

4    And, in fact, he also had been trained that a hot bin could, in

5    fact, explode.

6         So with all this training that these plaintiffs have

7    and the experience that they have, what did they do on the day

8    of the explosion?

9         When they came back from lunch, they saw that, in

10   fact, that there was smoke in the bin.  They were aware that

11   there was smoke.  They also, in fact -- that's Mr. Schmidt's

12   testimony about the smoke, but everyone testified they came

13   back and they were aware, they saw the smoke.  And then they

14   also saw glowing embers.

15        And did -- did anybody from ConAgra -- did they tell

16   anybody about it from ConAgra about the embers?

17        No, not to their recollection, but they know that they

18   have glowing embers in there.

19        In fact, if you look at it, you look at Mr. Becker's

20   testimony, he says, you know, that they are, you know, that

21   they see this smoke, and they are -- and they are discussing

22   it, the five of them.  The five contractors that are out there

23   are discussing the fact that the situation is getting worse.

24   So the three plaintiffs, Mr. Flitsch, and Mr. Nanez are all

25   discussing the fact that the situation is getting worse.

1          In fact, they were also aware that gases were being

2     formed because the -- they had a four-gas detector down in the

3     tunnel, and the four-gas detector went off.  And so they are

4     aware not only of smoke but of increased gases.  In fact,

5     Mr. Schmidt even told Mr. Flitsch that, you know, from the top

6     of the bin, he is seeing increasing smoke.  And he says that it

7     was getting -- it was getting very thick, and he's recommending

8     that the fire department be called.  So he is aware of this.

9          Now, Mr. -- he's aware that this is -- there is this

10    increasing smoke and he -- but what does he do?  He continued

11    to work for another half hour to 45 minutes after this smoke is

12    increasing.  So he knows the situation is getting worse, he's

13    been trained on this, and yet he continues to work for another

14    half hour to 45 minutes.  Similarly, Mr. Becker recognized that

15    there was a potential danger with the bin, and he told

16    Mr. Flitsch that the -- that the -- that the fire department

17    should be called.

18          So with all of that knowledge, then Mr. Flitsch makes

19    the unfortunate decision to send those workers who have --

20    Mr. Becker and Mr. Jentz, who have successfully evacuated,

21    Mr. Flitsch makes the fateful decision to send them back into

22    that tunnel.  And those employees, at that time, had -- had

23    knowledge of the hazards.  They had been trained on it.  They

24    knew the potential consequences.  They knew that an explosion

25    was possible when there was a hot bin situation.  And yet in

1    the face of that open and obvious hazard, they decided to, in

2    fact, follow Mr. Flitsch's instructions and go back into the

3    bin -- or go back into the tunnel.  And that's when the

4    explosion occurred.

5          So I think that these facts when you look at the

6    training, experience, and their knowledge at the time, I

7    believe that -- that it is clear that, in fact, that these

8    plaintiffs did assume the risk, and that they -- in fact, we

9    cite to you that *Hastings* case, whether couched in terms of an

10   absence of duty or in terms of an assumption of risk, summary

11   judgment in favor of a -- in favor of a premises owner is

12   appropriate where the allegedly dangerous condition was known

13   and a plaintiff chose to encounter that -- encounter that

14   danger.

15         And I would submit to you, Judge, that that's exactly

16   what happened here.

17         *THE COURT:*  I'll incorporate by reference your

18   argument on assumption of risk in opposition to that, which is

19   the plaintiffs' motions for summary judgment that to the motion

20   of defense.

21         *MR. ORLET:*  Okay.  I'm -- got ahead of myself.  I'm

22   sorry.

23         *THE COURT:*  Clearly, there are different principles,

24   but your argument, I assume, is going to be the same.

25         *MR. ORLET:*  Yes.

1          Then, your Honor, there is the issue of raised about

2    Section 343 and 343A, which I would submit does not impose a

3    duty on ConAgra, given the facts in this case.  And we've set

4    forth the case law that we have supporting that proposition.  I

5    would -- I would, though, particularly point out to the Court

6    that gay nows versus Illinois power case, where the Court

7    observed that the defendant would have no reason to anticipate

8    that an experienced electrical contractor would fail to

9    appreciate and avoid the danger posed by electrical wires.

10         And I think that is exactly the situation we have

11   here.  We have experienced contractors brought in to remedy a

12   situation.  And there would be no reason that a company like

13   ConAgra, who hires the most experienced and the company with

14   the most expertise in the country, West Side, to come in and

15   remedy the situation, that ConAgra would have any reason to

16   anticipate that those employees then would not appreciate the

17   hazards and, using their training and their expertise, avoid

18   those hazards.

19         THE COURT:  Was Guanos [ph] the same case, the same

20   Illinois Power case, it was Dick Boyle or Karl Lee that held

21   that you can't instruct separately on nature, extent, and

22   duration.

23         MR. ORLET:  No, it wasn't.  I remember I was working

24   for them at the time.

25         THE COURT:  It was an Illinois Power case, though,

1   wasn't it?

2        MR. ORLET:  Yeah, it was, where they -- yeah, that was

3   -- no, it wasn't an *Illinois Power* case because that was a Dick

4   Boyle case, and Karl did Illinois Power stuff.

5        THE COURT:  Okay.  Well, you and I are talking about

6   the same thing, but it doesn't apply here.

7        MR. ORLET:  Yeah.  Yeah.  Right.  Right.  Right.  It

8   was with Dick Boyle.  One of the things that his career was

9   known for was changing that jury instruction.

10        THE COURT:  Right.

11        MR. ORLET:  And he would be very disappointed in me

12   not being able to come up with that famous case.

13        THE COURT:  Hickman versus some swimming pool company.

14        MR. ORLET:  I will come up with that case before the

15   day is over, I'm sure so...

16        THE COURT:  Okay.

17        MR. ORLET:  So -- but I do think that principle in the

18   *Guanos* case is -- is particularly applicable in this case.

19        We also have moved for judgment on the *res ipsa* count.

20   And, again, the issue there is whether there was exclusive

21   control, and I think as the facts that I've just gone through

22   demonstrate, that far from there being even a situation where,

23   you know, you are in the operating room, and there is the

24   nurses and doctors, and we don't know.  So you are not sure who

25   has exclusive control, so you will let all of them be brought

1    in on a *res ipsa* count, here it is clear who had the actual

2    control, the exclusive control, and it was the West Side crew.

3    And it was -- it was not the ConAgra.  And I think the facts

4    I've gone through demonstrate that.

5         So thank you, Judge.

6         *THE COURT:*  Thank you.

7         Mr. Durkin.

8         *MR. DURKIN:*  Mr. Taxman -- Mr. Taxman is going to

9    address this one, if that's okay, your Honor.

10        *THE COURT:*  Sure.

11        *MR. DURKIN:*  Thank you.

12        *THE COURT:*  I thought you were going to stand up, so I

13    assumed you wanted to speak.

14        *MR. DURKIN:*  No.  No, I wasn't, Judge.  Thank you.

15        *MR. TAXMAN:*  Good morning, Judge.

16        *THE COURT:*  Good morning.

17        *MR. TAXMAN:*  May it please the Court.  I may need to

18    use the ELMO also.

19        *THE COURT:*  Sure.

20        *MR. TAXMAN:*  I don't know if it is still on or not.

21        *THE COURT:*  Yes, it is on.

22        *MR. TAXMAN:*  Judge, I think you had asked counsel for

23    ConAgra to sort of summarize his legal theories of summary

24    judgment here.  And I want to start in response by just

25    breaking down our theories of negligence and discuss a little

1    bit about where the individual duties are derived from, and

2    then we can say why summary judgment is not appropriate.

3           But starting with 414, that's the section of the

4    restatement of torts that says where an entity, like ConAgra,

5    hires an independent contractor, like West Side, and retains

6    some control over the work, there is a duty to exercise that

7    control for the safety of the plaintiffs, as in this case.

8           Now, some control has been interpreted by a plethora

9    of different courts.  They look at all sections of the

10   restatement and all aspects of control.  But let's look as

11   broad as possible here and decide is there enough to impose a

12   duty.

13          And I think your Honor is familiar with the *Bacodei*

14   *[ph]* case.  We cited that in our materials, and I want to start

15   with that as a discussion point.  That was a case where the

16   Court granted summary judgment in favor of a defendant, said

17   there wasn't enough control.  It went up on appeal.  The

18   appellate court outlined all of the elements of control, what

19   you look at.  And the appellate court not only reversed, but

20   held as a matter of law that a duty existed.

21          And I feel that the same exists here.  And if you look

22   at, first, the conduct of ConAgra, and then the written

23   materials, which are the contracts, the safety materials, the

24   procedures, and the policies that West Side and A&J were

25   obligated to follow, that there could be no other decision than

1    there is a duty that exists from that control, and summary

2    judgment should be denied.

3         And we start with, did they have control, and what are

4    the operative details of the work?

5         And there are a lot of innocuous terms and -- in 414.

6    Operative details means method, sequence, and all of these

7    different things.  But from the most basic aspect of what these

8    guys were doing with the drills and the drill bits, you have

9    ConAgra providing the actual drill bits; took them to a site to

10   obtain them; directed them to where the drill bits were; had

11   ConAgra drills being used; had ConAgra employees literally

12   standing over these people, showing them how to drill this

13   crusted material, which is at the bottom of the bin, which is

14   one of the reasons we couldn't get the 400 tons of pellets out

15   of there.  So you have actual direction of the work right

16   there.

17        You have control of the work.  You have ConAgra's

18   absolute right, that everybody admits in this case, to stop the

19   work.  And that's really the touchstone element in control, is

20   the ability to stop the work, that ConAgra had here, that they

21   didn't exercise:  should have stopped the work, should have

22   called the fire department.

23        You have ConAgra safety policies and rules and

24   regulations.  And the courts are clear, that if the safety

25   regulations affect the means and methods of the work of the

1    contractors, as they did here, then that's evidence of control

2    as well.

3           The only case that Mr. Orlet mentioned was the zzz zzz

4    *Calderon* case, which is completely different from this case.

5    It is a group of roofers who are out doing roofing work, and

6    you have the superintendent from a general contractor coming by

7    once in a while to give orders or directions.

8           You don't have the constant presence like you do with

9    ConAgra here.  You have Sean Belcher, who is in control of this

10   mill and these elevators.  You have Allan Bindel over him.  You

11   have Godfrey Friedt in Omaha above the whole operation.  And

12   you have Anthony Yount, the safety man, who is also in control

13   of this project.

14          And that's where I want to go to the ELMO, if we

15   could, for a minute.  You saw some -- and this is a bad copy of

16   the cover, but this is NFPA 61, which is cited in our brief.

17   And you saw some terms from the Web site of West Side, as

18   Mr. Orlet showed on here, but you don't have a direct quote in

19   the law, which is -- which is what this is, on this standard.

20   I hope you can see that.  But Anthony Yount is a member of

21   the --

22          *THE COURT:*  You can make it larger by -- down on the

23   bottom, there's a --

24          *MR. TAXMAN:*  Plus sign.

25          *THE COURT:*  Yeah.  A plus sign, yeah.

1          *MR. TAXMAN:*  I have to get my son up here to operate

2     the technical things.

