1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF ILLINOIS
2    _____

3    JOHN W. JENTZ,                      )
                                         )
4              Plaintiff,                )
                                         )
5    vs.                                 )   Case No. 10-cv-474-MJR-PMF
                                         )
6    CONAGRA FOODS, INC., et. al.,       )
                                         )      Consolidated with:
7              Defendants.               )
     ------------------------------      )
8    JUSTIN BECKER and AMBER             )
     BECKER,                             )
9                                        )
               Plaintiffs,               )
10                                       )
     vs.                                 )   Case No. 10-cv-952-MJR-PMF
11                                       )
     CONAGRA FOODS, INC., et. al.,       )
12                                       )
               Defendants.               )
13   ------------------------------      )
     ROBERT SCHMIDT,                     )
14                                       )
               Plaintiffs,               )
15                                       )
     vs.                                 )   Case No. 11-cv-391-MJR-PMF
16                                       )
     CONAGRA FOODS, INC., et. al.,       )
17                                       )
               Defendants.               )
18   _____

19                 **TRIAL DAY/VOLUME 11 (P.M. SESSION)**

20    BE IT REMEMBERED AND CERTIFIED that heretofore on  **5/23/2012**,
     the same being one of the regular judicial days in and for the
21    United States District Court for the Southern District of
     Illinois, Honorable Michael J. Reagan, United States District
22   Judge, presiding, the following proceedings were recorded by
      mechanical stenography; transcript produced by computer.

23

24   REPORTED BY:  **Molly N. Clayton, RPR**, **FCRR**, Official Reporter
     for United States District Court, SDIL, 750 Missouri Ave., East
25   St. Louis, Illinois 62201, (618)482-9226,
                     *molly_clayton@ilsd.uscourts.gov*

**APPEARANCES:**

*FOR PLAINTIFF(S) JOHN JENTZ AND ROBERT SCHMIDT*:  **Robert A.
Clifford, Kevin P. Durkin and Colin H. Dunn** of Clifford Law
Offices, P.C., 120 North LaSalle Street, Suite 3100, Chicago,
Illinois 60602 **and  Brad L. Badgley**, P.C., Brad L. Badgley, 26
Public Square, Belleville, Illinois 62220

*FOR PLAINTIFF(S) JUSTIN AND AMBER BECKER*:  **Marc A. Taxman, Sean
P. Murray, and Julie Levinson Pustilnik of Anesi Ozmon Rodin
Novak & Kohen**, Ltd,  161 N. Clark St,  21st Floor, Chicago,
Illinois 60601

*FOR DEFENDANT CONAGRA FOODS, INC*:  **John W. Patton, Jr., John A.
Ouska** of Patton & Ryan, 330 N. Wabash Avenue, Suite 2900,
Chicago, Illinois 60611 **and Joseph C. Orlet, Brandan P. Mueller
and Joseph A. Kilpatrick** of Husch Blackwell LLP, 190 Carondelet
Plaza, Suite 600, St. Louis, Missouri 63105.

*FOR WEST SIDE SALVAGE, INC*. (Jentz and Schmidt cases only):
**John G. Schultz and Jason B. Moore** of Franke Schultz & Mullen,
P.C, 8900 Ward Parkway, Kansas City, Missouri 64114.

*FOR THIRD-PARTY WEST SIDE SALVAGE, INC*:  **John G. Schultz, Jason
B. Moore** of Franke Schultz & Mullen, P.C, 8900 Ward Parkway,
Kansas City, Missouri 64114.

<u>INDEX OF WITNESS EXAMINATION</u>

|  | <u>DX</u> | <u>CX</u> | <u>R-DX</u> | <u>R-CX</u> |
|---|---|---|---|---|
| *Friedt, Godfrey (Beckers)* | | *191* | | *222* |
| *Friedt, Godfrey (ConAgra) .....114* | | | *218* | |
| *Friedt, Godfrey (Jentz & Schmidt)* | | *131* | | *220* |
| *Friedt, Godfrey (West Side)* | | *208* | | |

<u>INDEX OF EXHIBITS</u>

| <u>EXHIBIT</u> | <u>DESCRIPTION</u> | <u>Id'D</u> | <u>Rcv'd</u> |
|---|---|---|---|
| *Plfs' 201* | | | *229* |
| *348F* | | | *117* |

1          *(Lunch recess)*

2          THE COURT:  Please be seated.

3          Mr. Patton, you last talked about the tarp.

4          MR. PATTON:  Okay.  Thank you, Judge.

5                    **CONT'D DIRECT EXAMINATION**

6     **Q.  (BY MR. PATTON:)**  Okay.  Godfrey, I think we left off

7     talking about a tarp.  Okay?

8          And what was Mel doing at that time that you had this

9     conversation about getting a tarp to catch some of the

10    material?

11    A.  What he told me he wanted to do was to take the manhole

12    cover off the side of the bin and bore a hole some way up into

13    the product so that Robert could see it from up on top of the

14    roof.

15         And he also asked if he could put some water on the fire

16    or -- excuse me, on the product on the bin.

17    Q.  Okay.  Did there come a time when you saw a fire in an

18    aeration fan?

19    A.  Yes, there was.

20    Q.  Did he put water on that?

21    A.  Yes, he did.

22    Q.  Okay.  Now, did he ever tell you that there was a fire in

23    the bin at any time that day?

24    A.  No, he did not.

25    Q.  All right.  Have you since read materials where you have

Direct Examination - Friedt, Godfrey (ConAgra)

1    learned some other things about what was going on in the bin?

2              *MR. SCHULTZ:*  Objection to the form of the question.

3              *THE COURT:*  Sustained.

4    **Q.  (BY MR. PATTON:)**  When he said he was going to bore a hole

5    in the side manhole, what happened next?

6    *A.*  Well, they took the cover off and then they were digging at

7    it with a potato fork.  You know, the product was hard to dig

8    at, so they were working pretty hard to get at it.  And he got

9    in there, you know, a few feet.  And he was also digging

10   straight in horizontally and he started to angle up, which

11   would then take him through the product so that they could see

12   how deep it was or see it from the top.

13   *Q.*  Okay.  Now I want to show you what we've marked as

14   Defendant's Exhibit 348F.

15        Is this another picture of that side manhole?

16   *A.*  Yes, it is.

17   *Q.*  Okay.  I'm going to circle it with the laser here.

18        This is the cover that Mel had removed (indicating)?

19   *A.*  Yes.  Somebody from West Side had removed it.

20   *Q.*  When you say somebody, do you know who removed it?

21   *A.*  I believe it was Adam was working on the platform.

22   *Q.*  Okay.  And would that be Adam Nanez?

23   *A.*  Yes, I believe that was his last name.

24   *Q.*  So -- and he works for -- who was he working for?

25   *A.*  I believe he worked for West Side.

1   *Q.*  Now, are there bolts on this manhole?

2   *A.*  Yes, there are.  There are bolts that hold the manhole

3   cover on.

4   *Q.*  Okay.  And were those removed and the manhole taken off by

5   Adam Nanez?

6   *A.*  Yes, they would have to be to remove the cover.

7   *Q.*  And when you talked about seeing them use a potato fork, do

8   you see one in this picture that -- I'm sorry, it's 348F?

9        Do you see any of the equipment you saw Adam using?

10  *A.*  Yes, I do.

11  *Q.*  Would you take the laser and point to that.

12  *A.*  (Complying).  It is right here.

13       And down below here is the tines of the fork (indicating).

14  *Q.*  I'm just going to circle it.  Fork.

15       And just so we have a picture here, where was he sticking

16  it into?

17  *A.*  Once the manhole cover is removed and you are -- the

18  product is right there inside the bin, so he was sticking it

19  into the bin.

20  *Q.*  Would you take the laser and show the jury where you saw

21  him sticking it in?

22  *A.*  (Complying).

23  *Q.*  Okay.  And can you describe -- now, where were you standing

24  or located when he was doing this?

25  *A.*  I was standing on the scale directly perpendicular to the

1   bin.

2   Q.  And if I put this photograph back up --

3          THE COURT:  Any objection to 348F?

4          MR. MURRAY:  No, your Honor.

5          THE COURT:  Admitted.  No objection

6            (Exhibit DFT'S 348F received in evidence)

7          MR. PATTON:  I thought all photos were but I'll ask.

8          THE COURT:  I didn't think that one was.

9   Q.  (BY MR. PATTON:)  351, does that again show the scale, the

10  approximate area where you were standing?

11  A.  Yes, it does.

12  Q.  And can you just -- are you able to use the laser to show

13  us -- here, I'm going to point it towards you.

14     Use the laser and point us where you were standing.

15  A.  I'd say approximately here (indicating).

16          MR. CLIFFORD:  Excuse me.  I apologize, your Honor.

17          Could I ask the witness to do that again, I didn't...

18          THE COURT:  Some of the jurors didn't see.

19  Q.  (BY MR. PATTON:)  Mr. Friedt, Do you want to stand by

20  Mr. Clifford and point to that again?

21  A.  (Complying).  Right about here.

22  Q.  Okay.  So I got X marks the spot.

23     Okay.  And on this photograph, 348F, Mr. Nanez was standing

24  where?

25  A.  Up on this platform (indicating).

Direct Examination - Friedt, Godfrey (ConAgra)

1   *Q.*   Okay.   I'll put "Nanez."

2        Okay.   And you can take the stand again, please.

3        You're observing this taking place?

4   *A.*   Yes.

5   *Q.*   Okay.   Did Mr. Sumner -- I'm sorry, did Mr. Flitsch and

6   Mr. Nanez ever express to you at this point in time that there

7   was any hazards in the bin?

8   *A.*   No, they did not.

9   *Q.*   And were you able to observe Mr. Nanez with a potato fork

10  and what he was accomplishing with it?

11  *A.*   Yes, there was some product being removed.   And he was

12  making a little bit of progress into the product, yes.

13  *Q.*   And where was the pellets going as he would pick away at

14  them with the fork?

15  *A.*   They were falling onto the ground, onto the platform and

16  onto the ground.

17  *Q.*   Did there come a time when Mr. Nanez stopped using the

18  fork?

19  *A.*   Yes.   Once he got so far into the bin, he couldn't go any

20  further.

21  *Q.*   And what happened next?

22  *A.*   Then he and Mel got an air lance, which is a long piece of

23  pipe with a fitting on the end so that they could poke up and

24  blow some air into the bin to remove the product and loosen it

25  up and get the product out.

1    *Q.*  Did you actually observe this happen?

2    *A.*  Yes, I did.

3    *Q.*  Now, I want to put up here Defendant's Exhibit 352.  I'm

4    going to bring it over here.

5         *MR. PATTON:*  And, your Honor, could I have him come

6    down one more time?

7         *THE COURT:*  Sure.

8    ***Q.  (BY MR. PATTON:)***  Now, Godfrey, do you see the air lance

9    that Nanez was using in the manhole in this photograph?

10   *A.*  Yes, it's right here (indicating).

11   *Q.*  So you have a red circle around it.

12       Is that air lance in this photograph located below the

13   manhole that we see in 348F?

14   *A.*  Yes, it is.

15   *Q.*  Okay.  And also in Defendant's Exhibit 352, do we see all

16   the pellets that had been pulled out of the manhole lying on

17   the ground?

18   *A.*  Can I get up?

19   *Q.*  Yeah.  I'm sorry.

20       Do you still have the laser, would you...

21   *A.*  You know, there may be some more over this way (indicating)

22   to the right.

23   *Q.*  All right.  Will you show us where you do see the pellets

24   that you observe coming out of the manhole.

25   *A.*  All over here (indicating).

Direct Examination - Friedt, Godfrey (ConAgra)

1    *Q.*  This whole -- did I circle the group of pellets?

2    *A.*  Yes.

3    *Q.*  Can you give us an approximate time period that Nanez was

4    using the air lance into the manhole?  Ballpark.

5    *A.*  I would say slightly -- probably before 3:00 until about

6    3:15.

7    *Q.*  Okay.  Now, I have in this courtroom what we marked as

8    Defendant's Exhibit 365.  Is this substantially similar to the

9    air lance that you saw Mr. Nanez using in that manhole?

10   *A.*  Yes, it is.

11   *Q.*  Okay.  And how would you describe the angle of the lance as

12   he was using it?

13   *A.*  I would say up at a 50 or 60 degree angle.

14   *Q.*  And I'm going to start level and I'm going to raise it up.

15   And you tell me when I get high enough that depicts how he had

16   it that day.  Okay?

17   *A.*  Okay.

18        I'd say about there.

19   *Q.*  Okay.  And at this angle, what was he doing with it?  What

20   was his arms doing with this?

21   *A.*  He was pulling it in and out.

22   *Q.*  This motion (indicating).

23   *A.*  Yes.

24   *Q.*  And as he was doing it, were pellets coming out?

25   *A.*  Yes, they were.

1    Q.  And did his using that air lance into the side manhole

2    carry any type of significance to you?

3    A.  No, just what Mel told me, they were trying to get a hole

4    up into the pellets.

5    Q.  Okay.  Well, while he was doing this, did you see anything

6    else happen outside of Bin 15?

7    A.  Yes, I did.

8    Q.  What did you see?

9    A.  As he was doing that and using the compressed air, the

10   rubber gasket on the aeration fan, you know, flamed up.

11   Q.  I'm going to show you what we marked as 135F.

12       And, first of all, take a look at that and does that show

13   the area where the gasket flamed up?

14   A.  Yes, it's behind some of the equipment there.

15   Q.  I'm going to give you a marker so you don't have to keep

16   coming up and down.

17       And I'm going to let you draw on here with an arrow and

18   just have the arrow point to where you saw a flame up on an

19   aeration fan.

20   A.  Behind this (indicating).

21   Q.  Okay.  Don't talk to me talk to the record.

22   A.  It was behind the piece of equipment that I drew here

23   (indicating).

24   Q.  Okay.  Can you make that arrow a little bigger?  And color

25   it in.

Direct Examination - Friedt, Godfrey (ConAgra)

 1    *A.*   (Complying).

 2    *Q.*   Okay.  I'll take that.

 3          And you call that a fan gasket?

 4    *A.*   Yeah.

 5    *Q.*   Okay.  And I have the fan gasket words right above the

 6    arrow where you saw a flame up.

 7          Can you see that?

 8          Did I write the words "fan gasket" where you indicated the

 9    arrow that you saw the flame up?

10    *A.*   Yes, you did.

11    *Q.*   Okay.  Did that concern you when you saw that?

12    *A.*   Yeah, I had a slight concern.  But Adam grabbed the hose

13    that he had there and he -- you know, a couple seconds he

14    sprayed a little bit of water on it and it was out.

15    *Q.*   Does Exhibit Number 348F have the hose that he used?

16    *A.*   Yes, it does.

17    *Q.*   All right.  And would you point that out with the laser.

18    *A.*   (Complying).

19    *Q.*   I'm going to circle this hose.

20          So at the time that he was -- Nanez was working on the

21    manhole, he had an air lance, a potato fork, and a hose?

22    *A.*   That is correct.

23    *Q.*   Okay.  Did Mel at the point of this flame up express any

24    concern to you about the condition of the bin?

25    *A.*   No, he did not.

1    *Q.*  What was your impression when you saw this happen and then

2    they extinguished it?

3    *A.*  You know, that there was a little bit of oxygen in there

4    and the rubber, you know, had gotten hot enough where it caught

5    on fire.

6    *Q.*  Did you think that there was an actual fire inside the bin?

7    *A.*  No, I did not.

8    *Q.*  Did Mel at some point that day ask you to call the fire

9    department?

10   *A.*  Yes, he had.

11   *Q.*  Tell the ladies and gentlemen about that conversation.

12   *A.*  He had approached me and asked me if I would call the fire

13   department to have them come do a -- you know, have someone

14   come down and evaluate, you know, kind of what was going on,

15   the situation, the facility.

16        So I had asked some of the employees if I could get a

17   number for the, you know, fire chief so I could give him a

18   call.  They knew who the name of the fire chief was and so they

19   got the phone number for me.  And I called the fire chief.

20   *Q.*  And did you have a conversation with him?

21   *A.*  Yes, I talked with him.  I let him know who I was, what we

22   were doing.  I explained to him that, you know, we had had a

23   hot bin and that we had a contractor in working and taking the

24   product out of the bin.

25   *Q.*  And did you ask the fire chief at that time if he could to

1  come over and take a look around?

2  A.  Yes, I asked him to come around, to come down to the plant

3  and, you know, kind of assess the situation as Mel had asked me

4  to.

5  Q.  Okay.  And did the fire chief respond?

6  A.  Yes.  He said that he couldn't come down because he had --

7  I think it was a boy scout meeting or something like that, but

8  that he would call somebody else and he would have them come

9  down.

10  Q.  Do you know if the fire chief had said to you that he was

11  going to have his group come by after work?

12       MR. TAXMAN:  Could I just object to foundation?  I'm

13  not sure what time.

14       MR. SCHULTZ:  And it is leading.

15       THE COURT:  I heard Mr. Taxman's objection.

16       Mr. Schultz?

17       MR. SCHULTZ:  Leading.

18       THE COURT:  Sustained.  I thought it was going to be a

19  hearsay objection.  Overruled as to both.

20       MR. PATTON:  Okay.

21       MR. SCHULTZ:  Hearsay.

22       THE COURT:  Sustained.

23       THE COURT:  Your question was:  Do you know if the

24  fire chief had said to you that he was going to have his group

25  come by after work?

1    *A.*   He had told me they were having a fire department meeting

2    that night.  And so I said, Great.  Could you come down here to

3    have your fire department meeting down at the plant?

4        And he said no, that it was a business meeting, not a --

5    not a actual training meeting.  So he then reiterated to me

6    that he would get ahold of somebody to come down and do the

7    assessment as we asked.

8    *Q (BY MR. PATTON:)*  Okay.  Did you relay this information to

9    Mel Flitsch?

10   *A.*   Yes, I did.

11   *Q.*   Okay.  And what was his response to that?

12   *A.*   He was -- he was okay with it.  He knew I had called the

13   fire department and that, you know, there was someone going to

14   come down and do a walk-around.

15   *Q.*   Okay.  At any time when you were having this conversation

16   with Mel Flitsch, did he express any concern to you that the

17   bin would be on fire or explode?

18   *A.*   No, he did not.

19   *Q.*   Okay.  And do you recall the time period when you had this

20   conversation with the chief?

