IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

——————————————————————————

JOHN W. JENTZ,                          )
                                        )
            Plaintiff,                  )
                                        )
vs.                                     )    Case No. 10-cv-474-MJR-PMF
                                        )
CONAGRA FOODS, INC., et. al.,           )
                                        )       Consolidated with:
            Defendants.                 )
------------------------------          )
JUSTIN BECKER and AMBER                 )
BECKER,                                 )
                                        )
            Plaintiffs,                 )
                                        )
vs.                                     )    Case No. 10-cv-952-MJR-PMF
                                        )
CONAGRA FOODS, INC., et. al.,           )
                                        )
            Defendants.                 )
------------------------------          )
ROBERT SCHMIDT,                         )
                                        )
            Plaintiffs,                 )
                                        )
vs.                                     )    Case No. 11-cv-391-MJR-PMF
                                        )
CONAGRA FOODS, INC., et. al.,           )
                                        )
            Defendants.                 )

——————————————————————————

**TRIAL DAY/VOLUME 10 (P.M. SESSION)**

BE IT REMEMBERED AND CERTIFIED that heretofore on **5/22/2012**, the same being one of the regular judicial days in and for the United States District Court for the Southern District of Illinois, Honorable Michael J. Reagan, United States District Judge, presiding, the following proceedings were recorded by mechanical stenography; transcript produced by computer.

REPORTED BY: **Molly N. Clayton, RPR**, **FCRR**, Official Reporter for United States District Court, SDIL, 750 Missouri Ave., East St. Louis, Illinois 62201, (618)482-9226, *molly_clayton@ilsd.uscourts.gov*

APPEARANCES:

*FOR PLAINTIFF(S) JOHN JENTZ AND ROBERT SCHMIDT*:  **Robert A. Clifford, Kevin P. Durkin and Colin H. Dunn** of Clifford Law Offices, P.C., 120 North LaSalle Street, Suite 3100, Chicago, Illinois 60602 **and  Brad L. Badgley**, P.C., Brad L. Badgley, 26 Public Square, Belleville, Illinois 62220

*FOR PLAINTIFF(S) JUSTIN AND AMBER BECKER*:  **Marc A. Taxman, Sean P. Murray, and Julie Levinson Pustilnik of Anesi Ozmon Rodin Novak & Kohen,** Ltd,  161 N. Clark St,  21st Floor, Chicago, Illinois 60601

*FOR DEFENDANT CONAGRA FOODS, INC*:  **John W. Patton, Jr., John A. Ouska** of Patton & Ryan, 330 N. Wabash Avenue, Suite 2900, Chicago, Illinois 60611 **and Joseph C. Orlet, Brandan P. Mueller and Joseph A. Kilpatrick** of Husch Blackwell LLP, 190 Carondelet Plaza, Suite 600, St. Louis, Missouri 63105.

*FOR WEST SIDE SALVAGE, INC*. (Jentz and Schmidt cases only): **John G. Schultz and Jason B. Moore** of Franke Schultz & Mullen, P.C, 8900 Ward Parkway, Kansas City, Missouri 64114.

*FOR THIRD-PARTY WEST SIDE SALVAGE, INC*:  **John G. Schultz, Jason B. Moore** of Franke Schultz & Mullen, P.C, 8900 Ward Parkway, Kansas City, Missouri 64114.

## INDEX OF WITNESS EXAMINATION

| | DX | CX | R-DX | R-CX |
|---|---|---|---|---|
| Arnould, Richard (Beckers) | | 137 | | |
| Arnould, Richard (ConAgra) ....115 | | 143 | | |
| Arnould, Richard (Jentz & Schmidt) | | 134 | | |
| Friedt, Godfrey (ConAgra) .....157 | | | | |
| Hartley, Patrick (video deposition) | 103 | | | |

## INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | Id'D | Rcv'd |
|---|---|---|---|
| Plfs' 7 | | | 152 |
| Plfs' 8 | | | 152 |
| Plfs' 9 | | | 152 |
| Plfs' 10 | | | 152 |
| Plfs' 11 | | | 152 |
| Plfs' 20 | | | 152 |
| Plfs' 21 | | | 152 |
| Plfs' 82 | | | 152 |
| Plfs' 105 | | | 152 |
| Dft 155 | | | 151 |
| Dft 155A | | | 151 |
| Plfs' 325 | | | 152 |
| Plfs' 341 | | | 155 |
| Plfs' 355 | | | 153 |
| Plfs' 358 | | | 152 |
| Plfs' 359 | | | 152 |

1          *(Following proceedings held outside presence of jury:)*

2                  *THE COURT:*  Okay.  We are in open court, out of the

3     presence of the jury.

4                  And we are about 50 minutes late in starting today

5     because one of the jurors has been detained as a result of a

6     fatal traffic accident -- not involving her but impeding her

7     ability to get here.  We have just spoken to her on the phone

8     and she is another 30 minutes away.

9                  The parties have all agreed through counsel that they

10    will agree to the playing of a tape at this time for

11    evidentiary purposes of a Dr. Hartley.  When she arrives, she

12    will watch whatever portion of the tape remains and then at the

13    conclusion of the business day, I will have the portion of the

14    tape played that she has not yet seen played just for her.

15                 Plaintiff Jentz and Schmidt agree to that?

16                 *MR. CLIFFORD:*  Yes, your Honor.

17                 *THE COURT:*  Plaintiff Becker?

18                 *MR. TAXMAN:*  Yes, sir.

19                 *THE COURT:*  Defendant ConAgra?

20                 *MR. PATTON:*  We do, Judge.

21                 *THE COURT:*  And defendant West Side agree?

22                 *MR. SCHULTZ:*  Yes.

23                 *THE COURT:*  Okay.  All right.  Let me get the jury in.

24                 *COURTROOM BAILIFF:*  All rise.

25          *(Following proceedings held in presence of jury:)*

1          *THE COURT:*  Okay.  Folks, please be seated.

2          As I indicated to you, the one juror whose initials

3    are DG, who sits next to Ernest, has been delayed as a result

4    of an auto accident.  She was not in it.  It was a very serious

5    accident.  She's still 30 minutes away and we are almost an

6    hour late in starting.  So I have worked with the attorneys and

7    they have all agreed to the following, which I think is a good

8    idea:  There is a video of another doctor to be played.  So we

9    are going to play that for you.  And when she arrives, she is

10   going to be able to watch the back end of it and then at the

11   end of the business day, I will have her stay and watch the

12   front portion that she has not seen.  And that way we are going

13   to keep moving.

14          Okay.  So let's start.  And this is Dr. Hartley.

15          Mr. Taxman, would you introduce this witness.

16          *MR. TAXMAN:*  I will.

17          Good afternoon, ladies and gentlemen.

18          This is Dr. Patrick Hartley.  He is a pulmonologist at

19   the University of Iowa Hospitals and Clinics and he is the

20   doctor following Mr. Becker's inhalation injury.  Patrick

21   Hartley.

22   *(Videoed deposition of Patrick Hartley, taken April 16, 2010,*

23          *played to the jury beginning at 8:40 a.m.)*

24          *(Juror D.G. entered room; video paused).*

25          *THE COURT:*  Are you okay?

Examination - Hartley, Patrick (video deposition)

1           *JUROR:*  Yeah.

2           *THE COURT:*  Here's what we will do.  Watch the tape

3     from here to the end, and then we will play the rest that you

4     haven't seen for the rest later, okay?

5           Do you need to take a break or anything, use the

6     restroom?

7           *JUROR:*  No, I'm fine.

8           *THE COURT:*  For the record, we are at time stamp 9:09.

9           *MR. TAXMAN:*  Okay.  I marked the transcript also,

10    Judge.

11          *THE COURT:*  Okay.

12          All right, Rick.

13          *(Video deposition resumed; played to conclusion)*

14          *THE COURT:*  We'll play the beginning of that for Juror

15    D.G. at the close of business today.

16          Sandy, would you do lights, please?

17          What do we have next?

18          Okay.  We have an economist on behalf of ConAgra?

19          *COURTROOM DEPUTY:*  Would you please raise your right

20    hand?

21          Do you solemnly swear that the testimony you are about

22    to give shall be the truth, the whole truth, and nothing but

23    the truth, so help you God?

24          *THE WITNESS:*  I do.

25          *COURTROOM DEPUTY:*  Please be seated.  And, Doctor, I'm

1    going to take your picture.

2              *THE WITNESS:*  Standing or sitting?

3              *COURTROOM DEPUTY:*  Sitting, please.

4              Could you state and spell your name for the record,

5    please.

6              *THE WITNESS:*  Yes.  It's Richard Arnould,

7    A-R-N-O-U-L-D.

8              *THE COURT:*  Mr. Ouska.

9         *MR. OUSKA:*  Thank you.

10                      **DIRECT EXAMINATION**

11   *Q.  (BY MR. OUSKA:)*  Sir, can you give your name and spell your

12   first and last name?

13   *A.*  Richard Arnould; R-I-C-H-A-R-D, A-R-N-O-U-L-D.

14   *Q.*  And what is your occupation and profession, Doctor?

15   *A.*  I'm a retired professor of economics for the University of

16   Illinois.

17   *Q.*  Okay.  And can you tell the ladies and gentlemen of the

18   jury your background in the field of economics?

19   *A.*  Well, I received my Ph.D. in economics from Iowa State

20   University.  I spent a couple of years working for the

21   Department of Agriculture in Washington, which basically

22   involved writing my dissertation.  I then went to the

23   University of Illinois as an assistant professor and -- excuse

24   me -- stayed at the University of Illinois and worked through

25   the ranks to become a full professor, and now I'm professor

1  emeritus, which means I'm a retired professor.

2  Q.  Could you tell the ladies and gentlemen approximately how

3  many years you have been dealing with the field of economics?

4  A.  Well, from 1967 -- well, I started as a TA before that

5  time, a teaching assistant, so I had my degrees and was working

6  full-time in the field of economics from 1967 on.  The prior

7  five years, I was working on my degree in the field of

8  economics.

9  Q.  Sir, do you currently work?

10  A.  I currently work.  I'm retired from the University of

11  Illinois officially.  I still go back and teach a couple of

12  classes in the fall semester.  I still do consulting.  And I

13  also am the executive director of an organization called the

14  American Society of Health Economists.  That's a professional

15  association involving health economists.

