```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE SOUTHERN DISTRICT OF ILLINOIS
 2      _____

 3      JOHN W. JENTZ,                    )
                                         )
 4            Plaintiff,                  )
                                         )
 5      vs.                              )  Case No. 10-cv-474-MJR-PMF
                                         )
 6      CONAGRA FOODS, INC., et. al.,     )
                                         )     Consolidated with:
 7            Defendants.                 )
        -----------------------------    )
 8      JUSTIN BECKER and AMBER          )
        BECKER,                          )
 9                                       )
              Plaintiffs,                 )
10                                       )
        vs.                              )  Case No. 10-cv-952-MJR-PMF
11                                       )
        CONAGRA FOODS, INC., et. al.,     )
12                                       )
              Defendants.                 )
13      -----------------------------    )
        ROBERT SCHMIDT,                  )
14                                       )
              Plaintiffs,                 )
15                                       )
        vs.                              )  Case No. 11-cv-391-MJR-PMF
16                                       )
        CONAGRA FOODS, INC., et. al.,     )
17                                       )
              Defendants.                 )
18      _____
```

**TRIAL DAY/VOLUME 12 (P.M. SESSION)**

BE IT REMEMBERED AND CERTIFIED that heretofore on **5/24/2012**, the same being one of the regular judicial days in and for the United States District Court for the Southern District of Illinois, Honorable Michael J. Reagan, United States District Judge, presiding, the following proceedings were recorded by mechanical stenography; transcript produced by computer.

REPORTED BY: **Molly N. Clayton, RPR, FCRR**, Official Reporter for United States District Court, SDIL, 750 Missouri Ave., East St. Louis, Illinois 62201, (618)482-9226,
*molly_clayton@ilsd.uscourts.gov*

1                            **APPEARANCES:**

2   *FOR PLAINTIFF(S) JOHN JENTZ AND ROBERT SCHMIDT*:  **Robert A.**
    **Clifford, Kevin P. Durkin and Colin H. Dunn** of Clifford Law
3   Offices, P.C., 120 North LaSalle Street, Suite 3100, Chicago,
    Illinois 60602 **and  Brad L. Badgley**, P.C., Brad L. Badgley, 26
4   Public Square, Belleville, Illinois 62220

5   *FOR PLAINTIFF(S) JUSTIN AND AMBER BECKER*:  **Marc A. Taxman, Sean**
    **P. Murray, and Julie Levinson Pustilnik of Anesi Ozmon Rodin**
6   **Novak & Kohen**, Ltd,  161 N. Clark St,  21st Floor, Chicago,
    Illinois 60601

7

8   *FOR DEFENDANT CONAGRA FOODS, INC*:  **John W. Patton, Jr., John A.**
    **Ouska** of Patton & Ryan, 330 N. Wabash Avenue, Suite 2900,
9   Chicago, Illinois 60611 **and Joseph C. Orlet, Brandan P. Mueller**
    **and Joseph A. Kilpatrick** of Husch Blackwell LLP, 190 Carondelet
10  Plaza, Suite 600, St. Louis, Missouri 63105.

11  *FOR WEST SIDE SALVAGE, INC*. (Jentz and Schmidt cases only):
    **John G. Schultz and Jason B. Moore** of Franke Schultz & Mullen,
12  P.C, 8900 Ward Parkway, Kansas City, Missouri 64114.

13  *FOR THIRD-PARTY WEST SIDE SALVAGE, INC*:  **John G. Schultz, Jason**
    **B. Moore** of Franke Schultz & Mullen, P.C, 8900 Ward Parkway,
14  Kansas City, Missouri 64114.

15

16

17

18

19

20

21

22

23

24

25

1                    **INDEX OF WITNESS EXAMINATION**

2                                       **DX**      **CX**     **R-DX**    **R-CX**

3   *Flitsch, Melvin (Beckers)*          *190*
    *Flitsch, Melvin (ConAgra) .....110*                     *207*
4   *Flitsch, Melvin (Jentz & Schmidt)*  *187*
    *Flitsch, Melvin (Jentz & Schmidt)*  *203*
5   *Flitsch, Melvin (West Side)*        *165*
    *Nanez, Adam (depo excerpts)   213*
6   *Rihanek, Cathy (depo excerpts) 211*
    *Tabak, Karen (video depo)     228*
7   *Yount, Anthony (depo excerpts) 214*

8                        **INDEX OF EXHIBITS**

9   **EXHIBIT**              **DESCRIPTION**          **Id'D**      **Rcv'd**

10  *WSS 2*                                                         *211*
    *WSS 3*                                                         *212*
11  *Dfts' 17*                                                      *214*
    *Dft's 90*                                                      *118*
12  *Dfts' 93*                                                      *212*
    *Dfts' 300G*                                                    *142*
13  *Dfts' 300H*                                                    *142*
    *Dfts' 300D*                                                    *142*
14  *Dfts' 300E*                                                    *142*
    *Dfts' 300F*                                                    *142*
15  *Dfts' 300J*                                                    *145*
    *Dfts' 300A*                                                    *146*
16  *Dfts' 300B*                                                    *146*
    *Plfs' 331*                                                     *193*
17  *Plfs' 333*                                                     *193*

18

19

20

21

22

23

24

25

1                              *(Lunch recess)*

2               *THE COURT:*  Please be seated.

3               Mr. Patton.

4               *MR. SCHULTZ:*  Thank you, Judge.  We will call Mel

5     Flitsch.

6               *COURTROOM DEPUTY:*  Raise your right hand.

7               Do you solemnly swear that the testimony you are about

8     to give in this case shall be the truth, the whole truth, and

9     nothing but the truth, so help you God?

10              *THE WITNESS:*  I do.

11              *COURTROOM DEPUTY:*  Please state your name and spell

12    your last name for the record.

13              *THE WITNESS:*  Melvin Flitsch, F-L-I-T-S-C-H.

14              *MR. PATTON:*  May I proceed, Judge?

15              *THE COURT:*  Yes, sir.

16              *MR. PATTON:*  We are calling Mel Flitsch.

17                        <u>**DIRECT EXAMINATION**</u>

18     *Q (BY MR. PATTON:)* Good afternoon, Mr. Flitsch.  Are you

19    currently employed?

20    *A.*  Yes, sir.

21    *Q.*  Where are you working?

22    *A.*  West Side Salvage.

23    *Q.*  And what is your position with West Side?

24    *A.*  I'm a foreman, laborer, truck driver.

25    *Q.*  Okay.  When did you first start working for West Side?

1    *A.*  June 20th, 1988.

2    *Q.*  Okay.  And have you worked for West Side continuously since

3    1988?

4    *A.*  Yes, sir.

5    *Q.*  Okay.  What is the business of West Side?

6    *A.*  We do several different things between the trucking end and

7    cleaning up grain spills.

8    *Q.*  Okay.  You work on hot bins, right?

9    *A.*  Yes.

10   *Q.*  You have done over 50 hot bins before you came to the

11   Chester facility?

12   *A.*  Possibly.  I don't remember the exact number, sir.

13   *Q.*  Too many to count, correct?

14   *A.*  Yes.

15   *Q.*  All right.  Tell the ladies and gentlemen of the jury the

16   training that you received from West Side to work on hot bins?

17   *A.*  We go through a confined space course once a year at

18   Kirkwood Community College so we can enter bins.  And then as

19   far as working on the -- any bin that we consider hot is just

20   hands-on and on-the-job training.

21   *Q.*  Okay.  What about the safety hazards that are associated

22   with working on hot bins?  Tell us what Mr. Sumner and

23   Mr. Schwers had you trained to do, to do it safely.

24   *A.*  First of all, the key thing is, if you can, do not go

25   inside the bin at all.  And that's what we were trying to keep

1    from doing.

2    Q.   Okay.   That's one thing that you want to avoid, right?

3    A.   Then we got, you know, you also check your air, your

4    oxygen, your CO levels, make sure those are in OSHA

5    regulations.

6    Q.   Okay.

7    A.   And the other thing is just watch out for stuff that don't

8    look right.

9    Q.   Okay.   And when we talk about watch out for stuff that

10   doesn't look right, what we're talking about is a situation

11   that could lead to a fire?

12   A.   Or something else happening, yes.

13   Q.   All right.   Do you consider fire one of the principal

14   dangers of working on a hot bin?

15   A.   Yes.

16   Q.   And do you agree that if there is a fire in the bin, that

17   could lead to an explosion?

18   A.   Yes.

19   Q.   Okay.

20   A.   It could.

21   Q.   Go ahead.

22   A.   Yes, it could.

23   Q.   These are all things that you, as a foreman, would be

24   looking for in a bin hour by hour, minute by minute, as you and

25   your crew are working on a hot bin, true?

1    *A.*   True.

2    *Q.*   Okay.  What type of training did you have before you came

3    to the Chester facility to determine if there was any fire

4    hazards in a bin?

5    *A.*   I can't recall.

6    *Q.*   Did you receive any training?

7    *A.*   Fire hazards?

8    *Q.*   Yes,sir.

9    *A.*   No, sir.

10   *Q.*   Did you receive any training from Mr. Sumner or Mr. Schwers

11   about explosion hazards in bins that are hot?

12   *A.*   No, sir.

13   *Q.*   Okay.  Well, how would you know with your crew whether or

14   not the work you were doing was going to create a fire hazard?

15   *A.*   We didn't know there was a fire in the bin, so how could we

16   really know?

17   *Q.*   Okay.  I'm going to get to the Chester bin.  I'm asking you

18   just general questions so we can understand, you know, who Mel

19   Flitsch was before you arrived on our premises.  Okay?

20   *A.*   I misunderstood your question, sir.

21   *Q.*   That's all right.  That's all right.  And if you don't

22   understand my question, just ask me to rephrase it, and I'll be

23   happy to do that.  Okay?

24   *A.*   Yes, sir.

25   *Q.*   So what training and knowledge did you have before you came

Direct Examination - Flitsch, Melvin (ConAgra)

1    to ConAgra to identify potential fire hazards in hot bins?

2    A.   Other than on-the-job training, sir, none.

3    Q.   Okay.  And what did you learn on the job about identifying

4    fire hazards?

5    A.   I'm not sure how to answer it the way -- I know what I want

6    to say, I just don't know how to say it.  Um, to identify a

7    fire hazard, I mean, you know, we have a temperature gun that

8    we can use to check the temperature.  We look for embers and

9    stuff like that.  That's pretty much -- the rest of it is just

10   all common sense.

11   Q.   Okay.  When you find embers?

12   A.   That's usually a good sign that there's a fire.

13   Q.   And when you have a good sign that there's a fire, you

14   should call the fire department?

15   A.   Correct.

16   Q.   Because you are not trained?

17   A.   No, sir.

18   Q.   To fight fires?

19   A.   No, sir.

20   Q.   But you were fighting a fire out at Chester from the

21   morning all the way until the time it exploded; isn't that

22   true?

23   A.   No.

24   Q.   Did you find embers --

25   A.   I did not.

1   *Q.*  -- on the 27th?

2   *A.*  I did not see any embers.

3   *Q.*  Did you know, Mr. Flitsch, that there was embers that were

4   found the morning of the 27th?

5   *A.*  No, I did not know.

6   *Q.*  Okay.  You are the foreman out there --

7   *A.*  Correct.

8   *Q.*  -- correct?

9      And it's your job as the foreman to be in constant

10  communication with all the workers, correct?

11  *A.*  Correct.

12  *Q.*  Because you have workers stationed in all the key locations

13  around the bin to do the work, right?

14  *A.*  Correct.

15  *Q.*  And the purpose of being around that bin is to remove the

16  pellets, correct?

17  *A.*  Correct.

18  *Q.*  And it's to look for dangers, isn't it?

19  *A.*  Yes, sir.

20  *Q.*  Working on a bin that's hot, you've known, with all your

21  experience, can be dangerous?

22  *A.*  Can be.

23  *Q.*  Right.  So you want to avoid all of the things that can

24  turn a situation when we just have degrading pellets into a

25  situation where the bin's going to explode.

1      Do you agree?

2    A.   Yes.

3    Q.   All right.  Now, as soon as you find embers, you have some

4    choices, don't you?

5    A.   Yes.

6    Q.   The first choice -- the first thing you should do is get

7    the fire department out there, agree?

8    A.   Agree.

9    Q.   That's not something that's discretionary or calls for a

10   judgment on your part, you do it, true?

11   A.   True.

12   Q.   And you, as the foreman, are going to make sure that the

13   fire department is contacted, true?

14   A.   Yes.

15   Q.   You're not going to allow your workers to continue to work

16   around a bin that you know has a fire, true?

17   A.   Right.

18   Q.   And so if you allowed your workers to continue to work

19   around a bin that had a fire, you were not working in a safe

20   fashion, agree?

21   A.   Agree.

22   Q.   You were creating a danger of your workers that they could

23   be seriously injured.  Do you agree?

24   A.   Would you ask me that question again, please, sir?

25   Q.   Yeah.

```
 1        If you knew, Mr. Flitsch, that there was a fire in the bin
 2   you should have evacuated all the workers, true?
 3   A.   True.
 4   Q.   And your failure to evacuate workers when there's a fire in
 5   the bin presents a danger of injury or death to your workers?
 6        MR. SCHULTZ:  Judge, object to the form.  It assumes
 7   facts not in evidence.  That's not been established with this
 8   witness.
 9        THE COURT:  Overruled.
10   Q.   Agree?
11   A.   Agree.
12   Q.   When I say injury or death, I'm talking about if you get an
13   explosion in a bin, we're looking at some serious injuries
14   and/or deaths, agree?
15   A.   Yes.
16   Q.   Now, let's turn the clock back for a minute.  I want to
17   hand you, Mr. Flitsch, what we marked as Defendant's
18   Exhibit 90.  Would you take a moment to look at that?
19        Have you had a chance to look at those documents?
20   A.   I'm looking at them now.
21   Q.   Have you had a chance to look at them?
22   A.   Yes, sir.
23   Q.   Those are the time sheets that you prepared throughout the
24   time that you were at the Chester facility, correct?
25   A.   Correct.
```

1    *Q.*  Okay.  You prepared those yourself?

2    *A.*  Yes, sir.

3    **Q.  (BY MR. PATTON:)**  Move those into evidence, Judge.

4         *MR. SCHULTZ:*  No objection.

5         *THE COURT:*  90 admitted, no objection.

6         *(Exhibit Dft's 90 received in evidence)*

7    **Q.  (BY MR. PATTON:)**  Okay.  Let's start from the beginning.

8    At some point before April 19th, you got the assignment to

9    travel with a crew to the Chester facility?

10   *A.*  Correct.

11   *Q.*  Okay.  Who did you receive the assignment from?

12   *A.*  I don't remember exactly if it was Gene or Ron.

13   *Q.*  Okay.  It would have been one or the other?

14   *A.*  Correct.

15   *Q.*  All right.  And what did Gene or Ron Sumner -- that's Ron

16   Sumner?

17   *A.*  Right.

18   *Q.*  What did they explain to you was the condition of the bin

19   at ConAgra before you left?

20   *A.*  We was going on what we was -- Ron had looked at earlier --

21   Mr. Sumner looked at earlier, which I'm not sure how many weeks

22   it was earlier.  And it was gassy and high CO2.

23   *Q.*  Okay.

24   *A.*  And you couldn't -- and it wasn't -- he said he could not

25   see down in the bin.

1    Q.  All right.  And you understood gassy to mean carbon

2    monoxide?

3    A.  Gassy could be any type of gas, sir.

4    Q.  You understood when he said gassy, that whatever that gas

5    was, it could combust it could explode, true?

6    A.  True.

7    Q.  Okay.  And you knew how long the bin had been with this

8    condition when you showed up on April 19th; isn't that true?

9    A.  From the -- yes and no.

10   Q.  Okay.  Give us the "yes," and then give us the "no."

11   A.  The yes part is, yes, because we were originally called.

12   And the "no," how long was it going on before we were called?

13   Q.  Okay.  You knew the time period when you originally called,

14   and you knew how much time had passed until you showed up on

15   the 19th, true?

16   A.  True.

17   Q.  Okay.  And so you knew what the condition of the bin was

18   when Sumner looked at it, and you had expectations about what

19   the bin would look like when you showed up on the 19th --

20   A.  True.

21   Q.  -- isn't that true?

22   A.  True.

23   Q.  Okay.  And you had an opportunity when you showed up and

24   you met with Sean Belcher and others to ask questions about

25   anything that had happened to the bin between the time that

1    Sumner was there and you showed up, true?

2    A.   True.

3    Q.   Okay.  And ConAgra is your customer, right?

4    A.   Correct.

5    Q.   And you are working with the customer to solve a problem,

6    right?

7    A.   That's correct.

8    Q.   And there was cooperation on both sides -- you and Belcher

9    and others to discuss the condition of the bin, agree?

10   A.   Agree.

11   Q.   Okay.  So you had all the information that you wanted to

12   know when you showed up there on April 19th, agree?

13   A.   No, I don't agree.

14   Q.   Okay.

15   A.   Because we showed up there on the 19th, but I didn't talk

16   to anybody until the 20th.

17   Q.   All right.

18   A.   But, yes, I agree.

19   Q.   Okay.  On the 20th, you had all the information you needed

20   to do the job safely?

21   A.   Correct.

22   Q.   Okay.  And so let's just go to the 20th.

23        You then had an opportunity to inspect the bin, correct?

24   A.   Correct.

25   Q.   And discuss with the ladies and gentlemen of the jury how

1   you went about the process of inspecting the bin to determine

2   its condition.

3   A.   We took the elevator to the bin deck, which would be the

4   roof of the bins.  We went over to Bin 15, took the cover off,

5   shined a light down in.  We also had an explosion proof drop

6   light that we let down in the bin where we could see a little

7   better because the handheld explosion proof light wasn't giving

8   a good enough light in the bin.  So we lowered the explosion

9   proof one in.  And we could see pellets.  It was clear.  The

10  bin smelled, but it didn't smell bad or anything.

11  Q.   Okay.  So you inspect the bin, and you found it to be

12  clear?

13  A.   Correct.

14  Q.   You were amazed at how clear the bin was?

15  A.   Yes.  After five weeks, yes, I am -- I was.

16  Q.   You have used that term, you were amazed at how clear it

17  was?

