1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

JOHN W. JENTZ,              )      10-CV-474-MJR
          Plaintiff,       )
          Vs.              )      Consolidated with:
CONAGRA FOODS, INC., et al)
          Defendants,      )
JUSTIN BECKER and AMBER    )
BECKER,                    )      10-CV-952-MJR
          Plaintiffs,      )
          VS.              )
CONAGRA FOODS, INC., et al)
          Defendants,      )
                           )
ROBERT SCHMIDT,            )
          Plaintiffs,      )
          Vs.              )      11-CV-391-MJR
CONAGRA FOODS, INC., et al)
          Defendants,   )      May 30, 2012

          TRANSCRIPT OF TRIAL, VOLUME XV,
     BEFORE THE HONORABLE MICHAEL J. REAGAN,
     UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiffs:      Clifford Law Offices, P.C.,
                         By:  Robert A. Clifford
                              Kevin P. Durkin
                              Colin H. Dunn
                         120 North LaSalle Street
                         Suite 3100
                         Chicago, IL  60602

For Plaintiffs           Anesi, Ozmon, Rodin, Novak & Kohen
Justin and Amber Becker  By:  Mark Taxman
                              Sean Murray
                              Julie Levinson Pustilnik
                         161 N. Clark Street
                         Chicago, IL  60601

For Defendant            Patton & Ryan
ConAgra Foods, Inc.,     By:  John Patton, Jr
                              John Ouska
                         330 N. Wabash Avenue
                         Suite 2900
                         Chicago, IL  60611
```

```
 1                              Husch Blackwell, LLP
                                By:   Joseph Orlet
 2                                    Brandan Mueller
                                      Joseph Kilpatrick
 3                              190 Carondelet Plaza
                                Suite 600
 4                              St. Louis, MO  63105

 5    West Side Salvage, Inc.   Franke, Schultz & Mullen, P.C.
                                By:   John Schultz
 6                                    Jason Moore
                                8900 Ward Parkway
 7                              Kansas City,  MO  64114

 8    Court Reporter:           Barbara Kniepmann
                                750 Missouri Avenue
 9                              East St. Louis, IL  62202

