Pg. 129

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF ILLINOIS
2

3    JOHN W. JENTZ, JUSTIN BECKER, )
     AMBER BECKER AND ROBERT       )
4    SCHMIDT,                      )
                                   )
5                   Plaintiff,     )
                                   )
6         vs.                      ) No. 10-00474-MJR
                                   )
7    CONAGRA FOODS, INC. AND WEST  )
     SIDE SALVAGE, INC.,           )
8                                  ) May 29, 2012
                    Defendant.     )
9

10              TRANSCRIPT OF PROCEEDINGS
            TRIAL DAY/VOLUME #14 (P.M. SESSION)
11          BEFORE THE HONORABLE MICHAEL J. REAGAN
              UNITED STATES DISTRICT COURT JUDGE
12

**APPEARANCES:**
13

**For the Plaintiffs:**   Robert A. Clifford, Esq., Kevin P.
14   Durkin, Esq., Colin H. Dunn, Esq., Brad L. Badgley, Esq.,
     Marc A. Taxman, Esq., Sean P. Murray, Esq., Julie Levinson
15   Pustilnik, Esq.

16   **For the Defendant (ConAgra):**   John W. Patton, Jr., Esq.,
     John A. Ouska, Esq., Joseph C. Orlet, Esq., John G. Schultz,
17   Esq., Jason B. Moore, Esq.

18   **For the Defendant (West Side):**   John G. Schultz, Esq.,
     Jason B. Moore, Esq.
19

     Court Reporter:        Laura A. Blatz, RPR, CRR, CCR(MO)
20                          U.S. District Court
                            750 Missouri Avenue
21                          East St. Louis, IL  62201
                            (618) 482-9481
22

23

24       Proceedings recorded by mechanical stenography;
     transcript produced by computer.
25


              Plaintiff Becker's Closing Argument

 1      *(Court reconvened)*

 2      *(Jury in)*

 3           THE COURT:  Okay.  We have a new reporter.

 4   Mr. Taxman, your last words were, "Turning now to Amber".

 5              **PLAINTIFF BECKER'S CLOSING ARGUMENT**

 6           MR. TAXMAN:  Turning now to Amber Becker.  Thank

 7   you, Your Honor.

 8           All right.  And I have up on the Elmo, folks, the

 9   other verdict forms which pertains to Amber.  That's verdict

10   form A as well.  There's only an A and B with Amber because

11   her case is derivative of Justin's.  Any decisions you make

12   about Justin's conduct -- and I'll touch on that briefly

13   after I finish this verdict form -- will apply to Amber.

14           Looking at Verdict Form A, the Court will tell you

15   that the areas that Amber is allowed to seek compensation

16   for with regard to the injury that Justin sustained is the

17   reasonable value of the society, what the law calls --

18   society, companionship and sexual relationship with her

19   husband, which she's been deprived, and then also as to the

20   future.  So that's why we have Amber's life table figure in

21   there of 48.8 years.

22           So with regard to Justin's injury, we know his

23   endurance has been compromised, we know that because of what

24   he's been through, he treats Amber differently, they

25   interact differently.  He's harder on her.  It's been really

                    Plaintiff Becker's Closing Argument

 1    difficult for them.  The last two years have been completely

 2    different than any two that any couple would possibly be

 3    able to share.  And with regard to the last two years I

 4    would suggest a figure of $2 million to compensate Amber for

 5    her loss of consortium, which includes the society -- that's

 6    being in society as a couple -- companionship, their ability

 7    to be together and, of course, their sexual relationship

 8    together.

 9          With regard to the next 48.8 years it's going to be

10    a difficult road for them together as a couple, and none of

11    these ailments that Justin has are getting any better.

12    Everything is permanent.  So I would suggest to you a figure

13    of $4 million for the future, for a total of $6 million to

14    fairly and reasonably compensate Amber for her injuries for

15    the damage to the relationship.

16          Folks, with regard to the damages, if there's any

17    figure that I've suggested -- any lawyer who gets up in the

18    case would suggest a figure, if any figure that I suggested

19    to you as a jury is too high it's your duty to lower that.

20    I think you all know that.  If any figure I suggested to you

21    is too low it's your duty to raise it.  These are my

22    suggestions based on the uncontradicted evidence of the

23    injury to Justin and the effect it's had on the

24    relationship.

25          I used Verdict Form A in my description with Justin

                    Plaintiff Becker's Closing Argument

 1  and filled in the figures with regard to his damages.  One

 2  thing that should be crystal clear in this case, you'll know

 3  when you get the instructions and what the Court tells you,

 4  no matter what verdict form you choose, all legal

 5  responsibility will be accounted for.  So if you decide that

 6  Justin had no percentage in the fault of the legal

 7  responsibility, you'll be able, on Justin's verdict form, to

 8  divide it up between ConAgra and West Side.  It's the way

 9  the law works in a contribution action such as this one.

10  You're properly going to assess fault.

11          If you used Verdict Form B, which is this one,

12  you'll see, similarly, all legal responsibility will be

13  accounted for.  You would have a line for Justin, ConAgra,

14  and West Side because of the contribution action.  So I just

15  wanted to make that clear.

16          The last thing I do want to comment to you on is

17  the legal responsibility and specifically the way I think

18  that the law and the evidence should be viewed with regard

19  to Justin's conduct.  There's a very important detail in all

20  the instructions, but in the one about judging contributory

21  negligence, Justin's fault or Mr. Jentz's fault or

22  Mr. Schmidt's fault as plaintiffs, there's a caveat in

23  there, and you're going to find that.  And we've been

24  talking about these instructions and you're going to learn

25  about them.  They all mirror what you expect in real life

Plaintiff Becker's Closing Argument

1    and common sense.

2         You got to look at it under circumstances similar

3    to those shown by the evidence.  When you adjudicate the

4    conduct it's in a vacuum.  You can't just ask a question in

5    a vacuum, get a yes or no.  You've got to factor it in under

6    the circumstances that are shown by the evidence.  What do I

7    mean by that?  Can Justin be held responsible for the

8    injury?  And I submit no.  Zero percent is what I would

9    argue, and it's because of the concept of the chain of

10   command.

11        If you're at the bottom of the chain of command,

12   the totem pole where he was, he's hired to do a job, he's

13   paid 15 to $18 an hour to do it.  He says:  *I'll be that guy*

14   *at the bottom.  I'll answer to Mel Flitsch.  I'll be -- take*

15   *my place on this chain of command.  I will put my head down.*

16   *I will beat at that 14-inch hole nine hours a day.  I'll do*

17   *that for the 15, 16, 17 or $18 a day.  That's my job.*

18        In order to make this chain of command work

19   properly economically, logically, the people at the top have

20   got to go, *All right.  We've got this guy at the bottom.  He*

21   *agreed to do his job.  We've now got to watch over him or*

22   *her and make sure they're safe at the bottom of the chain of*

23   *command.  If that's what we're going to hire them to do as*

24   *laborers, that's what they sign up to do.*

25        Justin didn't sign up to take over the plant, call

Plaintiff Becker's Closing Argument

1   the fire department, go over his boss' head, go over

2   Godfrey's head.  He signed up to do his job.  And you heard

3   a lot of questions about training, trying to beat out of the

4   West Side guys what he was trained or not trained to do.

5   And every time you heard the same thing from everybody, top

6   to bottom:  It's on-the-job training.  Justin takes his

7   skill, his laborer skills to any job they send him to do and

8   he gets trained on the job.  This was the job.  This was the

9   circumstances similar to those in the evidence.  This was

10  the job.  This was what he was told to do, right or wrong,

11  and he did it, followed the command.  That's what he signed

12  up to do.  He said, *I'm going to listen to the people above*

13  *me.  I'm going to trust the people above me to watch for my*

14  *safety.*  And that's the only way that this system can work.

15         Justin can't be penalized for doing his job.  He's

16  getting his hands dirty.  The people at the top are not

17  going to get their hands dirty.  They got to watch over the

18  folks at the bottom that are willing to get their hands

19  dirty, that are willing to take those jobs because,

20  otherwise, the person that's got to go down in the trench

21  and fix the valve -- you know, when the trench collapses

22  they didn't put shoring in it, that guy's going to be

23  responsible.  Or some traffic barrier has to be fixed, and

24  the people who are designing the traffic control mess up,

25  well, the guy that went into traffic is going to get blamed,

                    Plaintiff Becker's Closing Argument

 1    the one that has to do the job, who takes their position on

 2    the chain of command.  It all falls apart if the people on

 3    top aren't watching over the folks that are willing to get

 4    their hands dirty and do the work.  That's what Justin

 5    signed on to do.  Nothing more.

 6         Last thing I can say is, don't penalize Justin for

 7    doing his job.  He didn't do anything other than his job.

 8    Penalize the folks on top that didn't look after him.  I

 9    think that's where the punitive aspect comes into this case.

10    You send a message in your verdict saying, *Stop the work.*

11    *Evacuate.  Don't look down the chain of command and say, Oh,*

12    *stupid you, look, you went into our bin and it exploded.*

13    Don't let them get away with that.  Ask yourselves when

14    you're sitting around the table, one of you ask each other:

15    How did it ever get that far?

16         Thank you, Judge.

17         *THE COURT:*  Mr. Dunn on behalf of Schmidt.

18              **PLAINTIFF SCHMIDT'S CLOSING ARGUMENT**

19         *MR. DUNN:*  May it please the Court.  Good

20    afternoon, folks.  I'm not going to obviously rehash

21    everything that Mr. Clifford and Mr. Taxman went over.

22         I do want to talk about Mr. Schmidt though.  And

23    I've talked about Mr. Schmidt in opening statement with you

24    and we talked about his prior experience in working, just

25    generally.  I told you that -- he told you on the stand he

                    Plaintiff Schmidt's Closing Argument

1    had never worked at a grain facility.  Okay.  He was a

2    former short order cook, temporary worker.  He worked a

3    number of different jobs but he had never heard of a

4    bin whip before responding to the ad at A&J Bin Cleaning,

5    2006.  So prior to that all this knowledge that some of

6    these folks have been talking about -- Mr. Friedt was

7    talking about, Mr. Yount talked about -- he didn't have that

8    at all prior to working for A&J.

9          You heard that he was a foreman with A&J.  What

10   does that mean?  Okay.  It meant that he was making a dollar

11   more than John Jentz an hour.  It meant that he got to fill

12   out paperwork at the end of the day if that was his job.  We

13   know that Mel did that.  He never filled out any paperwork

14   whatsoever for this job.  It meant, between the two of them,

15   who gets to go on top of the bin and who gets to work in the

16   dungeon.  Okay.  He chose to work on top.  So yes, he's a

17   foreman all right, but, you know, with all due respect to

18   Mr. Schmidt, he has no specialized education or knowledge or

19   experience other than what he got on the job.

20         I bring that up because I want to compare that to

21   Mr. Friedt, for instance.  Okay.  Mr. Friedt had a two-year

22   degree in diesel mechanics.  He had a four-year degree in

23   agricultural economics.  He had worked for Cargill, one of

24   the biggest companies in the world, doing this for ten

25   years, and he had been not only elevator operator there at

Plaintiff Schmidt's Closing Argument

 1    that facility but he became plant superintendent of the

 2    facility just like the one at Chester.  Okay.  He had that

 3    experience.  Mr. Yount was an NFPA, National Fire Protection

 4    Association, committee member on just this subject.  He was

 5    the head of safety for a $10 billion company and he was in

 6    charge of over 1700 grain bins across this country.

 7        Mel Flitsch had worked for West Side Salvage for a

 8    couple of decades.  You heard from Mr. Nanez's testimony

 9    that was read that, for Mel, fires were his specialty.  Bins

10    and fires were his specialty.  Okay.  And he had worked on

11    hundreds of hot bins and fires throughout his career.

12        Robert Schmidt had worked on one prior fire, one,

13    and that was in Dickens.  He talked about it.  West Side was

14    there, Mel was there, the fire department was there, and

15    that was handled safely.  And he had every reason to believe

16    that the Chester facility would be handled safely too.  And

17    why do I bring all this up?  Why am I talking about this?

18    Well, because you saw the way he was treated on the stand

19    during cross-examination, and evidently ConAgra has a new

20    theory that Robert blew up this bin, based on the questions

21    he was asked.  That's their new theory.

22        I say it's new because we don't just show up at

23    trial the day after an explosion and put on a case before

24    you.  We conduct what's called discovery.  You've seen

25    depositions, we swap documents, exhibits with each other to

Plaintiff Schmidt's Closing Argument

1   get a sense for what happened and to figure out how this is

2   going to be presented to a jury so there's no surprises

3   whatsoever in the evidence presented to you folks.  And in

4   the two-plus years after the explosion nobody had ever been

5   critical of Robert Schmidt in any way, not one witness.

6   These depositions, folks, some of them lasted for multiple

7   days, eight, ten hours.  Every question conceivable was

8   asked of everybody who testified in this case.  Not one

9   person was critical of Mr. Schmidt.

10          And we deposed people not only who were there at

11   the time of this explosion but people who are specifically

12   hired to figure out the who, the what, the where, the when,

13   the why, the how.  They're paid money to determine that.

14   And one of those people was Robert Schroeder.  That was the

15   expert that ConAgra hired to determine what happened here

16   and whose responsibility, whose fault it is.  And he said,

17   under oath in his deposition, after reviewing the entire

18   case, after going out to the facility a number of times, he

19   had no criticisms of Robert.  Okay.  He called him a good

20   guy.  That's his words.  He said -- I can't emphasize enough

21   how he gives him kudos for his actions.  That's

22   Robert Schroeder talking about Robert Schmidt.  And Robert

23   Schmidt told you the same things that he told us in his

24   deposition that Mr. Schroeder reviewed.

25          Okay.  So the only person, evidently, who blames

Plaintiff Schmidt's Closing Argument

1    him for anything is ConAgra's lawyer.  But remember that

2    what Judge Reagan told you, beginning of this case:  What we

3    say isn't evidence.  All right.  It's not evidence and it

4    certainly doesn't translate into legal responsibility.  But

5    it's an issue in the case for you, whether or not

6    Mr. Schmidt was contributorily negligent.

7            Your Honor, may I have the Elmo, please.

8            This is instruction that Judge Reagan read to you

9    already, and it talks about the fact that it's the duty of

10   each plaintiff to use ordinary care for his own safety.  And

11   it talks about that a plaintiff is contributorily negligent

12   if, number one 1, he fails to use ordinary care for his own

13   safety; and number two 2, his failure to use such ordinary

14   care is a proximate cause of the alleged injury.