3          *THE COURT:*  There you go.

4          *MR. TAXMAN:*  All right.  So Anthony Yount, he is a

5     member of this committee, this technical committee.  He's

6     actually charged under the law with the responsibility here.

7     You are not going to see that in anything, any Web site, any

8     testimony.  But he has got the responsibility to protect the

9     lives and health of the people working around this bin, and to

10    prevent explosion hazards.  That's the most definitive

11    statement on who is an expert and who isn't, and even

12    Mr. Shroeder, the retained witness of ConAgra, admits that.

13         But all I want to point out for the Court, to defeat

14    the summary judgment here -- and I would ask your Honor to rule

15    now, as a matter of law, that ConAgra had enough control to

16    certainly impose a duty, and I believe that duty was breached.

17    But we have every possible indicia of control.

18         And the best argument that ConAgra is going to be able

19    to make, to say don't hold us responsible under 414, is they

20    are going to say, Your Honor, we did nothing.  We didn't do

21    anything.  With all of the control we had, we decided to do

22    nothing but let this thing sit.  And that's not a basis for

23    escaping liability, that's a basis for imposing liability.

24    They have to act with this -- with this authority that they had

25    and the control that they had.

1          The reason why I started with the discussion of the

2    different duties and where they are derived from, you can't

3    assume the -- you cannot have an open and obvious condition

4    that bars their duty to exercise their authority.  Open and

5    obvious applies to premises cases, and that's because that duty

6    is derived from the condition of the land.  So if the condition

7    of the land is open and obvious, the law says an -- a land

8    owner doesn't have to warn a plaintiff or protect a plaintiff

9    against that kind of condition.

10          The law says you go a step further.  Is there an

11   exception to this bar, to the duty of open and obvious?  And we

12   look at distraction and we look at deliberate encounter, which

13   is the *LaFever* case.  *LaFever* is deliberate encounter.  The Ward

14   versus Kmart is distraction.

15          Whether we have to get into distraction or not in this

16   case, we have put some discussion in our brief.  It is a

17   deliberate encounter.  It is 100 percent a deliberate encounter

18   case, like *LaFever*.  It's like Mr. LaFever was asked to empty a

19   dumpster he had.  In order to do so, he had to cross a slippery

20   substance to get his job done.  And the law says where the

21   landowner, like ConAgra, creates the hazard and the employee

22   has to encounter that hazard to do the job, they are not going

23   to bar the duty.  They are not going to -- they are still going

24   to require ConAgra to protect the plaintiff, as in this case.

25          So under -- under the premises case, the condition of

1    the premises, the bin and the contents of that bin were created

2    by ConAgra.  And not only created by ConAgra, but from

3    March 12th of 2010 to April 27th of 2010, the day of the

4    explosion, they maintained control over all this material, and

5    between March 12th of 2010 and April 19th of 2010, that's the

6    day that the folks show up to take the stuff out, they don't

7    share any of the material, any of the e-mails that you, your

8    Honor, have the benefit of seeing, and we have the benefit of

9    seeing through discovery.

10        But all the information about the pellets on fire,

11   about the fire spreading, about the smoke and the burning

12   getting worse than ever, about the need to get this stuff out

13   of here as soon as possible, none of that stuff was shared with

14   any of the people from West Side, my client, Mr. Becker, or

15   AJ -- A&J, Mr. Jentz and Mr. Schmidt's employers.  And that's

16   another reason.

17        And I'm jumping around, trying to make all the pegs

18   fit together.  But you also have the orientation.  You have got

19   these folks from West Side and A&J as a captive audience in the

20   office at the scale house.  And Sean Belcher, who is running

21   that facility, who is in charge of this mill, has got an

22   opportunity to tell these guys everything:  train them,

23   educate them, give them the rules.

24        And he takes about 15 minutes, does a very cursory

25   review, doesn't share any of this information with these folks,

1    and doesn't educate them on the evacuation plans, emergency

2    plans, and all of the other things that he has an opportunity

3    to share with these folks.  But it is also, I mean, more

4    evidence of the control that ConAgra has over these workers.

5           So there is no doubt that this record, at the very

6    least, creates a question of fact where summary judgment should

7    be denied as to 414.  I submit that a finding as a matter of

8    law that there was enough control to impose that duty.

9           Under 343, and I think you -- in zzz gay nows, I think

10   *Guanos* came before 343A.  After Guanos versus Illinois Power,

11   you have the different exceptions to -- *Guanos* says open and

12   obvious you loose.  That was 343.  343A says there are

13   exceptions to that.  You have got distraction, which comes from

14   Ward versus Kmart.  You have got the deliberate encounter,

15   which comes under *LaFever*.

16          But in any event, the condition of this property and

17   how long it had been existent and how it festered and grew,

18   which is written and recorded in all these e-mails, something

19   that wasn't shared by ConAgra.  And they have a duty to tell

20   these folks what's going on and how bad the situation is.  And

21   all the experts have said that by not addressing it right away,

22   as Ron Sumner said, it should have been done on that Saturday,

23   March 13th 2010, when he was there, made this condition worse

24   and made this explosion more likely.

25          So the premises case is -- is vital.  There should be

1    no summary judgment on that.  There is question of fact on

2    comparative negligence, but we have a motion for summary

3    judgment on that.  But if you want me to argue that aspect of

4    it now, I can.

5         *THE COURT:*  Your chances of winning that are slim.  If

6    you want me to say 0 percent of comparative fault as a matter

7    of law, not one-tenth of one-thousandth of a percent.

8         *MR. TAXMAN:*  Which is why --

9         *THE COURT:*  I'm not afraid to do anything with a

10   lifetime appointment, but... neither am I stupid.

11        *MR. TAXMAN:*  Which is why I -- we are trying to give

12   you the facts straight here.  We know their best argument is

13   comparative.  It is not summary judgment on 343A.  It is not

14   summary judgment on 414.  And it certainly isn't also on *res*

15   *ipsa*.  And there is -- there is, at best, a joint control over

16   the instrumentalities here.

17        The grain bin itself wasn't cleaned for, if you look

18   at the evidence most favorable to us, under Rule 56, for 17

19   years.  If you look at the evidence even most favorable to

20   them, you can't get a clean bin -- find evidence of it being

21   cleaned within five years, and the material festered in this

22   conditions created by them.  So there is a joint control over

23   the instrumentality and it certainly was -- the probable cause

24   of this explosion was something that ConAgra could clearly

25   foresee would cause injury to these parties.

1          And the case that's instructive both on 414 and *res
2    ipsa* is the <u>McGuire versus Turner</u> case.  And in that case, you
3    have got a plaintiff's employer that built a scaffold that
4    collapses.  And they built it that day, earlier in the morning
5    or the afternoon, and both Turner, the general, and the
6    entities involved with inspecting that scaffold were deemed to
7    be joint managers, or joint control, of that scaffold.  And
8    this was only going on for a day.

9          Here you have got ConAgra, who is in control of this
10   thing for years leading up to the problem, certainly the five
11   weeks where the thing is festering, they don't share with
12   anybody, and, clearly, the five days where the -- the folks are
13   working on it.  And the worst part about it is the control
14   that -- the worst part of the facts in this case, which led to
15   these injuries, is the control they had for the five hours,
16   from 11:00 in the morning until 4:00 in the explosion, where
17   calls are frantic.

18         Calls are going back and forth between Friedt, who is
19   in Chester, and Anthony Yount, the fella listed in the
20   standard, about how everybody is anxious.  This thing is
21   getting worse.  It's deteriorating.  The situation is getting
22   worse.  And there is a huge concern for this thing.  Three
23   phone calls going forth, instead of going to the fire
24   department, calling from Chester to corporate.  And they're
25   doing nothing.  Nothing.  Letting the condition sit.

1          It should have never come to the point where Mel

2    Flitsch told these guys to go back into the tunnel.  The bin

3    should have been buttoned up, and they should have stopped in

4    that five hours, let alone earlier in the week, and they

5    didn't.  And ConAgra's own expert, the retained witness Robert

6    Shroeder says Yount should have exercised that authority that

7    he had and buttoned this bin up, and nobody ever goes -- gets

8    to be sent back in.

9          I guess the last thing I want to say, unless your

10   Honor has any other questions on the specific areas of

11   negligence, in this particular summary judgment motion is -- is

12   when Justin Becker and John Jentz are sent back into this

13   tunnel, you know, there has to be a little bit of context put

14   into that, in adjudicating that.

15         Everything is going, spiraled out of control.  You

16   have got the end of the five weeks, the five hours, and,

17   finally, somebody's on the phone, Friedt, talking to the fire

18   department.  But he's talking to Lockheed, at his place of

19   business at that point.  This isn't the 911 call.  We just got

20   the tapes, by the way.  Deb Katenberger *[ph]* called 911.  She

21   is the one that actually got the ball running to get people

22   responding to this situation.

23         But now, really, all hell's broken loose at this

24   point, and you have got Mel Flitsch, who sends these guys back

25   in to clear a path for the fire department.  So what they're

1    doing more is now in a state of, you know, after everything

2    they've been through, go back and make it easier for the fire

3    department to address this thing, and that's when,

4    unfortunately, the explosion occurs.

5              But it should have never got to that point.  It should

6    have been addressed on March 13th 2010.  Ron Sumner said, I'll

7    be out there in a heartbeat.  We will be on the first thing

8    burning, and we will get the stuff out of there.  And they just

9    let it fester.  And the ticking resulted in the explosion.

10             So summary judgment is not appropriate on any of those

11   theories.  And if your Honor has any questions on anything

12   else, I'll be happy to answer.

13             THE COURT:  Nope.  Nope.

14             Other plaintiffs?

15             MR. DUNN:  Good morning, again, just really briefly.

16   I wanted to touch upon Mr. Orlet's comments about Mr. Jentz's

17   knowledge about the potential for explosion.

18             And I'll just point out on Page 82 of his deposition.

19             THE COURT:  You are making me dizzy.

20             MR. DUNN:  There you go, sorry.

21        "Q.  When you would go to a hot bin did you believe that

22        there was a risk you could suffer burn injuries?

23        "A.  No.

24        "Q.  When you would go on any of those hot bin jobs for

25        A&J, did you believe there was a risk that an explosion

1       *could occur?*

2       "A.  No."

3       Further on Page 82 it is toward the bottom.

4       *"Q.  So until your injuries on the incident of*

5       *April 2010 that was the first time that you came to*

6       *realize that a hot bin situation could result in severe*

7       *burns and explosion?"*

8       Carries to the next page.

9       *"A.  Yes."*

10      I'll point out in their motion, ConAgra cites to Pages 154

11      to 156 to support the claim that Mr. Jentz was aware of a

12      potential for explosion on the day of the explosion.  On

13      Page 154 of his deposition he is asked by Mr. Mueller, attorney

14      for ConAgra.

15      *"Q.  What was your first indication, how did you learn*

16      *that there was a possible danger in that bin on that*

17      *day?"*

18      And then once we go through the friendly exchange by the

19      guys at the dep, on Page 155 his answer on Line 17 and 18 was

20      unequivocal.