21   *A.*   It was approximately at 3:00.

22   *Q.*   P.m.?

23   *A.*   P.m., yes.

24   *Q.*   What happened after that?

25   *A.*   Then Mel and I went back outside, and he asked me to again,

1    I guess, help them.  Adam continued to poke at the bin through

2    the manhole cover.

3    Q.  Was more pellets coming out?

4    A.  Yes, there were.

5    Q.  Was Mel asking you to tell him how to do his job?

6    A.  No, he was not.

7    Q.  What happened next?

8    A.  I think at some point Mel decided that they weren't getting

9    anywhere or that they had either poked through the, you know,

10   the product, um, because I remember that he said that Robert

11   couldn't see it from up top.  So then he shut the compressor

12   off, and I then walked into the scale office.

13   Q.  All right.  Give us a sense of the time period now.

14   A.  I'd say roughly around 3:30.

15   Q.  Okay.  And what happened next?

16   A.  I remember, you know, calling Omaha, Kathy Rihanek, to ask

17   her to start to change my plane reservations, to cancel the one

18   that I had -- was going to take earlier that afternoon and to

19   reschedule it.  And then I was also talking to Anthony Yount

20   about, you know, what we had done, what had happened.  You

21   know, we were out there, pulled the manhole cover off, trying

22   to get some pellets out.

23   Q.  Do you recall, as you sit here now, how many phone calls

24   that you had with Anthony Yount throughout the day?

25   A.  I'd say a handful.

Direct Examination - Friedt, Godfrey (ConAgra)

1  *Q.* Okay. And why were you talking to Anthony Yount throughout

2  the day?

3  *A.* There were several reasons. Some of them -- one of them

4  was -- or a couple of them were to tell him that, you know, I

5  wasn't going to be leaving for Huntsville, that I was going to

6  stay. And then other ones were, you know, what was going on.

7  We were unloading pellets, pulling the manhole cover off, as I

8  had just described, those kind of things.

9  *Q.* Did you express your concern about the developments of this

10  bin during these conversations?

11  *A.* I didn't have any concerns. Um, you know, we were getting

12  the pellets out, and I wasn't being conveyed any concerns.

13  *Q.* Okay. Did there come a time in a conversation with Anthony

14  Yount where you did express concerns?

15  *A.* Yes. That was after -- after the explosion.

16  *Q.* Okay. So we're in the afternoon. Are we now between

17  3:30 and 4:00?

18  *A.* Yes.

19  *Q.* Okay. Tell the ladies and gentlemen of the jury what

20  happened during that time period.

21  *A.* I was on the phone with Anthony. Mel came into the office,

22  and I could tell he was pretty nervous. And he said he needed

23  me to call the fire department right away. So I told A.Y., I

24  said, I got to go, and I just hung up from A.Y.

25  *Q.* Did you call the fire department?

Direct Examination - Friedt, Godfrey (ConAgra)

1    *A.* Yes, I grabbed -- I told somebody to go dial 911, and then

2    I grabbed the phone number that I had called Mike earlier, and

3    I grabbed the phone in the office and dialed his number.

4    *Q.* Did you reach him?

5    *A.* Yes.  I was talking to him, yes.

6    *Q.* What did you tell him?

7    *A.* I told him to send the fire trucks right away.

8    *Q.* How many conversations did you have with the chief that

9    day?

10   *A.* I --

11   *Q.* We covered -- we covered the first one.  Now we are

12   covering the one at four?

13   *A.* Yes, two.  Yeah.

14   *Q.* Okay.  At any time in these conversations with the chief,

15   Godfrey, did you tell the chief not to send fire trucks?

16   *A.* No, I did not.

17   *Q.* Did something happen while you were on the phone with the

18   chief?

19   *A.* Yes.  Um, as I was talking to the chief, the elevator blew

20   up.

21   *Q.* Did Mel -- when Mel Flitsch told you to call the fire

22   department and the -- and the bin blew up, how much time passed

23   between when Mel came in and told you to call the fire

24   department and the bin actually exploding.

25   *A.* Ten, fifteen seconds.

1    *Q.* Did you know that Mel, after telling you to call the fire

2    department, went back out and told Jentz and Becker to go back

3    down in the tunnel?

4         *MR. CLIFFORD:* Objection, foundation.  That's assuming

5    facts not in evidence, not a first person observer.

6         *THE COURT:* Sustained.  Rule 602.

7         *MR. CLIFFORD:* Yes, sir.

8    **Q.  (BY MR. PATTON:)** Did Mel tell you that he was going to

9    tell Jentz and Becker to go back into the tunnel?

10   *A.* No, he did not.

11   *Q.* After this happened -- do you need a minute?

12   *A.* Yeah.

13   *Q.* Could we get some water or something for him?

14        *COURTROOM BAILIFF:* He's got water.

15        *THE COURT:* Do you want to take a break?

16        *THE WITNESS:* Okay.

17   **Q.  (BY MR. PATTON:)** I want to go into what happened after

18   this explosion.  Okay?

19   *A.* Okay.

20   *Q.* What did you do after you heard the explosion?

21   *A.* I dropped the phone when it happened.  So I picked up the

22   phone and I told the chief that it just blew up.  And he said,

23   I heard it.  And I hung up the phone.  And I was -- I waited in

24   the -- in the scale office because all the training I've had,

25   there is usually more than one explosion.  There was concrete

1   falling down.  So I was, you know, kind of froze for a moment

2   to wait.  It didn't happen.  So I went outside of the scale

3   office.

4   Q.  What do you see?

5   A.  At that time, I saw a couple of people laying in the

6   street, um, so I picked up the phone, my cell phone, and I

7   called A.Y.  And I told him, It blew up, and there's a couple

8   of people laying in the street.  I could see Mel over there, so

9   I went over there.  And I knelt down beside each of them, one

10   at a time, and I, you know, I was looking at them.  And I could

11   -- you know, they -- they were -- they were burnt.  And so I --

12   I put my hand on their leg, you know, some place where it

13   wasn't burnt because I didn't want to hurt them.  And I asked

14   them if they could hear me.  And they didn't respond.  So I --

15   I said a prayer that they would be okay.

16       And then at that time, there were people coming out of the

17   office, a bunch of people coming from the mill.  And so I got

18   up, and I could see Mel across the street.  So I went -- I went

19   over to Mel, and I said, Mel, where is everybody?  And he said

20   Robert was on the manlift or on the elevator.  And I said, How

21   do you know that?  And they had radios, so he knew that, I

22   think, Robert was okay.

23       So I just kind of hung around Mel, and then he went and got

24   Robert off the manlift or off the elevator.  And then I was

25   still by the two guys that were laying in the street.  And then

1   Mel went, you know, back over, across, and he was -- he was

2   over there kind of by himself.  And then so I went over there,

3   and he was -- he was saying, It is my fault.  It's my fault.

4   And so I said, Everything's going to be okay, Mel.  And I gave

5   him a hug.  And then I went back over to the guys laying on the

6   street and waited for the paramedics.

7        *MR. PATTON:*  That's all I have right now, Judge.

8   Thank you.

9        *THE COURT:*  Mr. Clifford.

10       *MR. CLIFFORD:*  Yes, sir.

11       Just a moment, Judge.  Give me just a second here.

12                    **CROSS EXAMINATION**

13  *Q.  (BY MR. CLIFFORD:)*  Mr. Friedt, good afternoon.  My name is

14  Bob Clifford, I'm an attorney for Mr. Jentz and Mr. Schmidt.

15      Do you need a minute?

16  *A.*  Yeah, please.

17       *THE COURT:*  Why don't we do this, folks.  We are going

18  to take a walk around the block, so just put your books down.

19  And the block is inside.  So we are going to walk around and

20  come through those back doors.

21       Everybody else just sit tight.  We will give the

22  witness a chance to relax.

23       Follow me.  Got your keys, Red?

24       *JUROR:*  Conga line.

25                    *(Recess)*

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

```
 1            THE COURT:  Folks, please be seated.  I gave the
 2     jurors the nickle tour of my chambers called the back office.
 3            Mr. Clifford.
 4            MR. CLIFFORD:  Thank you, sir.
 5      Q (BY MR. CLIFFORD:) Mr. Friedt, let's go back a little bit to
 6     the beginning of your testimony, and I want to talk about you
 7     as a manager, you as a supervisor.  I think you told us that
 8     when you -- in Pennsylvania, when you got into a position of
 9     leadership and became a supervisor of the men at the facility
10     that you tried developing a relationship with them and their
11     families; is that right?
12     A.  I would -- would do that in most locations I was at.
13     Q.  And you did that because not only was it important to you
14     to develop a working relationship with your fellow employees,
15     because you were all fellow employees of the same company,
16     right?  All of you were fellow employees of the same company,
17     ConAgra?
18     A.  Yes.
19     Q.  But it was important to you that you thought it would
20     facilitate your own learning of your craft to take advantage of
21     the mentoring that you could and did receive from the older
22     gentlemen and ladies who also worked for ConAgra?
23     A.  That is correct.
24     Q.  Okay.  So that I think throughout your testimony today that
25     you've shared with us and yesterday that you've shared with us,
```

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1    that working with your fellow employees and listening to them

2    and their experience was something that you knew was important

3    and was valuable to you?

4    A.  Yes.  Together, it would make a difference.

5    Q.  And certainly ConAgra is a company that -- it's not in the

6    million business, if I understand it correctly, it is not as

7    big as Cargill or ADM; is that right?

8    A.  That is correct.

9    Q.  Okay.  But how many -- how many bins -- for example, how

10   many bins are at Chester?

11   A.  I believe there's between 80 and 90 bins.

12   Q.  Okay.  And within the ConAgra inventory of bins worldwide,

13   how many bins are there?

14   A.  In the division I work in, there is roughly 1700.

15   Q.  Okay.  And it's your testimony that within that inventory

16   -- within the company, is Mr. Yount the lead safety guy for

17   those approximate 1700 bins?

18   A.  Yes, he is.

19   Q.  Okay.  And when -- throughout your testimony you have

20   talked about West Side and their expertise.  Is it your

21   testimony to this Court and jury that, within ConAgra there,

22   you do not have the resources within the company that are the

23   equivalent to West Side when it comes to dealing with a hot

24   bin?

25   A.  I would say yes.

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1    *Q.*   Okay.  So, in other words, ConAgra owns 1700 or so bins,

2    but ConAgra needs to turn to an expert salvage company like

3    West Side for purposes of expertise in dealing with hot bins,

4    that's your testimony?

5    *A.*   Generally, yes.

6    *Q.*   And, by the way, when it comes to expertise and experts, do

7    you accept the proposition that if I'm going to ask you for

8    your opinion about something and I give you Facts A, B, and C

9    to assume as correct, and then give me your reaction to those

10   facts, give me your expertise applied to those facts, you might

11   give me in answer of X?

12       But if I throw in an additional fact, like Fact D, you

13   might give me a Y as an opinion?  And if I throw in a final

14   fact, a Fact E, you might give me a different opinion of Z?

15       The point being, that the quality of the opinion that you

16   would offer to me, if I sought your expertise, is directly

17   related to the facts that I've given to you to review for the

18   application of that expertise.

19       Are you with me?

20   *A.*   Yes, that's a long question.

21   *Q.*   It's a long question.  And I'm that way sometimes, and I

22   apologize.  So I'm not out to confuse you.  It is not a trick

23   question.  So I'll tell you where I'm going with this in a

24   moment.

25   *A.*   It's possible, yes.

1    *Q.*  Okay.  Well, I'm getting to -- I'm kind of jumping ahead

2    more quickly, but I'm getting to the dialogue you had or

3    claimed to have had, because you understand that Ron Sumner

4    doesn't have a -- see things quite the way that you do

5    necessarily.

6        Do you know that, sitting here today?

7            *MR. PATTON:*  Objection to the form of the question as

8    to what -- as to what Ron Sumner says or thinks.

9            *THE COURT:*  Overruled.

10   *A.*  Could you repeat question?

11   *Q.*  Sure.

12       I want you to assume for the sake of discussion that Ron

13   Sumner doesn't have the same recall of your dialogue that

14   you've shared with us.

15       Do you -- do you know that to be the case?

16   *A.*  I don't know if I know that to be the case.  But not

17   everybody remembers everything the same way.

18   *Q.*  Okay.  And you do want us to know that throughout the

19   period from March 13th, March 12th, up until a certain time

20   that we will get to, you had an exchange going on with Ron

21   Sumner; is that correct?

22   *A.*  That is correct.

23   *Q.*  And what I'm getting to is that you have testified here

24   that Ron Sumner never once expressed to you a concern about

25   what was going on in the bin; is that right?

1        *MR. PATTON:*  That mischaracterizes -- objection.  That

2   mischaracterizes his testimony.

3        *THE COURT:*  Overruled.  The jury knows what was and

4   what was not said.

5     **Q (BY MR. CLIFFORD:)** Did Ron Sumner ever express to you a

6   concern about what was going on in that bin?

7   *A.*  As a concern, it's a hot bin.

8   *Q.*  Okay.

9   *A.*  That's his concern.

10  *Q.*  But he never told you one thing that lead you to believe

11  that there was anything alarming going on in the bin; is that

12  correct?

13  *A.*  No.

14  *Q.*  Okay.  No, it's not correct, or, no, he never told you

15  anything to be alarmed about?

16  *A.*  No, he didn't tell me anything.  Yes.

17  *Q.*  Okay.  And you understand that Ron Sumner, before the

18  explosion, was at this scene one time?

19  *A.*  That is correct.

20  *Q.*  And you understand that whatever information Ron Sumner

21  knew about the condition of the bin, at least up until

22  April 19th, he got from you and you alone?

23  *A.*  I don't know that.

24  *Q.*  Well, I'll tell you to assume that's true.  Do you -- do

25  you have any knowledge at all about Ron Sumner speaking to any

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1    other ConAgra employees between April -- excuse me -- between

2    March 13th and April 19th?

3    A.   I do believe he called Sean Belcher at one time.

4    Q.   Okay.  And we are going to get to that in the moment.  That

5    pertained to the contract period, didn't it?

6         MR. PATTON:  Objection to foundation, what he knows.

7    Q.   (BY MR. CLIFFORD:)  If you know?

8    A.   I don't know.  I don't know the time frame.

9    Q.   Okay.  But suffice it to say, the information that Ron

10   Sumner would have been able to give to you, in terms of his

11   opinion about the condition of the bin, was going to be and was

12   directly related to whatever information he was supplied from

13   the scene, whatever the source?

14   A.   That is correct.

15   Q.   Okay.  Now, let's go back, because I'm a little confused,

16   and I want the -- I want our record to be as clear as we can

17   be.  You did not hire the West Side company until some time --

18   and we will get to what the time is -- after the March 13

19   meeting; is that right?

20   A.   That is correct.

21   Q.   Okay.  And when you listened to, as you tell us, the

22   employees of ConAgra at that lunch about a local supplier, one

23   of the differences between the West Side idea of how to deal

24   with this problem and the Southern Illinois Salvage idea about

25   how to deal with this problem was whether there was going to be

1    an additional hole made in the roof of the bin; isn't that

2    right?

3    A.   From what I recall, yes.

4    Q.   Southern Illinois wasn't advocating the possible addition

5    of another hole in which to insert the bin whip?

6    A.   Correct.

7    Q.   Because that additional hole that was contemplated as a

8    possibility by Sumner was related to their ability to properly

9    place the bin whip to do the job that they felt might need to

10   be done; isn't that right?

11   A.   If they needed to get to the far wall, yes.

12   Q.   Right.  But there was another difference between the West

13   Side bid and the Southern Illinois bid, and that was the price,

14   wasn't it?

15   A.   That is correct.

16   Q.   The Southern Illinois bid was cheaper?

17   A.   I believe, yes, it was.

18   Q.   Now, in connection with -- tell the ladies and gentlemen of

19   the jury who Brad Allen is?

20   A.   Brad Allen is the vice president of operations.  He is my

21   boss.

22   Q.   And throughout the time that you were at the scene and at

23   your office dealing with the problem at Chester -- so from

24   March 12th through the April 27th explosion -- you did discuss

25   this issue and this problem with your boss, didn't you?

1  *A.*  Yes, I did.

2  *Q.*  And, in fact, your boss visited the scene of this

3  occurrence before the work began by West Side; isn't that

4  correct?

5  *A.*  I am not aware of that.

6  *Q.*  So you are not aware that Mr. Allen visited the Chester

7  facility and met with Alan Bindel?

8  *A.*  That or I don't remember.  I don't remember him being

9  there.

10 *Q.*  Okay.  Now, by the way, your office, you mentioned -- tell

11 us a little bit about your work.  Are you -- do you have people

12 that work under you at the home office?

13 *A.*  No, I do not.

14 *Q.*  Okay.  So you report to Mr. Allen; is that correct?

15 *A.*  That is correct.

16 *Q.*  But all the other people who report to you are in different

17 facilities?

18 *A.*  Yes, they are.

19 *Q.*  They're not at the home office?

20 *A.*  That is correct.

21 *Q.*  Okay.  And your normal workday, does it take place at the

22 home office?

23 *A.*  No, 80 to 90 percent of my time is spent traveling.

24 *Q.*  Okay.  And when you are traveling, you are going to the

25 different facilities of ConAgra?

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1   *A.*   That is correct.

2   *Q.*   Okay.  And when you go to those facilities, are you dressed

3   in a Polo and khakis as you are today?

4   *A.*   Sometimes jeans as well.

5   *Q.*   Okay.  And how about when you go to the home office?

6   *A.*   Then I would dress as I do today.

7   *Q.*   Okay.  So do you ever wear a tie -- shirt and tie?

8   *A.*   Yes, I do.

9   *Q.*   And when is that -- for work now.

10      *MR. PATTON:*  Objection to relevance as to what he

11  wears to work.

12      *THE COURT:*  Where are you going?

13      *MR. CLIFFORD:*  I want to know why he dressed up for

14  his deposition differently than he did here today.

15      *MR. PATTON:*  Objection to relevance of dressing up for

16  a deposition to the issues in this case.

17      *THE COURT:*  Sustained.

18  *Q.   (BY MR. CLIFFORD:)*  Now, you view Mr. Yount as a resource;

19  isn't that right?

20  *A.*   Yes, I do.

21  *Q.*   And he was a consultant to you at all times during the

22  period between March 12 and April 27?