16  Q.  In your --

17  A.  Economists who specialize in the area of health, health

18  care, et cetera.

19  Q.  Okay.  You had mentioned to the ladies and gentlemen of the

20  jury that you do some consulting work.  Do you do consulting

21  work in the field of economic analysis, as it applies to

22  litigation?

23  A.  Yes, I do.

24  Q.  Okay.  And for how long have you been doing that, sir?

25  A.  Well, I started doing some work as a consultant.  I spent a

1    year on leave from the University of Illinois -- I believe it

2    was in 1974 -- at the United States Justice Department, the

3    U.S. Justice Department, working in the antitrust division.

4        Coming away from that and back to Illinois, I started doing

5    a small amount of this type of work mainly involving antitrust

6    cases, gradually got into the area of these types of cases, the

7    tort cases, lost income cases like this -- these two.

8    Q.   Okay.  When you say "these types of cases," you were asked

9    to perform an analysis in a tort case or personal injury case,

10   correct?

11   A.   That is correct.

12   Q.   These are cases that you have done work on for the last how

13   many years?

14   A.   Well, I probably started this in the late-'70s and did a

15   few cases through my career.  Probably in the last ten years,

16   the amount of work I've done on the personal injury cases has

17   increased rather substantially.

18   Q.   Have you ever been qualified to testify as an expert in the

19   field of economics in a court of law in Illinois?

20   A.   Yes, I have.

21   Q.   And have you ever testified, in fact, as an expert in the

22   field of economics as an expert?

23   A.   Yes.

24   Q.   Okay.  About how many times over the last five or ten

25   years, would you say?

1    *A.*   I don't recall.  Actually testifying in a court case the

2    last five years or so years, not very often.  In terms of

3    giving deposition testimony, quite a few times.

4    *Q.*   Okay.

5    *A.*   I supplied my record earlier, so I didn't go back and count

6    them.

7    *Q.*   Okay.  Now, sir, in this particular case, were you asked by

8    the attorneys for ConAgra to perform or conduct an analysis of

9    the economics involved in the case of Mr. Jentz and Mr. Becker?

10   *A.*   That's correct.

11   *Q.*   Okay.  And pursuant to that request, tell the ladies and

12   gentlemen what, in fact, you did, and specifically what, in

13   fact, you reviewed?

14   *A.*   The most critical thing I reviewed -- well, in the plural,

15   were the economic reports prepared for -- by the plaintiffs'

16   economists.  Dr. Grossman, I think, prepared the report for

17   Mr. Jentz, and Dr. Stevenson prepared the report for

18   Mr. Becker.

19   *Q.*   And also --

20   *A.*   I reviewed those.  I reviewed depositions.  I reviewed a

21   lot of other information.  I had tax returns, social security

22   returns for both of these two individuals.  I had some medical

23   reports.  But, really, their reports, the tax returns, and

24   social security records are the -- are the most critical things

25   I relied on.

1    *Q.*  Did you happen to review a life care plan?

2    *A.*  Yes, I did.

3    *Q.*  Who prepared that life care plan?

4    *A.*  Doctor -- I'm sorry.  I'm not sure if she was a doctor, but

5    Ms. Lovegood.

6    *Q.*  Lovegrove.

7    *A.*  Lovegrove.  I'm sorry.

8    *Q.*  Okay.  Based upon all of the review of all the documents,

9    which you just told the jury, after that review, were you able

10   to formulate opinions relative to lost wages, loss of household

11   services in a life care plan with respect to Mr. Becker and

12   Mr. Jentz?

13   *A.*  I did.  I did.  The answer to that is yes.  And -- but it

14   is basically in the sense of critiquing the reviews of

15   Dr. Grossman and Dr. Stevenson.

16   *Q.*  Okay.  And you have developed and formulated some opinions

17   relative to those issues in the case?

18   *A.*  Yes.

19   *Q.*  And I'm going to ask that you express those opinions,

20   Doctor, to a reasonable degree of economic certainty.  Okay?

21   *A.*  Yes.

22   *Q.*  Let's start with Mr. Jentz, okay.  Can you tell the ladies

23   and gentlemen of the jury what you were looking at with regard

24   to Mr. Jentz, by way of analysis, from an economics point of

25   view?

1    *A.*  Well, there are two or three things, I think, at least

2    three things I think that are critical:  One is the worklife

3    expectancy of an -- of an individual.  The second is the base

4    income on which, you know, you would base future lost earnings.

5    And the third is the -- I use something called the net discount

6    rate.  That determines from that income that comes in, in the

7    future.  There is a growth rate that might be expected in the

8    income, and then that has to be discounted back.

9         Rather than pick exact numbers for the gross rate and the

10   discount rate, I use the net discount rate, which is the --

11   essentially, the long-term -- the difference in the long-term

12   average of growth in average annual earnings, and I use

13   ten-year treasury bills.

14   *Q.*  Okay.  I'm going to ask you down the road about the net

15   discount rate, but let me first ask you, with regard to the

16   lost earnings of Mr. Jentz, how did you arrive at a figure

17   reflective of earnings for Mr. Jentz?

18   *A.*  Well, I agreed with Dr. Grossman on a number of things.  I

19   used the same base income as he used.  He uses a -- a specific

20   retirement date.  I use a worklife expectancy.

21   *Q.*  Can you explain to the ladies and gentlemen the worklife

22   expectancy and how that differs from Dr. Grossman?

23   *A.*  Yes.  There's a -- there's a very significant difference.

24   To pick an exact -- basically, Dr. Grossman picks an exact

25   retirement date.  That retirement date means that he knows for

1    certainty that two things are going to -- are there:  One is

2    that this person will definitely be alive every year out to --

3    I believe in this case it was 30-some years.  He knows that for

4    certain.  The second thing is, he knows for certain that he

5    will be fully employed each and every one of those years.

6        I don't know that.  I'm not -- I think it would almost be

7    odd to know that this person is going to be alive for that

8    future time frame.  So the worklife expectancy that I use is

9    what is referred to as a joint probability.  It takes into

10   account the probability the person will be alive in each and

11   every one of the next years and the probability that they will

12   be working.  And you look at the joint probabilities of those,

13   and that gives you this worklife expectancy.

14   Q.  And in the worklife expectancy that you use in analyzing

15   future lost wages with respect to Mr. Jentz, can you tell the

16   ladies and gentlemen how far out in the future you projected

17   that?

18   A.  I projected it to age 70.

19   Q.  Okay.

20   A.  And that doesn't mean I expect him to retire at age 70.  It

21   means that the worklife expectancy say he -- if you take these

22   joint probabilities and apply those to each of the years, you

23   get something less than one for each of those years.  This

24   means that I'm taking the worklife expectancy years and

25   distributing those out to age 70.

1   *Q.*  Okay.

2   *A.*  I can actually calculate them out to full life expectancy,

3   but I think it makes a little more sense to do it out to 70.

4   *Q.*  Would it be fair to say that the main distinction between

5   your figures and Dr. Grossman's figures would focus on the

6   worklife expectancy?

7   *A.*  That's correct.

8   *Q.*  Okay.  Now, were you able, then, to prepare a calculation

9   with respect to Mr. Jentz relative to the present cash value of

10  John Jentz's lost income?

11  *A.*  That's correct.  I did.

12  *Q.*  Could you --

13  *A.*  And, again, I used the same net discount rate as

14  Dr. Grossman, which is 2 percent.  So using that in the -- in

15  the same base income that he uses, I get a lost earnings of

16  $446,738.

17  *Q.*  Okay.  Now, Doctor, I'd like to move on, then, to Justin

18  Becker.  Have you formed an analysis relative to Mr. Becker's

19  economic analysis?

20  *A.*  Yes, I did.

21  *Q.*  Okay.  I'm going to -- 155.  I'm going to show you what's

22  been marked Defendant's Exhibit No. 155, and ask if you

23  recognize that?

24  *A.*  Yes, I do.  That's my initial report, and then it contains

25  revisions I made May 15th.

1   *Q.*  And you made revisions May 15th of what year?

2   *A.*  2012.  I'm sorry.

3   *Q.*  What was the reason for making revisions to your original

4   report?

5   *A.*  There was some -- there was -- not some.  There was clear

6   evidence that he was back working part-time, and that needs to

7   be deducted or netted out of the -- of the estimated lost

8   earnings.  And I think -- I don't think there was a change in

9   the Lovegrove life expectancy plan.  And I recalculated the

10  life expectancy -- I'm sorry -- the life care plan,

11  recalculated it based on the new data that she brought forth.

12  *Q.*  Do you have a copy, your own personal copy of Exhibit 155?

13  *A.*  Yes, I do.

14  *Q.*  Let me take this one back.  Thank you.

15       Now, Doctor, is it fair to say you reviewed similar

16  documents in your economic analysis relative to Mr. Becker,

17  which you spoke being depositions and reports, correct?

18  *A.*  That's correct.

19  *Q.*  And included in that was the report of Mr. Becker's

20  economist, Dr. Stevenson, true?

21  *A.*  Yes.

22  *Q.*  Okay.  First, I'd like to talk about lost wages.  Okay?

23  *A.*  Yes.

24  *Q.*  And you did, in fact, calculate future lost wages with

25  respect to Mr. Becker?

1   *A.*  Yes, I did.

2   *Q.*  Let's start out with your arrival at the wage rate or wages

3   for Mr. Becker.  How is it that you arrived at that figure?

4   *A.*  I used the average of his actual earnings reported in his

5   social security records from 2005 through 2009.

6   *Q.*  And in your analysis and your review of Dr. Stevenson, do

7   you know how Dr. Stevenson arrived at the figure that he used?

8   *A.*  I don't think it related at all to what Mr. Becker had

9   actually been earning.  He -- he, I believe, used a figure

10  that's provided by an Iowa labor source that was the average

11  income for people his age, Mr. Becker's age, in the state of

12  Iowa.

13  *Q.*  And it indicated that you arrived or you used the figure of

14  $21,987 based upon what?

15  *A.*  His actual -- his actual reported earnings and his social

16  security, I believe, social security records.

17  *Q.*  Okay.  And Dr. Stevenson used what figure?

18  *A.*  He used 26,000.