18  A.   I was.

19  Q.   Okay.  Was there a fire?

20  A.   I would say no.

21  Q.   Did you find any smoldering?

22  A.   I didn't, no.

23  Q.   Did you find any embers?

24  A.   I didn't, no.

25  Q.   Do you see any smoke coming out of the hatch?

1    A.  That day, no.

2    Q.  Do you see any smoke coming out of vents on the side of the

3    bin?

4    A.  That day, no.

5    Q.  You found the bin to be safe to do your work, true?

6    A.  True.

7    Q.  You didn't express any concerns to ConAgra about safety

8    issues in the bin, and I'm taking you day by day.  April 20th,

9    right?

10   A.  The morning of the April 20th, I asked that the fire

11   department was notified before I looked in the bin, just be on

12   standby, or if we could get some hoses or whatever, to have a

13   fire line.

14   Q.  Okay.  Did you express any concerns to ConAgra that there

15   was any safety issues you saw in the bin on the 20th?

16   A.  I didn't see anything to be concerned about.

17   Q.  Do you see anything in the bin that you felt you needed

18   water to extinguish?

19   A.  No.

20   Q.  Okay.  And you started your work?

21   A.  Yes, sir.

22   Q.  Okay.  And when I say you started your work, you had

23   Mr. Schmidt from A&J?

24   A.  Correct.

25   Q.  And you were familiar with Mr. Schmidt?

1    *A.*   Correct.

2    *Q.*   You worked well with Mr. Schmidt?

3    *A.*   Correct.

4    *Q.*   You were a foreman and he was a foreman?

5    *A.*   Correct.

6    *Q.*   And the way that you split your duties, Schmidt would be on

7    top of the silo, and you would be outside or down in the

8    tunnel, correct?

9    *A.*   Correct.

10   *Q.*   And you would have him have a walkie-talkie, true?

11   *A.*   True.

12   *Q.*   And you had a walkie-talkie?

13   *A.*   True.

14   *Q.*   Mr. Jentz had a walkie-talkie?

15   *A.*   True.

16   *Q.*   And Mr. Becker had a walkie-talkie?

17   *A.*   True.

18   *Q.*   All right.  And the purpose of having that type of

19   communication was so that you each knew minute by minute what

20   was happening in the bin, agree?

21   *A.*   True.

22   *Q.*   And the purpose of having those walkie-talkies was so that

23   if anybody, Mr. Schmidt, Mr. Becker, Mr. Jentz, or yourself

24   observed any dangers, you would communicate with each other

25   right away?

Direct Examination - Flitsch, Melvin (ConAgra)

1    A.  Correct.

2    Q.  And you all had the same frequency?

3    A.  Yes.

4    Q.  So that if you are talking to Mr. Schmidt, and assuming

5    Mr. Jentz had his walkie-talkie on, you could hear -- he could

6    hear you talking, correct?

7    A.  Correct.

8    Q.  And that was important, that everybody was able to hear

9    whatever was being discussed at whatever time there was a

10   discussion, agree?

11   A.  Agree.

12   Q.  And you also had an opportunity before work every day to

13   meet and talk about what you were going to be doing on the bin?

14   A.  Correct.

15   Q.  And you had an opportunity to discuss all the safety

16   precautions that you would be taking on the bin, true?

17   A.  True.

18   Q.  And at the end of the day, you all packed up your stuff and

19   went back to the same hotel, true?

20   A.  True.

21   Q.  And you had opportunities at the end of the day to discuss

22   anything that was observed, from the moment you started to the

23   moment you finished, concerning safety, true?

24   A.  True.

25   Q.  And, of course, you all took your lunches together, right?

1    *A.* Correct.

2    *Q.* So if anything was observed in the morning?

3    *A.* We discussed during lunch.

4    *Q.* You would discuss during lunch. That makes perfect since

5    because that's how you conduct your work safely, agreed?

6    *A.* Agreed.

7    *Q.* And did you find Mr. Schmidt, in your relations with him,

8    to be observant of dangers?

9    *A.* Yes, sir.

10   *Q.* Did you find him to be trained into how to recognize

11   hazards in and around a hot bin?

12   *A.* Yes, sir.

13   *Q.* Okay. And you felt the same way about Mr. Jentz? You knew

14   he was a foreman and he also was trained and showed you

15   knowledge of hazards in and around the bin?

16   *A.* Yes.

17   *Q.* And you say the same thing about Mr. Becker, because he was

18   working directly for you, true?

19   *A.* True.

20   *Q.* And the same with Mr. Nanez?

21   *A.* True.

22   *Q.* Okay. And you had, with this crew, all the resources you

23   needed, all the manpower you needed to do this job safely;

24   isn't that true, Mr. Flitsch?

25   *A.* Correct.

Direct Examination - Flitsch, Melvin (ConAgra)

1    *Q.*  Okay.  And to kind of complete April 20th, in the morning,

2    at lunchtime, after work, no discussions among the crew -- when

3    I use the term "crew," I'm talking about all of you, right,

4    Schmidt, Jentz, Becker, Nanez, and yourself -- no discussions

5    about any safety hazards or dangers observed in Bin 15 on

6    April 20th?

7    *A.*  Correct.

8    *Q.*  Okay.  Now, those time sheets...

9    *A.*  Yes, sir.

10   *Q.*  I think I put on top April 20th.

11   *A.*  No, you put April 19th on there.

12   *Q.*  April 19th, okay.

13   *A.*  Yes.

14   *Q.*  You didn't remove any pellets on the 19th?

15   *A.*  No, sir.  We just drove in and parked our equipment and

16   went to the motel.

17   *Q.*  Okay.  The 20th, what I have now in front of us here, what

18   did -- how many pellets or truck loads were removed that day?

19   *A.*  It says, I've got wrote down here 11,750 pounds.

20   *Q.*  Okay.

21   *A.*  Worth of pellets.

22   *Q.*  117 --

23   *A.*  Or is that 80?  I'll have to put my glasses back on.

24   *Q.*  All right.  Please do.  Pellets.

25   *A.*  760.

Direct Examination - Flitsch, Melvin (ConAgra)

1  Q.  760.  Okay.

2  A.  Correct.

3  Q.  So the operation is going according to plan; pellets are

4  draining down, true?

5  A.  That day it didn't go quite according to plan but, yes, it

6  was coming down.

7  Q.  Okay.  You came across some clumpy pellets?

8  A.  At the beginning, yes.

9  Q.  At the beginning.  But you were able to remove 11,760

10  pounds of pellets that day?

11  A.  Correct.

12  Q.  Eventually the pace picked up quite a bit, didn't it?

13  A.  That is true.

14  Q.  Okay.  Now, on that first day you used the air lance, isn't

15  that true?

16  A.  On the first day, yes, we did because there was wet pellets

17  in the bottom of the bin.

18  Q.  Okay.  And would you explain to the ladies and gentlemen of

19  the jury how that air lance was used?

20  A.  We have a high pressure -- high volume compressor with air

21  that puts out 180CFM.  And it goes with the rubber hose that

22  hooks to the end of the air lance.  And then we have a valve on

23  that where we stick up into the product and you move it around

24  to break up the product, to get to it fall out of the bin.

25  Q.  So I'm showing you what we've marked as 135 and that's that

1   high pressure compressor that you had, right?

2   *A.*   Correct.

3   *Q.*   And that would hook up to the yellow hose we see in here

4   (indicating)?

5   *A.*   Right.

6   *Q.*   And you take it and you then use it wherever you felt it

7   was appropriate to use?

8   *A.*   Correct.

9   *Q.*   All right.  It's not going to be effectively used unless

10   it's hooked up to the compressor?

11   *A.*   Correct.

12   *Q.*   You are not going to use the air lance without all that air

13   that you can use, agreed?

14   *A.*   Unless you want to use it to poke a clump with --

15   *Q.*   Okay.

16   *A.*   -- or to move the clump just a little bit.  We have done

17   that without using air.

18   *Q.*   Okay.  When you were using that air lance down in the

19   basement, you had it hooked up to the compressor?

20   *A.*   That is correct.

21   *Q.*   Okay.  Well, we will get our way to the 27th, Mr. Flitsch.

22   And the purpose of that air lance, you would pick at the --

23   let's start with the -- in the morning down in the basement,

24   you would use those potato forks and trying to get the material

25   out.  And if it wasn't effective with those potato forks and

1  getting the material out, you would power up the air lance and

2  start blowing those pellets apart; isn't that true?

3  A.  That day we did, yes, that's true.

4  Q.  So the point is you are using these poking devices and

5  they're not getting the job done that day.  You go with the

6  high-powered stuff, the air lance, and that broke through and

7  you started getting some flow, true?

8  A.  A little, yes.  True.

9  Q.  And how often did you continue to use the air lance that

10 week?

11 A.  Down in the basement, I don't think we used it very much

12 after that at all, after that first day after we had the

13 extension made for our jackhammer bit.

14 Q.  Because that air lance did the job for you in breaking up

15 the pellets, right?

16          MR. SCHULTZ:  Objection to the form of the question.

17          THE COURT:  Overruled.  You can answer, sir.

18 A.  Would you please repeat the question, sir.

19 Q.  Yeah.

20     You got the flow going because the air lance was effective

21 in breaking through the clumps and stuff and the flow started

22 to 11,760, true?

23 A.  That day, yes.  True.

24 Q.  Okay.  Let's go to April 21st, the next day.

25     Do you have your time sheets in front of you?

1    A.  Yes, sir.

2    Q.  Now, those time sheets record when you showed up and when

3    you left the job, true?

4    A.  True.

5    Q.  What else do they show?

6    A.  Our lunch and our equipment that we have there.

7    Q.  Okay.  And what else?

8    A.  It also shows that we didn't do any vacking this day.

9    Q.  Okay.  Does it show how much pellets are being taken off

10   the jobsite?

11   A.  Yes.

12   Q.  Okay.  It doesn't show any monitoring that was done for

13   atmospheric conditions inside the bin?

14   A.  We didn't even check it that day, no.

15   Q.  Okay.  You never checked the atmospheric conditions inside

16   the bin; isn't that true?

17   A.  Yes.

18   Q.  Okay.  But that would be a safe thing to do, Mr. Flitsch,

19   to determine whether or not the carbon monoxide levels were

20   starting to build inside the bin, wouldn't it?

21   A.  I didn't see any reason to check it inside the bin.

22   Q.  Okay.  Who made the judgment call?

23   A.  We weren't going in the bin.  Why should we have to check

24   it?

25   Q.  To determine whether or not you had carbon monoxide levels

Direct Examination - Flitsch, Melvin (ConAgra)

```
 1    that could explode.  That would be a good idea, wouldn't it?
 2         MR. SCHULTZ:  Objection to the argument, Judge.
 3         THE COURT:  Overruled.
 4    A.  Yes.
 5    Q.  I mean you are doctor out there diagnosing if there's any
 6    health problems in the bin --
 7         MR. SCHULTZ:  Objection to the form.
 8    Q.  -- aren't you?
 9         THE COURT:  Overruled.
10    A.  I'm not the doctor, no.
11    Q.  Aren't you diagnosing the health condition of the bin
12    day-to-day to determine if it's safe to work on?
13    A.  Yes.
14    Q.  Okay.  And you were given equipment, Mr. Flitsch, to do
15    that type of diagnosis, weren't you?
16    A.  Yes.
17    Q.  Okay.  You were given a temperature gauge, right?
18    A.  Yes.
19    Q.  To determine the temperature of the bin at any point around
20    the bin that you wanted to know if things were heating up,
21    agreed?
22    A.  Yes.
23    Q.  You were also given this four-gauge device, testing device
24    that gave you a lot of information about gases inside the bin.
25    Would you agree?
```

1   *A.*  Yes.

2   *Q.*  And the purpose -- one of the purposes of that gauge, that

3   device, was to determine whether or not each day that you

4   showed up there wasn't a change inside the bin that could lead

5   to a fire or an explosion, true?

6   *A.*  True.

7   *Q.*  Okay.  So you had everything you needed to make sure

8   ConAgra's bin wasn't being put in a situation where there would

9   be a risk of fire or explosion to your workers and to ConAgra

10  workers working around that elevator, true?

11  *A.*  True.

12  *Q.*  And you made the decision not to use this equipment down

13  inside the bin so you could assess every single day if

14  conditions were improving or deteriorating, true?

15  *A.*  True.

16  *Q.*  That kind of let ConAgra down; don't you agree?

17       *MR. SCHULTZ:*  Objection to the form.  602.

18       *THE COURT:*  Sustained.

19  *Q.*  You weren't fulfilling your obligations to ConAgra to use

20  your equipment to determine if that bin was changing for the

21  worse; do you agree?

22  *A.*  That day, yes.

23  *Q.*  Okay.  Every day.  You never used the equipment in the bin.

24  *A.*  Yes, we did.

25  *Q.*  Okay.  I thought your testimony a moment ago was you never

Direct Examination - Flitsch, Melvin (ConAgra)

1    took that equipment and lowered it down inside the bin to test

2    the atmospheric conditions.

3    A.   It doesn't do any good to lower it in the bin if you can't

4    read it.  I don't have the best use -- that gas monitor did not

5    have a -- a hose to drop down in the bin.  So you couldn't be

6    able to read it anyway.

7    Q.   Well, that would be West Side's problem in not providing

8    you with proper equipment to determine the health of that bin,

9    agreed?

10        MR. SCHULTZ:  Objection to the argument.  Form of the

11   question.

12        THE COURT:  Overruled.

13   Q.   Don't you agree?

14   A.   No.

15   Q.   Okay.  Who was supposed to supply you, Mr. Flitsch, with

16   the proper equipment to determine the atmospheric conditions

17   inside the bin as you are working on the bin day-to-day?

18   A.   My company, West Side.

19   Q.   You weren't expecting ConAgra to give you any equipment to

20   determine whether or not that bin was safe or dangerous to work

21   on, correct?

22   A.   Correct.

23   Q.   ConAgra was expecting you to do that, agreed?

24        MR. SCHULTZ:  602 objection, Judge.

25        THE COURT:  Overruled.

1   *A.*   Agreed.

2   *Q.*   Okay.  Now, let's go to April 21st.

3       I'll go down the list, so we can kind of move this along.

4   No fire, smoldering, embers, smoke, true?

5   *A.*   No none.   True.

6   *Q.*   No dangers in the bin?

7   *A.*   True.

8   *Q.*   No notice to ConAgra that you had any concerns that bin was

9   going to become on fire or explode, true?

10  *A.*   True.

11  *Q.*   As far as you were concerned that day, that bin was safe

12  for the work that you were doing?

13  *A.*   Correct.

14  *Q.*   As far as you were concerned, there was no problems, no

15  condition in that bin that West Side couldn't handle in a safe

16  way, true?

17  *A.*   True.

18  *Q.*   In fact, you have worked over your career on hot bins in

19  much worse condition than that Chester bin was on April 20th,

20  agreed?

21  *A.*   I agree.

22  *Q.*   In fact, you don't even want to describe this bin as a hot

23  bin, true?

24  *A.*   Pellets were hot, but that could be -- you know, a hot bin

25  is a hot bin, whether -- not necessarily on fire.

Direct Examination - Flitsch, Melvin (ConAgra)

1    *Q.*  Yeah.

2    *A.*  And no --

3    *Q.*  You don't want to describe this from your observations --

4            *MR. SCHULTZ:*  Judge, can he finish his answer, please.

5    *Q.*  I'm sorry.  Were you finished?

6    *A.*  Nothing led me to believe that the bin was on fire.

7    *Q.*  Yeah.  But what I'm referring to is you didn't consider

8    this to be a hot bin; you considered this bin to have heat

9    damage issues, true?

10   *A.*  True.

11   *Q.*  So when you say it has heat damage issues, that's like a

12   step below what a hot bin is, agree?

13   *A.*  Your heat damage can still have hot.  It can still be hot

14   but not on fire.

15   *Q.*  Okay.  Let me show you what we've marked as Defendants'

16   Exhibit 44.

17      And that's a copy of a statement you have given in this

18   case; isn't that true?

19      And did you review that before your testimony today?

20   *A.*  You are talking about the highlighted one?

21   *Q.*  Well, I'm talking about that whole statement.  That's your

22   statement that you --

23   *A.*  Yes.

24   *Q.*  -- gave after this accident, right?

25      And first I'm just going to ask you, you have had a chance

Direct Examination - Flitsch, Melvin (ConAgra)

1    to review that statement, agreed, in preparation for your

2    testimony today?

3    A.  I don't remember reading this.  I could be mistaken.

4    It's --

5    Q.  Well, here, let's do this, there's two --

6    A.  Let me go back a little bit further and let me look.

7    Q.  Okay.  Well, I just was going to give you another format it

8    was in, maybe that's the one you are familiar with.

9         MR. SCHULTZ:  There's two.

10   Q.  Let me show you 44A.

11        So then now 44 and 44A in front of you.  And do you

12   recognize --

13   A.  This is the one I recognize, sir.

14   Q.  Okay.  So I'll take the other one back.

15   A.  Oop.

16   Q.  So 44A is the statement that you gave in this case; is that

17   right?

18   A.  Correct.

19   Q.  Okay.  And you have had a chance to review that statement

20   in preparation for your testimony today, correct?

21   A.  Correct.

22   Q.  All right.  Let me have that statement back.

23        All right.  All I'm going to ask you is was this question

24   put to you and did you give this answer to that question, okay,

25   Mr. Flitsch?

1           *MR. PATTON:*  Page two, Counsel.

2       *"Q.  The last day, the day of the accident, I've heard*

3       *people call that the hot bin.  Is that a term that you*

4       *would use for it?  I'm not trying to pin you down on it.*

5       *I'm just trying to find a way of communicating.*

6       *"A.  I'm not -- I'm not real sure if that's what -- it*

7       *was definitely hot but I don't know if you would want to*

8       *call it a hot bin.  I would say it was a bin that -- it*

9       *had heat damage issues to it.  I don't know if I would*

10      *really want to categorize it underneath hot bin because*

11      *a hot bin to me would mean fire and I never seen no fire*

12      *at all until just before it blew."*

13   *Q.*  So was that question put to you and did you give that

14   answer?  Did I accurately read that answer?

15   *A.*  Yes, sir.

16   *Q.*  Okay.