10

11

12

13

14

15

16

17    Proceedings recorded by mechanical stenography, transcript
      produced by computer.
18

19

20

21

22

23

24

25
```

3

1          THE COURT:  We're in open Court out of the presence

2     of the jury.  Before I bring the jury in for rebuttal,

3     Mr. Patton had something to place on the record.  Mr. Patton?

4          MR. PATTON:  Yes, Judge.  I wanted to express my

5     concern about Mr. Schultz's closing statement in a couple of

6     respects.

7               First, he made an argument that certainly advocated

8     for punitive damages against ConAgra when he does not have a

9     cross claim against ConAgra for willful and wanton conduct,

10    but perhaps more surprising is that the plaintiffs have asked

11    for over $130 million, somewhere in that ballpark, and his

12    client only has $12 million in insurance coverage, so if the

13    jury were to find against West Side and approach the numbers

14    that have been asked for in this case, that would

15    theoretically bankrupt West Side, yet Mr. Schultz made no

16    arguments to this jury about damages, none whatsoever.  I

17    would think that if I were the president of West Side, I would

18    have great concern about the fact that damages weren't

19    commented on at all by their lawyer.  So you can either draw

20    the conclusion that Mr. Schultz did not present a very

21    competent defense of his client, though I don't think that is

22    right because I know he is a good lawyer.  The other

23    conclusion is that there has been a deal made in this case on

24    behalf of West Side with the plaintiffs, so that if there is a

25    judgment against his client, one deal would be that there is a

4

1   high low.  Another deal would be that there is an agreement

2   they wouldn't execute against West Side above the $12 million

3   policy limits.  I think there is ample evidence by that type

4   of argument.

5           I would say that at the front end of this case, I did

6   ask Mr. Schultz if he was intending to challenge damages in

7   this case and he said he was, yet throughout the trial they

8   asked no questions of any of the damage witnesses and put on

9   no damage defense in the closing statements, so the relief

10  we're asking for, we would like a hearing conducted by Your

11  Honor with all of the attorneys to ascertain whether or not

12  there is an agreement between them because I think that should

13  be brought to the attention of the jury.  That is number one.

14          Number two, I would like to --

15          THE COURT:  Do you have any authority for that?

16          MR. PATTON:  Whether you should conduct a hearing?

17          THE COURT:  Whether I can or whether you are entitled

18  to one.

19          MR. PATTON:  The only case that I would cite at this

20  point is the *Chessler* decision, and that was a case that

21  happened up in the Northern District.  It is an unpublished

22  decision, because I don't think the situation really happens

23  that much when attorneys, as officers of the Court, reach a

24  settlement and we have discovery outstanding to all of these

25  attorneys that if there is a deal you should disclose it and

5

1    they haven't.

2            THE COURT:  Let me ask you this.  I am going outside

3    of the record, but I happen to know certain things.  Who is

4    the insurer for West Side?

5            MR. PATTON:  I am not privy to those details.

6            THE COURT:  Who is the insurer?

7            MR. SCHULTZ:  First Colony and RSUI.

8            THE COURT:  It is not Ace Insurance?

9            MR. PATTON:  That is my insurance.

10           THE COURT:  I knew Ace was involved somewhere.  The

11   *Chessler* decision?

12           MR. PATTON:  It is the *Chessler* decision.  That was

13   one that actually Mr. Esposito was involved in and I'll cite

14   the West Law, 2001 West Law 1593142, Northern District of

15   Illinois, 2001.  And a friend of mine, Bill Johnson, was

16   involved in that case.  He had the defendant and there was a

17   deal that apparently was struck between the third party

18   defendant and the plaintiff and they didn't disclose it.  Once

19   the verdict was in, then they announced that they had made a

20   deal.  And when you read this decision, I think you will find

21   that the Federal Judge, it was a Magistrate Brown, had some

22   real problems with that and ordered a new trial based upon the

23   fact that there was an agreement that she felt the way that

24   the evidence was presented and the arguments of the lawyers,

25   that there probably was a deal that was arranged before and

6

1    that prejudiced the defendant.  So I wish I had better

2    precedent for you.  I don't think this is a situation that

3    comes out often.

4         THE COURT:  Well, there is a case of *Lewis v.*

5    *Illinois Central Railroad,* Justice Harriston, in which there

6    was an allegation that plaintiff's counsel teamed up with the

7    defense counsel.  What actually happened in that case, it was

8    just to the benefit of defense counsel, and I don't know if it

9    was target defendant or third party defendant, but basically

10   it was trial strategy.  Mr. Schultz doesn't say much, but when

11   he talks, this jury listens.  Mr. Schultz, your response?

12        MR. SCHULTZ:  You know, as I told John earlier, there

13   is no deal.  I resent the implication that there is.  I would

14   have told you when you asked me.  As a trial strategy

15   decision, I have to figure out the best way for my client to

16   get out of this case.  I think it is more than ConAgra arguing

17   no fault to us.  Frankly, I think suggesting that these

18   gentlemen, Becker and Jentz, get three to $5 million is

19   insulting.  I can't make that argument with a straight face.

20        Damages have been addressed by ConAgra throughout the

21   case.  They didn't need to be addressed twice by me.  I

22   thought that would be a waste of the jury time.  There is no

23   need for a hearing.  There is no deal.  We argued there should

24   be no fault placed on us.  That is a trial strategy decision.

25   I resent the comment that the defense was incompetent.  We're

1  in a tough position in this case.

2       THE COURT:  I don't think you are incompetent.  I

3  think the defense you put on, and everybody worked on the case

4  very hard.  It is trial strategy.  I understand that.

5       MR. SCHULTZ:  That is all it is.  There is no deal.

6  They can confirm that.

7       THE COURT:  I am taking the representation from all

8  of you as officers of the Court.  I don't intend to put anyone

9  under oath unless there is authority.  I consider you under

10  oath as officers of the Court as you make representations to

11  me.

12       MR. CLIFFORD:  I confess to being taken aback by

13  repeated, baseless, attacks on the professionalism and the

14  integrity of the lawyers here.  The only deal that I know

15  about is the deal by all of us to get what he refers to as a

16  just verdict, to seek justice in this courtroom.  There is no

17  deal of any kind by anyone with anyone, with any insurer, and

18  I find it almost laughable, given everything I know that is

19  not proper for the record here at the moment pertaining to

20  Ace's behavior and approach regarding the potential for an out

21  of Court, non litigation resolution and settlement of the

22  case.  It is remarkable to me.  But I guess that is where

23  we're at at this time of the proceeding.

24       THE COURT:  Mr. Murray?

25       MR. MURRAY:  I will echo what Mr. Clifford said and

1    also confirm there is no such deal.

2           THE COURT:  All right.  Miss Levinson?  I am going to

3    put you all on the spot.  You are all officers of the Court.

4           MS. LEVINSON:  Your Honor, I confirm there is no deal

5    with the Beckers.

6           THE COURT:  Mr. Durkin?

7           MR. DURKIN: Absolutely 100 percent no.

8           THE COURT:  No agreement on high low, no agreement

9    not to execute?

10          MR. DURKIN:  Nothing.

11          THE COURT:  Mr. Dunn?

12          MR. DUNN:  No deal whatsoever, Judge.  I point out

13   that Mr. Patton I think had three sentences on damages, so

14   there wasn't much from Mr. Patton on the way of damages, so

15   goose gander, gander, you know.

16          THE COURT:  Mr. Badgley?

17          MR. BADGLEY:  No, Your Honor, no deals.

18          MR. PATTON:  I have made the record I think I need to

19   make to protect us.  Thank you.

20          THE COURT:  Okay.  Let me make sure the ruling on the

21   record is clear as to the Motion to Conduct a Hearing and as

22   to whether or not there was a change in alignment of the

23   parties.  I have been involved in litigation for many years

24   and I understand that sometimes there are, in fact, agreements

25   made by and between the parties that they consider

1    confidential.  I have always considered side agreements to be

2    something that should be told to the Court because to do

3    otherwise, one could change the alignment of the parties.

4    Secondly, it could create a fraud upon the jury and the Court

5    to have the secret deal that the Court is not privy to.

6           In this particular case I find no reason to believe,

7    based upon the representations of counsel in this case who are

8    officers of the Court, who understand their representations to

9    the Court are not only serious but are subject to serious

10   sanctions, including the loss of their licenses, but I find

11   them to be credible and I find that there is no side deal with

12   respect to settlement, with respect to any kind of set offs

13   with respect to any agreement not to execute, with respect to

14   any high low or any agreements whatsoever.

15          Mr. Schultz, in my view from the beginning of this

16   case, has handled this case on behalf of his client as one

17   where he has great exposure, but has made a conscious effort

18   the best way to defend his client is to stay away from

19   damages, which in this case is certainly understandable

20   because we have some, without a doubt, horribly disfigured and

21   disabled individuals, and in my view probably made a conscious

22   decision that to challenge damages might dilute his challenge

23   to liability.  ConAgra did mention damages, but in a very

24   short manner and suggested a verdict of three to $5 million

25   per plaintiff.  This is a very dangerous case for everybody,

10

1    dangerous for the defendants because of the potential exposure

2    they have.  Mr. Schultz's determination to not challenge

3    damages but try to "walk his client" completely is something I

4    don't quarrel with and my experience with the way he has

5    handled the case, he goes last and, therefore, by the time it

6    is his turn, the jury might be a little tired.  That is why I

7    mentioned what I did to them yesterday about paying particular

8    attention and I found it to be extraordinarily competent.  He

9    is like Merryl Lynch or whatever.  When he speaks, people

10   listen.  Frankly, he doesn't talk much, but when he does, he

11   has something important to say.  To the extent there is any

12   belief that he in any way has not represented his client ably

13   or zealously, I can say with impunity that is absolutely

14   false.

15          Okay, I'll get the jury.

16          (Whereupon the following proceedings were held in

17   open Court, in the presence of the jury.)

18          THE COURT:  Is there anyone who did not follow the

19   Court's instructions with respect to discussing this matter

20   among themselves or with anyone else or done independent

21   research or received or sent any communications regarding the

22   case?  Hearing none at this juncture, we have rebuttal

23   argument on behalf of Plaintiff Jentz from Mr. Durkin, on

24   behalf of Plaintiff Schmidt from Mr. Dunn, and I will do the

25   jury instructions and you will be on your own.  Mr. Durkin?

1       MR. DURKIN:  Good morning, folks.  I think you heard

2   yesterday there would be hours and hours of rebuttal argument.

3   Actually, this will be done pretty quick.  I will try to be as

4   efficient as possible.

5       One of the things I want to talk to you about is the

6   law, the law of the case that the Judge is going to tell you

7   about.  One of the things, one of the important laws, is

8   written up on the screen right now.  It was the duty of the

9   defendant, each defendant, to be free to use ordinary care for

10  the safety of the plaintiffs, Jentz, Schmidt, Becker.  That

11  means it was the duty of each defendant to be free,

12  100 percent free, from negligence.  Okay, this is a case where

13  there is negligence all over the place.  Lots of negligence to

14  share among these defendants.

15      Proximate cause I think you heard yesterday, oh,

16  yeah, the last thing that happened was Mel Flitsch sent these

17  folks back into the tunnel.  Well, yeah, that is not true.  We

18  all know that.  Everyone -- within a minute, the whole world

19  knew that.  Didn't have to have Mel up here to admit he knew

20  it a minute after it happened that was the wrong thing to do.

21  That is not what proximate cause means.  It means a cause that

22  in the natural or ordinary course of events produced the

23  plaintiffs' injury.  It need not be the only cause or the last

24  or nearest cause.  It is sufficient if it combines with

25  another cause resulting in injury.  There are many, many

12

1    causes here.

2         Now let's remember, there was all sorts of things

3    that happened between March 13th and April 27th on ConAgra's

4    watch.  They want you to focus on April 27th, so I think I

5    will talk to you about April 27th, okay, because there are a

6    few things, a few forgotten facts of April 27th that you

7    didn't hear about yesterday.

8         Number one, in the morning Mel is concerned, bad

9    feeling.  Mel tells Godfrey, Godfrey tells Yount, the head of

10   safety.  One forgotten fact.

11        Two, Mel asked them to call the fire department in

12   the morning.  Wanted the fire department there, okay.  Wanted

13   the fire department there.  They didn't insist on that.

14   Second forgotten fact.

15        Now there is a conflict in there in what Mr. Friedt

16   said about that.  I don't know if you remember this.  When I

17   was talking to Chief Lochhead where Friedt had made a

18   statement to the Government about, well, it started yesterday

19   when counsel said he told the fire chief get down here and he

20   went now, very loud, the tone yesterday.  Well, here is what

21   the chief said.  "He didn't ask to come down right away.  You

22   guys worked it out where it was to be done after work."

23   That's correct.  Now is the Chief lying?  Chief is not lying.

24   Chief is telling what happened.  He called them, said oh, come

25   on down after work, not come down now, with a loud voice like

1    you heard yesterday.  Second forgotten fact.

2            Third, Godfrey on the phone with AY.  I am going to

3    pull up something here.  Your Honor, can we switch to computer

4    briefly?  These are the phone calls.  Think it through.  You

5    got 1,700 bins in the world, okay, and the director of all of

6    those is focused on bin C15 on April 27th.  Forgotten fact.

7    It is not on there.  One, two, three, four, five, six, seven,

8    eight different times, okay, that we have recordings or

9    testimony regarding conversations.  You know it is really --

10   take the first one that Yount talked about.  It is kind of

11   important, isn't that, when they are saying they are finding

12   the embers.  Remember in the statement to the Government,

13   Friedt says I'm talking to Flitsch, he is telling me about the

14   condition of the bin.  Friedt was there.  Flitsch is talking

15   to Friedt, Friedt is talking to Yount one, two, three, four,

16   five, six, seven, eight different times.  4:03 might be after

17   the occurrence, so seven times we can say before the

18   occurrence.  Look at that 3:55 one for six minutes.  Do you

19   remember what Mel -- I guess they want you to believe

20   everything Mel says when he says he didn't do the right thing

21   on that day.  But do you remember when he said this, when he

22   said this he said I went and told Mr. Friedt to call the fire

23   department, okay.  Then what happened after that?  Well, I was

24   by him in the scale house and he was on the phone for six

25   minutes, five minutes.  He said approximately five minutes.

14

1    This is not something he just said in Court here.  This is

2    what he said to the Government, what he said to everybody

3    right after the occurrence, and that is why we knew about him

4    calling for so called permission.  Five minutes, 3:55.  Then

5    he got off that phone call and made another phone call and

6    that was when the explosion took place.  That is the key for

7    that 3:55.  A third forgotten fact of that day, the seven

8    phone calls.

9         Four, Godfrey says I am talking to Flitsch about the

10   condition of the bin in his statement to the Government before

11   we get to Court here, relaying information on the bin to

12   Yount.  Fourth forgotten fact.  Well, wait a second, billowing

13   smoke.  Billowing black smoke, okay.  Just remember,

14   Mr. Friedt is out there.  Anyone at ConAgra saw the big

15   billowing black smoke.  Anyone could have seen it, okay.

16   Friedt had to have seen it if he was there.  That was the only

17   purpose he was there for that day.  Why would they not call

18   the fire department?  They are blaming Mr. Jentz for being

19   down in the tunnel when he is taking his potato fork and

20   breaking up pellets down there, for not calling.  Why is

21   somebody from ConAgra not calling the fire department?

22        Fifth fact forgotten and not brought up, big one,

23   2:30 there is a flame.  A flame comes out.  Friedt sees it.

24   He admits it.  Why did he not call the fire department?  Why

25   did Flitsch not call the fire department?  It was on their

1    watch.   Both of them should have taken some initiative at that

2    point and gotten these folks out of here.   Come on.   This is a

3    navy man, heavy equipment operator, worked construction.   The

4    industry didn't go, so he said, hey, I am gonna do what I got

5    to do and I'll do manual labor, breaking up pellets, doing

6    whatever I need to do to make a dollar.   I am not a specialist

7    as he has been portrayed.

8            So it is 2:30.   Flame.   Yount is told about the

9    flame; safety director.   The guy that is on this committee

10   about preventing explosions in bins, attends meetings, writes

11   standards about it, okay.   You see the phone calls, sixth

12   forgotten fact, the flames.

13           Seven.   Well, you know what, they talk about the

14   porthole somewhere.   They forgot the fact that Friedt was

15   almost holding the ladder at the bottom while that guy is up

16   on that port.   Okay, when he is up there using the air lance,

17   apparently Friedt is right at the bottom of the ladder talking

18   to Yount.   Seventh forgotten fact.

19           Water.   They blame for -- they blame I guess West

20   Side for using water.   Friedt told us use as much water as you

21   want, here is the hose.   Eighth forgotten fact.

22           Now you got all of this going on, you got concern,

23   flames, you got billowing smoke, you got people wanting the

24   fire department.   You got Sean Belcher, the plant

25   superintendent, not on location.   Now what does Friedt do?

1    Leaves for the airport.  He leaves for the airport when all of

2    that is going on and then he takes off, and to the Government

3    he says I came back because I was going to miss my plane and

4    in his deposition he says no one was there, so I felt I needed

5    to be there.  Ninth forgotten fact.

6             Tenth forgotten fact, Mr. Friedt put the tarp below

7    the porthole so the pellets wouldn't get in the scale house.

8    41 truck deliveries that day.  41 truck deliveries that day by

9    ConAgra on that scale causing more issues for that bin.  So my

10   question to you is, is Friedt and ConAgra free of negligence

11   on April 27th?  And if John Jentz from the tunnel, didn't even

12   ask him if he had a cell phone, could call the fire

13   department, couldn't Friedt or any single ConAgra employee

14   that was present, or Mr. Yount from Omaha who is being relayed

15   all of this information?

16            So my point to you is, April 27th, there was a lot of

17   fault with two companies, but there was none with this

18   gentleman who was doing his job.

19            Now let's talk about another aspect of what we heard

20   and that is we handed over a clean bin.  Everything got better

21   after March 13th.  Do you remember that?  Everything got

22   better, everything got better, on April 20th everything is

23   fine.  Wait a second.  You are going to see some e-mails, and

24   maybe you can remember or you will remember some of this

25   testimony.  March 28th, Friedt, urgent, we have pellets on

1  fire.  March 31st, Belcher, heated up yesterday, giving off a

2  very burned smell.  Now was that getting better?  April 1st,

3  burn smell is getting worse.  Get this situation taken care of

4  ASAP.

5       You know, fire doesn't mean fire in the words of

6  ConAgra.  Smoke doesn't mean smoke.  Embers -- remember

7  Mr. Weibrecht says I saw embers March 12th, and if you review

8  your notes Mr. Herring said on two occasions he saw embers.

9  Embers only count when they are seen by John Jentz.

10       You know, you heard yesterday, embers, and I think

11  the word was kabluwee.  How about the three times the ConAgra

12  folks saw embers?  What about that?  Do you think that should

13  have been brought up?  Do you think that should have caused

14  them to do something other than what was done?

15       April 2nd, Bindel, fire not going away.  Getting

16  worse.  Not getting better, getting worse.  April 10,

17  temperature of 112 on pipe coming out.  Bin not getting

18  better, getting worse.  April 12th, hot pellets spreading, we

19  need to get out.  Bin bag still smoking.  We sprayed water on

20  it.  We sprayed water on it.  April 12th, temperatures, 251,

21  102, 145, rubber flange melted off.  How hot does it have to

22  be to get rubber melted off?

23       Now let me ask you this.  You got these temperatures,

24  you also have this 400 degree clump that was found by Neal

25  Schaber.  They brought this gentleman in and Mr. Schroeder,

1   Dr. Schroeder --

2          (Whereupon the following is taken from a videotaped

3   deposition.)

4   Q.    So for instance, is there a specific Fahrenheit that

5   would have caused alarm?

6   A.    Back to the point about understanding what the normal

7   conditions and temperatures are?

8   Q.    Yes.

9   A.    I can't tell you what that temperature would be.

10  Q.    How about 150?

11  A.    Oh, I think that would certainly get my attention.

12  Q.    In the writings they tell you once you're at 150, you

13  better do something, some of the articles you provided?

14  A.    Sure, sure.

15  Q.    There was a range of like 140 up?

16  A.    In the wintertime I would be especially concerned if I

17  saw 150.

18  Q.    If you saw 400, what would you do?

19  A.    If I saw 400 on the bin, I would have already had the

20  rigs there.

21          MR. DURKIN:  I would have already had the rigs there.

22  That is their expert, the guy who has written an article about

23  I give the benefit of the doubt to the guy paying me the

24  money, but he had to say that because that is what he says.

25  He would have had the rigs there.  ConAgra should have had the

19

1    rigs there long before this happened.

2            April 15th, it is on fire.  It needs immediate

3    attention.  Vent is smoking.  How come smoke means so much to

4    Mr. Jentz, but in the parallel universe of ConAgra, fire

5    doesn't mean fire, smoke doesn't mean danger, embers don't

6    mean kabluwee and it is going to blow up.  It is smoking.  It

7    is not getting better.  April 16th, barbecue pit.  This was a

8    barbecue pit.  I don't know how else you can describe that.

9            I am not going to get into who said what or who

10   didn't say what.  You know, we're talking about -- we heard

11   the word "lied".  I am not into that.  I do tell you when

12   Mr. Friedt did give his statement to the Government, it was

13   pointed out one of the reasons this took so long was it took

14   some time for Mr. Sumner to put the quote in.  Was that fair?

15   I mean this was taken while this man was in a coma.  No one

16   was taking it from him.  He was there saying this was a delay

17   because this man, Mr. Sumner, took some time to put the quote

18   in.  Do you really believe that?  Is that right?  Is that

19   right?  You can look at someone's intentions by what they do