15           So what does that mean?  Basically the way I think

16   about it is, there's a "should" component and a "would"

17   component.  Should he have done something differently?

18   That's number one.  And number two, would it have made a

19   difference?  Okay.  And what ConAgra has done -- and you'll

20   get this instruction as well -- is they've compiled a list

21   of what they believe are negligent acts committed by all

22   three of the plaintiffs in this case.  And this will be part

23   of the instruction that you're given.  A, B, C, D, E, F, G.

24           All right.  Now, first of all, if you look at

25   these, this is what ConAgra is saying constitutes a

                   Plaintiff Schmidt's Closing Argument

1    negligent act.  If you look at A: "Negligently engaged in

2    fighting a fire in the bin when they were not qualified and

3    competent to do so."  First of all, we know ConAgra did,

4    right?  We know ConAgra's fighting this fire, dumping

5    thousands of gallons of water on it before West Side ever

6    got there.

7         If you look at F: "Failed to call for an

8    evacuation," you know ConAgra didn't do that either.

9         G:  "Negligently failed to alert the fire

10   department the situation in the bin was dangerous and out of

11   control."  We know ConAgra never did that either.

12        All right.  So ConAgra's admitting that these are

13   negligent acts.  We know they didn't do them.  But the main

14   criticism, as I understand it, of Mr. Schmidt is that he

15   should have called the fire department.  All right.  Now,

16   Mr. Schmidt knows about dust, he knows about fire, he knows

17   about explosion, and he knows that those things are bad in

18   the bin.  He never ever knew or was told by anybody that

19   carbon monoxide is explosive.  And all the experts agree

20   here, what led to this explosion was the carbon monoxide.

21   Not the dust, not the fire; the carbon monoxide.  That's not

22   something he would know, right?  He knows it's over 500

23   parts per whatever, you can't work in there.  But he doesn't

24   know about the explosive nature, was never told that.

25   There's no evidence he was ever told that.


                 Plaintiff Schmidt's Closing Argument

1          But of course, he or anybody could have called the

2     fire department.  They all have cell phones.  911 works on

3     everybody's phone.  Anybody could have done that.  But in

4     the context of this legally responsible for not doing that,

5     you have to remember that he's not trained to do that.  His

6     training is, if he thinks the fire department should be

7     called, he tells his boss -- in this case it was Mel -- and

8     then they deal with it.  He's never done that before.

9          In all the jobs he's ever been on, he'd never ever

10    been put in a position where he would have to decide, should

11    the fire department be called.  And you know, remember that

12    we're not talking about flames all around him, he can't see.

13    That's not the situation.  At the very end the smoke was

14    coming out and he made the call, but up until that point,

15    you know, he doesn't have the training to say, *Get the fire*

16    *department out here right now*.  Guys like Godfrey Friedt,

17    Mel Flitsch, Anthony Yount, they have the training to know

18    that.  He doesn't know that.

19          It simply makes no sense to say that he at any time

20    believed that there was going to be an explosion.  All

21    right.  He really believed that Mr. Schmidt or anybody would

22    have gone up on 120-foot crane and silo explosion.  Nobody.

23    Makes no sense.  And the answer is because he didn't know.

24          He went up there and he makes the call to call the

25    fire department.  *Justin, go down the manlift.  I'll come*

Plaintiff Schmidt's Closing Argument

1  *after you.*  He still has no reason to believe this thing's

2  going to explode.  All right.  That manlift takes three

3  minutes to go down and up.  There's other ways off of that

4  bin had he chosen, had he felt an explosion was imminent.

5  You don't go down the manlift.  He knows that.  All right.

6  Could no longer fight the fire.  Whatever they were doing up

7  there, they couldn't do it, so get off the bin.  That's what

8  happened.  That's what he was doing.

9      You know, at the end of the day here he was doing

10  the right thing.  He was radioing the conditions to Mel.  He

11  was doing his job.  If he made a mistake here he was

12  trusting that Mel and Godfrey and Anthony Yount would do the

13  right thing and call the fire department.  That's what his

14  mistake was, if he had any.  And that's the "should" aspect.

15      We talked about the "would" aspect.  Even if you

16  believe he should have done this, he should have done any of

17  the things ConAgra lists here in the instruction, the next

18  question you have to ask you is:  Would -- would it have

19  mattered?  Would it have mattered if Mr. Schmidt had said to

20  Godfrey Friedt, *Call the fire department*, when we know that

21  Kevin Herring worked with him three years.  We know

22  Allen Weibrecht, 36 years and counting, told him to do that.

23  Chet Lohman, 34 years, told him to do that.  The expert,

24  Mel Flitsch -- all right.  That's -- they want to say he's

25  the expert.  He told them on multiple occasions that day to

Plaintiff Schmidt's Closing Argument

1    call the fire department.  Do we really believe that adding

2    Robert Schmidt's name to that list would have made any

3    difference whatsoever to Godfrey Friedt?  Really believe

4    that?  He was bound and determined not to call the fire

5    department under any circumstance.  Adding Robert to that

6    list wouldn't have mattered.

7         And even -- again, if you think he did something

8    wrong here, you compare what he did to what ConAgra did,

9    what West Side did, and frankly, his conduct pales in

10   comparison.  Remember that he's on the top of a 120-foot

11   grain bin.  All right.  He puts himself in a position where

12   he must trust the guys on the ground, Godfrey Friedt and

13   Mel Flitsch, to protect him.  And we know Mel didn't, we

14   know Godfrey didn't, we know Anthony Yount didn't.  These

15   guys at least, Godfrey and Anthony Yount, refused to bring

16   in the fire department even after seeing a flame at 2:30 or

17   3:00, about an hour before the explosion.

18        And remember that there's only one entity here that

19   had a reason not to call the fire department.  You think it

20   would have made one bit of difference to Robert Schmidt in

21   him doing his job to have the fire department there?  Or

22   Mel Flitsch?  They could care less.  They want them there.

23   It doesn't interfere with them.  Just makes the job safer.

24   The only entity here that didn't want that to happen was

25   ConAgra.  That's it.  They made a conscious decision

Plaintiff Schmidt's Closing Argument

 1    throughout this entire time not to call the fire department,

 2    not to call 911 at any point in time until after it blew up.

 3         So we ask that you would not attribute any fault to

 4    Robert, but that if you do attribute fault to him, it be

 5    minimal compared to what ConAgra and West Side did leading

 6    up to this explosion.

 7         I need to talk a little bit about damages.  As with

 8    John Jentz and Justin Becker, you're going to get a verdict

 9    form for Robert Schmidt.  And just like for John Jentz,

10    you're going to get three verdict forms:  A, B, and C.  B

11    and C meaning, find in favor of either ConAgra and West Side

12    and not for Robert Schmidt.  We ask that you not use those

13    verdict forms but instead use Verdict Form A.

14         I know you've seen this before for John Jentz, but

15    just like his verdict form, the first thing you're asked to

16    do is answer yes-or-no questions as to whether or not you

17    find against ConAgra Foods and West Side Salvage.  And just

18    like for John Jentz, we ask that you check "yes" to both of

19    those.  The next thing you need to determine are the damages

20    for the different items of injury.  And the different

21    categories or potential categories for Mr. Schmidt that are

22    applicable to him are the disfigurement resulting from the

23    injury, the pain and suffering experienced, the pain and

24    suffering reasonably certain to be experienced in the

25    future, the emotional distress experienced, the emotional

                  Plaintiff Schmidt's Closing Argument

1    distress reasonably certain to be experienced in the future,

2    and the reasonable, necessary medical care and treatment he

3    received after the fact.

4           There's two of them that I think are pretty easy to

5    decide.  Okay.  The first is disfigurement.  You've seen

6    Mr. Schmidt standing over there the entire time.  Obviously,

7    compared to Mr. Jentz Mr. Becker, there's no dispute.  So we

8    put zero for that.  The next category is pain and suffering

9    experienced, pain and suffering reasonably certain to be

10   experienced in the future.  Here we're talking about the

11   doctor talking about how an injury to his hand -- you saw

12   the hands and how they were wrapped up.  Second degree burns

13   to his hands, that's part of the pain and suffering

14   experienced.

15          The unimaginable pain that these guys went through,

16   1500 degrees that he felt, burning his hands and his whole

17   body.  That's the pain and suffering experienced that we're

18   talking about.  When we talk about the pain and suffering

19   reasonably certain to be experienced in the future, they

20   were talking about the fact that, as the doctor indicated,

21   he was going to have problems because of the cold.  He lives

22   in Minnesota, usually cold up there.  Going to be problems

23   with his hands basically next 42 years of his life.  And as

24   well as the sun issue, the heat issue.  That's -- when we

25   say pain and suffering reasonably experienced in the future,

                   Plaintiff Schmidt's Closing Argument

 1    that's what we're talking about.

 2         The emotional distress aspect of it is what he and

 3    his wife talked about, the fact that it's just not the same.

 4    He has nightmares, he has flashbacks.  He doesn't sleep in

 5    the bed any more.  He sleeps on the couch where there's lots

 6    of open space.  He can't be in a bedroom any more obviously

 7    because of the confined feeling that he had when he saw this

 8    fireball coming at him while in the manlift.  That's what

 9    we're talking about here for emotional distress.  Not only

10    experienced but for the next 42 years what he's going to be

11    experiencing in the future.

12         The final one is the medical bills, what he's

13    incurred as a result, and that's another -- that's an easy

14    one too.  That's $64,407.49.  So the issue's going to be,

15    what do we do with the other categories?  Right.  So we

16    would suggest for the pain and suffering experienced, when

17    you're talking about the injury to his hands, an award of a

18    million dollars would be fair and reasonable.  The pain and

19    suffering experienced in the future, 500,000.  The emotional

20    distress experienced, a million dollars.  And emotional

21    distress reasonably certain to be experienced in the future,

22    500,000.  So the total is about little over $3 million

23    total.

24         Again, you've heard it from Mr. Clifford, you heard

25    it from Mr. Taxman.  These are just our representations.

                   Plaintiff Schmidt's Closing Argument

1    Take them or leave it.  This is your job to make the

2    decision.  We obviously recognize that, you know, Robert,

3    his burns were not as severe, not anywhere near as severe as

4    Mr. Jentz or Mr. Becker.  It turns out that these numbers

5    that his doctor up in Minnesota told us, that he had three

6    to four percent total body surface area burns and that he

7    had three or four percent permanent impairment.  So the way

8    we've worked it out here is, this is approximately 3 percent

9    of the figures that Mr. Clifford and Mr. Taxman gave you.  I

10   recommended about 3 percent.  That's where the number comes

11   from.

12         While we recognize that he was not as burned as

13   severe as Mr. Jentz or as Mr. Becker, please do not forget

14   that he still experienced the same 1500-degree fireball.

15   All right.  He still went through the same experience as

16   Mr. Jentz and Mr. Becker did at that facility.  And it's

17   unquestionable he's not the same person.  I don't think any

18   of us would quibble with that.  He's not the same guy

19   because of it.  And the fact of the matter is, he will never

20   be the same person.

21         Thank you for your attention.  We're done.

22   Appreciate your time.

23         *THE COURT:*  Folks, let's take ten minutes at this

24   time so the defense can get set up and discuss with you.

25         **(Break)**


                  Plaintiff Schmidt's Closing Argument

```
 1                        *   *   *   *

 2        (Jury out)

 3        (Break)

 4                        *   *   *   *

 5        (Jury in)

 6             THE COURT:  Closing argument on behalf of ConAgra.

 7   Mr. Patton?

 8                   DEFENDANT CONAGRA'S CLOSING ARGUMENT

 9             MR. PATTON:  May it please the Court.

10             Good afternoon, ladies and gentlemen of the jury.

11   This is my one time to address all of you.  I don't agree

12   with that law but I have to follow it.  Plaintiffs have the

13   burden, and so all these gentlemen have addressed you all

14   morning and they're going to have hours more time allocated

15   to them after I sit down, if they choose to use that time.

16   I'd like to get back up again and counter everything that

17   they just told you but I can't.  That's because they have

18   the burden of proof.

19             You've heard that an been awful lot, burden of

20   proof.  And that simply means that you can't just file a

21   lawsuit, make allegations and hope the jury awards money.

22   You have the burden to bring in the evidence to prove your

23   case.  You folks are going to make that decision whether or

24   not all of these gentlemen carry their burden.  I need to

25   respond to all three lawyers, but actually I have to respond
```

Defendant ConAgra's Closing Argument

1   to four, because, you know, West Side's lawyer also has an

2   opportunity to speak to you, and he goes after me.  I won't

3   get to get back up and counter him, so I have to anticipate

4   some of his arguments.  But his arguments are going to be

5   the same arguments you just heard.  So when I respond to

6   these three lawyers, I'm responding to all of the

7   allegations in this case.

8          So what is a closing statement?  Well, Judge Reagan

9   has made it clear, it's not evidence.  What is evidence is

10  what you're holding onto in your notebooks, your memories,

11  and what you observed in this courtroom.  What you observed

12  about what was going on around here and what you observed

13  that was happening on the witness stand.  And then your best

14  evidence is your common sense, your common sense.  Evidence

15  isn't in this case what somebody says.  For example, if

16  somebody comes in and says the sky is falling, you might

17  hear *the sky is falling*, but the lawyers then get to test

18  whether or not that witness is correct, whether the sky is

19  falling.  That's either direct examination or that's

20  cross-examination, because if they have no qualifications to

21  tell you that, that's something that's important for you to

22  know.

23         The other thing that's important for you to know

24  about trials is they're very difficult for all of us.  And

25  despite what I may be saying in the next 45 minutes to an

Defendant ConAgra's Closing Argument

1   hour, all of these gentlemen are hard-working, they have

2   clients to represent, and they have fought hard.  They have

3   fought hard over the several years that we've done

4   discovery, and obviously we've seen them fighting hard now.

5   We all can be likeable, okay?  And if you were to run into

6   us outside the courtroom I think that you'd probably like

7   each and every one of us.  But that's not what is important

8   in this trial.  It's not who you like or who you dislike;

9   it's what came from that stand and what you're going to be

10  allowed to look at once you start your deliberations.  This

11  case is too important to all sides for it to be decided on

12  anything other than the evidence.

13       And I heard a moment ago from one of the attorneys

14  talk about, well, if you hear something in trial that isn't

15  all that important because we work so hard to get

16  information during discovery, and when that evidence comes

17  out that ought to be more important than when somebody gets

18  cross-examined -- and I think he was referring to me and I

19  think he was referring to my cross-examination of

20  Mr. Schmidt, which we'll get into in more detail in a

21  minute.