21      *"A.  I never understood there was a danger in the bin."*

22      So for Mr. Orlet's to say that he did understand that, we

23      strongly disagree.  And we think that the evidence is to the

24      contrary.  We certainly agree with all Mr. Taxman's statements

25      to the Court, except for ConAgra's motion as it relates to

1    Mr. Jentz's.  We adopt them in total.  We ask that the motion

2    be denied.

3            THE COURT:  Why don't we take a 15 minute break and

4    give the court reporter a little rest.  Start up at 10:45.

5                            (Recess)

6            THE COURT:  Okay.  In Document 189 ConAgra moves for

7    summary judgment against all plaintiffs on the counts of res

8    ipsa, negligence, consortium, and premises liability.  For

9    reasons I will outline in a written order, that motion will be

10   denied.

11           I find that there are sufficient facts in dispute when

12   this case is viewed in the light most favorable to plaintiffs

13   that the motion ought not be granted.

14           My notes are 13 pages long, and rather than rule from

15   the bench I would rather tell you what the ruling is and get

16   you a written order soon on it.

17           I left the rest of my file.  Give me a minute.

18                            (Respite)

19           THE COURT:  Okay.  Next motion is Document 191.  It's

20   defendant, cross-claim defendant, third-party defendant,

21   cross-claim plaintiff, West Side Salvage's motion to exclude

22   certain opinions of plaintiffs Jentz and Schmidt's expert

23   William Field; to exclude certain opinions of expert Michael

24   Schulz which is Doc. 214; to exclude certain opinions of all

25   plaintiff expert Russell Ogle Document 220; and to exclude

1    certain opinions of ConAgra's expert Dr. Schroeder.

2            Mr. Moore.

3            *MR. MOORE:*  Thank you, your Honor.

4            May it please the Court.

5            *THE COURT:*  Mr. Moore.

6            *MR. MOORE:*  Your Honor, I will take these up in the

7    order that you called them off.  If I heard you correctly.

8    Starting with the *Daubert* motion on Professor Field.  There is

9    a couple of opinions at issue we think should be excluded.

10           One, Dr. Field opines that West Side Salvage should

11   have backed away or brought in external assistance from the

12   fire department once it realized that the situation had gotten

13   out of hand.  We think that this opinion should be excluded

14   because there is no qualification for -- or, Professor Field is

15   not qualified to state this opinion.  There is nothing in his

16   background, his professional experience, to suggest that he is

17   an expert in salvage operations.

18           And in order for him to make this opinion he would

19   need to be able to observe and interpret the same conditions

20   that he claims West Side Salvage should have interpreted as

21   being out of control.  But he cannot do this because he

22   admittedly is not a fire expert.

23           And I would direct your attention to the portion of

24   his deposition testimony -- it is actually set forth on Page 7

25   of my motion.  It is actually emphasized in bold -- where he

1    says, "but, you know, their job was to salvage and I don't

2    fault them for that."

3         He's also critical of Melvin Flitsch's decision to

4    send plaintiffs Jentz and plaintiff Becker back into the

5    tunnel.  And as I set forth in the motion, it is somewhat

6    unclear whether and to what extent he is actually critical

7    because he actually states in pertinent part on Page 248 Line 6

8    through 17; I have no criticism against Mr. Flitsch, I think

9    the time if any of us had been there we've got stuff burning,

10   it was a little bit chaotic and he makes a decision.

11        THE COURT:  Before he said that he answered "yes" to

12   the question about criticism of Melvin Flitsch and his decision

13   to send Jentz and Becker back into the tunnel to retrieve

14   tools.  And then he says "yes".  And then he said:  I have no

15   criticism of Mr. Flitsch.

16        MR. MOORE:  Right.  That's why it is somewhat unclear

17   as to whether and to what extent he is critical.  But our

18   position is, to the extent he is critical it should be

19   excluded; he is not a fire expert or a salvage expert.  There

20   is no foundation that he can make that sort of opinion.  So

21   that's -- those are the reasons that we think that those two

22   opinions offered by Professor Fields should be excluded.  I

23   would refer you to the written submission.

24        Do you want to take up the next one?

25        THE COURT:  Sure.  Why don't we do all the Dauberts at

1    the same time.

2            MR. MOORE:  Are we on Schulz?  Is that the one.

3            THE COURT:  Yes.  Field first, then Schulz, then Ogle.

4    But you can go out of order.

5            MR. MOORE:  I'll just go in your order.

6            Similar type argument.  Here we are dealing with two

7    opinions that Mr. Schultz is offering.

8            First, he says that West Side failed to recognize the

9    job at ConAgra on March 13th when my client first observed and

10   went out and looked at the situation.  He says that they failed

11   to recognize at that time that this was a fire suppression job

12   as opposed to just a salvage job.  He also opines that West

13   Side Salvage failed to ask questions and request information

14   from ConAgra that would have put it in a position to know that

15   it was not qualified, that the job was too big or beyond it's

16   pay grade.

17           Similar to Professor Field, Michael Schulz is not

18   qualified to make these decisions.  There is nothing in his

19   report, nothing in his CV, there is nothing in his professional

20   background that suggests that he has any salvage experience

21   much less expertise.  He admittedly has never worked in the

22   salvage industry.  He doesn't hold himself out as having

23   knowledge of salvage operations.  In fact, he actually in his

24   deposition admits that he lacks the requisite experience and

25   qualifications to render this opinion.  He says, "I'm not

1   offering that as an opinion, I guess I'm just making an

2   observation".  And just for the record that's on Page 268,

3   pages 15 through 25; and then 269, 1 through 7.  Our position

4   is that this unqualified observation does not rise to the level

5   of testimony and therefore should be excluded.

6          The other opinion that West Side Salvage failed to ask

7   questions and request information from ConAgra that would have

8   put it in a position to know that it was not qualified.  As

9   I've set forth in the motion, it should be excluded because it

10  is not relevant; it is not going to assist the jury in

11  determining any issue in this case.

12         He doesn't -- Mr. Schulz does not blame West Side

13  Salvage for causing or contributing to cause the explosion.  He

14  places all that on ConAgra.  But he's claiming that West Side

15  Salvage shouldn't have been at the facility in the first place

16  because it didn't ask the questions and find out information to

17  put it in a position to know that the job was beyond it.

18         But that doesn't -- that's a totally different issue.

19  It goes to whether and what extent West Side Salvage was

20  negligent once it arrived on the premises.  And what I meant to

21  say is that's different than the issue of whether and to what

22  extent West Side Salvage was negligent once it arrived on the

23  premises.  Mr. Schulz's opinion goes to whether West Side

24  should have even been on the premises.  But the operative

25  allegations and claims in this case are based on what West Side

1   Salvage did once it arrived on the scene.  So for those reasons

2   those two opinions should be excluded.

3        If you have any questions just please stop me;

4   otherwise, I'll move on to the next one.

5        *THE COURT:*  Next is Ogle Doc. 214.

6        *MR. MOORE:*  Yes, your Honor.

7        We are dealing with two opinions once again.  The

8   first opinion is that West Side Salvage failed to follow

9   accepted practices for fighting a grain bin fire.  This opinion

10  has to be excluded because Mr. Ogle is not qualified.  Nothing

11  in his report, his professional profile, suggests that he has

12  any experience much less expertise fighting fires or engaging

13  in fire fighting.  To the contrary, his own deposition

14  testimony confirms that he is not an expert in that area.  He

15  has no publications.  He even admitted that if he had been

16  called on March 12th like my client had been called by ConAgra,

17  he and his team would not be qualified to consult with ConAgra

18  regarding how to handle that hot bin.  He would actually defer

19  to a company like West Side Salvage is what he said.

20       He also attempts to offer an opinion about Melvin

21  Flitsch's decision to send the guys back in the tunnel.  This

22  goes to Melvin Flitsch's state of mind and he says, quote, I

23  can't address that.  I think it is pure speculation for him to

24  delve into the mind of Melvin Flitsch and offer an opinion to

25  go in there; especially given the fact that he has no

1    experience or expertise in the area of fire fighting.  And

2    that's all I have.

3            On all these I'm being brief and deferring to and

4    resting on what we've already submitted.  I'm just kind of

5    hitting the high points.

6            THE COURT:  Sure.

7            MR. MOORE:  And finally, with regard to Robert

8    Schroeder.  Robert Schroeder is ConAgra's liability expert.  He

9    is a fire and explosion expert; he is not a salvage expert.

10   And he offers some opinions on various things that we are

11   seeking to exclude.  The first one would be the opinion that

12   West Side Salvage took control of the -- and maintained control

13   of the facility.  This is essentially tantamount to a legal

14   opinion being offered by a cause and origin expert.  We don't

15   think it is an appropriate opinion for this kind of an expert

16   to be offering in this case.

17           THE COURT:  Let me kind of parse this.  You agree that

18   experts can give opinion on the ultimate issue, but in this

19   case your position is he is giving a position on a legal issue.

20           MR. MOORE:  He is.

21           THE COURT:  Can that be cured with a cautionary

22   instruction that the jury can't consider this as a legal

23   opinion?

24           MR. MOORE:  I think given the issue, no.  He's

25   stepping outside of his expertise to say that West Side Salvage

1    had control of the facility.  And I think that that's an

2    important issue in the case and something for which there is no

3    foundation that he can state that opinion.

4           THE COURT:  All right.

5           MR. MOORE:  He also offers some other opinions.

6    Namely, the -- you know, that West Side Salvage didn't have the

7    right tools, training, et cetera to deal with the situation.

8    But like the other experts we've talked about there's no

9    showing that Dr. Schroeder has any experience much less

10   expertise in the area of salvage.  And for that reason the

11   opinions regarding not having the right tools, the right

12   equipment, or plan of action are without an adequate factual

13   foundation.

14          Dr. Schroeder is not an expert in fire fighting and

15   therefore to the extent that any of his opinions are criticisms

16   of West Side Salvage for the way that it fought a fire or dealt

17   with a fire, those opinions should be excluded for lack of

18   foundation.

19          There's a couple of other opinions that I talk about

20   in the motion.  One was where he says that the actions -- and

21   I'm paraphrasing -- but the actions of West Side Salvage

22   essentially lit the fuse.  We think that that's an

23   inappropriate and prejudicial characterization of the situation

24   and will do nothing but inflame the jury, and we think that

25   that should be excluded.

1             And finally, kind of in line with the other issues we

2    have had with similar opinions on the experts that we've

3    discussed, is the criticism of Dr. Schroeder about Melvin

4    Flitsch sending the guys back in.  It amounts to speculation

5    and it is beyond his qualifications and expertise.

6             *THE COURT:*  Thank you.

7             *MR. MOORE:*  Thank you.

8             *THE COURT:*  Mr. Durkin.

9             *MR. DURKIN:*  Yes, Judge.  Your Honor, I'll just

10   address as brief as I can the opinions -- the motion as it

11   relates to Professor Field and Dr. Ogle.  You know, at the

12   outset, Judge, I want to say that, you know, there is a -- West

13   Side what they've done in this case is they've adopted

14   basically all the opinions of our experts except the ones that

15   are critical of West Side.

16            *THE COURT:*  Including West Side's own expert.

17            *MR. DURKIN:*  Yeah.

18            *THE COURT:*  That's lawyering.  That's lawyering.

19            *MR. DURKIN:*  West Side has somehow made -- they don't

20   have a liability expert.  They're using Dr. Ogle and Professor

21   Field, okay.

22            *MR. MOORE:*  That's not true.