23  *A.*   I could use him as a resource, yes.

24  *Q.*   Okay.  And you used him as a resource because he's the one

25  particular individual in your organization that knows the most

1    about hot bins?

2    A.  No, I wouldn't say that.

3    Q.  Okay.  Well, he's the gentleman that you sought out as a

4    resource in connection with safety issues associated with this

5    facility; isn't that right?

6    A.  He and other people, yes.

7    Q.  Okay.  And the other people were the likes of Alan Bindel?

8    A.  Yes.

9    Q.  And Sean Belcher?

10   A.  Yes.

11   Q.  Who else?

12   A.  Scott Martin.

13   Q.  Okay.  And anyone else?

14   A.  Dean Hoerning.

15   Q.  And Dean Hoerning was the gentlemen who is an engineer; is

16   that right?

17   A.  That is correct.

18   Q.  Did you ever discuss with Mr. Hoerning taking out the --

19   doing all the work from outside of the bin as opposed to from

20   the tunnel?

21   A.  I don't recall.

22   Q.  Okay.  Now, when you traveled to Chester on that Saturday,

23   you knew that you are going to Chester to deal with a safety

24   issue; is that right?

25   A.  We had a hot bin.  That's why I was going down there.

1    *Q.* That was not my question.  You knew you were going there

2    for a safety issue?

3    *A.* Yes, you know, it's -- safety is involved, yes.

4    *Q.* Okay.  And tell the ladies and gentlemen of the jury your

5    familiarity with knowing about explosions.  I think you said

6    something in your direct examination about your training in

7    explosions.  You have been trained to deal with the issue of

8    explosions in connection with your work in the bins?

9    *A.* I don't know to deal with them.  Most of the training that

10   I've had is around dust explosions, and airborne dust, and the

11   ignition source, those kind of things.

12   *Q.* Okay.  Now, you were telling the ladies and gentlemen of

13   the jury about Ron Sumner and when he left the scene on the

14   13th.  When did he give you a bid?

15   *A.* He verbally gave me a bid I believe Sunday morning.

16   *Q.* And that's because he told you he wanted to get the men

17   there and deploy them so that they could be on the scene on

18   Tuesday?

19   *A.* Repeat the question, please.

20   *Q.* Sure.

21       Ron Sumner on that Sunday -- which we know to be the 14th I

22   believe of March.  Do you agree on the date, sir?

23   *A.* Yes, I do.

24   *Q.* Okay.  You spoke to him and with him on several occasions

25   on the 14th of March 2010, didn't you?

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1    *A.*   Yes, I did.

2    *Q.*   And he gave you a bid at that time, did he not?

3    *A.*   Yes, he did.

4    *Q.*   Okay.  But you did not retain West Side at that time,

5    correct?

6    *A.*   That is correct.

7    *Q.*   Now, we've -- and then the fact is that he wanted to deploy

8    his crew to arrive at Chester on Tuesday the 16th; isn't that

9    correct?

10   *A.*   Yes, he was available, yes.

11   *Q.*   But you made, for the reasons you have described here, the

12   decision to seek out another provider who had a lower place and

13   a local flavor.  Is that your testimony?

14   *A.*   Yes.  And quality, yes, equal to West Side, yes.

15   *Q.*   Okay.  Well, say that again.

16   *A.*   And quality as well, too, I mean, you know, I wanted to

17   make sure everything was being equal.

18   *Q.*   Well, let's talk about that.  Southern Illinois Salvage,

19   the fact of the matter is Southern Illinois Salvage is a

20   two-man show; is it not?

21   *A.*   I don't know how many people they employ.

22   *Q.*   You just told us you wanted to have comparable quality.

23   You are talking about the ability to do the job; isn't that

24   right?

25   *A.*   Yes.

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1    *Q.*  Okay.  I'm asking you to assume for the sake of discussion

2    that Southern Illinois Salvage has two employees versus West

3    Side.  Do you consider that a comparable quality?

4    *A.*  I don't know.  I didn't know what it was going to take to

5    do the job.

6    *Q.*  Well, you know the only prior experience that Southern

7    Illinois Salvage had at the Chester facility was in connection

8    with a flood?

9    *A.*  At the Chester facility.

10   *Q.*  At the Chester facility.  And you know nothing about their

11   experience, if any, in dealing with hot bins?

12   *A.*  I -- we talk when I met with them on the 22nd or 23rd.

13   *Q.*  Now, when you were asked during your direct examination

14   about did Ron Sumner on that Saturday tell you that you had a

15   ticking time bomb on your hands.  Do you remember that line of

16   questioning?

17   *A.*  Yes, I do.

18   *Q.*  Okay.  And that's -- he, in fact, at one point in time did

19   tell you that you had a ticking time bomb on your hands but it

20   was not on that Saturday.  It was a day or two later; isn't

21   that correct?

22   *A.*  No, I don't remember him saying that.

23   *Q.*  Are you saying you don't remember or he did not say it?

24   *A.*  He did not say it.

25   *Q.*  All right.  So that he did not say to you you had a ticking

1    time bomb on your hands on Sunday, the 14th?

2         *MR. PATTON:*  Asked and answered.

3         *THE COURT:*  Overruled.

4    A.  Repeat the question.

5    Q.  Did he tell you on Sunday, the 14th, that you had a ticking

6    time bomb?

7    A.  No, he did not.

8    Q.  When was the next time after Sunday, the 14th, that you

9    spoke to Ron Sumner?

10   A.  I don't remember a date when I talked to him next.

11   Q.  Now I want to go back to your dealing with him because it

12   sounds like you are telling us that Ron Sumner told you to keep

13   him abreast of any changes in the condition of the bin starting

14   from the first time you met him that weekend of the 13th/14th;

15   is that right?

16   A.  Yes, he told us to take temperatures in the bin and to

17   inform him of changes.

18   Q.  Okay.  So -- and you relied on him and his expertise, did

19   you not?

20   A.  Amongst others, yes.

21   Q.  So what you are telling this jury is that you did not make

22   the decision to retain West Side until sometime in April -- and

23   I want to get to that date shortly.  But even though you didn't

24   have an agreement with West Side until sometime in April, you

25   are telling this jury you had a dialogue going on with Ron

1    Sumner for the last two weeks or so into the first part of

2    April; is that right?

3    A.   Yes.  He was still an option.

4    Q.   That's not my question, sir.  With all due respect.

5        What I'm saying to you is how often did you -- let me ask

6    you differently.

7        How often did you speak to Ron Sumner about the condition

8    of Bin C15 between March 13th and the date you say that you

9    decided to retain West Side?

10   A.   I don't recall.

11   Q.   Well, how about never?

12   A.   I don't know.  I don't recall.

13   Q.   So that if Ron Sumner told you that he did not consult with

14   you or if he told -- strike that.

15       If Ron Sumner stated that he did not consult with you about

16   the condition of the bin from March 14th, that Sunday, up until

17   the time you gave him the job, you have no basis to disagree

18   with that, do you?

19            MR. PATTON:  Objection to the form of the question as

20   to what Ron Sumner said.

21            THE COURT:  Overruled.

22   A.   Could you repeat the question.

23   Q.   Sure.  I'll ask a different one.

24   A.   Okay.

25   Q.   If Ron Sumner -- I want you to assume for the sake of

1   discussion that somewhere in your first conversation or two

2   with Ron Sumner that he told you you had a ticking time bomb on

3   your hands, you would have done things differently, wouldn't

4   you?

5   A.  I would have asked him what he meant by a ticking time

6   bomb, yes.

7   Q.  Okay.  You would have done things differently relative to

8   the management of that bin?

9   A.  I don't know if I'd have done anything different.  I'd have

10  still, you know, worked with him and see what was going on.

11  Q.  Okay.  Now, you said on your direct examination that you

12  decided on April 2nd to give West Side the job.  Do you

13  remember that testimony?

14  A.  Yes, I do.

15  Q.  And how -- and how did you communicate that decision to

16  West Side?

17  A.  I called Ron on Saturday, April 3rd.

18  Q.  Okay.  Was he happy about it?

19  A.  I don't know.  I can't describe his feelings.  I just let

20  him know that he had the job.

21  Q.  Okay.  Now, the fact --

22      MR. CLIFFORD:  You know, Rick, could you bring up a

23  calendar a March calendar -- excuse me, an April calendar, just

24  a blank one.

25      If he could have the computer, your Honor.

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1          Judge, can we have the computer here?

2          I don't have it here, Judge (speaking of ELMO cart

3     screen).

4          *THE COURT:*  Yours is blank?

5          *MR. CLIFFORD:*  Mine is blank.

6          The jury has the calendar, right?

7          *THE COURT:*  You have to do send to evidence on the

8     side drawer.

9     **Q.   (BY MR. CLIFFORD:)** So do you see the calendar --

10         *MR. CLIFFORD:*  Thank you, Judge.  I'm sorry for the

11    delay.

12    *Q.*  Do you see the calendar up there, Saturday, April 3?

13    *A.*  Yes, sir.

14    *Q.*  That's when you say you spoke to Ron Sumner, right?

15    *A.*  That is correct.

16    *Q.*  Now, do you recall that during your -- the follow up to

17    this explosion that you gave a statement to our government?

18    *A.*  Yes, I do.

19    *Q.*  Okay.  And that statement was given -- that asked you

20    questions about what you knew of the relevant facts as you were

21    going to provide them to the government?

22    *A.*  Yes.

23    *Q.*  Okay.  And that statement was something that you worked

24    with counsel for ConAgra to put together after a draft was

25    given to you by the government?

1    *A.*  I can't remember who I worked with.

2    *Q.*  Okay.  By the way, other than counsel for ConAgra, have you

3    worked with anyone in terms of preparation for your testimony

4    today?

5    *A.*  Yes, the attorneys that are here.

6    *Q.*  Other than those.  Anyone else?

7    *A.*  No, no.

8    *Q.*  Okay.  Did you read your statement to the government before

9    you testified?

10   *A.*  Today?

11   *Q.*  Yeah.  Or you know yesterday.

12   *A.*  Yes, I did.

13   *Q.*  Do you remember that you told the government that you

14   decided on April 8 or 9 to go with West Side and he thinks it

15   was probably on the 9th?

16   *A.*  Yes, I remember that.

17   *Q.*  Okay.  So -- but today you testified differently?

18   *A.*  That is correct.

19   *Q.*  Because after -- you now have a different recall?

20   *A.*  No.  I saw some e-mails that I didn't have when I was doing

21   my OSHA statement.

22   *Q.*  Okay.  All right.  Well, let's talk a little bit about

23   those e-mails.  Whether it was the 4th, or the 3rd, or the 8th,

24   or the 9th that you gave the job to West Side, did you tell Ron

25   Sumner that the information you had by way of e-mail was that

1    the smell in the bin was stronger every day and that it had

2    spread -- the burnt smell had spread to all of the elevators?

3        Did you tell that fact to Ron Sumner when you gave him the

4    job on April 3 or April 9?

5    A.  I don't remember all the details of my conversation with

6    Ron.

7    Q.  Well -- okay.  Did you tell Mr. Sumner, when you gave him

8    that job on either of those dates, that the bin has a fire in

9    it and it is not going away?

10   A.  No, I did not.

11   Q.  Okay.  Did you tell Mr. Sumner that there were pellets on

12   fire in the bin according to the reports you received from the

13   staff at Chester?

14   A.  No, I did not.

15   Q.  Did you tell Mr. Sumner that the hot pellets were

16   spreading?

17   A.  No, I did not.

18   Q.  Did you tell Mr. Sumner that the bin had been heating up

19   and giving off a very burnt smell?

20   A.  No, I did not.

21   Q.  Did you tell Mr. Sumner that every day the bin keeps

22   getting a stronger burnt smell to it?

23   A.  I can't remember telling him that, no.

24   Q.  Okay.  The fact is that you didn't tell him those things at

25   all; isn't that correct?

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1    A.  I don't remember.

2    Q.  Now, you did, in fact, tell people at the facility

3    beginning on and after March 13th to start recording

4    temperatures, did you not?

5    A.  I believe Ron had asked us to do that, yes.

6    Q.  Okay.  Let's talk about that.  My question was you did, in

7    fact, tell people at the facility to start recording

8    temperatures.  Your answer was Ron told me to do that.  Right?

9    That's what you just said?

10       I can understand why you did what you did.

11   A.  Yeah.

12   Q.  Okay.  I just wanted -- but you told the people at the

13   facility to do that; isn't that correct?

14   A.  There were several of us managers when he told us that,

15   so...

16   Q.  Hmmm.

17   A.  I guess I was in the group he told.

18   Q.  Who was -- you know, who is the boss?

19       You know, I'm just curious.  On March 13th, who was the

20   highest guy on the totem pole at Chester from a ConAgra

21   perspective?

22   A.  That would have been myself.

23   Q.  Okay.  And when Ron Sumner left, who was the highest man on

24   the totem pole from ConAgra when he left?

25   A.  I was.

1    *Q.* Who directed the employees at the Chester facility to start

2    recording temperatures?

3    *A.* I believe Alan Bindel did.

4    *Q.* Okay. And Alan Bindel did that and you reported that

5    ultimately to A.Y., did you not?

6    *A.* Repeat the question.

7    *Q.* Sure.

8        You told Mr. Yount that the staff at Chester was going to

9    be taking and recording the temperatures of Bin C15?

10   *A.* Yes, I believe I did.

11   *Q.* Okay. Now, when you changed the date here on us because

12   you say you saw some other e-mail, what e-mail do you see that

13   you didn't have available when you took the time to give our

14   government the statement that made you change your date from

15   the 9th to the 3rd?

16   *A.* It was an e-mail from myself to several other people that I

17   had talked to Ron on April 3rd.

18   *Q.* And Ron told you, did he not, that he could not be there

19   for two weeks?

20   *A.* That is correct.

21   *Q.* Okay. And when Ron told you that he could not be there for

22   two weeks, you did not communicate to him that you had received

23   reports about a fire in the bin; is that correct?

24   *A.* I did not tell him that I'd received an e-mail with that.

25   *Q.* Now, I'd like to go through some of those e-mails with you.

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1    And just quickly on some of them.

2        Showing you Number 87, this is the first e-mail dated

3    March 12 when you received notification about the problem in

4    Bin C15; is that right?

5    A.   That's correct.

6    Q.   Now, bringing up a new one for you, this will be number

7    1 -- so we're all clear on this April, I believe it is

8    Number 88.

9        Do you see your screen now?  That's the April 3 e-mail.  Is

10   that the one that you are referring to?

11   A.   Yes, it is.

12   Q.   Okay.  So on -- when you talked to Ron, just so we have a

13   summary version of this, you did not tell him about any of the

14   information you got by way of e-mail from March 13 through

15   April 3 regarding the condition of the bin; is that right?

16   A.   That is not correct.

17   Q.   Okay.  What did you tell Ron?

18   A.   I told Ron about the situation where the pellets had

19   sloughed off the side of the bin and that the temperatures had

20   gone up.

21   Q.   Okay.  Did you show Ron the e-mail from Alan Bindel to

22   Zimitsch, and you, and Scott reporting that the bin has a fire

23   in it and is not going away dated April 2?

24          MR. PATTON:  That's been asked and answered now

25   several times.

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1           *THE COURT:*  Overruled.

2    *A.*  No, I did not.

3    *Q.*  Let's talk about some of the e-mails that are directly from

4    you where you refer to a fire in the bin in your own words.

5        You don't deny that you had sent e-mails stating that there

6    was a fire in the bin, do you?

7    *A.*  No, I do not.

8    *Q.*  Okay.  And you ultimately am I correct in saying -- I mean

9    here's one, Number 189.  This was to the accounting department

10   where you told Samantha Tran that it was really urgent, that

11   you had pellets on fire in the bin.  Do you see that e-mail?

12   *A.*  Yes, I see the e-mail.

13   *Q.*  Okay.  You don't deny writing that e-mail, do you?

14   *A.*  No, I do not.

15   *Q.*  You -- as you sit there today, you want to take back the

16   use of the word "fire"?

17   *A.*  I would say knowing what I know today there was a lot

18   better term to describe that to Samantha in the situation that

19   I needed her help with.

20   *Q.*  And taking -- if you took back the use of the word "fire,"

21   there would be an awful lot of other people who would have to

22   take back the use of the word "fire"; isn't that true?

23          *MR. PATTON:*  Objection to the form of the question

24   what other people have to do.

25          *THE COURT:*  Overruled.

1    *Q.*  I'm referring to e-mails that you've received.  As you sit

2    here right now, how many e-mails do you think you received from

3    people at Chester telling you there was a fire in the bin?

4    *A.*  I don't know.

5    *Q.*  Certainly more than one?

6    *A.*  I would be speculating.

7    *Q.*  Pardon?

8    *A.*  Yes.

9    *Q.*  Alan Bindel told you there was a fire in the bin, didn't

10   he?

11   *A.*  I believe he wrote an e-mail with that word, yes.

12   *Q.*  Okay.  Belcher did the same?

13   *A.*  I can't remember.

14   *Q.*  Belcher talked about a barbecue.  Do you remember that?

15   *A.*  I remember barbecue, yes.

16   *Q.*  Do you remember you brought up the name Dunekacke?

17   *A.*  Dunekacke, yes.

18   *Q.*  Dunekacke.  Does he still work for the company?

19   *A.*  Yes, he does.

20   *Q.*  Dunekacke sent you an inappropriate e-mail at one time,

21   didn't he?

22        *MR. PATTON:*  Objection to the relevance of that e-mail

23   to the issues in this case.

24        *THE COURT:*  Overruled.

25   *Q.*  Dunekacke sent you an e-mail pertaining to his observations

1    of smoke coming out of one of those aeration fans, didn't he?

2    A.  I don't know what he was referring to when he sent me the

3    e-mail.

4    Q.  Well, hold on a second now.

5        Tell the folks who Brian Dunekacke is.

6    A.  At the time he was a team leader in Chester in the

7    warehouse.

8            MR. CLIFFORD:  I'm going to have to come back to that.

9            MR. TAXMAN:  203.

10           MR. CLIFFORD:  There we go.

11           Is it up?

12           There we go.

13   Q.  (BY MR. CLIFFORD:)  You just said a moment ago you didn't

14   know what he was referring to?

15   A.  That is correct.

16   Q.  The fact is he was referring "to the vent in the middle of

17   the picture is the one that is smoking.  It's the second fan

18   from the north up riverside".