19  *Q.*  Now, you explained a difference in the wages, at least the

20  figure that was used initially.  Did you then come to arrive at

21  a worklife expectancy relative to Mr. Becker?

22  *A.*  Right.  And I should make it clear, I don't actually

23  calculate the worklife expectancy.  Some others have calculated

24  it and published those data in publications.  And they don't do

25  it annually, they do it periodically.  They're economists by

1    the name of Skoog and Ciecka, and there's usually a third

2    person involved in those publications.

3    Q.   Did you -- excuse me. Did you utilize a table prepared by

4    Skoog and Ciecka with respect to worklife expectancy?

5    A.   Yes, I did.

6    Q.   Okay.  And do you know if Dr. Stevenson utilized that same

7    table?

8    A.   No, I don't.

9    Q.   Do you know how Dr. Stevenson arrived at his number of

10   years for worklife expectancy of Mr. Becker?

11   A.   No.  He simply said the worklife was about 30 years.

12   Q.   Now, also in this calculation for lost wages, you included

13   benefits, true?

14   A.   That's correct.

15   Q.   What figure did Dr. Stevenson use for benefits, do you

16   know?

17   A.   Dr. Stevenson had been using different figures in

18   different -- his different reports.  To my knowledge, in the

19   last report that I had access to, he used 15 percent and

20   claimed those to be the mandatory benefits, those mandated by

21   federal and state government.

22   Q.   Did you use the 15 percent figure for benefits relative to

23   Mr. Becker?

24   A.   No, I didn't.

25   Q.   What figure did you use?

1   *A.*   I used 7.6 percent.

2   *Q.*   Can you tell the ladies and gentlemen why and how you

3   arrived at using 7.6 percent for benefits?

4   *A.*   Well, I went to the Bureau of Labor Statistics on the -- on

5   the Internet.  They -- this is a -- a unit of the U.S.

6   Department of Labor.  And as you might expect, they are

7   responsible for providing a lot of data about employment and

8   earnings and they do some analysis of these things.  And they

9   regularly provide the cost of employment, which breaks down

10  different benefits.  And they report the mandatory benefits,

11  the legally-mandated benefits to be 7 -- well, 7.6 percent, at

12  the time I looked them up.

13  *Q.*   In an economic analysis to look at future lost wages,

14  Doctor, how is it that you arrive at amounts to reflect the

15  present cash value of those wages?

16  *A.*   Well, I added the 7.6 percent to the base income of 21,987,

17  and deducted it from that the $15.15 per day that Mr. Becker

18  was earning, had started earning.  And then I used a net

19  discount rate of 2 percent, the same as Mr. Grossman -- or

20  Dr. Grossman used to generate, then, my estimate of the net

21  present value of lost earnings.

22  *Q.*   Now, again, you mentioned that discount rate, correct?

23  *A.*   Yes.

24  *Q.*   Okay.  Can you briefly explain the significance of a net

25  discount rate in arriving at a sum or figure reflecting present

1    cash value of lost earnings?

2    *A.*  Sure.  You are all aware of this, but if you -- if you put

3    dollars -- you have to -- have to have income, a pool of money

4    today to replace future income:  next year, the following

5    year, the year after that, and in some of these cases, out 30

6    years or more.

7        That income may grow, but then it has to be discounted

8    back.  And why does it have to be discounted back?  Well, it is

9    just like I put a hundred dollars in the bank.  I get interest

10   on it.  So that hundred dollars is worth more tomorrow and next

11   year and the following year than it is today.

12       So to have -- to have a hundred dollars two years from now,

13   I have to discount that back to see, how much money do I have

14   to put in the bank today to make sure I'll have a hundred

15   dollars two years from now, or a hundred dollars three years or

16   five years from now?  So the way we do that is by discounting.

17   *Q.*  Okay.  You indicated earlier that you used that discount

18   rate of 2 percent?

19   *A.*  That's correct.

20   *Q.*  And that was also the figure used by Dr. Grossman in his

21   analysis?

22   *A.*  That is correct.

23   *Q.*  What net discount rate did Dr. Stevenson use?

24   *A.*  Dr. Stevenson seems to have used .5 for a few years and 1.5

25   thereafter.

1    *Q.*  Dr. Stevenson's net discount rate was lower than your

2    2 percent, being either .5 percent or 1.5 percent?

3    *A.*  That's correct.

4    *Q.*  Okay.  Explain to the ladies and gentlemen the significance

5    of Dr. Stevenson's lower net discount rate in calculation for

6    future lost wages?

7    *A.*  The lower the net discount rate, the more money you need up

8    front.  It's just like saying if the discount rate is 5 percent

9    and I need a hundred dollars two years from now, I don't need

10   as much money today as I would need if it was 2 percent or

11   1 percent today.

12   *Q.*  So what you are saying is, the lower the net discount rate,

13   the greater the amount of money you are going to need?

14   *A.*  That's correct.

15   *Q.*  And conversely, if you have a higher net discount rate?

16   *A.*  The less.

17   *Q.*  Okay.  Now, let's go into your calculations that you

18   prepared relative to Mr. Becker.  You, in fact, calculated lost

19   wages relative to Mr. Becker, correct?

20   *A.*  Yes, I did.

21   *Q.*  And I believe you explained the figures being the 21,800 --

22   excuse me -- $987, correct?

23   *A.*  Yes. Mmm hmm.

24   *Q.*  And you built in 7.6 for benefits?

25   *A.*  Yes.

1   *Q.*   Okay.  And you projected it out to 28.5 years?

2   *A.*   And I deducted the 15.50 a day.

3   *Q.*   Okay.

4   *A.*   And then I projected it out for -- out to age 70, given his

5   worklife expectancy.

6   *Q.*   Okay, if could just stop you.  You said you deducted out

7   the 15.50 per day.  What do you mean by that?

8   *A.*   Well, any earnings that he makes -- if you take, just the

9   21000-plus and add to that the 7.6 percent for benefits and

10  project that forward, that assumes he doesn't work at all in

11  the future.  He's already working 15 -- two hours a day, $15.50

12  per day.  Any earnings I'd expect him to make in the future

13  should be netted out of the losses.

14  *Q.*   And that's what you did in this case?

15  *A.*   That's what I did.

16  *Q.*   And that was including your revised report because you had

17  information that Mr. Becker was back at work for two hours a

18  day, correct?

19  *A.*   Yes.

20  *Q.*   And did you come to a figure reflective of lost wages,

21  present cash value of lost wages?

22  *A.*   Yes.

23      *MR. OUSKA:*  Bear with me.  I'm going to put up what is

24  marked as 155A, Judge.

25      Can you all see it?

Direct Examination - Arnould, Richard (ConAgra)

1    *Q (BY MR. OUSKA:)* Can you tell me, based upon your analysis,

2    what is the net present cash value of lost earnings with

3    respect to Mr. Becker?

4    *A.*  $351,004.

5    *Q.*  351?

6    *A.*  004.

7    *Q.*  Now, let me jump to the net present -- net present value,

8    the present crash value of the life care plan.  In your

9    analysis, what documents did you review relative to that

10   analysis?

11   *A.*  I reviewed, again, the -- there -- Dr. Livingston's -- I

12   don't know why I keep saying that -- Stevenson's report.  But I

13   also looked at Ms. Love -- is it Lovegrove?

14   *Q.*  Lovegrove.

15   *A.*  Lovegrove's report.

16   *Q.*  Okay.

17   *A.*  There was two reports.  There was one and then there was an

18   amended report or a revised report.

19   *Q.*  Okay.  And the figures that you came in your revised report

20   reflected the amended figures from Dr. -- from Ann Lovegrove,

21   true?

22   *A.*  The ones -- the ones I'm talking about today do.

23   *Q.*  And, in fact, in looking at Ann Lovegrove's life care plan,

24   did she provide one figure or several figures?

25   *A.*  At least two figures.  She had a high and low estimate on

1    many of the items in the plan.

2    Q.  Okay.  Do you know from Dr. Stevenson's report whether or

3    not he used that range, the two figures, or whether he used one

4    figure?

5    A.  He used one figure.

6    Q.  Okay.  You used two figures.  Can you tell me what the low

7    end of the present cash value of the life care plan relative to

8    Mr. Becker.  Can you first give me the low end?

9    A.  Okay.  Again, using the same discount rate as Dr. Grossman,

10   the low end is $237,967.

11   Q.  And how about the high end, Doctor?

12   A.  $263,219.

13   Q.  Well -- I screwed up my own board here.

14       But your net present cash value life care plan was 237,967

15   to 263,219?

16   A.  That's correct.

17   Q.  Okay.  Now, the final figure, Doctor, was you were asked to

18   do an analysis regarding loss of household services, true?

19   A.  True.

20   Q.  Now, will you tell the ladies and gentlemen, based upon

21   Dr. Stevenson's report, how he came to that calculation in his

22   report?

23   A.  Well, he had in -- he had the changing in different spans

24   of time, based on children at home and a variety of other

25   things.  He came to a wage rate -- unclear how he came to that

1    wage rate -- of I think it was $13, and simply multiplied that

2    wage rate times the number of lost dollars without discounting

3    it.

4    Q.  Okay.  So it's your opinion that Dr. Stevenson did not

5    provide a net present value with regard to loss of household

6    services?

7    A.  Yeah.  I don't believe he did.

8    Q.  Okay.  You spoke about Ann Lovegrove's life care plan,

9    true?

10   A.  Correct.

11   Q.  Okay.  In Ann Lovegrove's life care plan, Doctor, did you

12   see any item in there reflective of household services?

13   A.  Yes.

14   Q.  Can you tell ladies and gentlemen what you saw in Ann

15   Lovegrove's report relative to household services?

16   A.  She included in her report 3 to $4,000 per year in lost

17   household services as a result of the accident.

18   Q.  Now, Doctor, since Ann Lovegrove concluded that in her life

19   care plan, is it your opinion that that needs to be included in

20   Justin Becker's calculation for loss of household services?

21   A.  Not so long as he included it in her life care plan.

22   Q.  So that figure could be zero, relative to loss of household

23   services, if, in Ann Lovegrove's life care plan, it was already

24   included, true?

25   A.  That's correct.

1   *Q.*  Okay.  So let me put a zero.  But to be fair, Doctor, if,

2   in fact, as Ann Lovegrove says, entitled to 3 to $4,000

3   household services, did you come up with a present cash value

4   relative to every thousand dollars reflective of household

5   services?