17   *A.*  Best of my knowledge.

18   *Q.*  All right.  So we can downgrade the condition of the bin

19   when you showed up on April 20th as not being a hot bin.  It

20   was something less than that, right?

21   *A.*  Yes.

22   *Q.*  Okay.  Safe to work on?

23   *A.*  I would say it was, yes.

24   *Q.*  Okay.  And a bin that West Side would advertise that it had

25   the competency, and skill, and qualifications to fix the

1    situation in the bin safely, true?

2    *A.*   True.

3    *Q.*   Okay.  Now let's go to April 22nd.  Third day on the job.

4         You are looking at your time sheets, right?

5    *A.*   Correct.

6    *Q.*   Successful in removing pellets?

7    *A.*   Correct.

8    *Q.*   No fire, no smoldering, no embers, no smoke, no dangers?

9    *A.*   Correct.

10   *Q.*   No notice to ConAgra that you had any concerns about the

11   condition inside the bin?

12             *MR. SCHULTZ:*  Objection.  602 about what notice to

13   ConAgra.

14             *MR. PATTON:*  Let me rephrase.

15             *THE COURT:*  The witness' knowledge.  Sustained.

16   **Q.   (BY MR. PATTON:)**  You didn't provide any notice to ConAgra

17   on April 22nd that there was any dangers in the bin, true?

18   *A.*   True.

19   *Q.*   And you understood that, as part of your work out there, if

20   you observed any dangers, you were to notify ConAgra, right?

21   *A.*   True.

22   *Q.*   Fourth day April 23rd, right?

23   *A.*   Correct.

24   *Q.*   Business as usual?

25   *A.*   Correct.

1  Q.  What time did you show up?

2  A.  Looks like we got there about 7:00 a.m.

3  Q.  What time did you leave?

4  A.  3:15.

5  Q.  Okay.  Adequate time throughout that entire day to inspect

6  every inch of Bin 15 for any dangers, agreed?

7  A.  True.

8  Q.  And you had all your team, Schmidt, Jentz, Becker, Nanez.

9  Everybody's eyes are looking at the top of the bin, the bottom

10  of the bin, and inside the bin to determine whether or not any

11  safety hazards, agreed?

12  A.  Agreed.

13  Q.  No smoke, no smoldering, no fire, no dangers.

14  A.  True.

15  Q.  No smoldering -- did I say that?  Did I say that?  No

16  smoldering, you didn't see smoldering?  No embers?

17  A.  No embers, no smoldering, correct.

18  Q.  Safe, right?

19  A.  Correct.

20  Q.  Any concerns that you possibly could have had about the

21  delay in having the bin responded to, nonexistent, right?

22  A.  I didn't see any problem, no.

23  Q.  So let's make sure we are clear on that.  We report the

24  problem, Sumner comes out March 13th, you guys don't get out

25  there until April 20th.  Any delay that took place in fixing

1    the bin, you didn't see any dangers caused by that, true?

2    A.   True.

3    Q.   And you would have expected if there had been smoldering,

4    fire, pellets out of control between March 13th and April 20th,

5    you'd still see evidence of that in the bin when you got there,

6    don't you agree?

7    A.   I agree.

8    Q.   And it wasn't there, Mr. Flitsch.  Nothing.  Agree?

9    A.   At that point, yes, I agree.

10   Q.   Okay.  April 24th -- do you have that time sheet in front

11   of you?

12   A.   Yes.

13   Q.   Okay.  What time did you show up?

14   A.   Seven.

15   Q.   What time did you go home?

16   A.   We left there at 5:45.

17   Q.   Long day?

18   A.   Yes, sir.

19   Q.   A lot of time to inspect the top, the bottom, inside the

20   bin for danger, agree?

21   A.   Agree.

22   Q.   You even had a chance, obviously, to inspect pellets for

23   signs of danger, right?

24   A.   Yes.

25   Q.   None.  None, right?

1   *A.* Correct.

2   *Q.* No smoke, smoldering, embers, fire?

3   *A.* Correct.

4   *Q.* No danger, right, Mr. Flitsch?

5   *A.* Yes.

6   *Q.* Any of these conditions, any hazards on the 24th, you would

7   have reported that to ConAgra?

8   *A.* Correct.

9   *Q.* And you didn't?

10  *A.* There was no hazards that day.

11          *MR. PATTON:* Judge, this is 300H. I guess I better

12  get caught up on -- so the 24th is 300H, the 23rd is 300G.

13          *THE COURT:* Wait a minute.

14          300H if there are no objection --

15          *MR. CLIFFORD:* Well, what -- just to reserve ruling,

16  please.

17          *THE COURT:* Aren't these blowups of what I've already

18  admitted?

19          *MR. CLIFFORD:* I don't believe so.

20          *MR. PATTON:* No, no. These are -- Judge, let me show

21  you what I'm doing.

22          *MR. CLIFFORD:* They are blank sheets he is writing his

23  notes on. They're demonstrative devices.

24          *THE COURT:* Okay. I thought these were blowups of

25  what we've --

1           *MR. PATTON:*  No.  These are the date and I'm just --

2           *THE COURT:*  Oh, okay.

3           *MR. PATTON:*  -- when he tells the jury what it is, I'm

4      just writing it down.

5           *THE COURT:*  It can be admitted but they're

6      demonstrative and won't go back to the jury room and you can

7      use them in closing.

8           *MR. PATTON:*  I agree.

9           *THE COURT:*  So 300G, 300H admitted.

10          *MR. PATTON:*  Yep.

11        *(Exhibit Dfts' 300G and 300H received in evidence)*

12          *MR. PATTON:*  And I lost my train of thought.

13          April 20th, Judge, is 300D.

14          *THE COURT:*  Admitted.

15           *(Exhibit Dfts' 300D received in evidence)*

16          *MR. PATTON:*  April 21st is 300E.

17          *THE COURT:*  Admitted.

18           *(Exhibit Dfts' 300E received in evidence)*

19          *MR. PATTON:*  April 22nd I think I already said 300F.

20     If not, that's what it is.

21          23rd now G.

22          *THE COURT:*  Okay.  Admitted.

23           *(Exhibit Dfts' 300F received in evidence)*

24          *MR. PATTON:*  And H is the 24th.

25     *Q.  (BY MR. PATTON:)*  Let's go to the 25th, which is 300I.

1    What time did you show up?

2    A.  6:45.

3    Q.  What time did you leave?

4    A.  5:15.

5    Q.  Another long day?

6    A.  Yes, sir.

7    Q.  Plenty of time to get in the top of the bin, bottom of the

8    bin, and look inside the bin for any hazards, agree?

9    A.  Agree.

10   Q.  You were trained and your crew was trained to be constantly

11   on the alert for anything going on in this bin that would

12   present a risk of fire or explosion, true?

13   A.  True.

14   Q.  Was there any?

15   A.  Not that day, no, sir.

16   Q.  No smoke?

17   A.  No, sir.

18   Q.  No fire, no embers, no smoldering, nothing --

19   A.  Correct.

20   Q.  -- right?

21       No hazards and no dangers, true?

22   A.  True.

23   Q.  Business as usual, wasn't it?

24   A.  Yes, sir.

25   Q.  This was a routine operation by West Side and A&J to remove

1    pellets from Bin 15, wasn't it?

2    *A.*  Correct.

3    *Q.*  All your years of experience where you worked on bins that

4    have been on fire, bins that have exploded, none of that was

5    existing in Bin 15?

6         *MR. SCHULTZ:*  Objection to the form of the question.

7    It assumes facts not in evidence.

8         *THE COURT:*  Overruled.

9         *MR. SCHULTZ:*  I would ask the jury to disregard.

10        *THE COURT:*  Well, sustained as to what's exploded.

11   There is no indication of any similar circumstance here.  The

12   jury should disregard it.

13   **Q.  (BY MR. PATTON:)**  Let me back up.

14       You have worked on bins before you came to Chester that had

15   fires in them, true?

16   *A.*  True.

17   *Q.*  And you have worked on bins that had fires that ultimately

18   exploded, true?

19        *MR. SCHULTZ:*  Objection.  Same objection, Judge.

20        *THE COURT:*  We are going to have to do this out of the

21   presence of the jury.  I don't know that this is going to be

22   admissible.

23        *MR. PATTON:*  You know what?  I'll withdraw that

24   question.

25        *MR. SCHULTZ:*  Judge --

Direct Examination - Flitsch, Melvin (ConAgra)

1            *MR. PATTON:*  Just moving on here.

2            *MR. SCHULTZ:*  Excuse me.

3       Can the jury be requested to disregard that

4  information, that's not evidence in this case?

5            *THE COURT:*  Well, it was a question and they know that

6  the questions aren't evidence.  There was no answer.

7  **Q.   (BY MR. PATTON:)**  Okay.  But you did know that bins could

8  explode, right?

9  *A.*  Correct.

10  *Q.*  Okay.  So none of these signs, hazards and dangers of a bin

11  that could become on fire or explode, existed up to this point,

12  true, Mr. Flitsch?

13  *A.*  True.

14  *Q.*  26th, that's 300 J.  Okay?

15            *THE COURT:*  300 J admitted.

16            *(Exhibit Dfts' 300J received in evidence)*

17  *Q.*  We are now -- you have removed almost 80 percent or

18  85 percent -- you can look at the time sheets -- of all the

19  pellets that were in this bin, in ballpark?

20  *A.*  Mmm Mmm.  That would be a close estimate, yes, sir.

21  *Q.*  What time did you show up on the 26th?

22  *A.*  Seven.

23  *Q.*  What time did you leave?

24  *A.*  We left at 5:30.

25  *Q.*  A full day of opportunities to be determining now that this

1   bin is getting drained way down whether there was any risks or

2   hazards of fire or explosion, true?

3   A.   True.

4   Q.   No fire, smoke, smoldering dangers whatsoever, true?

5   A.   True.

6   Q.   No embers?

7   A.   No, sir.

8   Q.   No smoldering?

9   A.   No, sir.

10   Q.   No hazards or dangers?

11   A.   None that recognized my attention, sir.

12   Q.   Okay.  And if there were, you would be the guy to know,

13   right?

14   A.   Yes.

15   Q.   Didn't pass on any information to ConAgra that day that

16   there was any concerns about the condition of that bin, true?

17   A.   True.

18   Q.   Now let's go to the 27th.

19        MR. PATTON:  I'm going to put up on the easel, Judge,

20   300A.

21        THE COURT:  300A.

22        (Exhibit Dfts' 300A received in evidence)

23        MR. PATTON:  And then we have 300B.

24        THE COURT:  300B.

25        (Exhibit Dfts' 300B received in evidence)

1          *THE COURT:*  What day is that?  What day is B?

2          *MR. PATTON:*  It's the 27th.

3    **Q.  (BY MR. PATTON:)**  You got up that morning, came to work

4    what time?

5    *A.*  6:45.

6    *Q.*  Okay.  You were expecting another day of doing routine work

7    to take the pellets out of the bin, true?

8    *A.*  True.

9    *Q.*  When you showed up that morning, no signs whatsoever of

10   smoke and fire and embers and smoldering, anything, true?

11   *A.*  True.

12   *Q.*  You are now almost to the bottom of the bin, aren't you?

13   *A.*  Correct.

14   *Q.*  You were in a position to wrap up the work that day,

15   weren't you?

16   *A.*  It was a good possibility, yes.

17   *Q.*  Okay.  You are able to look from the top of the bin down to

18   the bottom, weren't you?

19   *A.*  Yes.

20   *Q.*  It was clear?

21   *A.*  Correct.

22   *Q.*  Safe?

23   *A.*  To the best of my knowledge, it was, yes.

24   *Q.*  Completely within the skill and competency of West Side to

25   finish the job, true?

1    *A.*  True.

2    *Q.*  You had all the same men out there that you had that

3    started back on the 20th?

4    *A.*  Correct.

5    *Q.*  No one's abilities changed in terms of recognizing hazards

6    and dangers in the bin, true?

7    *A.*  True.

8    *Q.*  Okay.  And all your procedures that you had in place to

9    communicate with the walkie-talkies were in place, weren't

10   they?

11   *A.*  Yes.

12   *Q.*  You started out that day and you had Robert Schmidt up on

13   top, right?

14   *A.*  Correct.

15   *Q.*  That was kind of his position throughout this whole

16   process, right?

17   *A.*  Correct.

18   *Q.*  And you were expecting Robert to be your eyes up on top of

19   the bin, true?

20   *A.*  True.

21   *Q.*  When I say "your eyes," you two worked in tandem as foreman

22   to foreman in getting this job done in a safe fashion, agree?

23   *A.*  I agree.

24   *Q.*  Okay.  Each one of you had responsibilities to let the

25   other person know, I've come across a danger, let's stop and

1    figure out what to do.  Agree?

2    A.  Agree.

3    Q.  And that was your relationship with Mr. Schmidt, right?

4    A.  Correct.

5    Q.  It was teamwork with you and him, right?

6    A.  Correct.

7    Q.  No competition, no fighting, none of that?

8    A.  No.

9    Q.  Okay.  Trying to get the job done in a safe and timely

10   fashion, right?

11   A.  Correct.

12   Q.  Okay.  And that really was the same situation with

13   Mr. Jentz and Nanez and Becker.  All teamwork?

14   A.  Correct.

15   Q.  Relying upon each other to identify safe work practices

16   and/or dangers, agree?

17   A.  Correct.

18   Q.  And you trusted each one of these men in what their

19   observations were to you, correct?

20   A.  Correct.

21   Q.  In other words, if anyone of these workers said, Mel, I've

22   come across burning embers, you would have no reason to dispute

23   that, would you?

24   A.  No, sir.

25   Q.  Okay.  Because everybody that was part of these two crews

1    had been trained to recognize burning embers, correct?

2    A.  Correct.

3    Q.  Because you knew from start to finish that you were going

4    to get a core, right?

5    A.  What do you mean by "core," sir?

6    Q.  Have you heard the expression "core"?

7    A.  Yes.

8    Q.  Okay.  Tell the ladies and gentlemen of the jury when you

9    use "core" what you mean.

10   A.  There could be several descriptions of the core.

11   Q.  All right.  Give us both.

12   A.  One description is your core is where your bin fills, and

13   it has a pile of fines like in a grain bin.  And the other one

14   could be a core that has water running down the side of the bin

15   or drips in the bin, and it will make a core standing up there.

16   Q.  Okay.

17   A.  Those are the two simplest ways I can explain it.

18   Q.  What do you describe -- what word do you use to describe

19   where all the pellets are heating up?  Isn't that also known as

20   the core?

21   A.  That could be, yes.

22   Q.  Okay.  All right.  When I use the term "core," I want you

23   to assume I'm referring to the source of the heat in the bin.

24   Okay?

25   A.  Okay.

1  *Q.*  All right.  You were trained to recognize and know that

2  eventually when taking out of condition pellets, or pellets in

3  a hot bin, that eventually you are going to come across the

4  core, agree?

5  *A.*  Yes.

6  *Q.*  Okay.  And you knew that, as part of that training and

7  experience and education, that it's the core that presents the

8  most danger, true?

9  *A.*  True.

10  *Q.*  Okay.  It's the core that can generate the heat?

11  *A.*  Correct.

12  *Q.*  You knew that before you showed up in Chester, right?

13  *A.*  Correct.

14  *Q.*  And you knew that the core could generate a fire before you

15  showed up in Chester?

16  *A.*  Possible, yes.

17  *Q.*  Right?

18      And you knew it was possible that a core could generate a

19  fire and then an explosion, true?

20  *A.*  Yes.

21  *Q.*  Okay.  I'm just trying to make sure that we understand.

22  When you got out there, just because business was going as

23  usual, you knew all along that eventually you were going to

24  have to deal with the core, right?

25  *A.*  Correct.

Direct Examination - Flitsch, Melvin (ConAgra)

1   *Q.   Okay.   So now we are on the last day, we are almost at the*

2   *bottom, and you knew the core was going to be there, right?*

3   *A.   Correct.*

4   *Q.   Okay.   And so what safety precautions did you take when you*

5   *showed up on the 27th -- you and the whole crew, to be ready*

6   *for the moment when now you are at the core?*

7   *A.   We hadn't done anything different than what we had been*

8   *doing.*

9   *Q.   Okay.   Because you had no concerns that that core would*

10  *present any danger of fire or explosion, true?*

11  *A.   Correct.*

12  *Q.   All right.   Because there was nothing unusual about*

13  *ConAgra's Bin 15 on the 27th that gave you any concern that*

14  *there was safety issues, agree?*

15  *A.   Yes.*

16  *Q.   Okay.   Because you had done many bins before you showed up*

17  *at ConAgra that had much worse conditions, including cores,*

18  *than what you were dealing with on the 27th, true?*

19  *A.   Yes.*

20  *Q.   Okay.   And just because you have a warm bin or a hot bin,*

21  *that certainly doesn't mean there's going to be a fire; do you*

22  *agree?*

23  *A.   Correct.*

24  *Q.   And just because you have a warm bin or a hot bin in all*

25  *your years of experience, it certainly doesn't mean there's*

1    going to be an explosion, agree?

2    A.   Yes.

3    Q.   One way, though, that you can take a safe condition and

4    turn it into a dangerous condition is by doing work on the bin

5    that can cause that core to get active and become on fire,

6    true?

7    A.   I suppose it could happen, yes.

8    Q.   Well, that -- that was your training, Mr. Flitsch, that

9    when you get down to the core, you need to be very careful how

10   you are taking those pellets out, because if you stir them up

11   or you put oxygen on 'em, you may have some problems, agree?

12   A.   I agree.

13   Q.   All right.  You weren't looking to ConAgra to teach you how

14   to safely deal with the core once you got to it, agree?

15   A.   Yes.

16   Q.   You weren't relying upon ConAgra to give you any direction,

17   supervision, information, once you got to the core, how to

18   safely remove that condition out of the bin; do you agree?

19   A.   Yes.

20   Q.   All right.  That was West Side's responsibility, to deal

21   with the core on the 27th in a safe way, not to cause a fire or

22   an explosion, Mr. Flitsch, do you agree?

23   A.   Yes.

24   Q.   Now, it's come to what happened on this day.  Okay.

25        Everybody's in communication, correct?

1   A.  Yes.

2   Q.  All right.  Didn't Mr. Schmidt tell you at some time

3   between 10:00 a.m. and 10:30 a.m. that embers, burning embers,

4   have been discovered by Mr. Jentz?