20   here and what they say.

21           How about I called the fire chief.  He could not come

22   down.  He had a boy scout meeting and fire department meeting.

23   I asked him to hold the fire department meeting at the plant.

24   Well, that never happened, okay.  That never happened.  Chief

25   Lochhead was very clear if he told me there was anything

20

 1    urgent, we would all be down there right away.  You worked it

 2    out so you could come down after 5:00 o'clock.

 3          Let me talk to you a little bit about proximate

 4    cause, a little bit more than we have.  That instruction, when

 5    I use the expression "proximate cause", any cause, only cause,

 6    not the latest cause or nearest cause.  Any time of those six

 7    conversations if Mr. Yount had exercised his authority or

 8    Mr. Friedt had exercised his authority, this would not have

 9    happened.

10          That is not the last cause.  We know what the last

11    cause is when they were sent to go in.  We know that.  That is

12    not the nearest cause, but it is a cause.  It would not have

13    happened but for that.  Do you remember Russ Ogle, the Ph.D.

14    we had come in?  I submit to you a very credible man.  First

15    of all, he talked to you about the process of self heating can

16    only occur if they were allowed to remain idle in the bin for

17    an excessive period of time.  All of this ties in with the not

18    cleaning this thing out for, what, since the '90s.  They

19    didn't properly control the temperature.  They didn't do the

20    right thing and they caused this situation, the primary cause,

21    the first cause, okay.

22          Now this is corroborated by Dr. Schroeder.  I'll show

23    you his opinion.  He says -- I think he used the words, they

24    weren't quite as strong, but he said they did a "less than

25    exemplary job" in maintaining their bin.  That means they were

21

 1    negligent by their own expert, okay.  Then that is what caused

 2    this whole situation.  Now if you believe this, if you believe

 3    it and it is your honest belief, stick with it.

 4         Next, ConAgra delayed the approval of West Side

 5    Salvage to begin the removal of material from bin C15.  This

 6    increased the hazard by making it more difficult to remove the

 7    material.  They periodically increased ventilation to bin C15

 8    by operating the conveyors in grain elevator C.  This

 9    increased the explosion hazard by preventing the self

10    extinguishing of the fire.  One of his conclusions was there

11    were no explosion risks on March 13th.  We have the

12    measurement taken by Mr. Sumner deep inside the bin.  Even

13    though the carbon monoxide reading was around 500 parts per

14    million, I don't know the LEL, the lower limit for explosion.

15    That is much greater than that.  There was no ability for it

16    to explode during that time frame.

17         Now do you remember yesterday you heard

18    Mr. Belcher -- actually, you will see an e-mail.  If we went

19    with West Side right away and gotten this done as we were told

20    to, okay, this would have been done in March.  It wasn't

21    explosive at that time.  The nest got bigger and bigger and

22    bigger as days went on.  That is what you saw, these things

23    going on in April.

24         Now if you believe that the delay, delay by West Side

25    was one of the causes, not acting immediately, the delay by

22

1   ConAgra, not acting immediately to get the bin pellets

2   removed, and that is your honest belief, stick with it because

3   that is another major cause of this occurrence.

4        ConAgra's requirements to dump the wheat middling

5   into the tunnel increased the hazard to contractor personnel.

6   Now this goes back to all of the documents that Mr. Yount is

7   in the National Grain Feed Association, there are documents

8   you may see that we'll send back.  They weren't really

9   supposed to be doing this in the tunnel.  The better way to do

10  it was on the outside.  ConAgra required them to do it so the

11  both of them did it.  Then they called in the bin whip

12  operator, whose only job is -- they don't have policy -- one

13  gets on top and one gets on the bottom.  They don't decide

14  anything else.

15       This occurred while they are entering the tunnel to

16  recover tools.  Never should have been in the tunnel doing

17  this job.  Never should have been in the tunnel doing this

18  job.  If they are not in there, the tools aren't in there to

19  move, no one is inside.  Dr. Ogle went through all of the

20  different things the way you are supposed to do it according

21  to the manuals, the National Grain Feed Association.

22       Talked about their own response to the emergency

23  action plan, how ConAgra didn't even follow their rules about

24  in their emergency action plan.  He told you how they didn't

25  follow the rules of the NGFA, which Mr. Yount is on.  He went

1    through these, told you how they didn't follow the rules of

2    the National Grain Feed Association, which is an association,

3    a periodical, designed to assist elevator managers, not manual

4    labor, bin operators.  They never heard of something like

5    that.  That is not something that came up in his line of work.

6         The actions of Mr. Jentz and Mr. Schmidt did not

7    cause or contribute to the occurrence.  Mr. Jentz didn't do

8    anything wrong.  When I asked Dr. Schroeder that question, and

9    I'll get to it in a little bit.  He said zero, zero.  He said

10   Mr. Schmidt, Mr. Schmidt deserves kudos.  He can't emphasize

11   enough how much kudos he gives Mr. Schmidt.  For the kind of

12   training he has as bin whip operator, to do what he did, to

13   finally get someone out of there with all of the people,

14   30 years in the industry, with safety people not doing it.

15   Dr. Schroeder's opinion is no criticism of Jentz, Becker and

16   Schmidt, zero contributory.  Schmidt, good guy, did the right

17   thing, I can't emphasize this enough.  I give him kudos for

18   April 27th.  This is their expert.

19        He says ConAgra directed West Side to use the tunnel

20   for removing pellets.  ConAgra did a less than exemplary job

21   before the discovery of the problem in managing their bin.

22   The monitoring equipment available would have assisted.  That

23   is the primary cause of this whole thing.  That is where it

24   all starts.  Both experts, both Ph.D.s agree.  The only one

25   that disagrees would be a J.D., a lawyer.  Two Ph.D.s agree.

24

1    ConAgra should have had a meeting with the fire department on

2    April 20th.  Not our expert, their expert.  He had said they

3    should have had the fire department out there April 20th.  Mel

4    Flitsch asked for it to be out there.  This is the first time

5    he asked anybody and they had not brought the fire department

6    out.  If he had seen the 400 degrees, he would have had the

7    fire rigs there.  Bad decision by Sean Belcher not to follow

8    through on Flitsch's request for the fire department.

9          Anthony Yount had two life lines on April 27th to

10   shut this thing down and get everybody out safely.  It should

11   have been shut down and evacuated, and then ConAgra, it is

12   their bin.  They are always, always, responsible for their

13   bin.  All of these proximate causes, delay creating, it not

14   calling the fire department, not reacting to 400 degrees, not

15   getting the rigs out, not listening to the requests of these

16   workers.  The worker stores 137 years of experience down

17   there.  They know this plant.

18          By the way, you know, you will see pictures.  Dr.

19   Ogle told you how smoke went.  There was a picture, I think --

20   is it 251.  These people say how in all the years they were

21   down there -- I don't care about this in '64 and we don't know

22   what happened between '64 and 2010, but all I can tell you

23   they told you you can see light when you are down there and

24   that is the way it has been.  There is evidence of it, okay.

25   The evidence of it is in the exhibit.  You see Dr. Ogle, it

25

1    will come to you, and it will show soot lines on all of the

2    bins from the fire.  There were soot lines all over the place

3    that were there that showed things were going back and forth.

4    In fact, there is an e-mail from Mr. Belcher that says the

5    odor has now left the bin and permeated all three elevators.

6    All three elevators, okay.  That is one of the bins, so this

7    stuff is going around.

8              These workers, Kevin Herring, I told them --

9              (Whereupon the following is taken from the playing of

10   a videotaped deposition.)

11   Q.    Did you ever talk to Mr. Friedt about the situation?

12   A.    One time he was in my office in elevator B and I had

13   said something to him that I was concerned about that bin and

14   that it might blow up and he said that was just my opinion.

15   Q.    When did that conversation happen?

16   A.    Approximately the same time when I talked to Alan

17   Bindel.

18   Q.    So before West Side was out there?

19   A.    Right.

20   Q.    Did you believe that Mr. Friedt was not fully

21   appreciating the danger of the situation?

22   A.    I think Mr. Friedt wasn't concerned about any opinion

23   we had.

24   Q.    You believe he wasn't listening to you, the guys that

25   are actually on the ground there?

26

1   A.      He was not listening.

2           THE COURT:  Five minutes.

3   Q.      And does it appear to you from sitting here today that

4   whoever made the decision to seek out other bids was putting

5   money ahead of safety?

6   A.      Yes.

7           MR. DURKIN:  All of them said it.  Mr. Weibrecht said

8   it, Mr. Herring said it.  He talked to these folks.  No one

9   acted on that.  Was that negligent?  Is that being free of

10  negligence?  No.  Is that a cause?  Yes, because the fire

11  department had called and if these folks had been listened to,

12  this would never have happened.

13          They talk about this contributorily negligent.  Let

14  me tell you real quick what that means.  If you are given an

15  award and Mr. Jentz, you find them to be two percent at fault,

16  you reduce the award by two percent.  If it is over 50, he

17  does not recover.  I can tell you this, every Ph.D., every

18  witness has said he did nothing wrong.  He did nothing wrong

19  other than his job, okay.  So I suggest to you, you go with

20  what Dr. Schroeder said, zero, zero contributory negligence.

21          Now let me talk about compensatory damages.  They

22  flippantly say give them a few million dollars.  70 to

23  79 percent burns, third degree, fourth degree, 95 percent of

24  his scars are mature, so he is working the procedures and the

25  five percent left.

1           Percentage of responsibility -- I don't know.  This

2     is up to you to decide.  If you decide against both

3     defendants, who is more responsible than not.  Who has more

4     time?  Who has more engineering department?  Who has more

5     safety department?  Who controls it more.  You got to make

6     those decisions.  I suggest to you it is clear who has more

7     responsibility.

8           Let me say one thing about this.  Mr. Sumner came in

9     here and told you on March 13th, he told Godfrey Friedt this

10    is a ticking time bomb.  Godfrey Friedt didn't listen to him.

11    Who was right?  Who was right?  Four workers, 137 years of

12    experience, told Mr. Friedt, Mr. Bindel, you have an explosion

13    risk.  You have an explosion risk.  Nobody told him.  He was

14    not in on the e-mails.  He was not in on the phone

15    conversations with Anthony Yount.  He was not in on it.  You

16    have an explosion risk.  The fire department needs to come out

17    here.  I am going to take a vacation I am so afraid to be

18    around here.  Who was right?  Were those four workers right?

19    I think they were.  Thank you, folks.

20          THE COURT:  Mr. Badgley on behalf of Mr. Schmidt?

21          MR. BADGLEY:  Thank you, Your Honor.

22          Counsel, ladies and gentlemen of the jury.

23          MR. CLIFFORD:  Your Honor, the ELMO?

24          MR. BADGLEY:  I have had the privilege of practicing

25    for 34 years.  During the course of this trial, I attended my

1    daughter's graduation from law school.  When I think about my

2    experiences as an attorney, the hopes of my daughter as she

3    starts a new career, and I compare it with what I have

4    witnessed in this courtroom, including what took place

5    yesterday, specifically the conduct of counsel, I am deeply

6    saddened and disappointed.

7            For 34 years I have practiced in courtrooms where

8    cases are decided on two sources of evidence, testimony from

9    the witness stand and exhibits.  These past few weeks we have

10   learned there is a third source; repetitive, boisterous,

11   misdirected comments.

12           In the courtrooms I have practiced in, witnesses are

13   who they are.  They don't dress down.  Yesterday I learned or

14   this past week, they dress down to fit what they are supposed

15   to say.

16           In the courtrooms I have practiced in, a witness is

17   allowed to speak.  What I have learned in this case, testimony

18   is masked by repetition, narration and misdirection.

19           In the courtrooms where I have practiced, a Court

20   permits a party to call witnesses out of order.  Yesterday I

21   was accused by counsel for ConAgra for playing a chess game

22   with my witnesses.

23           In the courtrooms where I have practiced, a Court

24   permits an attorney to speak to a witness.  Yesterday I was

25   again accused by counsel of ConAgra for improper conduct when

29

1    not only he, but his co-counsel in this case have spoken to

2    the same witness.

3            The courtrooms I practice in, a Court tells you to

4    consider the testimony of all the witnesses no matter by whom

5    they were called.  Yesterday I learned ConAgra accused me for

6    not calling witnesses who testified any way.

7            In the courtrooms I practice in, when in an opening

8    statement a jury is told honestly what the evidence will be,

9    the attorney sticks to it.  Earlier counsel of ConAgra blamed

10   West Side, but yesterday now he blames everyone based on

11   repeated epiphanies, which he created on the witness stand.

12   Said testimony, epiphanies, whatever you call them, are no

13   different than the information these folks gave the Government

14   within days after the accident.

15           Finally and most importantly, attorneys are officers

16   of the Court and have an obligation to treat each other, and

17   most importantly witnesses, with respect.  What did we see

18   yesterday?  Finger pointing and theatrics.  I ask you why.

19           The truth should be like a ball, and any way you look

20   at the ball, it should be the same.  It is not something that

21   is juggled, hidden, thrown up in the air to see where it

22   falls.

23           Reflecting on my years as an attorney, I believe I

24   found an answer to the question why.  If the facts are against

25   you, the lawyer argues about the law.  If the laws are against

30

1    you, the lawyer argues the facts.  If both are against you,

2    lawyers talk about each other and what they did or did not do.

3    Does this in any way sound familiar?

4          As we learned yesterday, the accident is now

5    Mr. Schmidt's fault.  Who says this?  Counsel for ConAgra.

6    Did he testify?  Yes, but not on the witness stand.

7          What did we hear from the stand?  Dr. Schroeder is

8    ConAgra's expert.  He is a life long firefighter.  He has

9    worked with West Side.  In this case you heard he spent

10   hundreds of hours at great expense reviewing all of the

11   materials on behalf of ConAgra.  What did he say about Mr.

12   Schmidt?

13         (Whereupon the following is played from a videotaped

14   deposition.)

15   Q.    Okay, so you have no criticism of Mr. Schmidt for the

16   record?

17   A.    No.  I think that he was communicating back down to

18   West Side the conditions that he was finding.  I don't

19   necessarily believe he had the expertise to be dealing with

20   that change of condition, but no.  I think that Mr. Schmidt is

21   a good guy.

22         MR. BADGLEY:  Then another segment please.

23   Q.    Let's talk again about the day of April 27th and I

24   think you said that -- maybe you didn't use the word hero, but

25   pretty much everything that Schmidt did was good?

31

1   A.      Yeah, I give Schmidt a lot of credit.

2           MR. CLIFFORD:  Back to the ELMO, Judge?

3           MR. BADGLEY:  He communicated the best he could

4   despite his lack of expertise.  What he did was good, lots of

5   credit, good guy, kudos.  That is testimony, not narrative,

6   not argument.

7           Counsel made comment about the highlight film that

8   was a part of an extremely long deposition, which counsel was

9   present, and like some of the things we have heard in this

10  courtroom, some of those depositions are like watching paint

11  dry, okay.  But that is why we pull out the snippets, because

12  it is boring to watch paint dry.

13          With respect to the nature and acts of ConAgra which

14  caused Mr. Smith's injury, those negligent acts took place in

15  three stages between March 12th and April 20th, between

16  April 20th and April 26th and April 27th.  With respect to the

17  issue of proximate cause, once again, comments of counsel are

18  not the law.  If I can get to the ELMO, Judge?  This is the

19  law that the Judge is going to give you.

20          THE COURT:  Is your screen not on?

21          MR. BADGLEY:  It is on.

22          It was the duty of each defendant before and at the

23  time of the occurrence to use ordinary care for the safety of

24  the plaintiffs.  That means it was the duty of each defendant

25  to be free from negligence.

1          Also like Mr. Durkin, I am giving ConAgra the benefit

2     of the doubt, and say let's assume that only April 27th of

3     2010 matters.  It is absurd for ConAgra to ignore the action

4     of its employees that day when they were within feet of where

5     the explosion subsequently occurred.

6          Now Mr. Durkin put, I don't know, 13 or 14 items on

7     the list that were left off.  One thing that came to me again

8     listening to arguments yesterday, remember how counsel from

9     ConAgra got up and on more than one occasion talked about West

10    Side, best of the best.  Had the resources and equipment to

11    fight fire.  Only going to say it once.  I am not going to

12    repeat it because you heard me.  Why did Mr. Friedt on the

13    26th or the 27th, all of these embers, pulled equipment out of

14    the top, water, whatever.  Mr. Belcher on April 20th when they

15    first showed up talked about the issue of fire fighting

16    equipment.  It was on the web page.  They knew they had it.

17    Wouldn't that have been a great time to say is there any issue

18    here regarding fire fighting equipment, or maybe shouldn't we

19    pull the fire fighting equipment out in case something

20    happens?  I submit to you, April 27th is ConAgra's lost day.

21    They didn't talk about the fire fighting equipment and you are

22    not going to see it in any of the exhibits because it didn't

23    exist.  You can't circle nothing.

24          Yesterday you heard several hours of argument from

25    counsel for ConAgra and West Side pointing the finger at each

33

1    other claiming they were each solely at fault.  Actually they

2    both got it right.  All of the facts speak to the joint

3    liability of ConAgra and West Side.  Mr. Schmidt and I are

4    pawns in ConAgra's chess game.  It is ConAgra's sense they are

5    better at the game than we are and that you will let them walk

6    out free from negligence, but what they don't realize and what

7    I believe is that he is wrong because this is the eighth game,

8    or sorry, sixth game of the World Series and you won't go

9    away.  It is my belief that you will consider all of the

10   evidence, do your job and render a verdict which is just,

11   proper and morally right.  Thank you.

12          THE COURT:  Okay.  Thank you, counsel.

13          Folks, I need to do a little bit on the record and

14   then get things straightened out so I can read the

15   instructions to you.  Why don't you take a 15-minute break and

16   then I will read the instructions.

17          (Whereupon a recess was taken.  The following

18   proceedings were held in open Court.)

19          THE COURT:  Please be seated.  I want to add a little

20   bit to the record regarding the last request by ConAgra to

21   conduct an evidentiary hearing with respect to whether or not

22   there was any type of settlement agreement between a

23   plaintiff, the plaintiffs and West Side.

24          I indicated that the only authority I knew about,

25   and, of course, I hadn't had a chance to research it, it came

34

1    up at the last minute, was *Lewis v. Illinois Central Railroad*

2    case, found at 234 Ill.App.3d 669, 1992, Fifth District,

3    Illinois case.  Rehearing was denied in 1992 and the Illinois

4    Supreme Court refused to take the case thereafter.

5         In this particular case, plaintiff's counsel sued the

6    railroad based upon FELA.  The railroad brought in Panasonic

7    and the Transportation Labor Incorporated, which was the

8    plaintiff's employer.

9         Just before closing arguments, plaintiff's counsel

10   settled with both Panasonic and Transportation Labor.  The

11   railroad was concerned about the settlements and argued that

12   they were not in good faith within the meaning of the

13   Contribution Act because the Court made that finding without

14   first conducting a proper hearing.

15        The Appellate Court held in fact there was a good

16   faith hearing, but the railroad claimed it was inadequate

17   because the Court did not permit it to subject the lawyers for

18   Lewis, Panasonic and Transportation Labor to questioning under

19   oath concerning their settlement negotiations.

20        The Fifth District said this argument is not well

21   taken.  "Forcing opposing counsel to testify as witnesses

22   during trial is an extreme measure which would have been

23   wholly unwarranted here.  The Circuit Court was thoroughly

24   familiar with this litigation, and counsel for Lewis,

25   Panasonic and TLI described to the Court, in detail and on the

1   record, how, when, and under what terms the settlements were

2   achieved.

3         The Court had no reason not to take these attorneys

4   at their word.  Under the rules of our Supreme Court, a lawyer

5   is prohibited from making a statement of material fact or law

6   to a tribunal which the lawyer knows or reasonably should know

7   is false.  Given this prohibition and the attendant sanctions

8   which counsel would face for its violation, counsel's factual

9   statements to the Court must be considered presumptively true.

10   This presumption is, of course, rebuttable, but there is

11   nothing in the record before us which suggests that the

12   presumption should give way here.  Despite this testimony, the

13   railroad insists now, as it did at trial, that the lawyers for

14   Lewis, Panasonic and TLI were lying.  It hypothesizes that

15   Lewis, Panasonic and TLI actually agreed to settle early on in

16   the case but kept their agreement quiet in order to preserve

17   the illusion that they were adversaries when they were not.

18   This deception was important, according to the railroad,

19   because it made the witnesses for TLI and Panasonic, who gave

20   testimony favorable to Lewis, appear more credible than they

21   would have otherwise."

22         The Court indicated a fundamental problem with the

23   railroad's hypothesis is that TLI and Panasonic and Lewis

24   never took an adversarial posture with respect to one another

25   at trial, nor did they ever give the jury the impression they

36

1   were adversaries.  From openings to closing arguments, TLI and

2   Panasonic took a constant and compatible position, which was

3   to concede the seriousness of Lewis' injuries, but to place

4   all blame for those injuries on the railroad.  In the end, TLI

5   and Panasonic argued as they did to minimize their perceived

6   monetary exposure, and that is exactly what they told the

7   trial Court.  There was nothing at all subtle, sinister or

8   unexpected about those actions.

9         What type of evidentiary hearing should be conducted

10  to produce the facts necessary to determine whether a

11  settlement was in "good faith", is committed to the discretion

12  of the trial Court.  The Fifth District indicated that under

13  the foregoing circumstances, it was scarcely an abuse of