22       But that's the whole point of a trial is, that's

23  where the truth should come in from.  It's amazing.  I've

24  done a little bit of this myself.  Witnesses can say a lot

25  of things in their depositions when they're tethered to

Defendant ConAgra's Closing Argument

1   their lawyers, but when they come into a court of law and

2   they have to look you in the eyes and they have Judge Reagan

3   sitting pretty darn close to them, a lot of times there's a

4   transformation.  A lot of times there's a transformation

5   where they start telling you exactly what happened during

6   the case.  And I think we got that.  I think we obtained

7   that from the key players in this case, Mel Flitsch,

8   Mr. Schmidt, and others that I'll comment on.

9        What else is a trial about?  Well, its a search for

10  the truth.  Each side should be doing that.  Each side

11  should be having a witness on the stand and not treat it

12  like a chess game.  We're not trying to make a couple moves

13  here to distract your attention away from the real issue in

14  the case, only to have then the lawyer have to come in and

15  give you the whole story.  A trial should be about the whole

16  story in the case, and then trust all of you to decide.  It

17  is not a chess game.  It is not giving you just lits bits

18  and pieces, playing the highlight reel of testimony without

19  giving you the full contents.  I think you get my point.

20       You need to decide which lawyer or lawyers

21  throughout the three weeks and even today were willing to

22  talk about the whole story so that you can decide.

23  "Verdict" is Latin, and "verdict" means the truth.  So when

24  you come out with your verdict, all of you have taken the

25  time to consider the evidence and you decide the truth.  And

Defendant ConAgra's Closing Argument

1    each one of you, each one of you individually is a judge now

2    of the facts.  Judge Reagan is a judge of the law.  Each one

3    of you has your own right to make a decision and you'll see

4    that instruction that will be coming to you, and all that

5    simply means is, it's not majority rules, it's not, you

6    know, who feels more passionate about an issue.  That's all

7    proper to consider.  But each one of you has to say, "I

8    agree", because if you don't, you don't sign the verdict

9    form.  Each one of you, no matter what the arguments are, if

10   in your heart you know that you heard a different case and

11   you're convinced that what you heard is the truth, doesn't

12   matter.  It just doesn't matter.  That's what justice is.

13   We don't get justice if you come out and sign a verdict that

14   you don't believe in.

15        So the whole story.  Did you just get the whole

16   story from the three lawyers that just spoke to you?  Well,

17   it seems to me it shouldn't be news that there was an

18   explosion.  That's how these gentlemen were injured.  Now,

19   which one of the three lawyers, in all the time that they

20   took on that clock, which one of them talked about there was

21   an explosion?  None of them.  Which one of them talked about

22   what you're here to decide, the cause of the explosion?

23   Certainly something happened in that bin.  Just doesn't

24   magically explode on its own.

25        I think all the experts -- Dr. Ogle, which you

Defendant ConAgra's Closing Argument

1    didn't hear about, their own expert, and Dr. Schroeder, they

2    agree on one thing:  The cause of the explosion was

3    West Side.  You didn't hear that.  Is that the whole story?

4    It shouldn't be ConAgra, ConAgra, ConAgra, with clips of

5    e-mails and snippets of people talking without at least

6    addressing the eight days that West Side had complete

7    control over that bin.  Which one of these lawyers went

8    through those eight days searching for the truth, searching

9    to explain why each day it was ConAgra's fault as opposed to

10   West Side's fault?  Which one?

11        You remember in opening statements I told you that

12   they have wiped the week of April 20th out of the history

13   books.  I forecasted that because, as I said, we know what

14   all the depositions say.  There's been no surprises to the

15   lawyers in terms of what the pages say, the deps say.  I

16   think we have a group now that are very surprised about what

17   the witnesses said, and we'll get into that more.

18        We certainly knew what the e-mails said and what

19   the witnesses said when they were in a room with lawyers,

20   but which one wanted to talk about the 20th and the 21st and

21   the 22nd?  And surely that has some importance to your

22   consideration.  What about the 27th, with what Mr. Schmidt

23   did and observed, what Mr. Flitsch did and observed?  Surely

24   that's got to be some part of your consideration to

25   determine the truth.  Why don't they want to talk about

                Defendant ConAgra's Closing Argument

1    that?

2           They don't want to talk about that because when I

3    got up in my opening statement I told you, despite what's

4    about to occur for three weeks, this was a very simple

5    story, a very simple story.  It is about the pellets that

6    started to decay and heat up, which was discovered on

7    Friday, March 12th.  I told you that this story would be

8    about the fact that then, over the next five weeks or six

9    weeks -- you guys can do the math -- that that bin in

10   ConAgra's possession got better.  And when lawyers get up in

11   opening statements way long ago and tell you what the case

12   is about, I think I might even have said this to you, we're

13   making promises.

14          Remember the promises that were made by these

15   gentlemen to you because I'm going to talk about some of

16   those promises.  My promise to you was, we had a decaying

17   bin, we had product in there, and we took steps, we relied

18   upon the experts, and then the bin gets better.  It gets

19   better so that when the experts finally arrive on the 20th,

20   they open it up and they do all their observations and

21   testing, and they would tell you it got better.  And I kept

22   my promise.  Mel Flitsch told you the bin was better.  A

23   simple story.  They have the bin on April 20th in a safe

24   condition, a condition that their expertise could easily

25   handle.  That wasn't me saying that; that was Mel Flitsch

Defendant ConAgra's Closing Argument

1    and Mr. Schwers and even Mr. Sumner.  They had a bin that

2    all it was was business as usual to take the pellets out.

3            I'm going to go into each day because I wrote them

4    down as the witnesses were testifying so I wouldn't forget

5    what they had to say.  So if they have a bin on April 20th

6    that is absolutely capable of being fixed -- they worked on

7    many more dangerous bins in their careers.  This one wasn't

8    even considered a hot bin; it was considered a bin with a

9    heat problem, according to Mr. Flitsch on the 20th.  So how

10   do we get from the 20th all the way to the 27th and it blows

11   up?  That ought to be your consideration as to who's at

12   fault for this.  Because you also know on the 27th the bin

13   was nearly empty.  They removed 90 percent of the pellets.

14   They saw to the bottom of the bin that morning.  How is it

15   in that condition ConAgra has taken the blame for what

16   happened?  Even the experts agree, it's what West Side did

17   on the bin that caused it to explode, and I haven't even

18   gotten into what Mr. Flitsch had to say.

19           So let's start then from the beginning and let's

20   talk about March 12th.  That is when the bin was discovered

21   to have smoke or some kind of condition.  People got

22   concerned.  And you heard about Allen Weibrecht and you

23   heard about Alan Bindel and you heard about Sean Belcher.

24   Okay.  All kind of critical people that first night.  First

25   thing we do, we call Omaha and we talk to Martin and AY and

Defendant ConAgra's Closing Argument

1    they give us the name of West Side.  Now, why would we call

2    Omaha if we had an expertise in hot bins?  Why wouldn't we

3    just do it ourselves and save the money?  Because the

4    undisputed evidence in this case is that we never had a hot

5    bin at the Chester facility.  Never.  I don't think that's

6    being contested.  How can you be negligent for having a hot

7    bin or pellets that are decaying if for over 34 years, with

8    90 bins there, never was there a decaying product?  Never

9    was a decaying product.  First time and it's the last time.

10        They have to prove that that decaying product was

11   the result of negligence.  It's not that they have to prove

12   it was a decaying product.  That's not enough.  They have to

13   prove that that decaying product was there because we were

14   negligent, we failed to exercise reasonable care in creating

15   that condition.  Well, if you were to do the math, all these

16   years and all these bins and never having that problem, it

17   can't be negligent.  They have a condition one time, and

18   they didn't hire an expert to come in and say, you know, I

19   looked at the process of making these pellets and they were

20   doing it wrong and they knew that they were doing it wrong

21   and they kept doing it and it was foreseeable that you have

22   decaying pellets.  No expert has come in, done any test or

23   told you that because there wasn't any negligence.

24        Dr. Schroeder told you in his opinion it was a cold

25   wall from the winter that day, and we know the core was

Defendant ConAgra's Closing Argument

 1    actually against that side of the wall, Mississippi side of

 2    the wall, and that is as logical of an explanation as any,

 3    but it's not negligence.  So now we have decaying product in

 4    the bin.  Does that mean that a bin is going to go on fire?

 5    Does that mean that the bin is going to explode?  All the

 6    experts weighed in on this as to some of the lay witnesses,

 7    and they told you that having that kind of condition is

 8    common in the agricultural industry.  This wasn't some rare

 9    event.  Farmers have it, companies have it.  It happens.

10    That's why West Side has all the work that they have, and

11    other companies that address hot bins, because it is common

12    to have it and they don't go on fire.  They don't explode.

13    It's a condition that you bring companies like West Side out

14    to remove that condition.  And even they admit 200 or more

15    hot bins they've worked on; no fires, no explosions, because

16    you can safely remove this.

17         So now we have Mr. Sumner that comes out to our

18    premises, all right, and he's out there on March 3rd.  Now,

19    I know that there's been some testimony about what he said

20    or -- this term that he used, you know, "ticking time bomb".

21    This Exhibit 130A, that's Mr. Sumner.  That's him on

22    Saturday, the next day after we discovered this problem.  He

23    did all his tests, right?  When he was on the stand I asked

24    him, *What did you find?  That was important for you to*

25    *consider.  What did you find?*  And he told you:  *There was*

Defendant ConAgra's Closing Argument

1   *no fire.  There was no explosion danger.  It was decaying*

2   *product that was gassy, and I wanted to bring my team out on*

3   *Monday.*

4        Let's rely upon the expert to establish whether or

5   not there was a fire, because you've been hearing throughout

6   this trial that there was a fire in the bin while it was in

7   our control before we brought West Side out there.  You also

8   heard there was a fire in the bin and we should have called

9   the fire department.

10        Now, you'll check your notes when we had Dr. Ogle,

11   plaintiff's expert, on the stand to talk about his opinions.

12   Now, let's remember a little bit about Dr. Ogle.  He had

13   some interesting opinions, but he told you that he doesn't

14   understand the custom and practice in the hot bin industry,

15   the industry that -- where hot bins are created.  In fact,

16   he told you that his company would never even let him work

17   on a hot bin.  This was his first case to deal with pellets.

18   So he's not a hot bin expert, he's not a firefighter; he's

19   chemist.

20        So he was describing to you the chemistry of what a

21   decaying product is creating, and it was his opinion that

22   there was fire in the bin in that decaying product.  But you

23   haven't heard that mentioned any more about Dr. Ogle because

24   Dr. Ogle told you that because there was a fire in the bin

25   the fire department should have been called that weekend.

Defendant ConAgra's Closing Argument

1    March 12 or March 13th, should have called the fire

2    department.  That's their expert telling you that.

3         What hasn't been mentioned about their expert, he

4    told you that Mr. Sumner should have known that.  He

5    criticized Mr. Sumner for not knowing there was a fire.  He

6    was asked on the stand:  *Well, didn't Mr. Sumner say there*

7    *was no fire?*  Do you remember what his response was?  *He got*

8    *it wrong.*

9         I don't think you're going to hear that testimony

10   any more about Dr. Ogle because Dr. Ogle's opinion is, he

11   should have called the fire department on that Saturday, or

12   ConAgra.  Well, if Mr. Sumner calls the fire department on

13   March 13th, then all of these e-mails and all of this

14   conduct that they've been saying occurred at ConAgra is no

15   longer relevant.  So let's believe Dr. Ogle, okay, because

16   they shouldn't have it both ways.  They shouldn't have it

17   both ways.

18        Just want to talk about the part between March 13th

19   and April 20th.  Let's accept their expert.  Let's accept

20   him.  He says he got it wrong, there was a fire, and he

21   should have called the fire department that weekend.  Well,

22   now we don't need to have a trial any more about everything

23   that happened after that because their theory is, call the

24   fire department and we wouldn't be here.  That's been that

25   constant message that they've been sending to you folks.


                   Defendant ConAgra's Closing Argument

1   All someone had to do is pick up the phone and call the fire

2   department and we wouldn't be here.  Well, okay, I'll accept

3   that.  It's right there.  It's right there, because he was

4   the expert.

5         You heard Mr. Bindel and Mr. Zimitsch and

6   Mr. Belcher:  No training, no knowledge about hot bins.

7   Well, isn't that important to your consideration?  That time

8   period between March 13th and April 20th, you've been seeing

9   all of these e-mails, fire in the bin.  I had their list

10  here a moment ago, smoldering, fire, all of these things.

11  I'm surprised it didn't come out when they were speaking

12  earlier, all of these criticisms from these e-mails.

13        All right.  So we got those witnesses on the stand.

14  I got Alan Bindel on the stand.  We got Sean Belcher, he

15  said "barbeque pit".  Alan Bindel said "fire in the bin".

16  And that was the point I was making earlier about, if

17  someone says the sky is falling, all right, you hear those

18  words.  If someone says there's a fire in the bin, you hear

19  those words, shouldn't the next thing that's done is ask the

20  witness, *Well, how did you know that?  How did you know*

21  *that?*  How did each one of these gentlemen that they brought

22  in here, Lohman, Herring, all of them that said fire in the

23  bin, call the fire department, what was asked of them about,

24  how did you know there was a fire in the bin?  Well, they

25  didn't know because none of them opened up the top hatch and

Defendant ConAgra's Closing Argument

 1    looked down.  They were legitimately concerned about the

 2    condition of the bin.  They were concerned about this bin

 3    from a point of view of, they didn't know what was happening

 4    inside this bin.  They weren't trained.  They've never had

 5    that happen before.

 6         The only person that has been referred to as having

 7    seen something is Mr. Weibrecht back on March 12th.  He saw

 8    some glowing, he told you.  And I asked him about that.  The

 9    fact is, I don't know what he saw.  But here's what we do

10    know:  There's never been glowing on the top.  The core was

11    at the very bottom, the very bottom of the bin, and you

12    certainly can't see it through the pellets to see glowing.

13    That's what he saw.  What was important then about

14    Mr. Weibrecht and that testimony?  You have been introduced

15    to evidence over and over and over by Mr. Herring they put

16    on the stand, by Mr. Lohmann, by Mr. Belcher.  You heard all

17    of these complaints that ConAgra refused to call the fire

18    department during that time period.  That is a big part of

19    their case, and we should be blamed because during that time

20    period we refused to call the fire department.