23            *THE COURT:*  They're keeping the cost down.

24            *MR. MOORE:*  We have named people as expert witnesses.

25            *MR. DURKIN:*  Oh, right.  Internal people, Judge.

1    Retained outside experts -- I agree with Mr. Moore.

2         MR. MOORE:  We have named your same experts.

3         MR. DURKIN:  I understand that.  They've retained --

4    they've basically named our experts as their experts and

5    parceled it down into, okay, these are very qualified people

6    that we are going to rely on to make our case in court for the

7    issues that are before the jury.  But the ones that we don't

8    like, the opinions we don't like, we are asking you, the Court,

9    to exclude that.  I want to bring that up.

10        And even, with all due respect, when the summary

11   judgment for West Side was argued earlier they asked you to

12   consider, consider the testimony of Dr. Ogle and Professor

13   Field as to their characterization of what Mr. Flitsch did,

14   okay, earlier this morning.  Which is -- now they're trying to

15   exclude what is their characterization of it.  Because I think

16   if I -- I think what he said was they testified it wasn't

17   intentional.  You know, Mr. Flitsch didn't intend for them to

18   get hurt when he went in there and that's how they used it in

19   support of that.

20        Briefly with Dr. Field I can't find -- there are very

21   few people that would be more qualified to testify to the

22   issues in this case.  He is a -- 30 years has consulted in

23   businesses about safety, injury prevention involving grain

24   bins.  He's one of the only people in the United States who

25   keeps data bases on incidents involving grain bins.

1          He has served on the USDA task force to explore causes

2     of grain dust explosions and grain storage and handling

3     facilities.  He is the primary editor of *Farm Rescue:*

4     *Responding to Incidents and Emergencies in Agricultural*

5     *Settings*.  He has been involved in training over 15,000

6     emergency first responders on responding to agricultural

7     incidents involving farm fires, grain bins, grain bin

8     entrapment, and chemical spills.

9          There was confusion in that answer and I think you

10    have to take into context the way it was.  He clearly was

11    highly critical of West Side for their supervisor Mr. Flitsch

12    sending back Mr. Jentz regarding the tools.  And I think if you

13    go to another paragraph in that -- Page 249 of Dr. Fields' --

14    of Professor Fields' deposition he says in response to a

15    question by Mr. Moore -- or Mr. Schulz, I forget which one, but

16    it says, "In your report you say that Mr. Flitsch's decision

17    exhibited a complete disregard for the safety and health of the

18    employees including Mr. Jentz?  ANSWER:  I stand by that.  It

19    is the decision that reflected the disregard.  But he himself

20    that may have been the only thing that came into his mind is I

21    get this equipment down there or something.  He just makes that

22    decision."

23          Now I don't think there is any equivocation about what

24    his opinion was.  Whatever -- I don't know how that statement

25    be brought up.  It is in his report and several times in his

1    deposition.  He is highly critical in that regard.

2         As to Dr. Ogle, again another adopted expert by West

3    Side, he specializes in scientific investigation of prevention

4    of fires and explosions.  He has taken courses and is learned

5    on emergency evacuation.  He is a certified safety

6    professional.  Obviously a chemical engineer.  Published

7    numerous articles:  Explosion safety, emergency evacuation and

8    risk assessment.  Okay.

9         If you really look, he's a guy that went out there and

10   spent weeks -- right at the beginning of this he went out and

11   spent -- him and his staff went out weeks going through the

12   whole site looking at all the -- examining the site.  He's

13   issued a extensive report that has mostly been adopted.  But he

14   talks about opinions or consequences of physical actions or

15   inactions how they affect the development of a fire which was

16   going on from March 12th up to the date and the subsequent

17   explosion and that's at his deposition Page 41.

18        He has -- most things there, Judge, I would say he

19   also received OSHA training in emergency response.  But he has

20   also taught and spoken about fire explosion safety and risk

21   assessment.  And that's what he has to offer in this case.

22        Most of the other matters, Judge, are included in our

23   briefs, so, I'll leave it at that unless you have any

24   questions.

25             *THE COURT:*  I don't.  Thank you.

 1          *MR. DURKIN:*  Okay.

 2          *THE COURT:*  Mr. Taxman.

 3          *MR. TAXMAN:*  Yes, sir.  Briefly, your Honor, Michael

 4   Schulz is an expert in fire and explosion analysis.  He did

 5   that in this case.  A couple opinions dealing with the

 6   defendant ConAgra was the fact that this was treated as a

 7   salvage operation and not a fire suppression operation.  And

 8   similarly, as Mr. Durkin stated, West Side adopted Michael

 9   Schulz, all his opinions, all logical extensions of his

10   opinions, and data, et cetera.

11          And they are likewise trying to bar two corollary

12   opinions to the one I just stated.  In cross I believe it was

13   Mr. Mueller who asked Mr. Schulz should West Side have asked

14   some more questions and requested more information.  And that's

15   how that opinion was elicited against West Side in the case.

16          In addition, through cross examination if not by

17   Mr. Mueller but by Mr. Moore himself, the other opinion about

18   whether West Side should have recognized this as a suppression

19   operation versus a salvage operation came out.  Putting in the

20   context of *Daubert*, your Honor, as the gate keeper.  Do you

21   keep that opinion out, is it reliable, is it based on proper

22   scientific data and sufficient information?  While it's within

23   the context of the whole case, it is corollary to the opinion

24   and the events leading up to the explosion.  So I just submit,

25   likewise, you can't sort of pick and choose which opinions come

1    in.  And it's within Mr. Schulz's analysis of the case and his

2    expertise specifically on the analysis of this explosion and

3    this fire.

4         *THE COURT:*  Okay.  I'm going to get you a written

5    order on this also.  But the ruling will be the *Daubert* motion

6    as to William Field, Doc. 191, is denied; as to Michael Schulz

7    Doc. 197 is denied; as to Russell Ogle, Doc. 214 is denied; as

8    to Robert Schroeder, Doc. 220, it is granted in part and denied

9    in part.

10        It is granted to the extent that in opinion eight

11   Mr. Schroeder uses the phrase, quote, light the fuse.  I think

12   that's argumentive.  I think it suggests colloquially that

13   there was an affirmative step taken by West Side to cause the

14   explosion and because of that that terminology can't be used.

15   I'm not suggesting that there can't be testimony by this expert

16   in his opinion West Side permitted to set into motion a series

17   of facts, et cetera.  But the phrase "light the fuse" is

18   argumentive and prejudicial.

19        Similarly, with respect to opinion ten unconscionable

20   act.  I don't think that is appropriate.  I don't know of any

21   jury instruction that's going to use that.  I think there is

22   terminology he can use to indicate his opinion as to what

23   caused this accident.  But determining one act is more

24   unconscionable than another I think is an inappropriate

25   comparison, and using terminology that is not going to be used

 1   before the jury.  So I'm going to get you something in writing

 2   on that also.

 3          Okay.  Doc. 192 is the plaintiff's motion for partial

 4   summary judgment as to the reasonableness and necessity of

 5   incurred medical expenses.

 6          The defense have not filed a response.  Is there any

 7   argument by the defense?

 8          *MR. ORLET:*  No, your Honor.

 9          *THE COURT:*  That motion will be granted.  Without

10   objection.

11          That was easy.

12          *MR. DURKIN:*  Judge, I had a long argument planned for

13   that one.  I'm sorry.

14          *THE COURT:*  Well, do you want to talk yourself out of

15   my ruling?  Go ahead.

16          *MR. DURKIN:*  No, Judge.

17          I'm just being funny.

18          *THE COURT:*  Somebody told me once to be careful what

19   you ask for, and I learned that the hard way.

20          Okay.  Doc. 193.  Defendant ConAgra moves for summary

21   judgment on plaintiff's claims for punitive damages.  Which

22   would be Count 3 of John Jentz's Fourth Amended Complaint; and

23   Counts 9 and 10 of Justin and Amber Becker's Fifth Amended

24   Complaint; and Count 3 of Robert Schmidt's First Amended

25   Complaint.

1        Mr. Orlet.

2        *MR. ORLET:*  Your Honor, I would just incorporate by

3   reference some of the earlier arguments that I made about the

4   expertise of West Side in the case.

5        The basis for punitive damages against ConAgra by the

6   plaintiffs I think can reasonably be broken down into two sets

7   of circumstances.  One is the conduct of ConAgra in the weeks

8   leading up to the start of the job.  And then, secondly, the

9   events during the job, particularly on the day of the

10  explosion.

11       And I think that if you -- and that's how I propose to

12  address them sort of globally.  The issue is whether ConAgra

13  acted with willful disregard of the plaintiffs' safety for its

14  actions in those first few weeks.  And the plaintiffs in their

15  papers make much of the information that ConAgra allegedly had

16  and the e-mails that went back and forth that use the term

17  fire, and the claim that somehow information was withheld from

18  the contractors during that time frame.

19       And I think that there are a couple of important

20  points to be made on that.  First of all, you know ConAgra did

21  go out and eventually hire the most reputable company in the

22  country to deal with this.  And could it have done things

23  differently?  Could it have taken perhaps different steps

24  during those six weeks to deal with this?  You know the law is

25  that there has to be a willful disregard.  And that a finding

1   of willful and wanton conduct is not just when someone ignores

2   -- if somebody ignores a known and plainly observable dangerous

3   condition that would be one basis for willful conduct.

4        But in this case what happened?  The day that ConAgra

5   employee noticed the smell and brought it to his supervisor's

6   attention, ConAgra reached out to these experts.  That day.

7   And within 24 hours, in fact less than that, West Side was on

8   the scene.  So ConAgra certainly did not ignore this dangerous

9   condition.  In fact, they didn't know what it was.  They didn't

10   know the danger of the condition.  They knew it was abnormal

11   and they acted.

12        So for instance the case Madena versus City of Chicago

13   that's cited in our papers talks about that.  If you ignore a

14   known and dangerous condition and I submit that ConAgra's

15   actions in getting the leading experts in the country out there

16   within a day shows it did not ignore this information -- this

17   condition.

18        The other thing, though, that they make much over, the

19   e-mails that go back and forth.  And whether ConAgra was taking

20   temperatures and passing that information on and what was the

21   information that was going to West Side during this -- these

22   six weeks.  And I think it's very important that that be put

23   into context of whether that had any effect on what was going

24   on.

25        We cite some law in our papers that says that it has

1     to be there has to be -- there has to be some relationship

2     between the conduct and the loss before you can rely on that

3     conduct to form the basis for punitive damages.  And here the

4     plaintiffs' own expert, Dr. Ogle, you know, he says now all

5     this information, you know -- he's saying, well, ConAgra was

6     taking these temperature readings and sometimes they might have

7     been passing it on, there were telephone calls occasionally,

8     but the information was not logged and it was not communicated

9     systemically to West Side and, therefore -- you know, therefore

10    this showed this wanton disregard.  Dr. Ogle says that in his

11    deposition.  He says, talking about you know the --

12         *MR. ORLET:*  The zoom button.

13         *THE COURT:*  There you go.