19       That was on April 15th.

20   A.  Correct.

21   Q.  So do you stand by your answer you didn't know what he was

22   referring to?

23   A.  Correct because there was an attachment to this.

24   Q.  Well, the attachment was an inappropriate picture of a lady

25   in a bikini?

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1   *A.*   That is correct.

2   *Q.*   So as you never saw -- as you sit here now, you never saw

3   the picture of the smoking aeration fan?

4   *A.*   I didn't know what he was referring to.  I thought he was

5   referring to the picture he had attached.

6   *Q.*   So when you read his e-mail, the vent in the middle of the

7   picture is the one that is smoking, it's the second fan from

8   the north up riverside, you thought he was referring to the

9   lady in the bikini?

10  *A.*   Yes, I did.

11  *Q.*   Okay.

12      Let's go back to when you gave our government a statement.

13      You had told the government that you were on site on

14  March 13th through the 14th, March 22 to 23, and April 26 to

15  27; is that correct best you recall?

16  *A.*   That is correct.

17  *Q.*   Now, had you ever been to the site before March 13 and 14,

18  2010?

19  *A.*   Yes, I believe I had.

20  *Q.*   Okay.  And how many times had you been to the Chester

21  facility before the March time frame?

22  *A.*   My best estimate would be once.

23  *Q.*   Okay.  And did you -- and how long did you -- were you

24  there?  A day, a week, couple days?

25  *A.*   I don't know.

1    *Q.*  Did you get to know of the men who worked at the facility

2    during the time that you were there both that -- that one time

3    and then the periods of March and April?

4    *A.*  I'm sure I got to know a little bit about them, yes.

5    *Q.*  Now, and when you got to know a little bit about them, that

6    was because you thought and believed that having the experience

7    and mentorship from the long-term employees of ConAgra is

8    important to you?

9    *A.*  Yes.

10   *Q.*  Okay.  And it's a fact, is it not, that you were repeatedly

11   told before April 27, 2010, by several of the men at the

12   facility that they wanted you to call the fire department

13   because there was going to be an explosion if you weren't

14   careful?

15   *A.*  We had discussions around that, yes.

16        *MR. CLIFFORD:*  May I have my question re-read?  I

17   would move to strike his answer as nonresponsive.

18        *MR. PATTON:*  Objection.  He responded to his question.

19        *THE COURT:*  It's a fact, is it not, that you were

20   repeatedly told before April 27, 2010, by several of the men at

21   the facility that they wanted you to call the fire department

22   because there was going to be an explosion if you weren't

23   careful?

24        That was the question.

25        *THE WITNESS:*  Excuse me.

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1      THE COURT:  His response was:  We had discussions

2  around that, yes.

3      MR. CLIFFORD:  Does the answer stand, Judge?  I'll

4  just move on if it does.

5      THE COURT:  It does.

6      MR. CLIFFORD:  Okay.

7  **Q.  (BY MR. CLIFFORD:)**  One of those men was Al Weibrecht,

8  wasn't it?

9  A.  I don't -- I don't remember everybody that I guess I talked

10  to.

11  Q.  Well, let me show you a clip by Mr. Weibrecht, and see if

12  this refreshes your memory.

13      MR. PATTON:  Objection to this procedure of showing

14  clips of other people.

15      THE COURT:  Overruled.

16      "Q.  Did you ever talk to Mr. Friedt about the

17      situation?

18      "A.  One time he was in my office in Elevator B, and I

19      had said something to him, and I was concerned about

20      that bin and that it might blow up.  And he said that

21      was just my opinion.

22      "Q.  When did that conversation happen?

23      "A.  Approximately the same time as when I talked to

24      Alan Bindel.

25      "Q.  So before West Side was out there?

1     *"A.  Right.*

2     *"Q.  Did you believe that Mr. Friedt was not fully*

3     *appreciating the danger of the situation?*

4     *"A.  I think Mr. Friedt wasn't concerned about any*

5     *opinion we had.*

6     *"Q.  You believe he wasn't listening to you or the guys*

7     *who were actually on the ground there?*

8     *"A.  He would not listen."*

9     **Q (BY MR. CLIFFORD:)** Did Mr. --

10          *MR. PATTON:*  Show my objection to that.

11          *THE COURT:*  Overruled.

12    **Q.  (BY MR. CLIFFORD:)**  Did Mr. Weibrecht say those words to

13    you?

14    A.  I don't -- I don't remember.

15    Q.  How about Mr. Kevin Herring?  One more here.

16          *"Q.  Other than the conversation --*

17          *MR. PATTON:*  Note my objection.  Can we stop this for

18    a second --

19          *THE COURT:*  Noted and overruled.

20          *"Q.  -- the conversation you had with Mr. Bindel about*

21          *bringing the fire department out there, did you ever*

22          *relay any other concerns that you had about this bin to*

23          *him or Sean during this time period?*

24          *"A.  I would say through the whole time, I'd say*

25          *sometime or other, you know, pretty well all of us guys,*

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1       *you know, there made statements, you know, to -- to Alan*

2       *Bindel or Sean or Mr. Godfrey about getting somebody in*

3       *there.*

4       *"Q.   And every time they rebuffed you?*

5       *"A.   Yeah.*

6       *"Q.   Did they ever explain to you why they believed*

7       *there was no danger?*

8       *"A.   No."*

9       **Q.   (BY MR. CLIFFORD:)**  Do you remember Mr. Herring?  I want to

10      ask you about him, do you remember him?

11      *A.*   I remember who he is, yes.

12      *Q.*   Okay.  He's the fella that was with you on that Saturday

13      morning when you went to the top of the bin with Sumner,

14      correct?

15      *A.*   I don't remember him being with us, no.

16      *Q.*   Okay.  He's the man who was with you on the date of the

17      explosion, that went and got the tarps that were put down by

18      the scale.  Do you remember that?

19      *A.*   He may have, yes.  I don't remember who --

20      *Q.*   Okay.  He's the man who you spoke to after the explosion in

21      the office of Building B, and you asked him how he was doing.

22      Do you remember that conversation?

23      *A.*   No, I don't.

24      *Q.*   Do you remember being told by an employee that you asked

25      how he was doing that he was doing fine, except for the

1   decisions that you made?

2           *MR. PATTON:*  Objection to the form of the question.

3           *THE COURT:*  Overruled.

4   *A.*  No, I don't.

5   *Q.*  Now, I'd like to talk to you a little bit about the date of

6   the explosion, and I think you told us that you were doing your

7   best to stay out of the way of Mr. Flitsch and his people; is

8   that right?

9   *A.*  I would ask if I wanted to, you know, be in the area, yes.

10  *Q.*  So you are telling -- you are telling us, as you sit here,

11  that you needed the permission of the West Side employees to go

12  walking around your own bin and elevator?

13  *A.*  I would ask, yes, because I don't know what they're doing.

14  *Q.*  I understand that.  But you used the word "permission."

15  You didn't need anybody's permission to go anywhere you wanted,

16  did you?

17  *A.*  No, that is not correct.

18  *Q.*  Well, it is correct, is it not, that ConAgra's rules in

19  dealing with contractors on the job are that you have the

20  right, but not the obligation, to inspect any and all of the

21  work that they're performing?

22  *A.*  That is correct.

23  *Q.*  And so, therefore, it is correct that you didn't need

24  anyone's permission to go anywhere?

25  *A.*  No.  But it is -- I see it as a courtesy to ask and let

1    them know where I'm at.

2    Q.  Well, let's talk about that courtesy.  You know, one of the

3    things that you told the folks about is that you went to the

4    airport -- you headed out for the airport.

5        Do you remember that line of discussion?

6    A.  That -- that is correct.

7    Q.  Okay.  And you headed out for the airport around 2:00 or

8    so?

9    A.  Yeah, it was after two, yes.

10   Q.  Okay.  But then you came back; isn't that right?

11   A.  Yes, I did.

12   Q.  And when you gave your statement to our government, you

13   came back because you told our government that you had missed

14   your flights and that you decided to go back to the plant; is

15   that right?

16   A.  That's part of it, yes.

17   Q.  Well, it says here "Friedt left around 2:15 to catch a

18   flight.  Realizing that he would be late for the flight, he

19   returned after 5 minutes.  West Side continued to work poking

20   into the portal."

21       Do you remember that?

22   A.  Yes, I do.

23   Q.  Okay.  And yet in your deposition, you told us that you

24   left the property, and as you were on your way away from it,

25   you realized that Alan wasn't -- Alan Bindel wasn't on

1    property, right?

2    A.   That is true.

3    Q.   And Sean Belcher wasn't on property, right?

4    A.   That is correct.

5    Q.   And that you felt, well, we are kind of almost home and

6    there's no management there.  I should really go back to make

7    sure that things get buttoned up the right way.

8         Isn't that a fact?

9    A.   Yes.

10   Q.   One of the other things, too, that you told us about, is

11   that Mel had asked you to stop the trucks from unloading on the

12   scale.

13        Do you remember that testimony?

14   A.   Yes, I do.

15   Q.   Because, just so we're all clear, for the two days that you

16   were there, April 26th and 27th, you were receiving at that --

17   at Bin C, or Elevator C, rather, deliveries from the trucks,

18   isn't that right, of grain?

19   A.   That is correct.

20   Q.   Okay.  Over almost 90 of them, from what I could tell;

21   isn't that right?

22   A.   I don't have information as to the number of trucks.

23   Q.   Okay.  But you've told us that what -- I did what Mel told

24   me to do, and he told me to stop the trucks, and I did.  And I

25   went and told the fellas to go home or go to Alton.

1    Do you remember that line of questioning?

2    A.  Yes, I do.

3    Q.  What you didn't tell us is that you when you came back from

4    the airport, you were amazed that the trucks were still

5    unloading; isn't that right?

6    A.  Yes, the trucks were still unloading.  And you were like --

7    now, let's get the time frame here.  If we accept the

8    government's report that you gave them before is true, it's

9    2:15.

10    MR. PATTON:  Objection to the form of the question.

11    Testifying.

12    MR. CLIFFORD:  It is cross examination.

13    MR. PATTON:  It is testifying.

14    MR. CLIFFORD:  It is cross examination.

15    THE COURT:  Objection is overruled.

16    Q.  (BY MR. CLIFFORD:)  It's 2:15 when you leave.  How far did

17    you get away, 15 minutes, maybe?  Ten?  Five?  You name it.  I

18    don't care.  Just give me a number that's reasonable.

19    A.  Ten, fifteen.

20    Q.  Okay.  So let's keep it on the low end of that, add

21    20 minutes.  All right.  So now you are at just past 2:30.  And

22    you come back and there are still trucks unloading.

23    Isn't that a fact?

24    A.  That is correct.

25    Q.  Okay.  And what you told us before is that you went up to

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1    Mel and you said, Hey, Mel, your guy is there at the manhole.

2    What's with the trucks?  You asked me to stop them.  What

3    happened here?

4        And isn't it a fact that you said Mel is being a nice guy,

5    and he is letting these guys get their work done?

6    A.  Could you repeat the question?

7    Q.  Sure.

8        You left.  And when you left, there were no trucks

9    unloading, correct?  The -- the last truck was there.

10   A.  Repeat that question.

11   Q.  When you left the scene to go to the airport at 2:15, there

12   were no trucks unloading at Elevator C --

13   A.  That's not --

14   Q.  -- C15?

15   A.  That's not correct.

16   Q.  Okay.  What is correct is that you went into the scale

17   house and, you said that the truck that's there now is going to

18   be the last truck; isn't that right?

19   A.  Correct.

20   Q.  It was on the scale.  Okay.  Was that truck still on the

21   scale when you left for the airport?

22   A.  It's probable that it was, yes.

23   Q.  How long does it take to unload a truck?

24   A.  I don't know, in Chester.

25   Q.  Well, I'll rely on your experience.  Give us your best

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1    estimate on how long it takes to unload a truck?

2    A.  Roughly, 3 to 4 minutes.

3    Q.  Okay.  So the last truck -- you don't dispute, do you, that

4    you instructed that the truck that was on the scale when you

5    went into the scale house and executed Mel's request to stop

6    loading trucks was the last truck of the day?  Yes or no?

7    A.  I believe that's correct, yes.

8    Q.  Okay.  So now you leave, you drive 10 minutes away, maybe

9    15, but let's say 10, you realize, you've got to turn around

10   and come back.  That's another ten.  And you come back, and

11   there are trucks unloading.

12       That's correct, is it not?

13   A.  Correct.

14   Q.  Okay.  And you said, What the heck?  I'm the boss.  I said

15   no more trucks.  Isn't that -- you said that to yourself,

16   didn't you?

17   A.  I don't know what I said to myself.

18   Q.  Okay.  Well, you certainly went up to Mel and asked Mel why

19   there were trucks being unloaded when you had stopped them;

20   isn't that correct?

21   A.  Yes, I did.

22   Q.  And Mel told you that he wanted to be a nice guy, and he

23   let those trucks continue to unload, even though he had asked

24   you to stop 'em.

25       Isn't that what you say Mel said?

1    *A.* That is correct.

2    *Q.* Okay. So now you -- let me get this right. Not only did

3    you need Mel's permission, so you say, to go around your

4    elevator, you also conceded to Mel the operation of your

5    elevator.

6        Why would you let a guy from West Side start the delivery

7    process again?

8    *A.* I didn't. I was gone.

9    *Q.* Okay. Did that upset you at all? Did you do anything

10   about it?

11   *A.* I was confused as to, you know, he had asked me to stop.

12   *Q.* That wasn't my question. Did that upset -- two parts. Did

13   that upset you at all?

14          *MR. PATTON:* Objection, asked and answered.

15          *MR. CLIFFORD:* He didn't answer.

16          *MR. PATTON:* He is arguing with the witness.

17          *MR. CLIFFORD:* I am.

18   ***Q. (BY MR. CLIFFORD:)*** Did that upset you at all?

19   *A.* I would say a little bit, you know --

20   *Q.* Okay.

21   *A.* -- that I was confused as to why he would do that.

22   *Q.* And what did you do about it?

23   *A.* Nothing. I just let them finish dumping the truck.

24   *Q.* How long did they continue to dump trucks?

25   *A.* I believe that was the last truck that was being dumped.

1    *Q.*  Now, you tell us about this manhole and the use of the

2    manhole.

3        You told us that you had no supervisory role relative to

4    what West Side was doing that day; isn't that true?

5    *A.*  You know, I wouldn't say none whatsoever, but, you know,

6    operations throughout the plant and other parts of the plant.

7    *Q.*  Well, you were actively involved in what Mel was doing with

8    the manhole, were you not?

9    *A.*  Um, yes, he had asked me to assist him in that.

10   *Q.*  Okay.  So much so that as far as you were concerned that

11   after you got back and Mel had been doing what he was doing

12   with the manhole that you -- that you described the process as,

13   We removed the hole cover to get to the pellets that were

14   behind the cover; isn't that right?

15   *A.*  I was standing there watching, yes.

16   *Q.*  You were actively engaged in his decision to do that work,

17   were you not?

18   *A.*  He had -- he had said he wanted to remove the cover.  I was

19   standing there watching.

20   *Q.*  Page 350, Sentence 9 to 22, Counsel.

21       "*Q.  When you were on the --*

22       *MR. CLIFFORD:*  Your Honor, you'll have to turn the

23   volume up, please, on this, we learned.  I'll start again.

24       *THE COURT:*  Okay.  Try it.

25       *MR. PATTON:*  Can I first have the page and line

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

```
 1   number --
 2            MR. CLIFFORD:  Yes.
 3            MR. PATTON:  -- before we start playing clips?
 4            THE COURT:  350, Line 22.
 5            MR. PATTON:  Page 50, Line 22?
 6            THE COURT:  Page 350.
 7            MR. CLIFFORD:  350, Line 9 to 22.
 8       "Q.  When you were on top of the bin?"
 9            THE COURT:  Let me.
10            COURT REPORTER:  I can't hear it at all.  I'm sorry.
11            THE COURT:  Let me...
12                 (Video playing but sound not audible.)
13       THE COURT:  Why don't we take our break.  I want to
14   get the IT person to fix that screen and see if I can get the
15   volume turned up.
16            MR. CLIFFORD:  Okay, Judge.
17            THE COURT:  It will take probably 20 minutes.
18            BAILIFF:  All rise.
19                           (Recess)
20            THE COURT:  Be seated.
21            MR. CLIFFORD:  May I proceed, your Honor?
22            THE COURT:  You may.
23   Q.  (BY MR. CLIFFORD:)  Let me start over again, Mr. Friedt, so
24   we have got a frame of reference.
25       You were -- the way you described yourself to us in your
```

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1    direct examination, you want to present the picture that you

2    were a passive participant and observer in what was going on

3    with the manhole; isn't that correct?

4    A.   Yes, that is correct.

5    Q.   And the fact is, though, that you were an active decision

6    maker with Mel to the point where it was a group effort; we

7    were doing this, we were doing that?

8    A.   Again, I was -- he asked me to help from what I recall.

9    Q.   Well, let me show you at --

10        MR. CLIFFORD:   Page 108, Line 11, counsel, to Page

11   110, Line 17.

12        "Q.   Why was the fire department called that day?

13        "A.   Why were they called?

14        "Q.   Yes.

15        "A.   Mel had asked me at 3:00 if he could have the fire

16        department come, come to take a walk-around.  So I

17        called the fire chief and asked him to come out to the

18        facility to do a walk-around because that's what Mel had

19        asked me to do.

20        "Q.   And what was the purpose of the walk-around?

21        "A.   From our discussion with Mel, I believe it was

22        something along the line of he wanted to assess, you

23        know, what was going on.

24        "Q.   What was going on that was different than the day

25        before?

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1      "A.  The only thing that I know externally is, you know,

2      we had removed the port hole cover, and he was pulling

3      pellets out of the side of the bin and trying to poke a

4      hole into the bin.

5      "Q.  So did you call the fire department?

6      "A.  Yes, I called Mike, the fire chief, and talked with

7      him.

8      "Q.  Prior to talking to Mike, the fire chief, did you

9      call anyone from ConAgra?

10     "A.  I believe I was in correspondence."

11          MR. PATTON:  I'm objecting; no connection to the

12     question pending to the witness.