6   *A.*  Yes.  And that's how I usually present this, and I let

7   other evidence come in as to how much -- how much household

8   services a person is actually providing and -- and relating

9   that to that individual, as well as other studies.  I estimate

10  that net present value of a thousand dollars worth of household

11  services per year.  So if you think there may be $3,000 worth

12  of household services, you would -- you would multiply my net

13  present value that I arrived at times 3.

14  *Q.*  Okay.

15  *A.*  If you think it is $4,000, you multiply it times 4.

16  *Q.*  Okay.  Well, let's assume, let's take Ann Lovegrove's

17  higher end, being $4,000, you take your present cash value of

18  26,864 and multiply it by 4, is that what you are saying,

19  Doctor?

20  *A.*  That is correct.

21  *Q.*  Okay.  And would that come to a figure of 107,000?

22  *A.*  956.  Is that right?

23  *Q.*  I've got 456.

24  *A.*  Okay.

25  *Q.*  So if we were to add all these totals together -- if we add

1    all those totals together, Doctor, we come up with a range of

2    $588,967 to $721,679?

3    A.   I haven't added them that way, but I'm assuming you added

4    correctly.

5    Q.   Okay.  And if I haven't, I'm sure the jury will correct me

6    on that.

7         Again, in that particular calculation relative to lost

8    earnings, the net discount rate he used, again, was?

9    A.   2 percent.

10   Q.   Doctor, have all of the opinions that you have given today

11   in this court been to a reasonable degree of economic

12   certainty?

13   A.   I believe so.

14             *MR. OUSKA:*  I have nothing else.

15             *THE COURT:*  Mr. Badgley.

16             *MR. BADGLEY:*  I just have a few questions.

17                          <u>**CROSS EXAMINATION**</u>

18    *Q (BY MR. BADGLEY:)* Doctor, my name is Brad Badgley.  I just

19   have a few questions on behalf of my client, Mr. Jentz.

20        Isn't it true that in terms of your consulting work,

21   testimony such as you are giving today, 95 percent of that work

22   is for defendants versus plaintiffs?

23   A.   That's correct.

24   Q.   Also, is it my understanding in testifying here today that

25   your only testimony relates to the present cash value of lost

Cross Examination - Arnould, Richard (Jentz & Schmidt)

1    future wages of Mr. Jentz in the amount of $446,000?

2    A.   That's correct.  And I --

3    Q.   And --

4    A.   And because of that, I agreed with Mr. Grossman on the

5    other calculations he made.

6    Q.   Right.  Mr. Grossman's calculations --

7    A.   Dr. Grossman, I should say.

8    Q.   Dr. Grossman was approximately $200,000 higher; is that

9    correct?

10   A.   That's correct.

11   Q.   And, basically, you agreed with his conservative income

12   valuation and discount rate; is that correct?

13   A.   Yes.

14   Q.   The only disagreement came in, is he picked a retirement

15   date of 67, and you used this work expectancy; is that correct?

16   A.   Worklife expectancy.

17   Q.   Right.

18   A.   Which is very frequently used.

19   Q.   And the worklife expectancy, you saw him only working 23

20   years, but actually Mr. Grossman picked an age of 67.  You

21   picked 70; is that correct?

22   A.   I saw him working 23.43 years, which is -- comes directly

23   from the worklife expectancy tables -- over the time period

24   from the date of the accident to age 70.

25   Q.   And you gave him worklife expectancy of 70 years, where

1    Dr. Grossman picked 67; is that correct?

2    *A.*  No, no.  I don't -- I said earlier, I don't have him

3    retiring at age 70.  I'm saying that these 23.43 years that

4    he -- that the worklife expectancy says that he will be working

5    throughout his life expectancy will occur between the date of

6    the accident, when he was 36.1 years old, to age 70.

7    *Q.*  Right.  But, basically, that worklife table assumes

8    unemployment, either intentionally or unintentionally; is that

9    correct?

10   *A.*  That's correct.

11   *Q.*  And that the person won't live their full life expectancy?

12   *A.*  Well, yes.  But that's -- that's the appropriate thing to

13   assume because none of us know if we are going to live our full

14   life expectancy.

15   *Q.*  I noticed -- you read the papers, don't you, Doctor,

16   obviously watch TV?

17   *A.*  Yes.

18   *Q.*  And you are aware of the debt crisis internationally,

19   locally, everything across the board?

20   *A.*  Yes.

21   *Q.*  The reason I ask you is you couch many of your opinions to

22   a reasonable degree of economic certainty; is that correct?

23   *A.*  That is correct.

24   *Q.*  Isn't that today's age sort of an oxymoron?

25   *A.*  Well, I don't think so.  I think we can still take a look

1   at long-term trends and the history of these different things

2   we're looking at.  That's how Dr. Grossman got up to 2 percent

3   net discount rate.  I used the same long-term changes in income

4   and discount rates, interest rates.  So...

5   Q.  But an oxymoron is a combination of contradictory, out of

6   place words such as living dead, open secret, original copy; is

7   that correct?

8   A.  I don't know.

9   Q.  But isn't it true under your analysis Mr. Jentz must and

10  has to bear the full risk of economic uncertainty?

11  A.  No.

12  Q.  Thank you, Doctor.

13  A.  No.

14          THE COURT:  Mr. Murray.

15                    **CROSS EXAMINATION**

16  **Q.  (BY MR. MURRAY:)**  Good afternoon, Dr. Arnould?

17  A.  Hi.

18  Q.  Now, Mr. Badgeley started out by saying that you do about

19  95 percent defense work.  Isn't that closer to about a hundred

20  percent?

21  A.  It's between 95 and a hundred.

22  Q.  In fact, right now is a hundred percent of your work, your

23  active caseload on behalf defendants like ConAgra?

24  A.  No, I have two or three cases pending that involve

25  plaintiff cases.

1    *Q.* And in this case, you were hired by Mr. Orlet, who we have

2    seen come in and out of the courtroom, who works with

3    Mr. Patton, correct?

4    *A.* No, I was originally hired by an attorney from -- Husch

5    Blackwell is it?

6    *Q.* Do you know Joe Orlet is a partner at Husch Blackwell?

7    They contacted you, that's how you got involved in this

8    particular case; is that correct?

9    *A.* A person by the name of Joe Kilpatrick contacted me.

10   *Q.* That's Mr. Orlet's associate.

11       So you were hired by Husch Blackwell, correct?

12   *A.* That is correct.

13   *Q.* In your own words, over your career you have done quite a

14   bit of work with Husch Blackwell; is that correct?

15   *A.* I don't know quite a bit is the way to state it.  I have

16   done work on other cases with them.

17   *Q.* Okay.  How many cases have you done with Husch Blackwell?

18   *A.* I don't have a count in my mind.

19   *Q.* Would you agree that you have done at least six or eight

20   cases with Husch Blackwell?

21   *A.* Yes, I have.

22   *Q.* Now, we were talking about the discount rate or the net

23   discount rate and I think that Mr. Ouska brought up the fact

24   that if you increase the net discount rate, that lowers the sum

25   of money that's needed to produce the stream of income over

Cross Examination - Arnould, Richard (Beckers)

1    somebody's career.

2    A.   That is correct.

3    Q.   So in this case what we're doing to be fair, Justin Becker

4    and Mr. Jentz they've been severely injured.  You understand

5    that, correct?

6    A.   Yes, I do.

7    Q.   They need some help in the future with their medical bills,

8    with their lost wages, with their life care plans, correct?

9    A.   Yes.

10   Q.   So what we are doing here is we're trying to determine a

11   sum of money that if paid at this point in time will be enough

12   to pay for these issues they are going to have in the future

13   with their wages, with their medical bills, with their life

14   care plans, correct?

15   A.   Yes, correct.

16   Q.   And if we use a lower net discount rate which -- so we are

17   on the same page, Dr. Stevenson, who we hired in this case --

18   do you know Dr. Stevenson?

19   A.   No.

20   Q.   Did you know or do you know by way of his background that

21   he was a professor at the University of Iowa, went up to a dean

22   and he did that for about 30-some years?  Did you know that?

23   A.   I saw that in his record.

24   Q.   Did you know that now that what he does in his professional

25   capacity -- he's not an expert witness like you or a hired

1   witness.  What he does is he gives financial advice to

2   individuals who need it.  Were you aware of that, sir?

3           *MR. OUSKA:*  Objection to form.

4           *THE COURT:*  Sustained.

5   **Q.  (BY MR. MURRAY:)**  Were you aware that Dr. Stevenson gives

6   financial advice?  That's his financial occupation.  Were you

7   aware of that?

8   *A.*  No.

9   *Q.*  In this particular case, Dr. Stevenson chose to use .5 for

10  a net discount rate, correct?

11  *A.*  Over a certain period of time.

12  *Q.*  I'm --

13  *A.*  Go ahead.

14  *Q.*  I'm with you.  .5 up until about 2035 and then he jumps up

15  to 1.5, which is right near your number, correct?

16  *A.*  That's correct, he jumps to 1.5.

17  *Q.*  All right.  So he is not too far off after 2035 from your

18  figures, correct?  At least with regard to the net discount --

19  *A.*  With regard to the net discount rate, he is .5.

20  *Q.*  All right.  Returning back to Mr. Ouska's point, as you

21  raise the net discount rate, you need a bigger sum of money now

22  to account for the future, correct?

23  *A.*  That's correct.

24  *Q.*  You also understand --

25  *A.*  Now wait.  Did you -- you said as you raise the net

Cross Examination - Arnould, Richard (Beckers)

1   discount rate?

2   *Q.*  You need a lower sum.

3   *A.*  A lower sum.

4   *Q.*  You also understand that as you raise the net discount

5   rate, you increase the risk to individuals like Justin Becker

6   and like Mr. Jentz here, who need this sum of money for the

7   future?

8   *A.*  I don't believe they do or I wouldn't have used these lower

9   figures.

10  *Q.*  Are you familiar with Dr. Linke and Dean DeBrock of the

11  University of Illinois?

12  *A.*  Yes, I am.

13  *Q.*  You worked with them, correct?

14  *A.*  I have.

15  *Q.*  Do you respect their work?