5   A.  I do not recall that, sir.  I'm not saying he didn't say

6   it.  I'm saying I just don't -- do not recall it.

7   Q.  Okay.  Well, if burning embers are discovered in the

8   basement on the 27th, that would be very important information

9   for you to know, agreed?

10  A.  Correct.

11  Q.  And you would certainly expect, knowing Jentz and knowing

12  Schmidt, that if that situation was discovered, you'd be the

13  first to know?

14  A.  Yes.

15  Q.  Okay.  Is it your testimony under oath that you were not

16  told on the morning of April 27th that burning embers have been

17  discovered in the basement of our facility?

18       MR. CLIFFORD:  Your Honor.

19       MR. SCHULTZ:  Judge, that's been asked and answered

20  now twice.  He's arguing with the witness.

21       THE COURT:  Overruled.

22       MR. CLIFFORD:  Badgering the witness.

23  A.  I do not remember if it was said.  If it was, and I'm not

24  saying it wasn't.  I'm saying I do not remember, sir.

25  Q.  Okay.  Can we agree, Mr. Flitsch, with this, had you been

1  told by Mr. Schmidt, your fellow foreman, that burning embers

2  for the first time were discovered in the basement, you should

3  have called the fire department?

4  A.  I'll agree with that.

5  Q.  Because with burning embers down in the basement of

6  ConAgra's facility, you would know there's a fire.

7  A.  That would be correct.

8  Q.  And you didn't rely upon ConAgra to tell you to do the safe

9  thing and call the fire department upon discovery of burning

10 embers, true?

11 A.  I never asked -- no.  I asked the fire department be

12 called, be put on standby, in case there is a problem.  When

13 they got called, I do not know if they were called that morning

14 or not.  I do not recall ever seeing or hearing about

15 burning -- burning embers in the basement.

16 Q.  Let me -- let me say my question to you again because we

17 may have misunderstood.  Okay.

18     If you had discovered burning embers that morning, you,

19 sir, you didn't need ConAgra to tell you to call the fire

20 department?

21 A.  No.

22 Q.  You knew that was your job, to call the fire department

23 because there's a fire in the bin --

24 A.  Yes.

25 Q.  -- true?

1   *A.*   Yes.

2   *Q.*   Okay.  And what you shouldn't do, Mr. Flitsch, with a fire

3   in the bin, is engage in firefighting, agreed?

4   *A.*   Yes.

5   *Q.*   Okay.  And you would agree that Mr. Schmidt should not have

6   engaged in firefighting if there was a fire in the bin, true?

7   *A.*   True.

8   *Q.*   Neither one of you were qualified or competent to take a

9   condition of a fire and extinguish it yourself, agreed?

10  *A.*   Yes.

11  *Q.*   Whatever was left in that bin that morning -- you are now

12  down to the bottom -- it wasn't worth the time to try and get

13  it out if you had a fire in the bin, true?

14  *A.*   True.

15  *Q.*   Is it your testimony, sir, that on the morning of the 27th,

16  that you did not know there was smoke in the bin?

17  *A.*   I wasn't aware of that, no.

18  *Q.*   Okay.  Would you expect that if Mr. Schmidt observed, from

19  the top, smoke in the bin that that was something he should

20  have told you?

21  *A.*   Yes.

22  *Q.*   Okay.  Because smoke now with the core is an indication of

23  a fire.  Don't you agree?

24  *A.*   Yes.

25  *Q.*   So now if we have embers down in the basement, and we have

1    smoke in the bin, the bin's on fire.

2            MR. SCHULTZ:  Judge, that's --

3     Q (BY MR. PATTON:)  True?

4            MR. SCHULTZ:  Judge, that calls for an opinion.  He's

5    not said that.

6            MR. PATTON:  I'm asking him about his experience and

7    qualifications.

8            THE COURT:  Overruled.

9    A.  Yes.

10   Q.  You wouldn't need any more information, Mr. Flitsch,

11   knowing burning embers and smoke, you take your cell phone or

12   to charge over to the office and call the fire department,

13   true?

14   A.  True.

15   Q.  I take it that since your testimony is you didn't know

16   about embers, didn't know about smoke in the morning of the

17   27th, then you didn't tell Godfrey Friedt that information,

18   right?

19   A.  True.

20   Q.  Okay.  So can we agree, the whole morning Godfrey Friedt

21   certainly wouldn't have known that there was burning embers

22   down in our basement and smoke in our bin?

23           MR. SCHULTZ:  Objection.  602.  No firsthand

24   knowledge.

25           THE COURT:  Sustained.

Direct Examination - Flitsch, Melvin (ConAgra)

1    *Q (BY MR. PATTON:)* You didn't tell him any unsafe conditions

2    that were existing in the bin on the morning of the 27th, true?

3    A.  True.

4    Q.  Okay.

5        So what did you do at the end of that morning?  What did

6    you and your crew do?

7    A.  Just before lunch, we always sprayed a little water on it

8    just to settle the dust, you know, from the roof.

9    Q.  So it's your testimony that you were just spraying water on

10   dust?

11   A.  We did it every day, sir, before we went to lunch.

12   Q.  I didn't ask you.

13           *MR. PATTON:*  Judge, nonresponsive.

14           *MR. SCHULTZ:*  Judge, objection.

15   *Q (BY MR. PATTON:)* I'm asking you on the 27th.

16           *MR. SCHULTZ:*  I'd like to have a sidebar.

17           *THE COURT:*  The question was:  So it is your testimony

18   that you were just spraying water on dust?

19           You can answer that, yes or no.

20   A.  Yes.

21   Q.  Not because there was embers burning in our basement and

22   smoke in our bin, right?

23   A.  Correct.

24   Q.  Whatever was existing that morning, can we agree on this,

25   you went to lunch?

Direct Examination - Flitsch, Melvin (ConAgra)

1   *A.*  Right.

2   *Q.*  Okay.  And you didn't leave anybody behind to stand watch

3   on the bin?

4   *A.*  Correct.

5   *Q.*  And would you agree with me, Mr. Flitsch, that if there was

6   burning embers in the basement and smoke in the bin on the

7   morning of the 27th, you shouldn't have left that bin without

8   anybody monitoring it, agree?

9   *A.*  If there was burning embers on the floor and smoke in the

10  bin, yes, I agree.

11  *Q.*  Because now you are exposing ConAgra to a risk of an

12  explosion, agree?

13      *MR. SCHULTZ:*  Objection to the form, speculation.

14      *THE COURT:*  Sustained as to form.

15   *Q (BY MR. PATTON:)* If there's smoke in the bin, and there's

16  burning embers down in the basement, you knew from your

17  training that that presented a potential for an explosion,

18  true?

19  *A.*  Correct.

20  *Q.*  Okay.  So if you left the facility to go to Hardee's and

21  have lunch, and there had been burning embers down in the

22  basement and smoke in the bin, wouldn't you agree with me that

23  you left a bin unmonitored that had a potential for an

24  explosion?

25  *A.*  If there was that going on, yes.

Direct Examination - Flitsch, Melvin (ConAgra)

1    *Q.* Okay. Now, let's go to when you came back after lunch,

2    okay?

3    *A.* Yes, sir.

4    *Q.* Tell the ladies and gentlemen of the jury what you observed

5    as you are driving back down the hill from lunch.

6    *A.* Smoke.

7    *Q.* Where was the smoke, Mr. Flitsch?

8    *A.* In that bin we were working on, which was Bin 15.

9    *Q.* Did it -- did it just magically appear?

10   *A.* It wasn't like that when we --

11          *MR. SCHULTZ:* Objection.

12   *A.* -- when we left, sir.

13          *THE COURT:* Sustained.

14   **Q.  (BY MR. PATTON:)** Okay. Here's what we know from Mel

15   Flitsch. Okay.

16       The morning, so what time did you show up?

17   *A.* 6:45.

18   *Q.* Okay. 6:45.

19       What time did you take lunch? And ballpark is fine.

20   *A.* It took a long time to load that first -- that truck. It

21   was somewheres around 12:30.

22   *Q.* Okay.

23   *A.* 1:00.

24   *Q.* We will make it 12:30, 1:00.

25   *A.* That's correct.

Direct Examination - Flitsch, Melvin (ConAgra)

1    *Q.*  No burning embers.  No smoke.  No fire.  No danger.  And

2    water for dust.  True?  That morning, 6:45 to 12:30, 1:00?

3    *A.*  After we get done loading the truck, yeah.  Whatever time

4    it was we got done loading, we went to eat lunch.

5    *Q.*  Okay.

6    *A.*  Yeah, that's true.

7    *Q.*  And what we have then?  Lunch.

8        Now, what time did you get back, approximately?

9    *A.*  Half an hour after we left, roughly.

10   *Q.*  Well, you would have taken longer than that, right?  You

11   have got to drive all the way up --

12   *A.*  Well --

13   *Q.*  -- into the town of Chester, have your lunch, and drive all

14   the way back down.  About an hour lunch, right?

15   *A.*  Forty-five minutes.

16   *Q.*  All right.  Make it 45.  So you came back at 1:45?

17   Approximately?

18   *A.*  Yes.

19   *Q.*  Okay.  Don't you record it on your time sheets?

20   *A.*  I didn't have it finished up yet.

21   *Q.*  Okay.  Something interrupted that, right?

22   *A.*  Yes.

23   *Q.*  All right.  1:45, back from lunch.

24       Smoke coming out of the top of the bin, true?

25   *A.*  True.

Direct Examination - Flitsch, Melvin (ConAgra)

1    *Q.*  Now you know there's a fire in the bin, right?

2    *A.*  Yes.

3    *Q.*  Now you know.  At 1:45, a fire in the bin.

4         *MR. SCHULTZ:*  Judge, my objection is this is estimate

5    he gave as to time, and I don't think we need to keep

6    establishing this as the time is proper.

7         *THE COURT:*  The jury has heard what this witness has

8    said about the times, so they understand if this is correct or

9    not.

10        Overruled.

11   **Q (BY MR. PATTON:)** True, sir?

12   *A.*  Yes.

13   *Q.*  What time did the bin explode?

14   *A.*  I don't remember.

15   *Q.*  If I throw out -- if I throw out that Mr. Schmidt says, at

16   4:00, call for the fire department, that sound about right to

17   you?

18   *A.*  Yes, it was in there somewheres, a little before.

19   *Q.*  Somewheres, a little bit before.  Okay.  I'll settle for

20   3:45, 3:45 to 4:00?

21        *MR. SCHULTZ:*  That's not a fair question if he doesn't

22   remember the time.

23        *THE COURT:*  Sustained.  He doesn't remember that.

24   ***Q.  (BY MR. PATTON:)***  What is your best estimate?  4:00, 3:45?

25   *A.*  Somewheres in there.

Direct Examination - Flitsch, Melvin (ConAgra)

1    *Q.*   Okay.

2          That's the call for the fire department, correct?

3    *A.*   Yes.

4    *Q.*   Would you agree with me, Mr. Flitsch, that you allowed, at

5    the minimum, two hours to pass when you knew there was a fire

6    in the bin and you didn't call the fire department, true?

7    *A.*   True.

8    *Q.*   And can we agree that from 1:45 to 3:45 or 4:00 p.m., you

9    didn't tell Godfrey Friedt that there was a fire in the bin,

10   true?

11   *A.*   True.

12   *Q.*   Wasn't that valuable time for you to protect yourself and

13   your crew members, to get the fire department out there, and

14   extinguish that fire?

15   *A.*   Yes.

16   *Q.*   Shouldn't you have ordered an evacuation, Mr. Flitsch, at

17   1:45, when you determined there was a fire in the bin?

18   *A.*   Yes.

19   *Q.*   An evacuation would take Mr. Schmidt, Mr. Jentz, and

20   Mr. Becker out of harm's way, true?

21   *A.*   Yes.

22   *Q.*   It was Mr. Schmidt that told you around 4:00 p.m. to call

23   the fire department; isn't that true?

24   *A.*   Yes.

25   *Q.*   It wasn't your idea?

1    *A.*  I asked him how it was.

2    *Q.*  Didn't he call down to you on the walkie-talkie and tell

3    you it was time to get the F out of here or something to that

4    effect, call the fire department?

5    *A.*  He didn't say that.  Not to my knowledge.

6    *Q.*  You then went in and told Godfrey Friedt to call the fire

7    department, true?

8    *A.*  Yes.

9    *Q.*  And between the time that you told Godfrey Friedt to call

10   the fire department and the explosion was a matter of minutes,

11   true?

12   *A.*  Yes.

13   *Q.*  There was no time for ConAgra to call the fire department

14   to put out that fire, true?

15        *MR. SCHULTZ:*  Objection to the form.

16        *THE COURT:*  What was the objection?

17        *MR. PATTON:*  To the form.

18        *MR. SCHULTZ:*  Foundation.

19        *THE COURT:*  What time frame are you talking about?

20        Sustained.

21   ***Q.  (BY MR. PATTON:)***  When you went to Godfrey Friedt at

22   3:45 or 4:00 to tell him to call the fire department, there

23   wasn't any time left on the clock, Mr. Flitsch, for the fire

24   department to get there and put that fire out.  Don't you

25   agree?

1    A.  I agree.

2    Q.  After you told Godfrey Friedt to call the fire department,

3    what did you do next?

4        I'll withdraw the question.

5        After you had the conversation with Godfrey Friedt, you

6    told Mr. Becker and Mr. Jentz to go back down into the tunnel,

7    true?

8    A.  True.

9    Q.  And they had only walked 20 or 50 feet in response to your

10   direction when the whole facility blew up in their face, true?

11   A.  True.

12            MR. PATTON:  That's all the questions I have, Judge.

13            THE COURT:  Let's take our afternoon break, folks.

14            COURTROOM BAILIFF:  All rise.

15                        (Recess)

16            THE COURT:  Mr. Schultz.

17            MR. SCHULTZ:  Thank you, Judge.

18                   **CROSS EXAMINATION**

19   *Q.  (BY MR. SCHULTZ:)*  Mel, after the explosion, did you have a

20   conversation with Godfrey Friedt?

21   A.  Yes.

22   Q.  And what did you say to him and what did he say to you?

23   A.  Well, I was pretty upset and I told him, I said it wasn't

24   my fault.  And he told me it wasn't.  So...

25   Q.  Did he make any comment to you about whether it was within

Cross Examination - Flitsch, Melvin (West Side)

1    your control or not?

2    *A.*   He may have but I do not remember.

3    *Q.*   Okay.  You've been in the salvage business for over 20

4    years as of the date of the explosion?

5    *A.*   Yes.

6    *Q.*   Worked on over 50 hot bins?

7    *A.*   Roughly.

8    *Q.*   Give or take?

9    *A.*   Yes.

10   *Q.*   When you asked Mr. Jentz and Mr. Becker to go in and move

11   the tools for the fire department, did you have any reason to

12   believe the bin was going to explode at that moment?

13   *A.*   No, sir.

14   *Q.*   If you did have that mindset, would you have sent them in

15   there?

16   *A.*   No.

17   *Q.*   You have been working on this bin for -- since April 20,

18   eight days, right?

19   *A.*   Sounds right.

20   *Q.*   At any time during those eight days, did you feel that

21   there was any urgency about an explosion?

22   *A.*   No, sir.

23   *Q.*   What about when you saw smoke the afternoon when you came

24   back form lunch?

25   *A.*   I was definitely concerned but I didn't know what was going

Cross Examination - Flitsch, Melvin (West Side)

1   on.

2   Q.  Did you express that concern to Godfrey Friedt?

3   A.  He was out there and they told him I don't know what.  I

4   just didn't know.  I mean we tried a couple things that -- but

5   I shouldn't have been the only one that had to have been able

6   to call the fire department.  Anybody could have.

7   Q.  That's the point I'm getting to.

8       Was the smoke coming out of the top of the bin visual not

9   only to you but to Godfrey?

10  A.  That I --

11          MR. PATTON:  Objection as to what Godfrey could see.

12          THE COURT:  Sustained.

13  **Q.  (BY MR. SCHULTZ:)**  Was shortly before the explosion the

14  only time you asked Godfrey to call the fire department?

15  A.  No.

16  Q.  Can you tell the jury about the other times.

17  A.  I asked him earlier that morning to call the fire

18  department to get down there and get a line up for standby.

19  Q.  Why did you do that?

20  A.  Just for the fact that -- just in case something did

21  happen, we would already have a line in place and all they

22  would have to do is hook their hose up.

23  Q.  If that hose was there, is that something you would have

24  hooked up after lunch?

25  A.  Yes.

1  *Q.*  Did the fire department come out to the facility after you

2  asked Godfrey to call them that morning?

3  *A.*  No.

4  *Q.*  Did Godfrey tell you why they weren't coming?

5  *A.*  No.

6  *Q.*  Had you asked anybody from ConAgra to have the fire

7  department on standby on any day prior to April 27th?

8  *A.*  I asked Sean when I got there if the fire department had

9  been notified about a possible fire in a bin.

10  *Q.*  What did he say?

11  *A.*  He said no.

12  *Q.*  Did you ask for the fire department to come out and take a

13  look and be on standby?

14  *A.*  No.  I --

15  *Q.*  Go ahead.

16  *A.*  Let me rephrase that answer.

17      I asked the fire department to be notified or put on

18  standby that day.  I know it's been a long time since the

19  incident and sometimes I forget exactly everything.  But...

20  *Q.*  Okay.

21  *A.*  I thought it would be a good idea for the fire department

22  to get out there, to at least get a hose ran up to the top of

23  the bin in case it ever needed be.  But at that point when we

24  first got there, I didn't think we was going to have a problem.

25  *Q.*  Well, let's go to the morning of the 27th.  What's your

1    best recollection about when you asked Godfrey to call the fire

2    department that morning?

3    A.   Midmorning.

4    Q.   And the reason was?

5    A.   Just had a bad feeling.  There wasn't -- I didn't see any

6    smoke, or any embers, or anything like that that I can recall.

7    I just had a bad feeling.

8    Q.   Can you explain -- you will have to explain to us what you

9    mean about that.