14  discretion for the Circuit Court to refuse the railroad's

15  request to subject opposing counsel to the extraordinary

16  measure of being examined under oath.  "That request was

17  utterly groundless.  It was also an affront to the dignity of

18  the profession.  While lawyers currency may be diminishing in

19  the public's mind, honesty and integrity remain precious to

20  most practitioners.

21        We admonish counsel for the railroad that if it

22  levies charges of dishonesty against its colleagues again, he

23  should come prepared with more than unsubstantiated suspicion.

24        In this case I believe that the position of ConAgra

25  that there was some kind of deal based upon the

37

1    representations of counsel to me is utterly groundless and

2    scurrilous. Just as lawyers have books on judges, judges have

3    books on lawyers, and I can tell you that I have known

4    Mr. Badgley for 30 years. I have known Mr. Clifford for 20

5    plus years. Neither are my friend. I don't have business

6    relationships with them, I don't see them socially. The same

7    thing with respect to Mr. Orlet. None of those individuals

8    have ever, ever dissembled or come close to that with me. I

9    take them at their word in this case, although Mr. Orlet was

10   not asked because of his position in the case.

11          I would also point out and apologize to you,

12   Mr. Schultz, because these type of allegations will follow you

13   forever. The lawyer in the Lewis case was up for Federal

14   Judgeship and lost his initial hearing before the Senate

15   Judiciary Committee until these allegations could be cleared

16   up. They ultimately were and I am sitting here today. Give

17   me five minutes and we'll do closing instructions.

18          MR. CLIFFORD: Thanks, Judge.

19          (Whereupon a recess was taken. The following

20   proceedings were held in open Court.)

21          THE COURT: Please be seated.

22          Folks, you have seen and heard all of the evidence

23   and it is now time for me to read the jury instructions to

24   you. I read the instructions at the beginning of the case and

25   you should consider all those as well as these, not singling

38

1    one instruction out over any of the others.  Consider them as

2    a whole.  I read from the green packet.  Remember those

3    instructions apply to all of the claims, so when you take, for

4    example, Mr. Jentz's packet, which would be the red packet,

5    you must consider it in conjunction with the green packet.

6    Each packet will also have that portion of the power point

7    presentation that I did just as reminder for you as to what

8    the claims are.  Again, the instructions are the white pieces

9    of paper.  The power point presentation is merely a road map

10   for you.  I will have the instructions in the common folder

11   stapled to the right so they cannot be taken out, so you won't

12   commingle them with anything else.  When we get to the

13   individual cases, I will have the instructions stapled to the

14   right.  The power point presentation I made will be loose and

15   the actual verdict forms will be loose also.  The only thing

16   you write on will be the verdict forms.

17        The following instructions apply along with the green

18   packet in the case Jentz v. ConAgra Foods and West Side

19   Salvage, Inc., packet number two, the red folder.

20        There are five claims for your consideration as I

21   discussed with you earlier.  Plaintiff Jentz's Complaint

22   consists of two counts each against both defendants ConAgra

23   and West Side Salvage.

24        The issues to be decided by you under Count 1,

25   (negligence-ConAgra) of the Complaint are as follows:

39

1          The plaintiff claims that he was injured and

2     sustained damage and that the defendant ConAgra was negligent

3     in one or more of the following respects:

4          THE COURT:  I want to mention something right here.

5     This applies not only to the plaintiff's claims, but the

6     claims West Side makes against ConAgra and ConAgra makes

7     against West Side.  Look very carefully where it says one or

8     more.  They don't have to prove all of these, just one or

9     more.  When I was a young lawyer I tried an auto accident case

10    and my client was rear ended.  I alleged the driver behind him

11    should have stopped or swerved, was traveling too fast or

12    should have honked their horn.  At the end of the case I lost.

13    One of the jurors came up and said Mr. Reagan, you proved two

14    of those three things, but we didn't think honking the horn

15    made any difference whatsoever.  They didn't read the

16    instructions.  I just had to prove one or more.  So in

17    plaintiff's case they just have to prove one or more.   In

18    ConAgra's case they have to prove one or more.  In West Side's

19    case they have to prove one or more.

20          A.   Failed to properly maintain the wheat middling

21    pellets within grain bin C15 in a reasonably safe manner and

22    condition.

23          B.   Allowed the wheat middling pellet within grain

24    bin C15 to self heat and smolder, creating an increased risk

25    of fire and an unreasonably dangerous condition to individuals

1   on the premises like John W. Jentz.

2           C.   Failed to properly inspect or monitor the wheat

3   middling pellets within grain bin C15 for signs of self

4   heating, smoldering or fire.

5           D.   Failed to remove the wheat middlings within bin

6   C15 in a timely fashion, which created an increased risk of

7   fire and or explosion, and an unreasonably dangerous condition

8   to individuals on its premises like John W. Jentz.

9           E.   Failed to properly monitor the atmosphere of bin

10  C15 for the presence of combustible gasses, including carbon

11  monoxide and or smoke.

12          F.   Failed to properly monitor the wheat middling

13  pellets in bin C15 for the presence of high temperatures.

14          G.   Failed to implement its facility emergency action

15  plan upon the discovery of a fire in bin C15.

16          H.   Failed to warn John W. Jentz or his employer, A &

17  J Bin Cleaning, LLC, of the dangerous conditions; that is the

18  potential for fire and explosion hazards in bin C15.

19          I.   Failed to timely alert and notify local fire

20  department and other emergency personnel of the fire on its

21  premises.

22          J.   Continued to conduct operations within Elevator

23  C, which increased the risk of explosion within bin C15.

24          K.   Failed to immediately evacuate individuals

25  working in and around bin C15 on and before April 27, 2010,

1  like John W. Jentz, when ConAgra knew or should have known of

2  an imminent danger to those individuals, that an explosion

3  could occur.

4          L.   Failed to immediately evacuate individuals

5  working in and around bin C15 on April 27, 2010, after

6  deciding to request that one or more representatives of the

7  Chester Fire Department come to the scene.

8          M.   Failed to call the fire department to the Chester

9  facility at any time prior to the explosion, despite repeated

10 requests.

11         N.   Failed to properly clean and maintain bin C15.

12         O.   Permitted West Side Salvage, Inc., to remove the

13 wheat middling pellets from the tunnel in violation of

14 industry standards.

15         In Count 3, (negligence-West Side Salvage), the

16 plaintiff claims that he was injured and sustained damage and

17 that the defendant West Side Salvage was negligent in one or

18 more of the following respects:

19         A.   Failed to properly inspect and monitor the wheat

20 middling pellets within grain bin C15 for signs of self

21 heating, smoldering or fire.

22         B.   Failed to properly monitor the atmosphere of bin

23 C15 for the presence of combustible gasses and or vapors.

24         C.   Failed to properly monitor temperature levels in

25 bin C15 and the wheat middling pellets within bin C15.

1            D.  Failed to adequately train employees in the

2 recognition and prevention of the hazards present in bin C15.

3            E.  Failed to warn John W. Jentz of the dangerous

4 conditions in grain bin C15.

5            F.  Failed to notify local fire department of the

6 fire on the premises.

7            G.  Instructed John Jentz to go into the tunnel in

8 spite of the existing fire and explosion hazards.

9        The plaintiff further claims that one or more of the

10 foregoing was a proximate cause of his injuries.

11        Each defendant denies that it did any of the things

12 claimed by the plaintiff, denies that it was negligent in

13 doing any of the things claimed by the plaintiff, and denies

14 that any claimed act or omission on the part of the plaintiff

15 was a proximate cause of the plaintiff's claimed injuries.

16        The defendants claim that the plaintiff was

17 contributorily negligent in one or more of the following

18 respects.

19            A.  Negligently engaged in fighting a fire in the bin

20 when they were not qualified and competent to do so.

21            B.  Negligently left the bin to go to lunch on

22 April 27th without confirming that the fire in the bin had

23 been completely extinguished.

24            C.  Negligently failing to provide for the continuous

25 monitoring of the bin when he went to lunch on April 27th.

43

D.   Negligently failed to timely alert ConAgra of the condition of the bin whether he knew or should have known that the situation in the bin was dangerous and out of control.

E.   Negligently failed to call for an evacuation of all workers at the ConAgra facility when he knew or should have known that the situation in the bin was dangerous and out of control.

F.   Negligently failed to alert the fire department that the situation in the bin was dangerous and out of control.

G.   Negligently entered the tunnel under the bin after being alerted that the situation in the bin was dangerous and out of control.

The defendants further contend that one or more of the foregoing was a proximate cause of the plaintiff's injuries.

The plaintiff denies that he did any of the things claimed by the defendant, denies that he was negligent in doing any of the things claimed by the defendant, and denies that any claimed act or omission on his part was a proximate cause of his claimed injuries.

Turning now to Count 3, willful and wanton against ConAgra of the Complaint.  The issues to be decided by you under that count are as follows:

The plaintiff claims that he was injured and

44

1    sustained damage and that the conduct of defendant ConAgra was

2    willful and wanton in one or more of the following respects:

3          A.   Refused to call the fire department to the

4    Chester facility at any time prior to the explosions despite

5    repeated requests because of concerns that doing so would

6    adversely affect facility operations.

7          B.   Failed to inform John W. Jentz or his employer of

8    a known fire in bin C15.

9          C.   Failed to follow the recommendations of West Side

10   Salvage, Inc., to immediately remove the knowingly dangerous

11   wheat middling pellets in bin C15 because it was putting money

12   over safety.

13         D.   Continued to conduct operations within Elevator C

14   despite requests by West Side Salvage, Inc., to not do so,

15   which increased the risk of explosion within bin C15.

16         E.   Failed to immediately evacuate individuals

17   working in and around bin C15 on and before April 27th, 2010,

18   when ConAgra knew or should have known of an imminent danger

19   to those individuals that an explosion could occur.

20         F.   Failed to immediately evacuate individuals

21   working in and around bin C15 on April 27, 2010, after

22   deciding to request that one or more representatives of the

23   Chester Fire Department come to the scene.

24         In Count 4, willful and wanton against West Side

25   Salvage, the plaintiff claims that he was injured and

1    sustained damage and that the conduct of defendant West Side

2    Salvage was willful and wanton in one or more of the following

3    respects:

4           A.   Failed to warn John W. Jentz or his employer of

5    the known dangerous condition in bin C15.

6           B.   Instructed John W. Jentz to go into the tunnel of

7    Elevator C after the decision to call the fire department to

8    the facility was made.

9           The plaintiff further claims that one or more of the

10   foregoing was a proximate cause of his injuries.

11          Each defendant denies that it did any of the things

12   claimed by the plaintiff, denies that it was willful and

13   wanton in doing any of the things claimed by the plaintiff,

14   and denies that any claimed act or omission on the part of the

15   defendant was a proximate cause of the plaintiff's claimed

16   injuries.

17          In shorthand, folks, what I just read to you are what

18   we call the issues instructions, the issues to be decided by

19   you.  What I am going to talk to you now about is what we

20   refer to as the burden of proof instruction.

21          The plaintiff has the burden of proving each of the

22   following propositions in Count 1, negligence against ConAgra,

23   and Count 3, negligence against West Side Salvage, of his

24   complaint as to each defendant.

25          First, that the defendant acted or failed to act in

46

1   one of the ways claimed by the plaintiff as stated to you in

2   these instructions, and that in so acting or failing to act

3   the defendant was negligent.

4         Second, that the plaintiff was injured.

5         Third, that the negligence of the defendant was a

6   proximate cause of the injury to the plaintiff.

7         You are to consider these propositions as to each

8   defendant.

9         In order to recover in this action on Counts 1,

10  negligence against ConAgra, and 3, negligence against West

11  Side Salvage, the plaintiff must prove all of the above

12  propositions.

13        If you find from your consideration of all the

14  evidence that all of the propositions, first, second and

15  third, in Counts 1, negligence against ConAgra, and Count 3,

16  negligence, against West Side, have been proved, then you must

17  next consider the defendant's claim that the plaintiff was

18  contributorily negligent as to Counts 1, negligence against

19  ConAgra, and Count 3, negligence against West Side Salvage.

20        As to that claim, each defendant has the burden of

21  proving each of the following propositions:

22        A.   That the plaintiff acted or failed to act in one

23  of the ways claimed by the defendant as stated to you in these

24  instructions, and that in so acting or failing to act the

25  plaintiff was negligent.

47

     B.   That the plaintiff's negligence was a proximate cause of his injury.

          If you find from your consideration of all the evidence that the plaintiff has proved all of the propositions required of the plaintiff, first, second and third, in Counts 1, negligence against ConAgra, and Count 3, negligence against West Side Salvage, and if you find from your consideration of all the evidence that either of the propositions required of the defendant, A or B, has not been proved, then your verdict should be for the plaintiff and you shall not reduce the plaintiff's damages.

          If you find from your consideration of all the evidence that one or more of the above propositions required of the plaintiff, first, second or third, in Counts 1, negligence against ConAgra, and 3, negligence against West Side, has not been proved, then your verdict shall be for the defendant.

          If you find from your consideration of all the evidence that the plaintiff has proved all of the propositions required of the plaintiff, first, second and third, in Counts 1, negligence against ConAgra, and Count 3, negligence against West Side Salvage, and if you further find from your consideration of all the evidence that the plaintiff has proved both of the propositions required of the defendant, A and B, and that the plaintiff's negligence was greater than

1    50 percent of the total proximate cause of the injury or

2    damage for which recovery is sought, then your verdict shall

3    be for the defendant.

4         If you find from your consideration of all the

5    evidence that the plaintiff has proved all the propositions

6    required of the plaintiff, first, second and third, in Counts

7    1, negligence against ConAgra, and Count 3, negligence against

8    West Side Salvage, and if you further find from your

9    consideration of all the evidence that the defendant has

10   proved both the propositions required of the defendant, A and

11   B, and that the plaintiff's negligence was 50 percent or less

12   of the total proximate cause of the injury or damage for which

13   recovery is sought, then your verdict shall be for the

14   plaintiff and you shall reduce plaintiff's damages in the

15   manner stated to you in these instructions.

16        The plaintiff has the burden of proving each of the

17   following propositions in Count 2, willful and wanton against

18   ConAgra, and Count 4, willful and wanton against West Side

19   Salvage, of his complaint as to each defendant.

20        First, that the defendant acted or failed to act in

21   one of the ways claimed by the plaintiff as stated to you in

22   these instructions, and that in so acting or failing to act

23   the defendant was willful and wanton.

24        Second, that the plaintiff was injured.

25        Third, that the willful and wanton conduct of the

49

1    defendant was a proximate cause of the injury to the

2    plaintiff.

3         You are to consider these propositions as to each

4    defendant.

5         If you find from your consideration of all the

6    evidence that all of these propositions, first, second and

7    third, has been proved, then your verdict should be for the

8    plaintiff as to Counts 2, willful and wanton against ConAgra,

9    and Count 4, willful and wanton against West Side Salvage.

10        On the other hand, if you find from your

11   consideration of all the evidence that any of these

12   propositions has not been proved, then your verdict shall be

13   for the defendants as to Count 2, willful and wanton against

14   ConAgra, and Count 4, willful and wanton against West Side

15   Salvage.

16        If you find that either of the defendants is legally

17   responsible for proximately causing -- Sorry.

18        If you find that either of the defendants is legally

19   responsible for proximately causing plaintiff's injuries, then

20   you must apportion damages by determining the relative degree

21   of legal responsibility of each entity named or described on

22   the verdict form.

23        In making that determination, you should consider the

24   degree to which the entities' conduct proximately caused

25   plaintiff's injuries.

50

1       In your verdict form you will state the percentage of

2  legal responsibility of each of the entities named on the

3  verdict form.  The total of these percentages must add up to

4  100 percent.

5       In what I just talked about and what I talk about now

6  is what I call the contribution claim.  That is where I had

7  the arrows for West Side and ConAgra, and West Side and

8  ConAgra in this particular case.

9       In addition to the claim of the plaintiff against

10  ConAgra, ConAgra makes a claim against West Side.  ConAgra

11  claims that if it is liable to the plaintiff for damages, then

12  it is entitled to contribution from West Side for a percentage

13  of these damages.

14       If you find West Side liable to the plaintiff, then

15  you must consider the claim for contribution by ConAgra.

16       ConAgra claims that West Side was negligent in one or

17  more of the following respects:

18       A.   Failed to use proper means and methods in

19  removing the pellets after discovering the core inside the

20  bin.

21       B.   Failed to provide an adequate safety plan when it

22  began to work with the core of the bin.

23       C.   Failed to timely call the fire department and

24  notify ConAgra personnel of the condition of the bin when it

25  knew that the situation in the bin was dangerous.

1          D.   Failed to timely evacuate workers from the work

2    site when it -- that should be knew -- knew that the situation

3    inside the bin was dangerous.

4          E.   Failed to properly inspect and monitor the wheat

5    middling pellets within bin C15 for signs of self heating,

6    smoldering or fire.

7          F.   Failed to properly monitor the atmosphere of bin

8    C15 for the presence of combustible gasses and or vapors.

9          G.   Failed to properly monitor temperatures levels of

10   bin C15 and the wheat middling pellets within bin C15.

11         H.   Failed to adequately train employees in the

12   recognition and prevention of the hazards present in bin C15.

13         I.   Failed to warn John Jentz of the dangerous

14   conditions in grain bin C15.

15         J.   Instructed John Jentz to go into the tunnel in

16   spite of the existing fire and explosion hazards.

17         ConAgra further claims that one or more of the

18   foregoing was a proximate cause of the plaintiff's injuries.

19         West Side denies that it did any of the things

20   claimed by ConAgra, denies that it was negligent or willful

21   and wanton in doing any of the things claimed by ConAgra, and

22   denies that any claimed act or omission on the part of West

23   Side was a proximate cause of the plaintiff's injury.

24         So that was the issues instruction in the case

25   ConAgra versus West Side.

52

1          This is the burden of proof instruction in the same

2     claim.

3          As to the claim of ConAgra against West Side, ConAgra

4     has the burden of proving each of the following propositions:

5          First, that West Side acted or failed to act in one

6     of the ways claimed in these instructions, and that in so

7     acting or failing to act West Side was negligent.

8          Second, that the negligence of West Side was a

9     proximate cause of John Jentz's injuries.

10          If you find from your consideration of all the

11     evidence that both of these propositions has been proved, then

12     your verdict should be for ConAgra and against West Side and

13     you should include West Side in apportionment of damages.

14          If, on the other hand, you find from your

15     consideration of all the evidence that either one or both of

16     these propositions has not been proved, then your verdict

17     should be for West Side and you will have no occasion to

18     consider the apportionment of damages against West Side.

19          So that was ConAgra's claim for contribution against

20     West Side.

21          This is West Side's contribution claim against

22     ConAgra, again in the Jentz case.  This is the issues

23     instruction.

24          In addition to the claim of the plaintiff against

25     West Side Salvage, West Side Salvage makes a claim against

53

1    ConAgra.

2          West Side Salvage claims that if it is liable to the

3    plaintiff for damages, then it is entitled to contribution

4    from ConAgra for a percentage of those damages.

5          If you find ConAgra liable to the plaintiff, then you

6    must consider the claim for contribution by West Side Salvage.

7          Should this not say West Side here?

8          MR. PATTON:  I think the answer is yes.

9          THE COURT:  Okay, there is a typo here, folks.  It

10   should say if you find West Side.  I am going to change it.

11         If you find West Side Salvage liable to the

12   plaintiff, then you must consider the claim for contribution

13   by West Side Salvage.

14         West Side Salvage claims that ConAgra was negligent

15   or willful and wanton in one or more of the following

16   respects.

17         A.  Failed to maintain the grain material, grain bin

18   15, and the grain elevator in a reasonably safe manner and

19   condition.

20         B.  Allowed wheat middlings to self heat and smolder,

21   creating an increased risk of fire and unreasonably dangerous

22   condition to individuals on its premises, like plaintiff John

23   Jentz.

24         C.  Failed to properly inspect and monitor the

25   premises, including but not limited to the aforementioned

54

1  grain bin 15 for signs of self heating, smoldering or fire.

2        D.   Failed to properly and efficiently provide for

3  the removal of self heating and smoldering wheat middlings in

4  a timely fashion, which created an increased risk of fire and

5  or explosion and an unreasonably dangerous condition to

6  individuals on its premises like Robert Schmidt.

7        This should say John Jentz.

8        E.   Failed to properly and sufficiently monitor the