21         Well, you remember what Allen Weibrecht had to say

22    when I asked him questions?  What did he say to you?  He

23    says, That night I contacted Sean Belcher, and Sean Belcher

24    told me, *You want to call the fire department?*  *If you're*

25    *concerned, call the fire department.*  And then I followed up

Defendant ConAgra's Closing Argument

1   with Mr. Weibrecht.  Remember, he's all part of the group of

2   laborers that work together day in and day out.

3   Mr. Lohmann's part of that group, Mr. Garris, Mr. Herring.

4   They all work together, they all communicate together.

5           Mr. Weibrecht told you:  *At no time throughout that*

6   *entire time period did Sean Belcher ever change his opinion*

7   *that if I wanted to call the fire department, I was free to*

8   *call the fire department.*  And that's powerful evidence.

9   That's powerful evidence because they've made

10  Godfrey Friedt, you know, to be the Darth Vader of ConAgra

11  but they don't want to talk about Sean Belcher who these

12  gentlemen reported to.  They didn't report to

13  Godfrey Friedt; they reported to Sean Belcher.

14          And it was interesting because after Sean Belcher

15  testified -- you can check your notes -- there was no other

16  ConAgra employees that were called to testify to the stand,

17  no one, because they did not understand that Sean Belcher

18  had a personal relationship with each one of these

19  individuals.  And we went into it a little bit when he was

20  on the stand.  All the things they did in their personal

21  lives together, bringing construction equipment to their

22  homes, working on trucks together.  Sean Belcher had a

23  personal life with each one of these people, and it simply

24  is not believable that he would refuse any request to call

25  the fire department.  And he was on the stand and he told

                    Defendant ConAgra's Closing Argument

1   you folks that, and they didn't get any information out of

2   him to make a change, change his opinion that, if you wanted

3   to call the fire department, all you had to do was pick up

4   the phone.

5          So we're going through this time period.  Every

6   time you see an e-mail put up on the screen, every time you

7   see an e-mail, ask yourself:  *Did that witness that wrote*

8   *that e-mail actually look into the hatch and see a fire?*

9   Because each time they show you that e-mail, all the way

10   from March 13 to April 19th or April 20th, each time they

11   show you an e-mail, that witness testified, on the stand:  *I*

12   *wasn't trained in hot bins.  I don't know what goes on in*

13   *hot bins.  I just was afraid because there was a hot bin.*

14          Now, one of the key things that should be addressed

15   here in this case:  If there's smoldering, if there's fire

16   in the bin, what happened to it?  Their whole case is, boy,

17   this thing was ready to blow up while we had sealed it down.

18   Every part of this bin was sealed down.  Their case is, you

19   know, this thing was ready to blow up.  Surely by the 20th,

20   April 20th, West Side would open up that bin and tell you

21   this bin had been on fire, this bin had been smoldering,

22   this bin had been smoking, and that's why it was important

23   that Sean -- that Melvin Flitsch got on the stand and talked

24   about what he observed.

25          Your Honor, can I just have a sidebar briefly on

Defendant ConAgra's Closing Argument

1    something?

2              THE COURT:  On the record?

3              MR. PATTON:  No.

4                          *   *   *   *

5         **(Discussion held at sidebar off the record)**

6                          *   *   *   *

7              THE COURT:  Mr. Patton.

8              MR. PATTON:  Thank you, Judge.

9         I think I was covering that period between when

10   this thing was discovered.  One of the things that the

11   plaintiffs had promised you during their opening statements,

12   because they need to explain to you how this bin got worse,

13   right?  They need to explain to you:  *While it was in our*

14   *care, even though we sealed it all down, that it got worse.*

15        Promises that were made to you in the opening

16   statement, some of the witnesses that they put on the stand

17   was that there was vents that connected the different bins

18   and that there was somehow an inch-and-a-half gap all the

19   way around.  Now, that was just wrong.  And you haven't

20   heard about vents since that time, but this is the plans

21   that went back to '64, and these plans were produced and all

22   the attorneys had them and all the experts had them.  And it

23   was Dr. Schroeder walked you through this.  There are no

24   vents.  There are no vents between 14, 15 and 16.

25        So all of this testimony and their arguments that

                     Defendant ConAgra's Closing Argument

```
 1    somehow there were vents -- remember the point of the vents.

 2    They want that condition in the bin to get worse from March

 3    13th to April 20th.  They're focused on those five weeks.

 4    All these arguments are focused on those five weeks.

 5    They're not talking about the week that West Side was there.

 6    So they want it to get worse.  They want to put blame on

 7    ConAgra.  And their argument is:  *We continued to run our*

 8    *operations and so the dust collector in 14, put pellets in*

 9    *there.  It sucks air.  It sucked the dust out.*  And they

10    were arguing to you that that then pulled air from the

11    bottom of 15, and air, we all know, is bad for a core.

12    There are no vents.

13          And then Dr. Schroeder testified, in addition to

14    his opinion there's no vents -- because they're not drawn in

15    here -- he was at the scene, as was Dr. Ogle, after the

16    accident to take photographs.  This is what I mean by a

17    witness can say something, but it's the physical evidence

18    that has no stake in the outcome of the case.  Doesn't care

19    who wins.  The physical evidence shows all of these bins,

20    14, 15 and 16 -- their allegation they were arguing to you,

21    and putting some of the ConAgra laborers on the stand to

22    tell you that 14 had a vent that went into 15, and so when

23    we're putting pellets in 14, we're pulling air out of 15 to

24    go into 14 because that's how the dust collection system

25    worked.  That was false.  That was wrong.  There are no
```

Defendant ConAgra's Closing Argument

1    vents.

2         So now I'm hearing, well, okay, we won't talk about

3    vents any more.  Let's talk about an inch-and-a-half gap

4    between a 400-ton roof and the top of these bins.  That was

5    Dr. Ogle's opinion that there's a gap in the roof sitting on

6    them and maybe that's where air could be sucked in.  Okay.

7    Again, Dr. Ogle had all these pictures.  15, 16.  Here's the

8    roof, the original roof that was cut to replace the roof,

9    and you can see how it rests on top of the bin.  Do you see

10   an inch-and-a-half gap?  Is this roof a hovercraft that

11   hovers above these bins?  That's not the physical evidence.

12   That's not true.  There is no air that was being sucked out

13   of 15 to make that core become more dangerous by the time

14   that West Side showed up.

15        So their case to you, folks, has been that, while

16   in our possession, before West Side showed up, their claim

17   is, that delay, that delay in not having West Side show up

18   on Monday, and instead, show up six weeks later, that delay

19   took the condition in the bin and made it more dangerous.

20   That has been a constant argument that they've been making.

21   You have no evidence, none, that this condition got worse.

22   Everything that they've said about vents and gaps happening

23   is wrong; wrong by the evidence from the stand and your own

24   view of these bins.

25        Then I heard one today, because understand, they

                 Defendant ConAgra's Closing Argument

```
 1   have to -- they have to show you that on April 20th when
 2   Mr. Flitsch took possession of the bin, they have to show
 3   you that the condition in that bin was such that it was
 4   going to become on fire and that it was going to explode.
 5   They have to do that, to blame ConAgra.  Well, we heard
 6   today that the reason why Mel Flitsch was amazed at how
 7   great the condition of the bin was on April 20th was because
 8   we had put water in the bin.  Okay.  Didn't hear that one
 9   before.  We're hearing it now.
10        They have to explain to you folks, keep the blame
11   on ConAgra that by the time that Mel Flitsch got it, you
12   know, it either wasn't in this great condition or we had
13   done something to change it.  Well, you know what?  I'll
14   accept the fact -- just like I'll accept Dr. Ogle telling
15   you that Sumner should have called the fire department five
16   weeks earlier, I'll accept the fact that putting water in
17   the bin, as Mr. Clifford said, extinguished the fire.  Now
18   we know there was no fire in that bin in terms of flames.
19   Let's go with what he had to say.  We put water in the bin
20   and the fire's gone.  Of course we know that's not how it
21   works because all day on the 27th Mr. Schmidt and
22   Mr. Flitsch were dumping water into the bin and actually
23   made it worse.
24        Let's say that somehow we got it right with the
25   water.  Isn't the point here that, what was the condition of
```

Defendant ConAgra's Closing Argument

```
 1    the bin when West Side finally took over?  And if the
 2    condition of the bin was it was safe and it was business as
 3    usual, why is ConAgra to blame for that?  All those five
 4    weeks, all those e-mails, I use Mr. Clifford's term, are red
 5    herrings.  A red herring, we learned that back in law
 6    school.  A red herring is something to distract your
 7    attention away from what's really important for you to
 8    consider.  That's red herrings.  They use that term
 9    correctly.
10          And you remember the only time that he used the
11    term "red herring" in his statements to you?  He only used
12    it once.  He told you that Mel Flitsch was a red herring.
13    He's telling that you Mel Flitsch doesn't mean anything in
14    this case, just keep focusing on ConAgra.  How can
15    Mel Flitsch not be an important witness to your
16    consideration in this case after what you heard from him
17    when I put him on the stand?  And that really comes back to
18    the point I'm making about, were you given the full story or
19    were you given just a very small portion?
20          Mel Flitsch is the most important witness in this
21    case because he has the greatest expertise, the greatest
22    experience, and he could tell you from day one what was
23    happening inside Bin 15.  How can he be a red herring?  How
24    can he be nonessential?  How can he be a nobody to your
25    effort to come to the truth?  The reason why they're calling
```

Defendant ConAgra's Closing Argument

1    him a red herring is because his testimony is so devastating

2    to your decision as to the true cause of, not only the

3    explosion, but the injuries to Mr. Jentz and Mr. Becker for

4    him sending them back in the tunnel.  So coming back then to

5    the 20th, April 20th, what are the red herrings?  Because if

6    the evidence shows -- and the evidence does show on the

7    20th, this bin was safe, ConAgra cannot be to blame.  What

8    do we know about the condition on the 20th?  What do we know

9    from Mel Flitsch, who was not called by the plaintiffs in

10   their case?

11       I had walked through with Mel Flitsch:  Did he have

12   the time, did he have the resources, was there anything that

13   he was unable to do on the 20th of April, being the expert?

14   We established with Mel Flitsch and through Mr. Sumner and

15   through the other witnesses, including Mr. Schwers, who

16   West Side was when they showed up.  The evidence has showed

17   exactly who West Side is.  They're the top company when it

18   comes to fixing hot bins.  They have no peers.

19       You have a decaying condition that you want to be

20   removed safely, you don't want fire, you don't want

21   explosion, call them.  And each one of them, Sumner and

22   Mr. Schwers and Mr. Flitsch, testified, *We are the experts.*

23   *Hundreds of bins we've worked on worse*, they told you, *than*

24   *the condition in Chester*.  Worse.  I know that they've been

25   trying to say -- you know, they're kind of backing away a

Defendant ConAgra's Closing Argument

 1   little bit from their expertise in trying to convince you

 2   they just do salvage.  Even Dr. Schroeder, he's worked with

 3   them, and they do a lot more than salvage.

 4          They're experts in elevator fires and experts in

 5   emergency removal.  Those are their words.  They're telling

 6   the ConAgras and the Cargills:  *Any time you have a*

 7   *condition, any type of condition in your bins, long before a*

 8   *fire, long before an explosion, call us.  Call us because we*

 9   *cover the entire country coast-to-coast.  Call us.  We know*

10   *what we're doing.  We can do this safely.  We have the*

11   *equipment to bring out there and tell you what's going on*

12   *inside your bin.  We have the equipment to tell you, are*

13   *there gases going on in there that we need to be careful*

14   *about?  We have the equipment to tell you, can there be a*

15   *fire?  And we have the skill and the expertise to avoid all*

16   *of that and do it safely.*

17          That's who we hired.  And you've been hearing about

18   what -- it took you too long.  It took you too long.  You

19   delayed.  You tried to bid it out, you tried to get a

20   cheaper bid.  That is what's called a red herring because

21   what they're not mentioning is, from the beginning we're

22   interested in West Side, but also Southern Illinois Salvage,

23   a competitor of theirs, and we continued to try to get

24   somebody out there, not delay.  You heard Sean Belcher

25   testify, you heard Godfrey Friedt testify:  *We worked on*

                Defendant ConAgra's Closing Argument

1    *them day-by-day to come out but they didn't have the proper*
2    *paperwork.  They didn't comply with our corporate policies.*
3    And then e-mails, *We were strung out by them.*
4            So then what happens?  That first week of April,
5    April 2nd, we decide, cut 'em loose, cut Southern Illinois
6    loose.  By the way, Godfrey told you that, not only did
7    Mr. Sumner come out and look at the bin, but he had the
8    president of Southern Illinois Salvage come out and look at
9    our bin too.  Two experts.  Does that sound like a company
10   that's not interested in safety?  Does that sound like a
11   company that's not trying to take care of this condition?
12   *Two experts came out and they told us the same thing:*
13   *There's no fire hazard here.  There's no explosion hazard*
14   *here.  Seal it down.  Starve it.*  "Starve it", those are
15   important words when we get to the 27th about what should
16   have been done.
17           So that's the message to us.  I understand all
18   these other gentlemen out there that are concerned, but they
19   weren't experts.  They aren't experts.  We had two experts
20   come out and look at the bin.  We chose one of them and he
21   didn't come up with the paperwork.  So now we call
22   April 2nd, and we call Mr. Sumner.  I know I'm jumping
23   around a little bit here, but want to make sure I address
24   all this.  You remember Mr. Sumner.  We heard it again today
25   about ticking time bomb.  There's been no ConAgra employee

                Defendant ConAgra's Closing Argument

 1    that's come in here -- and a lot of them have talked to

 2    Mr. Sumner.  Not one of them have said he used the term

 3    "ticking time bomb".

 4            I also quote -- Mr. Sumner was on the stand and I

 5    asked him about the ticking time bomb comment, and he made

 6    it clear to you folks he wasn't referring to a fire, he

 7    wasn't referring to an explosion.  He just wanted us to get

 8    him in there and start doing this work.  Why was he so

 9    interested in getting out there so fast?  That's probably

10    something you've been wondering about.  Why was Mr. Sumner

11    so interested in getting out there on Monday, as he

12    testified to you?  Was it because there was some danger in

13    the bin?  We know there wasn't a danger in the bin because

14    on April 20th, Mel Flitsch inspected it and told you how

15    amazed he was at how good it was.  But Sumner was going on

16    vacation in March.  He was going on vacation in March, and

17    you already heard, once we called him in April he'd already

18    been booked up.  He wanted to get out there because he

19    wanted that job done.  He knew he was going on vacation and

20    he knew that April was going to be a problem for him

21    scheduling crews because they're so busy fixing everyone

22    else's bins.