14         *MR. ORLET:*  So Ogle is being asked about the

15    temperatures during this time frame March 20th through April --

16    or March 12th through April 20th.  And he says:  That does not

17    mean that the history of how we got to that point is

18    irrelevant.  The period between March 20 and April -- or

19    March 12th and April 20th matters.  "It just may be that it

20    doesn't matter once you start removing the pellets and looking

21    at instantaneous data and hourly data to give you an idea of

22    what's happening inside."

23         And the reason for that, he testifies a few pages

24    earlier, is that the conditions in the bin when they're taking

25    this material out -- maybe let me just give you just one idea

1   of what's going on here so that -- we have got 120-foot bin.

2   And so roughly I guess 12 stories.  And when they first get

3   there -- when the crew first gets there.  I believe it's

4   Mr. Schmidt tries to see how full it is.  And I believe it goes

5   down 30 feet.  He measures down 30 feet to the top of it.  So

6   there's roughly nine -- 90 feet of material in there.

7        And so they're working for eight days.  And during

8   that time they've got it down -- they measure it right the day

9   of the accident, they got it down to its about 10 feet of

10  material left.  And so what Ogle is talking about here is the

11  conditions are changing so much as you are taking that material

12  out, because there is this hot spot somewhere in there.  And

13  when you are taking material out, you are enabling more oxygen

14  to get to that hot spot and feed it and have it grow.  And so

15  he's -- so that's why, you know -- that's why he is saying it

16  might have been useful to have that information.  But once you

17  start taking the material out, you know, he says the conditions

18  are fluctuating like the Dow Jones Industrial Average.  So all

19  that other information is of little -- is -- well, he says -- I

20  mean, he says:  It just maybe doesn't matter once you start

21  removing pellets and looking at instantaneous data or hourly

22  data.  Because the conditions are changing.

23        So to say that the conduct during those six weeks of

24  not providing them the information, and not, you know, telling

25  them exactly what's going on, that that somehow rises to a

1   level of willful conduct I think is not reasonable since it

2   doesn't have -- even if that were somehow -- somehow -- you

3   know, willful conduct, it doesn't relate to what actually

4   happened out there by their expert's own conduct *[sic]*.

5       The other thing I would say when you are looking at

6   the reasonableness of ConAgra's conduct is that they're own

7   experts testify that there is no standard protocol for how you

8   deal with these things.  And so again they want to -- they want

9   ConAgra to have all this to have all this expertise and

10  knowledge in how to handle one of these and do all the things

11  right when their own experts say every one of these is

12  different and there's no standard protocol in how you do this.

13      So ConAgra acted reasonably in bringing out the people

14  who are supposed to know the most about it.  And relying on

15  them to be able to take over and operate safely.

16      Then when you look at what happened on the day of the

17  incident, they fault ConAgra for not calling out the fire

18  department fast enough.  And they criticize Mr. Friedt and

19  people -- Mr. Yount who is out in Omaha for not ordering the

20  fire department be called.

21      First of all, when you hire someone, an expert, to

22  come in, who has done this more than anybody else, it is

23  reasonable that you rely on that expert to be able to do the

24  job the proper way.  And that's what they were doing.  They

25  were following the advise of these people and letting them do

1    the job as they saw appropriate.  Mr. Flitsch asked Mr. Friedt

2    of ConAgra, well -- on the day of the incident, the day of the

3    explosion he says, Can we have the fire department come out and

4    consult.  That's the term that Mr. Flitsch used.  He asked them

5    to come out and -- he wanted them to come out and consult.

6         Mr. Friedt of ConAgra calls the fire chief and says,

7    Would you come out and consult.  And fire chief says, If I come

8    out I bring everything.  And so Mr. Friedt reports that back to

9    Mr. Flitsch, and Mr. Flitsch says okay.  So ConAgra has done

10   exactly what it was asked by Mr. Flitsch.  And Mr. Flitsch goes

11   back to work.  And, in fact, they go off to lunch.  That's how

12   concerned they are.  So, you know, there's no sense of urgency

13   by Mr. Flitsch at that point.  In fact, they go to lunch.

14        And so -- and then the testimony is when

15   Mr. Flitsch --

16        THE COURT:  The counter argument is that's utter

17   disregard.  Why are they eating lunch when things are going to

18   hell in a hand basket.

19        MR. ORLET:  They're the ones who know the conditions

20   in the bin and ConAgra doesn't.  And yet they're going to

21   lunch.  And so ConAgra people are supposed to think, well, wait

22   a minute?  These people, these crew members, these contractors,

23   apparently don't have much concern because they're going to

24   lunch.  And so we're supposed to have concerns when the people,

25   the experts, don't have concerns?

1          So that's the fallacy of the argument that they're

2     making is we're supposed to have all this concern and we're

3     supposed to be making decisions in Omaha, or the folks at

4     the -- Mr. Friedt is supposed to be making these decisions

5     about telling these two crews what to do and whether we should

6     be calling the fire department when they're the ones -- the

7     contractors are the ones taking the material out, seeing what's

8     going on.  And so we're relying on them to know how to do their

9     job.

10          That does not rise to a level of willful and wanton

11    behavior.  And the testimony is in the afternoon when

12    Mr. Flitsch finally becomes concerned and he comes to Friedt

13    and says we need to -- we need you to call the fire department,

14    Friedt does.  So there's -- so the bottom line is, on the day

15    of the incident the things that ConAgra is asked to do, they

16    do.  They do what the experts asked of them.  They otherwise

17    rely on them.  And how that can be construed to be willful and

18    wanton conduct I just don't believe that the law in the Seventh

19    Circuit and in the State of Illinois permit it under those

20    circumstances.

21          Thank you.

22          *THE COURT:*  Mr. Durkin.

23          *MR. DURKIN:*  Yes, your Honor.

24          Your Honor, there were a lot of -- the law was

25    discussed by my colleague Colin Dunn before when the West Side

1     motion was addressed.  I don't want to regurgitate those

2     things.  And also I think when Mr. Taxman argued a lot of the

3     negligence claims, he talked about the inactions and actions

4     that took place in the hours and days before this.  But I do

5     want to point on out a couple things as to, you know, Mr. Jentz

6     and they're kind of characterizing Mr. Jentz and Mr. Schmidt as

7     West Side, but they are bin whip operators.  One of them stands

8     on top of the bin and operates this whip that is a fiberglass

9     type whip that just breaks apart the material.  Okay.  And

10    that's all they do; they're bin whip operators.

11            But I think what they say, they say they did the

12    responsible thing when they noticed that there was a

13    quote-unquote fire on April 12th by calling West Side.  Well,

14    they forgot to mention what occurred then.  You know.  When

15    Mr. Sumner came out there on that Saturday, he was in Louisiana

16    I think or down south coming from a job.  And he said, Listen I

17    can come by and take a look at it for you.  And he did on that

18    Saturday.  Mr. Sumner, From West Side.  And he said, You have a

19    ticking time bomb on your hands; we can have our crew out here

20    to help you Monday.  And it was agreed.  It was agreed that

21    West Side would come out two days later, on Monday, to take

22    care of this ticking time bomb.  Well, Mr. Sumner took off.

23    And phone calls were not returned.  And there was some

24    conversation with Mr. Sumner that, oh, it is getting a little

25    better.

 1          But, in fact, what was happening was they were trying

 2     to get another bid, a cheaper bid.  And that's what really was

 3     the issue at that stage.  And that took several weeks because

 4     they started trying to get a bid from a company named Southern

 5     Illinois Salvage.  And of course it turned out that under their

 6     corporate policy they didn't have the requisite liability

 7     insurance to the point where the e-mails start going about

 8     April 1st, in Exhibit 10, from Mr. Friedt -- who is a national

 9     corporate officer in charge of all elevator operations.  "It is

10     really urgent.  We have pellets on fire in a bin and using

11     these guys to get them out."

12          What happened was, of course, West Side they have

13     limited crews and their crews were now engaged by the time they

14     decided that they needed them back.  And so I wanted to put

15     that in context.

16          Also, Judge, they talk about there's no standard

17     protocol.  One thing that is the standard protocol that I think

18     everyone has stated in here:  When you have a fire in the bin

19     you call the fire department.  Okay.  And that's really one

20     of -- the crux of the cases against ConAgra because besides

21     those e-mails, several e-mails saying we have urgency, we have

22     a fire, we have a problem, we have a number of employees from

23     ConAgra who have given testimony -- I've referenced them in the

24     brief.  And some of those, I'll give you a couple of the

25     namings.  Kevin Herring 33 years an employee at that plant;

1    Rodney Garris 34 years at that plant; Allan Weibrecht 36 years

2    working at that plant; and Richard Lohman 36 years.  That's 137

3    years.  This is a -- it's a larger plant but there is not that

4    many employees out there.  But these are some of the core

5    employees that have been there since the '70s.  They know what

6    a problem is.  Okay.  And I'll just point out Mr. Weibrecht.

7    Mr. Weibrecht is an elevator operator.

8           And, your Honor, can I switch over to the computer?

9    Is it okay?

10          THE COURT:  Sure.

11          MR. DURKIN:  Would you mind if I just walk over here?

12          THE COURT:  As terms of protocol, you can walk and

13   stand on your head as long as I can hear you.  And that's the

14   same rule during trial.

15          MR. DURKIN:  I can't stand on my head to save my life.

16   But you can always hear me, that's for sure.

17          Okay.  All right.  So Mr. Weibrecht is a employee.

18          THE COURT:  Can everybody see that?

19      (Playing video deposition excerpts via ELMO system)

20     "Q.  How long have you worked for ConAgra?

21     "A.  It will be 36 years in October.

22     "Q.  Have you worked any other facilities besides the

23   Chester facility?

24     "A.  No."

25   Continuing.

1  "Q.  Did you ever talk to Mr. Friedt about this

2  situation?

3  "A.  One time he was in my office in Elevator B and I

4  had said something to him that I was concerned about

5  that bin and that it might blow up, and he said that was

6  just my opinion.

7  "Q.  When did that conversation happen?

8  "A.  Approximately the same time as when I talked to

9  Allan Bindel.

10  "Q.  So before West Side was out there?

11  "A.  Right.

12  "Q.  Did you believe that Mr. Friedt was not fully

13  appreciating the danger of the situation?

14  "A.  I think Mr. Friedt wasn't concerned about any

15  opinion we had.

16  "Q.  You believe he wasn't listening to you, the guys

17  that were actually on the ground there?

18  "A.  He would not listen."

19  He continues.

20  "Q.  Did you ever hear of that from anybody that they

21  believed that the fire department wouldn't have made a

22  difference?

23  "A.  No.  I didn't hear anybody would really tell me

24  they didn't think the fire department would make a

25  difference.  What I did hear I guess they said -- one of

1        *the three apparently said I guess it wasn't really none*

2        *of their business.*

3        *"Q.  It wasn't the fire department's business?*

4        *"A.  Right.*

5        *"Q.  When were they trying what?*

6        *"A.  I guess they were trying to keep it in-house and*

7        *trying to take care of it their self.*

8        *"Q.  Is it fair to say if it was up to you, you would*

9        *have the fire department out there on March 12th?*

10       *"A.  Yes.*

11       *"Q.  And do you believe that not taking care of the*

12       *situation as soon as possible was something that risked*

13       *the safety of yourself and all the other folks that were*

14       *working out there?*

15       *"A.  Yes."*

16       One last one from Mr. Weibrecht.

17       *"Q.  And does it appear from you sitting here today that*

18       *whoever made the decision to seek out other bids was*

19       *putting money ahead of safety?*

20       *"A.  Yes."*

21           *MR. DURKIN:*  Judge, they didn't want the fire

22       department out there because the fire department would take

23       over.  They would have evacuated probably the whole building.