13          THE COURT:  Let's hold up.

14          Is there more?

15          MR. CLIFFORD:  There's a little bit more.

16          MR. PATTON:  There hasn't been anything in connection

17     with the question to the witness.

18          THE COURT:  Overruled.

19     "A.  I believe expected the other people prior to that

20     but in between what time and what?

21     "Q.  Between when he asked you to call the fire

22     department.

23     "A.  I believe I talked to Anthony Yount.  I can't

24     recall exactly what time all those conversations went

25     on.

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1          *"Q.  So you called the fire department.  And what did*

2     *you tell you -- you talked to the fire chief?*

3          *"A.  I talked to the fire chief and I asked him if he*

4     *could have somebody come out or he would come out to the*

5     *facility and take a walk-around.*

6          *"Q.  And what did he say?*

7          *"A.  Um, he said he couldn't, um, because he had*

8     *something going on and -- a Boy Scout meeting or*

9     *something, but he would send somebody else out to the*

10    *facility."*

11          MR. PATTON:  Continued objection here, Judge.  We

12    haven't even come close to what his question was.

13                        *(Video started.)*

14          *"A.  Not between the time I made the call and when the*

15    *incident happened.*

16          *"Q.  So how long between the time you made that call and*

17    *the incident happening?*

18          *"A.  I'd say roughly an hour."*

19          Okay.

20          *"Q.  So you called the fire department, and you asked*

21    *him to come out, and an hour later there was an*

22    *explosion?*

23          *"A.  Roughly, yes."*

24          *THE COURT:  Okay.*

25          *MR. CLIFFORD:  Okay.*

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1    *Q.   (BY MR. CLIFFORD:)*  Now, it's a fact, is it not, that you

2    told Mr. Yount, A.Y., that you were bringing him up to speed

3    about the process that was going on and "we had opened up the

4    manhole cover"?  You told Mr. Yount that obviously after we had

5    opened up the manhole cover, correct?

6    *A.*   I may have told him, yes, that we opened up the manhole

7    cover.

8    *Q.*   And the fact is that Mr. Yount, the head of safety for

9    those 1700 bins, was kept apprised by you throughout the course

10   of the day, correct?

11   *A.*   Yes, I called him several times.

12   *Q.*   And one of the times that you called him, you reported to

13   him about that fire at the fan gasket, didn't you?

14   *A.*   I may have.  I don't remember.

15   *Q.*   Well, sitting here today is there any doubt in your mind

16   that that fire at the fan gasket was something of import and of

17   concern to you?

18   *A.*   It was a concern.  I don't remember whether I told him or I

19   didn't.  I don't remember.

20   *Q.*   You were certainly reporting to Mr. Yount all of the things

21   that were of concern to you, were they not?

22   *A.*   Again, I don't remember everything I told Anthony.

23   *Q.*   You certainly both, either or -- both you and Anthony could

24   have stopped the work at this site at any time; is that

25   correct?

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1    *A.*  Yeah, we probably -- yeah, we could have, yes.

2    *Q.*  You didn't need West Side's permission to stop the work

3    over a safety concern, did you?

4    *A.*  If I would have had a reason to stop, I would have.

5    *Q.*  You didn't need -- let's try this again.

6        You didn't need West Side's permission to stop the work at

7    any time that you chose to do so over a safety concern?

8            *MR. PATTON:*  Asked and answered.

9            *THE COURT:*  Overruled.

10   *A.*  Again, if I would have seen something that -- you know,

11   that would have caused me to do that, I could have stopped it.

12   *Q.*  And a fire -- how -- what do you know what temperature it

13   takes to melt rubber or start it on fire?

14   *A.*  No, I do not.

15   *Q.*  You are a pretty bright guy.  Is there any -- did you draw

16   any connection between heat that was hot enough to start a

17   rubber gasket on fire next to the bin and even the remotest of

18   possibilities that there was a fire inside of the bin?

19   *A.*  No.  I know there's different types of rubbers and I don't

20   know what the point is where they would, you know, catch on

21   fire like that.

22   *Q.*  So your testimony is that it could be hot enough to start

23   this piece of rubber on an industrial building like Bin C15 but

24   not hot enough to have a fire on the inside?

25   *A.*  I don't know that.  I didn't know that.

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1    *Q.* Among the things that you didn't know is that there were

2    recordings of temperatures of clumps of the product as high as

3    400 degrees; isn't that right?

4    *A.* That's correct.

5    *Q.* And as high as 251 degrees?

6    *A.* In what respect?  251 degrees of what?

7    *Q.* That there was a temperature taken inside the bin of

8    251 degrees?

9    *A.* I was not aware of that, no.

10   *Q.* And you weren't aware that a temperature was taken around

11   that duct at 112 degrees?

12   *A.* I may have.  I remember something about 112 degrees.  I

13   don't remember exactly what that was, no.

14   *Q.* And is there any doubt in your mind that you never

15   communicated any of those temperatures to Ron Sumner or anyone

16   else from West Side?

17         *MR. PATTON:* Asked and answered.

18         *THE COURT:* Overruled.

19   *A.* I don't know the time frame of those temperatures, so I

20   don't know when they were taken.

21         *MR. CLIFFORD:* Rick, could we have 140 redacted in

22   evidence?

23   *Q.* So directing your attention to April 12th, 251 degrees,

24   April 12th, 102 and 145.  Smoke coming out of the bin,

25   coming -- cooling fan intake.

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1          That's April 12, 2010.  That's a log of ConAgra?

2     A.   I do not know whose log that is.

3     Q.   Well, I'll make the representation to you, Mr. Friedt, that

4     that's a log of ConAgra.

5          Are you telling us that no one ever told you those things?

6     A.   No, I was not aware of that.

7     Q.   Okay.  And so, therefore, obviously you never communicated

8     those to Mr. Sumner before his team arrived on April 19th?

9     A.   Yes, if I was not aware, I could not have.

10    Q.   You agree, don't you, that safety is a concern and a

11    responsibility for everyone?

12    A.   Could you repeat the question.

13    Q.   You agree, do you not, that safety is a concern and

14    responsibility to everyone?

15    A.   Yes, safety is a concern.

16    Q.   In fact, in some companies -- and I'm sure you have heard

17    the phrase -- safety is job one?

18    A.   Yes, I have.

19    Q.   Now, when you gave your statement to our government, did

20    you tell our government that you had been repeatedly told by

21    employees of ConAgra, those employees who had been there for

22    30-plus years individually, collectively over a hundred years,

23    that they were concerned about their safety and the possibility

24    of an explosion before the job began?

25    A.   I don't remember that.

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1    *Q.*  You don't remember that because you didn't do it, did you?

2    *A.*  I don't know.

3    *Q.*  Well, do you want to take a look at your statement?

4        Is there any doubt that you didn't tell the government

5    that?

6    *A.*  I don't recall seeing it in my statement.

7    *Q.*  The -- by the way, if the stopping -- taking the manhole

8    cover off of Bin C15 and stopping the truck deliveries would

9    have interrupted the business operations of ConAgra that day,

10   correct?

11   *A.*  Yes, it would have stopped unloading trucks.

12   *Q.*  And if the fire department was called for anything other

13   than a walk-around and a walk-through, you recognize the

14   possibility that they take over the entire facility and it's

15   theirs to do what they wish?

16       *MR. PATTON:*  Objection.  That calls for speculation.

17       *THE COURT:*  Overruled.

18   *Q.*  You can answer.

19   *A.*  Yes, it is possible they would do that.

20   *Q.*  And you didn't want that to happen, did you?

21   *A.*  It wouldn't have mattered to me.  It didn't matter.

22   *Q.*  Well, you agree that if the fire department closed down the

23   mill, that's not a good thing from the business perspective of

24   ConAgra; isn't that correct?

25   *A.*  That is correct.

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1    *Q.* And you did not want that to happen, did you?

2            *MR. PATTON:* Asked and answered.

3            *MR. CLIFFORD:* He hasn't answered it.

4            *THE COURT:* Overruled.

5    *A.* I don't know what the fire department would have done when

6    they came.  The mill is totally separate from the elevator.

7    *Q.* After the explosion occurred at the elevator, both that

8    elevator and the mill, all operations were shut down, weren't

9    they?

10   *A.* Yes, they were.

11   *Q.* So the fire department had they come and made the decision

12   that they had to battle a fire in that bin, the entire facility

13   would have been closed, wouldn't it?

14   *A.* I don't know that.

15   *Q.* Is there any doubt in your mind about it?

16           *MR. PATTON:* Objection.  Asked and answered; and

17   foundation.

18           *THE COURT:* Sustained.

19   *Q.* I'd like to go back to this phone call with the chief at

20   3:00.  And I bring up for you --

21           *MR. CLIFFORD:* If I could have the ELMO, your Honor.

22   *Q.* We have got just a sheet that talks about April 27 calls to

23   A.Y.

24       That A.Y., you call that Mr. Yount again for the record,

25   right?

1    *A.* That is correct.

2    *Q.* These are your cell phone records.  You have looked at

3    those times, haven't you?

4    *A.* Yes, I have.

5    *Q.* And is it your testimony to this jury that you do not know

6    the content of what the exact exchange was with Mr. Yount

7    during any of these calls?

8    *A.* I recall some of them, yes.

9    *Q.* Okay.  Well, give us what you can.

10    2:17 do you remember anything?

11   *A.* Yes.  I was -- that's when I had left the plant and I was

12   calling people to let them know I was leaving.

13   *Q.* Okay.  2:27?

14   *A.* It's either he called me back or I called him that I had

15   actually gotten back to the facility.

16   *Q.* 2:28, seven minutes?

17   *A.* Again, I don't know is that an incoming or an outgoing

18   call.

19   *Q.* Your line's hot that's what I know about it.

20   *A.* That's -- you know, him calling me back probably.

21   *Q.* Okay.  3:04?

22   *A.* That's when I talked to him about them wanting to take the

23   manhole cover off.

24   *Q.* Okay.  I thought it was a we.  I thought you called -- I

25   thought you told us a moment ago that when you called Mr. Yount

1   you said that we were going to take the manhole cover off.  Did

2   you forget that already?

3   A.  No.

4          MR. PATTON:  Objection to the form of the question.

5          THE COURT:  Sustained.

6   A.  Mel asked me if they could remove the cover.

7   Q.  And you were telling Mr. Yount that the cover was coming

8   off because that was a safety concern of yours; is that right?

9   A.  Repeat the question, please.

10  Q.  You were telling Mr. Yount that the cover was coming off

11  and the fact that it was coming off was a safety concern of

12  yours?

13  A.  Not necessarily, no.

14  Q.  Okay.  So you were just giving him every blow by blow?

15  A.  I'm giving him some information, yes, as I, you know,

16  witness what's going on.

17  Q.  The 3:55 call, that's a six-minute call.  That's a long

18  call with Mr. Yount at that time, right?

19  A.  It is six minutes, yes.

20  Q.  Okay.  Now, one of the things about that call, as you sit

21  there today, are you aware of the fact that Kevin Herring said

22  that you called the fire department chief the first time on the

23  morning of April 27?

24  A.  I don't know what Kevin said, no, I don't know.

25  Q.  I'm asking you if you are aware.

1    A.  I don't recall.

2    Q.  Okay.  As you sit there now, are you aware that the fire

3    chief told us that you called him the morning of April 27?

4    A.  No, I don't remember that.

5    Q.  So do you really -- strike that.

6        You -- no matter what time that call was made, you reported

7    the fact the Mel wanted the fire department called to

8    Mr. Yount, correct?

9    A.  Yes, I did.

10   Q.  And Mr. Yount and you had every ability in the world to

11   stop that job at that time until the fire department got out to

12   check out the situation in the bin?

13   A.  If there was a reason that we saw we needed to, yes.

14   Q.  Okay.

15         MR. CLIFFORD:  I'll move to -- strike that. as

16   nonresponsive.

17         MR. PATTON:  Objection.

18         THE COURT:  Sustained.

19         MR. PATTON:  He answered the question.

20         THE COURT:  No, it's nonresponsive.

21   Q.  Please listen to the question.  Okay?  I know I am, and I

22   apologize, I really don't want to argue with you.  Okay?

23         MR. PATTON:  Objection to the comments to the witness

24   now, Judge.

25         THE COURT:  Okay.  Look, you are all testifying here.

1    So let me start right here.  We are in week three, patience are

2    running thin.  Your problem is mine are getting thin.

3             Proceed.

4         MR. CLIFFORD:  Yes, sir.  Thank you, Judge.

5    *Q.  (BY MR. CLIFFORD:)*  You -- no matter what time that call

6    was made to the fire department, the guy that you are now

7    telling us is the expert on the site wants the fire department

8    to come out and inspect this property, correct?

9    *A.*  Yes, Mel asked me to do that.

10   *Q.*  And he did it at a time when you knew that there was a fire

11   that had started at the aeration duct rubber gasket, correct?

12   *A.*  Yes, that is correct.

13   *Q.*  And you reported that, in all likelihood, the burning of

14   the gasket to Mr. Yount?

15   *A.*  Again, I don't remember telling him that.

16   *Q.*  I said in all likelihood.

17   *A.*  I don't remember.

18   *Q.*  Okay.  Well, whether you did or you didn't, when you have

19   the man who was the expert on the scene, as you described him,

20   as opposed to the expert on the phone, there was nothing that

21   prevented you guys from buttoning up that job at that moment in

22   time until the fire department came and took a look around,

23   correct?

24   *A.*  Yes, that's -- probably could have been done, yes.

25   *Q.*  And there is no doubt in your mind that that's your

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1    property and that ConAgra has the right to stop the work and

2    you didn't, correct?

3    A.  We have if we understand what's going on, yes.

4    Q.  And if you don't understand what's going on on your own

5    property, that's a safety concern, isn't it?

6    A.  That's why we had people in there to work on it, they

7    understand what it is.

8            MR. CLIFFORD:  Move to strike as nonresponsive.

9            THE COURT:  Sustained.

10   Q.  If you don't know what's going on on your property, that's

11   a safety concern, isn't it?

12   A.  It's possible it could be, yes.

13   Q.  And that's because management is responsible and

14   accountable for providing a safe workplace to all of the

15   employees; isn't that right?

16   A.  That's what our safety policy says, yes.

17   Q.  Now, by the way, you knew that Mel was going to add and did

18   add gallons of water to the core of that bin, correct?

19   A.  No, I did not.

20   Q.  Do you remember that statement you gave to our government?

21   A.  Yes, I do.

22   Q.  Where you were sworn to oath under penalties of perjury,

23   and fine, and incarceration?

24           MR. PATTON:  Objection to the form of the question.

25           THE COURT:  Overruled.

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1    *A.*  Yes.

2    *Q.*  "Melvin told Friedt", Page 4, "that he wanted to dump water

3    on the contents of the bin.  Friedt told Melvin to dump as much

4    water as he wanted.  A hose was put on top and another at the

5    aeration fan hole."

6        You told that to our government, did you not?

7    *A.*  Yes, I did.

8    *Q.*  And you told A.J. *[sic]* that the water was being added to

9    the bin, did you not?

10   *A.*  No, I did not.

11   *Q.*  So you consulted with Mr. Yount from a safety perspective,

12   correct?

13   *A.*  Yes.  A.Y., yes.

14   *Q.*  Adding water to a burning whatever is addressing a safety

15   concern, is it not?

16   *A.*  I did not know that.

17   *Q.*  Mr. --

18   *A.*  Say it again.

19   *Q.*  Adding water to a burning pellet is addressing a safety

20   concern, is it not?

21   *A.*  It could -- could probably, yes.

22   *Q.*  And in all likelihood, don't you agree that you told

23   Mr. Yount that you were -- that you were allowing water to be

24   added to the inside of the bin?

25   *A.*  It's possible I may have, yes.

1    *Q.*  Any doubt in your mind about it, sir?

2    *A.*  I don't remember, no, sir.

3    *Q.*  You went into the tunnel that day, did you not?

4    *A.*  Yes, I did.

5    *Q.*  Pretty stinky, dungy place, wasn't it?

6    *A.*  Dungy, yes.

7    *Q.*  Okay.  What did it smell like?

8    *A.*  I don't remember right now.

9    *Q.*  Smell like roses?

10   *A.*  No, it did not.

11        *MR. PATTON:*  Objection to the form.

12    **Q (BY MR. CLIFFORD:)** How about burnt coffee?

13   *A.*  I don't remember what it smelled like.

14   *Q.*  So have you ever used your senses, your sense of smell to

15   detect whether or not there was something that might be burning

16   in your space?

17   *A.*  Yes, I have.

18   *Q.*  Okay.  And it is your testimony, as you sit there now, that

19   when you went into that tunnel your sense of smell didn't alert

20   you to the fact that something might be burning on the morning

21   of April 27th?

22   *A.*  I don't remember being down in the tunnel on the morning of

23   April 27th.

24   *Q.*  Well, I thought -- isn't it a fact that you told us you

25   went into the tunnel, and you also went up to the top of the

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1    bin on the 27th?

2    *A.*   In the morning, I went up to the top of the bin, yes.

3    *Q.*   Okay.  And you also went into the tunnel right before the

4    men broke for lunch?

5    *A.*   Yes, but...

6    *Q.*   And when you went into that tunnel, you didn't see anything

7    that caused you to be shocked that the two guys that were down

8    there, Becker and Jentz, would be going to lunch after they had

9    closed up the chute?

10   *A.*   No, I did not.

11   *Q.*   Okay.  And, in fact, they really stopped the work because

12   they had finished loading the last truck; isn't that right?

13   *A.*   According to what they told me, yes.

14   *Q.*   And that's why they went to lunch.  When there is no truck,

15   they can't work, correct?

16   *A.*   They were going -- they told me they were going to lunch,

17   yes.

18   *Q.*   When there's no truck, there's no work, correct, for those

19   guys in the tunnel?

20   *A.*   That's not -- that's not correct.

21   *Q.*   For those guys in the tunnel?

22   *A.*   That's not correct.

23   *Q.*   Okay.  Now, to the best of your knowledge, the employees of

24   A&J and A&J did not do anything wrong, did they?

25          *MR. PATTON:*  Objection to the foundation of this

1    question.

2              *THE COURT:*  Overruled.

3    *A.*  I don't have an opinion.  I don't -- I don't know.  I can't

4    say that.

5              *MR. CLIFFORD:*  Counsel, Page 379, Line 7 through

6    Line 13.

7              May I have the computer, Judge?

8              *THE COURT:*  I'm sorry.