16  *A.*  Depends which part of it you are asking me.  I respect and

17  agree with are two different things.

18  *Q.*  Okay.  Have you ever talked with Dr. Linke about risk

19  versus certainty?

20  *A.*  Yes.

21  *Q.*  You understand that, first of all, Dr. Linke, for the

22  ladies and gentlemen of the jury, he is an economist at the

23  University of Illinois.  He is a teacher there, a professor

24  there.  And he's been doing that for some time, correct?

25  *A.*  Correct.  He is retired.

1    *Q.*   In fact, did you office with him at some point?

2    *A.*   Yeah, we shared an office.

3    *Q.*   Okay.  The same building, the same school?

4    *A.*   Same building.

5    *Q.*   And you have had this discussion of risk versus certainty

6    with him; is that correct?

7    *A.*   Sure.

8    *Q.*   In fact, Dr. Linke, your colleague, believes that a net

9    discount rate of between zero and one is the appropriate net

10   discount rate in a case like this to use; is that correct?

11   *A.*   Yes, he does.

12   *Q.*   And that's what Dr. Stevenson used --

13   *A.*   He did when he quit doing these cases.  I don't believe he

14   is doing them anymore.

15   *Q.*   Well, I can tell you that he is and he still uses that

16   rate.

17   *A.*   Okay.

18   *Q.*   And you understand that in this particular case,

19   Dr. Stevenson used a net discount rate of .5, which is squarely

20   between the zero to one net discount rate that Dr. Linke uses,

21   your colleague; is that correct?

22   *A.*   That is correct.  But he established that in a much

23   different way than Professor Linke establishes his.  He

24   established by --

25   *Q.*   All right.  There's no question pending.

Cross Examination - Arnould, Richard (Beckers)

1      And how Dr. Linke substantiates that, or supports that, or

2  argues for that is he believes that the lower the net discount

3  rate the less risk you are putting on somebody like a John

4  Jentz or a Justin Becker; is that correct?

5  *A.*  I think it would be more correct to say that he justifies

6  that by basing it on one-year Treasury bills.

7  *Q.*  Which are a safer investment than ten-year or 20-year that

8  you are professing to use in this case?

9  *A.*  No.  That's where we disagree, that's where Dr. Linke and I

10  disagree.

11  *Q.*  I understand you disagree but that's his argument, true.

12  *A.*  Well, he claims there is less of one kind of risk but not

13  necessarily other types of risk.

14  *Q.*  He believes and he would argue with you in this courtroom

15  that you are putting more risk on Jentz and Becker with your

16  higher net discount rate than Dr. Stevenson is; isn't that

17  true?

18  *A.*  He would say that, yes.

19          *MR. MURRAY:*  I don't have anything else.  Thank you.

20          *THE COURT:*  Mr. Ouska.

21                    **CROSS EXAMINATION**

22  ***Q.*  (BY MR. OUSKA:)**  First you were asked by counsel for

23  Mr. Jentz whether or not Mr. Jentz would bear the risk of

24  economic uncertainty.  Do you remember that question?

25  *A.*  Yes.

1    *Q.*  And your answer is?

2    *A.*  No.

3    *Q.*  Could you explain what do you mean by, no, that Mr. Jentz

4    would not bear the risk of economic uncertainty.  Explain what

5    you mean by that.

6    *A.*  I believe my basis for giving this 2 percent rate discount

7    rate provides enough economic certainty about what the future's

8    going to bring and equally as much as Dr. Grossman -- well, we

9    use the same, so I'm not arguing with him.  But certainly as

10   much as Dr. Stevenson.

11   *Q.*  Okay.  Now, you were asked several questions by counsel for

12   Mr. Becker about Dr. Linke, correct?

13   *A.*  Yes.

14   *Q.*  And you were asked specifically about the net discount rate

15   that Dr. Linke has used in the past, correct?

16   *A.*  That's correct.

17   *Q.*  And I believe the testimony or the question was posed that

18   Dr. Linke in the past has used zero to 1 percent as a net

19   discount rate?

20   *A.*  That's correct.

21   *Q.*  You use a 2 percent discount rate, correct?

22   *A.*  That's correct.

23   *Q.*  So you disagree with Dr. Linke?

24   *A.*  Yes.

25   *Q.*  Explain to the ladies and gentlemen why you disagree with

 1    Dr. Linke in his use of zero to 1 percent net discount rate.

 2    A.  Where I disagree with Dr. Linke -- and he and I have

 3    discussed this many times -- he bases this totally on one-year

 4    Treasury bills.

 5    Q.  Why would it not be -- why would you not agree with basing

 6    it on one-year Treasury bills?

 7    A.  Well, one-year Treasury bills have the lowest discount

 8    rate, so they require the most money up front, whether they're

 9    justified or not.

10    Q.  One of the words tossed out was "risk," correct?

11    A.  Yes.

12    Q.  That is something that's considered in looking at

13    projecting out income or income stream into the future,

14    correct?

15    A.  Correct.

16    Q.  Can you explain to the ladies and gentlemen the idea of

17    risk with regard to net discount rate and what figures are used

18    for that particular calculation?

19    A.  Yes.  I use a ten-year Treasury bill, which I use for the

20    following reasons -- take the following example:  If you use

21    one-year Treasury bills and you have $300,000 in the portfolio,

22    you are putting all $300,000 in one-year Treasury bill and I

23    have never found a financial adviser who ever recommended

24    anyone to put this amount of money in only one-year Treasury

25    bills.  And then at the end of the year they come due and you

1  have to reinvest them.  Well, if interest rates have gone

2  down -- if interest rates have gone down, you are going to

3  reinvest what is left, you paid out the first year of lost

4  earnings, et cetera, but you are going to have to reinvest that

5  at lower interest rates.  And if they go up, you reinvest at

6  higher interest rates.  But you have this downside risk if the

7  rates go down.

8      What normally is done in an investment of this sort -- and

9  to minimize risk, the type of risk that we are trying to get to

10  a minimum level, is that investment adviser would use something

11  called laddering.  And laddering means you would have some

12  one-year, you would have some five-year, you would have some

13  ten-year, 20, maybe even 30-year Treasury bills.

14      Now, they're all riskless from the point of view of the

15  government I think defaulting.  And I think that's a solid

16  assumption to make.

17      And you have got some of the longer-term Treasury bills,

18  which are locking in a rate.  Now, you don't run the downside

19  risk that Linke keeps talking about when he promotes this kind

20  of an investment because you have enough short-term interest

21  rate so that you never have to sell off a longer term interest

22  rate that you are using for some kind of insurance.  You want,

23  if possible, to be able to hold those to maturity.

24      So by doing so, I use the ten-year because it's giving you

25  some kind of an average.  Rather than pick what the blend

1    should be between short-term and long-term, I pick ten year

2    because it gives you I think a very comfortable average in

3    government Treasury bills, which are about as riskless as you

4    can get.

5    Q.  In short, Doctor, in summary, would you say that your use

6    of the ten-year Treasury bill is less risky than the use of a

7    one-year Treasury bill with a net discount rate of between zero

8    and 1 percent?

9    A.  I think it is less risk and I think it's more realistic.

10   Q.  Finally, let's talk about Dr. Stevenson and his net

11   discount rate of .5 percent.

12       Can you tell ladies and gentlemen how he arrived or came to

13   utilize the .5 net discount rate?

14   A.  He predicted the growth in income over the period from the

15   date of the accident to maybe 19 or 20, 25, some year in the

16   future.

17   Q.  Do you agree with that?

18   A.  No.  I don't believe I can do that.

19   Q.  Why not?

20   A.  How do I know what the growth and income is going to be in

21   2020.

22   Q.  Okay.

23   A.  Same thing with the discount rate, how do you know what the

24   interest rates are going to be in 2020.

25       What Linke agrees to, what Grossman agrees to, what I agree

1    to is there is pretty reasonable stability between the growth

2    rate, if you look at the long-term history of growth rate in

3    average hourly earnings -- and I go back 50 years -- and you

4    look at the discount rate, the interest rate and I use ten-year

5    Treasury bills over the past 50 years.  And that gives me --

6    that gives Grossman an average -- a two-percent difference in

7    those two values.

8        So I can talk about that with a high degree of economic

9    certainty.  I can't talk about what wages are going to be in

10   2025 or what the interest rate will be in 2025 with any degree

11   of economic certainty.

12   Q.  Is that why you used the ten-year Treasury bills with a net

13   discount rate of 2 percent?

14   A.  Well, they don't have the discount rate but they generate

15   the net discount rate of 2 percent.

16   Q.  I'm sorry.  And that's the reason you used those figures?

17   A.  Yes.

18   Q.  That's all I have.

19           MR. TAXMAN:  Nothing further, your Honor.

20           THE COURT:  Okay.  Folks, let's take 15-minute break

21   at this juncture.

22           COURTROOM BAILIFF:  All rise.

23       (Following proceedings held outside presence of jury:)

24           THE COURT:  Okay.  Please be seated.

25           I have a question I wanted to ask and I didn't want to

Cross Examination - Arnould, Richard (ConAgra)

1   ask in front of the jury.

2           This 2 percent rate that you get, is that the ten-year

3   Treasury bill rate?

4           THE WITNESS:  No, no.  That's the difference between

5   the 50-year average annual growth and average hourly earnings

6   and the average of -- the 50-year average of ten-year Treasury

7   bills.  I think what --

8           THE COURT:  So you just don't go out to a ten-year?

9           THE WITNESS:  No, no, no.  It is not what it is at any

10  particular time.

11          THE COURT:  Understood.

12          Can the witness be released?

13          MR. BADGLEY:  Well, just real quick, Judge, I just

14  want to make sure the record is clear.  I don't know if counsel

15  is going to offer the Doctor's report, but he did not -- in the

16  Doctor's report, he addressed Mr. Jentz going back to work and

17  he could work minimum wage and plugged in another figure as

18  long as they're sticking with the $446,000, that's fine, but...

19          MR. OUSKA:  If I may, Judge, the report 155 is just

20  the report relative to Mr. Becker.