10   A.   It just -- I felt like something could go wrong.

11   Q.   But up until the time everything had gone perfect?

12   A.   True.

13   Q.   So why did you feel that morning something could go wrong?

14   A.   I don't know.  I have no idea.

15   Q.   Did you explain that to Godfrey when you asked him to call

16   the fire department midmorning?

17   A.   Probably.  But maybe not fully.

18   Q.   Did the fire department come out midmorning?

19   A.   No.

20   Q.   That afternoon when you were working after lunch, was

21   Godfrey standing nearby as you were working?

22   A.   Yes.

23   Q.   One point in time you went to the manhole.

24   A.   Correct.

25   Q.   What were you trying to do at the manhole?

Cross Examination - Flitsch, Melvin (West Side)

1    *A.*   We opened the manhole up and we tried to get the pellets

2    removed from the manhole, so we could have a spot to put water

3    on if need be or see what was going on inside the bin.

4    *Q.*   Okay.

5    *A.*   And we couldn't.

6    *Q.*   Did you tell Godfrey you were going to do that?

7    *A.*   Yeah.

8    *Q.*   What did he say?

9    *A.*   Okay.

10   *Q.*   And when you were doing it, was he standing there watching?

11   *A.*   Most of the time, yes.

12   *Q.*   Okay.  When you opened the manhole, was it packed pellets?

13   *A.*   Packed hard pellets, yes.

14   *Q.*   Was it hard to get -- burrow a hole through there?

15   *A.*   We had to use our chipping hammer, our jackhammer.

16   *Q.*   Did you use anything else?

17   *A.*   Before we used the jackhammer, we tried the air wand.

18   *Q.*   And what happened with that?

19   *A.*   It was like blowing air on a concrete wall, nothing.

20   *Q.*   Nothing moved.

21   *A.*   Nothing moved so we shut it off and got a jackhammer?

22   *Q.*   And did the jackhammer work?

23   *A.*   Yes.

24   *Q.*   Did you use any other tools?

25   *A.*   Part of the air wand as a poking stick to poke the clumps

Cross Examination - Flitsch, Melvin (West Side)

1    out of the way.

2    Q.  Was there air blowing at that time?

3    A.  No.

4    Q.  If someone in this courtroom suggested to the jury that you

5    put an air wand in and blew air right on the core, would that

6    be accurate based on what you remember that day?

7    A.  No.

8    Q.  Were you trying to open a hole to blow air on the core?

9    A.  No, sir.

10   Q.  Why were you opening the hole?

11   A.  To see where the problem was and see if we could even do

12   anything with it.

13   Q.  Put some water on it?

14   A.  Anything to help.

15   Q.  You were trying to do what you could?

16   A.  Correct.

17   Q.  At any time that afternoon did Godfrey Friedt tell you to

18   stop working and evacuate?

19   A.  No.

20   Q.  Do you know how many employees of ConAgra asked Mr. Friedt

21   to call the fire department before April 27th?

22        *MR. PATTON:*  Objection.  Foundation.

23        *THE COURT:*  Sustained.

24   Q.  I want to jump around to a couple of topics.

25        Do you still have your notes in front of you from your job?

1    A.  Yes, sir.

2    Q.  Would you turn to April 21st, which was the second workday

3    at the bin.

4    A.  Okay.

5    Q.  It doesn't say on here whether you removed any grain that

6    day.

7    A.  We did not.

8    Q.  Wheat middlings?

9    A.  We did not.

10   Q.  And why didn't you?

11   A.  I suggested end dumps for that day and they couldn't give

12   me end dumps available.  I was trying to tell them to take it

13   out and put it on a big tile.  Worry about selling the stuff

14   later.

15       And I think also that day we went to their machine shop,

16   which was east of town, a place that does some of their machine

17   shop work for them, and we made a longer jackhammer bit.  The

18   jackhammer bit I had there was only like 18 inches to 2 feet

19   long.  Maybe a little bit longer.  And we had to stretch it out

20   to a six-foot bar, a six-foot jackhammer bit, so we could reach

21   up in the bottom of the chute of the bin and get the clump

22   busted up that we couldn't get busted up with the air wand.

23   Q.  So how long is this -- can you give the jury a measure?

24   How long is the jackhammer itself before you get to the bit

25   part?

1   A.   The jackhammer itself probably -- rough guesstimate from

2   where it comes down here to about right in here (indicating).

3   Q.   Then how long of a bit did you have to put on it?

4   A.   We had one built that was six-foot long.  We cut one of our

5   old bits in half and then had them put an extension in there

6   basically.

7   Q.   Did somebody from ConAgra take you to do that?

8   A.   Sean.

9   Q.   On the 21st on the bottom left it says no trucks.

10  A.   That's correct.  It was getting late in the day and they

11  didn't think we could get another truck in that day or even a

12  truck in that day, so we just called it a day.

13  Q.   If there were trucks available, would you have been able to

14  pull material out and put it in the trucks?

15  A.   Once we got the jackhammer bit made.

16  Q.   What was the suggestion you made about the end dump?  What

17  is an end dump?

18  A.   It is just like a rock truck, but it's got a tailgate on

19  it.  And you just back up and raise it up and dump the product

20  out on the ground in one big pile.

21  Q.   Did ConAgra accept that suggestion?

22  A.   They ended up we didn't do it that way.  We just had

23  regular trucks come in and shipped off to wherever.

24  Q.   Let's step back one day to April 20th.  Did you have any

25  trouble getting the product out when you started work on the

1   morning of the 20th?

2   A.  Yes, I did.

3   Q.  Would you describe to the jury what the problem was.

4   A.  It was wet.  Why it was wet I wasn't real sure.  And it

5   was -- well, there was that big clump down there, too, that

6   shifted up and blocked off the door.

7   Q.  What do you mean a big clump?

8   A.  Where the pellets were real hard and it formed wherever --

9   however it shifted, it broke off and it was just a great big

10  clump that we couldn't get busted up without the jackhammer

11  bit.

12  Q.  You were able to remove some product on the 20th?

13  A.  Yes, sir.

14  Q.  And do you know where this product was going and for what

15  reason?

16  A.  No, sir.

17          MR. PATTON:  Objection as to relevance.

18          THE COURT:  Overruled.

19  Q.  Do you know whether it was being sold?

20          MR. PATTON:  Same objection.

21          THE COURT:  Overruled.

22  A.  To my knowledge it was, yes.

23  Q.  The first day you made a note of how much product.  The

24  second day you didn't pull any product out.

25  A.  Correct.

1  *Q.* And on the third day on to the 26th, you got a pretty good

2  flow of product from the bin?

3  *A.* Correct.

4  *Q.* And would you and your crew do pretty much the same thing

5  every day in terms of individual job responsibilities?

6  *A.* Yes.

7  *Q.* What would you do?

8  *A.* I'd relieve one -- well, either Adam or Justin downstairs

9  in the basement and give them a break and they could go out and

10 watch the vac.  But -- and then Robert and John do the same

11 thing helping up top and down below.  Just that way everybody

12 had a little break without doing the same thing over and over

13 and over and over.  But as far as job roles, they never

14 changed.

15 *Q.* Who was in the basement?

16 *A.* Most of the time it was John, Adam, and J.J.

17 *Q.* And who was up top?

18 *A.* Most of the time it would be Rob.

19 *Q.* When you first start getting pellets out on day one, you

20 are seeing the pellets come out of that chute.  You seem to

21 describe that there was a sliding door, correct?

22 *A.* Correct.

23 *Q.* Was there anything about the pellets coming out on day one

24 that led you to believe the bin was on fire?

25 *A.* No.

1   *Q.*  Were they burnt or were they smelly or anything that would

2   cause you to believe there was a fire going on inside?

3   *A.*  I would say there was some heat damage done to them.  But I

4   wouldn't call them burnt pellets, no.

5   *Q.*  This four-gas meter was that operating down there in the

6   tunnel?

7   *A.*  That day I don't remember if we even checked it down in the

8   tunnel.

9   *Q.*  What about day two, was there anything about the product

10  you were pulling out that caused you any concern or reason to

11  believe the bin was on fire?

12  *A.*  The product was black.  But it didn't -- it didn't give me

13  any concern that the bin was on fire.

14  *Q.*  Any change in the product coming out from the first day to

15  the second day?

16  *A.*  Other than it flowed out better once we got that clump out

17  of there.

18  *Q.*  Okay.  Let's go to day three then.  How was the product

19  looking coming out of the bin?

20  *A.*  Let me look at day three.

21      Day three went pretty decent.

22  *Q.*  That would be the 22nd?

23  *A.*  Correct.

24  *Q.*  Anything about the product that you saw that...

25  *A.*  On the second truck it looked like it was starting to get a

1    little lighter color.  It wasn't as dark.

2    Q.  You were asked a question about you were -- every day you

3    were there you had the opportunity to inspect every inch of

4    this bin to see if there was any danger.

5        You never went in this bin, did you?

6    A.  No, sir.

7    Q.  It wasn't a job that called for you to go inside the bin,

8    was it?

9    A.  Correct.

10   Q.  What was your job out there?

11   A.  To remove the product out of the bin as safely as we could

12   without getting hurt.

13   Q.  You weren't hired to go in and do readings or measurements

14   inside the bin, were you?

15   A.  No.

16   Q.  So on the 22nd, day three, the second truck, the product is

17   a little lighter?

18   A.  Towards the end, yes.

19   Q.  What does that indicate to you?

20   A.  Pellets are getting better, better quality.

21   Q.  Let's go to the next day, the 23rd.  How is the product

22   looking coming out of the bin?

23   A.  Towards the end of the day, the pellets really started

24   looking really good.

25   Q.  Okay.  And there's a mention here at the bottom of the

1    23rd.  How much product have you taken out then in the first

2    four days?

3    A.  I got 126-ton.

4    Q.  You took 126 tons out of the bin by the fourth day?

5    A.  That is correct.

6    Q.  Okay.  Let's go to the 24th.  How is the product looking?

7    A.  Towards the end of the fourth truck, the pellets started

8    turning back to a darker color.

9    Q.  What did that indicate?

10   A.  Just that the -- flowing from a different spot or, you

11   know, got down a little bit lower, pellets around the core or

12   near the core or the column.  It really didn't concern me at

13   all.

14   Q.  Let's go to the 25th.  Tell the jury what you observed

15   while you were removing pellets from the bin.

16   A.  Pellets got a little darker but I mean they didn't still

17   give us any concern for fire or anything like that.

18   Q.  The 25th is a Sunday.  Did you work Saturday and Sunday?

19   A.  Yes, sir.

20   Q.  Full days?

21   A.  Yes, sir.

22   Q.  Let's go to Monday, the 26th.  How's the product looking?

23   A.  About the same, not changing any worse, not changing any

24   better.

25   Q.  All right.  Did you know there was a fire in the bin that

1    day?

2    A.  No, sir.

3    Q.  Did you know there were burning embers?

4    A.  No, sir.

5    Q.  By the way, there's been some testimony in the case that

6    Neal Schaber from ConAgra found embers that he gauged to be

7    400 degrees in temperature in that tunnel.  Did he ever tell

8    you that?

9    A.  There was a note but I don't remember who was the one that

10   found it.  And the dump pit operator in the scale house, or the

11   scale house operator, or however you want to call it, told me

12   about it that morning.

13   Q.  What morning was that during the seven days?

14   A.  I don't remember.

15   Q.  Okay.  So when you go home on the 26th, that's Monday

16   evening, you know you are getting close to the bottom?

17   A.  Correct.

18   Q.  No problems that led you to believe there was any fire or

19   anything?

20   A.  No, sir.

21   Q.  So you come in on the morning of the 27th and start work.

22   I think you told us at I think you said six --

23   A.  Seven.

24   Q.  7:00?

25   A.  Yep.

1    *Q.*  Business as usual, right?

2        But you had that feeling.  And after you had that feeling,

3    you told Godfrey you wanted to fire department out?

4            *MR. PATTON:*  Leading.

5            *MR. SCHULTZ:*  I'll rephrase it.

6            *THE COURT:*  Sustained.

7            *MR. SCHULTZ:*  I'll rephrase.

8    *Q.*  Tell us what you did after you had that feeling.

9    *A.*  I talked with Godfrey about getting the fire department out

10   there, so at least we would have a hose up the side of the

11   building.

12   *Q.*  Had you met Godfrey before this day?

13   *A.*  I believe so but I cannot say yes or no on it.

14   *Q.*  Had he been on site there while you were working?

15   *A.*  Just that -- just Monday and Tuesday.

16   *Q.*  Did he tell you why he came back to the facility on the --

17   or came to the facility on the 26th?  That would be that

18   Monday.

19   *A.*  No.

20   *Q.*  But he was there and you two talked?

21   *A.*  Correct.

22   *Q.*  Did you understand he was from corporate?

23   *A.*  Yes, sir.

24   *Q.*  That he was the guy overseeing the plant?

25           *MR. PATTON:*  Leading.

Cross Examination - Flitsch, Melvin (West Side)

1   Q.  Well, what did you understand --

2          THE COURT:  Sustained.

3   Q.  -- his position to be?

4   A.  That he was the one we were going through besides the

5   people at ConAgra and Chester to talk with if -- about the job

6   and the fire or possible fire, possible whatever.

7   Q.  You have been asked questions by ConAgra about why didn't

8   you check temperatures and CO in the bin itself.  Why didn't

9   you?

10  A.  Why would we need to check -- first of all, the temperature

11  gun that we have is only good at close ranges.  You can buy

12  them at any hardware store.

13  Q.  And how tall was this bin?

14  A.  Roughly 140 feet.  Hundred and twenty, 140 feet.  I don't

15  remember the exact height.

16  Q.  Does that temp gun give you accurate readings if you

17  dropped it into the bin?

18  A.  Only if you hold onto it.

19  Q.  So if you put it down on a long rope, you can't can you see

20  what's being read down there?

21  A.  No, sir.

22  Q.  Do you know whether ConAgra had any thermal couples or any

23  monitoring devices inside of Bin 15?

24          MR. PATTON:  Relevance, foundation.

25          THE COURT:  Overruled.

Cross Examination - Flitsch, Melvin (West Side)

1  A.  No, I don't.

2  Q.  So when you are removing the pellets, you are determining

3  what is going on by looking at the pellets themselves?

4  A.  And the temp gun to see -- I mean we wouldn't check it

5  every minute but we would periodically check it.

6  Q.  And you also looked in the bin?

7  A.  From the top.  That's the only spot you could see in it.

8  Q.  Okay.  All the way up until lunchtime on the 27th, had you

9  ever seen embers or a fire in the bin?

10  A.  Not to my knowledge, no.

11  Q.  But you knew you were getting close to the core and down at

12  the bottom of the bin?

13  A.  That is correct.

14  Q.  There's been testimony from some witnesses about sending

15  the trucks away on the 27th.  Did you have any involvement with

16  the request to send the ConAgra trucks away?

17  A.  Which trucks are you talking about, sir?

18  Q.  The trucks that would come either drop off grain or pick it

19  up and move it out.

20     Was there any discussion about the trucks on the 27th?

21  A.  The grain trucks?

22  Q.  Yeah.

23  A.  The ones that were unloading, yes.

24  Q.  What was the discussion?

25  A.  That they should just go home and not unload today until we

1    get this took care of.

2    Q.  I didn't understand your answer.  Say it again.

3    A.  Not unload the trucks that were there until this situation

4    was under control.

5    Q.  And who made that request?

6    A.  I did.

7    Q.  Why did you make it?

8    A.  Because of the dust.

9    Q.  What about the dust?

10   A.  Unloading a grain truck creates dust.

11   Q.  What did you make that request of?

12   A.  I don't remember.

13   Q.  Did ConAgra heed your request and stop the trucks from

14   coming in?

15   A.  Yes.

16   Q.  Did you ever tell ConAgra to restart the trucks that

17   afternoon?

18   A.  No.

19   Q.  Were there other operations going on in the elevator that

20   you were working in and around there where Bin C15 was?

21   A.  My understanding is that they were --

22        MR. PATTON:  Objection.  Objection.  Hearsay.

23        MR. SCHULTZ:  It's not based on what anybody told him.

24   What do you see?

25        THE COURT:  Overruled.  He can answer.

Cross Examination - Flitsch, Melvin (West Side)

1  *A.*  My understanding that they were using the blow line
2  upstairs to blow pellets to the adjacent bin, the dust
3  collection systems were running.
4  *Q.*  Did you make any comment to ConAgra about whether that was
5  good practice?
6  *A.*  I said it wasn't a good idea.
7  *Q.*  Why wasn't it a good idea in your opinion?
8  *A.*  Also creates dust.
9  *Q.*  After you came back from lunch and you had seen smoke up
10  top, did you stop the salvage operations and try to put water
11  in the bin?
12  *A.*  That is correct.
13  *Q.*  About calling the fire department, you were asked why
14  didn't you call the fire department yourself.  Why did you
15  request that Godfrey do it instead of you do it?
16  *A.*  Why wasn't the fire department called before we got back if
17  there was smoke coming out of the bin?
18  *Q.*  Well, why didn't -- the question was posed to you, though,
19  why didn't you call yourself and you said that you asked
20  Godfrey to call.
21        *MR. PATTON:*  Objection.
22        *MR. SCHULTZ:*  I'm directing --
23        *MR. PATTON:*  Mischaracterization and he is leading.
24        *THE COURT:*  Overruled.
25  *Q.*  Go ahead.

Cross Examination - Flitsch, Melvin (West Side)

1   *A.*  First of all, I didn't know the phone systems, how to

2   operate their phones.  And, second of all, my cell phone didn't

3   have any reception.

4   *Q.*  When you asked Godfrey to call the fire department, did he

5   immediately do so?

6   *A.*  He made a phone call but to whom I couldn't tell you.

7   *Q.*  Were you standing nearby?

8   *A.*  I was standing in the truck dump office but I couldn't tell

9   who he was talking with.

10  *Q.*  How long was he on that call?

11  *A.*  I'm not sure.

12  *Q.*  Five minutes or so?

13          *MR. PATTON:*  Objection.  Leading.

14          *THE COURT:*  Sustained.

15  *Q.*  What's your best estimate as to the amount of time?

16  *A.*  Three or four minutes.  I don't know.  That's just a guess.

17  *Q.*  Was it longer than saying, hey, 911, we've got at fire,

18  send the fire trucks?