9  atmosphere of the grain bin elevator for the presence of

10  combustible gasses, including carbon monoxide, and smoke.

11        F.   Failed to properly monitor the wheat middling

12  pellets in bin C15 for the presence of high temperatures.

13        G.   Failed to implement a proper facility emergency

14  action plan upon the discovery of a fire in bin C15.

15        H.   Failed to warn John W. Jentz or his employer, A &

16  J Bin Cleaning, LLC, of the dangerous conditions, i.e., the

17  potential for fire and explosion hazards in bin 15.

18        I.   Failed to timely alert and notify local fire

19  department and other emergency personnel of the fire on its

20  premises.

21        J.   Continued to conduct operations within Elevator C

22  which increased the risk of explosion within bin C15.

23        K.   Failed to immediately evacuate individuals

24  working in and around bin C15 on or before April 27, 2010,

25  like John W. Jentz, when ConAgra knew or should have known of

55

1    an imminent danger to those individuals, that an explosion

2    could occur.

3           L.   Failed to immediately evacuate individuals

4    working in and around bin C15 on April 27th of 2010 after

5    deciding to request that one or more representatives of the

6    Chester Fire Department come to the scene.

7           M.   Failed to call the fire department to the Chester

8    facility at any time prior to the explosions despite repeated

9    requests.

10          N.   Failed to properly clean and maintain bin C15.

11          O.   Instructed West Side Salvage, Inc., to remove the

12   wheat middling pellets from the tunnel in violation of

13   industry standards.

14          West Side Salvage further claims that one or more of

15   the foregoing was a proximate cause of the plaintiff's

16   injuries.

17          ConAgra denies that it did any of the things claimed

18   by West Side, denies that it was negligent or willful and

19   wanton in doing any of the things claimed by West Side

20   Salvage, and denies that any claimed act or omission on the

21   part of West Side was a proximate cause of the plaintiff's

22   injuries.

23          This is the burden of proof that West Side has in

24   it's contribution claim, and it is a mirror image of the

25   burden of proof ConAgra had.

56

1          As to the claim of West Side Salvage against ConAgra,

2    West Side Salvage has the burden of proving each of the

3    following propositions:

4          First, that ConAgra acted or failed to act in one of

5    the ways claimed in these instructions, and that in so acting

6    or failing to act ConAgra was negligent.

7          Second, that the negligence of ConAgra was a

8    proximate cause of John Jentz's injuries.

9          If you find from your consideration of all the

10   evidence that both of these propositions has been proved, then

11   your verdict should be for West Side Salvage and against

12   ConAgra and you should include ConAgra in the apportionment of

13   damages.

14         If, on the other hand, you find from your

15   consideration of all the evidence that either one or both of

16   these propositions has not been proved, then your verdict

17   should be for ConAgra and you will have no occasion to

18   consider the apportionment of damages against ConAgra.

19         Okay, so we have heard about the Jentz claim against

20   West Side and Jentz's claim against ConAgra.  Those two

21   entities claim that Jentz was contributorily negligent, and we

22   have heard about the West Side claim against ConAgra and

23   ConAgra's claim against West Side.  Now we move on to some

24   damage instructions.

25         If you decide for the plaintiff on the question of

57

1    liability, then you must fix the amount of money which will

2    reasonably and fairly compensate him for any of the following

3    elements of damages proved by the evidence to have resulted

4    from the negligence of the defendants, taking into

5    consideration the nature, extent and duration of the injury,

6    the disfigurement resulting from the injury, the loss of a

7    normal life experienced and reasonably certain to be

8    experienced in the future, the increased risk of future harm

9    resulting from the injuries, the emotional distress

10   experienced and reasonably certain to be experienced in the

11   future, the pain and suffering experienced and reasonably

12   certain to be experienced in the future as a result of the

13   injuries, the reasonable and necessary medical care, treatment

14   and services received and the present cash value of the

15   reasonable expenses of medical care, treatment and services

16   reasonably certain to be received in the future, the value of

17   earnings and benefits lost and the present cash value of the

18   earnings and benefits reasonably certain to be lost in the

19   future.

20          Whether any of these elements of damages has been

21   proved by the evidence is for you to determine.

22          When I use the expression "loss of a normal life", I

23   mean the temporary or permanent diminished ability to enjoy

24   life.  This includes a person's inability to pursue the

25   pleasurable aspects of life.

58

1          If you find that the plaintiff is entitled to damages

2     arising in the future because of injuries or because of future

3     medical expenses or because of loss of earnings, you must

4     determine the amount of these damages which will arise in the

5     future.  If these damages are of a continuing nature, you may

6     consider how long they will continue.  If these damages are

7     permanent in nature, then in computing these damages you may

8     consider how long the plaintiff and his spouse are likely to

9     to live.

10          There is no spouse in this case.  I am going to

11     strike the portion here about a spouse.  That doesn't apply in

12     the Becker instance.

13          So it reads, if these damages are permanent in

14     nature, then in computing these damages you may consider how

15     long the plaintiff is likely to live.

16          With respect to loss of future earnings, you may

17     consider that some persons work all their lives and others do

18     not, that a person's earnings may remain the same or may

19     increase or decrease in the future.

20          In computing the damages arising in the future

21     because of future medical expenses or because of the loss of

22     future earnings or benefits, you must determine their present

23     cash value.

24          Present cash value means the sum of money needed now,

25     which when added to what that sum may reasonably be expected

59

1    to earn in the future, will equal the amount of the expenses,

2    earnings and benefits at that time in the future when the

3    expenses must be paid or the earnings and benefits would have

4    been received.

5          Damages for pain and suffering; loss of a normal

6    life, emotional distress and disfigurement are not reduced to

7    present cash value.

8          According to a table of mortality in evidence, the

9    life expectancy of a male aged 38 years is 40 years.  These

10   figures are not conclusive.  They are the average life

11   expectancies of persons who have reached these ages.

12         They may be considered by you in connection with

13   other evidence relating to the probable life expectancy of the

14   plaintiff in this case, including evidence of his occupation,

15   health, habits and other activities, bearing in mind that some

16   persons live longer and some persons less than the average.

17         When you retire to the jury room, you will first

18   select a foreperson.  He or she will preside during your

19   deliberations.

20         I am not going to help you pick your foreperson.

21   That is up to you.  You will start deliberating in here.  I

22   will take the instructions and put them in the middle of this

23   table, and I have found in the past that if I put them next to

24   somebody, that tends to be the foreperson, so I am going to

25   put them in the middle of the table.  So if you don't want to

60

1    be the foreman, stay away from the middle of the table.  It is

2    your decision, not mine, as to who is the foreperson.

3            Your verdict must be unanimous.  Forms of verdict are

4    supplied with these instructions.  After you have reached your

5    verdict, fill in and sign the appropriate form of verdict and

6    return it to the Court.

7            You will do that by knocking on the door.  Red will

8    be outside.

9            Your verdict must be signed by each of you.  You

10   should not write or mark upon this or any of the other

11   instructions given to you by the Court.

12           Now although you must sign these verdicts and

13   everything in our Court is open to the public and available

14   online, I will redact your names from that verdict form so no

15   one will see your actual signatures.  The forms you do sign

16   will be sealed, so they'll be available only to my staff and

17   myself and the attorneys.  They know they are not allowed to

18   disseminate those.  We have tried hard to keep your identity

19   secret.  I don't know if Judge Frazier used your names or

20   numbers during voir dire.  If your names were used, we redact

21   that information.  That information you filled out in the

22   notebook has already been destroyed.  There is only one copy

23   left.  I have it.  At the conclusion of the case I will

24   destroy it.  You can rest assured your identities will be kept

25   confidential.

61

1          At the conclusion of the case, sometimes the

2     attorneys like to talk to you.  That is completely up to you.

3     If you do want to talk to the attorneys, I'll have you go out

4     a special door where the attorneys wait to talk to you.  If

5     you don't go out of the door, you don't talk to them.  That is

6     completely up to you.

7          If you find for John Jentz and against ConAgra and

8     West Side Salvage as to Counts 1, negligence ConAgra, 2,

9     willful and wanton ConAgra, 3, negligence West Side, and 4,

10    willful and wanton West Side Salvage, and if you further find

11    that John Jentz was not contributorily negligent, then you

12    should use verdict form A.

13         If you find for John Jentz and against ConAgra and or

14    West Side Salvage, and if you further find that the

15    plaintiff's injury was proximately caused by a combination of

16    negligence or willful and wanton conduct of ConAgra and West

17    Side Salvage, as well as the negligence of John Jentz, and

18    that John Jentz contributory negligence was 50 percent or less

19    of the total proximate cause of the injury or damage for which

20    recovery is sought, then you should use verdict form A.

21         If you find for ConAgra and against John Jentz or if

22    you find that the plaintiff's contributory negligence was more

23    than 50 percent of the total proximate cause of the injury or

24    damage for which recovery is sought, then you should use

25    verdict form B.

62

1          If you find for West Side Salvage and against John

2    Jentz, or if you find that plaintiff's contributory negligence

3    was more than 50 percent of the total proximate cause of the

4    injury or damage for which recovery is sought, then you should

5    use verdict form C.

6          There should be another section to this instruction.

7    It should also read if you find for ConAgra and against John

8    Jentz, or if you find that the plaintiff's contributory

9    negligence was more than 50 percent of the total proximate

10   cause of the injury or damage for which recovery is sought,

11   then you should use verdict form B.

12         Okay, I missed it.  It is complete.  I am reading

13   from two different things.

14         So this is what verdict form A looks like.  What you

15   would do is based upon all of the evidence you heard, fill in

16   yes or no, yes or no.  If you answer yes to either of those,

17   then you fill in the damages.

18         It reads as follows:  It has what we call the style

19   at the top.  John W. Jentz, Plaintiff, versus ConAgra Foods,

20   Inc., and West Side Salvage, Inc., 10-CV-474 with my initials

21   and the magistrate judge's initials.

22         Verdict form A as to Counts 1, negligence-ConAgra,

23   and 3, negligence-West Side Salvage.  We, the jury, find for

24   John Jentz and against the following defendant or defendants.

25   If you find against ConAgra, you would check yes.  If you

63

1    don't find against them, you would check no.  If you find

2    against West Side, yes.  If you don't find against them, no.

3         We further find the following:  First, without taking

4    into consideration the question of reduction of damages due to

5    the negligence of John Jentz, if any, we find that the total

6    amount of damages suffered by John Jentz as a proximate result

7    of the occurrence in question is blank, itemized as follows:

8         If you find against one or both of the defendants,

9    then what you would do is fill out each line item and come up

10   with a total.  This total equals this total here, and you do

11   not consider any contributory fault.

12        The line items are as follows:  The disfigurement

13   resulting from the injury.  The loss of a normal life

14   experienced.  The loss of a normal life reasonably certain to

15   be experienced in the future.  The increased risk of future

16   harm resulting from the injuries.  The emotional distress

17   experienced.  The emotional distress reasonably certain to be

18   experienced in the future.  The pain and suffering

19   experienced.  The pain and suffering reasonably certain to be

20   experienced in the future.  The reasonable and necessary

21   medical care, treatment and services received.  The present

22   cash value of the reasonable expenses of medical care,

23   treatment and services reasonably certain to be received in

24   the future.  The value of earnings and benefits lost.  The

25   present cash value of the earnings and benefits reasonably

64

1    certain to be lost in the future.  Then you would total all of

2    those up and put a total here.  That is the same number that

3    goes on page one.

4         Then you need to do this calculation.  Assuming that

5    100 percent represents the total combined legal responsibility

6    of all persons or entities that proximately caused John

7    Jentz's injury, we find the percentage of legal responsibility

8    attributable to each as follows:  You would fill in a

9    percentage for John Jentz if you believe he should be

10   allocated one, one for ConAgra, and one for West Side if you

11   believe they should be allocated one.

12        If you find that the plaintiff was not contributorily

13   negligent or if you find any other party listed on the verdict

14   form was not legally responsible in a way that proximately

15   caused plaintiff's injury, you should enter zero as to that

16   party.

17        Let's assume back on this form you don't believe

18   Jentz was contributorily negligent.  You would put zero.  Or

19   you don't believe ConAgra bears any responsibility.  You would

20   put zero.  Or West Side does not bear any responsibility.  You

21   put zero.

22        Then after, if you have allocated any negligence to

23   John Jentz, then this tells you after reducing the plaintiff's

24   total damages from paragraph first by the percentage of

25   negligence, if any, of John Jentz, from line A in paragraph

65

1    second, we award John Jentz recoverable damages in the amount

2    of blank.

3         Let me give you an example.  Let's say you find for

4    Jentz and against both ConAgra and West Side.  I am making it

5    all up.  Let's say you award him $10.  You would find his

6    damages were $10, so you would put $10 here, and after you add

7    up all the line items -- let's say you put $10 and let's say

8    you found him 2 percent contributorily negligent.  Two percent

9    is what you would put here.  Let's say you thought ConAgra and

10   West Side were equally responsible.  That leaves each of them

11   49 percent.  49, 49, plus two is 100.  Then what you would do

12   down here is take the total damages of $10, subtract the 2

13   percent you allocated to Jentz, and he would get $8.  So that

14   is how it works.  That is verdict form A.

15        Verdict form B is used if you find in favor of

16   ConAgra or that Jentz was more than 50 percent contributorily

17   negligent.

18        It reads, again the style at the top, Verdict Form B.

19   We, the jury, find for the defendant ConAgra Foods, Inc., and

20   against plaintiff John W. Jentz, and there is a place for you

21   to sign as there was on the previous document.  Foreperson

22   signs first and everybody else signs after that.

23        Verdict form C is what you would use if you find,

24   again, the plaintiff more than 50 percent contributorily

25   negligent, or you find in favor of West Side.

66

1          We, the jury, find for the defendant West Side

2     Salvage and against the plaintiff John Jentz.  Again,

3     foreperson signs and everybody else signs on the balance of

4     the lines.

5          In addition to compensatory damages, the law permits

6     you under certain circumstances to award punitive damages.  If

7     you find that the conduct of ConAgra and or West Side Salvage

8     was willful and wanton and proximately caused injury to John

9     Jentz, and if you believe that justice and the public good

10    require it, you may award an amount of money which will punish

11    ConAgra and or West Side Salvage and discourage them and

12    others from similar conduct.

13         In arriving at your decision as to the amount of

14    punitive damages, you should consider the following three

15    questions:

16         The first question is the most important to determine

17    the amount of punitive damages.  How reprehensible was the

18    conduct of ConAgra and or West Side Salvage.  On this subject,

19    you should consider the following:

20         A.  The facts and circumstances of the defendant's

21    conduct.

22         B.  The vulnerability of the plaintiff.

23         C.  The duration of the misconduct.

24         D.  The frequency of the defendant's misconduct.

25         E.  Whether the harm was physical as opposed to

1   economic.

2          F.   Whether the defendant tried to conceal the

3   misconduct.

4          Number 2.  What actual and potential harm did the

5   defendant's conduct cause to the plaintiff in this case.

6          Number 3.  What amount of money is necessary to

7   punish the defendant and discourage the defendant and others

8   from future wrongful conduct in light of the defendant's

9   financial condition.

10         The amount of punitive damages must be reasonable and

11  in proportion to the actual and potential harm suffered by the

12  plaintiff.

13         The evidence concerning the size and revenue of

14  ConAgra is to be considered by you only if you decide to award

15  punitive damages against ConAgra.  It should not be considered

16  for any other purpose.

17         The evidence concerning the size and revenue of West

18  Side Salvage is to be considered by you only if you decide to

19  award punitive damages against West Side Salvage.  It should

20  not be considered for any other purpose.

21         If you find for the plaintiff, compensatory damages

22  you award will not be subject to income taxes and, therefore,

23  you should not consider taxes in fixing the amount of the

24  verdict.

25         If you award punitive damages to the plaintiff, such

68

1     damages are subject to income taxes.

2            It was the duty of the defendants before and at the

3     time of the occurrence to refrain from willful and wanton

4     conduct which would endanger the safety of the plaintiff.

5            When I use the expression "willful and wanton

6     conduct", I mean a course of action which shows an utter

7     indifference to or conscious disregard for the safety of

8     others.

9            Defendants ConAgra and West Side Salvage are

10    corporations and can act only through their respective

11    officers and employees.

12           As to John Jentz's claims for compensatory damages

13    against defendants ConAgra and West Side Salvage, any act or

14    omission of an officer or employee within the scope of his

15    employment is the act or omission of the defendant

16    corporation.

17           As to John Jentz's claims for punitive damages

18    against defendants ConAgra and West Side Salvage, a different

19    rule applies.  Punitive damages may be awarded against

20    defendants ConAgra and or West Side Salvage only:

21           One, if you find in favor of the plaintiff and

22    against defendants ConAgra and or West Side Salvage under

23    Counts 2, willful and wanton-ConAgra, and 4, willful and

24    wanton-West Side Salvage, of the Complaint.

25           Two, if you find that as to the acts or omissions

69

1  giving rise to the liability under Counts 2, willful and

2  wanton-ConAgra, and Count 4, willful and wanton-West Side

3  Salvage, and the corporation through its management authorized

4  the doing and the manner of the act or omissions.

5          You must consider these propositions separately as to

6  each defendant.

7          Then there is a verdict form for your consideration

8  under punitive damages.  This just reads at the top, Verdict.

9  Again, it has the style.  We, the jury, award punitive damages

10  in favor of John Jentz and against the following defendant or

11  defendants.  Here you would check yes or no as to ConAgra, yes

12  or no as to West Side.  If you answer no as to either

13  defendant, place a zero on the line for the defendant on the

14  appropriate line below.

15          So let's say for the sake of argument you find no

16  punitive damages against either defendant, you check no.

17          If you would find punitive damages against both, you

18  check yes and then you put the amount of punitive damages in

19  this line as to ConAgra, and in this line as to West Side.  If

20  you found for one, against one, but not the other, you put a

21  zero where you found no punitive damages and you put the

22  amount of punitive damages in the other line and the

23  foreperson would sign and the rest of the jurors on the

24  balance of the lines.

25          That concludes the instructions in John Jentz's case.

70

1    Next we move on to the blue folder, which I have denominated

2    packet number three.  This is Justin Becker.  I haven't gotten

3    to Amber yet.  She is coming up.  This is Justin Becker's

4    case.  So again, you will consider his case in conjunction

5    with all of the instructions in the green folder.

6          In this case, packet number three is the blue folder

7    and it contains instructions of verdict forms unique to the

8    Justin Becker claim and there are three claims for your

9    decision.  Becker sues only ConAgra.  Count 1 is allegations

10   of negligence requesting compensatory damages.  Count 3 is an

11   allegation alleging willful and wanton conduct requesting

12   punitive damages, and then in this case we have ConAgra making

13   a claim against West Side for that apportionment of legal

14   responsibility, or what I refer to as contribution.

15         So we start as we did in the Jentz case with the

16   issues instruction.

17         Plaintiff Justin Becker's complaint consists of two

18   counts.  The issues to be decided by you under Count 1,

19   negligence, of the complaint are as follows:  The plaintiff

20   Justin Becker claims that he was injured and sustained damage

21   and that the defendant ConAgra was negligent in one or more of

22   the following respects.

23         A.  Failed to properly maintain the wheat middling

24   pellets in grain bin C15 in a reasonably safe manner and

25   condition.

1          B.   Allowed the wheat middling within grain bin C15

2    to self heat and smolder, creating an increased risk of fire

3    and an unreasonably dangerous condition to individuals on its

4    premises like Justin Becker.

5          C.   Failed to properly inspect or monitor the wheat

6    middling pellets within grain bin C15 for signs of self

7    heating, smoldering or fire.

8          D.   Failed to remove the wheat middling within bin

9    C15 in a timely fashion, which created an increased risk of

10   fire and or explosion and an unreasonably dangerous condition

11   to individuals on its premises like Justin Becker.

12         E.   Failed to properly monitor the atmosphere of bin

13   C15 for the presence of combustible gasses, including carbon

14   monoxide and or smoke.

15         F.   Failed to properly monitor the wheat middling

16   pellets in bin C15 for the presence of high temperatures.

17         G.   Failed to implement its facility emergency action