23            So when you hear this argument about a delay, they

24    try to say it was, you know, us trying to save money.  You

25    heard the witnesses testify.  We kept trying to get people

                    Defendant ConAgra's Closing Argument

 1    out there.  And April 2nd, several weeks later, we were

 2    ready for him to come out that Monday.  Not April 20th; the

 3    first week in April.  That's undisputed.  Sumner said it, he

 4    agreed, when Godfrey called him up he was ready to come out.

 5    Godfrey wanted him to come out that Monday but he was too

 6    busy, Mr. Sumner.

 7         So when you listen to these arguments about ticking

 8    time bomb, let's just think about that for a moment.

 9    They're using the word "ticking time bomb" to create a

10    danger in the bin.  They want to create this image in your

11    minds, "ticking time bomb".

12         Even though Mr. Sumner disavowed their

13    interpretation of that term, let's go with that for a

14    moment, "ticking time bomb".  Did he say "ticking time bomb"

15    on April 2nd, Mr. Sumner?  Because surely if it was a

16    ticking time bomb under the definition they want you to

17    think about, ready to blast off, ready to explode, wasn't it

18    a ticking time bomb two weeks later?  And if it was a

19    ticking time bomb two weeks later -- you remember I had

20    Mr. Sumner on the stand.  Did he tell you that he had any

21    concerns on April 2nd about that ticking time bomb?  And if

22    he really thought it was a ticking time bomb, and it should

23    be the definition they want you to have, why was he

24    comfortable saying, *I'll see you in two weeks*?  Wouldn't you

25    think that if Mr. Sumner felt that that bin was dangerous on

                Defendant ConAgra's Closing Argument

1    March 13th, he would still think it was dangerous on

2    April 2nd?  And if he thought it was dangerous on April 2nd

3    would he still have his crew show up two weeks later?

4           This is what I mean by, you can hear people say

5    things to you but you have to use your common sense.  Judge

6    the actions of these individuals, not just the words that

7    are being suggested, the meanings to these words.  Because

8    what you heard Mel Flitsch tell you is, when he showed up on

9    April 20th, Mr. Sumner didn't tell him to have any concerns

10   about the bin.  Mr. Schwers didn't tell him to have any

11   concerns about the bin.  He told -- Mel Flitsch told you, *I*

12   *didn't do anything different when I showed up on April 20th.*

13   So when you hear about how five weeks caused this bin to get

14   more dangerous, don't hear that argument; ask yourself, what

15   witness in this case said that?  What witness?

16          Do you remember I took that sheet where they wrote

17   down "barbeque pit" and "smoldering"?  And I went down the

18   list with Mel Flitsch, because they want you to believe the

19   words of individuals that had no experience in bins, and I

20   said, *What -- did you find a barbeque pit?  Did you find*

21   *smoldering?  Did you find smoke?  Did you find embers?  I*

22   *asked him, Where did it go?*  Whether you're trying to search

23   for the truth -- and you have a burden in this case --

24   wouldn't he be the logical person to ask?  Didn't those five

25   weeks, Mr. Flitsch, handicap you?  Didn't those five weeks

Defendant ConAgra's Closing Argument

1   that it was sealed up, didn't somehow that present some

2   impossible task for you to do your work safely?

3   Mr. Flitsch, five weeks -- look at all these words we wrote

4   down from other people during this trial.  Isn't that true?

5   Isn't that what you saw that day?  Shouldn't he have asked

6   those questions?

7           Since it's their burden to prove to you, those five

8   weeks somehow this condition was ready to explode?  I asked

9   those questions, seemed important.  And he told you, none of

10  that existed on the 20th, none.  He told you, safe to do the

11  work.  And he removed about 11,700 pellets on April 20th, 5

12  or 6 weeks later.  No concerns, he told you.  Business as

13  usual is what he told you, the expert, the man that

14  West Side sent out to our facility to discover hazards, the

15  man that West Side sent out to our facility to discover

16  dangers, fire, explosion.  That's what his job was.  What

17  did he find?  Nothing.  In fact, he told you:  *I wouldn't*

18  *even call ConAgra's bin a hot bin.*  Remember that?  It's

19  less than a hot bin.  It's a bin with heat damage.  He even

20  lowered the category of this bin and told you it was going

21  to be easy for him to do his work and it was easy for them

22  to do their work starting on the 20th.

23          Now let's go to the 21st, these days that don't

24  exist in the plaintiffs' case.  In the plaintiffs' case this

25  is no longer history, this is gone, because it didn't help

Defendant ConAgra's Closing Argument

1    them.  They got a tough time explaining to you that this bin

2    is so safe to the experts, why blame ConAgra?  Which one of

3    these lawyers went through this list with the key people?

4    Schmidt, Becker, Jentz, Flitsch.  If they're pursuing the

5    truth, isn't this important to you to know?  If they've

6    created this image in your minds for five or six weeks this

7    bin was ready to explode, blame ConAgra.  They were putting

8    money over safety, they were ignoring all these people's

9    concerns and fears.  Be mad at Godfrey Friedt, be mad at AY.

10         Okay.  Take it as true, because you should see

11   evidence of that, right?  If we did all these terrible

12   things to the bin over those five or six weeks, the physical

13   evidence that doesn't lie, it has no stake in who wins in

14   this case, shouldn't it be evidenced here?  Because we got

15   the best of the best out there.  If anyone is going to know

16   how dangerous that bin is, how much we screwed up over those

17   five or six weeks, isn't it Mel Flitsch?  And shouldn't they

18   have asked him?

19         Well, I did.  The day that no longer exists,

20   April 21st.  *Mel, tell the ladies and gentlemen of the jury,*

21   *did you have all the time you needed that day to do all your*

22   *testing, to do all your observing, to do all your talking*

23   *with the other experts out there as to what's going on in*

24   *the bin?  Because you're responsible for the safety of your*

25   *men, right?  Right, now?  You got to protect Jentz, you got*

Defendant ConAgra's Closing Argument

1    *to protect Becker, got to protect Schmidt, Nanez; right,*

2    *Mel?*

3          *Right.  Right, Mr. Patton.*

4          *So what did you do the next day?*

5          *You know, I had my eyes, Schmidt on top; I had my*

6    *eyes, Becker, down in the basement with Jentz.*

7          And I went through, are they qualified?

8          I want to talk about this notion of contributory

9    negligence and how it was addressed by counsel earlier

10   because that is an issue you need to consider.  Contributory

11   negligence, whether or not Schmidt and Becker and Jentz

12   exercised care for their own safety.  That's the law.

13         So I asked Mr. Schwers, I asked Mr. Sumner, I asked

14   Mr. Flitsch:  *Tell us about these other workers' experiences*

15   *and training.*  And I asked them too, each one of them.  I'll

16   get into what they had to tell you in a minute, but the

17   evidence in your notes is going to show that all of these

18   individuals knew about hot bins, knew about fires, knew

19   about explosions.  That was their job to be there and work

20   together as a team.

21         So Mr. Flitsch, what was being seen up top by

22   Mr. Schmidt?  What was seen down at the bottom by Mr. Jentz

23   and Mr. Becker?  Surely that's important for you guys to

24   know that.  Surely the jury ought to know this dangerous bin

25   that they've been told about for five or six weeks surely

                    Defendant ConAgra's Closing Argument

 1   the next day is going to rear its ugly head.  We're going to

 2   have fire again, we're going to have danger.  Because if

 3   it's not there, why are you blaming ConAgra?  That's called

 4   the search for the truth.

 5          Mel Flitsch could have said, listen, because, you

 6   know, West Side has -- their agenda is to have ConAgra

 7   blamed for everything, right?  They are no friend of

 8   ConAgra.  They betrayed their trust to ConAgra at the scene

 9   and they're betraying their trust in this courtroom.  So

10   certainly Flitsch had an opportunity to tell you: *You know*

11   *what?  It was bad.  It was bad.  Those guys from ConAgra,*

12   *darn them, they should have done something for five or six*

13   *week instead of sitting on their hands.  Boy, they really*

14   *messed things up for me.  I'm the expert but, you know, I*

15   *got to tell you, I got there on the 21st and, man, that bin*

16   *was ready to explode and I couldn't do anything about it.*

17   *Though I did want to mention to the jury on the 21st there*

18   *was no fire, no embers, no smoke, no danger, and we didn't*

19   *tell ConAgra that there was any danger.*

20          This whole case has been from these guys about what

21   they knew and what Godfrey knew.  Blame them.  Misdirect the

22   blame from West Side and stick it on ConAgra.  Well, here's

23   two days in a row now the evidence is going to ConAgra,

24   safe, business as usual.  And they're taking a lot of

25   pellets out, right?  Because we know they drained it all the

                    Defendant ConAgra's Closing Argument

```
1   way down to the bottom on the 27th.

2           All right.  Well, maybe Mel got it wrong on the

3   21st.  Maybe the expert got it wrong.  Maybe there was

4   fires, maybe there was ember, it was hell down in that bin,

5   right?  Got it wrong.  So then on the 22nd, the day that no

6   longer exists in the history books, according to the

7   plaintiffs, surely after three days all that danger they

8   were telling you about, while it was in our hands, is going

9   the rear its ugly head again, right?  What did the experts

10  say?  This isn't the lawyer saying this.  Separate the

11  lawyers' talk in this case and let's go to what the

12  witnesses under oath staring you folks in the eye had to

13  say.  My hand was getting tired if you remember during that

14  trial.  I was getting tired of writing all the stuff down.

15  Even my spelling probably is bad.  I just started writing

16  "safe" on there.

17          All right, Mel.  You're there.  You got Schmidt,

18  you got Becker, you got Jentz.  You got all your equipment,

19  your monitor, your testing devices.  You got 20 years of

20  experience, Mel.  Over 50 hot bins that you told the jury

21  were worse than ours.  So tell them, now we've done

22  something bad.  Remember they got trucks showing up.  They

23  got the dust collectors blasting everything.  No vents.  But

24  that's what they're telling you.  That's their search for

25  the truth.  What did you get?  Here's your chance, Mel.
```

                    Defendant ConAgra's Closing Argument

1  Now, you know you're not a friend of ConAgra, right?  Here's

2  your chance.  Throw me a little bit of a loop.  Tell them,

3  you know, it was getting bad.  No fire, no smoke no embers,

4  no dangers.  The day that no longer exists in history.

5       Okay.  So now we're what, 20, 21st, 22nd.  That's

6  three full days.  Remember, they'd show up at six, leave at

7  five.  All those hours to tell you folks, you know, things

8  were starting to change.  Darn ConAgra, they messed up

9  again.  They gave me a situation.  I'm the best of the best,

10 but I couldn't handle this one.  Okay.  So you tell the

11 ladies and gentlemen on the 23rd, four days -- because you

12 remember, they want you to believe we threw some water on it

13 and we fixed everything.

14      Okay.  *Well, Mel, did you have* -- series of

15 questions here:

16          *Did you have an adequate full day to*

17          *investigate the hazards inside the bin?*

18          *Yes, I did.*

19          *Wasn't that your job, Mr. Flitsch, every*

20          *day, make sure no hazards, no dangers, because*

21          *you got to protect yourself, you got to protect*

22          *your coworkers, and you got to protect ConAgra,*

23          *right?  We have men and women working within feet*

24          *of these bins.  Surely it's not just about you,*

25          *sir; it's about everybody out there, right?*

Defendant ConAgra's Closing Argument

1               *Right, Mr. Patton.*

2               *Tell them about that fire that you saw.*

3               *I can't.  There was no fire.*

4               *Tell them about the smoke.*

5               *I can't.  There was no smoke.*

6        And you remember I went through this with

7   Mr. Schmidt as well because he's on top.  If anybody

8   knows -- remember, he told you he laid on the ground and

9   looked down in there.  He's watching his bin whip tearing up

10  the bin going all the way down.

11              *Smoldering, isn't that important?*

12              *No smoldering, sir.*

13              *Embers, right?  Embers.  Got to be embers,*

14          *because we really messed up for five or six*

15          *weeks.*

16              *No embers.*

17       I was really running out of gas.

18              *Was it safe?*

19              *It was safe.*

20              *Okay.  Any notice to ConAgra?  I mean you*

21          *walked by our office every single day.  You're*

22          *talking to Sean Belcher.  Did you tell him, hey,*

23          *you know what?  Looks grim.  The situation's*

24          *changed on me.*

25              *No, no, I didn't tell him anything about*

                 Defendant ConAgra's Closing Argument

1          *that because there was no hazards, there was no*

2          *dangers.*

3          Another day that no longer exists on the calendar

4    in plaintiffs' case.  Now let's go to the 24th.  Getting

5    close, guys.  Stay with me.  Five days.  Five days now

6    they've got the top hatch open, they've got the bottom hatch

7    open.  Air's coming in there, right?  Because they got to

8    drop that bin whip down.  Jentz and Becker in the basement.

9    They got the hatch open because they're taking all the

10   pellets out.

11         By the way, remember how they've been denying in

12   their opening statements and denying about the air lance?

13   Still here, right?  Remember how they denied, wasn't used on

14   the afternoon of the 27th.  Patton's got it wrong.

15   Remember?  That's been their whole case.  I don't think

16   they're going to say that any more, do you?  Because Mel got

17   on the stand and said, *We used the air lance on the*

18   *afternoon of the 27th in the side manhole.*  I'll cover that

19   in a minute.  Took awhile but we got it.

20          *24th, Mel, did you have a full day, all*

21          *your men strategically placed, still looking for*

22          *hazards?*

23          *Still looking for hazards.*

24          *Still looking for dangers?*

25          *Still looking for dangers.*

Defendant ConAgra's Closing Argument

```
 1                    Protecting your guys?

 2                    Yes.

 3                    Talking to our guys?

 4                    Yes.

 5                    What did you see?

 6                    No smoke.

 7          I even started getting a little tired there.  No

 8    smoke, embers, fire, no dangers.  They're not going to talk

 9    about this day with you.

10          All right.  Well, maybe we're lucky.  Maybe

11    ConAgra's just flat out lucky that all those dangers they

12    said existed -- they want to talk about women in bikinis,

13    all these red herrings.  Surely we got lucky.  And now the

14    sixth day they're out there.  We can only hide the danger

15    for so long is what they're suggesting to you.  We didn't

16    have like a tarp over this thing.  We had the top open, we

17    had the bottom open.  Tell them about the 25th, another day

18    that no longer exists on the calendar of 2010, according to

19    the plaintiffs.  They're not going to ask you.  They're not

20    going to talk about this.  No fire, no smoldering, no smoke,

21    no embers.  I don't have a clue what that is.  No dangers.

22    That's bad.  You know I was getting tired at that point.

23              THE COURT:  You know, point it out to me, would

24    you?

25              MR. PATTON:  "No harm" maybe?  "No hair"?  I don't
```

Defendant ConAgra's Closing Argument

1  know, Judge.