24       These are folks, I'm not going to play the others.  Maybe I

25       will summarize them a little bit.  These are folks that are

1    actually working in Bin 15.  They're afraid for their own

2    safety from March 12th to the day of the occurrence.  Even when

3    they are in areas outside of where these two bin whip operators

4    were allowed to go that didn't have the knowledge they did of

5    these conditions, these temperatures, and these 137 years of

6    experience of working for those four individuals.

7          Mr. Herring had worked there since '79.  He spoke to

8    both Godfrey Friedt and Allan Bindel and was rebuffed.  He

9    would -- he said it was dangerous.  He was told not to call the

10   fire department, at Page 43 of his deposition, he wanted to.

11   He, at Page 76, felt like money was coming before safety by the

12   actions of Mr. Friedt.  He said, at Page 77, he felt like

13   indirectly he was going to be punished if he called the fire

14   department.  And he was in fear of his job, at Page 78, if he

15   went around the supervisor's back and called the fire

16   department.  And he says at Page 88 that he believed this was

17   not a simple mistake it was a reckless act by ConAgra.

18         Mr. Rodney Garris 14 years -- 34 years there,

19   maintenance lead man.  This gentleman, at Page 27, was so

20   concerned about his safety he took a vacation to get away from

21   this, when he talked to these folks.  He took a vacation, an

22   extra week vacation to get away from this.

23         Then you have got Mr. Lohman who, again, been there

24   since March 20th of 1978.  He spoke to Mr. Friedt.  Well here,

25   I think this is an important one to hear is Mr. Lohman about

1    his conversation with Mr. Friedt.

2         *(Playing video deposition excerpts via ELMO system)*

3         *"Q.  Can you pinpoint for me when in that time frame you*

4    *would have told Mr. Friedt directly that you wanted the*

5    *fire department called out?  And I don't need an exact*

6    *date, but can you tell me closer toward that March 12th*

7    *date, is it closer to the date of the explosion or --*

8    *"A.  I think it was about two weeks before the*

9    *explosion, I think.  Because he was down there checking*

10   *it all on out.  And like I said, me and him we had words*

11   *through the whole time down there.  And I asked him that*

12   *one time, I said, 'What would you do, say, if a school*

13   *bus drove by here, a 72-passenger school bus or just*

14   *that charter bus, and it exploded?  Well, that's just*

15   *your opinion.  And I said, now, how in the heck would*

16   *you explain to these parents that you knew this was*

17   *going on this whole time and you didn't want to do*

18   *nothing.  He said, We got people in Omaha that is*

19   *experienced because we had one in Mexico that caught on*

20   *fire and it never exploded so they know what they're*

21   *doing.'*

22   *"Q.  Let me ask you, when you had this conversation with*

23   *Mr. Friedt was the -- was his company West Side that was*

24   *brought in, were they on site yet?*

25   *"A.  Yeah, they were there.*

1          *"Q.   They were there when you were having this*
2          *conversation with him?*
3          *"A.   Yep -- well, let me rephrase that.   I think one of*
4          *them was or in there.   Because me and him got into it*
5          *and I told him, I said, 'Let's step in the back room'.*
6          *And me and him went at it.   And I told him you have got*
7          *to get somebody down here before somebody gets hurt bad.*
8          *And that's -- he just acted like he didn't care if*
9          *anybody got hurt.   He didn't care.   You are just a*
10         *number in a book."*
11              *MR. DURKIN:*   Judge, I won't play any more, but as you
12      can see there are several pages we cited he was told to keep it
13      hush hush, the whole situation; that's at Page 49.   He said
14      that during that time frame he stopped and bought roses every
15      night for his wife because he was afraid it was going to be the
16      last time that he came back home from work.   And that's cited
17      in there.
18              This is in our view raises -- is -- we think it
19      certainly raises to the standard that we've talked about before
20      in terms of that.
21              Judge, just a couple other things.   They talked about
22      the delay and about I think the temperatures.   I think what
23      Mr -- what Dr. Ogle said in his deposition, I think what he
24      said was that the delay -- this is at Page 137 and 139 and also
25      at Page 19 and 20 of his report which was Exhibit 5.   And he

1    said the delay increased the hazard, increased the

2    possibility -- the probability of explosion because with each

3    passing day the smoldering wave in the bin is getting larger in

4    terms of its surface area.  And therefore the hazards are

5    increasing.  And this goes for March 12th.

6              He testified that the fire department should have been

7    called to the facility shortly after ConAgra discovered the

8    problem in the bin -- this is Professor Field now -- in the bin

9    in March, and had that been done the fire department would have

10   evacuated everyone from the site including the plaintiffs had

11   they been there so it could assess and address the situation.

12   That's Field deposition at Page 197 to 202; and his report

13   Exhibit 7 at Page 5 and 6.

14             Judge, I think the evidence is at this stage we have

15   met our burden to proceed to the trier of fact on this issue.

16   Unless you have any questions, Judge, I'm done.

17             *THE COURT:*  No.  I don't.

18             Pursuant to Rule 56 the defendant ConAgra has moved

19   for summary judgment on plaintiffs' claims for punitive damages

20   which, as I indicated, Count 3 of John Jentz's Fourth Amended

21   Complaint; Counts 9 and 10 of Justine and Amber Becker's Fifth

22   Amended Complaint; and Count 3 of the Robert Schmidt's First

23   Amended Complaint.

24             As I indicated, with respect to Doc. 188, whether

25   punitive damages can be awarded for a particular case is a

1    question of law, but whether a defendant's conduct was

2    sufficiently willful or wanton to justify the imposition of

3    those damages is a question of fact for the jury to decide.

4              That's Medow v. Flavin, 782 N.E.2d 733, 746 (Ill. App.

5    2002), citing Schmidt v. Ameritech Illinois, 768 N.E.2d 303

6    (2002), and Cirrincione v. Johnson, 703 N.E.2d 67 (Ill. 1998).

7              In the Gambino decision, Illinois law disfavors the

8    award of punitive damages.  And Gambino is 922 N.E.2d 384, 423.

9              In this case on this issue ConAgra submits that on the

10   same date it noticed a potential issue with the grain bin, they

11   contacted and subsequently retained West Side Salvage, Inc, a

12   company that publicly advertised it's expertise in "hot bins"

13   more frequently than any other contractor and with better

14   expertise than anyone else in the United States.

15             Moreover, according to ConAgra, it was West Side along

16   with its subcontractor A&J Bin Cleaning that were exclusively

17   in control of Bin C15 on the day of the explosion and that

18   created with no advice or assistance from ConAgra the

19   assistance that ultimately lead to the explosion.

20             ConAgra submits that it relayed all information

21   requested by West Side; allowed West Side to go about its work

22   without interference; and relied upon West Side's experience

23   and expertise in handling hot bins and bin fires.

24             In short, ConAgra asserts that it acted with due care

25   to address the hot bin and it's conduct falls short of willful

1   and wanton standard necessary to impose punitive damages.

2        Plaintiffs respond that the evidence in this case

3   demonstrates that ConAgra acted with conscious disregard for

4   the safety and rights of others by wasting time and trying to

5   save money by putting business ahead of safety.  Which is

6   admittedly reckless.  For example, according to plaintiffs,

7   Godfrey Friedt, ConAgra's director of elevator operations,

8   delayed addressing the condition of the bin and attempted to

9   exercise, quote, good business practices, closed quote, by

10  shopping around for a cheaper salvage company.

11       After West Side and executive vice president, Ron

12  Sumner, called trying to confirm that West Side was starting

13  the job and that call initially went unanswered, Friedt called

14  Sumner on March 14th 2010 which is two days after the initial

15  report of a burning odor coming from one of the grain storage

16  bins and claimed that the conditions in the bin were improving

17  and that ConAgra would, quote, hold off, closed quote, and West

18  Side should not mobilized.

19       According to plaintiffs there was evidence shows the

20  contrary, that the conditions at Bin C15 had not changed and

21  the smoke and burning smell were still the same on March 16th.

22  Friedt sought other quotes from another company, Southern

23  Illinois Salvage, which would have cleaned Bin C15 for a

24  cheaper price, could not secure the insurance requirements that

25  ConAgra demanded.  Accord to plaintiffs, Friedt also sought out

1    a buyer for the pellets in C15 as ConAgra planned to sell the

2    salvage pellets.  Plaintiff contend that this delay shows that

3    instead of immediately abating a known safety issue ConAgra put

4    business ahead of safety and recklessly allowed the problem to

5    sit.

6         Plaintiffs assert that ConAgra was supposed to

7    institute a 24-hour fire watch where employees were to monitor

8    the temperature of Bin C15 and record the temperatures every

9    hour, but instead monitored on a hit-and-miss basis, producing

10   only one page from a day of temperature readings.

11        Plaintiffs submit that ConAgra's employees were afraid

12   the bin would explode and recorded fire in the bin, and

13   repeatedly asked ConAgra to call the fire department.

14        Friedt and Sumner agreed on a start date of April 20th

15   which was more than a month after the burning smell was

16   originally detected.  According to plaintiffs, ConAgra

17   willfully withheld information from West Side regarding the

18   worsening condition of the bin and did not inform West Side of

19   the prior -- of the fire prior to its arrival on the site prior

20   to April 19th.

21        Plaintiffs further assert ConAgra did not want to call

22   the fire department to fight the fire because the fire

23   department's efforts to douse the pellets with water would not

24   only injure the bin structurally but would contaminate the

25   pellets inside.  And ConAgra would not be able to sell any of

1    the pellets.  And, in addition, would relinquish control to the

2    fire department.

3            Plaintiffs submit that the most egregious act by

4    ConAgra after a five-week series of alleged egregious acts was

5    the five-hour delay calling the fire department when beginning

6    at ten or 11:00 a.m. Friedt made several calls to the ConAgra

7    corporate office in Omaha expressing increasing anxiety

8    regarding the state of the bin.  Friedt called Omaha again

9    about an hour later; and a third time about an hour after that.

10           Plaintiffs submit that what causes this to rise to the

11   level of willful and recklessness and conscious disregard for

12   the safety of the plaintiffs is the length of time it took

13   ConAgra to act when it had specific knowledge that there was no

14   greater hazard in the grain-handling industry than fires and

15   explosion.  The fire department was called around 4:00 p.m. but

16   no order was issued to sound the alarm or evacuate.

17           Plaintiffs submit the bin exploded while ConAgra was

18   on the phone with the fire department.

19           I note parenthetically -- and this also goes back to

20   Doc. 188, which I did not mention -- that in addition to the

21   requirement that I recognize that Illinois law disfavors the

22   award of punitive damages, there are four other reasons why

23   this Court looks at motion for award of punitive damages with

24   the somewhat jaundice eye.  First, is that sometimes plaintiffs

25   counsel use punitive damages to interject heat or aggravating

1    circumstances or rhetoric into a case;

2            Second, they're able to introduce evidence not

3    otherwise admissible had there not been a punitive damages

4    claims;

5            Third, punitive damage claims can set up conflicts

6    between counsel and their client's counsel and the insured --

7    insureds and insurers;

8            And lastly, sometimes punitive damages are used to

9    enhance compensatory damages.