9    *"Q.  Is there anything that A&J did or did not do that*

10   *contributed to cause the accident, to your knowledge?*

11   *"A.  Not to my knowledge.*

12   *"Q.  Is there anything they should have done differently*

13   *to have prevented this accident?*

14   *"A.  Not to my knowledge."*

15   *Q (BY MR. CLIFFORD:)* Mr. Friedt, it's true, is it not, that

16   you were there for the sole purpose -- you were at Chester on

17   the 26th and 27th for the sole purpose -- strike that -- the

18   primary purpose of overseeing the removal of these pellets from

19   Bin C15?

20   *A.*  That's not correct.

21   *Q.*  So you are saying on the 26th and 27th, there was a

22   different primary purpose?  I gave you "primary" to give you

23   your deal on the peddle patch *[ph]* or whatever you are talking

24   about, the PowerPoint thing that you were making.

25            Am I confusing you?

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1    A.   Yes.   Could you repeat the question?

2    Q.   I apologize.

3         You -- you were in your office doing another project,

4    right?

5    A.   Yes.

6    Q.   That other project had to do with addressing the phenomenon

7    of these pellets clumping up inside of the bins, right?

8    A.   Correct.

9    Q.   And the -- and the belief was that the pellets were going

10   inside to the bins, and they were a little too hot and maybe a

11   little too moist, correct?

12   A.   That's kind of what we started out with, yes.

13   Q.   Okay.   And that's kind of where you ended up, isn't it?

14   A.   To this point, yes.

15   Q.   Yes.

16        And even until today, right?

17   A.   Yes.

18   Q.   Okay.   You never concluded that there was some cold wall

19   syndrome going on with the bins, did you, that caused this

20   problem?

21   A.   I don't understand what that means.

22   Q.   Okay.   That's okay.   You don't have to.

23        But now going back, you did do some work on this project on

24   the 26th and the 27th, correct?

25   A.   That is correct.

1    *Q.* But that wasn't the primary reason why you were there

2    on-site at Chester, correct?

3    *A.* Correct.

4    *Q.* The primary reason why you were there at Chester was to

5    finalize and oversee the final buttoning up of this salvage

6    project, correct?

7    *A.* I was there to observe.

8    *Q.* Okay.  Well, you told ladies and gentlemen of the jury that

9    after the explosion, Mel Flitsch said to you, It's my fault.

10   It's my fault.

11        Do you remember that testimony?

12   *A.* Yes, I do.

13   *Q.* Do you remember a fella at the job by the name of Lohman?

14   *A.* Yes, I do.

15   *Q.* Okay.  I want you to accept that Lohman came in here and he

16   said that these fellas -- that if he had done his job, these

17   fellas wouldn't have gotten burned up.

18        Have you heard about that?

19        *MR. PATTON:*  Objection to relevance.

20        *THE COURT:*  Overruled.

21   *A.* Repeat the question.

22   *Q.* Have you heard that Mr. Lohman sat on that witness stand

23   and took accountability for what happened to these men that

24   day?

25   *A.* No, I am not aware.

Cross Examination - Friedt, Godfrey (Jentz & Schmidt)

1          *MR. PATTON:*  Objection to relevance.

2          *THE COURT:*  Overruled.

3     *Q (BY MR. CLIFFORD:)* Well, it's a fact, is it not, sir, that

4     neither you, on behalf of ConAgra, have ever once accepted a

5     smidgen of accountability for what happened that day?

6          *MR. PATTON:*  Objection to the form of the question.

7          *THE COURT:*  Overruled.

8     A.  Sir, I live with that every day.  Okay?

9     Q.  I understand that.  So do these men.

10    A.  I don't know how to answer the question.

11    Q.  Do you or do you not accept any accountability for what

12    occurred that day?

13         *MR. PATTON:*  Same objection.

14         *THE COURT:*  Overruled.

15    A.  I -- I don't know.  I don't know if there was -- you know,

16    any accountability on my part or not.  I don't know.

17         *MR. CLIFFORD:*  Thank you, sir.

18         I have no further questions at this time, Judge.

19         *THE COURT:*  Mr. Taxman.

20                        **CROSS EXAMINATION**

21    *Q.  (BY MR. TAXMAN:)*  Do you have water up there?

22    A.  Yeah.

23    Q.  Mr. Friedt, do you remember me?  I'm Marc Taxman.  I

24    represent Justin Becker.

25    A.  Yes, I do.

1    *Q.* Okay. We've met before when you gave your sworn

2    disposition in the case. Do you remember that?

3    *A.* Yes.

4    *Q.* All right. I think where Mr. Clifford ended off, he talked

5    about accountability. And is it fair for us to believe that a

6    principle of ConAgra, and a principle of Godfrey Friedt, is

7    that if you don't live up to the standards of your job, you

8    might be accountable for something, fair to say?

9    *A.* Regardless, you're accountable all the times, I believe.

10   *Q.* So we are in agreement: If you don't live up to the

11   standards of your job, you could be accountable for something,

12   fair to say?

13   *A.* I think you are accountable, even if you don't live up to

14   the standards of your job.

15   *Q.* Do you understand the question that I'm asking you?

16          *MR. PATTON:* Objection, your Honor.

17          *THE COURT:* Overruled.

18   *A.* Repeat the question.

19   *Q.* The question is, do you understand what I'm asking you?

20   *A.* No, I do not.

21   *Q.* Okay.

22        Now, I noticed when counsel for ConAgra was asking

23   questions of you, you answered all of the questions. I don't

24   think you said I don't know or I don't remember one time, did

25   you?

1           *MR. PATTON:*  Objection.

2           *THE COURT:*  What basis?

3           *MR. PATTON:*  Argumentive.

4           *THE COURT:*  Overruled.  Cross examination.

5    *A.*  I don't remember.

6    *Q.*  Okay.

7       Not one time when counsel for ConAgra asked you a single

8    question did you say I don't understand the question.  Is that

9    fair to say?

10          *MR. PATTON:*  Again, same objection, your Honor.

11          *THE COURT:*  Overruled.

12          *MR. PATTON:*  Improper, argumentative.

13          *THE COURT:*  Overruled.

14   *A.*  It's possible.  I don't know.

15   *Q.*  You just can't remember to a couple of hours back when they

16   were asking you questions?

17   *A.*  It's possible that -- yes.

18   *Q.*  Okay.  I want to go back to the 27th.

19          *MR. TAXMAN:*  If I may use the ELMO, your Honor?

20   ***Q.  (BY MR. TAXMAN:)***  All right.  I sort of doodled this while

21   you were giving your testimony.  If I have this all right, in

22   the first column here, I wrote Chief Lochhead.  He is the fire

23   chief at Chester Fire Department.

24       You know that man, correct?

25   *A.*  Yes, I do.

1   *Q.* All right.  And he told us that at some time around 8:30 to

2   10:30, you called him up early in the morning, and you said, We

3   would like you to come down, take a look at our bin, and see

4   what is going on.

5       Just accept that to be true.  That's what he told this

6   Court.

7       The first question I have, if we go back before April 27,

8   2010, all the way back to March 13, 2010, at no time did you,

9   Godfrey Friedt, ever call the fire department and arrange for a

10  meeting to discuss what's going on in Bin C15, true?

11  *A.* That is correct.

12  *Q.* Okay.  It would make -- it would be a good idea, and it

13  would make good safety sense for you to arrange for the fire

14  department to come into the Chester facility, take a look

15  around, see what is going on, and do a little bit of

16  preplanning.

17      That just makes good safety sense, true?

18  *A.* Depending on the conditions, yes, it would.

19  *Q.* Does it make good safety sense to have the fire department

20  come in, look around, and see what's going on?

21  *A.* And I would say, depending on conditions, yes, they

22  would -- yes, it would.

23  *Q.* Sir, you know the conditions.  From March 13, 2010, all the

24  way to April 27, 2010, there is a hot bin, there's smoke,

25  there's elevated temperatures.  There is oxygen that's

Cross Examination - Friedt, Godfrey (Beckers)

1    depleted.  There's carbon monoxide that's increasing.  You have

2    got fire on the aeration fans.  You have got smoke coming out

3    of the aeration fans.  You have got smoke coming out of the

4    top.

5        You know that those are the conditions observed during that

6    time period, correct?

7    A.  What dates?

8    Q.  March 13, 2010, that's the day you find out about this and

9    you end up in Chester, to the day of the explosion, April 27,

10   2010.

11       You know those are the conditions, correct?

12   A.  I'm aware of them, most of those, yes.

13   Q.  All right.  So we are getting off on a tangent, sir.  I'm

14   just asking you, do you agree?  Can you help these folks out?

15       Tell them, to help them judge this case, does it make good

16   safety sense to get the fire department in, look around, see

17   what's going on, when you have those kinds of conditions?

18   A.  Yes, it would.

19   Q.  Never done by ConAgra, correct?

20   A.  No, it was not.

21   Q.  The fire department never came out between April 27, 2010,

22   and March 13, 2010, correct, for a consultation?

23   A.  No, they did not come out.

24   Q.  Okay.  So, here, I'm getting back to our chart.  It is a

25   good idea if you call the fire chief first thing in the morning

Cross Examination - Friedt, Godfrey (Beckers)

1    on the 27th.  You want him to come out, take a look around, see

2    what is going on, take a breather, just assess the situation

3    before anyone goes any further, that would be a good idea,

4    wouldn't it, sir?

5    *A.*  Yes, it would.

6    *Q.*  Okay.  Now, here, under oath, you've told us you didn't

7    make that call.  Your first call was at 3:00 p.m., correct?

8    *A.*  That's what I remember.

9    *Q.*  Okay.  Well, you are trying to testify here under oath, to

10   the best of your ability, give these folks the facts they need

11   to judge this case.

12         *MR. PATTON:*  I'm objecting to the speech.

13         *THE COURT:*  Don't refer to the jury.  Sustained.

14         *MR. TAXMAN:*  Okay.  I apologize.  I apologize.

15   *Q (BY MR. TAXMAN:)* You are giving testimony, which is evidence

16   in this case, to make a record under oath the best you can,

17   correct?

18   *A.*  That is correct.

19   *Q.*  All right.  The chief says the second call comes at 4:00 on

20   that day, and that's when the explosion happens.  It is too

21   late to do any safety assessments.  It is too late to do

22   anything at that point, correct?

23   *A.*  That is correct.

24   *Q.*  All right.  Now, on our other side of the column here, I've

25   wrote Yount.  And what I've recorded here -- and I'll show you

Cross Examination - Friedt, Godfrey (Beckers)

1   this in a minute -- there is seven phone calls to Anthony

2   Yount.  And you told this Court and this jury that you made a

3   handful of calls to A.Y.  You said, I'm not going to

4   Huntsville -- that's one of the things -- and you wanted to let

5   him know what's going on in the bin.  But you didn't have any

6   concerns.

7       That's what you said here, right?

8       You remember that, don't you?

9   A.  Yes.  I -- I recall that, yes.

10  Q.  You recall that because that was your sworn testimony that

11  you just gave here 45 minutes ago, right?

12  A.  It's possible, yes.

13  Q.  You don't even remember, do you?

14          MR. PATTON:  Objection to the form of the question.

15          MR. TAXMAN:  Let me rephrase it.  I agree with that.

16          THE COURT:  Sustained.

17  **Q.  (BY MR. TAXMAN:)**  Do you remember saying that here to these

18  folks, under oath, about 45 minutes ago?

19  A.  It's possible I did, yes.

20  Q.  Well, let me refresh your memory.  You said after the

21  explosion, you expressed concerns to Anthony Yount.  You didn't

22  express any concerns to Anthony Yount before 4:00, before the

23  explosion, correct?

24  A.  I said I do not remember if I did or didn't.

25  Q.  No, no, no, no, no.

1      You said, unequivocally, after the explosion is when I

2   expressed the concerns to Anthony Yount, and I did not express

3   any concerns to him beforehand.

4      That's what you told us, correct?

5          MR. PATTON:  Objection.  That mischaracterizes his

6   testimony.

7          THE COURT:  Overruled.

8    Q (BY MR. TAXMAN:) Right?

9   A.  I -- I don't remember what I said an hour ago.  I...

10  Q.  All right.  Well, and you don't have to, because there are

11  other folks that are listening and will decide what is said in

12  this courtroom.

13          MR. PATTON:  Objection to the speech, Judge.

14          THE COURT:  Move on.

15  Q.  (BY MR. TAXMAN:)  The information that Anthony Yount had

16  about the bin was information that Godfrey Friedt was giving to

17  Anthony Yount during this time period, correct?

18  A.  That is correct.

19  Q.  Nobody else was reporting to Anthony Yount what's going on

20  at Chester, except you, Godfrey Friedt, correct?

21  A.  Not that I know of.

22  Q.  Okay.

23      All right.  I want to go through that time period covering

24  this segment on the right hand of the chart.

25      And, your Honor, I will need to change to the computer for

Cross Examination - Friedt, Godfrey (Beckers)

1   a moment.

2      *"Q.  What time was the first call that you received from*

3      *Godfrey?*

4      *"A.  Mid-morning.  I don't -- I don't know exactly.*

5      *"Q.  Somewhere around 10, 11:00?*

6      *"A.  I would say a guess, yeah.*

7      *"Q.  Okay."*

8   **Q.  (BY MR. TAXMAN:)**  All right.  No reason for A.Y. to make

9   any of that up, correct?

10      *MR. PATTON:*  Just objection to the form of the

11   question.  A.Y., he is testifying.

12      *THE COURT:*  Overruled.

13  A.  Repeat the question.

14  Q.  Yes, sir.

15      No reason for A.Y. to make up anything on that timeline,

16  correct?

17  A.  Yeah, that's what he said, yes.

18  Q.  Okay.  All right.

19      *"Q.  Godfrey was concerned, he made you aware of it, now*

20      *you were concerned, correct?*

21      *"A.  Yes."*

22      *"Q.  What time was the next phone call?*

23      *"A.  An hour later, maybe.*

24      *"Q.  Okay.  Same thing?  Godfrey is concerned, he's*

25      *expressing that to you in your -- talked about what is*

Cross Examination - Friedt, Godfrey (Beckers)

1    *going on in Bin C15, correct?*

2    *"A.  Sorry.  He was -- he was expressing Mel's concern.*

3    *"Q.  I understand.  Mel's concern is ConAgra's concern?*

4    *"A.  That's right.  Absolutely.*

5    *"Q.  Okay.  And Mel is doing what he is supposed to do.*

6    *He finds something that's a concern.  He's bringing it*

7    *to Godfrey's attention, Godfrey is bringing it to your*

8    *attention, right?*

9    *"A.  Yes."*

10   *"Q.  What time or how long after the second conversation*

11   *did the third conversation occur at?*

12   *"A.  I -- I don't think there was a lot of time --*

13   *well...*

14   *"Q.  About another hour?*

15   *"A.  No, I don't think so.  I think it was sooner than*

16   *that.*

17   *"Q.  Okay.*

18   *"A.  As I recall.*

19   *"Q.  Well, fair enough.  Would it be fair for us to*

20   *believe that all the conversations were about the*

21   *concern with what was going on in Bin C15, as far as the*

22   *smoldering or the fire or the smoke or whatever the*

23   *situation was?*

24   *"A.  Correct."*

25   *"Q.  So you know there's a bin with a hot spot with this*

Cross Examination - Friedt, Godfrey (Beckers)

1            *potential for fire and for combustion.  You know that*

2            *for this whole week, right?*

3            *"A.  Yes.*

4            *"Q.  You get notified on the day that it blows up that*

5            *there's concern, there's nervousness about this*

6            *situation, correct?*

7            *"A.  Yes."*

8      **Q (BY MR. TAXMAN:)**Okay.  And the last one, sir.

9            *"Q.  I -- I think you're adequately telling us that,*

10           *that Mel was concerned.  He came to Godfrey.  Godfrey*

11           *came to you, correct?*

12           *"A.  Correct.*

13           *"Q.  And you didn't say stop, get out of the bin, did*

14           *you?*

15           *"A.  No.*

16           *"Q.  I just want to know what -- if you did this.  You*

17           *didn't say stop, get out of the bin, call the fire*

18           *department, correct?*

19           *"A.  Correct."*

20               *MR. TAXMAN:*  Your Honor, may I go back to the ELMO for

21      a moment.

22       **Q (BY MR. TAXMAN:)** So Mr. Yount was taking us through the

23      first call, the second call, the third, and the fourth call.

24      And he's relaying the information that you provided to him.

25           There are no calls by -- all these are going from you to

Cross Examination - Friedt, Godfrey (Beckers)

1    Omaha, correct?

2    A.  I don't know -- I'd have to look at the phone records to

3    see if I called him in the morning.  I don't recall doing that.

4    Q.  Well, we did, and we looked at the records, and we took

5    Mr. Yount's testimony.  I'm simple asking you --

6            MR. PATTON:  Objection to the speech.

7            THE COURT:  It wasn't a speech.  Form's proper.

8    **Q.  (BY MR. TAXMAN:)**  All the phone calls are going from

9    Godfrey, in Chester, to Yount, in Omaha, correct?

10   A.  I -- I don't know that.  I -- it's what you have written on

11   the piece of paper.  I don't know.

12   Q.  Well, I wrote the paper from what Mr. Yount just said under

13   oath.  I'm just asking you a geography question, sir.

14           MR. PATTON:  Same objection, Judge.

15           THE COURT:  Overruled.

16   **Q.  (BY MR. TAXMAN:)**  The calls are going from Godfrey, and you

17   were in Chester, correct?

18   A.  Yes, I was in Chester.

19   Q.  And any call that you made, whatever time it was, in

20   April 27, 2010, made to Mr. Yount, who was in Omaha, correct?

21   A.  I believe he was, yes.

22   Q.  Right now you don't even remember if he was in Omaha, as

23   you sit there?

24   A.  I don't know.  I -- I don't know if he was in Omaha that

25   day or where he was.