21          THE COURT:  Okay.  But here's --

22          MR. BADGLEY:  Oh.

23          THE COURT:  You have offered and I've accepted into

24  evidence a lot of documents where the witness has been live but

25  there's not been testimony regarding the entire document.  I

1    don't intend those, number one, to go back to the jury or,

2    number two, to be argued out of fairness because what happens

3    is it would allow you to sandbag your opponent's by saying,

4    well, this is what the report says when you didn't ask those

5    questions.

6         *MR. BADGLEY:*  I apologize.  I should ask counsel.  So

7    you didn't put in --

8         *MR. OUSKA:*  No.

9         *MR. BADGLEY:*  -- John Jentz's report?

10        *MR. OUSKA:*  No, the only report I marked -- because he

11   had but the one figure with regard to Jentz, Judge, and he

12   agreed basically with most of Grossman's amounts, I did not use

13   the figure.  But there was certainly definite differences

14   between Stevenson and Dr. Arnould.  And thus, I marked that

15   report and only the report relative to Becker and the revised

16   report because we had new information being that Mr. Becker

17   went back to work.

18        *THE COURT:*  All right.  You intend to offer them?

19        *MR. OUSKA:*  I would offer them into evidence.

20        *THE COURT:*  Okay.  I'm going to accept them.  But

21   again, they are not going back to the jury and you can't argue

22   anything out of them because we have a live witness.  I don't

23   know why they are in evidence.  I'm going to be consistent

24   anyway.  Thank you.

25        *THE COURT:*  Admitted.

1            *(Exhibit Dft 155 & 155A received in evidence)*

2            COURT REPORTER:  What were those exhibit numbers,

3    Judge?

4            MR. OUSKA:  155 is the report and 155A is the

5    demonstrative with the figures.

6            COURT REPORTER:  Thank you.

7                        *(Recess)*

8        *(Following proceedings held outside presence of jury:)*

9            THE COURT:  Counsel, we are in open court out of the

10   presence of the jury.  I think the plaintiffs had something,

11   exhibits or something?

12           MS. LEVINSON:  Your Honor, we have a few exhibits that

13   were referenced yesterday during Dr. Schroeder's testimony, and

14   we would like to formally admit them.  82.

15           THE COURT:  What is it?

16           MS. LEVINSON:  I'm sorry?

17           THE COURT:  What is this?

18           MS. LEVINSON:  82 is a picture of the silos.  I showed

19   counsel before we started.

20           THE COURT:  Oh, and all these?  Okay.

21           MS. LEVINSON:  105.

22           THE COURT:  Go ahead and give me all the numbers and

23   I'll admit them all later.

24           MS. LEVINSON:  325, 335.  And then the clips that we

25   played of Robert Schroeder and Anthony Yount --

1          *COURTROOM DEPUTY:*  I'm sorry.  I couldn't hear the
2    number.
3          *MS. LEVINSON:*  358 and 359.
4          *THE COURT:*  Okay.  I'll admit them without objection.
5     *(Exhibit Plfs' 82, 105, 325, 358 and 359 received in evidence)*
6          *MS. LEVINSON:*  And then the pictures that were
7    referred to during Dr. Hartley's testimony, 20 and 21, it's his
8    report.
9          *THE COURT:*  Okay.  It's admitted without objection.
10          *(Exhibit Plfs' 20 & 21 received in evidence)*
11          *MS. LEVINSON:*  And 7 through 11 also were referenced
12    through the doctor's deposition last week.
13          *THE COURT:*  Again, admitted without objection.
14          *(Exhibit Plfs' 7 to 11 received in evidence)*
15          *THE COURT:*  Anything else for Plaintiff Jentz?
16          *MR. PATTON:*  Are they going to rest?
17          *MR. DUNN:*  We have life tables, Judge, that we would
18    like to publish to the jury.
19          *THE COURT:*  Okay.
20          *MR. DUNN:*  There is also Exhibit 355 that Mr. Durkin
21    used yesterday, which is the overlay over Mr. Patton's Exhibit
22    Number --
23          *MR. DURKIN:*  Oh, yeah.
24          *MR. DUNN:*  -- 355.
25          *MR. DURKIN:*  Oh, it is over his one.

1          *MR. DUNN:*  Plaintiffs 355 is the overlay.

2          *MR. PATTON:*  I object to that.

3          *THE COURT:*  We'll decide later whether it goes to the

4     jury, but it is admitted over objection.

5              *(Exhibit Plfs' 355 received in evidence)*

6          *MR. TAXMAN:*  Okay.  Brad is going to read the life

7     table for both plaintiffs so we have that number in for the 34

8     instruction.  And then I think both sides need to publish the

9     total of the medical bills.  We can start the witness first, if

10    you want, or we can publish it now.

11         *THE COURT:*  Why don't we just -- why don't you rest,

12    subject to the medical bills and the life tables.  And then I

13    want to indicate now, then, that Rule 50 motions are going to

14    be filed by the defense.  We agreed beforehand that they will

15    be timely filed and argued.  But we will not do it at the close

16    of the plaintiff's case because I have got jurors waiting.  It

17    will be considered timely when they do file them, and there is

18    no argument by any side that there is a waiver.

19             Is that correct on behalf of the plaintiffs, Jentz and

20    Schmidt?

21         *MR. CLIFFORD:*  Yes, your Honor.

22         *THE COURT:*  And Plaintiff Becker?

23         *MR. TAXMAN:*  Yes, sir, that's the agreement we made.

24         *THE COURT:*  Does that satisfy the defense?

25         *MR. TAXMAN:*  Judge, we will be filing ours

1    electronically this afternoon.

2           THE COURT:  Okay.  I just want to be clear.  I did

3    indicate in the beginning that I knew this is coming, and it is

4    considered timely, but we will not take it up right now because

5    of the fact that jury is waiting and we have witnesses ready to

6    go.

7           So then we will do what you suggested, and then I'll

8    ask you.  You'll tell me you rest, you rest formally in front

9    of the jury, and we will go into ConAgra's case.

10          MR. DURKIN:  Judge, we do want to go through our

11   exhibits.  You know, if there are any exhibits we have missed,

12   we can --

13          THE COURT:  No -- no problem.  I am very liberal about

14   re-opening your case, if you need to, because of the

15   technicality of it.

16          MR. DURKIN:  Okay.

17          THE COURT:  There is a lot of exhibits and a lot of

18   testimony both sides.

19          MR. OUSKA:  Both sides, right?  Mutual.

20          MR. CLIFFORD:  Goose and gander.

21          THE COURT:  Okay.  Let me get the jury.

22          (Following proceedings held in presence of jury:)

23          THE COURT:  Folks, there are a few more things that

24   plaintiffs are going to be offer you and then they will rest

25   and we are going into the defense case.

1          On behalf of the plaintiffs, Mr. Badgley.

2          *MR. BADGLEY:*  Yes, your Honor.  I would like to offer

3     into evidence Plaintiff's Exhibit 72, which is the U.S.

4     Department of Health and Human Services National Vital

5     Statistics Report of the United States life tables, 2007.  And

6     reading from those tables, on behalf of my client, Mr. Jentz,

7     age 38, his life expectancy is 40 years.  And for

8     Plaintiff Becker, age 31, his life expectancy is 46.5 years.

9          *THE COURT:*  Mr. Taxman.

10         *MR. CLIFFORD:*  There's one other for -- there's one

11    other for Robert Schmidt, your Honor.

12         *THE COURT:*  Right.  That's -- okay.  I didn't know who

13    was going to do that.

14         *MR. TAXMAN:*  Well, you know what, I'll finish this and

15    look up this after.  Mr. Badgley has published it so far on

16    behalf of the two of the plaintiffs, and we will look up

17    Mr. Schmidt.

18         What I would like to do is publish Plaintiff's

19    Exhibit 341.  The medical bills, total medical bills for Justin

20    Becker.  Is there a marker?  From April 27, 2010, through

21    April 10, 2012, the total is $2,275,844.22.  This is for

22    Becker.  We will offer 341 into evidence.

23         *THE COURT:*  Okay.  Admitted without objection.

24              *(Exhibit Plfs' 341 received in evidence)*

25         *THE COURT:*  The life tables of Mr. Schmidt.

1              MR. TAXMAN:  Mr. Schmidt, Page 35, 42.8 years.

2              THE COURT:  And you can consider all that as evidence

3    in the case.

4              Plaintiff Jentz rests?

5              MR. CLIFFORD:  Yes.  Yes, your Honor.

6              THE COURT:  Plaintiff Schmidt rests?

7              MR. DUNN:  Yes, Judge.

8              THE COURT:  And Plaintiff Becker rests?

9              MR. TAXMAN:  Your Honor, we rest the plaintiffs' case,

10   both plaintiffs.

11             THE COURT:  Okay.  Rule 50 motion is timely filed and

12   to be argued later.

13             On behalf of ConAgra, the defense case, Mr. Patton.

14             MR. PATTON:  Thank you, Judge.  We'll call as our

15   first witness Godfrey Friedt.

16             COURTROOM DEPUTY:  Sir, could you please raise your

17   right hand?

18             Do you solemnly swear that the testimony you are about

19   to give shall be the truth, the whole truth, and nothing but

20   the truth, so help you God?

21             THE WITNESS:  I do.

22             COURTROOM DEPUTY:  I'm going to take your picture for

23   the jurors.

24             MR. PATTON:  May I proceed, Judge?

25             THE COURT:  Yes.

Direct Examination - Friedt, Godfrey (ConAgra)

<u>**DIRECT EXAMINATION**</u>

1

2   *Q.  (BY MR. PATTON:)*  Good afternoon, Godfrey.  I'd like to

3   just start by kind of introducing you to the jury and talking

4   about your background.  Okay?

5   *A.*  Okay.

6   *Q.*  Can you tell the ladies and gentlemen of the jury, are you

7   currently employed?

8   *A.*  Yes, I am.

9   *Q.*  All right.  And who are you employed by?

10  *A.*  ConAgra Foods.

11  *Q.*  And how long have you been employed with ConAgra?

12  *A.*  Eight and a half years.

13  *Q.*  Before I go into more detail about the work you do for

14  ConAgra, let's kind of go into your background.  Okay?

15  *A.*  Okay.

16  *Q.*  Tell us where you grew up.

17  *A.*  I grew up in a small town in North Dakota.

18  *Q.*  Okay.  And what town was that?

19  *A.*  Mott.

20  *Q.*  Okay.  And did you attend high school?