19  *A.*  I would say so, yes.

20  *Q.*  And then after he got off that call, did he make another

21  call?

22  *A.*  Yes.

23  *Q.*  And who was that call to?

24  *A.*  I'm not sure.

25  *Q.*  You couldn't hear what was being said?

Cross Examination - Flitsch, Melvin (West Side)

1   *A.*   That and I wasn't trying to eavesdrop either.

2   *Q.*   I understand.  But was it during that second call that the

3   explosion occurred?

4   *A.*   Yes.

5   *Q.*   When you heard the explosion, what sounds did you hear?

6   *A.*   First there was a rumble and then several little bangs.

7   I'm sure it was a lot louder than that but it sounded like

8   little bangs to me.

9   *Q.*   Were you injured as a result of the explosion?

10  *A.*   Yes, I was.

11         *MR. PATTON:*  Objection.  Relevance.

12         *THE COURT:*  Overruled.  I can see some evidence.

13  **Q.   (BY MR. SCHULTZ:)**  What happened to you as a result of the

14  explosion?

15  *A.*   I stepped out of the dump pit office to check to see where

16  one of my guys was that I knew was outside.  And that's when

17  the concrete started falling down and I didn't get around the

18  corner of the building in time and I got hit in the ankle with

19  a chunk of concrete and broke my ankle.

20  *Q.*   When the paramedics came, did you receive treatment from

21  them or tell them to go somewhere else?

22  *A.*   I asked them to take care of the other three guys first.

23         *MR. SCHULTZ:*  That's all I have.

24         *THE COURT:*  Mr. Taxman?

25         *MR. DURKIN:*  Is it you?

Cross Examination - Flitsch, Melvin (West Side)

1          *THE COURT:*  Or Mr. Durkin?

2          *MR. DURKIN:*  Oh, I just got a couple, Judge.  I

3     thought it was mine.

4                       **CROSS EXAMINATION**

5     *Q.  (BY MR. DURKIN:)*  Mr. Flitsch, counsel for ConAgra on

6     several occasions today asked you about the training of your

7     crew.  Do you recall that?

8     *A.*  Yes, sir.

9     *Q.*  You don't specifically know the specifics of any training

10    that John Jentz or Robert Schmidt had because they work for

11    A&J; is that correct?

12    *A.*  That is correct.

13    *Q.*  And we spoke with Mr. Friedt about a statement he made with

14    the government right after the occurrence and in the afternoon

15    he stated --

16          *MR. PATTON:*  I'm objecting to the relevance of him

17    reading this statement to this witness.

18          *THE COURT:*  On what basis?

19          *MR. PATTON:*  A fact witness, what somebody else said,

20    wasn't to him.  It is not relevant.

21          *THE COURT:*  Who is this a statement of?

22          *MR. DURKIN:*  Statement of Godfrey Friedt.  And I'm

23    just bringing it in for fact confirmation.

24          *THE COURT:*  To whom?

25          *MR. DURKIN:*  To the federal government.

1            *THE COURT:*  Okay.  Overruled.

2   **Q.  (BY MR. DURKIN:)**  Mr. Friedt gave a statement to the

3   government where he said in the afternoon, after lunch, Friedt

4   and Melvin had a conversation about the condition of the bin.

5   Okay?

6   *A.*  Yes, sir.

7   *Q.*  Do you have any reason to disagree with that?

8   *A.*  No, sir.

9   *Q.*  He was there with you that afternoon?

10  *A.*  That is correct.

11  *Q.*  There was -- you know, I forgot the times but I'm going to

12  pull this up.

13        Earlier in the trial we've talked about some phone calls

14  and I want to know if you are privy to any of them.  Okay?

15        And I'm going to ask you about conversations or phone calls

16  from Godfrey Friedt to the director of corporate safety for

17  ConAgra.  Okay?

18  *A.*  Yes, sir.

19  *Q.*  Anthony Yount --

20            *MR. PATTON:*  Objection.  Foundation of this witness.

21            *THE COURT:*  Are these hypotheticals?

22            *MR. DURKIN:*  Not hypotheticals.

23            *THE COURT:*  All right.  Where is this going?

24            *MR. DURKIN:*  I'm going to ask him if he is privy to

25  any of these conversations.

Cross Examination - Flitsch, Melvin (Jentz & Schmidt)

1          *THE COURT:*  Is that the overlay that you put on top of

2     Mr. Patton's?

3          *MR. DURKIN:*  Yeah, yeah.

4          *THE COURT:*  All right.  Go ahead.

5          *MR. DURKIN:*  That's all.

6     **Q.  (BY MR. DURKIN:)**  We have records that there was a

7     one-minute phone call at 2:17 from Godfrey Friedt to the

8     director of corporate safety for ConAgra.  Were you there or

9     privy to that conversation, know anything about it?  At 2:17.

10    *A.*  I'm not real sure about that one.

11    *Q.*  There is another one at 2:27.  There is another one for

12    seven minutes at 2:28.  There is one at 3:04 and there was a

13    six-minute one at 3:55.  And then finally one at 4:03, a

14    one-minute phone call.

15    *A.*  I'm not --

16    *Q.*  Do you know anything about conversations Godfrey Friedt was

17    having that afternoon with the director of corporate safety for

18    ConAgra?

19    *A.*  Not to my knowledge, no.

20    *Q.*  But Mr. Friedt was in your area for most of the afternoon;

21    is that correct?

22    *A.*  That is correct.

23    *Q.*  And he -- what you saw he saw --

24          *MR. PATTON:*  Objection.

25    *Q.*  -- is that right?

1        *MR. PATTON:*  Objection as to what Mr. Friedt saw.

2        *THE COURT:*  Sustained.

3   **Q.  (BY MR. DURKIN:)**  Okay.  Well, he was by you, right?

4   *A.*  Most of the time but not all the time.

5   *Q.*  Okay.

6   *A.*  But most of the time.

7   *Q.*  And you were talking to him; is that right?

8   *A.*  Off and on.

9        *MR. DURKIN:*  Okay.  No further questions.

10       *THE COURT:*  Mr. Taxman.

11                    <u>**CROSS EXAMINATION**</u>

12  **Q.  (BY MR. TAXMAN:)**  Good afternoon, Mr. Flitsch.

13       Marc Taxman.  I want to ask you a question.  You said the

14  pellets.  Did you know that they were going to be sold?

15  *A.*  I didn't care what they did with them as long as they got

16  them out of the way.

17  *Q.*  Did you know that they were going to be sold?

18  *A.*  Not --

19       *MR. PATTON:*  Objection.  Irrelevant.

20       *THE COURT:*  Overruled.

21  *A.*  No, I didn't know they were going to be sold.

22  *Q.*  Were they properly being weighed as they came out of the --

23  *A.*  Yes, they were.

24  *Q.*  And the only reason I brought it up was you mentioned

25  something about putting them on the ground, they didn't want

1    them on the ground when there were no trucks available.  Can

2    you explain to us just so we can understand what you meant?

3    A.  Because the gravel will get into the pellets and any time

4    you have got gravel in pellets you go to feed it to any type of

5    livestock, you are going to have possibility of chipped teeth

6    just like any person would get.

7    Q.  Okay.  So by putting it on the ground, would decrease the

8    quality of the pellets?

9    A.  That is correct.

10   Q.  Okay.  So when there was no trucks available as you are

11   taking these out of there, you had to stop and wait for trucks

12   to be available?

13   A.  It worked out during that time other than the one day we

14   had the trucks scheduled just about right where we -- if we had

15   a break it was only five, ten minutes between the two trucks.

16   Q.  No problem.  All right.

17       So if there was a five or ten-minute delay, you had to wait

18   because you couldn't keep throwing them out and -- vacuuming

19   out and put them on the ground?

20   A.  No.

21           MR. TAXMAN:  Could we please bring up Plaintiffs'

22   Number 331.  This is already in evidence.

23   Q.  Mr. Flitsch, can you see that to the right?

24   A.  Yes, sir.

25   Q.  Do you recognize that photograph?

Cross Examination - Flitsch, Melvin (Beckers)

1    A.  Yes.

2    Q.  Was that taken sort of -- I guess that would be up river in

3    the direction that's Water Street?

4    A.  Yes.

5    Q.  All right.  And the white building in there, that's the

6    scale house office that was referred to earlier today?

7    A.  That is correct.

8    Q.  And if we move away from the scale house office, that white

9    building toward the blue sky you can see the bins we have been

10   talking about; is that fair to say?

11   A.  The concrete structure behind the light building?

12   Q.  Yes, sir.

13   A.  Those are the concrete silos.

14        MR. TAXMAN:  All right.  And can we have 333.

15   Q.  Is that a picture of the front of that scale house office

16   that we just saw in that picture?

17   A.  That is a picture of one of those, the doors to it.  Which

18   one I'm not sure.

19   Q.  All right.  That's the door that faces in the direction we

20   were just looking.  There is another door that goes right in

21   the tunnel, correct?

22   A.  And there's one that goes out -- this side here is off the

23   north side of the building (indicating).

24   Q.  Exactly.  That's the one that's looking at what we were

25   just looking at --

1    *A.*   Correct.

2    *Q.*   -- which was the clear view from that office right to those

3    bins, the manhole, and the area we have been talking about?

4    *A.*   Correct.

5    *Q.*   That's pretty close to each other?

6    *A.*   Yes.

7         *MR. TAXMAN:*   Okay.  I'd like to move 331 and 333 into

8    evidence.   I thought they were already but...

9         *MR. PATTON:*   No objection.

10        *THE COURT:*   331, 333 admitted.  No objection.

11        *MR. TAXMAN:*   Thank you, Judge.

12        *(Exhibit Plfs' 331 and 333 received in evidence)*

13   **Q.   (BY MR. TAXMAN:)**   All right.  In that office, that's the

14   area where you talked about Mr. Flitsch being on the -- you are

15   Mr. Flitsch.  Mr. Godfrey -- where Godfrey was on the phone, he

16   was in that office, you saw him in there?

17   *A.*   Correct.

18        *MR. TAXMAN:*   All right.  And back to 331, please.

19   *Q.*   And then that area right there next to the bin and the

20   manhole (indicating), that's where you saw Godfrey as well,

21   correct?

22   *A.*   Correct.

23   *Q.*   All right.  Would it be fair for us to believe that

24   anything Godfrey knew about the conditions in the bin, whether

25   they were good, bad, or in between, was information he would

1    have got either by talking to the people there or seeing with

2    his own eyes?

3                MR. PATTON:  Objection.  Foundation.

4                THE COURT:  Overruled.

5    Q.  (BY MR. TAXMAN:)  Is that fair for us to believe?

6                MR. PATTON:  And speculation.

7                THE COURT:  Overruled.

8    A.  Yes.

9                MR. TAXMAN:  I'm sorry, Judge?

10               THE COURT:  I overruled it.  He could answer.

11               MR. TAXMAN:  Did the witness answer?

12               THE COURT:  He said yes.

13   Q.  (BY MR. TAXMAN:)  Okay.  Would it be fair for us to believe

14   that Godfrey Friedt was somebody you recognized as the highest

15   ranking person from ConAgra on this property on the 26th and

16   the 27th?  The 27th being the day that the bin exploded.

17   A.  Correct.

18   Q.  Would you believe that Godfrey Friedt was relaying

19   accurately anything he had seen with his own eyes or anything

20   that he had heard about the condition of the bin to the

21   corporate safety individual in Omaha?

22               MR. PATTON:  Objection to what he believes.

23   Foundation for what Mr. Friedt was doing.

24               THE COURT:  602.  Sustained.

25   Q.  (BY MR. TAXMAN:)  There was a chain of command out there on

Cross Examination - Flitsch, Melvin (Beckers)

1    this project, sir.  I think you talked about that earlier.

2        You were a foreman, correct?

3    A.  Correct.  I was considered the foreman.

4    Q.  All right.  I'm just going to keep going up the chain of

5    command.  In your company, Ron Sumner and Mr. Schwers are above

6    you in the chain of command, fair to say?

7    A.  Correct.

8    Q.  All right.  And then out on this project, we have Sean

9    Belcher.  He has been identified as a team leader for the

10   elevator.  He is somebody stationed in Chester.

11       You had some dealings with him, true?

12   A.  True.

13   Q.  I don't know if you dealt with him because it didn't come

14   up, but did you know Alan Bindel, who was the superintendent

15   for this facility?

16   A.  I don't remember if I actually met him down there or not.

17   I believe I spoke with him on the phone.

18   Q.  Okay.  So we have Belcher, who is a team leader, and

19   Bindel, who is a superintendent, and we have Mr. Godfrey

20   Friedt, who is a director of business operations from Omaha

21   corporate, correct?

22   A.  Correct.

23   Q.  In your line of work, there's a chain of command, or a

24   chain of communication, and you go up in authority as I was

25   going through the ranks; is that fair to say?

1          *MR. PATTON:*  Object to the relevance to this inquiry

2    as to chain of hierarchy of ConAgra with this witness.

3          *THE COURT:*  Overruled.

4    *A.*  Yes.

5    *Q.*  Is it fair to believe that communications about the

6    condition of the bin should flow up that chain of command --

7          *MR. PATTON:*  Objection.

8     *Q (BY MR. TAXMAN:)* -- which is part of the custom and

9    practice?

10          *MR. PATTON:*  Objection, relevance, foundation.

11          *THE COURT:*  Sustained.  I don't know that he has the

12    background to talk about the chain of command of ConAgra.

13     *Q (BY MR. TAXMAN:)* Any communications that go up the chain of

14    command in your business as a matter of custom and practice

15    should be accurate; is that fair to say?

16    *A.*  As accurate as it can be, yes.

17    *Q.*  Okay.  If at any time a directive came through the chain of

18    command from ConAgra for you to stop working and evacuate,

19    would you have followed that directive?

20    *A.*  By all means.

21    *Q.*  After lunch on the 27th, you told Godfrey that it was a,

22    quote, pretty good problem going on in the bin, correct?

23    *A.*  I may have.  I don't recall exactly what I said, sir.

24    *Q.*  Okay.  And I know, sir, you have given statements and a

25    sworn deposition and everything in the case.  But according to

1    the testimony you have given in this case, in your deposition,

2    you were describing for us that you relayed to Godfrey that

3    after lunch there was a pretty good problem going on in the

4    bin.

5         MR. PATTON:  Objection.  Objection to this form of the

6    question as refreshing memeory.

7         THE COURT:  Sustained.  You can show him the document,

8    but you can't read it.

9         MR. TAXMAN:  May I show the witness the...

10        THE COURT:  Sure.

11        MR. TAXMAN:  Thank you.

12   Q (BY MR. TAXMAN:) All right.  And the way this works, I'm

13   going to show you this.  You look at the part I underlined.

14   Just read it and let me know when you have finished reading it,

15   okay?

16   A.  All right.

17   Q.  All right.  And the first question I have to ask you, this

18   is just the way the procedure works, does that refresh your

19   memory about that?

20   A.  Yes, sir.

21   Q.  Tell the jury, please, what you told Mr. Friedt.

22   A.  I told him that there was a problem in the bin.  I

23   couldn't -- I was hoping it wasn't as big as what I thought it

24   might be.

25   Q.  Okay.  We talked about the core, and I think when counsel

1   for ConAgra brought that up, you had asked him, What do you

2   mean by "core"?

3       Do you remember that exchange?

4   A.  Yes, sir.

5   Q.  Mr. Flitsch, when a bin of this size, it's assumed, has a

6   core to it, can there be more than one core?

7   A.  It's possible.

8   Q.  Can the core be cold and burnt out?

9   A.  Yes.

10  Q.  Can the core be warm?

11  A.  Yes.

12  Q.  Can the core be mushy and fermentic?

13  A.  Possible.

14  Q.  Can the core be hot?

15  A.  Yes.

16  Q.  Can the core have -- be smoldering?

17  A.  Yes.

18  Q.  Can the core have embers?

19  A.  Yes.

20  Q.  Can the core be on fire?

21  A.  Yes.

22  Q.  Okay.  I think you were asked some questions about

23  monitoring the health of the bin, and I think in this courtroom

24  there's been examples about doctors and patients.  The history

25  that a patient brings, or a bin brings to a situation, on

 1    April 19, 2010, the history of the conditions are important to

 2    know.

 3              MR. PATTON:  Objection to testifying.

 4              THE COURT:  Overruled.  It is cross examination.

 5     Q (BY MR. TAXMAN:) The history that the bin brings to

 6    April 19, 2010, are important to know:  If there's one core,

 7    multiple cores, if the core is slushy, mushy, fermentic, warm,

 8    embers, smoldering, or on fire.  All of that is important data

 9    to make some kind of a determination; is that fair to say?

10    A.  Yes.

11    Q.  Especially a bin of this size, when you have been told it's

12    120 feet, and there was about 80 or 90 feet of product in

13    there; is that fair to say?

14    A.  Yes.

15    Q.  And you weren't presented with any thermal imaging or

16    anything that would tell you how many spots there were; is that

17    fair to say?

18    A.  Correct.

19    Q.  You weren't given a packet of data which showed the

20    temperatures over time; is that fair to say?

21    A.  Correct.

22    Q.  You weren't told that smoldering had been seen in the bin

23    before you got there; is that fair to say?

24    A.  Correct.

25    Q.  You hadn't been told that the aeration pipe had heated up

1    and melted a rubber gasket, true?

2    A.   True.

3    Q.   You hadn't been told that folks there suspected there was a

4    fire in the bin, true?

5    A.   True.

6    Q.   Would it be fair to believe, and you went through the

7    timing of the events, but as soon as you formed in your mind

8    that there was a problem here, or even on potential problem,

9    that you had started to take steps, and, in fact, involved

10   ConAgra to get lines run up to the bin for water, that's one of

11   the things you do?

12          MR. PATTON:   Still object to him testifying.

13          THE COURT:   Overruled.

14    Q (BY MR. TAXMAN:)  You can go ahead.

15   A.   Correct.

16   Q.   And please tell us, how big were the lines that you had

17   available to you on the job?

18   A.   A garden hose.

19   Q.   And what kind of line -- and you wanted fire hose lines

20   because they were bigger and had a better capacity for dumping

21   water?

22   A.   Well, that way if we did need the fire department, all they

23   had to do is just pull a line over from their truck right to

24   the hose and hook it up, and they were in business.  They

25   didn't have to spend the time to pull a hose up there.