18   plan upon the discovery of a fire in bin C15.

19         H.   Failed to warn Justin Becker or his employer,

20   West Side Salvage, of the dangerous conditions, that is a

21   potential for fire and explosion hazards in bin C15.

22         I.   Failed to timely alert and notify local fire

23   department and other emergency personnel of the fire on its

24   premises.

25         J.   Continued to conduct operations within Elevator C

72

1    which increased the risk of an explosion within bin C15.

2            K.   Failed to immediately evacuate individuals

3    working in and around bin C15 on and before April 27th of

4    2010, like Justin Becker, when ConAgra knew or should have

5    known of an imminent danger to those individuals, that an

6    explosion could occur.

7            L.   Failed to immediately evacuate individuals

8    working in and around bin C15 on April 27th, 2010, after

9    deciding to request that one or more representatives of the

10   Chester Fire Department come to the scene.

11           M.   Refused to call the fire department to the

12   Chester facility at any time prior to the explosion despite

13   repeated requests.

14           N.   Failed to maintain and clean bin C15.

15           O.   Permitted West Side Salvage, Inc., to remove the

16   pellets from the tunnel in violation of industry standards.

17           The plaintiff Justin Becker further claims that one

18   or more of the foregoing was a proximate cause of his

19   injuries.

20           The defendant ConAgra denies that it did any of the

21   things claimed by the plaintiff, denies that it was negligent

22   in doing any of the things claimed by the plaintiff, and

23   denies that any claimed act or omission on the part of that

24   defendant was a proximate cause of the plaintiff's claimed

25   injuries.

73

1          The defendant ConAgra claims that the plaintiff

2     Justin Becker was contributorily negligent in one or more of

3     the following respects:

4          A.   Negligently engaged in fighting a fire in the bin

5     when they were not qualified and competent to do so.

6          B.   Negligently left the bin to go to lunch on

7     April 27th without confirming that the fire in the bin had

8     been completely extinguished.

9          C.   Negligently failing to provide for the continuous

10    monitoring of the bin when he went to lunch on April 27th.

11         D.   Negligently failed to timely alert ConAgra of the

12    condition of the bin when he knew or should have known that

13    the situation in the bin was dangerous and out of control.

14         E.   Negligently failed to call for an evacuation of

15    all workers at the ConAgra facility when he knew or should

16    have known that the situation in the bin was dangerous and out

17    of control.

18         F.   Negligently failed to alert the fire department

19    that the situation in the bin was dangerous and out of

20    control.

21         G.   Negligently entered the tunnel under the bin

22    after being alerted that the situation in the bin was

23    dangerous and out of control.

24         The defendant ConAgra further contends that one or

25    more of the foregoing was a proximate cause of the plaintiff

74

1    Justin Becker's injuries.

2         The plaintiff Justin Becker denies that he did any of

3    the things claimed by the defendant ConAgra, denies that he

4    was negligent in doing any of the things claimed by defendant

5    ConAgra and denies that any claimed act or omission on his

6    part was a proximate cause of his claimed injuries.

7         Turning now to Count 3, willful and wanton, of

8    plaintiff Justin Becker's Complaint.  The issues to be decided

9    by you under that count are as follows:

10        The plaintiff claims that he was injured and

11   sustained damage and that the conduct of the defendant ConAgra

12   was willful and wanton in one or more of the following

13   respects:

14        A.  Refused to call the fire department to the

15   Chester facility at any time prior to the explosions despite

16   repeated requests by employees of both ConAgra and West Side

17   Salvage because of concerns in doing so would adversely affect

18   facility operations.

19        B.  Failed to inform Justin Becker or his employer of

20   a known fire in bin C15.

21        C.  Failed to follow the recommendation to

22   immediately remove the knowingly dangerous wheat middling

23   pellets in bin C15 because it was putting money over safety.

24        D.  Continued to conduct operations within Elevator C

25   despite requests by West Side Salvage to not do so, which

1    increased the risk of explosion within bin C15.

2           E.   Failed to immediately evacuate individuals

3    working in and around bin C15 on and before April 27, 2010,

4    when ConAgra knew or should have known of an imminent danger

5    to those individuals that an explosion could occur.

6           F.   Failed to immediately evacuate individuals

7    working in and around bin C15 on April 27th of 2010, after

8    deciding to request that one or more representatives of the

9    Chester Fire Department come to the scene.

10          The plaintiff Justin Becker further claims that one

11   or more of the foregoing was a proximate cause of his

12   injuries.

13          The defendant ConAgra denies that it did any of the

14   things claimed by the plaintiff Justin Becker, denies that it

15   was willful and wanton in doing any of the things claimed by

16   plaintiff Justin Becker, and denies that any of the claimed

17   act or omissions on the defendant ConAgra's part was a

18   proximate cause of plaintiff Justin Becker's claimed injuries.

19          Defendant ConAgra further denies that plaintiff

20   Justin Becker was injured or sustained damages to the extent

21   claimed.

22          That was the issues instruction in Justin Becker.

23   Now we have the burden of proof.

24          The plaintiff Justin Becker has the burden of proving

25   each of the following propositions in Count 1, negligence, of,

1    his complaint.

2          First, that the defendant ConAgra acted or failed to

3    act in one of the ways claimed by the plaintiff as stated to

4    you in these instructions, and that in so acting or failing to

5    act the defendant was negligent.

6          Second, that the plaintiff was injured.

7          Third, that the negligence of the defendant was a

8    proximate cause of the injury to the plaintiff.

9          In order to recover in this action on Count 1,

10   negligence, the plaintiff Justin Becker must prove all of the

11   above propositions.

12         If you find from your consideration of all the

13   evidence that all of the propositions, first, second and

14   third, in Count 1, negligence, have been proved, then you must

15   next consider the defendant's claim that the plaintiff was

16   contributorily negligent as to Count 1, negligence.

17         As to that claim, the defendant has the burden of

18   proving each of the following propositions:

19         A.  That the plaintiff acted or failed to act in one

20   of the ways claimed by the defendant as stated to you in these

21   instructions, and that in so acting or failing to act the

22   plaintiff was negligent.

23         B.  That the plaintiff's negligence was a proximate

24   cause of his injury.

25         If you find from your consideration of all the

77

1  evidence that the plaintiff has proved all of the propositions

2  required of the plaintiff, first, second and third in Count 1,

3  negligence, and if you find from your consideration of all the

4  evidence that either of the propositions required of the

5  defendant, A or B, has not been proved, then your verdict

6  shall be for the plaintiff and you shall not reduce the

7  plaintiff's damages.

8          If you find from your consideration of all the

9  evidence that one or more of the above propositions required

10  of the plaintiff, first, second or third, has not been proved,

11  then your verdict shall be for the defendant.

12          If you find from your consideration of all the

13  evidence that the plaintiff has proved all of the propositions

14  required of the plaintiff, first, second and third, in Count

15  1, negligence, and if you further find from your consideration

16  of all the evidence that the defendant has proved both of the

17  propositions required of the defendant, A and B, and that the

18  plaintiff's negligence was greater than 50 percent of the

19  total proximate cause of the injury or damage for which

20  recovery is sought, then your verdict shall be for the

21  defendant.

22          If you find from your consideration of all the

23  evidence that the plaintiff has proved all of the propositions

24  required of the plaintiff, first, second and third, in Count

25  1, and if you further find from your consideration of all the

78

1    evidence that the defendant has proved both of the

2    propositions required of the defendant, A and B, and that the

3    plaintiff's negligence was 50 percent or less of the total

4    proximate cause of the injury or damage for which recovery is

5    sought, then your verdict shall be for the plaintiff and you

6    shall reduce plaintiff's damages in the manner stated to you

7    in these instructions.

8         The plaintiff has the burden of proving each of the

9    following propositions in Count 3, willful and wanton, of his

10   Complaint.

11        First, that the defendant acted or failed to act in

12   one of the ways claimed by the plaintiff as stated to you in

13   these instructions, and in so acting or failing to act the

14   defendant was willful and wanton.

15        Second, that the plaintiff was injured.

16        Third, that the willful and wanton conduct of the

17   defendant was a proximate cause of the injury to the

18   plaintiff.

19        If you find from your consideration of all the

20   evidence that the plaintiff has proved all of the propositions

21   required of the plaintiff, first, second and third, in Count

22   3, willful and wanton, then your verdict shall be for the

23   plaintiff as to Count 3, willful and wanton.

24        THE COURT:  Folks, many of the instructions are

25   duplicates from one packet to the next, but some aren't.  The

79

1    reason I have duplicates is so you don't have to look at one

2    large set and figure out what goes with what.

3          More than one person may be to blame for causing an

4    injury.  If you decide that a defendant was negligent and that

5    it's negligence was a proximate cause of injury to a

6    plaintiff, it is not a defense that some third person who is

7    not a party to the suit may also have been to blame.

8          However, if you decide that the sole proximate cause

9    of injury to a plaintiff was the conduct of some person other

10   than the defendant, then your verdict should be for the

11   defendant.

12         If you decide for the plaintiff on the question of

13   liability, you must then fix the amount of money which will

14   reasonably and fairly compensate him for any of the following

15   elements of damages proved by the evidence to have resulted

16   from the negligence of the defendants, taking into

17   consideration the nature, extent and duration of the injury,

18   the disfigurement resulting from the injury, the loss of a

19   normal life experienced and reasonably certain to be

20   experienced in the future, the pain and suffering experienced

21   and reasonably certain to be experienced in the future as a

22   result of the injuries, the emotional distress experienced and

23   reasonably certain to be experienced in the future, the

24   reasonable and necessary medical care, treatment and services

25   received, and the present cash value of the reasonable

1    expenses, medical care, treatment and services reasonably

2    certain to be received in the future, the value of earnings

3    and benefits lost and the present cash value of the earnings

4    and benefits reasonably certain to be lost in the future, the

5    reasonable expense of necessary services and the present cash

6    value of such expenses reasonably certain to be required in

7    the future.

8              Whether any of these elements of damages has been

9    proved by the evidence is for you to determine.

10             When I use the expression "loss of a normal life", I

11   mean a temporary or permanent diminished ability to enjoy

12   life.  This includes a person's inability to pursue the

13   pleasurable aspects of life.

14             In computing the damages arising in the future

15   because of future medical expenses or because of the loss of

16   future earnings, benefits or services, you must determine

17   their present cash value.

18             Present cash value means the sum of money needed now,

19   which when added to what that sum may reasonably be expected

20   to earn in the future, will equal the amount of the expenses,

21   earnings, benefits and services at the time in the future when

22   the expenses must be paid or the earnings benefits and

23   services would have been received.

24             Damages for pain and suffering, loss of a normal

25   life, emotional distress and disfigurement are not reduced to

1    present cash value.

2        If you find that the plaintiff is entitled to damages

3    arising in the future because of injuries or because of future

4    medical expenses or because of loss of earnings, you must

5    determine the amount of these damages which will arise in the

6    future.

7        If these damages are of a continuing nature, you may

8    consider how long they will continue.

9        If these damages are permanent in nature, then in

10    computing these damages you may consider how long the

11    plaintiff and his spouse are likely to live.

12        With respect to a loss of future earnings, you may

13    consider that some persons work all their lives and others do

14    not, that a person's earnings may remain the same or may

15    increase or decrease in the future.

16        According to a table of mortality in evidence, the

17    life expectancy of Justin Becker, a male aged 31 years, is

18    46.5 years.  These figures are not conclusive.  They are the

19    average life expectancy of persons who have reached these

20    ages.

21        They may be considered by you in connection with

22    other evidence relating to the probable life expectancy of the

23    plaintiff in this case, including evidence of his occupation,

24    health, habits and other activities, bearing in mind that some

25    persons live longer and some persons live less than average.

82

1        If you find for the plaintiff, compensatory damages

2   you award will not be subject to income taxes and, therefore,

3   you should not consider taxes in fixing the amount of the

4   verdict.

5        If you award punitive damages to the plaintiff, such

6   damages are subject to income taxes.

7        Speaking of taxes, you are probably going to get more

8   than $600 from us, so you are going to get a 1099.  Sorry.

9   Somebody has to pay my salary.

10       When you retire to the jury room, you will first

11  select a foreperson.  He or she will preside during your

12  deliberations.

13       Your verdict must be unanimous.

14       Forms of verdict are supplied with these

15  instructions.  After you have reached your verdict, fill in

16  and sign the appropriate form of verdict and return it to the

17  Court.  Your verdict must be signed by each of you.

18       You should not write or mark upon this or any of the

19  other instructions given to you by the Court.

20       If you find for Justin Becker and against ConAgra and

21  if you further find that Justin Becker was not contributorily

22  negligent, then you should use verdict form A.

23       If you find for Justin Becker and against ConAgra and

24  if you further find that Justin Becker's injury was

25  proximately caused by a combination of ConAgra's negligence or

83

1    willful and wanton conduct and Justin Becker's contributory

2    negligence, and that Justin Becker's contributory negligence

3    was 50 percent or less of the total proximate cause of the

4    injury or damage for which recovery is sought,then you should

5    use verdict form B.

6          If you find for ConAgra and against Justin Becker, or

7    if you find that Justin Becker's contributory negligence was

8    more than 50 percent of the total proximate cause of the

9    injury or damage for which recovery is sought, then you should

10   use verdict form C.

11         Then we have the contribution issue, and then this is

12   the claim of ConAgra against West Side.  This is the issues

13   instruction in that particular case.

14         In addition to the claim of Justin Becker against

15   ConAgra, ConAgra makes a claim against West Side.  ConAgra

16   claims that if it is liable to Justin Becker for damages, then

17   it is entitled to contribution from West Side for a percentage

18   of those damages.

19         If you find ConAgra liable to Justin Becker, then you

20   must consider the claim for contribution by ConAgra.

21         ConAgra claims that West Side was negligent in one or

22   more of the following respects:

23         A.  Failed to use proper means and methods in

24   removing the pellets after discovering the core inside the

25   bin.

84

1          B.   Failed to provide an adequate safety plan when it

2    began to work with the core of the bin.

3          C.   Failed to timely call the fire department and

4    notify ConAgra personnel of the true condition of the bin when

5    it knew that the situation in the bin was dangerous.

6          I think the word "true" should be stricken.

7          MR. SCHULTZ:   Correct.

8          THE COURT:   Forget that folks.   That is a typo.

9          I am making for the record any changes on the

10   instructions.   I am making them as we go.   They'll be made on

11   the jury clean copy and those will also be uploaded.

12         Let me repeat.

13         C.   Failed to timely call the fire department and

14   notify ConAgra personnel of the condition of the bin when it

15   knew that the situation in the bin was dangerous.

16         D.   Failed to timely evacuate workers from the work

17   site when it knew that the situation inside the bin was

18   dangerous.

19         E.   Failed to properly inspect and monitor the wheat

20   middling pellets within bin C15 for signs of self heating,

21   smoldering or fire.

22         F.   Failed to properly monitor the atmosphere of bin

23   C15 for the presence of combustible gasses and or vapors.

24         G.   Failed to properly monitor temperatures levels of

25   bin C15 and the wheat middling pellets within bin C15.

1          H.   Failed to adequately train employees in the

2     recognition and prevention of the hazards present in bin C15.

3          I.   Failed to warn Justin Becker of the dangerous

4     conditions in grain bin C15.

5          J.   Instructed Justin Becker to go into the tunnel in

6     spite of the existing fire and explosion hazards.

7          ConAgra further claims that one or more of the

8     foregoing was the proximate cause of Justin Becker's injury.

9          West Side denies that it did any of the things

10    claimed by ConAgra, denies that it was negligent in doing any

11    of the things claimed by ConAgra, and denies that any claimed

12    act or omission on the part of West Side was a proximate cause

13    of Justin Becker's injuries.

14         We have the burden of proof in the contribution

15    claim.

16         As to the claim of ConAgra against West Side, ConAgra

17    has the burden of proving each of the following propositions:

18         First, that West Side acted or failed to act in one

19    of the ways claimed in these instructions and that in so

20    acting or failing to act West Side was negligent.

21         Second, that the negligence of West Side was a

22    proximate cause of Justin Becker's injuries.

23         If you find from your consideration of all the

24    evidence that both of these propositions has been proved, then

25    your verdict should be for ConAgra and against West Side and

1    you should include West Side in apportionment of damages.

2         If, on the other hand, you find from your

3    consideration of all the evidence that either one or both of

4    these propositions has not been proved, then your verdict

5    should be for -- your verdict should be for West Side and you

6    will not have occasion to consider the apportionment of

7    damages against West Side.

8         So I read the burden, but I had a different

9    instruction up there, okay.  Why didn't you say something?

10   That was a test to see if you were paying attention.  That was

11   the burden of proof.  Here is what it looks like.  I am not

12   going to read it again.  This is the second time you heard it.

13   You are going to hear it two more times.  Okay, this will look

14   familiar.

15        Defendant ConAgra is a corporation and can act only

16   through it's respective officers and employees.

17        As to the plaintiff's claims for compensatory damages

18   against defendant ConAgra, any act or omission of an officer

19   or employee within the scope of his employment is the act or

20   omission of the defendant corporation.

21        As to plaintiff's claims for punitive damages against

22   defendant ConAgra, a different rule applies.  Punitive damages

23   may be awarded against defendant ConAgra only, one, if you

24   find in favor of plaintiffs and against defendant ConAgra

25   under Count 3 of the complaint, and two, if you find that as

87

1    to the acts or omissions giving rise to liability under Count

2    3, the corporation, through it's management, authorized the

3    doing and the manner of the acts or omissions.

4         The evidence concerning the size and revenue of

5    ConAgra is to be considered by you only if you decide to award

6    punitive damages against ConAgra.  It should not be considered

7    for any other purpose.

8         In addition to compensatory damages, the law permits

9    you, under certain circumstances, to award punitive damages.

10   If you find that ConAgra's conduct was willful and wanton and

11   proximately caused injury to the plaintiff, and if you believe

12   that justice and the public good require it, you may award an

13   amount of money which will punish ConAgra and discourage it

14   and others from similar conduct.

15        In arriving at your decision as to the amount of

16   punitive damages, you should consider the following three

17   questions:  The first question is the most important to

18   determine the amount of punitive damages.

19        Number 1.  How reprehensible was ConAgra's conduct.

20   On this subject you should consider the following:

21        A.  The facts and circumstances of the defendant's

22   conduct.

23        B.  The vulnerability of the plaintiff.

24        C.  The duration of the misconduct.

25        D.  The frequency of the defendant's misconduct.

88

1          E.   Whether the harm was physical as opposed to

2     economic.

3          F.   Whether defendant tried to conceal the

4     misconduct.

5          Number 2.  What actual and potential harm did the

6     defendant's conduct cause to the plaintiffs in this case.

7          Number 3.  What amount of money is necessary to

8     punish the defendant and discourage defendant and others from

9     future wrongful conduct in light of the defendant's financial

10    condition.

11         The amount of punitive damages must be reasonable and

12    in proportion to the actual and potential harm suffered by the

13    plaintiff.

14         It was the duty of the defendant before and at the

15    time of the occurrence to refrain from willful and wanton

16    conduct which would endanger the safety of the plaintiff.

17         When I use the expression "willful and wanton

18    conduct", I mean a course of action which shows an utter

19    indifference to or conscious disregard for the safety of

20    others.

21         If you find that the defendant is legally responsible

22    for proximately causing plaintiff's injuries, then you must

23    apportion damages by determining the relative degree of legal

24    responsibility of each entity named or described on the

25    verdict form.

89

1          In making that determination, you should consider the

2     degree to which the entities conduct proximately caused the

3     plaintiff's injuries.

4          In your verdict form you will state the percentage of

5     legal responsibility of each of the entities named on the

6     verdict form.  The total of these percentages must add up to

7     100 percent.

8          Yes, I already read this.  I won't read duplicates to

9     you.

10          Okay, here is verdict form A.  It has the style at