2          *THE COURT:*  I thought maybe I could help you,

3  but --

4          *MR. PATTON:*  No, no.  Hopefully it's in the notes.

5          All right.  So Mel, did you have all that time to

6  be looking around?  Were you protecting your guys?  Were you

7  protecting our guys?  Are you still the expert?  You didn't

8  lose your expertise, right?  You didn't forget 20 years,

9  worse bins than ours?  Did you forget any of that?  No.

10  Where's all these dangers that they've been telling you

11  about?  They hiding like little gremlins somewhere?

12  Draining the bin down.  All right.  Feel the finale coming

13  here.

14          Twenty-sixth, the day before, the day before.

15  There's that word again.  I hope it's good.  You know, my

16  handwriting gets bad.  Judge would be mad at me.  All right.

17          Here's the 26th, day before.  The day before the

18  explosion, surely an important day for somebody in this

19  courtroom to want to talk about.  Somebody blaming ConAgra.

20  Somebody that's been telling you for five or six weeks we

21  created an inferno ready to blow up.  All our fault.  This

22  is Mel Flitsch telling you this, not me telling you this.

23  This is an individual that had every motivation not to want

24  to say things that helped ConAgra.  By the way, did their

25  lawyer get up with Mel?  Did he get up with Mel and try

                    Defendant ConAgra's Closing Argument

1    clarify any of this, try to show Mel was wrong?  You're

2    searching for the truth.  I mean, of course, you're his

3    attorney.  You knew the truth.  No smoke, no fire.  This is

4    going to bother me.  No hazards.  Hazards.  No hazards,

5    Judge -- hazards or dangers in this case, in this bin.  Did

6    you share that with ConAgra?  Yes.  You didn't put us on

7    alert the day before, talk about Godfrey, what's he

8    thinking?  Talking about AY Yount, Anthony Yount, what's he

9    thinking?  Safe.  This was a routine operation by the best

10   of the best and they got it down to the bottom of the bin.

11   There was no secret danger, no -- nothing that they didn't

12   have the equipment and the ability to detect.

13          That's evidence from the person who would know.

14   You didn't hear much from the three speakers a moment ago

15   talking about West Side.  Okay.  I'll do these in tandem.

16   Now, as I said -- how's my time, Judge?

17          THE COURT:  I think you're fine.

18          MR. PATTON:  I was hoping you would say I'm almost

19   done.

20          THE COURT:  You have an hour and ten minutes.

21          MR. PATTON:  I'm not going to take that long.

22          All right.  Now --

23          THE COURT:  An hour 'til your warning.

24          MR. PATTON:  Okay.  Remember, this was Mr. Schmidt.

25   I believe Mr. Dunn suggested that somehow Mr. Schmidt

                    Defendant ConAgra's Closing Argument

1  telling you the truth on the stand means nothing.  Well, I

2  think you decide, draw as the focus of where the evidence

3  should be.

4        So now we've gone through the whole litany.

5  There's no dangers in this bin, there's no fires, there's no

6  embers.  ConAgra hasn't caused anything that these folks

7  couldn't fix on their own.  They were paid to fix it.  They

8  knew they could fix it.  They had no excuse why they

9  couldn't fix it.

10        So now we go to the 27thth.  Which one of the

11  attorneys that spoke before me were interested in the 27th?

12  If you're searching for the truth, if you want to give the

13  jury the whole story, we'll start out with Mr. Schmidt.  And

14  yes, he did do some good things that day, as our

15  Dr. Schroeder testified to.  But what was Dr. Schroeder, our

16  expert, referring to when he said that Mr. Schmidt was a

17  good guy?  Calling the evacuation and telling Flitsch to

18  call the fire department at 4 o'clock.  All you would have

19  to decide, whether or not there's blame that belongs there.

20  I'm just going to give you the facts.  You're going to have

21  to decide.

22        I went through with Mr. Schmidt what his experience

23  was, and I thought he was candid, I thought he shot

24  straight.  I don't know what they're talking about that this

25  should mean nothing and this doesn't mean there's fault on

Defendant ConAgra's Closing Argument

1   his part.  I didn't understand that argument.  But I did

2   understand what Robert told you folks, and what Robert told

3   you folks is that he did have a lot of experience working on

4   hot bins.  That's why he was a foreman.  And he told you,

5   and Flitsch -- kind of a lot to say about Schmidt, and his

6   experience too.  These are not ConAgra employees telling you

7   this.  Two individuals that have no interest in helping

8   ConAgra.  But once they got on the stand and realized what

9   this whole process was about, I think they really had an

10   epiphany as to, well, we'll give them the whole story.

11       So Mr. Schmidt tells you that what he knows about

12   hot bins is that there's really only one thing you need to

13   be concerned about, the core.  That's what causes a -- core

14   is the beginning process.  We also heard the term "nest".

15   They're all one in the same, core, nest, hot spot.  And I

16   showed him his statement to help him refresh his memory

17   about what he said before, and he told you that he was the

18   eyes of this operation on the roof.

19       In addition to operating the bin, the bin whip, his

20   job was to look for safety hazards.  His job was to look for

21   dangers.  And that makes perfect sense.  That's your common

22   sense telling you that.  He's up there because if there's

23   smoke coming up or you see fire, you know that's something

24   that you're going to want to alert Mel Flitsch about because

25   you may want to call an evacuation, you may want to call the

Defendant ConAgra's Closing Argument

```
 1    fire department.  So he's up there doing his job, as they

 2    say, experienced and knowledgeable about conditions that can

 3    turn for the worse, that can cause fires, that can cause

 4    explosions.

 5            I asked him all those questions, and he told you,

 6    Yes, I knew all of that.  And, Yes, that was my job to be on

 7    top of the roof working to find these hazards and working

 8    with my walkie-talkie with Mel Flitsch down below, with my

 9    walkie-talkie to Mr. Jentz in the basement and a

10    walkie-talkie with Mr. Becker.  They had it all right.  They

11    organized themselves perfectly.  They behaved like experts.

12    They communicated like they were experts.

13            What went wrong?  Mr. Schmidt told you that between

14    ten and 10:30 he gets a walkie-talkie transmission from who?

15    From Mr. Jentz, also a foreman for A&J.  So you have two

16    foremen, one in the basement, one on -- you have three

17    foremen:  One on the basement, one on top, and Mel Flitsch,

18    feet on the ground.  Three foremen who knew they were

19    dealing with a warm bin, who all knew that the only thing

20    you really have to be careful about is the core.  That's

21    where the heat is.

22            So I went through all the questions with him:

23                What is it about a core, Robert?  What is

24                it about the core that you need to be careful of?

25                It can become on fire, Mr. Patton.  And
```

Defendant ConAgra's Closing Argument

1                    *Mr. Patton, if it's on fire, it can lead to an*

2                    *explosion.*

3              Now, there may be a little bit of wordsmithing

4      going on here because I believe Mr. Dunn told you, *Well, he*

5      *said that, but he was referring to dust explosions.*  And he

6      didn't say that he knew about carbon monoxide explosions,

7      which we all agree that's what happened out there.  All the

8      experts:  Dust had nothing to do with this accident.  It was

9      a carbon monoxide explosion from the decaying pellets.

10             That was one question I probably should have asked

11     him, carbon monoxide, but didn't seem important.  What was

12     important to me is, he knew up on top that embers, fire,

13     dust, ka-booey, it blows.  That was his job.  He wasn't

14     thinking, *Well, you know what, if it's carbon monoxide*

15     *gases, you know, I don't know about that so I don't need to*

16     *alert anybody.*  He was up there thinking fire, thinking

17     explosion.  It doesn't matter if he had dust on his mind.

18     It has everything to do with whether he was looking for

19     fires, looking for smoke, looking for potential for

20     explosion.

21             And so he gets the call from Jentz.  And I'm going

22     to cover Mr. Jentz in a minute, but that's evidence.  And

23     that's evidence.  That's not lawyers telling you what the

24     evidence is; that's a witness, a plaintiff, a plaintiff

25     suing, blaming ConAgra on the stand, sworn to tell the

                    Defendant ConAgra's Closing Argument

1    truth, and he knew at 10:00 that for the first time in eight

2    days -- "burning", "glowing", "red" were his words.  Glowing

3    red embers down in the basement.

4            And he told you that that's a dangerous situation,

5    and he knew it.  And he told you -- I'm going down the list

6    here.  *What did you do in response that you knew it was*

7    *dangerous?*  He told you:  *My company's standard operating*

8    *procedures, we yank the bin whip out.*  Why do you suppose

9    they yank the bin whip out when they find embers?  Because

10   the bin whip caused the embers, right?  He told you that

11   that morning, now he sees the bottom, and he has Mr. Jentz

12   down in the bottom with his flashlight sticking it up the

13   shaft, and he could see the light and he could see the

14   emptiness down on the bottom.  And Jentz was doing that to

15   help guide him with the bin whip.

16           So Jentz is here -- this is Exhibit 291.  So Jentz

17   and Becker are in the basement on the 27th.  Jentz is

18   sticking this flashlight up the hole.  Mr. Schmidt is all

19   120 feet above, and Mr. Schmidt tells you, *I looked down.  I*

20   *could see the bottom.  I could see that flashlight.  And*

21   *then I had Mr. Jentz help me lower my bin whip all the way*

22   *down so I could, you know, cut into what was left down there*

23   *and had it removed.*  And that spinning, he described it as a

24   weed whacker.  It's like, you know, going to a campfire, and

25   you still have those coals, and you take a stick and you

                   Defendant ConAgra's Closing Argument

1    stir them up, you blow air on them.  Might get a flame.  So

2    he does that.  He gets the embers and he pulls his equipment

3    out.  He pulled his equipment out because he knew that

4    putting that bin down there -- that bin whip down there,

5    stirring up the core, was dangerous.  He stopped that work.

6        I asked Mr. Schmidt -- it's in your notes -- *Tell*

7    *us about embers.  What do you know about embers?  Because*

8    *you're there, right?  You're blaming ConAgra.*  Surely it's

9    important for all you to know what he was seeing and doing

10   that day.  He says, *Well, once those embers were discovered,*

11   *I knew that there was potential for a fire and I knew that*

12   *there was a potential for explosion.*  I said, *Really?  Well,*

13   *did you tell Mel Flitsch?*  Because you remember what

14   Mel Flitsch said?  He said, *Schmidt never told me about*

15   *embers, never told me about smoke.*

16       Remember, Mel Flitsch, his story starts at 12:30 or

17   1:00 when he gets back from lunch.  I took him through the

18   morning.  He's like, *I didn't know nothing.*  So when we talk

19   about comparative fault, you guys are going to have to sort

20   that out, but surely if Mr. Schmidt did not tell Mr. Flitsch

21   about the embers burning in the basement and yanking his

22   equipment out, I think that's fault, because he told you --

23   remember I asked him, *Dangerous situation, right?  Aren't*

24   *those circumstances that you knew that morning something*

25   *that a fire department should know about, burning in our*

Defendant ConAgra's Closing Argument

 1   *basement, smoke in our bin?  Standard operating procedures,*
 2   *yank the bin whip out.  Situation's turned grim, hasn't it?*
 3   "Yes" to all those questions.  And, *No, I didn't call the*
 4   *fire department*, and, *No, I didn't tell ConAgra.*  And I
 5   don't know why he didn't.
 6        There's another big one, and no one seems to want
 7   to talk about it.  You remember in opening statements
 8   Mr. Schmidt was characterized as just a cleaner.  He told
 9   you, When we discovered the embers, I knew between ten and
10   10:30, I knew, Robert Schmidt knew what they found.  What
11   did he tell you?  *I found the core.  I found* -- he called it
12   the hot spot.  Between ten and 10:30 what they were supposed
13   to be concerned about, vigilant about, careful about, for
14   eight days there's only one thing:  The core.  And he found
15   it.  His words:  *I knew we found the core.  I knew where it*
16   *was.  I knew that we'd done something to the core.  Now we*
17   *got embers coming out.*  He knew he stirred it up.  He knew
18   he stirred it up with that weed whacker.
19        So this is the artist's drawing.  Here's Schmidt,
20   here's his bin whip.  He testifies under oath, dropped it
21   all the way down to the bottom under Mr. Jentz's guidance,
22   cranking it up.  Embers are discovered.  Flitsch told you
23   embers is fire.  Okay.  ConAgra didn't cause the fire.
24   ConAgra wasn't up here.  ConAgra wasn't down here.  They
25   knew they had a fire at 10 a.m. in the morning.  That's

                    Defendant ConAgra's Closing Argument

1     their testimony.  Isn't that important for you to know that?

2            So all these things you've been hearing about

3     ConAgra should have called the fire department, should have

4     ordered evacuation, okay, I'll go with that.  What about you

5     guys?  No.  And they didn't even tell us.  Got smoke -- and

6     I skipped one as if there was any doubt that he knew he had

7     a fire.  What did he tell you he did that morning?  Started

8     pouring water in from the top.  Why don't you pour water

9     into an empty bin with embers if you don't think you got a

10    fire?  That's facts, that's evidence, that's coming from

11    them.  And according to Mel, none of this was told to Mel.

12    You'll have to sort that out.

13           Okay.  I want to change directions for a moment and

14    talk about Godfrey Friedt, the Darth Vader, apparently, of

15    ConAgra.  Now, you heard a lot of comments about Godfrey.

16    All right.  They put people on.  You know, he's terrible, he

17    wouldn't let me do this, he wouldn't let me do that.  And it

18    goes on and on, and hear about phone calls and all that.

19    Surely you had this picture of a guy coming in with horns

20    coming out of his head, right?  Did they call him?  Did they

21    call him in their case?  If he's so bad -- they got the

22    burden.  No.  I called him.  Did they call Flitsch?

23    Somebody knew something, right?  Search for the truth,

24    giving you the whole story.  Did they call Flitsch?  Who is

25    the last witness in the case called by me?  Mel Flitsch.