10           In this case, it is my view that the plaintiffs have

11   not used any of those methods, but instead the facts in this

12   case support, uniquely, a claim for punitive damages.  And so

13   Document 193 is denied.

14           Okay.

15           Next we have dock 196 and 218.  Plaintiff Jentz and

16   Schmidt and plaintiff Justin and Amber Becker move for partial

17   summary judgment as to defendants' affirmative defense of

18   contributory fault.

19           *MR. BADGLEY:*  Your Honor, based upon the Court's

20   previous comments would stand on the pleadings.

21           *THE COURT:*  You had to ask him to say that.  So you

22   could go back and report to your supervisor whoever it is:

23   Badgely blew this one.  I didn't even argue it.

24           *MR. DURKIN:*  We didn't lose that one, but Brad.  We

25   are joking, your Honor.  We have no response.

1          *THE COURT:*  Mr. Taxman?

2          *MR. TAXMAN:*  I'll stand on my argument.

3          *THE COURT:*  And I take it seriously, I really do.  And

4    I've read everything and I'm going to rule in detail.  I just

5    think saying there is no chance of any comparative fault is --

6    I look at this the same way I at the *Kotecki* deal here.  I

7    think a jury is going to say, hey, there was a contract here

8    and I think there is a *Kotecki* waiver.  But that's me.  I'm not

9    the decider, that's the jury's decision.

10         Here I don't think they will hit your people for

11   comparative fault, but they might.  And a reasonable jury

12   could.  And so I think it is a jury question.

13         Anybody want to say anything?

14         *MR. ORLET:*  No, your Honor.

15         *THE COURT:*  Mr. Moore?

16         *MR. MOORE:*  No.

17         *THE COURT:*  The Court declines the invitation to find

18   as a matter of law that there is no comparative fault in this

19   case as to Justin Becker derivatively Amber Becker or plaintiff

20   Jentz and Schmidt.

21         Under section 2116 of the Code of Civil Procedure 735

22   ILCS 5/2, a plaintiff is barred when his or her contributory

23   negligence is more than 50 percent of the proximate cause of an

24   injury or damages for which recover is sought.  That's Merca v.

25   Rhodes, *960 N.E.2d 85, 95-96 (Ill.App.Ct. 2011),* citing Hobart

1    v. Shin, 705 N.E.2d 907 (Ill. 1998).  A plaintiff is

2    contributorily negligent when he or she acts without a degree

3    of care that a reasonably prudent person would use for his or

4    her own safety under like circumstance and that action is the

5    proximate cause for his or her injuries or death.

6            Generally the issue of contributory negligence is a

7    question of fact for the jury, but it does become a question of

8    law, quote, when all reasonable minds would agree that the

9    evidence and the reasonable inferences therefrom viewed in the

10   light most favorable to the non-moving party so overwhelmingly

11   favors the movant that no contrary verdict based on that

12   evidence could ever stand."  That's Coole v. Central Area

13   Recycling, 893 N.E.2d 303, 309 (Ill.App.Ct. 2008), citing

14   Basham, 773 N.E.2d at 1226.

15           In this case for the reasons alleged in the briefing

16   of the defendants as well as the arguments made by counsel with

17   respect to the assumption of the risk argument which was

18   rejected by the Court, the Court believes that the issue of

19   comparative fault as to the plaintiffs in this case is uniquely

20   suited for the jury.  And so Documents 196 -- Doc. 196 and 218

21   are denied.

22           Okay Doc. 195.

23           Under Rule 56 and 12(c) West Side moves for summary

24   judgment and judgment on the pleadings on third-party claims

25   and cross-claims asserted by ConAgra for common law indemnity

1   and breach of contract.  And we have had some argument under

2   the initial argument earlier this morning.

3          Mr. Moore.

4          *MR. MOORE:*  And I -- some of the arguments do overlap

5   especially with regard to the contract and I won't regurgitate

6   what we have already said.  But may it please the Court.

7          *THE COURT:*  Let me ask you this:  Can I decide this

8   unless and until a jury determines there was a contract?

9          *MR. MOORE:*  I think you can because there is another

10  argument we are making.

11         *THE COURT:*  Okay.

12         *MR. MOORE:*  We're -- ConAgra is making several claims

13  via its cross-claims and third-party complaint against my

14  client.

15         We are moving for summary judgment on two of them.

16  One is the common law indemnification claim.  And, briefly,

17  what is common law indemnification?  Under Illinois law in

18  order to prevail on a claim for common law indemnity a

19  plaintiff must show two things.  One, a pretort relationship

20  between the indemnitor and indemnitee.  Classic examples of

21  this are employer/employee, owner and lessee, master and

22  servant.  It's where the employer is liable solely by virtue of

23  its relationship with the employee so the liability is

24  completely derivative.  The second requirement is that the

25  indemnitee was held derivatively liable for the acts of the

1    indemnitor.  Applying the indemnity seeks to shift the entire

2    liability for loss from a party compelled to pay through no

3    fault of its own to a party actually at fault.  And as I

4    mentioned the liability must be wholly derivative resulting

5    solely out of the agent or employee in the indemnitee's

6    actions.

7              And going back to the pretort relationship requirement

8    it should also be noted that a common undertaking is not

9    enough.  There must be a distinction between conduct of the two

10   parties.  The basis for our motion which was actually

11   characterized as a motion for judgment on the pleadings is that

12   West Side Salvage is entitled to judgment because there is no

13   allegation of a pretort relationship that gives rise to a claim

14   for common law indemnity.  There is no allegation of an

15   employment relationship.  There's no allegation of a

16   relationship based on tenancy or lease.  There's no allegation

17   of agency.  Essentially ConAgra alleges or refers to a special

18   relationship.  And we don't think that's enough.  There is no

19   allegation that they recognized pretort relationship.

20             Now ConAgra claims -- well, let me just address some

21   of ConAgra's claims.  Contrary to ConAgra's contention, West

22   Side Salvage is not denying the existence of any relationship

23   preexplosion because, yeah, there was a time on March 13th

24   where we went out and looked at the bin.

25             We are just denying the existence of a special

1    relationship that would constitute a pretort relationship for

2    purpose of common law indemnity.

3         ConAgra relies and points to the existence of a

4    contract.  But for the reasons that I've already stated earlier

5    today, your Honor, we dispute the existence of a valid,

6    enforceable, written contract until nearly a month after the

7    accident.  There was no contract in place that was signed by

8    the parties until at least May 25th, May 26th 2010.

9         They also raise this quasi contract argument.  And my

10   response to that is that there was no contemplation of an owner

11   contracted relationship in early March.  There is no support

12   for the argument that there was actually a relationship formed

13   at that time.

14        There was -- and even once the relationship was formed

15   the contract, the written contract, is what distinguishes

16   between the type of conduct between the two parties.  Earlier I

17   mentioned how the conduct has to be distinct.  And the contract

18   establishing that ConAgra is the owner and we are the

19   contractor is what delineates that.

20        So for that reason we would move for judgment on the

21   pleadings.  This is not a case where ConAgra was merely a

22   blameless party liable only for the acts of its employee, it's

23   agent, it's indemnitee.  There is no allegation, much less

24   negligence, of a pretort relationship that gives rise to a

25   claim for common law indemnity.

1          *THE COURT:*  What about a claim that there was a

2     master/servant relationship here?  That ConAgra was a master,

3     you were the servant, and the right to excise control wouldn't

4     that be a pretort?

5          *MR. MOORE:*  At what point in time?

6          *THE COURT:*  Well that's another.  My second question

7     how long does this relationship have to occur before we call it

8     pretort?  I don't see any cases that give us a time line, a

9     day, a week, a month, an hour.

10         *MR. MOORE:*  There is no delineation or distinction

11    between the owner/contractor rule until the contract is signed.

12    When we went out -- if we are talking about in early March or

13    mid March when we went out there.  After looking at the bin and

14    after advising ConAgra that they had a ticking time bomb on

15    their hands, we were essentially waiting.  We, as in my client,

16    were waiting for ConAgra to form that relationship.  There was

17    no relationship formed.

18         And I would just point to the fact that they have not

19    alleged or pointed to any recognizable pretort relationship

20    that the cases discuss.

21         *THE COURT:*  What about this -- forget about the

22    contract, that's in play with the jury.

23         What about implied indemnity or common law

24    indemnification and that requires pretort relationship, there

25    is no question about it.  What about the argument that you had

1    this pretort relationship when you went out the 19th of April,

2    that that's when the relationship started because whether there

3    was a contract or not you voluntarily undertook to start the

4    work.  Is that a sufficient pretort relationship?

5         *MR. MOORE:*  Our position on that was it was a common

6    undertaking, and a common undertaking does not suffice for a

7    pretort relationship as defined in the cases.  It was nothing

8    but a common undertaking unless and until the contract was in

9    place which delineated you know owner slash contractor and

10   independent contractor.

11        We were essentially called in to address and to remove

12   some pellets, but it was merely a common undertaking.

13        *THE COURT:*  Okay.

14        *MR. MOORE:*  Moving on -- unless you have any more

15   questions I'm going to move on to the next claim in which we

16   are seeking judgment; and that would be the breach of contract

17   claim.  The first part of my argument is that the work order

18   contract was not in place at the time of the accident.  We have

19   talked about already today.  And I would in large part just

20   refer to and incorporate the arguments previously made on that.

21   But just a couple of thing I would just point out:  Again there

22   was no contract in place at the time of the accident because

23   the contract was not signed by the parties until about a month

24   after the accident.  It is undisputed that the work order

25   contract at issue in this case was not signed by the parties

1   until May 25th, May 26th.

2          The deposition testimony of Kathy Rihanek who is the

3   contract administrator for ConAgra sent the work order contract

4   to West Side Salvage on May 25th because she did not have one.

5   ConAgra did not have a contract at that time.  Hence her

6   sending it to West Side Salvage for execution.

7          Moreover, in Kathy's deposition she confirmed that she

8   had never received this partially executed work order contract

9   form by Ken Langham who, by the way, testified in his

10  deposition that he didn't have authority to enter into any sort

11  of contract.  He signed it, put it aside, with the intention of

12  having his superiors look at it before ever sending it back,

13  and it never got sent back.  Ken Langham didn't bind West Side

14  to anything.  ConAgra never had that document; that's why Kathy

15  sent us that one on May 25th to sign it, it was a prerequisite.

16         I mentioned the *Bloomington* case in my papers, and I

17  would respectfully refer the Court's attention to that case and

18  contend that the facts of this case fall squarely within the

19  holding of *Bloomington*.

20         I would also point out that it is undisputed the fully

21  executed contract was a condition precedent as ConAgra told

22  West Side Salvage it would not pay West Side Salvage for the

23  work unless and until ConAgra had a signed work order contract.

24  And that's why Gene Schwers, the president of the company, sent

25  it back a month after the accident on May 26th.