1    *Q.  So you can't remember that, right?*

2    *A.  I believe he was in Omaha, yes.*

3    *Q.  Well, you know for a fact he was.  He got on the corporate*

4    *plane and flew to St. Louis right after the explosion, and he*

5    *showed up with a bunch of other people from ConAgra, in Omaha,*

6    *including Mr. Bindel, who was in Omaha, correct?*

7    *A.  Yes, yes.*

8    *Q.  All right.  No phone calls by Godfrey to Chief Lochhead.*

9    *And let's go to the 3:00 time period.*

10       *At 3:00, you saw fire on the aeration fan, correct?*

11   *A.  Roughly around that time, yes.*

12   *Q.  Did you tell -- well, let's look at --*

13          *MR. TAXMAN:  Your Honor, I apologize.  We need to go*

14   *to the computer.*

15       *"Q.  Did you see a fire that day?*

16       *"A.  On Tuesday?*

17       *"Q.  Yes.  Before the explosion.*

18       *"A.  I saw a fire on the aeration duct on the outside of*

19       *the bin, yes.*

20       *"Q.  On the outside of the bin?*

21       *"A.  Yes.*

22       *"Q.  And what time was that about, when you saw that?*

23       *"A.  I -- I don't know if that was 3:00 or around*

24       *3:00 or after 3:00."*

25   ***Q.  (BY MR. TAXMAN:)*** Did you tell the chief that you saw fire

Cross Examination - Friedt, Godfrey (Beckers)

1    on the aeration duct when you called him at 3:00?

2    A.  No, I did not.

3    Q.  Okay.  Did you tell the chief that people were worried

4    about the safety of that bin at 3:00 when you called him?

5    A.  No.  And I was not aware of that.

6        "Q.  *After you called the fire department to get*

7        *somebody to come and look at the safety and integrity of*

8        *the bin at about 3:00, did you know that people were*

9        *continuing to work on the bin?*

10       "A.  *I -- I believe they continued to work on the bin,*

11       *yes.*

12       "Q.  *All right.*

13       "A.  *Yes, I do.  Yes.*

14       "Q.  *You had that knowledge, correct?*

15       "A.  *Yes.*

16       "Q.  *All right.*"

17           *MR. TAXMAN:*  I hit the wrong tab, Judge.

18           *MR. PATTON:*  Judge --

19           *MR. TAXMAN:*  I agree.  I agree with him.

20           *MR. PATTON:*  If he is doing impeaching, I should be

21    told a page number and the line before he just starts clicking.

22           *MR. TAXMAN:*  I agree with that.  Page 294, Line --

23    beginning on Line 21.  That was going to be my next question.

24    I apologize.  I hit the wrong tab.  But this is the impeaching

25    one.  The question I asked him about was if he told the chief

1    that folks were concerned.  He said that he did not tell the

2    chief that because he didn't know.

3            This is the one I meant to play.

4        *"Q.  Did you tell Mike Lochhead that the folks working*

5        *on the bin are worried about what's going on in there,*

6        *and they want somebody to come and do a walk-through to*

7        *see if it's safe?*

8        *"A.  Yes, I did.*

9        *"Q.  You conveyed that to Mr. Lochhead?*

10       *"A.  Yes, I did.*

11       *"Q.  Okay."*

12    **Q (BY MR. TAXMAN:)** It is the opposite of what you just said

13    here, correct?

14    *A.*  I said I called the fire chief, yes.

15            *MR. TAXMAN:*  Could I have the question read back to

16    the witness?

17            *THE COURT:*  This is at 3:49:25, if this is what you

18    are looking for.

19                *(An off-the-record discussion was had)*

20                *(Judge read back requested testimony)*

21            *MR. TAXMAN:*  All right.  Now I want to play this clip

22    to impeach that answer.

23        *"Q.  Did you tell Mike Lochhead that the folks working*

24        *on the bin are worried about what's going on in there,*

25        *and they want somebody to come and do a walk-through to*

1      *see if it's safe?*

2      *"A.   Yes, I did.*

3      *"Q.   You conveyed that to Mr. Lochhead?*

4      *"A.   Yes, I did.*

5      *"Q.   Okay."*

6      *Q (BY MR. TAXMAN:)* That's the opposite of what you said here

7      under oath, correct, sir?

8      *A.*   Yes.

9      *Q.*   In your deposition, you are telling us, under oath, I told

10     the chief they were concerned.  I am conveying this to the

11     chief.  You are in court, you are saying, you didn't tell him

12     that because "I didn't know"?

13            *MR. PATTON:*  Objection to the speech.

14            *THE COURT:*  Overruled.

15     *Q.*   Correct?

16     *A.*   Correct.

17     *Q.*   Okay.

18            *MR. TAXMAN:*  Your Honor, may we go back to the ELMO

19     for a moment?

20            *THE COURT:*  Sure.

21     *Q (BY MR. TAXMAN:)* The chief came and testified you never

22     called him at 3:00.  Let's assume that to be true, Mr. Friedt.

23         It would have been a good idea to call the chief at

24     3:00 and tell him there is a fire on the aeration fan, folks

25     are nervous.  Folks are concerned about the safety of this bin,

1    and they don't want to go in there until you do a walk-through.

2         That would have been good safety sense, correct?

3    A.   I did call the fire chief at 3:00.

4    Q.   He says you didn't.  And you and the chief can argue about

5    it.  I'm just asking you.  Assume you didn't call him --

6         MR. PATTON:  Objection to the form of the question.

7    Who can argue with who.

8         THE COURT:  Overruled.

9    Q (BY MR. TAXMAN:) It would have been a good idea to call the

10   chief at 3:00 and tell him there's concern about the bin --

11   A.   I did.

12   Q.   -- folks are worried about safety, there was concern.

13   A.   To the best of my recollection, I called at 3:00.

14   Q.   Okay.  At 3:00 you knew that people were still working on

15   the bin, correct?

16   A.   Yes, I did.

17   Q.   You didn't stop them from working, did you?

18   A.   No, I did not.

19   Q.   That was an hour before the bin blew up, correct?

20   A.   That is correct.

21   Q.   If Godfrey Friedt, the highest ranking individual on this

22   site, says stop, evacuate, nobody is in the tunnel, nobody is

23   on that bin when it explodes, correct?

24   A.   I was the highest ranking ConAgra, yes.

25        MR. TAXMAN:  That's all the questions I have, Judge.

1        *THE COURT:*  Mr. Schultz.

2        *MR. SCHULTZ:*  Thank you, Judge.

3                         **CROSS EXAMINATION**

4   *Q.  (BY MR. SCHULTZ:)*  Mr. Friedt, I'm John Schultz for West

5   Side Salvage.

6        I want to direct your attention back to the -- your direct

7   examination by Mr. Patton when you said we had no hesitation to

8   call Ron Sumner and we immediately did what Sumner told us.

9        Do you remember talking about that earlier today?

10  *A.*  I remember talking about that phone call, yes.

11  *Q.*  There was hesitation by you in hiring Sumner and West Side,

12  correct?

13  *A.*  I went and got a second quote, yes, second opinion.

14  *Q.*  You were the guy in charge of hiring this contractor?

15  *A.*  I did hire them, yes.

16  *Q.*  You were the person who made the decision who to hire and

17  when to have them start, right?

18  *A.*  Who to hire, yes.

19  *Q.*  And when to have them start?

20  *A.*  That was depending on when they were available.

21  *Q.*  Well, they were available on Monday, March 15th, true?

22  *A.*  That is correct.

23  *Q.*  It was your decision not to have them there on March 15th?

24  *A.*  Yes, it was.

25  *Q.*  And you searched for a cheaper bid?

1  A.  Price is something we do in getting quotes, yes.

2  Q.  Well, let's talk about why price is so important.  I

3  imagine this must have been a pretty big deal to get you out of

4  Omaha on a plane down to Chester to hire a contractor.  Pretty

5  big deal, right?

6  A.  Yes, it was.

7  Q.  Because you don't go to all these plants around the country

8  that you supervise to hire contractors at each plant I take it?

9  A.  No, I do not.

10  Q.  So to get a guy out of corporate, the head guy, to come in

11  and hire a contractor it's got to be a pretty big situation and

12  this was?

13  A.  I've done it in lots of occasions, yes.

14  Q.  All right.  And do you agree that safety was a concern to

15  you on the 13th of March when Ron Sumner was there based on

16  your discussion with him?

17  A.  Safety is a concern with me every day at every location.

18  Q.  In fact, you called Anthony Yount a few times on the 13th,

19  the first day Sumner was there?

20  A.  I believe I did, yes.

21  Q.  But yet you didn't hire him?

22  A.  That is correct.

23  Q.  The reason you didn't hire him is his price was above your

24  budget, true?

25  A.  That's not true.

Cross Examination - Friedt, Godfrey (West Side)

1    *Q.*  Well, your budget was $30,000.  That was the cap, correct?

2    *A.*  That was an estimate, yes.

3    *Q.*  And his quote came out to be about 43,000, correct?

4    *A.*  That's correct.

5    *Q.*  So the reason you didn't hire Sumner, let him mobilize on

6    the 15th of March, was because of money?

7    *A.*  That's not correct.

8    *Q.*  What other reason would there be?  He's the expert, right?

9    *A.*  We were -- you know, we were looking for a second opinion.

10   *Q.*  A second opinion or a second price?

11   *A.*  Both.

12   *Q.*  Okay.  Well, I thought you said that Ron and Mel are the

13   experts, they are the guys you go to when you have a situation

14   like this.

15   *A.*  Yes, that's what I said.

16   *Q.*  Why would you ever look for another contractor, if they're

17   the guys to go to?  It had to be price?

18   *A.*  Price plays a part into it, yes.  There are other things

19   that play into it, yes.

20   *Q.*  So you decided to put the expert on the bench and look for

21   a cheaper option, right?

22   *A.*  That's part of it, yes, part of the reason why.

23   *Q.*  And the person who made that decision and kept West Side

24   from mobilizing on March 15, 16, 17, 18, 19, 20, 21, 22, 23,

25   24, 25, 26, 27, 28, 29, 30, March 31, April 1, 2, 3, and 4 was

Cross Examination - Friedt, Godfrey (West Side)

1   you?

2   *A.* That's not correct.

3   *Q.* You didn't call Sumner until the 4th of April or was it the

4   2nd?

5   *A.* It was the 3rd of April --

6   *Q.* 3rd of April.

7   *A.* -- I called him.

8   *Q.* All right.  Without repeating the question, from March 15th

9   to April 3 the reason the experts were on the sidelines was

10  your decision and yours alone?

11  *A.* Partially, yes.

12  *Q.* You were the guy making the call?

13  *A.* Yes, but there were other people who had input to me as

14  well.

15  *Q.* Were you the man responsible for West Side not mobilizing

16  on the 15th?

17  *A.* Not a hundred percent, no.

18  *Q.* Who else is to blame for that?

19          *MR. PATTON:* Objection to the form of the question.

20          *THE COURT:* Sustained as to blame.  Rephrase.

21  ***Q.  (BY MR. SCHULTZ:)*** Who else had a role?

22  *A.* Anthony Yount did.

23  *Q.* He didn't want West Side to mobilize on the 15th?

24  *A.* No, he did not.

25  *Q.* He didn't?

1    *A.*  Repeat the question.

2    *Q.*  Anthony Yount did not want West Side to mobilize on the

3    15th?

4    *A.*  No.  We talked about the situation in Puerto Rico.

5    *Q.*  When you called Sumner on the 3rd of April, you didn't tell

6    him that you had been looking for another bid, did you?

7    *A.*  No, I did not.

8    *Q.*  You led him to believe the bin had cooled down and just

9    started recently warming up.  Isn't that what you lead him to

10   believe?

11   *A.*  I informed him what was happening in the bin.

12   *Q.*  Well, the truth of the matter, the reason you didn't call

13   him until the 3rd, you were monkeying around trying to get

14   Southern Illinois Salvage in, right?

15        *MR. PATTON:*  Objection to the form.

16        *MR. SCHULTZ:*  I agree.  I'll rephrase.

17        *THE COURT:*  Sustained

18   ***Q.  (BY MR. SCHULTZ:)***  The real reason you didn't call until

19   the 3rd of April is you were trying to get the cheaper

20   contractor in and make that work, correct?

21        *MR. PATTON:*  Asked and answered.

22        *THE COURT:*  Overruled.

23   *Q.*  Is that true?

24   *A.*  Yes, but I don't believe it is fair to tell another

25   contractor you are having somebody else come in and do it.  I

1   don't do it on another jobs that I do.

2   Q.  Why not just be honest with him and say, you know what, we

3   tried to get a cheaper contractor, it didn't work out, now we

4   need you, the experts, to come back?  You didn't tell them

5   that, did you?

6   A.  No, I just said we want you to come out.

7   Q.  And that might be fine, Mr. Friedt, but my issue with that

8   call to Sumner is not really that.  It is this:  Why did you

9   tell him the bin had cooled down and just suddenly recently

10  started heating up again?  Why did you give him that excuse for

11  not calling?  Because that's not really what happened, is it?

12  A.  Could you repeat your question.  I don't understand it.

13  Q.  Yeah.  You told Sumner on the 3rd of April we need you out

14  here, the bin started warming up, right?

15  A.  Yes, I told him that the pellets had sloughed off and the

16  temperatures had come up to the 90s.

17  Q.  And when you talked to him on that Sunday, after you got

18  his quote for 8,000 a day, you told him the reason you didn't

19  want to let him mobilize on Monday was the bin had cooled down.

20  Do you agree with that?

21  A.  Yes, I do.

22  Q.  You weren't honest with him then and said, hey, Ron, you

23  are too expensive, we are going to go look for someone else.

24  Your story to him was it's cooled down?

25          MR. PATTON:  Objection to the speech.  Object to the

Cross Examination - Friedt, Godfrey (West Side)

1    form of the question.

2              *THE COURT:*  Overruled

3    *Q.*  Is that true?

4    *A.*  Could you repeat your question.

5    *Q.*  When you talked to him on Sunday the 14th of March, the

6    reason you gave him for not letting him mobilize was the bin

7    was cooling down.  You didn't tell him you were going to search

8    for a cheaper subcontractor?

9              *MR. PATTON:*  Objection to the relevance of this

10   inquiry.

11             *THE COURT:*  Overruled

12   *Q.*  True?

13   *A.*  No, I did not tell him I was looking for another bid.

14   *Q.*  Okay.  Back to the money.

15      You had a $30,000 cap when Sumner first came out but then

16   at some point in time as the days went on, it became a non-cap

17   situation; is that true?

18   *A.*  I would have to explain what you mean by $30,000 cap.

19   *Q.*  Well, let's just see if we can agree to this.

20      You had a cap and then it became a non-cap situation by the

21   time he eventually came out, fair?

22   *A.*  30,000 was my guess at first what I thought it would cost.

23   *Q.*  Okay.  You've never participated in cleaning out a hot bin

24   before, though, have you?

25   *A.*  No, I have not.

Cross Examination - Friedt, Godfrey (West Side)

1   *Q.*   So you had no idea what it would cost?

2   *A.*   That's correct, that's why I said it was a guess.

3   *Q.*   So why would you let that guess about the budget interfere

4   with your ability to get the experts on the scene on the 15th

5   of March?  You had them there.  They wanted to come.

6   *A.*   Again, you know, we went out and I looked for a second

7   opinion on what, you know, was going on in the bin and who else

8   could handle it.

9   *Q.*   Okay.  I'm going to direct your attention to the 27th of

10  April, sir, on the questions Mr. Patton asked you, you said

11  what was Mel doing and you had the conversation regarding the

12  tarp.  And you said Mel wanted to remove the manhole and bore a

13  hole and put water on the product.  Do you remember that

14  testimony?

15  *A.*   Yes, I do.

16  *Q.*   It was okay with you for Mel to put as much water as he

17  could on that product, fair?

18  *A.*   As much as he wanted to.

19  *Q.*   You approved it?

20  *A.*   It was okay whatever he wanted to do, yes.

21  *Q.*   You were at the manhole when they tried to access it,

22  right?

23  *A.*   Yes.

24  *Q.*   Standing right there?

25  *A.*   They did access it, yes.

Cross Examination - Friedt, Godfrey (West Side)

1   *Q.* You told them, go ahead, and put as much water on it as you

2   need to?

3   *A.* Yes.

4   *Q.* Okay.  And then you said -- you were asked were you

5   concerned and you said I had a slight concern.

6       So I want to ask you about that.  You had much more than a

7   slight concern on the afternoon of the 27th, right?

8   *A.* Yes, I was concerned.  I didn't know exactly what was

9   happening, going on, those kind of things.

10  *Q.* After you saw the fire at the aeration fan, you let those

11  men keep working, didn't you?

12  *A.* They kept working, yes.

13  *Q.* Never told them to stop?

14  *A.* No, I did not.

15  *Q.* Never issued an evacuation order?

16  *A.* No, I did not.

17  *Q.* In fact, when you went to call the fire chief, not the fire

18  department, and ask for this walk-around, they were working,

19  weren't they?

20  *A.* I was in the office, so I believe they were.

21  *Q.* They were working to fix and solve ConAgra's problem,

22  right?

23  *A.* Yes, they were.

24  *Q.* They didn't cause that condition, material to come out of

25  condition, right?  That was on ConAgra's watch?

Cross Examination - Friedt, Godfrey (West Side)

1    *A.*  No, they did not cause it to go out of condition.

2    *Q.*  And in terms of the delay from the 15th of March until the

3    3rd of April, that wasn't West Side's fault either, was it?

4           *MR. PATTON:*  Objection as to fault, form.

5           *MR. SCHULTZ:*  I'll rephrase.

6           *THE COURT:*  Sustained

7    **Q.  (BY MR. SCHULTZ:)**  The delay was your decision from the

8    15th of March to the 3rd?

9    *A.*  Yes, along with other people, yes.

10   *Q.*  During all these calls with Anthony Yount on the 27th of

11   April, the men were still working, right?

12   *A.*  I believe so.  I would have to look at the, you know,

13   they -- yeah, they were on site, yes.

14   *Q.*  When you left the plant, the men were still working?

15   *A.*  Yes, they were.

16   *Q.*  When you came back to the plant, the men were still

17   working?

18   *A.*  Yes, they were.

19   *Q.*  Still working to fix ConAgra's problem, right?

20   *A.*  That is correct.

21   *Q.*  Even after you saw fire, right?

22          *MR. PATTON:*  Asked and answered.

23          *THE COURT:*  Overruled

24   *Q.*  Is that right?

25          *THE COURT:*  You can answer.

Cross Examination - Friedt, Godfrey (West Side)

1    *A.*  That's correct.

2    *Q.*  You have been asked a lot of questions about timing.  How

3    long does it take to call 9-1-1?