21  *A.*  Yes, I did.

22  *Q.*  Okay.  And where did you attend high school?

23  *A.*  At Mott Lincoln High School in Mott, North Dakota.

24  *Q.*  And you graduated?

25  *A.*  Yes, I did.

1    *Q.*  Okay.  And then after graduation, did you attend further

2    schooling?

3    *A.*  Yes, I did.  I went two years to a trade school in

4    Wahpeton, North Dakota as a diesel mechanic.

5    *Q.*  Okay.  And did you obtain a degree as a diesel mechanic?

6    *A.*  Yes, I did.

7    *Q.*  Okay.  And then after obtaining that degree?

8    *A.*  I --

9    *Q.*  Go ahead.

10   *A.*  I went back to my hometown.  I was fortunate to get a job

11   in my hometown working for a John Deere and Chevrolet

12   dealership where I was employed as a diesel mechanic.  And I

13   also helped on the farm during that time as well.  And after

14   three years of doing that, I quit as a diesel mechanic, and I

15   strictly -- I went farming, strictly the farming.

16   *Q.*  Okay.  And what kind of farming did you do?

17   *A.*  We were a dairy operation so we milked cows, and so, like,

18   a lot of our work was putting up hay.  We grew sunflowers,

19   oats, barley, canola, and also spring leaf.

20   *Q.*  Was this a family business?

21   *A.*  Yes.  At the time, it was just my father and myself.

22   *Q.*  Okay.  And a lot of kids in your family?

23   *A.*  Yes, I had five brothers and four sisters.

24   *Q.*  And where did you fit along the line?

25   *A.*  I was Number 8.

Direct Examination - Friedt, Godfrey (ConAgra)

1   *Q.*   Okay.  And did you get kind of by virtue of the fact that

2   your other siblings moved out, did you have to stay back and

3   work the farm?

4   *A.*   Yes.  I did that, more or less, in high school.  You know,

5   a lot of my older brothers and sisters had moved away.  And

6   then during high school, I worked quite a bit with my dad when

7   I was a sophomore, a junior, and senior in high school because

8   I was the oldest at home at that time.

9   *Q.*   Okay.  And then after going back, after some schooling to

10  work, what did you do next?

11  *A.*   After -- there was a -- there was as drought in 1988 up in

12  North Dakota.  So at that time, I decided I would go back to

13  school.  And I had always been good at math so I decided I was

14  going to go back to college to pursue a degree in teaching

15  math, and I did that for about almost two years.

16  *Q.*   Which college is that?

17  *A.*   That's in North Dakota State University in Fargo, North

18  Dakota.  And then I switched my major to agricultural

19  economics.

20  *Q.*   Why did you go from math to agricultural economics?

21  *A.*   Because of the people.  I was in a fraternity, and there

22  were a lot of people that were in that, I guess, that degrees.

23  And it's very math based.  I like the math, obviously.  I

24  was -- I wanted to become a math teacher.  And I really enjoyed

25  the economics side of it.  And understanding the macro and

1    micro economics of the world and the country.

2    Q.   Okay.  Did you ultimately obtain a degree in agricultural?

3    A.   Yes, I did attain a degree in agricultural economics.

4    Q.   And can you give us a ballpark what -- what year that was?

5    A.   Oh, that was in 1992.

6    Q.   Okay.  And how old are you today?

7    A.   I am 48.

8    Q.   Now, after obtaining that degree, did you go back into the

9    workforce?

10   A.   Yes.  At that time, I got a -- a job with Cargill,

11   Incorporated.

12   Q.   And what's the nature of the work or business Cargill is

13   involved in?

14   A.   The division that I was in was the grain division.  So we

15   originated grain from the country and processed it and moved it

16   all the way to export elevators down in the Gulf of Mexico out

17   on the west coast.

18   Q.   And what -- how would you characterize your job

19   responsibilities and duties when you first started at Cargill?

20   A.   When I first started, we went through, of course, safety

21   training.  And then after about three weeks of learning on the

22   job, I went to -- and worked night shift, supervising a crew.

23   I was the only supervisor at night with 15 employees.  We

24   unloaded cars, loaded cars, loaded barges, unloaded trucks, and

25   that was about it.

1    *Q.*  And were you doing this labor in addition to supervising?

2    Were you doing the unloading as well?

3    *A.*  Yes.  I learned how to do it.  I always like to have -- I'm

4    a hands-on guy.  I grew up on a farm, I love that stuff.  And

5    part of what I like to do is -- was to work with the guys and

6    learn how to do those things because I really felt that I

7    wanted to understand, you know, the struggles they would go

8    through in working through their jobs.  And it helped me

9    understand how to better help them if they had a problem.

10   *Q.*  Okay.  And how long did you have this position?

11   *A.*  I had the position, that position, for about three and a

12   half years, but it was at two different locations.

13   *Q.*  Okay.  And where were these locations?

14   *A.*  I started in Savage, Minnesota, and after a year and a

15   half, I moved to Reserve, Louisiana.

16   *Q.*  Was the work with Cargill one that required you to move a

17   lot?

18   *A.*  Yes.  In the nine years that I was -- 11 years that I was

19   with Cargill, my wife and I moved seven times.

20   *Q.*  Your choice?

21   *A.*  No.  I think three of them were, you know, job changes.

22   They wanted me to, you know, they were eliminating job

23   positions.  And other ones were promotions, they wanted me to

24   move up.

25   *Q.*  Okay.  And so take us from the first job as a night

Direct Examination - Friedt, Godfrey (ConAgra)

1  supervisor to what your final position was at Cargill, and give

2  us a sense of what year that was.

3  A.  In -- well, after several moves, my final destination was

4  back down in Reserve, Louisiana.  And I was the logistics

5  coordinator, so I handled all the vessels coming into the

6  facility, all the barges, all the railcars, and managed all the

7  merge and dispatch that's associated with those, and all the

8  grades, working with the U.S.D.A. in the grades that the corn,

9  soybeans, milo, wheat, and rice were graded at.  So a

10  relationship with the U.S.D.A.  And then that would have been

11  in 2003 when I -- when that happened.

12  Q.  Okay.  Now, throughout that time period with Cargill, would

13  you have any responsibilities with silos or bins?

14  A.  Yes, I did.

15  Q.  Okay.  And would you describe for the ladies and gentlemen

16  of the jury what type of duties you would have with that:

17  bins, silos, elevators?

18  A.  Early on, you know, some of the training we went through

19  was just to observe them.  You want to see if there's any

20  structural cracks, those kind of things.  Roofing.  You know,

21  if the roof is in good condition because you don't want water

22  leaking into the bin.  And then down in Reserve, I actually

23  helped clean out some bins that, you know, we were -- had some

24  bin bottoms that were -- had some product in them, so we

25  actually cleaned them out.  And that's all I can think of.

1    *Q.*   Okay.  All right.  And so that began kind of your

2    connection with grain bins in the farming industry?

3    *A.*   That is correct.

4    *Q.*   Okay.  Now, why did you leave Cargill?

5    *A.*   Um, I left Cargill because, again, they were going through

6    another restructuring.  They were eliminating my job as

7    logistics coordinator.  And having moved that many times and

8    those kind of things, you know, I thought this is just time for

9    me to go look for something different.

10       And I had had a friend who had worked with Cargill, with me

11   at Cargill several years before, who had been working for

12   ConAgra for about three years.  And he kept calling me and

13   asking me, Hey, this is a great company.  Why don't you come

14   work for them.  And I said, no, I'm happy with Cargill at this

15   time.

16       So I think this was the time in my life where my wife and I

17   talked about it and that we decided that I was going to try

18   something different and just go out and see what else was out

19   there.

20   *Q.*   Where in this timeline with Cargill -- did you get married

21   when you were working at Cargill?

22   *A.*   Yes.  I got married, let's see, roughly a year after I

23   started with Cargill.  I kind of told my wife, or girlfriend at

24   the time, you know, they kind of told me when I started that I

25   would probably be at a location for a year and a half.  So I

1    kind of let her know that we are approaching a year and a half.

2    And I said, Do you want to get married?  So we got married.

3    Q.  Okay.  And do you have kids?

4    A.  Yes, we have four kids.

5    Q.  Where do you currently live?

6    A.  My wife and I, family, live in Omaha, Nebraska.

7    Q.  Now, did you take that job with ConAgra?

8    A.  Yes, I did.

9    Q.  Okay.

10   A.  Martins Creek, Pennsylvania.

11   Q.  And what were you doing with ConAgra at that time?

12   A.  The job that I was offered was kind of a double job.  It

13   was managing the grain elevator and then also managing a flour

14   blending plant.  Again, this was totally new to me, the flour

15   industry.  You know, I know the grain industry and wheat.  I

16   did not know anything about flour at that time.

17   Q.  And when you say you were managing, can you give us a sense

18   of how you were managing an elevator and this flour production?

19   One at a time, tell us what your job duties were.

20   A.  As the elevator manager, I would get the information as far

21   as the number of cars coming into the plant.  We had to

22   segregate by protein of the wheat because that is how flour is

23   made is made, with different proteins.  There is also different

24   varieties, such as soft wheat, hard wheat, and spring wheat.

25   And those are segregated by protein.

Direct Examination - Friedt, Godfrey (ConAgra)

1        That was the elevator's job, is to unload the cars, and

2   then to take that wheat and blend it so you get a very

3   homogenous quality wheat so that the baker -- once the flour --

4   once the wheat is milled into flour, the baker does not see

5   variations in quality.  Because of today's high automated

6   bakeries, they don't want to see a lot of variety.  They want

7   to see consistency because that's what the customer is

8   demanding.

9        In the blend plant, then, we took the flour from the mill.

10  That's where the mill sent the flour to us.  Again, it was

11  segregated by protein and by variety:  soft wheat, spring

12  wheat, and hard wheat.  And then each of the customers had

13  their own specific recipe that they wanted us to supply them

14  flour.  Some of it had enrichment on it, which is the iron,

15  those kind of things.  So all of those and all of that process

16  happened in the blend plant.

17       We loaded bulk trailers, 50,000-pound semis, there.  And

18  then also we sent flour up to the packers.  Twenty-four hours,

19  seven days a week, we were packing.  And so we were packing

20  about 10,000 bags of flour a day.