Cross Examination - Flitsch, Melvin (Beckers)

1   *Q.* Because you had a bad feeling.  It had gone good so far,

2   you hadn't been given all this data, and you wanted to take

3   some precautions, fair to say?

4   *A.* True.

5   *Q.* You were asking for help; is that fair to say?

6   *A.* Yes.

7   *Q.* You have been pretty candid in your testimony, and I know

8   hindsight is 20/20, and please don't take offense when I ask

9   you this question:  But when you look at everything the way it

10  developed, I think you are admitting freely that you might have

11  made a mistake by not calling the fire department sooner.

12          *MR. PATTON:*  Object to this line of questioning.

13          *THE COURT:*  It is directly on what you asked.

14          *MR. PATTON:*  It is testifying.

15          *THE COURT:*  The first part was.  Why don't you just

16  rephrase the whole thing.

17          *MR. TAXMAN:*  Certainly.

18   *Q (BY MR. TAXMAN:)* You have given your testimony.  I think

19  you've admitted quite candidly, in fact, you might have made a

20  mistake, and you are man enough to admit it, right?

21  *A.* Correct.

22  *Q.* You weren't the only guy out there, sir.

23     Godfrey Friedt formed an opinion that the fire department

24  shouldn't have been called, he made a mistake too, didn't he?

25          *MR. PATTON:*  Objection, relevance and foundation with

1    this witness.  Calling for an opinion.

2         *THE COURT:*  Sustained, not on the opinion, but the

3    relevance.  I think this witness opining as to somebody else

4    making a mistake is inappropriate.  That's the jury's

5    determination.

6         *MR. TAXMAN:*  Okay.

7    **Q.   (BY MR. TAXMAN:)**  If Godfrey Friedt had exercised his

8    judgment and his authority on that day to call the fire

9    department, would you have stood in his way?

10   *A.*  No.

11   *Q.*  Did Godfrey Friedt need you to tell him when he should

12   form, in his own mind, the opinion as to when he should pull

13   the trigger as far as calling the fire department?

14   *A.*  I never in such way tried to do that to him.

15   *Q.*  You wouldn't do that, would you?

16   *A.*  And I wouldn't either.

17   *Q.*  If ConAgra wanted to stop the work of you or your crew

18   members for safety reasons on this job, anyone of these guys

19   would have stopped immediately in their tracks, is that true?

20   *A.*  Correct.

21   *Q.*  If Sean Belcher or Alan Bindel or Godfrey Friedt told any

22   one of you guys to jump, you would say how high, fair to say?

23        *MR. PATTON:*  Objection.  Objection to the form of the

24   question.

25        *THE COURT:*  Overruled.  It is rhetorical.

Cross Examination - Flitsch, Melvin (Beckers)

1    *A.*  Yes.

2         *MR. TAXMAN:*  That's all I have.  Thank you.

3         *THE COURT:*  Mr. Dunn.

**CROSS EXAMINATION**

5    *Q (BY MR. DUNN:)* Good afternoon, Mr. Flitsch.  My name is

6    Colin Dunn, and I represent Robert Schmidt and John Jentz.

7    Okay?

8    *A.*  You're who?

9    *Q.*  My name is Colin Dunn.  I represent Robert Schmidt and --

10   *A.*  I just missed your -- I missed your name is all.

11   *Q.*  Okay.  I met you earlier today, right?

12   *A.*  Yep, correct.

13   *Q.*  You told us before that you were never told by ConAgra that

14   there was a fire in this bin prior to getting out to the

15   facility on April 19th, correct?

16   *A.*  No one thought there was a fire in the bin, correct.

17   *Q.*  On April 27th, though, you actually did see flame coming

18   out of the aeration fan?

19   *A.*  After lunch.

20   *Q.*  And that was after lunch.  And who else was standing right

21   near you when that happened?

22   *A.*  I'm not sure who all was there.  I mean, Godfrey could have

23   been there.  I'm not sure which one of our co-workers were

24   there.

25   *Q.*  Well, Godfrey told us yesterday that he was standing there.

1    Do you have any reason to disagree with that?

2    A.  No, sir.

3    Q.  Okay.  And at that time, Robert would have been up on the

4    roof, right?

5    A.  That's very possible, yes.  That should have been about the

6    same time frame.

7    Q.  And John Jentz would have been down in the tunnel, right?

8    A.  I honestly don't remember where John was at, at that

9    particular moment.

10   Q.  You don't remember him standing next to you, right?

11   A.  Not next to me, no.  But I don't remember where he was,

12   either.

13   Q.  Were you ever told, prior to getting out to the facility,

14   that ConAgra employees had been fighting a fire in that been

15   and dumped a few thousand gallons of water into the bin the

16   weekend before you got out there?

17            MR. PATTON:  Objection to the form of the question.

18   Facts not in evidence.

19            THE COURT:  Overruled.

20   A.  I heard something about water getting put in the bin with a

21   garden hose.  How much, I don't know.

22   Q.  And they had put so much water in the bin that when you

23   opened it on April 20th, it had gone all the way down to the

24   opening there, and it was causing a problem for you getting it

25   out, right?

1   *A.*  To start with, correct.

2   *Q.*  You were asked some questions about the wheat trucks

3   dumping.  Do you remember those questions?

4   *A.*  Yes.

5   *Q.*  And you objected to that, right?

6   *A.*  Correct.

7   *Q.*  My notes have it that you told Sean that you were concerned

8   about that, the trucks dumping, right?

9   *A.*  I was concerned about dumping wheat trucks, yes.

10   *Q.*  And, specifically, you were concerned about a possible

11   explosion or a new ignition source in that bin, right?

12   *A.*  Correct.

13   *Q.*  And Robert told us that he complained to you about that.

14   Do you remember that?

15   *A.*  Yes.

16   *Q.*  And then when you talked to Sean and said, Sean, I have a

17   problem with this, Sean's response to you was, We're running

18   out of wheat, right?

19   *A.*  That's correct.

20   *Q.*  Not, Oh, we'll stop immediately.  We're running out of

21   wheat, right?

22   *A.*  Correct.

23   *Q.*  Mr. Durkin asked you some questions about phone calls with

24   Godfrey Friedt and A.Y., Anthony Yount, in Omaha, right?  Do

25   you remember those questions?

1   A.   The times of the phone calls and just like that?

2   Q.   Just the questions that he asked you.  Do you remember

3   those questions that he was asking?  Not the times, but just

4   general questions.

5   A.   General questions, yes.

6   Q.   And you understood that Mr. Yount was a fellow out in

7   Omaha, right?

8   A.   Mr. Whom?

9   Q.   Anthony Yount.  You ever -- you ever heard of him?

10   A.   I heard of Anthony, I don't ever remember meeting him.

11   Q.   Or talking to him, right?

12   A.   Um, no.

13   Q.   So at no time in the week you were there, between the 19th

14   and the 27th, did you ever talk to Anthony Yount, correct?

15   A.   No, I didn't talk to him at all that week.

16   Q.   Including on the 27th, right?

17   A.   Correct.

18   Q.   Including after telling Godfrey Friedt, I have a bad

19   feeling about this, right?

20   A.   Right.

21   Q.   Including after telling Godfrey Friedt, Call the fire

22   department, on several occasions, right?

23   A.   Correct.

24   Q.   He never once asked you, Why don't you talk to Anthony

25   Yount here in Omaha.  He's the safety guy.  He never asked you

1    that, did he?

2             *MR. PATTON:*  Objection, relevance.

3             *THE COURT:*  Overruled.

4    *A.*  No, he didn't.

5     **Q (BY MR. DUNN:)** And you never, not once, saw Anthony Yount

6    out at that facility during your time out there?

7    *A.*  Not at that facility, no.

8             *MR. DUNN:*  I have no further questions, your Honor.

9    Thank you.

10            *THE COURT:*  Mr. Patton.

11            *MR. PATTON:*  Just a couple follow-up.

12                    **REDIRECT EXAMINATION**

13   **Q.  (BY MR. PATTON:)**  Mr. Flitsch, I have two very limited

14   areas I'm going to ask you questions on.  Okay?

15       First one is, if you felt it was important enough at any

16   time to have the fire department be on standby, you could have

17   done it yourself, agree?

18   *A.*  Yes, I could have.

19   *Q.*  Okay.  And, lastly, one of these gentlemen asked you about

20   the side manhole.  Do you recall that?

21   *A.*  Yes, sir.

22   *Q.*  Okay.  That was your decision to open up the side manhole

23   on the 27th, right?

24   *A.*  Yes.

25   *Q.*  Okay.  And you weren't looking to Godfrey to give you any

1  direction on where you should be working on this bin, true?

2  A.  True.

3  Q.  Okay.  You open up the manhole, and you were asked some

4  questions about poking away at it.  Do you remember those

5  questions?

6  A.  Correct.

7  Q.  Okay.  And you admitted under questioning by some of these

8  gentlemen that in the afternoon, the air lance was used while

9  hooked up to the compressor to poke at that side manhole, true?

10  A.  True.

11  Q.  Okay.  And just so we're clear, we are talking about the

12  air lance marked Defense Exhibit 365, right?

13      In the afternoon that was used, true?

14  A.  Yes.

15  Q.  Okay.  And it was hooked up to the compressor when it was

16  being used on the afternoon of the 27th, true?

17  A.  Correct.

18  Q.  Okay.  And this is the compressor we're talking about, and

19  that's Exhibit 135, right?

20  A.  Yes.

21  Q.  Okay.  What you were able to do that afternoon is bore a

22  basketball size hole through the side manhole and pierce all

23  the way through to the inside of the bin, true?

24  A.  Yes.

25  Q.  Okay.  So when you opened up that side manhole, you created

1   a basketball hole that went all the way through the pellets,

2   into the open part of the bin, right?

3   A.  Yes.

4   Q.  And you did that with the air lance --

5   A.  No, sir.

6   Q.  -- didn't you?

7           MR. PATTON:  That's all I have.

8           THE COURT:  Mr. Schultz?

9           Mr. Durkin?

10          MR.DURKIN:  Nothing further, your Honor.

11          THE COURT:  Okay.

12          MR. TAXMAN:  Nothing further.  Thank you.

13          THE COURT:  Okay.  Mr. Schultz.

14          MR. SCHULTZ:  Judge, we have three depositions to

15   read.  I think we can get it done by 4:30.

16          THE COURT:  Okay.  I have talked to the jury, and they

17   were willing to stay until 5:30, if that gets all the evidence

18   in today.

19          MR. PATTON:  We just have some statements also, some

20   admissions and statements we are going to read.  The

21   submissions that Mr. Schultz is going to read are also part of

22   the ConAgra submissions, so we are adopting those that he is

23   reading.  And subject to gathering all these exhibits that

24   we've marked over and moving them into evidence, your Honor,

25   ConAgra rests.

Redirect Examination - Flitsch, Melvin (ConAgra)

1            *THE COURT:*  Okay.

2            Mr. Schultz.

3            *MR. SCHULTZ:*  Okay.

4            *THE COURT:*  So, folks, we have depositions for you

5    now.  The same ruling applies.  Consider them as live testimony

6    in the case.

7            Jason, are you going to read?

8            *MR. MOORE:*  I'm going to ask the questions, and

9    Mr. Schultz is going to be the witness.

10            *COURT REPORTER:*  Judge, does he want me to take these

11    down or...

12            *THE COURT:*  Can we submit these to the court reporter,

13    then, so she doesn't take them down?

14            *MR. MOORE:*  Yes.  We will mark them when we are done

15    and give them to you.

16            *THE COURT:*  Okay.  Great.

17            Will we need her, then?

18            *COURT REPORTER:*  Oh, I'll stay.  Yeah.

19            I'll just make a reference to the exhibit number,

20    Judge.

21            *THE COURT:*  Okay.

22            *COURT REPORTER:*  We will mark them as an exhibit and

23    will make a reference.  I will get you a pen.

24            *MR. SCHULTZ:*  Where did we leave off on exhibits?

25            *COURTROOM DEPUTY:*  West Side.  Cathy Rihanek is

Redirect Examination - Flitsch, Melvin (ConAgra)

 1   Number 14.  We are ready to go.

 2        *MR. MOORE:*  Ladies and gentlemen I'm Jason Moore for

 3   West Side Salvage; John Schultz is going to play the part of

 4   Cathy Rihanek.  She is the contract administrator for ConAgra

 5   that's based in Omaha.  I'm going to read portions that was

 6   taken back in September of 2011.  May it please the Court.

 7        *THE COURT:*  You may.

 8   *(Exhibit 14, Deposition of Cathy Rihanek, as delineated by*

 9                *attorneys, read to the jury).*

10        *THE COURT:*  Show it now.

11        *MR. MOORE:*  Use the ELMO.  The question was:  "Do you

12   recognize the document or documents I've put in front of you?"

13        Your Honor, I move to admit West Side Salvage

14   Number 2.

15        *THE COURT:*  Admitted.

16           *(Exhibit WSS 2 received in evidence).*

17        *THE COURT:*  How are we going to refer to that?

18        *MR. MOORE:*  The exhibit that I've previously marked

19   has been WSS number whatever number it is to differentiate

20   between the exhibits that the other defendant has so the

21   stickers say WSS number.

22        *THE COURT:*  Okay.

23   *(Reading of Exhibit 14, Cathy Rihanek deposition, resumed).*

24        *MR. MOORE:*  For the record this is West Side Salvage

25   Number 3 exhibit shown to jury.  Sorry I have the wrong exhibit

1    hold on a second.

2          This is the one I meant to put up.  This is the one in

3    your Exhibit 393.

4       *(Reading of Exhibit 14, Cathy Rihanek deposition, resumed).*

5          MR. MOORE:  ConAgra Defendants Exhibit Number 93.

6          MR. OUSKA:  If I may judge no objection.

7          MR. MOORE:  It's been admitted.

8          THE COURT:  Admitted.

9             *(Exhibit Dfts' 93 received in evidence)*

10     *(Reading of Exhibit 14, Cathy Rihanek deposition, resumed).*

11         MR. MOORE:  For the record this is WSS Number 3.

12   John, I've shown this to you.

13         MR. OUSKA:  Yep.

14     *(Reading of Exhibit 14, Cathy Rihanek deposition, resumed).*

15         MR. MOORE:  Judge, I will move for the admission of

16   WSS Number 3.

17         MR. OUSKA:  No objection.

18         THE COURT:  Admitted no objection.

19            *(Exhibit WSS 3 received in evidence)*

20        *(Reading of Cathy Rihanek deposition resumed).*

21         MR. MOORE:  That's it.

22         MR. SCHULTZ:  That's been marked as Exhibit 14.

23         THE COURT:  Right.  Okay.

24         This will be Adam Nanez.

25         THE COURT:  This is Exhibit 15 Adam Nanez deposition.

1          *(Exhibit 15, Adam Nanez deposition, as delineationed by*

2                          *attorneys, read to the jury).*

3          MR. OUSKA:  If I may for Exhibit 120 we would refer

4   Defendant's Exhibit 135 to reflect the air compressor.

5          THE COURT:  (to jury:)  Just so you know what is

6   happening.  When lawyers take the deposition months ago they

7   mark the exhibits certain numbers.  But at trial they get

8   marked differently.  But they are the same exhibit.  That's why

9   it is a little confusing.

10          MR. MOORE:  Page 71

11          *(Reading of Adam Nanez deposition resumed).*

12          MR. SCHULTZ:  That's the completion and that's

13   Exhibit 15, Judge.

14          THE COURT:  Next would be Exhibit 16, Anthony Yount.

15          MR. MOORE:  Do you have your copy?

16          MR. SCHULTZ:  I've got a copy, yeah.

17          THE COURT:  This is Anthony Yount.  Is this the last?

18          MR. DUNN:  We have the video that's eight minutes

19   long.

20          MR. OUSKA:  We have statements, but before that a

21   sidebar.

22          THE COURT:  We are fine.

23          MR. SCHULTZ:  This is Anthony Yount, ConAgra.  His

24   deposition taken on August 11th the 2011.  Page 28 Line 22.

25          *(Exhibit 16, deposition of Anthony Yount, as delineated by*

1                          *attorneys, read to jury)*

2          THE COURT:  That completes the deposition of Anthony

3   Yount.

4          THE COURT:  Anything else on behalf of the West Side

5   Salvage?

6          MR. SCHULTZ:  Yeah, we do.  By stipulation of

7   plaintiffs' counsel, we have an updated financial statement

8   from West Side Salvage to submit on the punitive claim.

9          THE COURT:  Okay.

10         MR. PATTON:  And we have some admissions too.

11         THE COURT:  Okay.  Let's do those.

12         MR. PATTON:  They're short.

13         MR. TAXMAN:  Judge, we haven't seen these.

14         Yeah, they're new.

15         THE COURT:  Okay.  Why don't you take a look at them.

16         MR. SCHULTZ:  Judge, by stipulation with plaintiffs'

17  counsel, Defendant West Side Salvage introduces Exhibit 17,

18  which is the financial statements of West Side Salvage from

19  December 31, 2011, and 2010.

20         THE COURT:  Okay.  17 admitted, no objection.

21             *(Exhibit Dfts' 17 received in evidence)*

22         MR. SCHULTZ:  Thank you.

23         THE COURT:  You are reserving your position on

24  punitive damages, so some admissions to read?

25         MR. CLIFFORD:  Well, that we're hearing about right

Examination - Yount, Anthony (depo excerpts)

1    now, so...

2         *MR.DURKIN:*  We would need to talk to you.

3         *THE COURT:*  Okay.  Why don't we do this, can we play

4    that video, and you folks talk out there?

5         *MR. CLIFFORD:*  Sure, that's a good idea.

6         *THE COURT:*  Okay.  And I know what this video is, and

7    I've waited until after the close of all the evidence, and I

8    believe it is all, except for these admissions, and I'm

9    prepared to rule.  It can be played.

10        *MR. OUSKA:*  Can we make a record before the tape is

11   played, Judge?

12        *THE COURT:*  Okay.  Is it what I think, is ConAgra

13   okay.  And I know there is an objection to it, but I reserve

14   ruling pending all.  Is there something else that hasn't been

15   argued that I don't know about?