11    the top.  It again reads, and all of this stuff here doesn't

12    mean anything, folks.  As you know from the beginning these

13    were three separate cases I consolidated.  One was assigned to

14    a different judge, so I took them all over.  That is why you

15    see the numbers.  You don't need to worry about them.

16          Verdict form A, first as to Count 1, negligence.  We,

17    the jury, find for Justin Becker and against ConAgra Food,

18    Inc.  We assess the damages in the sum of blank, itemized as

19    follows:  The disfigurement resulting from the injury.  The

20    loss of normal life experienced.  The loss of a normal life

21    reasonably certain to be experienced in the future.  The pain

22    and suffering experienced as a result of the injuries.  The

23    pain and suffering reasonably certain to be experienced in the

24    future as a result of the injuries.  The emotional distress

25    experienced as a result of the injuries.  The emotional

90

1    distress reasonably certain to be experienced in the future as

2    a result of the injuries.  The reasonable and necessary

3    medical care, treatment and services received.  The present

4    cash value of the reasonable expense of medical care,

5    treatment and services reasonably certain to be received in

6    the future.  The value of earnings and benefits lost.  The

7    present cash value of the earnings and benefits reasonably

8    certain to be lost in the future.  The present cash value of

9    service reasonably certain to be required in the future.

10           Then you would add all of those up again if you

11   choose this verdict form.  This number here must equal the one

12   on the front page.

13           Then, assuming 100 percent represents the total

14   combined legal responsibility of all persons or entities that

15   proximately caused Justin Becker's injuries, we find the legal

16   responsibility attributable to each as follows:

17           This is the contribution claim, so you put the

18   amounts there if you get to that,

19           Instructions say if you find any other party listed

20   on the verdict form that was not legally responsible in a way

21   that proximately caused plaintiff's injury, you should enter

22   zero as to that party and then you sign it.  That is verdict

23   form A.

24           Verdict form B, Justin Becker case, reads as follows:

25   Verdict form B as to be Count 1, negligence.  We, the jury,

1    find for Justin Becker and against the following defendant.

2    ConAgra, yes or no.  If you answer no, you don't need to fill

3    in any of the rest of it.  If you answer yes, you put in the

4    total damages that you itemize.

5           Again, I am not going to reread these.  They are the

6    same ones I just went over.

7           Second, assuming that 100 percent represents the

8    total combined legal responsibility of all persons or entities

9    that proximately caused Justin Becker's injuries, we find the

10   percentage of legal responsibility attributable to each as

11   follows.  There you fill in the percentages.  Again, they need

12   to add up to 100.  Then the last page after reducing the

13   plaintiff's total damages from paragraph first by the

14   percentage of negligence, if any, of Justin Becker from line

15   A, and paragraph second, we award Justin Becker recoverable

16   damages in the amount of blank, and the foreperson would sign

17   it.

18          You do the same calculation that I told you about in

19   the Jentz case, although the percentages certainly could be

20   different from case to case.  One you might find comparative

21   fault, one you may not.  Each case stands on its own and that

22   is why I have separate instructions for you.

23          Then there is a verdict form C.  Is there no B in

24   this case?  That was B.  Got it.

25          Verdict form C reads as follows:  We, the jury, find

92

1    for the defendant ConAgra Foods and against the plaintiff

2    Justin Becker.  So you would pick either A, B or C in this

3    case, and also the same thing in Jentz, although again, your

4    verdicts could be different in terms of liability and

5    certainly damages.

6            The evidence concerning the size and revenue of

7    ConAgra is to be considered by you only if you decide to award

8    punitive damages against ConAgra.  It should not be considered

9    for any other purpose.

10           Then the last verdict form for you to consider in the

11   Justin Becker case is the punitive damage verdict form.

12   Again, the style is at the top.  Verdict, we, the jury, award

13   punitive damages in favor of plaintiff Justin Becker and

14   against the following defendants.  You would answer yes or no.

15   If you answered yes, you would put in the amount here and sign

16   it.  If you answer no, you don't need to get to any amount.

17   That concludes the Justin Becker instructions.  Why don't we

18   take about 15 minutes so Barb can rest.

19      (Whereupon a recess was taken.  The following proceedings

20   were held in open Court.)

21           THE COURT:  Please be seated.

22           Okay, folks, next is Amber Becker, and again, you

23   will consider all of the instructions in the green packet,

24   which are common, and then Amber's case.  Remember, her case

25   is in the purple folder, packet number four.  There are two

1   claims for your decision.  Reminder again that she has what we

2   call loss of consortium claim, and her claim is derivative,

3   meaning if Justin does not succeed, then she cannot succeed.

4        If you found for plaintiff Justin Becker on the

5   question of liability, you must then fix the amount of money

6   which will reasonably and fairly compensate Amber Becker for

7   any of the following elements of damages arising out of

8   injuries to her husband which she has proven by the evidence

9   to have resulted from the negligence of the defendant:  The

10  reasonable value of the society, companionship and sexual

11  relationship with her husband of which she has been deprived,

12  the society, companionship and sexual relationship with her

13  husband of which she is reasonably certain to be deprived in

14  the future.

15       Whether any of these elements of damages has been

16  proved by the evidence is for you to determine.

17       If you find that the plaintiff is entitled to damages

18  arising in the future because of loss of companionship and

19  sexual relations, you must determine the amount of these

20  damages which will arise in the future.  If these damages are

21  of a continuing nature, you may consider how long they will

22  continue.  If these damages are permanent in nature, then in

23  computing these damages you may consider how long the

24  plaintiff and her spouse are likely to live.

25       According to a table of mortality in evidence, the

94

1    life expectancy of Amber Becker, a female aged 34 years, is

2    48.8 years.   These figures are not conclusive.   They are the

3    average life expectancies of persons who have reached these

4    ages.   They may be considered by you in connection with other

5    evidence relating to the probable life expectancy of the

6    plaintiff in this case, including evidence of her occupation,

7    health, habits and other activities, bearing in mind that some

8    persons live longer and some persons less than average.

9         If you find for the plaintiff, compensatory damages

10   you award will not be subject to income taxes and, therefore,

11   you should not consider taxes in fixing the amount of the

12   verdict.

13        When you retire to the jury room, you will first

14   select a foreperson.   He or she will preside during your

15   deliberations.

16        Your verdict must be unanimous.

17        Forms of verdict are supplied with these

18   instructions.   After you have reached your verdict, fill in

19   and sign the appropriate form of verdict and return it to the

20   Court.   Your verdict must be signed by each of you.   You

21   should not write or mark upon this or any of the other

22   instructions given to you by the Court.

23        If you found for Justin Becker and against ConAgra as

24   to either Count 1, negligence, or Count 3, willful and wanton,

25   and if you further find for Amber Becker as to Count 2, loss

1   of consortium-negligence, then you should use verdict form A.

2          If you found for ConAgra against Justin Becker or if

3   you find for Justin Becker but against Amber Becker as to her

4   claim, then you should use verdict form B.

5          So this is the one you would use if you find in favor

6   of Amber, which means you would have had to find for Justin.

7   Verdict form A, Amber Becker, has the style at the top.  We,

8   the jury, find for Amber Becker and against ConAgra Foods.  We

9   assess damages in the sum of blank, itemized as follows:  The

10  reasonable value of society, companionship and sexual

11  relationship with her husband of which she has been deprived.

12  The reasonable value of the society, companionship and sexual

13  relationship with her husband of which she is reasonably

14  certain to be deprived in the future.

15         Then you put the total there.  The total here has to

16  equal the total there and then you sign it.  Note there is no

17  calculation you make here for reducing this award by

18  comparative fault of Justin.  If you choose to use this form,

19  I will automatically make the calculation.

20         When I gave you the example with the Jentz case and I

21  had the $10 and the 2 percent, my math was wrong.  Let me

22  start over again.  Let's say that was a $100 award and you

23  found him 2 percent responsible.  All right, you all get it.

24  So let's say its the same case as in the Becker case.  Let's

25  say you find Justin Becker 2 percent at fault and it was $100

96

1    award.  You would knock off the $2.  Here I will do the

2    percentage calculation on the Amber Becker damages.  That, of

3    course, assumes you find in favor of her.

4         If you find in favor of defendant ConAgra, then you

5    would use verdict form B, which, again, has the style.

6    Verdict form B, Amber Becker.  We, the jury, find for

7    defendant ConAgra Foods and against the plaintiff Amber

8    Becker.

9         That concludes the instructions on Amber Becker.

10        Robert Schmidt is packet five, yellow folder.  Again,

11   you use all of the instructions in the green folder.  In the

12   Schmidt folder, there are five claims for your decision.

13        Count 1 is Schmidt against ConAgra requesting

14   compensatory damages alleging negligence.  Count 2 alleges

15   willful and wanton conduct against ConAgra requesting punitive

16   damages.  Count 3 is against West Side alleging negligence

17   requesting compensatory damages, and Count 4 is against West

18   Side Salvage alleging willful and wanton misconduct requesting

19   punitive damages.  As in Jentz, there is a contribution claim,

20   ConAgra versus West Side and West Side versus ConAgra, asking

21   you to calculate the relative legal responsibility of those

22   two parties.

23        Okay, we start out with the issues instruction in the

24   Schmidt case.  Plaintiff Schmidt's Complaint consists of two

25   counts each against both defendants ConAgra and West Side.

97

The issues to be decided by you under Count 1, negligence against ConAgra of the complaint are as follows:

The plaintiff claims that he was injured and sustained damage and that the defendant ConAgra was negligent in one or more of the following respects:

A.  Failed to properly maintain the wheat middling pellets within grain bin C15 in a reasonably safe manner and condition.

B.  Allowed the wheat middling pellets within grain bin C15 to self heat and smolder, creating an increased risk of fire and an unreasonably dangerous condition to individuals on its premises like Robert Schmidt.

C.  Failed to properly inspect or monitor the wheat middling pellets within grain bin C15 for signs of self heating, smoldering or fire.

D.  Failed to remove the wheat middlings within bin C15 in a timely fashion, which created an increased risk of fire and or explosion, and an unreasonably dangerous condition to individuals on its premises like Robert Schmidt.

E.  Failed to properly monitor the atmosphere of bin C15 for the presence of combustible gasses, including carbon monoxide and or smoke.

F.  Failed to properly monitor the wheat middling pellets in bin C15 for the presence of high temperatures.

G.  Failed to implement it's facility emergency

98

1  action plan upon the discovery of a fire in bin C15.

2        H.   Failed to warn Robert Schmidt or his employer, A

3  & J Bin Cleaning, LLC, of the dangerous conditions, that is

4  the potential for fire and explosion hazards in bin C15.

5        I.   Failed to timely alert and notify local fire

6  department and other emergency personnel of the fire on its

7  premises.

8        J.   Continued to conduct operations within Elevator

9  C, which increased the risk of explosion within bin C15.

10       K.   Failed to immediately evacuate individuals

11 working in and around bin C15 on and before April 27, 2010,

12 like Robert Schmidt, when ConAgra knew or should have known of

13 an imminent danger to those individuals, that an explosion

14 could occur.

15       L.   Failed to immediately evacuate individuals

16 working in and around bin C15 on April 27th of 2010 after

17 deciding to request that one or more representatives of the

18 Chester Fire Department come to the scene.

19       M.   Failed to call the fire department to the Chester

20 facility at any time prior to the explosions, despite repeated

21 requests.

22       N.   Failed to properly clean and maintain bin C15.

23       O.   Permitted West Side Salvage, Inc., to remove the

24 wheat middling pellets from the tunnel in violation of

25 industry standards.

99

1          In Count 3, negligence against West Side Salvage, the

2     plaintiff claims that he was injured and sustained damage and

3     that the defendant West Side Salvage was negligent in one or

4     more of the following respects.

5          A.   Failed to properly inspect and monitor the wheat

6     middling pellets within grain bin C15 for signs of self

7     heating, smoldering or fire.

8          B.   Failed to properly monitor the atmosphere of bin

9     C15 for the presence of combustible gasses and or vapors.

10         C.   Failed to properly monitor temperature levels of

11    bin C15 and the wheat middling pellets within bin C15.

12         D.   Failed to adequately train employees in the

13    recognition of and prevention of the hazards present in bin

14    C15.

15         E.   Failed to warn Robert Schmidt of the dangerous

16    conditions in grain bin C15.

17         F.   Failed to notify local fire department of the

18    fire on the premises.

19         The plaintiff claims that one or more of the

20    foregoing was the proximate cause of his injuries.

21         Each defendant denies that it did any of the things

22    claimed by the plaintiff, denies that it was negligent in

23    doing any of the things claimed by the plaintiff, and denies

24    that any claimed act or omission on the part of the defendant

25    was a proximate cause of the plaintiff's claimed injuries.

1          The defendants claim that the plaintiff was

2    contributorily negligent in one or more of the following

3    respects:

4          A.   Negligently engaged in fighting a fire in the bin

5    which they were not qualified and competent to do so.

6          B.   Negligently left the bin to go to lunch on

7    April 27th without confirming that the fire in the bin had

8    been completely extinguished.

9          C.   Negligently failing to provide for the continuous

10   monitoring of the bin when he went to lunch on April 27th.

11         D.   Negligently requested the opening of the side

12   manhole cover when he knew or should have known that doing so

13   would introduce additional oxygen into the bin.

14         E.   Negligently failed to timely alert ConAgra of the

15   condition of the bin when he knew or should have known that

16   the situation in the bin was dangerous and out of control.

17         F.   Negligently failed to call for an evacuation of

18   all workers at the ConAgra facility when he knew or should

19   have known that the situation in the bin was dangerous and out

20   of control.

21         G.   Negligently failed to alert the fire department

22   that the situation in the bin was dangerous and out of

23   control.

24         The defendants further contend that one or more of

25   the foregoing was a proximate cause of the plaintiff's

1   injuries.

2           The plaintiff denies that he did any of the things

3   claimed by the defendant, denies that he was negligent in

4   doing any of the things claimed by the defendant, and denies

5   that any claimed act or omission on his part was a proximate

6   cause of his claimed injuries.  Turning now to Count 2,

7   willful and wanton, against ConAgra of the Complaint.

8           The issues to be decided by you under that count are

9   as follows:  The plaintiff claims that he was injured and

10  sustained damage and that the conduct of the defendant ConAgra

11  was willful and wanton in one or more of the following

12  respects:

13          A.  Refused to call the fire department to the

14  Chester facility at any time prior to the explosion, despite

15  repeated requests because of concerns that doing so would

16  adversely affect facility operations.

17          B.  Failed to inform Robert Schmidt or his employer

18  of a known fire in bin C15.

19          C.  Failed to follow the recommendations of West Side

20  Salvage to immediately remove the knowingly dangerous wheat

21  middling pellets in bin C15 because it was putting money over

22  safety.

23          D.  Continued to conduct operations within Elevator C

24  despite requests by West Side Salvage to not do so, which

25  increased the risk of explosion within bin C15.

1          E.   Failed to immediately evacuate individuals

2    working in and around bin C15 on and before April 27th of 2010

3    when ConAgra knew or should have known of an imminent danger

4    to those individuals that an explosion could occur.

5          F.   Failed to immediately evacuate individuals

6    working in and around bin C15 on April 27, 2010, after

7    deciding to request that one or more representatives of the

8    Chester Fire Department come to the scene.

9          In Count 4, willful and wanton against West Side

10   Salvage.  The plaintiff claims that he was injured and

11   sustained damage and that the conduct of defendant West Side

12   was willful and wanton in one or more of the following

13   respects.

14         A.   Failed to warn Robert Schmidt or his employer of

15   the known dangerous condition in bin C15.

16         The plaintiff further claims that one or more of the

17   foregoing was the proximate cause of his injuries.

18         Each defendant denies that it did any of the things

19   claimed by the plaintiff, denies that it was willful and

20   wanton in doing any of the things claimed by the plaintiff and

21   denies that any claimed act or omission on the part of the

22   defendant was a proximate cause of the plaintiff's claimed

23   injuries.

24         So those are the issues instructions on Robert

25   Schmidt.  Now we're moving to the burden instructions.

1          The plaintiff has the burden of proving each of the

2   following propositions in Counts 1, negligence, and Count 3,

3   negligence.  Count 1 is ConAgra, Count 3 is West Side of his

4   Complaint as to each defendant.

5          First, that the defendant acted or failed to act in

6   one of the ways claimed by the plaintiff as stated to you in

7   these instructions, and in so acting or failing to act the

8   defendant was negligent.

9          Second, that the plaintiff was injured.

10          Third, that the negligence of the defendant was a

11   proximate cause of the injury to the plaintiff.  You are to

12   consider these propositions as to each defendant.  In order to

13   recover in this action in Counts 1, negligence against

14   ConAgra, and 3, negligence against West Side Salvage, the

15   plaintiff must prove all of the above propositions.

16          If you find from your consideration of all the

17   evidence that all of the propositions, first, second and

18   third, in Counts 1 and 3 have been proved, then you must next

19   consider the defendant's claim that the plaintiff was

20   contributorily negligent as to Counts 1, negligence - ConAgra,

21   and Count 3, negligence - West Side Salvage.

22          As to that claim, each defendant has the burden of

23   proving each of the following propositions:

24          A.  That the plaintiff acted or failed to act in one

25   of the ways claimed by the defendant as stated to you in these

1    instructions, and that in so acting or failing to act the

2    plaintiff was negligent.

3         B.   That the plaintiff's negligence was a proximate

4    cause of his injury.

5         If you find from your consideration of all the

6    evidence that the plaintiff has proved all of the propositions

7    required of the plaintiff, first, second and third, in Counts

8    1, negligence -- Should this not read "and or"?

9         MR. SCHULTZ:  Yes.

10        THE COURT:  There is kind of a typo here, folks.  I

11   think when you look at the instructions as a whole, it is

12   clear.  If you read this instruction literally as the burden

13   of proof, and the Jentz case and the Becker case, it seems to

14   imply that the plaintiff has to prove his case against both

15   ConAgra and West Side where West Side is a defendant.  That is

16   not correct.  In the case where both West Side and ConAgra are

17   defendants, he can prove his case against either of them or

18   both of them.  He does not have to prove his case against both

19   of them in order to prove it.  To the extent this is

20   misleading, that correction applies.

21        MR. CLIFFORD:  Are you going to write that in?

22        THE COURT:  I'll make the changes on the other pages

23   too.  Let me start over.

24        If you find from your consideration of all the

25   evidence that the plaintiff has proved all of the propositions

1    required of the plaintiff, first, second and third, in Counts

2    1, negligence against ConAgra, and/or, Count 3, negligence

3    against West Side Salvage, and you find from your

4    consideration of all the evidence that either of the

5    propositions required of the defendant, A or B, has not been

6    proved, then your verdict shall be for the plaintiff and you

7    shall not reduce the plaintiff's damages.

8        If you find from your consideration of all the

9    evidence that one or more of the above propositions required

10   of the plaintiff, first, second or third, in Counts 1,

11   negligence, and/or Count 3, negligence - West Side Salvage,

12   has not been proved, then your verdict shall be for the

13   defendant.

14       If you find from your consideration of all the

15   evidence that the plaintiff has proved all of the propositions

16   required of the plaintiff, first, second and third, in Counts

17   1, negligence, and/or Count 3, negligence against West Side

18   Salvage, and if you further find from your consideration of

19   all the evidence that the defendant has proved both of the

20   propositions required of the defendant, A and B, and that the

21   plaintiff's negligence was greater than 50 percent of the

22   total proximate cause of the injury or damage for which

23   recovery is sought, then your verdict shall be for the

24   defendant.

25       If you find from your consideration of all the

1   evidence that the plaintiff has proved all of the propositions

2   required of the plaintiff, first, second and third, in Counts

3   1, negligence against ConAgra, and/or Count 3, negligence

4   against West Side Salvage, and if you further find from your

5   consideration of all the evidence that the defendant has

6   proved both of their propositions required of the defendant, A

7   and B, and that the plaintiff's negligence was 50 percent or

8   less of the total proximate cause of the injury or damage for

9   which recovery was sought, then your verdict shall be for the

10   plaintiff and you shall reduce plaintiff's damages in the

11   manner stated to you in these instructions.

12        The plaintiff has the burden of proving each of the

13   following propositions in Count 2, willful and wanton -

14   ConAgra, and/or Count 4, willful and wanton - West Side

15   Salvage, of his complaint as to each defendant.

16        First, that the defendant acted or failed to act in

17   one of the ways claimed by the plaintiff as stated to you in

18   these instructions, and that in so acting or failing to act

19   the defendant was willful and wanton.

20        Second, that the plaintiff was injured.