                    Defendant ConAgra's Closing Argument

```
 1              Let's talk about Godfrey for a minute.  Now, my
 2    take when I was hearing people talk was he was this big
 3    corporate guy, three-piece suit, wingtips, handkerchief.
 4    Forget about all those guys down below me; I'm not spending
 5    a dime for the fire department to come out, I'm not spending
 6    another 10,000 for West Side, and it's all about money.
 7    Okay.  Then he gets on the stand.  He's a farm boy, one of
 8    ten kids.  Had to work on the farm and all the other
 9    siblings went away.  Worked on that farm.  And what was his
10    ambition in life?  Mr. Corporation?  A diesel mechanic.
11    Does that sound like a guy that would eventually go to work
12    for a company and wants to expose people to hazards and
13    risks?  Is that the DNA of a person that's going to be like
14    that?  Didn't you feel that this giant man was going to come
15    in and be defiant and fighting the lawyers?  He's a
16    pushover.  He's a nice guy, cares about his people, and yet
17    all the lawyers in the world able to tear into him.  Did
18    they?  As you -- did you come away with the impression that
19    the Godfrey you saw on that stand matched up with the
20    picture that they were painting to you all along?
21              Well, I'll suggest this to you:  When the witness
22    does well on the stand, when he's believable, that's when
23    you call him a liar.  That's when you tell the jury that his
24    crying, his emotion was fake.  You don't make those
25    comments.  Lawyers shouldn't be calling witnesses liars.
```

                  Defendant ConAgra's Closing Argument

1   They can say that their statements aren't supported by the

2   evidence.  You can say that they shouldn't be believed.  But

3   when you get down in the gutter and start defaming the

4   person on the stand -- liar, liar -- forget everything that

5   they said about him.  I would suggest that they're concerned

6   that you liked Godfrey.  I think their concern that -- you

7   saw the pain that he had, because guess what?  He was within

8   15 feet of that building exploding.  All right.  Okay.  He's

9   in the scalehouse.  Concrete's dropping all over the place.

10  He runs out there and he goes and he sees these burned men,

11  and they put on a witness to tell you that he didn't kneel

12  down and pray.  That's pretty low.  That's desperation.

13  That doesn't meet with their game plan about having you

14  folks angry at Godfrey.

15      He is pained to this day about that memory, and

16  that came across.  But whether you believe everything that

17  Godfrey had to say, you don't believe everything that

18  Godfrey had to say, let me tell you about one mistake he did

19  make.  And I know that you got a lot of evidence in this

20  case and it was coming from all directions.  Let's talk

21  about how these lawyers have been telling you about this

22  3:00 phone call, okay?  They have been beating Godfrey over

23  the head about this 3:00 phone call and the 4 o'clock phone

24  call.  We'll get into that in a minute.  Let's talk about

25  the 3:00 phone call.

Defendant ConAgra's Closing Argument

 1          They have been telling you that 3:00, you know, he

 2   made a phone call to the fire chief, and he knew all these

 3   things were going wrong and he didn't tell the fire chief

 4   that.  This is important.  This is an important part of this

 5   case.  He was wrong.  Godfrey got it wrong.  And there isn't

 6   anybody in this courtroom that doesn't know that.  This is a

 7   got-you trial.  This is isn't, I got ya at 3:00 and now I'm

 8   going to -- now, as Mr. Taxman did, he tries to put motives

 9   in Godfrey's head about why, you know, 3:00.  Godfrey was

10   wrong.  He didn't call at 3:00.  He called in the morning.

11          People make mistakes when they have to go back and

12   remember all these events.  How do we know people make

13   mistakes?  Haven't you heard from key witnesses in this case

14   that have made mistakes in their memories?  Haven't you?

15   How about Mr. Becker?  One of the people suing, Mr. Becker,

16   who is shoulder-to-shoulder with Mr. Jentz testified to you,

17   no embers, equipment wasn't pulled out, no water, right?

18   Mr. Becker told you that.  Mr. Becker told you in the

19   afternoon, *I'm up on the roof.*  Never had been on the roof

20   for seven days.  You think it was a coincidence they got him

21   up on the roof?  Smoke's coming out.  What did Mr. Becker

22   tell you?  It was dust.  It wasn't smoke; it was dust.

23   *Well, Mr. Becker, tell us how the situation turned for the*

24   *worse as Mr. Schmidt testified to*, and Mr. Becker says,

25   didn't -- *Nothing happened that day.  Nothing happened that*

                     Defendant ConAgra's Closing Argument

1    *day.  I just remember that Mr. Schmidt told me it was time*

2    *to get off the roof.  I went down in the manlift, and I came*

3    *out, and Mr. Flitsch, in very calm terms, said, you know,*

4    *it's time for you to go down in the tunnel and move some*

5    *equipment.*

6            Now we know that Mr. Becker had to be mistaken

7    about it, right?  Because we know everything that happened

8    that day.  It's kind of hard to be mistaken.  It's kind of

9    hard -- it's kind of hard not to remember being up on the

10   roof as black billowing smoke is coming out, so much that

11   Mr. Schmidt told you he had to put his respirator over his

12   face.  We'll call it he was mistaken.  Okay?  He made a

13   mistake.  Not a liar, not got on the stand to try to

14   dissuade you folks from faulting him for knowing all of this

15   and going down into the tunnel anyway.  He was mistaken.

16           Who else has made mistakes in this case?  How about

17   Mr. Jentz, another plaintiff?  Isn't he mistaken about this

18   day?  Mr. Jentz told you:

19               *I never found embers, never that day.  None*

20               *of this happened, Mr. Patton.  None of this*

21               *happened.  It was work as usual, and then I get*

22               *a --*

23           And then what does he tell you?  Says:

24               *Really the only thing I remember about that*

25               *day is Mel Flitsch telling me to go down in the*

Defendant ConAgra's Closing Argument

1          *tunnel.  That's all I remember that day.*

2          I asked him:

3                      *Well, didn't Mr. Schmidt tell you about one*

4                  *minute before Mel to get the F out of there and*

5                  *evacuate?*

6                      *I don't remember that.  I only remember*

7                  *Mel Flitsch.  I have a specific memory of how he*

8                  *looked.*

9          Remember?  He told you this:

10                     *I remember his behavior towards me, and I*

11                 *remember his words word-for-word.  I don't*

12                 *remember that my foreman told me to get the F out*

13                 *of here and evacuate couple minutes before.*

14         That's a mistake.  He has to be mistaken.  A lot of

15    reasons, time has passed, the trauma, trying to remember

16    these things.  No one is calling him a liar.  No one is

17    saying that, you know, they told you to come on the stand

18    and say this or say that.  So when they say that to you

19    about Godfrey, let's put this in context.  But what is

20    really -- I won't use the word "tragic", but let me use the

21    word "regrettable".  What's regrettable about Godfrey's

22    mistake about that 3:00 phone call?  What's regrettable

23    about it is that had he remembered the morning phone call.

24    That really puts him in a good light, doesn't it?  Because

25    what did the Chief tell you?  By the way, who called the

                    Defendant ConAgra's Closing Argument

1    Chief in the search for the truth?  The Chief told you that,

2    *Godfrey called me the morning of the 27th.*  Remember?  No

3    one's telling ConAgra anything.  No one.

4         Mel Flitsch says he was never told about this, and

5    Mr. Schmidt admitted, *I didn't share any of this with*

6    *Godfrey or ConAgra.*  So we have Godfrey in the morning,

7    according to the Chief -- and Mel Flitsch says this too, by

8    the way.  Godfrey -- Mel says Godfrey call the fire

9    department.  All the accusations, this whole trial they

10   don't want to call the fire department, Godfrey's concerned

11   about calling the fire department, might shut the place

12   down, might charge them for it.  What did the Chief tell

13   you, folks?  *He called and he asked me to come over now in*

14   *the morning.*  That's evidence, okay?  That's something that,

15   if you're searching for the truth, you ought to call the

16   Fire Chief before you start beating up on Godfrey for a 3:00

17   phone call that he never made.

18        And by the way, one of the first questions I asked

19   the Chief:

20             *Did you talk to any of the other lawyers,*

21             *share all this information with them?*

22             *Yeah, I talked to Mr. Durkin, I talk to*

23             *Mr. Badgley, and I told them about that phone*

24             *call with Godfrey in the morning and I told them*

25             *about the phone call with Godfrey in the*

                 Defendant ConAgra's Closing Argument

1              *afternoon.*

2                    They all knew that, and yet they've been savaging

3     Godfrey for a mistake he made saying he made a phone call at

4     3:00.  You ought to put that down.  Is this justice?  Is

5     that justice?

6                    That reminds me of another thing that happened in

7     this trial.  They put Mr. Herring on the stand.  You have to

8     go back in your notes.  The judge made a great call.  That

9     picture's in there, so that kind of refreshes your memory.

10    What did they put Mr. Herring on the stand to tell you?

11    Well, it was so disturbing to me, I'm assuming it's still

12    disturbing to you, but I know there's been a lot of evidence

13    here.

14                   Mr. Herring was put on the stand and he told you

15    that, *I was next to Godfrey Friedt and I heard him on the*

16    *phone twice with the fire department, and I heard Godfrey*

17    *say, 'Don't send the trucks'.*  They knew the Chief would

18    never, never back that up.  Are we searching for the truth

19    or are we trying to distract your attention away and get you

20    mad?  So I call -- remember I was saying to Herring:

21                        *Are you sure that's what you heard?  I*

22                *said, Now, you know the chief.*

23                        *I know the Chief.  He's a good friend of*

24                *mine.*

25                        *Would you defer to the Chief, if he came in*

                    Defendant ConAgra's Closing Argument

1          *here and told this jury what those phone calls*

2          *really involved?*

3               *Said:  Yeah, I probably would.*

4          They didn't call the Chief, but I was so disturbed

5     by that gentleman, Mr. Herring, being put on the stand and

6     make Godfrey look like he was this cold-blooded, callous,

7     don't bring the trucks out here.  And he said it there and

8     told you at 4 o'clock the place is ready to explode, Godfrey

9     tells the Chief, *Don't send your trucks.*  That had to stick

10    in someone's memory here, you know what, I can't wait to see

11    Godfrey because he's got to have horns out of his head.

12         But the Chief gets up here and says, *No.  I had two*

13    *calls with him.  The first one was in the morning and he*

14    *asked me to come out right then and there.*  Godfrey screwed

15    up with his 3:00 phone call because that information

16    certainly would be important to you to know.  All these

17    things they kept saying about Godfrey are flat out wrong.

18         Then what's the second phone call?  Remember the

19    evidence coming from these folks?  West Side's jumping in

20    too.  What was that second phone call that they've been

21    telling you about?  Remember?  Godfrey's dialing up Omaha.

22    He's got to get permission before he could call the fire

23    department.  Godfrey doesn't want the fire.  He wants

24    someone else to make the call.  We got his phone records.

25    We got all this stuff.  We got Herring overhearing him.

Defendant ConAgra's Closing Argument

 1    Really?  Is that the truth?  Is that searching for the
 2    truth?

 3          Because both Schmidt and Mel Flitsch say -- when he
 4    told Mel Flitsch -- we'll get into that -- to call the fire
 5    department at 4 o'clock, minutes went by before the
 6    explosion.  Minutes.  Timelines are real important if you're
 7    going to accuse somebody of fooling around on the phone and
 8    not wanting to call the fire department.  Mr. Jentz,
 9    Mr. Becker, gentlemen, would you tell the jury how much time
10    passed between when Mel told you to go down into the tunnel
11    and the explosion?  Timelines matter when you're accusing
12    somebody of fooling around on the Phone.  Becker said, *I
13    only walked 20 feet and I was blown up.*  Jentz says, *I
14    walked 50 feet and I was blown up.*

15          There's your timeline.  There's your evidence that
16    when Mel told Godfrey, *Call the fire department now*, he
17    called the fire department now.  He had the Chief on the
18    phone and the Chief hears the explosion.  Don't be fooled
19    when you get accusations about people.

20          All right.  I got off on a tangent.  Let me come
21    back to the 27th.  So I've already established with you
22    folks that Mr. Schmidt -- and you have to believe
23    Mr. Flitsch knew that morning between ten and 10:30 there
24    was a fire in the bin.  You have to believe that, right?
25    Aren't the foremen talking?  Which one of them said they

                    Defendant ConAgra's Closing Argument

1    don't talk on the phone?  Which one of them said that as

2    soon as they notice a hazard or a danger, what do they do?

3    On the walkie-talkie, same frequency.  So when Jentz calls

4    Schmidt to tell him there's fire down in the basement, you

5    don't think Mel heard that?  You don't think Mr. Schmidt,

6    acting as a safe person, didn't then follow up with Mel that

7    morning?  And you don't think together they agreed, we're

8    going to take the equipment out and we're going to start

9    fighting the fire with water?

10            And then I asked him all these questions that

11   they're saying about ConAgra.  *Did you tell ConAgra that*

12   *morning any of this?  Godfrey, did you tell* -- you know

13   Godfrey went down in the basement.  Remember, this is the

14   guy they say doesn't care about safety.  And that morning

15   Godfrey told you between -- I think it was like 6 a.m. he

16   attended their toolbox talk.  A guy that doesn't care about

17   safety gets up early to meet with the crew, and then what

18   does he do?  The guy that doesn't care about safety, the guy

19   that doesn't want to call the fire department, guy that's

20   concerned about money over safety, he goes up on the roof

21   with Mr. Schmidt that morning before all of this, about 8:00

22   in the morning.  And as Godfrey said, they were BS'g, just

23   talking about things.  Wasn't that the time there was danger

24   for Mr. Schmidt to tell him?  So they knew in the morning,

25   folks.  They're fighting a fire from the morning.  And every

                    Defendant ConAgra's Closing Argument

1   one of these attorneys is telling you, you know, West Side

2   and A&J, they don't fight fires.  They're not skilled,

3   they're not -- *We don't fight fires.  When there's a fire we*

4   *call the fire department.*

5          And of course, I asked Mel Flitsch that.  Important

6   questions, you would think.  Mel -- and this is the sworn

7   testimony:

8                *Mel -- I'll assume, Mel, that Schmidt*

9          *didn't tell you about embers?*

10               *Okay.  He didn't tell me about those*

11         *embers.*

12               *I want you to assume though that you knew*

13         *there was embers.*

14               *Okay.  All right.  I'll assume that.*

15               *What does it mean, Mr. Flitsch, embers?  He*

16         *told you fire.  Embers is fire.*

17         Between ten and 10:30, Mel Flitsch knew there was a

18  fire.  All this stuff about ConAgra should have called the

19  fire department, ConAgra should have ordered an evacuation.

20  We never knew about that.  Mr. Flitsch -- kind of getting

21  ahead of myself.  Remember my questions to him all day long?