1          In their briefing ConAgra cites a couple of cases to

2     dispute the idea that a contract has to be signed by both

3     parties.  There is the *Fields* case and the Hua.  I don't know

4     if I'm pronouncing that correctly.  I mentioned this earlier.

5     *Fields* is an Iowa case -- it is a federal case interpreting

6     Iowa law.  *Hua* is a federal case interpreting California law.

7     We contend that neither of these cases is applicable to the

8     issue of the Court here; under Illinois you have to have both

9     parties sign the contract.

10          ConAgra also makes the point that West Side Salvage

11    acted as if it considered the contract to be in place as early

12    as April 19th 2010.  This just simply isn't true.  As I

13    mentioned, Ken Langham didn't have any authority to enter into

14    that contract, that's why he set it aside with the intention of

15    having his superiors look at it.  In his deposition Mr. Langham

16    stated he didn't understand the terms of the contract and he

17    never returned it to ConAgra.  He had no authority to do so.

18          And finally on that issue, they make a point about us

19    sending it to OSHA post-accident.  I don't think that whether

20    and when we sent this partially executed contract to OSHA has

21    any bearing whatsoever on the formation of the contract in the

22    case at hand.  That's just simply a copy of the contract which,

23    you know, on its face looks the same but for the fact that it's

24    not executed.

25          And then finally, your Honor, on this point, this idea

1    that perhaps the contract was formed or the offer was accepted

2    by West Side Salvage arriving in Chester at the ConAgra

3    facility and commencing the work.

4         And I believe I state this earlier, I'll just

5    reiterate it.  Even assuming for argument purposes that West

6    Side Salvage accepted ConAgra's offer to come and remove these

7    pellets from the bin, there is no meeting of the minds as to

8    the specific terms, provisions, and conditions set forth in

9    that work order contract.  That work order contract simply

10   says:  Scope of work, remove pellets.  And then, as you know,

11   it's got several provisions in there; including the disputed

12   indemnity provision.  There is no testimony, there is no

13   evidence, in this case that anyone from West Side Salvage had

14   seen, contemplated, much less agreed, to any of those

15   boilerplate terms; including the provision in that contract.

16   So even if you want to say that West Side Salvage formed some

17   kind of contract by arriving on the scene on April 19th, there

18   was no agreement as to indemnity.

19        THE COURT:  I understand your argument.  My question

20   was:  What were your people doing?

21        MR. MOORE:  Removing pellets from the bin.

22        THE COURT:  What were they going to get in return?

23        MR. MOORE:  My client and ConAgra had agreed they were

24   going to be out there on the 20th and they were going to do it

25   for a price certain.

1          THE COURT:  Okay.

2          MR. MOORE:  But I mean --

3          THE COURT:  And that's all.

4          MR. MOORE:  -- beyond that, they certainly did not

5   discuss indemnity.

6          THE COURT:  We know they didn't because if they did,

7   when you signed that contract in March you would have scratched

8   out the indemnity and we wouldn't be here.  I bet you wish that

9   would have been sent to you.

10          I don't expect an answer.

11          I understand.

12          MR. MOORE:  And, your Honor, if you don't have any

13   further questions I'll move to my last.

14          THE COURT:  I do.  On this common law.  Forget about

15   the contract.  Common law indemnification what does that get

16   ConAgra; does it shift everything to you even if ConAgra is

17   negligent?

18          MR. MOORE:  Yeah.  I think it is just another basis

19   for shifting the entire responsibility.  As I think your Honor

20   even said it earlier, you can have express or contractual

21   indemnity, you can have implied indemnity, and this is just

22   another theory for indemnity, so yes.  And it would in effect

23   shift the entire responsibility to us.

24          And if you look at the cases in which common law

25   indemnity has been found, the classic example is the

1    employer/employee.  It is when the employer is liable solely by

2    virtue of the fact that he is derivatively liable for the acts

3    of the agents.  That's not the situation here.  We have heard

4    several instances of negligent acts and omissions by ConAgra

5    that are separate and independent from those of West Side

6    Salvage.  This is not a situation for which there would be a

7    common law indemnity claim.

8         *THE COURT:*  Let's take this situation.  Let's say the

9    jury comes back on the case where the plaintiff can sue you

10   directly, you are not the employer.  And the jury says you are

11   24 percent at fault, right; and ConAgra is 76 percent at fault.

12   Are you going to be able to shift everything back to you if

13   there is common law indemnity?

14        *MR. MOORE:*  It would seem to be the case.

15        *THE COURT:*  Okay.

16        Your next argument.

17        *MR. MOORE:*  The final argument, your Honor, is that

18   even if we want to assume for argument purposes that the

19   contract existed between parties, the indemnity claim -- the

20   contractual, the express indemnity claim fails as a matter of

21   law because as set forth in the papers I've submitted, and as

22   in the *Cooper* case, the contractual -- a contractual indemnity

23   provision premised on the act or omissions of indemnitee will

24   reasonably be read as the one for contribution.  In the *Cooper*

25   case that's discussed, and my briefing goes through that.  And

1    like to *Cooper* case the indemnity provision at issue in this

2    case is premised on the contractor.  So West Side Salvage

3    contribution for liability on account of the contractor's acts

4    and omissions.

5         So therefore the indemnity provision in this case

6    provides not for indemnity that shifts the entire loss to West

7    Side, but rather for contractual contribution.  And under

8    Illinois law that's how it's read.

9         *THE COURT:*  But I just asked you that question in

10   advance --

11        *MR. MOORE:*  And I just realized you asked me that

12   question.

13        *THE COURT:*  I don't know that you are inconsistent

14   because you have plaintiffs working for you and plaintiffs not

15   working for you.  Maybe as to one it all gets shifted but the

16   other it's not.

17        Boy, the instructions are going to be a mess.

18        *MR. MOORE:*  As I was speaking I realized that was

19   somewhat related to the question you just asked me.

20        *THE COURT:*  I wasn't smart enough to set you up,

21   frankly, I just got lucky.  But I think your answer is -- I

22   think your answer still could be correct.  As to one of the

23   plaintiffs it is full shifting; as to one it is not.  I don't

24   know.

25        It is interesting, which is why I'm going to take this

1    one under advisement even though I haven't heard from you.

2         *MR. MOORE:*  I would respectfully rest and refer the

3    Court to the materials already submit.

4         *THE COURT:*  Okay.

5         *MR. MOORE:*  Thank you, your Honor.

6         *THE COURT:*  Mr. Orlet.

7         *MR. ORLET:*  Just briefly, your Honor.

8         I understand the Court's ruling that it is a question

9    of fact for the jury as to whether a contractor applies.  I

10   would point your Honor, though, to -- there is a case in our

11   papers that talks about a contract, subcontractor where there

12   was not a contract and there was found to be a sufficient

13   pretort relationship.

14        Let me give you the cite on that.  I just had it --

15        *THE COURT:*  *Carlton at the Lake*?

16        *MR. ORLET:*  Yeah.

17        *THE COURT:*  Yeah.

18        *MR. ORLET:*  The other thing so I think that -- well,

19   first of all, I think there is a contract.  I'm not going to go

20   back and reargue that.  But I do think and we have cited in our

21   papers that, you know, they signed the contract.  They're

22   trying to make some argument that because it didn't make it

23   back to ConAgra that there wasn't a contract.  You know, we

24   sent them a contract.  They signed it.  That's classic offer

25   and acceptance.  And there's no requirement for there to be

1    acceptance that you have to then return it, that I'm aware of.

2    I've never seen anything like that.  So I think under straight

3    contract law we've made an offer, they've accepted it.  And so

4    therefore there is a contract.

5            Even if that isn't the case, we do cite the cases in

6    our papers that say that, that you can bind yourself to a

7    contract by your course of conduct.  And that's *the Landmark*

8    case that we cite in there.

9            So I think there is a contract.  Even if there isn't,

10   there is a sufficient pretort relationship given the fact that

11   they came out and did the job as a subcontractor on the

12   project.

13           I'm trying to think if there were any other points I

14   wanted to address.

15           Unless your Honor has any other questions that's all I

16   have.

17           *THE COURT:*  Okay.

18           *MR. ORLET:*  I would just make one observation for the

19   Court.  And the Court just made a comment about the

20   instructions.  I will raise an issue that has occurred to me

21   and I think we will have to think about it well in advance of

22   the jury instruction conference.  But going back to the *res*

23   *ipsa* counts, I'm trying to -- I'm trying to figure out how we

24   instruct a jury given the alignment of the parties and the fact

25   that these cases have been consolidated on *res ipsa*.  Because

1    as I understand it, the instructions would have to be on the

2    employees of, you know, in the West Side cases -- West Side

3    employee cases -- or case, you are going to have -- there is

4    going to be an allegation that ConAgra and A&J were in control,

5    exclusive control.  And in the A&J plaintiff case we are going

6    to have to have -- instruct a jury on *res ipsa* that ConAgra and

7    West Side were in control.

8         So I just raise that for your Honor and counsels'

9    thought that we may have a problem -- we are going to give some

10   thought to how we do that instruction.

11        *THE COURT:*  Sure.  And my experience has been that

12   sometimes plaintiffs' counsel review the complaint and decide,

13   hey, I'm going to drop that for this or that reason.  So I

14   don't get too worried except I'm going to tell you our

15   instruction conference is going to be on the Saturday between

16   trial.  We will not be able to knock this out during a lunch

17   hour.  So I appreciate that.

18        I'm going to take under advisement this last motion

19   which is at Doc. 195.  It's very interesting.  We either have a

20   contract or we don't from April 19th or whatever the April date

21   was.  And I -- that's a jury question.  We know we have one in

22   May for sure.

23        If there is a contract with indemnification that

24   applies to this incident then the question becomes, as to the

25   plaintiffs who could not sue West Side directly because they

1  were employees, is it full indemnification or does it get

2  shifted completely to West Side?  But as to the employee who

3  could sue West Side directly, is it a comparative fault type

4  shifting under contribution.  I don't know the answer to it.

5  I'm going to have to hit the books, frankly.

6           I often say that what I do can be done by 95 percent

7  of the people in this country with common sense; 4 percent

8  takes a law clerk; and I get paid for 1 percent.  This is that

9  1 percent.

10          Anything else on the record?  If not I will discuss

11  questions off the record.  Anything else?

12          Just -- still on the record.  One of the great things

13  about being a federal judge is we get a good quality of lawyers

14  here who file good documents and make good arguments, and this

15  case has been an example of that.  I appreciate the hard work

16  you have put into this case.  Nobody has filed anything

17  frivolous, all your papers have been first class and so have

18  your arguments.

19          Off the record.

20              *(An off-the-record discussion was had).*

21                 *(Court adjourned)*

22                        -oOo-

23

24

25

1                      REPORTER'S CERTIFICATE

2        I, Molly N. Clayton, RPR, Official Court Reporter for the

3    U.S. District Court, Southern District of Illinois, do hereby

4    certify that I reported with mechanical stenography the

5    proceedings contained in pages 1 - 114; and that the same is a

6    full, true, correct and complete transcript from the record of

7    proceedings in the above-entitled matter.

8

9               DATED this 31st day of March, 2012.

10

11

12                                   *Molly Clayton, RPR*

13                                   _____

14

15

16

17

18

19

20

21

22

23

24

25