4    *A.*  Ten seconds.  I don't know.

5    *Q.*  You had a cell phone that day, didn't you?

6    *A.*  Yes, I did.

7         *MR. SCHULTZ:*  Thank you.

8         *THE COURT:*  Mr. Patton.

9         *MR. PATTON:*  I think I'm up to the plate.

10        *THE COURT:*  I think you are.

11                    **REDIRECT EXAMINATION**

12   *Q.*  **(BY MR. PATTON:)**  Godfrey, you answered a question a moment

13   ago that you were okay with whatever Mel wanted to do.  What

14   did you mean by that?

15   *A.*  I would say concerning the job that they were working on

16   that they understood what they needed to get done.  They had

17   the procedures, the process, the knowledge to do what we needed

18   help with getting Bin 15 empty.

19   *Q.*  On the 27th of April, did you put your trust in Mel?

20   *A.*  I put my trust in everybody, yes, there that day.

21   *Q.*  Why did you put your trust in Mel?

22   *A.*  Because he had been there from the day they started taking

23   the pellets out of there.  He had the experience.  And, you

24   know -- he knew what he was doing.  I had the feeling he knew

25   what he was doing.  If I didn't trust him, I wouldn't have went

1   up on top of the bin that day if I didn't know that.

2   Q.  When he asked to open up the manhole and put the lance in

3   there, did you trust him?

4   A.  Yes, I did.  He told me what he wanted to do.

5   Q.  When that fire occurred on the aeration fan, it was Mel and

6   Nanez that put it out?

7   A.  Repeat the question.

8   Q.  The fire that happened while they had the lance in the

9   manhole, did -- was it West Side that put that fire on the

10  aeration fan out?

11  A.  Yes, it was.

12  Q.  Did you continue to trust Mel to do the job safely?

13  A.  Yes, I did.  He gave me no reason not to.

14  Q.  And as the day progressed, did Mel do anything that caused

15  you not to trust his judgment in doing the job safely?

16  A.  None whatsoever.

17  Q.  Did Mel ever ask you to evacuate the jobsite?

18  A.  No, he did not.

19  Q.  Did Mel ever tell you that he was fighting a fire inside

20  the bin?

21  A.  No, he didn't.

22  Q.  Did Mel ever tell you that he needed to have the fire

23  department come out there because there was a fire in the bin?

24  A.  No, he did not.

25           MR. PATTON:  That's all I have.

Redirect Examination - Friedt, Godfrey (ConAgra)

1           *THE COURT:*  Mr. Clifford?

2           *MR. CLIFFORD:*  Yes, your Honor.  Just two areas.

3                        **RECROSS EXAMINATION**

4    *Q.  (BY MR. CLIFFORD:)*  You said to counsel from West Side a

5    moment ago that you thought it was appropriate to not disclose

6    to Ron Sumner that you had been out seeking another bid.  Do

7    you remember that line of inquiry?

8    *A.*  Yes, I do.

9           *MR. PATTON:*  Objection to the relevance of this

10   inquiry.

11          *THE COURT:*  Overruled

12   *Q.*  And, indeed, from a business perspective, you don't quarrel

13   with the idea that it might well be best practices to get a

14   couple of different bids; is that right?

15   *A.*  Yes, that is correct.

16   *Q.*  But equally true, while it might be best practices to do

17   that, do you also think it's fair and good business practices

18   to before you retain the guy to pick his brain and claim to be

19   relying upon him for his expertise?

20      Do you see where I'm going with this?

21   *A.*  I don't understand your question.

22   *Q.*  Well, unless I'm confused -- and I've been trying to get to

23   this.  So unless I'm confused -- and that could easily be the

24   case, okay?

25      You were engaged in a process of getting another bid and

Recross Examination - Friedt, Godfrey (Jentz & Schmidt)

1   you weren't telling West Side about it.  Okay.  We all know

2   that, right?

3   A.  That's correct.

4        MR. PATTON:  Same objection.  Can I have a continuing

5   objection to this line of questioning so I don't have to

6   interrupt Mr. Clifford?

7        THE COURT:  Mr. Clifford do you stipulate to a

8   continuing objection?

9        MR. CLIFFORD:  Yes, sir.  Sure.

10  Q.  But at the same time you were getting this other bid, you

11  claimed to be relying on West Side and rightly relying on West

12  Side and their expertise; isn't that right?

13  A.  That is correct.

14  Q.  And you think that's fair business practice as well, don't

15  you?

16       MR. PATTON:  Objection to the form of the question.

17       THE COURT:  Overruled

18       MR. CLIFFORD:  I'll withdraw it.

19  Q.  Your counsel a moment ago asked you a lot of questions

20  about your trust in Mel.  Do you remember that line of inquiry?

21  A.  Yes, I do.

22  Q.  And you placed your trust in Mel that day.  And do you

23  think that was fair and appropriate to do so?

24  A.  Regarding Bin 15, yes.

25  Q.  And it's equally true, don't you think, that for the

Recross Examination - Friedt, Godfrey (Jentz & Schmidt)

1   workmen and the employees on the site on that day they had

2   every right to trust in the ConAgra management to supply them,

3   in accordance with your rules, with a responsible and

4   accountable, safe workplace?  That's true, too, isn't it?

5   A.  I would say that's fair, yes.

6   Q.  Thank you.

7        MR. CLIFFORD:  Nothing further, Judge.

8        THE COURT:  Mr. Taxman.

9                    RECROSS EXAMINATION

10  Q.  (BY MR. TAXMAN:)  Very briefly.  Two areas I want to cover,

11  safety and business.  On the business end, it might be

12  reasonable to take a second quote.  Can you agree with that?

13       MR. PATTON:  Objection.  This has all been asked and

14  answered multiple times.

15       THE COURT:  Overruled

16  Q.  Do you agree with that?

17       THE COURT:  You can answer.

18  A.  I guess.

19  Q.  You would never, never want to put safety ahead of

20  business.  Do we agree on that?

21  A.  That is -- no.  Safety is in front of business.

22  Q.  You would never want to put safety ahead -- yeah, you are

23  right.

24       MR. TAXMAN:  ConAgra has enough lawyers over there.

25  Let me go back to this table.

1          MR. PATTON:  We will stipulate to that comment.

2          MR. TAXMAN:  Finally.

3    Q.  (BY MR. TAXMAN:)  You would never want to put business

4    ahead of safety, true?

5    A.  That is correct.

6    Q.  And I want to ask you if you agree with this from the

7    number one safety guy in the company --

8          MR. TAXMAN:  Your Honor, I need the computer.  I'm so

9    sorry.

10       "Q.  And there's no greater hazard in the grain handling

11       industry than fires and explosions, correct?

12       "A.  That's correct."

13   Q.  (BY MR. TAXMAN:)  You agree with that, sir?

14   A.  Yes, sir.  Yep.

15   Q.  Okay.  And this is also the ConAgra safety professional

16   Anthony Yount:

17       "Q.  And clearly you recognize the situation in Chester

18       in between March and April of 2010 as a safety issue,

19       correct?

20       "A.  In terms of the safety issue?

21       "Q.  You recognized it as a safety issue what was

22       happening at Chester between March and April of 2010,

23       correct?

24       "A.  Yes."

25   Q.  (BY MR. TAXMAN:)  You agree with that, too, don't you, sir?

Recross Examination - Friedt, Godfrey (Beckers)

1    *A.*  Yes.  That it was a safety issue?  Yes.

2    *Q.*  You knew that the minute you step on the plane March 13,

3    2010, you knew it the whole time until this unfortunate tragedy

4    happened, correct?

5    *A.*  That is correct.

6    *Q.*  And, in fact, you knew, you Godfrey Friedt, knew that the

7    way this could play out from the minute you heard about it

8    could be tragic?  You knew that, didn't you?

9    *A.*  I did not know that.

10         *"Q.  I'm asking you about Godfrey Friedt.  You accept,*

11         *Godfrey Friedt, as your responsibility that you've got*

12         *to act immediately to control situations that could*

13         *result in a tragedy, true?"*

14              *MR. PATTON:*  Objection.  That's not impeaching.

15         *"A.  If I knew there was"* --

16              *MR. PATTON:*  Objection.

17              *THE COURT:*  Where are you going?

18              *MR. TAXMAN:*  Page 275, beginning on Line 23 to the end

19    of the page, beginning on Page 276, Lines 1 through 13.

20              *MR. PATTON:*  And objection; is not impeaching.

21              *THE COURT:*  I have to see or hear it.

22              *MR. TAXMAN:*  May I tender it to your Honor and then

23    you can read it and I don't have to play it until you have read

24    it.

25              Do you have the question and answer?

1          Thank you.  And here's the follow up as well.

2          *THE COURT:*  Where am I here?

3          The objection is overruled.

4          *MR. TAXMAN:*  Thank you, your Honor.

5     *"Q.  I'm asking not about everyone.  I'm asking about*

6     *Godfrey Friedt.  You accept, Godfrey Friedt, as your*

7     *responsibility that you've got to act immediately to*

8     *control situations that can result in a tragedy, true?*

9     *"A.  If I knew -- if I knew there was a tragedy and I*

10    *knew it was going to happen, do I have a responsibility*

11    *to control that?  Yes, I do.  But I did not know there*

12    *was going to be a tragedy.  I did not know that.*

13    *"Q.  You know that -- you knew that that's the way it*

14    *could play out, though, true?*

15    *"A.  Could."*

16    *Q.   (BY MR. TAXMAN:)*  Did you give that answer to the question

17    that was posed?

18    *A.*  Excuse me.

19    *Q.*  Did you give that testimony?

20    *A.*  Yes, I did.

21    *Q.*  Okay.

22          *MR. TAXMAN:*  Same deposition, Page 274, Line 21.

23    *"Q.  What you knew was that if the source of the heat*

24    *could not be found and eliminated, that the way this*

25    *could play out could be tragic.  You knew that?*

Recross Examination - Friedt, Godfrey (Beckers)

1     *"A.  It could be, yes."*

2     ***Q.  (BY MR. TAXMAN:)*** So you knew that.  You knew that from

3     your training, you knew that from the ConAgra principles from

4     the 1700 bins and what you know about fires and explosions in

5     bins, correct?

6     *A.*  That is correct.

7     *Q.*  All right.  And the last area I just wanted to cover was

8     when --

9              *MR. TAXMAN:*  Your Honor, the ELMO, please -- well, I

10    won't put it on the ELMO.  Just for the Court and not the jury.

11    This one is not in evidence.

12             *THE COURT:*  Okay.  You can see this, sir, but the jury

13    cannot.  So if you look at the monitor.

14    ***Q.  (BY MR. TAXMAN:)***  You know that the Chester Fire Department

15    came to the scene, you were there when the fire trucks showed

16    up, correct?

17    *A.*  Yes, I was.

18    *Q.*  They brought multiple fire departments from the area,

19    correct?  Maybe five or six different ones?

20    *A.*  I believe so, yes.

21    *Q.*  Okay.  And when they were alerted to the situation, they

22    shut the power lines down that run behind the facility,

23    correct?

24    *A.*  That's not correct.

25    *Q.*  It's not.  Take a look at --

Recross Examination - Friedt, Godfrey (Beckers)

```
 1            MR. TAXMAN:  What number exhibit are we on?
 2   Q.  362, does that refresh your memory as to whether the fire
 3   department shut down the power lines?
 4   A.  I can't see where you are at.
 5   Q.  Do you see where I'm pointing?
 6   A.  Yes, it says they shut down the power lines.
 7   Q.  Okay.  And they shut down the Union Pacific Railroad,
 8   correct?
 9   A.  Yes, they did.
10   Q.  And they got the Illinois State Fire Marshal involved,
11   contacted Investigator Bruce Dalhem, correct?  He responded to
12   the scene?
13   A.  I didn't meet him.  I don't know.
14   Q.  But you know that he came out and he interviewed various
15   people and investigated, correct?
16            MR. PATTON:  Objection.  Foundation.
17            THE COURT:  Sustained
18   Q.  Do you know that?
19   A.  I don't recognize the name, no, I don't.
20   Q.  Okay.  Did you know -- and then you have the chief also
21   dispatched Bill Fulton, an instructor from the Illinois Fire
22   Services Institute, to the scene?
23   A.  Again, I did not meet him.
24   Q.  Okay.  And that the Chester Fire Department came to the
25   seen on the 28th to open the silo and flush out the product,
```

1   right?  You know that, don't you?

2   *A.*  Yes, I do.

3   *Q.*  And then they came back and they inspected the top of the

4   silo and the whole area for any hot spots, correct?

5   *A.*  That's what it says.  I don't know.

6   *Q.*  Well, it makes sense that's what -- once the fire

7   department got involved, they hit everything A so Z?

8        *MR. PATTON:*  Objection.  The relevance of what

9   happened after the accident.

10        *THE COURT:*  Sustained.  Okay.  This is post-accident.

11        *MR. TAXMAN:*  All right.  And last one I have to put

12   this in evidence.  Again, just for the witness on the computer,

13   your Honor.  This is Exhibit Number 201.

14        Rick, if you could bring that up, please.

15        This is the last piece that was not put into evidence

16   and I promised the Court I would put it in.

17   ***Q.  (BY MR. TAXMAN:)***  On our chart -- okay, April 12.  Look at

18   Exhibit 201, sir.

19      Do you see that's an e-mail from you to Cathy Rihanek?

20   *A.*  That is correct.

21   *Q.*  This e-mail --

22        *MR. TAXMAN:*  Well, first of all, I would like to admit

23   Plaintiffs' 201 into evidence.

24        *THE COURT:*  Any objection?

25        *MR. PATTON:*  The one on the screen?

Recross Examination - Friedt, Godfrey (Beckers)

1          *THE COURT:*  The one on the screen.

2          *MR. PATTON:*  No objection.

3          *MR. TAXMAN:*  Thank you.

4          *THE COURT:*  201 admitted.  No objection.

5             *(Exhibit Plfs' 201 received in evidence)*

6     **Q.  (BY MR. TAXMAN:)**  And that e-mail says on April 12th 2010

7     you are asking Ms. Rihanek to put in another one for West Side.

8     This is a purchase work order, correct?

9     *A.*  Tht's correct.

10    *Q.*  This is for Chester and it is a non-cap.  That's what you

11    have got in here, correct?

12    *A.*  That's what it says, yes.

13    *Q.*  "They will probably have to come early this week, since the

14    hot pellets are spreading and we need to get them out." That's

15    what you wrote, correct?

16    *A.*  That's what I wrote, correct.

17    *Q.*  That's 15 days before this --

18          *MR. TAXMAN:*  May I publish it, your Honor?  I don't

19    know if it's already published.

20          *THE COURT:*  Oops.  There you go.

21    *Q.*  That's 15 days before this occurrence, correct?

22    *A.*  Yes, it is.

23    *Q.*  Okay.

24          *MR. TAXMAN:*  That's the last question I have.

25          *MR. PATTON:*  I have nothing further.

Recross Examination - Friedt, Godfrey (Beckers)

1          MR. SCHULTZ:  No.

2          THE COURT:  Mr. Clifford?

3          MR. CLIFFORD:  No, sir.

4          THE COURT:  Okay, sir, you can step down.

5          MR. OUSKA:  Released.

6          THE COURT:  Yes, he's released.

7          MR. OUSKA:  Thank you.

8          THE COURT:  We have five minutes, Mr. Taxman.  Do you

9    have your life tables ready?

10          MR. TAXMAN:  Yes, we do, your Honor.

11          THE COURT:  And then we will go to sidebar off the

12   record and chat.

13          Mrs. Levinson.

14          MS. LEVINSON:  Your Honor, we were reading from

15   Exhibit 76.

16          According to the U.S. Department of Health and Human

17   Services, the Centers for Decease Control and Prevention, the

18   National Vital Statistics Reports from September of 2007, the

19   life expectancy of a female age 34 is 48.8 years.  This is for

20   Amber Becker.

21          THE COURT:  Okay.

22          MR. DUNN:  And just briefly, Judge, for the plaintiff

23   John Jentz, I would like to offer into evidence Plaintiffs'

24   Exhibit 357, which is a summary of his medical expenses

25   incurred by reasonably answer the question, that total is

Recross Examination - Friedt, Godfrey (Beckers)

1    $1,813,609.55.

2         *THE COURT:*  Any objection?

3         *MR. PATTON:*  No.

4         *MR. OUSKA:*  No.

5         *MR. SCHULTZ:*  No.

6         *THE COURT:*  The jury can also consider that.

7         Counsel, let's go to sidebar.

8         Do you want to stand and stretch?  I want to see what

9    is up tomorrow.

10        *(An off-the-record discussion was had at sidebar.)*

11        *THE COURT:*  Okay.  Folks, that concludes today's

12   testimony.

13        I don't know if the lawyers are working me hard or if

14   I'm working them hard.  But for the third night in a row, we

15   are going to work on jury instructions.  We have been doing

16   this for the past two nights and we will continue doing it

17   tonight.

18        We will have testimony tomorrow.  I will know tomorrow

19   a little more where we are but I'm confident that we will go

20   into next week.  I'm just kind of softening the blow now.

21        So go home.  Forget about the case.  It's been a long

22   day for everybody.  I lost my temper a little bit.  I apologize

23   to everybody for that.

24        *MR. CLIFFORD:*  Ditto for us all, Judge.

25        *THE COURT:*  It is at the end.  It's been a long trial

Recross Examination - Friedt, Godfrey (Beckers)

1   and these lawyers have really worked hard.  You have worked

2   hard.  I haven't worked that hard, so I shouldn't have lost my

3   temper but I will be better tomorrow.  So see you tomorrow

4   morning.

5           *COURTROOM BAILIFF:*  All rise.

6                           -oOo-

7                    REPORTER'S CERTIFICATE

8       I, Molly N. Clayton, RPR, FCRR, Official Court Reporter
    for the U.S. District Court, Southern District of Illinois, do
9   hereby certify that I reported with mechanical stenography the
    proceedings contained in pages v.11, pgs 111 - 233; and that
10  the same is a full, true, correct and complete transcript from
    the record of proceedings in the above-entitled matter.

11          DATED this 24th day of May, 2012.

12

13                          *Molly Clayton, RPR*

14          _____

15

16

17

18

19

20

21

22

23

24

25

Recross Examination - Friedt, Godfrey (Beckers)