21  *Q.*  Now, how did you learn all this stuff at ConAgra?

22  *A.*  Um, it was tough.  At the time, I was 40 years old.  I had

23  just turned 40 when I went there.  The elevator, I understood

24  and got a pretty good idea, worked with the guys, talked with

25  them.  So they kind of knew a little bit about me, and we knew

1    what we had to get done.

2        The blend plant, those guys had been there several years as

3    well.  But I really went to them and said, Guys, I don't know

4    anything.  I need you to help me understand what it is you do,

5    how you do it, and I'm -- you know, I'm here to help you to try

6    to figure out some of the things that, you know, they struggled

7    with.

8        And, you know, it being -- you're receiving product from

9    the mill.  And the mill controls the moisture level and the ash

10   level in the flour.  And if those are wrong, we had to deal

11   with it.  So part of my job was to relate back the problems

12   from there to the head miller, who was the guy in control of

13   those particular things.

14   Q.  Okay.  And how long were you in Pennsylvania doing this

15   job, in ballpark?

16   A.  Roughly a year.

17   Q.  All right.  And are we in 2002 or 2003, somewhere in there?

18   A.  I started in 2003, and then in 2004 is where we're at now.

19   Q.  Okay.  So you had to pull stakes and move again.  And where

20   did you go?

21   A.  Actually, I didn't.  What they wanted me to do -- at that

22   time, the plant manager was leaving, and it was also another

23   small plant 15 miles away from where we were.  So I had an

24   option.  I could either become the operations manager at the

25   plant -- at the plant I was at, in Martins Creek, or I could

Direct Examination - Friedt, Godfrey (ConAgra)

1    move over to a smaller plant where I was the plant manager.  I

2    was the only -- would be the only management person over there.

3    So I left that up to my boss to make that decision.  I said, I

4    will do whatever you want me to do.  So they moved me over to a

5    small flour mill in Treichlers, Pennsylvania.

6    Q.  And as plant manager?

7    A.  Yes, as plant manager.

8    Q.  Okay.  And give us a sense of how large of a plant this is.

9    A.  Can you repeat the question?

10   Q.  How large was the plant?  Give us a sense of how large of a

11   plant that was.

12   A.  Treichlers runs about 3,200 hundred-weights a day, which is

13   six semi loads of flour.  That's what they make a day.

14   Q.  Okay.  What -- as a plant manager, what are you doing to

15   make sure that plant is being operated efficiently?

16   A.  There were 11 employees at that plant.  They had been there

17   a long time.  They were a couple brothers working there, they

18   were very close friends.  So I pretty much went over there and

19   asked them or let them know that, you know, I needed their help

20   to get things done.

21       I was not a miller by trade, so I had to figure out how I

22   was going to manage three guys running a mill, and I'm not a

23   miller.  So I worked with them and let them know that, you

24   know, I knew some things.  There were technical millers within

25   ConAgra that taught me a few things.  And then I was going

1   to -- I had exceptions that I set for them that targets that

2   they had to hit on quality.

3       So I let them know that.  And I told them I wasn't going to

4   touch any of their equipment.  I would help them, if they

5   needed help, but I wasn't going to go in and touch their

6   equipment, change settings, do those kind of things.  That was

7   their responsibility.

8       The other part of it was, you know, again, you are there by

9   yourself.  You had to manage safety.  So I had a gentlemen by

10  the name of Kenny.  He was the car unloader, and I kind of

11  asked him to help me with safety.  He was a really good safe

12  guy, so helped him with that.

13  Q.  What did that involve?  When you say that part of your

14  responsibilities were safety, give us a sense of what that

15  involved.

16  A.  We had to have weekly safety meetings.  So at that point,

17  you are running three shifts.  You have got to be there at the

18  end of some shifts, start of other shifts, to make sure you are

19  covering all that.  You have to cover all the required policies

20  that we had implemented at the time.  You had to do inspections

21  throughout the facility.  You had to have safety committee

22  meetings where you are working with the employees, sitting down

23  with them discussing issues that are out there.  I remember at

24  the time one of the biggest things we were going through was

25  improvement of guarding on equipment.

Direct Examination - Friedt, Godfrey (ConAgra)

1    *Q.*  And what kind of equipment required this guarding?

2    *A.*  The roller mills.  This facility was built in the late

3    1800s.  So, again, a lot -- some of this equipment had

4    fabricated some guards over the years.  So, again, those all

5    had to be designed, fabricated, moving equipment, such a

6    conveyors.

7         And, you know, railroad safety, we unloaded cars there.  We

8    didn't unload any trucks.  So we had to make sure that we were

9    right next to the mainline, the Norfolk Southern Mainline.  So

10   we had to make sure that we were blue-flagging the tracks so

11   the railroad wouldn't come in when we were working.

12   *Q.*  What is blue-flagging?

13   *A.*  That's like a lock-out/tag-out.  All railroads, if you talk

14   to anybody that works in the railroad, anything that's

15   blue-flagged, they're not allowed to hook up, touch it, go down

16   that track.

17   *Q.*  What other safety responsibilities did you have as the

18   plant manager?

19   *A.*  Walking around observing employees, you know, making sure

20   they were doing their jobs safely.  We had a program where

21   employees would actually go watch other employees do their jobs

22   and to, you know, kind of peer each other to say, Hey, I see --

23   I see somebody, my brother -- we called it my brother's

24   keeper -- where you are out there watching somebody else do

25   their job to make sure they're not getting hurt.

Direct Examination - Friedt, Godfrey (ConAgra)

1          And then we implemented changes, if there were changes,

2     whether it was an equipment change or just simply a change in

3     the process or procedure of how somebody does something.  Maybe

4     they're doing Step 4 in front of Step 5.  And we talk to the

5     employees about that.

6     Q.  Was safety something that was important to you, Godfrey?

7     A.  Yes, very much so, very much.

8     Q.  Why was it important to you?

9     A.  Because those were the guys when I look back at it today, I

10    called that plant my plant because that was the first one

11    within ConAgra that I actually managed myself.  And those

12    employees were my employees.  I cared about them.  I got to

13    know their families, I got to know them.  And I didn't want to

14    see any of them get hurt.

15    Q.  Okay.  Now, how long were you there at that plant?

16    A.  I was there about five months and then they moved me to

17    Omaha, Nebraska.

18    Q.  Okay.  And what did you do in Omaha?

19    A.  There I was the regional manager over three flour mills;

20    two of them in Omaha, Nebraska and one in Fremont, Nebraska.

21    So I not only was managing a plant where I had four supervisors

22    working for me, I also had two other plants where I had two

23    head millers who were managing the plant and then also two

24    quality people at each of these plants.

25    Q.  Did this job require some travel?

Direct Examination - Friedt, Godfrey (ConAgra)

1   *A.*   Some, yes.   They're pretty close to each other, so 15 miles

2   is about as far as I had to drive to Fremont because I lived

3   out on the west side of Omaha.   So if I wanted to go to

4   Fremont, I just went the opposite direction.   It was about the

5   same mileage to Fremont as it was to the one of the plants

6   downtown.

7   *Q.*   Okay.   And with this new position, how would you carry out

8   your job responsibilities in doing this?

9   *A.*   The first thing I had to get used to was managing other

10  managers.   I had a safety manager, I had a head miller,

11  quality, and a pack supervisor because we also packed flour

12  there, too, as well.

13      So, again, it was getting to know people, what their

14  strengths were, how they managed, kind of set some expectations

15  of what I wanted to see.

16      I also met with the union stewards the first day that I was

17  there, just to let them know who I was.   You know, kind of sat

18  down with them and, you know, see how they viewed things.

19      So started with that and kind of worked especially through

20  the safety guy to kind of help and guide me through some of the

21  things that he thought that all three of these plants -- since

22  he managed -- since he went to all three of them -- just to

23  kind of see what his thoughts were on what some of the ideas

24  and thoughts that he had that we needed to get taken care of

25  right away.

1          *MR. PATTON:*  I'm getting the sense of running out the

2     clock here.

3          *THE COURT:*  Is this a good time for us to break?

4          *MR. PATTON:*  I think so.

5          *THE COURT:*  We will stop with this testimony, folks.

6          What I need to do next is show juror D.W. *[sic]* the

7     portion of the tape that she didn't see.  That's about 30

8     minutes.

9          And then, Counsel, I'll meet you at 5:30.  Same place

10    as last night.

11         *MR. SCHULTZ:*  Yes.

12         *THE COURT:*  Are we locked in until 8:00?

13         *MR. SCHULTZ:*  Or later whatever.

14         *THE COURT:*  Okay.  Okay.  So those of you who need to

15    work on jury -- get things ready are free to leave now and I

16    will stay with Rick and anybody else who wants to stay and show

17    that portion of the tape.

18         The rest of the jurors are free to go.  We will see

19    you tomorrow morning.

20         *COURTROOM BAILIFF:*  All rise.

21         *THE COURT:*  And, DW, you get your own show.

22         *MR. PATTON:*  Just one scheduling issue.

23         *THE COURT:*  Why don't we go to sidebar.

24         I'm sorry, D.G.

25         Are we done with the court reporter?  She has

1    something...

2            MR. PATTON:  Sure.

3            THE COURT:  Okay.  So by agreement we are going to

4    show the balance -- the first part of the tape to juror DG, the

5    rest of the jurors are released.

6            And then we will take up with the balance of the

7    testimony of this witness tomorrow.

8            MR. CLIFFORD:  And we will leave Rick with you and

9    have arrangements made to get him back.

10           THE COURT:  He can ride with me.

11           MR. CLIFFORD:  Okay.  We'll work it out.

12   (Beginning of Dr. Hartley's video deposition played for juror

13                            D.G.)

14                            -oOo-

15                     REPORTER'S CERTIFICATE

16       I, Molly N. Clayton, RPR, FCRR, Official Court Reporter
     for the U.S. District Court, Southern District of Illinois, do
17   hereby certify that I reported with mechanical stenography the
     proceedings contained in pages v.10, pg 109 - 173; and that the
18   same is a full, true, correct and complete transcript from the
     record of proceedings in the above-entitled matter.

19
                     DATED this 22nd day of May, 2012.
20

21
                                    *Molly Clayton, RPR*
22                                  _____

23

24

25

Direct Examination - Friedt, Godfrey (ConAgra)