16        *MR. OUSKA:*  Just our objection to the playing of it,

17   Judge.

18        *THE COURT:*  Okay.

19        Folks, could you take a five-minute break.  We need to

20   do something on the record here.

21      *(Following proceedings held outside presence of jury:)*

22        *THE COURT:*  We are in open court out of the jury.

23   Just for the record, West Side just read the deposition

24   excerpts of Exhibits 14, 15, and 16.  The witnesses were

25   Rihanek, Nanez, and Yount.  The entire depos are going to be

 1   part of the record.  The excerpts that were read were either

 2   underlined or highlighted, I believe.

 3            MR. SCHULTZ:  Yes.

 4            THE COURT:  All right.

 5            MR.DURKIN:  Judge.

 6            MR. OUSKA:  May I?

 7            THE COURT:  Sure.

 8            MR.DURKIN:  That's fine.

 9            MR. OUSKA:  We were -- there are two things we have to

10   discuss with you outside the presence.  First thing, your

11   Honor, can we talk about the statements first?  Do you want to

12   talk about that?

13            MR. PATTON:  Yeah.  Let's do the statements.  It is

14   simple, Judge.  These are the statements of Robert Schmidt.  I

15   had given them to Robert Schmidt.  He authenticated that those

16   were his statements.  He had no changes to make.  I moved for

17   them to be admitted.  There was an issue about that.  You said

18   you will reserve.  And you said that as long as the statements

19   are narrow, we could read those as admissions, and that's what

20   we are doing now.

21            MR. CLIFFORD:  The response -- I'm sorry.  Are you

22   done?

23            MR. PATTON:  Yes.

24            MR. CLIFFORD:  The response is, is that I don't

25   believe what counsel just said the Court said is an accurate

1    statement.  We are -- we do not dispute, and never have, the

2    authentication of these statements, Number 1.  Number 2, we, in

3    fact, I believe every time any statement was used with Schmidt,

4    it was either to impeach him or to refresh his memory.

5          He is not -- and then, finally, he is not a member of

6    the control group or any such thing that there's an admission

7    that should be properly asserted against him, against, what is

8    it, West Side or A&J.  I presume they're saying it is an

9    admission against his personal interest, which certainly would

10   be something the Court might consider.  But we think these are

11   improper in use and form.

12         MR. TAXMAN:  And the last objection, Judge, is that we

13   have not seen any of what they asked, that they're asking the

14   Court to allow them to read.  So they've never, ever tendered

15   us what they want to play.

16         THE COURT:  One thing at a time.  First of all, when

17   Mr. Patton was using those, I ruled that they were not

18   independently admissible at that juncture because they were

19   used to impeach him.  I did indicate that they may be available

20   as admissions, but he wasn't using them at that time.  So

21   that's the first issue.

22         Second issue is, if these are truly Mr. Schmidt's

23   statements and they are truly admissions, they would be the

24   admissions against him individually, but not against West Side

25   or anybody else.  There is no indication that Mr. Schmidt was

1    in the control group such that he could make any admissions

2    against West Side or anybody else.

3            The third thing is, if they want to read certain

4    admissions, out of fairness and the rule of completeness, you

5    have a right to read any other portion of it also.

6            MR. ESPASITO:  We --

7            COURT REPORTER:  May I ask who you are.

8            MR. PATTON:  Paul Espasito [ph].

9            THE COURT:  I'm sorry.  That's up to Mr. Patton.

10           MR. PATTON:  Well, as long as you are agreeing, I was

11   going to have Paul just cite the cases where you can read

12   statements as admissions of a party opponent.

13           THE COURT:  If they are truly admissions.

14           MR. CLIFFORD:  We don't dispute that as a matter of

15   law.  What we are disputing is, it would have been nice if

16   somebody would have followed up on what they represented to the

17   Court they might want to do and tell us before, you know,

18   almost 5:00 at night on the last day of trial, when the jury is

19   being held over in the first place.

20           THE COURT:  Okay.

21           MR. TAXMAN:  We haven't had an opportunity to even

22   make --

23           MR. CLIFFORD:  We haven't had an opportunity to view

24   these, we don't have an opportunity to --

25           MR. PATTON:  There's not that many, and they're

1      welcome to look at them while they play the tape.

2            THE COURT:  While the tape is being played.  Look at

3      them.  If you think you need more time, what I will do is, is

4      let you counter-designate and read when I bring the jury back

5      on Tuesday.

6            MR. CLIFFORD:  Well, let's see what -- let's see what

7      they've got.  Maybe they got one -- they've got one, they've

8      got ten.  It looks like they're loaded for bear there.

9            THE COURT:  First of all, what is the number of the

10     tapes, the exhibit?

11           MR. TAXMAN:  It would be Exhibit 363.

12           COURT REPORTER:  363?

13           MR. TAXMAN:  363.  And we will tender it.  We don't

14     have a copy right now, your Honor, but we will tender a copy.

15           THE COURT:  Okay.  And articulate for the record what

16     it is.

17           MR. TAXMAN:  It is the deposition, videotaped

18     deposition of Karen Tabek, T-A-B-E-K, who was our economist

19     expert to discuss the net worth of ConAgra in relation to the

20     punitive damage claim.  It is one of the elements that the jury

21     is to consider.

22           THE COURT:  By way of history, our plaintiffs had

23     wanted to play this tape at the conclusion of their case, which

24     would be part of their burden, part of their proof before they

25     rested.  However, everybody has stipulated that the Court could

1   wait until it's heard all of the evidence in the case before

2   ruling on the admissibility of it.

3          So there is an objection to this by ConAgra.

4          Mr. Ouska.

5          *MR. OUSKA:*  Yes, thank you.  Judge, again, we are

6   renewing our objection to the playing of this tape which talks

7   about the net worth of ConAgra.  The sole purpose of this is

8   for the issue regarding punitive damages.  Not to belabor the

9   point, you know our position with regard to punitive damages.

10  Your Honor has correctly said that he would hold off on playing

11  this tape until he has heard all the evidence.

12         I'm not going to repeat the evidence, but I do want to

13  point out, you heard the testimony yesterday of Godfrey Friedt,

14  the main corporate person from ConAgra, and in addition you

15  heard the testimony today of Melvin Flitsch.  Looking at the

16  conduct of -- solely of ConAgra, we believe that based upon all

17  the evidence, that the conduct of ConAgra certainly has not

18  risen to the willful and wanton standard, which is necessary

19  for punitive damages.

20         I'd like to point out that willful and wanton

21  standard, as applied to the issue of punitive damages, is

22  almost -- is certainly higher than mere negligence.  We know

23  that.  And it almost rises to the level of criminal.  I think

24  it's been deemed by the courts as quasi-criminal when you are

25  looking at the burden of proof, willful wanton, as applied to

1  punitive damages.

2       In addition, Judge, I would point out again 3501, the

3  pattern jury instructions in Illinois, which says, "in addition

4  to compensatory damages, the law permits you under certain

5  circumstances to award punitive damages, period.  If you find

6  that" -- ConAgra in this case -- "the conduct was fraudulent,

7  intentional, willful and wanton".  That's the first threshold.

8       We would submit the conduct in this particular case

9  from the evidence, all the evidence, does not show any willful

10  and wanton conduct.  But moreover, not only does the conduct

11  have to be willful and wanton or rise to the level of willful

12  and wanton, in addition it has to proximately cause the injury

13  to the plaintiff.

14       So we would submit that not only has the conduct not

15  risen to the level of willful and wanton, but even if you were

16  to assume for argument's sake that it had, that conduct did not

17  proximately cause the injury to these plaintiffs.  You heard

18  today what conduct caused the injury to the plaintiffs, sending

19  them back down after the evacuation or the fire department had

20  been called.  That is the act.  That is the -- that is not an

21  act attributed -- attributable to ConAgra and, therefore,

22  Judge, we believe that punitive damages do not apply.

23       One final thing, Judge.  In addition, if I can read on

24  to that instruction, and, again, this is 3501.  The third prong

25  I talked about willful and wanton.  I talked about proximate

1    cause.  And the third prong says, "And if you believe that

2    justice and the public good require it."  Require it.  That is

3    the imposition of punitive damages, "you may award an amount of

4    money which will punish ConAgra."

5         Again, Judge, it's our assertion and our belief, based

6    upon the evidence, the entire evidence which you have heard in

7    this case to date, that the public good and justice does not

8    require the imposition of punitive damages.  I'll end my

9    argument there.  You know the facts of the case.

10         I just want to point out the witnesses have testified

11    recently -- being Godfrey Friedt for ConAgra and Mr. Melvin

12    Flitsch, as well as Mr. Gene Schwers, on behalf of West Side.

13    And based upon that and based upon the evidence, Judge, again,

14    we say that punitive damages has no place against ConAgra in

15    this case, and ask that this tape not be played.

16         Thank you.

17         THE COURT:  For the plaintiffs.

18         MR. CLIFFORD:  Your Honor, we certainly oppose the

19    remarks just made by counsel.  It's a bit more sensitive than I

20    expected for the reasons that we have articulated to you in our

21    conferences.  We believe that it is fair and appropriate to

22    allow this tape to be played.  I don't really have anything new

23    to add to the discussion.  If anything, Mr. Friedt and

24    Mr. Flitsch offered testimony that enforces or re-enforces the

25    arguments we made in support of the claim going to the trier.

1              *THE COURT:*  Mr. Taxman.

2              *MR. TAXMAN:*  Yes, Judge.  On the record, I believe

3      we've had some comments before.  But there is direct evidence

4      of willful and utter indifference to the safety.  Let's start

5      with Alan Bindel, who testified in this courtroom, that if he

6      had followed the written policies of ConAgra as far as fire

7      prevention and emergency evacuation, if he had seen the factors

8      that we have listed in evidence in this case, he would have

9      called the fire department.  He said here under oath that

10     instead of doing that, he did the opposite, 180 degrees the

11     opposite.  There is no greater evidence than willful conduct

12     there.

13             In addition, the retained expert of ConAgra in this

14     case said that Anthony Yount had two lifetimes to prevent this

15     injury.  He knew that this was a hot bin situation.  He knew it

16     was smoldering, he knew there was combustion for a week with

17     the potential for explosion.  He did nothing.  He didn't go

18     there, he didn't exercise his authority and stop the work.

19             And Godfrey Friedt, who testified yesterday, the Court

20     heard his testimony.  He also had the opportunity and knew what

21     was going on, was making calls to Omaha instead of the fire

22     department.  And we had this tragedy.

23             So the evidence does support the imposition of

24     punitive damages to go to this jury to make that determination.

25             *MR. SCHULTZ:*  Judge, I'm sorry.

1          *THE COURT:*  Mr. Dunn.

2          Mr. Schultz.

3          *MR. SCHULTZ:*  We offered the financials based on your

4    statement the other night that you are going to submit

5    punitive, and we will reserve ours for tomorrow.

6          Is that...

7          *THE COURT:*  Well, I -- when you were walking away

8    after I admitted them, I did say that it was subject to you

9    reserving your --

10         *MR. SCHULTZ:*  Tomorrow's record.

11         *THE COURT:*  Yeah, that's -- to make it clear, you did

12   not waive anything by submitting that.  It's been very clear in

13   the past three nights that we've met off the record, that I was

14   going to submit punitive against West Side, as well as ConAgra.

15         Okay.  First of all, I do not believe there is

16   evidence of intentional conduct on the part of ConAgra in this

17   case.  However, I do believe that a reasonable jury could find

18   that there was willful and wanton conduct that proximately

19   caused the injuries in this case, and as a result I will let

20   the punitive case go as to ConAgra.

21         In terms of this specific evidence on 35.011 of the

22   elements the jury should consider, if they do believe that it's

23   appropriate to award punitive damages, it is the amount of

24   money necessary to punish the defendant and discourage the

25   defendant and others from future wrongful conduct.  As a

1    result, the net worth of the big corporation is directly

2    relevant of that issue, so it will be played over the objection

3    of Defendant ConAgra.

4         MR. CLIFFORD:  Thank you, sir.

5         As to the admissions, alleged admissions, in our quick

6    review of the material, our observations are that, number one,

7    it's the same information that counsel elicited from the

8    witness stand in his -- I'll call it vigorous examination of

9    Mr. Schmidt.  There's nothing new and, hence, it is, at a

10   minimum, repetitive.  It is, at a minimum, cumulative and not

11   new or different.

12        THE COURT:  Okay.  Let me see them.  I enjoy a rather

13   good memory on certain testimony.  And if it's...

14        MR. TAXMAN:  It is the tabbed pages.

15                           (Respite)

16        THE COURT:  I'm going by memory.  I know you have

17   daily transcripts, so if you want to prove me wrong, do it, and

18   we can take this up Tuesday again.  Is this section right here,

19   where it talks about Robert started whipping the bin Tuesday

20   and was hitting chunks?  Since it was warm, a warm bin, he was

21   visually looking for the core or hot spot.

22        I just don't remember that.  He might have said that.

23   The other things you -- you went into.

24        MR. PATTON:  Okay.  Can we do this?  Can we -- we'll

25   read this part as admission.  I'll make an offer of proof with

1    the other ones that you are rejecting.

2         *THE COURT:*  Sure.

3         *MR. PATTON:*  And then if I have anything, if I have

4    daily transcripts, and I can show the Court.  I didn't get into

5    it.  Bring it up on Tuesday.

6         *THE COURT:*  You bet and so you need.

7         *MR. PATTON:*  You may be right.

8         *MR. CLIFFORD:*  Yeah.

9         *MR. PATTON:*  Okay.

10        *THE COURT:*  Okay.  So we are going to read that.  And

11   then do we do anything else, besides the video?

12        *MR. PATTON:*  Go home.

13        *THE COURT:*  Everybody's ready to rest.

14        *MR. PATTON:*  Yes, sir.

15        *THE COURT:*  Okay.  Then when we are done, I want to

16   spend -- I want to spend a few minutes when we're done today.

17   This is off the record.

18             *(An off-the-record discussion was had)*

19        *THE COURT:*  I'm going to hand you what I have just in

20   a few minutes prepared as a PowerPoint presentation so that I

21   can tell the jury what this procedurally is like, that this is

22   the first flight of arguments.  And so take it, it is very

23   self-explanatory.  Take a look and see if you have any

24   objection to me doing this when we talk tomorrow.  But,

25   basically, I'm going to tell them what the claims are, very

1    generally; that they have to make five decisions, for example,

2    in the Jentz case.  You know, the first four are the -- are the

3    counts, and the fifth is the contribution claim.  I made one

4    copy for each party.  Other issues?

5                    *(An off-the-record discussion was had).*

6           *(Following proceedings held in presence of jury:)*

7           *THE COURT:*  We have one more very short piece of

8    evidence from the defendant, and then a short video from the

9    plaintiffs, and then you will have heard all the evidence in

10   the case.  And I will get you out of here by 5:30.  I didn't

11   say central standard time.

12          Mr. Ouska.

13          *MR. OUSKA:*  Thank you, Judge.

14          Ladies and gentlemen, what I'm going to read to you is

15   a statement that was provided to the -- to the government on

16   June 4th 2010, by Robert Schmidt, and that statement is as

17   follows:

18          "Robert started whipping the bin on Tuesday,

19   April 20th 2010, and was hitting chunks.  Since it was a warm

20   bin, he was visually looking for the core or hot spot."

21          *THE COURT:*  Thank you.

22          *MR. OUSKA:*  Thank you.

23          *THE COURT:*  ConAgra rests.  West Side rests.

24   Everybody rests, except for Plaintiff Jentz, Becker, and

25   Schmidt.

1          *MR. TAXMAN:*  That's correct, Judge.  At this time,

2     your Honor, we would ask if we could play Exhibit 263, which is

3     a deposition of Karen Tabek, who is an economist who will talk

4     about ConAgra's net worth.

5          *MR. CLIFFORD:*  8 minutes.

6          *MR. TAXMAN:*  8 minutes long.

7          *THE COURT:*  Okay, Rick, let's see how this goes here.

8     *(Exhibit 263, video deposition of Karen Grossman Tabak, played*

9                             *for the jury).*

10         *THE COURT:*  Okay, folks.  You have heard all the

11    evidence.  We are going to recess now until Tuesday for you.

12    We are going to work tomorrow and finish the jury instructions

13    and work on exhibits.

14         Here's what Tuesday is going to look like for you --

15    it is going to be a long day:  What I would like to do is get

16    all the closing arguments and the jury instructions to you on

17    Tuesday and then have you start deliberating on Wednesday.

18         And the reason I say that is there have been an awful

19    lot of exhibits, it's been a long case, and it's an important

20    case to all the parties.  Because of that I'm going to give

21    them a lot of time to argue the case to you.

22         Additionally, it is going to take me a long time to

23    read the instructions to you.  They are very voluminous, so

24    I'll read them in parts.  I'm going to start by reading some

25    instructions, have arguments, and then I will finish with

1    instructions.

2             And I think it could be a very long day.  We could

3    start at nine -- I'm going to supply lunch on Tuesday.

4             Can we do that?

5             Yeah, we can still order it tomorrow.

6             So I will supply lunch.  As soon as you are done

7    eating, we will start up again.  So that we don't waste any

8    time so maybe we can get done in a half hour or 45 minutes our

9    lunch.

10            And then if you could plan to stay until 6:00 -- I'm

11   hoping it is not going to take that but just in case.  And then

12   we will come back on Wednesday and you will start deliberating.

13   And then your time is your own and you control your own time.

14            Okay.  So forget about the case for the next four

15   days.  And, obviously, don't do any -- and you know the end of

16   that phrase by now.

17            Okay.  Thanks, folks.

18            *COURTROOM BAILIFF:*  All rise.

19                              -oOo-

20

21

22

23

24

25

1                          REPORTER'S CERTIFICATE

2          I, Molly N. Clayton, RPR, FCRR, Official Court Reporter

3     for the U.S. District Court, Southern District of Illinois, do

4     hereby certify that I reported with mechanical stenography the

5     proceedings contained in pages v.12, pgs 107 - 230; and that

6     the same is a full, true, correct and complete transcript from

7     the record of proceedings in the above-entitled matter.

8

9                    DATED this 25th day of May, 2012.

10

11                                    *Molly Clayton, RPR*

12                         _____

13

14

15

16

17

18

19

20

21

22

23

24

25