21        Third, that the willful and wanton conduct of the

22   defendant was a proximate cause of the injury to the

23   plaintiff.

24        You are to consider these propositions as to each

25   defendant.

1          If you find from your consideration of all the

2    evidence that all of these propositions, first, second and

3    third, has been proved, then your verdict should be for the

4    plaintiff as to Counts 2, willful and wanton against ConAgra,

5    and/or Count 4, willful and wanton against West Side Salvage.

6          On the other hand, if you find from your

7    consideration of all the evidence that any of these

8    propositions has not been proven, then your verdict shall be

9    for the defendant as to Counts 2, willful and wanton -

10   ConAgra, and/or -- this should be and/or -- Count 4, willful

11   and wanton against West Side Salvage.

12         The same correction I made here apply to Jentz and I

13   will handwrite those corrections on the burden of proof too.

14   It is and/or.  If anyone wants me to rereread those, ask me at

15   the end and I will.  I have made handwritten corrections on

16   many of the instructions that go back to the jury.  I have not

17   made the corrections on the marked copies with the citation

18   authorities.

19         It was the duty of the defendants before and at the

20   time of the occurrence to refrain from willful and wanton

21   conduct which would endanger the safety of the plaintiff.

22         When I was use the expression "willful and wanton

23   conduct", I mean a course of action which shows an utter

24   indifference to or conscious disregard for the safety of

25   others.  Defendants ConAgra and West Side Salvage are

1    corporations and can act only through their respective

2    officers and employees.

3          As to Robert Schmidt's claims for compensatory

4    damages against defendants ConAgra and West Side Salvage, any

5    act or omission of an officer or employee within the scope of

6    his employment is the act or omission of the defendant

7    corporation.

8          As to Robert Schmidt's claims for punitive damages

9    against defendants ConAgra and West Side Salvage, a different

10   rule applies.  Punitive damages may be awarded against

11   defendants ConAgra and or West Side Salvage only if, one, you

12   find in favor of the plaintiff and against defendant ConAgra

13   and or West Side Salvage under Counts 2, willful and wanton -

14   ConAgra -- and this should be and or -- willful and wanton -

15   West Side Salvage, of the complaint, and two, if you find that

16   as to the acts or omissions giving rise to liability under

17   Counts 2, willful and wanton - ConAgra, and or Count 4,

18   willful and wanton - West Side Salvage, the corporation,

19   through its management, authorized the doing and the manner of

20   the act or omission.  You must consider these propositions

21   separately as to each defendant.

22         This is the damage instruction.  If you decide for

23   the plaintiff on the question of liability, you must then fix

24   the amount of money which will reasonably and fairly

25   compensate him for any of the following elements of damages

1    proved by the evidence to have resulted in the negligence of

2    the defendants, taking into consideration the nature, extent

3    and duration of the injury, the disfigurement resulting from

4    the injury, the pain and suffering experienced and reasonably

5    certain to be experienced in the future as a result of the

6    injuries, the emotional distress experienced and reasonably

7    certain to be experienced in the future, the reasonable and

8    necessary medical care, treatment and services received.

9           Whether any of these elements of damages has been

10   proved by the evidence is for you to determine.

11          Life tables involving Mr. Schmidt.  According to a

12   table of mortality in evidence, the life expectancy of a male

13   age 35, is 42.8 years.  These figures are not conclusive.

14   They are the average life expectancies of persons who have

15   reached these ages.  They may be considered by you in

16   connection with other evidence relating to the probable life

17   expectancy of the plaintiff in this case, including evidence

18   of his occupation, health, habits and other activities,

19   bearing in mind that some persons live longer and some persons

20   less than average.  If you find for the plaintiff,

21   compensatory damages you award will not be subject to income

22   taxes and, therefore, you should not consider taxes in fixing

23   the amount of the verdict.

24          If you award punitive damages to the plaintiff, such

25   damages are subject to income taxes.

1          If you find that either of the defendants is legally

2     responsible for proximately causing plaintiff's injuries, then

3     you must apportion damages by determining the relative degree

4     of legal responsibility of each entity named or described on

5     the verdict form.  In making that determination, you should

6     consider the degree to which the entities conduct proximately

7     caused the plaintiff's injuries.

8          In your verdict form you will state the percentage of

9     legal responsibility of each of the entities named on the

10    verdict form.  The total of these percentages must add up to

11    100 percent.

12         In addition to compensatory damages, the law permits

13    you under certain circumstances to award punitive damages.  If

14    you find that the conduct of ConAgra and or West Side Salvage

15    was willful and wanton and proximately caused injury to Robert

16    Schmidt, and if you believe that justice and the public good

17    require it, you may award an amount of money that will punish

18    ConAgra and or West Side Salvage and discourage them and

19    others from similar conduct.

20         In arriving at your decision as to the amount of

21    punitive damages, you should consider the following three

22    questions.  The first question is the most important to

23    determine the amount of punitive damages.

24         How reprehensible was the conduct of ConAgra and or

25    West Side.  On this subject, you should consider the

1    following.

2            A.   The facts and circumstances of the defendant's

3    conduct.

4            B.   The vulnerability of the plaintiff.

5            C.   The duration of the misconduct.

6            D.   The frequency of the defendant's misconduct.

7            E.   Whether the harm was physical as opposed to

8    economic.

9            F.   Whether the defendant tried to conceal the

10   misconduct.

11           Number two, what actual and potential harm did the

12   defendant's conduct cause to the plaintiff in this case.

13           Number three, what amount of money is necessary to

14   punish the defendant and discourage the defendant and others

15   from future wrongful conduct in light of the defendant's

16   financial condition.

17           The amount of punitive damages must be reasonable and

18   in proportion to the actual and potential harm suffered by the

19   plaintiff.  The evidence concerning the size and revenue of

20   West Side Salvage is to be considered by you only if you

21   decide to award punitive damages against West Side Salvage.

22   It should not be considered for any other purpose.

23           The evidence concerning the size and revenue of

24   ConAgra is to be considered by you only if you decide to award

25   punitive damages against ConAgra.  It should not be considered

1    for any other purpose.

2         Okay, then we have contribution claims.  These are

3    the issues instructions.  This is the issue instruction in

4    ConAgra versus West Side.

5         In addition to the claim of Robert Schmidt against

6    ConAgra, ConAgra makes a claim against West Side.  ConAgra

7    claims that if it is liable to Robert Schmidt for damages,

8    then it is entitled to contribution from West Side for a

9    percentage of those damages.

10        If you find ConAgra liable to Robert Schmidt, then

11   you must consider the claim for contribution by ConAgra.

12   ConAgra claims that West Side was negligent in one or more of

13   the following respects.

14        A.  Failed to use proper means and methods in

15   removing the pellets after discovering the core inside the

16   bin.

17        B.  Failed to provide an adequate safety plan when it

18   began to work with the core of the bin.

19        C.  Failed to timely call the fire department and

20   notify ConAgra personnel of the condition of the bin when it

21   knew that the situation in the bin was dangerous.

22        D.  Failed to timely evacuate workers from the work

23   site when it knew that the situation inside the bin was

24   dangerous.

25        E.  Failed to properly monitor the wheat middling

1  pellets within bin C15 for signs of self heating, smoldering

2  or fire.

3         F.   Failed to properly monitor the atmosphere of bin

4  C15 for the presence of combustible gasses and or vapors.

5         G.   Failed to properly monitor temperature levels

6  within bin C15 and the wheat middling pellets within bin C15.

7         H.   Failed to adequately train employees in the

8  recognition and prevention of the hazards present in bin C15.

9         I.   Failed to warn Robert Schmidt of the dangerous

10  conditions in grain bin C15.

11         ConAgra further maintains that one or more of the

12  foregoing was the proximate cause of plaintiff's injuries.

13  West Side denies that it did any of the things claimed by

14  ConAgra, denies that it was negligent in doing any of the

15  things claimed by ConAgra, and denies that any claimed act or

16  omission on the part of West Side was a proximate cause of

17  Robert Schmidt's injuries.

18         Then the burden of proof that ConAgra has in its

19  contribution claim.

20         As to the claim of ConAgra against West Side, ConAgra

21  has the burden of proving each of the following propositions:

22         First, that West Side acted or failed to act in one

23  of the ways claimed in these instructions, and that in so

24  acting or failing to act West Side was negligent.

25         Second, that the negligence of West Side was a

114

1    proximate cause of Robert Schmidt's injuries.

2         If you find from your consideration of all the

3    evidence that both of these propositions has been proved, then

4    your verdict should be for ConAgra and against West Side and

5    you should include West Side in apportionment of damages.

6         If, on the other hand, you find from your

7    consideration of all the evidence that either one or both of

8    these propositions has not been proved, then your verdict

9    should be for West Side and you will have no occasion to

10   consider the apportionment of the damages against West Side.

11        So that is the contribution claim of ConAgra versus

12   West Side.  Then we have the contribution claim of West Side

13   versus ConAgra, and here are the issues in that claim.

14        In addition to the claim of the plaintiff against

15   West Side Salvage, West Side Salvage makes a claim against

16   ConAgra.  West Side Salvage claims that if it is liable to the

17   plaintiff for damages, then it is entitled to contribution

18   from ConAgra for a percentage of those damages.  If you find

19   ConAgra liable to the plaintiff, then you must consider the

20   claim for contribution by -- Should this not be West Side?

21        MR. PATTON:  Yes.

22        THE COURT:  If you find West Side Salvage liable to

23   the plaintiff, then you must consider the claim for

24   contribution by West Side.  West Side Salvage claims that

25   ConAgra was negligent or willful and wanton in one or more of

1    the following respects:

2         A.   Failed to maintain the grain material, grain bin

3    15 and grain elevator in a reasonably safe manner and

4    condition.

5         B.   Allowed wheat middlings to self heat and smolder,

6    creating an increased risk of fire and an unreasonably

7    dangerous condition to individuals on it's premises like

8    plaintiff Robert Schmidt.

9         C.   Failed to properly inspect and monitor the

10   premises, including but not limited to the aforementioned

11   grain bin 15 for signs of self heating, smoldering or fire.

12        D.   Failed to properly and efficiently provide for

13   the removal of self heating and smoldering wheat middlings in

14   a timely fashion, which created an increased risk of fire and

15   or explosion and an unreasonably dangerous condition to

16   individuals on its premises like Robert Schmidt.

17        E.   Failed to properly and sufficiently monitor the

18   atmosphere of the grain bin elevator for the presence of

19   combustible gasses, including carbon monoxide and smoke.

20        F.   Failed to properly monitor the wheat middling

21   pellets in bin C15 for the presence of high temperatures.

22        G.   Failed to implement a proper facility emergency

23   action plan upon the discovery of a fire in bin C15.

24        H.   Failed to warn Robert Schmidt or his employer, A

25   & J Bin Cleaning, LLC, of the dangerous conditions, that is

1   the potential for fire and explosion hazards in bin 15.

2         I.   Failed to timely alert and notify local fire

3   department and other emergency personnel of the fire on the

4   premises.

5         J.   Continued to conduct operations within Elevator

6   C, which increased the risk of explosion within bin C15.

7         K.   Failed to immediately evacuate individuals

8   working in and around bin C15 on or about April 27th of 2010,

9   like Robert Schmidt, when ConAgra knew or should have known of

10  an imminent danger to those individuals that an explosion

11  could occur.

12        L.   Failed to immediately evacuate individuals

13  working in and around bin C15 on April 27th of 2010 after

14  deciding to request that one or more representatives of the

15  Chester Fire Department come to the scene.

16        M.   Failed to call the fire department to the Chester

17  facility at any time prior to the explosions despite repeated

18  requests.

19        N.   Failed to properly clean and maintain bin C15.

20        O.   Instructed West Side Salvage, Inc., to remove the

21  wheat middling pellets from the tunnel in violation of

22  industry standards.

23        West Side further claims that one or more of the

24  foregoing was a proximate cause of the plaintiff's injuries.

25        ConAgra denies that it did any of the things claimed

117

1    by West Side Salvage, denies that it was negligent or willful

2    and wanton in doing any of the claims claimed by West Side

3    Salvage, and denies that any claimed act or omission on the

4    part of West Side was the proximate cause of plaintiff's

5    injuries.

6         Then the burden of proof that West Side has against

7    ConAgra and it's contribution claim.

8         As to the claim of West Side Salvage against ConAgra,

9    West Side Salvage has the burden of proving each of the

10   following propositions:  First, that ConAgra acted or failed

11   to act in one of the ways claimed in these instructions and

12   that in so acting or failing to act, ConAgra was negligent.

13        Second, that the negligence of ConAgra was a

14   proximate cause of Robert Schmidt's injuries.

15        If you find from your consideration of all the

16   evidence that both of these propositions has been proved, then

17   your verdict should be for West Side Salvage and against

18   ConAgra and you should include ConAgra in the apportionment of

19   damages.

20        If, on the other hand, you find from your

21   consideration of all the evidence that either one or both of

22   those propositions has not been proved, then your verdict

23   should be for ConAgra and you will have no occasion to

24   consider the apportionment of damages against ConAgra.

25        When you retire to the jury room, you will first

1    select a foreperson.  He or she will preside during your

2    deliberations.  Your verdict must be unanimous.

3         Forms of verdict are supplied with these

4    instructions.  After you have reached your verdict, fill in

5    and sign the appropriate form of verdict and return it to the

6    Court.  Your verdict must be signed by each of you.  You

7    should not write or mark upon this or any of the other

8    instructions given to you by the Court.  Again, you will only

9    write on verdict forms.

10        If you find for Robert Schmidt and against ConAgra

11   and West Side Salvage as to Counts 1, negligence - ConAgra,

12   Count 2 --  And or.  Should that not be "and or" here also?

13        If you find for Robert Schmidt and against ConAgra

14   and West Side Salvage as to Count 1, negligence as to ConAgra,

15   and or Count 2, negligence against West Side Salvage, and

16   Count 3, willful and wanton against ConAgra, and or Count 4,

17   willful and wanton against West Side Salvage, and if you

18   further find that Robert Schmidt was not contributorily

19   negligent, then you should use verdict form A.

20        If you find for Robert Schmidt and against ConAgra

21   and or West Side Salvage, and if you further find that the

22   plaintiff's injury was proximately caused by a combination of

23   negligence and or willful and wanton conduct of ConAgra and or

24   West Side Salvage, and as well as the negligence of Robert

25   Schmidt, and Robert Schmidt's contributory negligence was

119

1    50 percent or less of the total proximate cause of the injury

2    or damage for which recovery is sought, then you should use

3    verdict form A.

4         If you find for ConAgra and against Robert Schmidt or

5    if you find that the plaintiff's contributorily negligent or

6    willful and wanton conduct was more than 50 percent of the

7    total proximate cause of the injury or damage for which

8    recovery is sought, then you should use verdict form B.

9         If you find for West Side Salvage and against Robert

10   Schmidt, or if you find that the plaintiff's contributorily

11   negligent or willful and wanton conduct was more than

12   50 percent of the total proximate cause of the injury or

13   damage for which recovery is sought, then you should use

14   verdict form C.

15        Here is verdict form A for Robert Schmidt.  It has

16   the style at the top.  As to Count 1, negligence against

17   ConAgra, and Count 3, negligence against West Side Salvage,

18   we, the jury, find for Robert Schmidt and against the

19   following defendants.  Yes or no as to ConAgra.  Yes or no as

20   to West Side Salvage.  Then you consider the line items of

21   damages which I have already read to you.

22        If you find in favor of Robert Schmidt, you would

23   fill in the amounts of the damages individually itemized and

24   you would total them up here.  It would be the same total as

25   here.  Then you go to the second part.  Assuming that

120

1    100 percent represents the total combined legal responsibility

2    of all persons or entities that proximately caused Robert

3    Schmidt's injury, we find the percentage of legal

4    responsibility attributable to each as follows:  There you put

5    any percent.  The total has to equal 100.  If somebody has

6    none, you put in zero.

7         Fourth, after reducing the plaintiff's total damages

8    from paragraph first by the percentage of negligence, if any,

9    of Robert Schmidt from line A in paragraph second, we award

10   Robert Schmidt the recoverable damages in the amount of blank.

11   Let me try to do the math here with a different example.

12   Let's say you award him $100, okay, total, and you put that

13   there, and let's say you find him ten percent negligent.  All

14   right, then you would award him 90 percent of his damages

15   here.

16        Do I have that right?  I am not a doctor for two

17   reasons; math and physics.  I still believe when the elevator

18   is falling, you can jump at the last minute and save yourself.

19   You are falling at 32 feet per second and you can't jump at 32

20   feet per second, so they say you are still going to get hurt

21   even though you jump.  Also the flying airplane.  How fast is

22   it going?  I don't think it is going 600 miles an hour.  What

23   do I know.

24        Verdict form B has a style at the top.  It reads, we,

25   the jury, find for the defendant ConAgra Foods, Inc., and

121

1    against the plaintiff Robert Schmidt.

2         Verdict form C, style at the top.  We, the jury, find

3    for the defendant West Side Salvage and against the plaintiff

4    Robert Schmidt.

5         The last verdict form is that one for punitive

6    damages if you would decide to award those, or not award them,

7    you would use this.  We, the jury, award punitive damages in

8    favor of Robert Schmidt and against the following defendant:

9    ConAgra, yes or no.  West Side, yes or no.

10        If you answered yes to either of those.  You would

11   come down here and fill in the amount of punitive damages as

12   to whichever defendant you said yes to.  If you said no to

13   both, you don't fill out anything, but you do sign.

14        That completes the jury instructions, so what I am

15   going to do now is make the changes in handwriting and in the

16   Jentz form to add that "and or" language so it mirrors what we

17   talked about on Schmidt.

18        So it is clear, the plaintiff can recover against

19   ConAgra and or West Side.  Doesn't have to recover against

20   both, and again, you can find he doesn't recover against

21   either.  So I will make those changes.  I will get the verdict

22   forms all ready to go.  I'll staple the instructions and I'll

23   ask the attorneys to get everything out of here.  By the time

24   you are done eating lunch, I should be able to bring you back

25   in here to deliberate.  One more thing.  John?

122

    1              (Whereupon the court security officer is sworn.)

    2              THE COURT:  Okay, so the oath that John just took in

    3    Medieval times was to not let you have food or fire until you

    4    had a verdict, so we would freeze you to the death and starve

    5    you death.  We're not going to do that.  If you want anything,

    6    if it is within my power to get it for you, knock on the door.

    7    If I can't get it to you, you will get a response.  Take your

    8    time.  We'll start when you are ready.

    9              (Whereupon the jury retires to deliberate.  The

   10    following proceedings were held in open Court, out of the

   11    presence of the jury.)

   12              THE COURT:  All right, the instruction that I read to

   13    the jury which begins, "When you retire to the jury room, you

   14    will select a foreperson.  He or she will preside during

   15    deliberations."  At the bottom it talks about the plaintiff's

   16    contributory negligence or willful and wanton conduct.  The

   17    "or willful and wanton conduct" needs to be stricken.  I am

   18    going to strike it.  The parties agree I don't need to bring

   19    the jury back to reread it.  Both ConAgra and West Side

   20    preserve their objections in this case.  They want willful or

   21    wanton or contributory fault in the case, but I ruled it does

   22    not go to the jury, therefore, I am going to strike this.

   23              If you have something in here that is not going to

   24    the jury, make sure it is out.

   25              MR. PATTON:  Judge, briefly on these, your ruling was

123

1  no pictures that are just pictures, writings.  They put all of

2  this stuff in there.  That is why I am objecting.

3        THE COURT:  That is demonstrative.  That is out.

4  Anything that has the writings or wording that was not part of

5  the original does not go.  I consider it demonstrative.

6        MR. PATTON:  My last objection is the Life Care Plan.

7        THE COURT:  The Life Care Plan was shown, this

8  particular one, was shown to the jury.  The other one I said

9  no, the other Life Care Plan, but 57 is okay.  This was shown

10  to the jury.

11        MR. DURKIN:  This is the last one, the A & J Bin

12  Cleaning, who is not a party, their work place, and it was

13  actually highlighted.

14        THE COURT:  So who wants it in?

15        MR. PATTON:  I want it in.  It goes with Schmidt's

16  comparative fault.  It is his work rules and the work rules

17  for ConAgra are going in.

18        THE COURT:  In over objection to the jury.

19        Stay on this floor or downstairs.  I am going to

20  bring them in, tell them here are the exhibits, here are the

21  instructions, so if you need anything, knock on the door.

22        (Jury deliberating.  Court is adjourned.)

23  I certify that the foregoing is a correct transcript from the

24  record of proceedings in the above-entitled matter.

25  SS/Barbara Kniepmann                        May 31, 2012