22  He said:

23               *At the end of the day when Schmidt told*

24         *you, the guy most responsible for safety, that he*

25         *was evacuating and to call the fire department,*

                  Defendant ConAgra's Closing Argument

1              did you tell -- this is important here -- all day

2              long did you tell Godfrey there was embers?

3                   No.

4              All day long did you tell Godfrey there was

5              a fire in the bin?

6                   No.

7         So they've been spending all this time trying to

8    redirect your attention because they know they got a problem

9    with all of this, so they want you to say, well, ConAgra

10   should have somehow swooped in with a cape and overruled

11   West Side.  ConAgra -- their argument -- on the 27th should

12   have saved Flitsch and Schmidt from themselves.  That's

13   their argument.  They keep playing the AY tape.  He's in

14   Omaha.  They keep trying to say Godfrey knew this or knew

15   that.  This is what people knew.  This isn't speculation,

16   this isn't guesswork this isn't a lawyer telling you what

17   was in their heads.  This is what they told you from the

18   stand under oath with no resistance, and no other lawyer got

19   up, none, and had them change any of this.  This is the

20   truth.

21        So how is ConAgra to blame for the best of the best

22   fighting the fire all day long, not telling us about it, not

23   themselves calling the fire department and not themselves

24   ordering an evacuation?  How is ConAgra to blame at all for

25   this?  And I'm waiting for them to talk about this, by the

                    Defendant ConAgra's Closing Argument

1   way, about time.

2          Lastly, even with all of this, even with all of

3   this, Schmidt ordered the evacuation.  Now, he didn't tell

4   ConAgra to evacuate, right?  Didn't tell ConAgra.  *I only*

5   *ordered my men to evacuate.  I let everybody at ConAgra stay*

6   *just where they were.*  Flitsch never called for an

7   evacuation.  Never told ConAgra to evacuate.  Never called

8   the fire department himself.  He left our people there next

9   to a bin that they knew was out of control on fire and ready

10  to explode, and ConAgra's to blame?

11         I go through all of this with them, Mr. Schmidt --

12  and when I said Mr. Schmidt, Mr. Flitsch is right there.

13  It's just not believable, with the walkie-talkies and his

14  close relationship they had, they weren't communicating.

15  They got embers, they got fire, they got smoke, and where do

16  they go?  Lunch.  Lunch.  And they don't tell ConAgra.  Both

17  of them admitted this to you under oath:  We didn't tell

18  ConAgra any of this, and we went to lunch, and we didn't

19  leave anybody behind to watch that bin, and we left it open.

20  They left the bottom open, they left the top open, and guess

21  what happens when you got a burning core and you add air in

22  there?  Exactly what happened when they came back from

23  lunch, smoke billowing out of the top.  Risking all of our

24  employees and they're telling you not only are we at fault,

25  they're telling you we should be punished.  We should be

                  Defendant ConAgra's Closing Argument

 1   punished.  The hypocrisy.  The hypocrisy of knowing all this

 2   information, getting on the stand and telling you:  *We never*

 3   *told ConAgra this information.  We left the bin unattended.*

 4   *We knew there was an explosion hazard.*  And they want to

 5   punish us?  Punitive damages?

 6         The story only gets grimmer, right?  They got a

 7   fire, they got smoke.  What do they do at 3:00?  They got

 8   fire, they got smoke.  Put water in the bin.  What do they

 9   do?  All this expertise they have.  Remember, I asked

10   Mr. Schmidt, I asked Mr. Flitsch:

11         *If you have a burning core what don't you*

12         *want to put on that core?  What's the thing you*

13         *never want to put on a core?  Now that you've*

14         *found it now that you know where it is, now that*

15         *it's small, it's limited, what don't you want to*

16         *do?*

17         *Mr. Patton, you don't want to put oxygen on*

18         *it.*

19         What do the experts tell you?  What do they agree

20   on?  You don't put oxygen on a core.  It cranks it up.  That

21   makes it nasty.  That leads to an uncontrolled fire.  That

22   leads to an explosion.  This is the experts we put our trust

23   into, and they fought all trial to say, we didn't do that,

24   we didn't do that.  But Mel came in and he took a look at

25   you folks.  Maybe he understood -- I think he understood the

                 Defendant ConAgra's Closing Argument

 1     higher duty here to give you the whole story.  And he told

 2     you he put a lance hooked up to the compressor, opened up

 3     the side manhole cover, *and we stuck the lance in it*.

 4           Now, I do remember that Mr. Flitsch did limit the

 5     amount of time or that -- we're talking about this -- the

 6     amount of time that they stuck it in that hole.  Maybe it

 7     was the recognition finally of what he did when Nanez caused

 8     this explosion and couldn't quite get over that hump.  They

 9     fought me all trial, never, never, never was this used in

10     the afternoon.  West Side's lawyer:  *Well, if it was, it*

11     *wasn't hooked up.*  Remember, we put the compressor on there.

12     It's got the yellow tape.  And he went into all this

13     nonsense, *It's not hooked up, it's not hooked up*, right?

14     Said -- Mel said it was hooked up, because that's the only

15     way you use this.  You got all these other tools, potato

16     forks and rebar poles, you got all kinds of good stuff to

17     use if you want to try to push things out of the way.

18     Here's the compressor.

19           So the chorus over here was constantly telling you

20     this didn't happen, Mr. Patton is wrong, wrong.  This is our

21     expert, after reading the depositions, taking the testimony,

22     and everybody, here's the core.  No mystery any more.  They

23     found it, as Mr. Schmidt said.

24           Mel Flitsch told you:  *We bore a basketball size*

25     *hole that afternoon, 3:00, through the side manhole all the*

                 Defendant ConAgra's Closing Argument

1    *way through.  We pierced through.*  Now, he couldn't get

2    himself to say, *we did it exclusively with the air lance*,

3    but he did tell you that down in the basement they would use

4    the potato forks.  He told you:  *We'd use all this equipment*

5    *to dig and dig and dig, and when it got too clumpy and too*

6    *hard, we went with the heavy duty stuff.  We went with the*

7    *lance, hooked it up, stuck it in there and blew that stuff*

8    *out of there.*  Well, he told you the same thing about the

9    side manhole.  It was tough, it was -- pellets were all

10   clumped up.  But he admitted, he admitted -- whatever tool

11   you want to believe he used, but I think we know what he

12   used -- *We got through.*

13        Now they got three, three openings into a bin where

14   they know they have a fire, they know where the core is, and

15   what does Mr. Schmidt tell you once they -- what did he tell

16   you under oath that happened once they got the side manhole

17   over?  Spelled that right.  Updraft of smoke.  That's

18   evidence.  White smoke from the top.  Mel Flitsch, talking

19   about it:  *We didn't call the fire department.  I didn't*

20   *order an evacuation.*  And Schmidt told you:  *I could have*

21   *done all of that.*  And Mel Flitsch told you:  *I could have*

22   *done all of that if I wanted to.*  And they're blaming

23   ConAgra.  *We opened up the manhole*, and Schmidt tells you,

24   *now I got an updraft really in my face.  I got to put my*

25   *respirator on.*  Well, of course you got an updraft.  You

                Defendant ConAgra's Closing Argument

1    opened up the side manhole cover.  Now you have this

2    complete chimney effect.  And what the experts told you,

3    their expert agrees, that updraft caused that core to

4    explode.  That wasn't ConAgra opening up the side manhole

5    cover, that wasn't ConAgra using the lance, that wasn't

6    ConAgra telling them to do any of this stuff.  Their means

7    and method, their decisions, and they want you to have

8    ConAgra swoop down and save the day.  They want you to have

9    a safety director in Omaha who put his trust in these men to

10   do it safely to somehow tell them to stop what they're

11   doing.  That is one mixed up distorted view of life, folks.

12   That is really a stretch.

13          And they want to punish ConAgra?  They knew all of

14   this.  Mel knew all of this.  Mel told you:  *I have the*

15   *power to call the fire department*.  Schmidt told you:  *I'm*

16   *empowered to call the fire department and we do call if we*

17   *have bad situations*.  Can't get any worse than this.  And

18   they want to blame ConAgra.  So they caused this fire, they

19   caused this explosion, and then when Schmidt finally does

20   the right thing and orders an evacuation to Becker on the

21   roof and Jentz down in the basement, *get away from this*, Mel

22   knew all of this information and they come down and what

23   does Mel tell them to do?  What did he tell them to do, with

24   all of this information, all of his 20 years of experience,

25   knowing that bins blow up, knowing there's a fire already in

Defendant ConAgra's Closing Argument

 1    the bin, knowing where the core is?  Well, I'll tell you

 2    another thing to believe about these experts, Dr. Ogle and

 3    Dr. Schroeder, they are simpatico when they tell you under

 4    oath, had Mel Flitsch not done that, *We would have no*

 5    *injuries to Jentz or Becker and we wouldn't be here today.*

 6    We'd be here today on ConAgra's suit against West Side for

 7    blowing up our building.

 8             That's proximate cause, folks.  That's the jury

 9    instructions you are going to get.  Who's negligence

10    proximately caused these injuries?  All of this that they

11    did when they were given a safe bin.  No one has come in

12    here and told you on April 20th that bin was unsafe.  No one

13    from West Side and no one from A&J, who knew best what was

14    in that bin.

15             I'm not going to walk you all the days again.

16    Every day was a routine day for them.  Every day they're

17    draining that baby all the way down to the end.  There's no

18    mystery any more where that core is.  But they decided that

19    they were going to fix this problem themselves.  They

20    decided to fight that fire.  Now, why?  No one seems to want

21    to know why.  Since they knew all of these dangers, why

22    would -- I would submit to you the reason why is because

23    they're almost done.  They had it drained down to the

24    bottom.  They told you, *One more truck is all we had.  We're*

25    *done.  We've done our job.  We can go home.*  I think they

                    Defendant ConAgra's Closing Argument

```
 1   just -- call it overconfidence, call it stupidity, certainly
 2   call it negligence, but they thought that they could beat
 3   that fire, and they're telling you, all the lawyers, they're
 4   not competent, they're not qualified to fight fires and this
 5   is why.  This is what happens when you're not qualified or
 6   competent to fight a fire.  You make it worse.  All the
 7   experts agree, even Mel Flitsch agreed, when you are
 8   confronted by a fire, you seal it up.  That's the first
 9   thing you do.  You don't keep all the hatches open, you
10   don't open up the side manhole cover.  You do what ConAgra
11   did.  And Mr. Sumner's request --
12            THE COURT:  Ten minutes, Counsel.
13            MR. PATTON:  Thank you, Judge.
14            You seal it up.  And they didn't seal it up.  They
15   stoked it and stoked it until it blew up.  There's no
16   conduct here by ConAgra that we should be punished for.
17   There's no conduct here that we were negligent for, given
18   all of these things.
19            Now, you have the Jentz and Schmidt claims, and
20   they're against ConAgra and they're against West Side.
21   We're both on the same level Here.  Becker has not sued his
22   employer; he's only sued ConAgra.  Of course, we brought
23   West Side in in that case too.  So you're going to have to
24   decide a fault in this case.  And I told you in the opening
25   statements, I promised you that this was going to be the
```

Defendant ConAgra's Closing Argument

1    cause of the explosion, and Mel's conduct was the proximate

2    cause, not only of this explosion, but also of the injuries

3    that were sustained to the two gentlemen that sustained

4    serious injuries.

5            I've kind of blown through my time, but damages are

6    certainly on the table here.  And you got requests for over

7    130 million.  I couldn't even write out all the numbers.

8    I'm not going to tell you that that's not something that

9    concerns anybody as defendant, ConAgra, and I'm sure the

10   attorney defending West Side feels the same way.  And by the

11   way, in terms of this punishment thing, I don't think

12   West Side is guilty of punitive damages or conduct of

13   punitive damages either.  I think they really screwed up

14   here.  I think it's obvious.  I think the facts that came to

15   you, not the lawyers, tell you to ignore that.  But there's

16   no conduct here that rises to the level of punitive damages.

17   There's a lot of negligence here.  In terms of these

18   damages, you just shouldn't get up there and write

19   $40 million, $60 million.  When you put those kind of

20   numbers down -- maybe now you'll understand why they don't

21   want to talk about this.  Maybe now your eyes are open to

22   all this red herring, misdirection towards ConAgra even

23   though they are suing West Side.

24            These gentlemen here, they were injured seriously

25   and they should get their medical expenses and they should

Defendant ConAgra's Closing Argument

1   get their lost wages.  And we get to the noneconomic part,

2   and remember, all this is tax-free, as one of the attorneys

3   told you.  But to suggest these kind of numbers -- and I

4   think Mr. Clifford said in his experience this is what it's

5   going to take.  I can tell you, those numbers are ludicrous,

6   they're irrelevant, irrational, they're unfair.  It's a

7   continuation of the injustice that they have been doing to

8   ConAgra to suggest those kind of numbers.  It reflects why

9   they're doing what they're doing.  They got all these

10  millions of reasons to do that, why they don't want you to

11  be considering this.  But there should be fair damages and

12  West Side should be made to pay.  I would say anywhere in

13  the range of three-and-a-half to 5 million for each one of

14  these gentlemen.  And for Schmidt, you know, $75,000 in

15  medical expenses.  Couple hundred grand be fair and just.

16          We count on all of you.  This is the only country

17  in the world that has jurors in the civil justice system.

18  Think about all that.  All the democracies in the world, and

19  we believe jurors we don't even know should be deciding

20  cases, hundreds of millions of dollars.  We put our trust in

21  you.  We put our trust in West Side and they betrayed that

22  trust.  We put our trust in you to know the right thing to

23  do here, the fair and reasonable, all sides.

24          And thank you for your kind attention.  And again,

25  I won't get up any more.  It's my last shot.  Good luck with

Defendant ConAgra's Closing Argument

1    your deliberations and please bring back the truth.

2         *THE COURT:*  Folks, we need to change out court

3    reporters, so if you want to take a ten-minute break.

4     *(Break)*

5                  *  *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Defendant ConAgra's Closing Argument

1                       **REPORTER'S CERTIFICATE**

2

3        I, Laura A. Blatz, RPR, CRR, CCR(MO), Official Court
Reporter for the U.S. District Court, Southern District of
Illinois, do hereby certify that I reported in shorthand the
4   proceedings contained in the foregoing 87 pages, and that
the same is a full, true, correct, and complete transcript
5   from the record of proceedings in the above-entitled matter.

6        Dated this 30th day of May, 2012.

7

8                            /s/
                    _____
9                    LAURA A. BLATZ, RPR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25