1

```
 1
 2                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF ILLINOIS
 3
    JOHN W. JENTZ,              )      10-CV-474-MJR
 4            Plaintiff,        )
              Vs.              )      Consolidated with:
 5  CONAGRA FOODS, INC., et al)
              Defendants,      )
 6  JUSTIN BECKER and AMBER    )
    BECKER,                    )      10-CV-952-MJR
 7            Plaintiffs,      )
              VS.              )
 8  CONAGRA FOODS, INC., et al)
              Defendants,      )
 9                             )
    ROBERT SCHMIDT,            )
10            Plaintiffs,      )
              Vs.             )      11-CV-391-MJR
11  CONAGRA FOODS, INC., et al)
              Defendants,     )      May 31, 2012
12
                    TRANSCRIPT OF TRIAL, VOLUME XVI,
13            BEFORE THE HONORABLE MICHAEL J. REAGAN,
              UNITED STATES DISTRICT JUDGE, and a jury.
14
    APPEARANCES:
15
    For the Plaintiffs:        Clifford Law Offices, P.C.,
16                             By:  Robert A. Clifford
                                    Kevin P. Durkin
17                                  Colin H. Dunn
                               120 North LaSalle Street
18                             Suite 3100
                               Chicago, IL  60602
19
    For Plaintiffs             Anesi, Ozmon, Rodin, Novak & Kohen
20  Justin and Amber Becker    By:  Mark Taxman
                                    Sean Murray
21                                  Julie Levinson Pustilnik
                               161 N. Clark Street
22                             Chicago, IL  60601

23  For Defendant             Patton & Ryan
    ConAgra Foods, Inc.,       By:  John Patton, Jr
24                                  John Ouska
                               330 N. Wabash Avenue
25                             Suite 2900
                               Chicago, IL  60611
```

2

```
 1                              Husch Blackwell, LLP
                                By:   Joseph Orlet
 2                                    Brandan Mueller
                                      Joseph Kilpatrick
 3                              190 Carondelet Plaza
                                Suite 600
 4                              St. Louis, MO  63105

 5   West Side Salvage, Inc.    Franke, Schultz & Mullen, P.C.
                                By:   John Schultz
 6                                    Jason Moore
                                8900 Ward Parkway
 7                              Kansas City,  MO  64114

 8   Court Reporter:            Barbara Kniepmann
                                750 Missouri Avenue
 9                              East St. Louis, IL  62202

10

11

12

13

14

15

16

17   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
18

19

20

21

22

23

24

25
```

3

1          THE COURT:  Good morning all.  Please be seated.  We

2     are in open Court, out of the presence of the jury in Jentz

3     versus ConAgra, et al.

4          Just a couple of things for your information.  I

5     think I told all of you this yesterday when I caught you in

6     the hallway and off the record, but yesterday the jury

7     formally received all of the exhibits and instructions about

8     12:55 in the afternoon.  About 3:10 they asked for a

9     calculator.  I sent one in to them and they stopped

10    deliberating about 5:30 last evening.  When they stopped

11    deliberating, we had provided them with menus for ordering

12    their lunch for today.

13          When the foreperson, and I identified the person as

14    the foreperson because earlier when I went back to take the

15    menus to the jurors, an individual asked me if they could ask

16    a question.  I said you can only ask me questions about

17    timing, nothing to do with the substance of the case.  He

18    said, well, this has something to do with substance.  Then I

19    just said put it in writing and who is the foreperson.  This

20    individual then identified himself as the foreperson.  If you

21    look at the jury, he is the individual in the top right, far

22    right.  He said he would put a note in writing.  Later when I

23    went to collect up the menus and release them for the day, he

24    handed me a note.  I gave it back to him and said give it to

25    me tomorrow morning.  I think he does have a note for us to

4

1    consider.  My plan was to bring them in today, let you confirm

2    they are all here, get the note, release them and hear from

3    you as to how we ought to handle the note.

4         MR. CLIFFORD:  Your Honor, on behalf of the

5    plaintiffs, we certainly accept the Court's observation about

6    whether they are all here or not and waive any need or local

7    requirement to confirm they are all here in person.  In fact,

8    to be candid, we feel much more comfortable not having any

9    contact whatsoever with the jury.  So for you to bring the

10   jury in and us to know they are all here, we appreciate that

11   courtesy, but it is not necessary from our perspective and,

12   frankly, I don't know that it is a good practice.  You asked

13   us about practices and things like that.  I don't know that

14   that is a particularly good one.

15        THE COURT:  The reason I do it is just so you know

16   all ten are still here.

17        MR. CLIFFORD:  If you tell us they are here, Judge,

18   we accept that as true.

19        THE COURT:  I am told by the courtroom deputy they

20   are all here.  Let me start over again.  My intention is to

21   hear if anyone disagrees with Mr. Clifford.  I mean I am happy

22   to not bring them in.

23        MR. TAXMAN:  We have no disagreement with that.

24        MR. SCHULTZ:  We agree.

25        THE COURT:  Deb, would you go down and get the note

5

1    and then would you also tell the jurors they can go into the

2    courtroom and start deliberating and we'll get back to them on

3    the note?  You have all of the exhibits and everything ready

4    for them.  We'll let them start deliberating and we'll take a

5    look at the note.

6              MR. CLIFFORD:  You are doing sentencings in here

7    today?

8              THE COURT:  Sentencings at 9:00, 10:00 and 1:30 I

9    think.  Okay, what I do on the notes, I write in the bottom

10   where I can find space when I received it, so it is 8:40.

11   Today is the 31st.  Okay, the question, and you will get

12   copies of this.  "Can we get the economists numbers?"  It is

13   signed ████████.  And then another question.  "How do you

14   want the decision handed to you at the end?"

15             So I can explain to them with respect to the end that

16   they should just give me the respective folders with the jury

17   verdict forms in each folder as they were given to them.  The

18   Jentz verdict forms will be the red folder, Becker's will be

19   in the blue, Amber's in the purple, Schmidt in the yellow.

20             The question, "Can we get the economists numbers?",

21   here is what I think this means, just from past practice with

22   jurors.  You have all entered or some of the reports of the

23   economists have been entered into evidence, but I did not send

24   them back initially.  There are multiple reasons why I don't.

25   First of all, this case has, if I am right, about 435

6

1    exhibits, 350 for the plaintiffs, 80 for ConAgra and about

2    five for West Side.  When a witness testified, such as an

3    economist, who has rendered a report, if that report is

4    available for cross examination, which it has been in this

5    case, and it is offered as an exhibit, I usually don't send it

6    back immediately.  If the jury asks for it, I hear any

7    argument and then I may or may not send it back based upon the

8    argument and whether or not someone has made a persuasive

9    argument.  With so many exhibits in this case, it seems to me

10   that I didn't want to send everything back.  That is why we

11   went over with you what should and should not go back.

12   Another reason I don't send back reports automatically is

13   typically the expert testifies about their qualifications and

14   their report might have the curriculum vitae attached and that

15   would be duplicative.  I don't send duplicative things back to

16   begin with.  I am happy to hear any argument.  Let's start

17   with Mr. Taxman.

18          MR. TAXMAN:  I do have a thought on it.  If they are

19   saying the numbers, I have no problem providing them with the

20   numbers of ours and our note with regard to Becker.  We can

21   write it on piece of paper and not send the report back.  If

22   they ask for the report, we can send it back later.

23          MR. BADGLEY:  With respect to Jentz, I believe the

24   only exhibit we put in was the one sheet of paper.  We didn't

25   put in the report.  I don't see any reason why they can't see

7

1     the paper.

2            THE COURT:  I did send something back.

3            MR. DURKIN:  It was future medical care, but not with

4     discounted, so it was the life plan.

5            THE COURT:  Right, it was the life plan.  The jury

6     had seen each page of that.

7            MR. DURKIN:  There is one page economist where we cut

8     it out, just the one page that had the numbers.  We're happy,

9     like Mr. Taxman, if you want to write past medical, future

10    medical, future wage, whatever it is.

11           MR. CLIFFORD:  It can be -- it can be for all

12    economists, in other words --

13           THE COURT:  Right.  I wouldn't send back just the

14    plaintiffs or just the defense either.

15           MR. CLIFFORD:  Josh is not here right now, but I know

16    he did all of that for ConAgra, but whatever numbers he

17    posted, if you want to put those all consolidated on a sheet

18    of paper, that might be useful to the jury and we would

19    endorse that process.

20           THE COURT:  Mr. Schultz?

21           MR. SCHULTZ:  John Schultz on behalf of West Side.

22    Being that I may be on the receiving end of a verdict, I have

23    to object to this.  I realize it is discretionary and your

24    call, but I would point out the jury took notes while this

25    testimony was being received and they should rely upon their

1   memory and the notes rather than having the reports and the

2   numbers sent back.  We object.

3           THE COURT:  Mr. Patton?

4           MR. PATTON:  I have to agree with Mr. Schultz on this

5   one, and it is also a slippery slope.  Once they start making

6   requests for documents, you start sending stuff back, it can

7   lead to a situation where you will be asked to get those for

8   more information.  I think the Court's original basis for your

9   decision not to send them back was a sound one.  I think we

10   should stick with it.

11           THE COURT:  Okay.  Well, I am not going to send them

12   just numbers.  Just numbers weren't in evidence.  What I am

13   going to do is send back any reports from an economist that

14   has been admitted, plaintiff, defendant, whatever, so you are

15   going to have to give me the numbers of those.  We have them

16   segregated so the jury does not have them.

17           My understanding is that Judge Williams wrote a case

18   -- actually, it was -- yes, Judge Williams wrote a case and I

19   believe Judge Canelli, *Deicher v. City of Evansville,* D E I C

20   H E R, 545 F.3d, 537, and in that case Judge Williams laid out

21   the test that I should consider in deciding whether to send

22   exhibits back to the jury during deliberations.  My decision

23   is reviewed for clear use of discretion.  The Court indicated

24   that discretion is usually exercised to exclude exhibits that

25   neither party has relied on and have no relevance to any of

1    the issues central to the case or that are cumulative,

2    prejudicial, confusing or misleading.  Basically it is a 403

3    balancing act and also relevance consideration.

4          I did permit these particular reports to be admitted

5    into evidence.  All the reports were present when the relative

6    experts were cross examined, and so the data therein was

7    available to all sides for cross examination.  It had been

8    properly disclosed in advance, so there can't be any surprise,

9    so I am going to allow the entire reports in.

10          The reason I am not going to just give them the

11    numbers is because of the objections of the defense counsel.

12    I don't think I can extract the numbers without unduly

13    highlighting them.  As such, I am just going to give them the

14    evidence that has been admitted, which is the reports

15    themselves.  So having said that, let's go off the record.

16          (Whereupon a discussion was held off the record.  The

17    following proceedings were held in open Court, out of the

18    hearing of the jury.)

19          THE COURT:  Okay, back on the record.  I have

20    Plaintiff's 338, which is a one page document, which I believe

21    is from Dr. Leroy Grossman dated May 7th of 2012.  I have

22    document 299, which is Richard Stephenson letter to Mr. Taxman

23    and it is a multi page document, and I have document 155 which

24    is a report of Dr. Richard Arnould, A R N O U L D, that is a

25    five page document.

1       MR. CLIFFORD:  Then the only other thing, if the

2   Court wants to consider it, we really don't know which numbers

3   they are entirely asking for.  There were a couple of "special

4   summaries" where I believe the information on them, they are

5   one page documents, and the information on them was admitted

6   in, there was no objection, simply on some past -- is it just

7   past medical bills if they need that?

8       THE COURT:  They have only asked for the economist

9   reports.  My inclination is to give them what they ask for,

10  nothing more, nothing less.  I am sending back 155, 299 and

11  338.  Everything they have now was either by agreement of the

12  parties or on the record I ruled whether they could get it or

13  not.  There are probably, just an absolute guess, 16 to

14  18 inches of documents they don't have.

15      MR. DURKIN:  Would you mind if I see 338?

16      MR. TAXMAN:  Your Honor, may I see the letter to me,

17  299?

18      MR. CLIFFORD:  We'll just be hanging out.

19      Is it also okay, like yesterday, hypothetically we'll

20  keep one person here in power?

21      THE COURT:  Sure, if somebody is in power to answer

22  questions, make arguments.

23      (Whereupon a recess was taken.  The following

24  proceedings were held in open Court, out of the presence of

25  the jury.)

11

1          THE COURT:  At 1:21, a few moments ago, the jurors

2     sent out a note.  It says as follows:  On punitive damages,

3     can we check yes and award -- and there is a dollar sign zero

4     -- question mark.  On punitive damages, can we check yes and

5     award $0?  I am open for suggestions.  Anybody.

6          MR. SCHULTZ:  Yes.

7          THE COURT:  As an officer of the Court with an

8     unbiased view, what would you say?

9          MR. TAXMAN:  We'll take new trial on damages only on

10    the punitive.

11         THE COURT:  What if I would tell them to reread that

12    instruction, which I haven't looked at in awhile myself?

13         MR. CLIFFORD:  On behalf of Jentz and Schmidt, I

14    think that would be the better course.  They are either going

15    to want to award punitive damages or they are not, but I think

16    that might tell us.  You speculate about what that tells you,

17    but I would encourage you to tell them to reread the

18    instructions before doing anything else.

19         THE COURT:  I have no idea where they are in the

20    deliberations, which count, which case.  It just says exactly

21    what I told you it says.

22         MR. CLIFFORD:  I suppose intellectually the answer is

23    yes.  If we allow them to enter zero on other things, what

24    that means, they found willful and wanton conduct, but they

25    don't want to award.

12

1          THE COURT:  They have to find first that justice and

2     the public good requires it.  Then they may award an amount

3     that will punish ConAgra.

4          MR. CLIFFORD:  Or West Side.

5          THE COURT:  Or West Side, yes.

6          MR. SCHULTZ:  Objection.

7          MR. DURKIN:  It seems that rereading the instruction

8     will give them an answer.  You just used the word "may",

9     right?

10          THE COURT:  I think if they enter zero there is a

11     potential it will be a problematic verdict.

12          MR. PATTON:  We're going to take the position in the

13     instruction itself it says "may", which implies may not.  I

14     would simply answer their question yes.  That is the position

15     of ConAgra.

16          MR. DUNN:  I am sorry, I don't have it in front of

17     me, but the verdict form for the punitive damages, the

18     preparatory, before they get to the yes, no, what was the

19     question?

20          THE COURT:  We, the jury, award punitive damages in

21     favor of John Jentz and against the following defendant or

22     defendants.

23          MR. DUNN:  I think that would be inconsistent if they

24     say yes to that and gave zero.  If we have them reread the

25     instruction as well as the verdict form --

13

```
 1              THE COURT:  I think I am just going to -- We can do
 2    it one of two ways.  The instructions we're talking about, at
 3    least in Jentz, is instruction 8.  That is the one that says,
 4    "In addition to compensatory damages, the law permits you
 5    under certain circumstances to award punitive damages.  If you
 6    find that the conduct of ConAgra and or West Side was willful
 7    and wanton and proximately caused injury to John Jentz, and if
 8    you believe that justice and the public good require it, you
 9    may award an amount of money which will punish ConAgra and or
10    West Side and discourage others from similar conduct."  Then
11    it goes on.  I can tell them to reread the instruction as
12    applies in the Jentz, Schmidt and Becker cases.  I can give
13    them copies again with a note saying please reread these
14    instructions.  I am not inclined to answer yes or no to them
15    on the dollar amount.  I don't know the answer.
16              MR. CLIFFORD:  On behalf of Jentz and Schmidt, we
17    would ask that you instruct them to reread the instruction.
18              MR. TAXMAN:  We would join in, absolutely, at this
19    point on that.
20              THE COURT:  On behalf of Mr. Schmidt, Mr. Dunn?
21              MR. DUNN:  We would agree, Judge.
22              MR. SCHULTZ:  Doing that encourages them to return a
23    dollar award on punitive when it is clear the jury's intent by
24    that question is to return no punitive damages.  They can
25    award zero punitive or as much as they want.
```

14

1    THE COURT:  I don't know if they can.  I don't know

2  if they can award zero punitive.  How does that punish?  They

3  have to first find it is in the public good and punishment is

4  necessary before they get to consider that.  For them to say

5  yes, this company should be punished, and yes, it is in the

6  public good, but then to award $0, that might be inconsistent.

7  I haven't analyzed it.  Never run into this.

8    MR. CLIFFORD:  Certainly telling the jury to reread

9  an instruction is neutral.

10    THE COURT:  I don't see how that could be error.

11    MR. SCHULTZ:  For the record, we object to it.

12    MR. ESPOSITO:  They don't have to award the damages.

13  Let's assume they are awarding compensatory.  If they felt

14  they had given enough compensatory, they can say that is

15  punishment enough.

16    THE COURT:  Well, then they should answer no to the

17  punitive damage verdict form.  I think yes and awarding zero

18  is inconsistent from a five minute cursory review with no

19  research.  I cannot justify or substantiate what I am saying,

20  but at first blush to say, yes, the company needs punishment,

21  yes, it is in the public good, but $0 --

22    MR. SCHWARTZ:  They can find willful and wanton

23  conduct and then its says you may award punitive damages.

24  They may say we think their conduct was willful and wanton,

25  but we don't want to award damages.  That is what they are

1    trying to convey in the note.  So to tell them to read the

2    instruction --

3              THE COURT:  If they reread it and conclude what you

4    said, they'll put zero in.  If I answer yes, I am encouraging

5    them to put zero in there.

6              MR. CLIFFORD:  Or you are not.  You don't know what

7    you're doing.  That is the whole point.  You don't know what

8    you're doing by answering yes or no.  You do know what you're

9    doing by rereading the instruction and there is ample

10   authority about the neutrality of directing the jury back to

11   reviewing the instructions as well as the evidence they have

12   heard.

13             THE COURT:  That is what I am going to do.  Do you

14   want me to bring them in and reread these three instructions

15   to them, or do you want me to make copies and tell them to

16   reread them and send a note back to them?

17             MR. TAXMAN:  I would opt for either just telling them

18   to reread the instructions or in the interest of thoroughness,

19   if Your Honor wants to hand them those three instructions with

20   the note telling them to reread the instructions and continue

21   the deliberations, we would support either option.

22             MR. PATTON:  Our position -- I find it unusual to be

23   adapting Mr. Schultz's position twice in one day.  We can make

24   it as a matter of record here I am adopting his position, but

25   the fallback position is to tell them to reread the

1   instructions, but I don't think you xerox and give them the

2   instructions again.  That is unnecessarily highlighting those

3   instructions.

4           THE COURT:  If I tell them to reread the

5   instructions, Mr. Patton, do you know how long it took me to

6   read them?  Somebody told me two and a half hours for me to

7   read the instructions.  If I can't point out to them which

8   instructions they should read, I am wasting their time and

9   judicial resources.

10          MR. PATTON:  That is the jury's job to find the right

11  instructions.  I don't think you should direct them where to

12  look.  I think that to be neutral, Your Honor should be

13  neutral, and I think telling them the answers are in the jury

14  instructions, reread them --

15          THE COURT:  I am not going to have them go on a

16  fishing expedition and look for the needle in the hay stack.

17  I am going to direct them that their answer is in this

18  instruction.

19          Do you want me to bring them in or tell them?  How do

20  you want me to do it?  I know you want me to do it all.

21          MR. SCHULTZ:  I would say give the instructions,

22  don't bring them back in would be our position, subject to our

23  previously stated objection.

24          MR. CLIFFORD:  I see no need for you to bring them

25  out.  Even if you choose to do that, I would not want counsel

1    present.  As far as I'm concerned and we're concerned, do what

2    you normally do.  Stick your head in and tell them what you

3    want to tell them.

4          THE COURT:  So the record is clear on this, I am

5    going to photocopy Jentz instruction 8 and the companion

6    instructions that would have occurred in Becker and Schmidt

7    and put a note on top of it and say the response to your

8    question, which is attached, is attached.  That will be those

9    three instructions, and I'll have them reread it that way.

10         MR. ESPOSITO:  Your Honor, if you do that, don't you

11   also have to give them the instruction on complicity?

12         THE COURT:  What is complicity?

13         MR. ESPOSITO:  I am taking it the instruction you are

14   going to give them is what we call 35.01?

15         THE COURT:  Yes.

16         MR. ESPOSITO:  There is 35.02.  Wouldn't that have to

17   be read too?

18         THE COURT:  Give me a hint as to what it says.

19         MR. ESPOSITO:  The one that says if you are dealing

20   with the corporation, you have to find it is one of these

21   basis.

22         THE COURT:  I think that is going beyond their

23   question.  I know which one you mean.  You are talking about

24   35.02, Jentz 9.

25         MR. ESPOSITO:  Well then, just for purposes of the

1    record, Your Honor, we believe, ConAgra believes that

2    instruction should also be given.  If you are going to be

3    giving the jury instructions, they should have all of the

4    instructions on punitive damages.

5           THE COURT:  You want me to give them the ones about

6    your size and then I am reinstructing all together on punitive

7    damages?

8           MR. CLIFFORD:  What would be wrong with the Judge

9    simply verbally saying to the jury, you have all of the

10   instructions, the answer to your question is to be found in

11   the instructions, period.

12          MR. PATTON:  That was our position and the Judge

13   declined.

14          THE COURT:  What I find wrong with look at the

15   instructions, it is too voluminous.

16          MR. CLIFFORD:  Can you say look at the instructions

17   pertaining to punitive damage issues?  Why can't you simply do

18   that?

19          THE COURT:  I can do that.

20          MR. TAXMAN:  If everyone is in agreement, I would say

21   go with that.  If we get another question on it, I am fully in

22   favor of the Court taking out the punitive damages

23   instructions and attaching them to either a subsequent note or

24   even this note.  As long as we're in agreement at this point,

25   let's just answer the question in that fashion, so look at

1   those instructions, or tell them to look at those instructions

2   on the punitive damages and follow them.

3        THE COURT:  Okay.  Is the agreement that you do not

4   want me to do this in front of you, you want me to do it -- I

5   am going to take the court reporter in to do this though.

6        MR. SCHULTZ:  Agreed.

7        MR. PATTON:  What are we agreeing to now?

8        THE COURT:  I am going in with the court reporter and

9   say, Ladies and gentlemen, I received a note from you at 1:21

10  p.m. today.  It reads as follows:  On punitive damages, can we

11  check yes and award $0?  I have met with the attorneys and

12  here is the response to that question.  You should reread all

13  of the instructions regarding punitive damages with respect to

14  Jentz, Schmidt and Becker, period.

15       MR. CLIFFORD:  Would you say reread the instructions

16  and verdict forms?

17       THE COURT:  I can do that.

18       MR. PATTON:  No.

19       MR. CLIFFORD:  We're fine with just the instructions.

20  That is fine.

21       THE COURT:  If they want them to read everything, I

22  am going to say punitive damage instructions and verdict

23  forms.  That way they have covered everything.

24       MR. PATTON:  We object to that.  They are asking for

25  guidance on punitive damages and I think you are covering

20

1   verdict forms by telling them reread all of the --

2          THE COURT:  I have clearly separated verdict forms

3   from instructions when I talked to them.  When I gave them the

4   packets, the instructions were stapled, verdict forms were

5   loose.  When I told them you can't write on anything except

6   the verdict forms, I think I have distinguished them from the

7   instructions.

8          MR. SCHULTZ:  The verdict form is not an instruction.

9          THE COURT:  Objection is noted and overruled.

10         Okay I have sentencing to do first.  Actually, I

11  probably ought to do this first.

12         (Whereupon the following proceedings were held in the

13  presence of the jury without counsel.)

14         THE COURT:  Okay, we're in the courtroom in which the

15  jury has been deliberating, and I am here at the request of

16  the attorneys who asked that I meet with the jury out of their

17  presence and on the record with the court reporter.  That is

18  why she is here with me, as is courtroom security and my

19  deputy courtroom clerk.

20         At about 1:21 this afternoon, I received the

21  following note from you, the jurors:  On punitive damages, can

22  we check yes and the word zero dollars?  I have met with the

23  attorneys just now on the record and they gave me their

24  position with respect to this question and I have this

25  response for you.  You should reread all of the jury

21

1    instructions in Becker, Schmidt and Jentz regarding punitive

2    damages.  In addition, you should look at the verdict form in

3    Becker, Jentz and Schmidt regarding punitive damages.  That is

4    my response.

5         You all doing okay, so the lawyers know?  You need

6    anything?  Doing good.  I am going to come back and check on

7    you and roughly, about 4:00 o'clock, we'll bring menus in for

8    tomorrow and see how you are doing.  Is the temperature okay?

9         JUROR:  I think it is wonderful.  We were cold

10   yesterday.

11        THE COURT:  You wanted an afghan when it was 90 last

12   week.

13        Thanks, folks.  Again, on behalf of everybody, we

14   appreciate your diligence.

15        (Whereupon a recess was taken.  The following

16   proceedings were held in open Court.)

17        THE COURT:  Please be seated, folks.

18        Juror number 14, original juror number, are you the

19   foreperson in the case.

20        JUROR 14:  Yes, I am.

21        THE COURT:  I ask you because I see that you have the

22   folders.  Has the jury reached a unanimous verdict as to all

23   four plaintiffs in this case and their claims consistent with

24   the Court's instructions?

25        JUROR 14:  Yes, we have.

1          THE COURT:  Would you please hand the folders to the

2     courtroom security officer?  One more question.  Did you check

3     the math, by the way, with the calculator?

4          JUROR 14:  I did, double, triple, quadruple.

5          THE COURT:  Okay.  The following is the jury verdict

6     as to the case John Jentz against ConAgra Foods, Incorporated

7     and West Side Salvage.  The jury checked verdict form A.  They

8     checked yes as to finding negligence against both ConAgra

9     Foods and West Side Salvage.  The total amount of damages

10    without any reduction for comparative fault is $40,971,150.00.

11    That is allocated as follows:  I am going to publish this so

12    you can all see it, by the way.  $20,000,000 in disfigurement,

13    $750,000 for loss of a normal life, $8,000,000 for loss of a

14    normal life reasonably certain to be experienced in the

15    future, $1,000,000 for the increased risk of future harm

16    resulting from the injuries, $1,500,000 for the emotional

17    distress experienced, $750,000 for the emotional distress

18    reasonably certain to be experienced in the future, $5,000,000

19    for pain and suffering experienced, $1,000,000 for the pain

20    and suffering reasonably certain to be experienced in the

21    future, $1,813,000 for the reasonable and necessary medical

22    care, treatment and services received, $1,100,000 for the

23    present cash value of the reasonable expenses of medical care,

24    treatment and services reasonably certain to be received in

25    the future, $55,000 for the value of earnings and benefits

23

1    lost, $617,000 for the present cash value of the earnings and

2    benefits reasonably certain to be lost in the future.

3          According to the jury, that totals -- there is a

4    discrepancy in that.  The total damages at the bottom here

5    don't equal the total up here.  I think I know where that came

6    from.  The jury assessed John Jentz one percent comparative

7    fault, ConAgra 54 percent, West Side Salvage 45 percent.

8          Juror Foreperson, this figure at the top, is that --

9    could you come here?  I want to make sure I can read your

10   handwriting.  Could you read this number out loud to us,

11   please?

12         JUROR 14:  $41,385,000.00.

13         THE COURT:  Did you take one percent off of that to

14   come up with this figure?

15         JUROR 14:  Yes.

16         THE COURT:  I think we have a Scrivener's error here.

17   The numbers actually work out.  Let me explain to you what has

18   happened here.  This is the front page.  The figure he just

19   read is a total of all the itemized damages.  What they did

20   then was took one percent off of that and wrote it down here.

21   That is also the same number as right here, so I think it is

22   consistent, they just put the number in a different place than

23   where I had instructed, but I think it is consistent.

24         Was it the intention of the jury to reduce the total

25   amount of damages by one percent?

24

1          JUROR 14:  Yes.

2          THE COURT:  I have a question for each of you now

3    with respect to this particular verdict form.  I am going to

4    refer to your juror numbers that were original numbers, not

5    the seats you are in now or that you were in.

6          Starting with juror number 14, the foreperson.  With

7    respect to the verdicts in the case John Jentz versus ConAgra

8    Foods and West Side Salvage, is this your verdict now and was

9    it when you signed it?

10         JUROR 14:  Yes.

11         THE COURT:  Juror number 2, with respect to this

12   case, is this your verdict now and was it when you signed it?

13         JUROR 2:  Yes.

14         THE COURT:  Juror number 3, is this your verdict now

15   and was it when you signed it?

16         JUROR 3:  Yes.

17         THE COURT:  Juror number 5, is this your verdict now

18   and was it when you signed it?

19         JUROR 5:  Yes.

20         THE COURT:  Juror number 9, is this your verdict now

21   and was it when you signed it?

22         JUROR 9:  Yes.

23         THE COURT:  Juror number 12, is this your verdict now

24   and was it when you signed it?

25         JUROR 12:  Yes.

25

```
1          THE COURT:  Juror number 16, is this your verdict now
2   and was it when you signed it?
3          JUROR 16:  Yes.
4          THE COURT:  Juror number 18, is this your verdict now
5   and was it when you signed it?
6          JUROR 18:  Yes.
7          THE COURT:  Juror number 24, is this your verdict now
8   and was it when you signed it?
9          JUROR 24:  Yes.
10         THE COURT:  Juror number 26, is this your verdict now
11  and was it when you signed it?
12         JUROR 26:  Yes.
13         THE COURT:  Okay.  Foreperson juror number 14, by
14  this verdict was it your intention to award a total amount of
15  damages in the amount of $41,385,000 less one percent for an
16  ultimate verdict of $40,971,150?
17         JUROR 14:  Yes, it was.
18         THE COURT:  Juror number two, same question.
19         JUROR 2:  Yes.
20         THE COURT:  3?
21         JUROR 3:  Yes.
22         THE COURT:  5?
23         JUROR 5:  Yes.
24         THE COURT:  9?
25         JUROR 9:  Yes.
```

26

1          THE COURT:  12?

2          JUROR 12:  Yes.

3          THE COURT:  16?

4          JUROR 16:  Yes.

5          THE COURT:  18?

6          JUROR 18:  Yes.

7          THE COURT:  24?

8          JUROR 24:  Yes.

9          THE COURT:  26?

10          JUROR 26:  Yes.

11          THE COURT:  Juror number 14, the foreperson, by this

12   verdict was it your intention to allocate the legal

13   responsibility in this case as follows:  One percent to John

14   Jentz, 54 percent to ConAgra, 45 percent to West Side Salvage?

15          JUROR 14:  Yes, it was.

16          THE COURT:  Juror number 2?

17          JUROR 2:  Yes.

18          THE COURT:  3?

19          JUROR 3:  Yes.

20          THE COURT:  5?

21          JUROR 5:  Yes.

22          THE COURT:  9?

23          JUROR 9:  Yes.

24          THE COURT:  12?

25          JUROR 12:  Yes.

27

1          THE COURT:  14?

2          JUROR 14:  Yes.

3          THE COURT:  16?

4          JUROR 16:  Yes.

5          THE COURT:  18?

6          JUROR 18:  Yes.

7          THE COURT:  24?

8          JUROR 24:  Yes.

9          THE COURT:  26?

10         JUROR 26:  Yes.

11         THE COURT:  With respect to the verdict on punitive

12    damages, the verdict reads as follows:  We, the jury, award

13    punitive damages in favor of John Jentz and against the

14    following defendant or defendants:  ConAgra, yes.  West Side

15    Salvage, yes.

16         We award punitive damages in favor of John Jentz and

17    against ConAgra Foods in the amount of $33,333,333.33.  We

18    award punitive damages in favor of John Jentz and against West

19    Side Salvage in the amount of $1,000,000.  It is signed by the

20    foreperson and the balance of the jurors.

21         Juror number 14, foreperson, is this your verdict now

22    and was it when you signed it?

23         JUROR 14:  Yes.

24         THE COURT:  Was it your intention to award the

25    damages that I just read with respect to punitive damages?

28

1          JUROR 14:  Yes.

2          THE COURT:  Juror number 2?

3          JUROR 2:  Yes.

4          THE COURT:  3?

5          JUROR 3:  Yes.

6          THE COURT:  Juror number 5?

7          JUROR 5:  Yes.

8          THE COURT:  Juror number 9?

9          JUROR 9:  Yes.

10          THE COURT:  Juror number 12?

11          JUROR 12:  Yes.

12          THE COURT:  Juror number 16?

13          JUROR 16:  Yes.

14          THE COURT:  Juror 18?

15          JUROR 18:  Yes.

16          THE COURT:  Juror 24?

17          JUROR 24:  Yes.

18          THE COURT:  Juror 26?

19          JUROR 26:  Yes.

20          THE COURT:  Let me briefly publish this verdict so

21    everyone can see it.  Again, you will see copies of this.  The

22    juror names will be redacted.

23          MR. CLIFFORD:  Can we respectfully request that you

24    check the math again on verdict form A?

25          THE COURT:  Yes.  In fact, I was going to have that

29

1    done while I move on to the verdict form in the other case.

2    Carol, would you check the math on verdict form A for me?

3         Turning now to Justin Becker versus ConAgra Foods,

4    the jury used verdict form B, checked yes in favor of Justin

5    Becker and against ConAgra, found a total amount of damages

6    without any reduction for comparative fault to be $34,390,000

7    itemized as follows:  Disfigurement, $10,000,000, loss of

8    normal life, $1,000,000, loss of normal life reasonably

9    certain to be experienced in the future, $8,000,000, pain and

10    suffering experienced as a result of the injuries, $2,000,000,

11    pain and suffering reasonably certain to be experienced in the

12    future, $4,000,000, emotional distress experienced as a result

13    of the injuries, $2,000,000, emotional distress reasonably

14    certain to be experienced in the future, $5,000,000,

15    reasonable and necessary medical care and treatment,

16    $2,300,000, the present cash value of reasonable expenses and

17    medical care, treatment and services reasonably certain to be

18    received in the future, $240,000, the value of earnings and

19    benefits lost, $50,000, present cash value of the earnings and

20    benefits reasonably certain to be lost in the future,

21    $600,000, present cash value of services reasonably certain to

22    be required in the future, $200,000.  They calculate that

23    total at $34,390,000.

24         In terms of comparative fault, they assessed 5

25    percent to Justin Becker, 51 percent to ConAgra and 44 percent

30

1  to West Side Salvage, and after reducing the verdict by 5

2  percent for comparative fault, they came up with the total

3  verdict of $32,670,500.

4         Juror number 14, is this your verdict now and was it

5  when you signed it?

6         JUROR 14:  Yes.

7         THE COURT:  Was it your intention before reducing any

8  amount for comparative fault to award Mr. Becker a total of

9  $34,390,000?

10         JUROR 14:  Yes.

11         THE COURT:  And after a five percent reduction, was

12  it your intention to award $32,670,500?

13         JUROR 14:  Yes.

14         THE COURT:  Juror number 2, would your answer be the

15  same if I would ask you?

16         JUROR 2:  Yes.

17         THE COURT:  3?

18         JUROR 3:  Yes.

19         THE COURT:  5?

20         JUROR 5:  Yes.

21         THE COURT:  9?

22         JUROR 9:  Yes.

23         THE COURT:  12?

24         JUROR 12:  Yes.

25         THE COURT:  16?

31

1          JUROR 16:  Yes.

2          THE COURT:  18?

3          JUROR 18:  Yes.

4          THE COURT:  24?

5          JUROR 24:  Yes.

6          THE COURT:  26?

7          JUROR 26:  Yes.

8          THE COURT:  With respect to the punitive damage

9    claim, we, the jury, award punitive damages in favor of the

10   plaintiff, Justin Becker, and against the following

11   defendants:  They checked yes for ConAgra.  The punitive

12   damage award is $33,333,333.33.  Both forms are signed by all

13   of the jurors.

14          With respect to this form on punitive damages, Juror

15   number 14, is this your verdict now and was it when you signed

16   it?

17          JUROR 14:  Yes.

18          THE COURT:  Was it your intention to award punitive

19   damages against ConAgra in the amount of $33,333,333.33?

20          JUROR 14:  Yes.

21          THE COURT:  Juror number 2, if I ask you the same

22   questions, would your answers be the same?

23          JUROR 2:  Yes.

24          THE COURT:  3?

25          JUROR 3:  Yes.

1          THE COURT:  5?

2          JUROR 5:  Yes.

3          THE COURT:  9?

4          JUROR 9:  Yes.

5          THE COURT:  12?

6          JUROR 12:  Yes.

7          THE COURT:  16?

8          JUROR 16:  Yes.

9          THE COURT:  18?

10          JUROR 18:  Yes.

11          THE COURT:  24?

12          JUROR 24:  Yes.

13          THE COURT:  26?

14          JUROR 26:  Yes.

15          THE COURT:  We will double check the math on this

16   also.  I want to publish these briefly.  This is verdict form

17   B.  This is the punitive damages verdict form.

18          Turning now to Amber Becker against ConAgra Foods,

19   the jury used the verdict form A.  They found a total amount

20   of damages in the amount of $250,000.  For the reasonable

21   value of society, companionship and sexual relationship

22   deprived $150,000.  The reasonable value of the society,

23   companionship and sexual relationship reasonably certain to be

24   deprived in the future, $100,000, for a total of $250,000

25   prior to the Court reducing that amount by any comparative

33

1    fault of Justin Becker.

2         Juror 14, is this your verdict now and was it when

3    you signed it?

4         JUROR 14:  Yes.

5         THE COURT:  Was it your intention to award $250,000

6    prior to the Court reducing that amount by the plaintiff

7    Justin Becker's comparative fault?

8         JUROR 14:  Yes.

9         THE COURT:  Juror 2, would your answer be the same?

10        JUROR 2:  Yes.

11        THE COURT:  3?

12        JUROR 3:  Yes.

13        THE COURT:  5?

14        JUROR 5:  Yes.

15        THE COURT:  9?

16        JUROR 9:  Yes.

17        THE COURT:  12?

18        JUROR 12:  Yes.

19        THE COURT:  16?

20        JUROR 16:  Yes.

21        THE COURT:  18?

22        JUROR 18:  Yes.

23        THE COURT:  24?

24        JUROR 24:  Yes.

25        THE COURT:  26?

34

1          JUROR 26:  Yes.

2          THE COURT:  This is the form in the Amber Becker

3     case.

4          In the case of Robert Schmidt against ConAgra Foods

5     and West Side Salvage, the jury used verdict form A.  They

6     found against both ConAgra and West Side Salvage.  They found

7     a total amount of damages prior to any reduction for

8     comparative fault in the amount of $2,915,000 itemized as

9     follows:  $500,000 for disfigurement, pain and suffering

10    experienced, $250,000, pain and suffering reasonably certain

11    to be experienced in the future, $100,000, the emotional

12    distress experienced, $1,500,000, emotional distress

13    reasonably certain to be experienced in the future, $500,000,

14    the reasonable and necessary medical care, treatment and

15    service received, $65,000.

16         With respect to the combined legal responsibility,

17    they found Robert Schmidt 0 percent responsible, ConAgra

18    65 percent, West Side Salvage 35 percent.

19         Juror number 14, is this your verdict now and was it

20    when you signed it?

21         JUROR 14:  Yes.

22         THE COURT:  Was it your intention to award a total

23    amount of damages in the amount $2,915,000 and not have that

24    amount reduced by any comparative fault?

25         JUROR 14:  Yes.

1          THE COURT:  Was it also your intention to allocate

2     legal responsibility in the amount of 65 percent to ConAgra

3     and 35 percent to West Side Salvage?

4          JUROR 14:  Yes.

5          THE COURT:  Juror number 2, would your answer be the

6     same?

7          JUROR 2:  Yes.

8          THE COURT:  Juror 3?

9          JUROR 3:  Yes.

10          THE COURT:  5?

11          JUROR 5:  Yes.

12          THE COURT:  9?

13          JUROR 9:  Yes.

14          THE COURT:  Juror 12?

15          JUROR 12:  Yes.

16          THE COURT:  14?

17          JUROR 14:  Yes.

18          THE COURT:  16?

19          JUROR 16:  Yes.

20          THE COURT:  18?

21          JUROR 18:  Yes.

22          THE COURT:  24?

23          JUROR 24:  Yes.

24          THE COURT:  26?

25          JUROR 26:  Yes.

36

```
 1              THE COURT:  With respect to the punitive damage
 2   verdict form, the jury checked yes as to ConAgra and yes as to
 3   West Side -- or no as to West Side Salvage.  Yes as to ConAgra
 4   and no as to West Side Salvage on Schmidt.  The punitive
 5   damage award is in the amount of $33,333,333.34, and zero
 6   against West Side Salvage.
 7              Juror number 14, is this your verdict now and was it
 8   when you signed it with respect to the punitive damage claim?
 9              JUROR 14:  Yes.
10              THE COURT:  Was it your intention to award
11   $33,333,333.34?
12              JUROR 14:  Yes.
13              THE COURT:  Juror number 2, are your answers the
14   same?
15              JUROR 2:  Yes.
16              THE COURT:  Juror 3?
17              JUROR 3:  Yes.
18              THE COURT:  5?
19              JUROR 5:  Yes.
20              THE COURT:  9?
21              JUROR 9:  Yes.
22              THE COURT:  12?
23              JUROR 12:  Yes.
24              THE COURT:  14?
25              JUROR 14:  Yes.
```

1            THE COURT:  16?

2            JUROR 16:  Yes.

3            THE COURT:  Old habits are hard to break.  16 again?

4            JUROR 16:  Yes.

5            THE COURT:  18?

6            JUROR 18:  Yes.

7            THE COURT:  24?

8            JUROR 24:  Yes.

9            THE COURT:  26?

10            JUROR 26:  Yes.

11            THE COURT:  Okay, we will publish these.  This is

12    verdict form A in the Schmidt case.  This is the verdict form

13    regarding punitive damages in the Schmidt case.  For the

14    record, when I say I am publishing this, I am putting it on

15    the ELMO in the courtroom so the jurors and counsel can see

16    it.

17            Okay, folks, would you return to the jury room until

18    I get back to you?  It will just be a couple of minutes,

19    minimum of 15 or 20, so if you want to take a longer break,

20    that is fine.

21            (Whereupon the following proceedings were held in

22    open Court, out of the presence of the jury.)

23            THE COURT:  Okay, counsel, let's go on the record.

24    Some of the numbers aren't adding up.  We won't be able to

25    resolve it in a matter of minutes.  My intention is to release

38

1  the jury for the night.  They know they have to come back on

2  the contract claim anyway, so I am going to have them report

3  here tomorrow at 8:30 and we'll continue working today.  We'll

4  get copies of the verdicts for you and formulate a strategy as

5  to what to do next.  I'm going to release them for the

6  evening.  I am happy to bring them back in here and admonish

7  them not to discuss the case with anyone or I can do it back

8  in chambers.  Anyone's preference?

9          MR. CLIFFORD:  Back in chambers is fine with us.

10         MR. PATTON:  You don't need to bring them out on our

11 behalf.

12         THE COURT:  Okay with you, Mr. Schultz?

13         MR. SCHULTZ:  Yes, fine.

14         (Whereupon a recess was taken.)

15         THE COURT:  Okay, we're back in open Court on the

16 record out of the presence of the jury.  I have given them

17 menus and released them to come back tomorrow.  I have handed

18 out the verdict forms.  First of all, you have copies that are

19 signed by the jury.  Those are for you, but the Court's

20 instructions are that they are for your use only, attorneys.

21 They cannot be given to your clients or sent anywhere because

22 they have juror signatures on them.  You can redact the

23 signatures and send them to your clients or whoever you have

24 to report to.  I am giving you the actual signed copies by the

25 jury.  Those must remain with you.  That is the order of the

39

1    Court.   Again, you can block out jury names and then send it.

2         It appears to me, and I am in no way trying to glean

3    something from the entrails of a goat, but it appears to me in

4    the Jentz case what has happened is that the jurors misread

5    their handwriting.   When I asked Juror number 14 to read his

6    handwriting for me here in open Court, he read a total amount

7    of $41,385,000.   I think that should be $41,585,000 because

8    that figure is what all of the itemized verdicts add up to.

9    When they reduced the one percent, I think he also misread the

10   handwriting and came off one percent from the 41,385 as

11   opposed to 41,585.   I think that is probably just a

12   Scrivener's error, just an explanation as to what may have

13   happened.

14        With respect to the punitive claim on Jentz, the

15   numbers are not mathematically incorrect.

16        With respect to the Becker case, there is an error.

17   I think they merely, again, did not add the itemized amounts

18   correctly.   One explanation would be we sent them a calculator

19   back that doesn't have a tape.   So they are adding numbers,

20   they are seeing digital numbers and they might not have seen

21   the previous number and they might have misentered a number.

22   I think where we awarded 34,390,000, they should have entered

23   35,390,000.   That is the sum total of the itemized damages and

24   the reason their total is off.   By knocking off five percent

25   for Justin Becker, they used an incorrect number as a total.

40

1    Again, I am just speculating and engaging in guess,

2    speculation and conjecture.

3          Punitive damage award as to Becker is mathematically

4    not inconsistent with anything.

5          Amber Becker's total is accurate mathematically.  Of

6    course, it has to be reduced five percent for the five percent

7    allocated to Justin Becker.

8          The Schmidt case, looks like verdict form A all adds

9    up correctly and punitive damage case does not have

10   mathematical inaccuracies.

11         MR. ESPOSITO:  What was the punitive damage award in

12   the Becker case, or was there one?

13         MR. TAXMAN:  33,333,333.33.

14         MR. ESPOSITO:  None to West Side, correct?

15         MR. TAXMAN:  We didn't sue West Side.

16         THE COURT:  In the Jentz case, punitive damages

17   against ConAgra was three -- what they did was give

18   100,000,000 punitive divided by three.  They award

19   $33,333,333.33 to Jentz against ConAgra and to Jentz against

20   West Side they awarded $1,000,000.

21         So the question becomes, what do we do?  I have had

22   cases in the past where there were mathematical errors and by

23   agreement I just sent the jury back and said hey, the numbers

24   don't add up.  We never bothered researching it.  I want to

25   research in this case.  I would ask all of you to hit the

1    books.  I would like to meet tomorrow morning.  The jury is

2    going to be here thinking 8:30 start.  I still have to do

3    instructions on contract tonight and then we have to decide

4    what we're going to do about the numbers.  I suggest we meet

5    here at 7:30 tomorrow morning, maybe go on the record about

6    8:00 or so.  Hit the books in the meantime.  I'm sure we'll

7    find the same cases.  The question is what do we do.  Do I

8    tell the jury the numbers don't add up and send them their

9    former forms along with a new blank one, or do I give them

10   different colored pen and tell them to correct the numbers

11   that are inaccurate here?  I don't know the answer.  I am open

12   to suggestions and I assume I will hear them from you

13   tomorrow.

14          Anything else for the record tonight before I go to

15   my on the record jury instruction conference in the contract

16   claim?  All I need now is John Patton and John Schultz.

17          Again, don't forget the protective order.  The

18   verdict forms are not to be disseminated outside of counsel

19   unless the juror names are redacted.

20          (Whereupon a recess was taken.  The following

21   proceedings were held out of the presence of the jury.)

22          THE COURT:  We're on the record out of the presence

23   of the jury.  The jury returned verdicts with respect to what

24   I described as the personal injury/contribution case, and what

25   remains in the pleadings now is indemnity claim, negligence

42

1    claim, ConAgra versus West Side alleging property damage, and

2    contract claim, ConAgra versus West Side.

3         What is the position of West Side with respect to the

4    implied indemnity and negligence claim now that we have

5    verdicts on the personal injury case?

6         MR. SCHULTZ:  Neither survive the fault findings and

7    they should not be submitted, just breach of contract.

8         THE COURT:  Mr. Orlet?

9         MR. ORLET:  For the record, we would ask that the

10   jury be -- that there be a separate finding without the

11   involvement of the plaintiffs on each of those claims.

12        THE COURT:  I know you have instructions you are

13   going to offer with respect to qualitative difference that we

14   discussed yesterday off the record.  My understanding of

15   implied indemnity as outlined in my April 16th order is that

16   in order to obtain implied indemnity, one must be completely

17   free from fault.  In this case the jury has found ConAgra more

18   than 50 percent at fault in the cases of Jentz, Schmidt and

19   Becker.  One case had a finding of 51 percent, one had 56 and

20   one had 60, roughly.  In any event, they were more than

21   50 percent and clearly more than 0 percent, so as a result I

22   think the implied indemnity claim as a matter of law does not

23   survive.

24        Under the negligence statute, since in each of the

25   cases the jury found ConAgra more than 50 percent responsible,

43

1   my understanding of the law is they are barred just as

2   plaintiff would have been barred in personal injury had his or

3   her contributory fault exceeded 50 percent.  I rule as a

4   matter of law that the negligence claim does not survive

5   either.

6        That leaves us with the breach of contract claim.

7   Yesterday we spent time going over the instructions and I am

8   now going to go through them.  Folks, they are on the monitor.

9        First is ConAgra's instruction 150, given with no

10  objection.

11       ConAgra 151 is given over objection.  Mr. Schultz,

12  your objection please?

13       MR. SCHULTZ:  My objection is there was no written

14  contract in existence as of the date of the explosion and,

15  therefore, the entire breach of contract claim should not be

16  submitted, that there is no factual basis for it.  There has

17  not been a submissible case that a written contract between

18  ConAgra and West Side was in existence and, therefore, we

19  object to the submission of this instruction.

20       THE COURT:  Mr. Orlet?

21       MR. ORLET:  Judge, the law is clear that a contract

22  can be formed by conduct, and in this instance the evidence,

23  undisputed, that a contract was sent to West Side and signed

24  by Mr. Langham and subsequently West Side came to Chester and

25  performed under the terms of the contract, so we believe that

44

1    under the case, including Your Honor's case in -- I don't have

2    the cite.

3           THE COURT:  *Spivey?*

4           MR. ORLET:  *Spivey* case, that performance by or

5    conformance or acts inconsistent with rejecting the terms of

6    the contract render a contract valid.  We believe that is the

7    case here and it is undisputed.

8           THE COURT:  I think we have an error in this

9    instruction though.  Number one says the existence of a

10   written contract.  You have the burden of proving a contract,

11   not a written contract.  I think the word "written" is an

12   error.

13          MR. ORLET:  Yes, you are right.

14          THE COURT:  It will be given over objection of West

15   Side.

16          Next instruction which will be given over objection

17   of West Side Salvage is ConAgra 152A, issues instruction in

18   the case.  Mr. Schultz?

19          MR. SCHULTZ:  Same objection.

20          THE COURT:  Mr. Orlet?

21          MR. ORLET:  I will adopt my earlier comments.

22          THE COURT:  The Court believes this is a correct

23   statement of the issues in the case and ought to be presented

24   to the jury.

25          Next is ConAgra 153A, given, no objection.

1              Next is ConAgra 154, given, no objection.

2              ConAgra 158 given, no objection.

3              ConAgra 159 is given with an objection by West Side.

4    Mr. Schultz?

5              MR. SCHULTZ:  Judge, these allegations that

6    Mr. Langham engaged in conduct of a kind that he was employed

7    to perform have not been proven, a submissible case not made

8    on that.  In fact, the evidence was completely to the contrary

9    that he did not have authority to sign contracts without the

10   express approval of Gene Schwers or Ron Sumner, so, therefore,

11   I don't think that should be submitted.

12             THE COURT:  Mr. Orlet?

13             MR. ORLET:  The testimony in the case was, and I was

14   checking that, testimony of Mr. Sumner was that part of

15   Mr. Langham's ongoing job duties in his position as vice

16   president of operations was to sign contracts, so we believe

17   that there is sufficient evidence in the record to support

18   finding that he was acting within the scope of his employment.

19             THE COURT:  I am going to overrule this objection.

20   There was significant controverted testimony as to whether or

21   not Mr. Langham did or did not have the authority to bind West

22   Side Salvage on contracts.  I remember a lot of cross

23   examination in the case with respect to the hierarchy of

24   Mr. Langham on the corporate chart and whether he could or

25   couldn't and who was above him or not.

46

1          I think this instruction is particularly and uniquely

2     suited to this case where the jury is going to have to decide

3     whether or not Mr. Langham was acting within the course and

4     scope of his employment with respect to this work order

5     contract.  It is given over objection.

6          160A is the next ConAgra instruction, also given over

7     objection.

8          MR. SCHULTZ:  Judge, this instruction asks the jury

9     to find that ConAgra timely paid West Side.  They did not pay

10    West Side until more than a month after the accident,

11    therefore, this element does not have any bearing on whether

12    there was a contract in existence on the date of the accident.

13    We object to the submission of this instruction as not

14    supported by the evidence, no submissible case was made.

15         THE COURT:  Mr. Orlet?

16         MR. ORLET:  Mr. Schwer testified that West Side was,

17    in fact, paid by ConAgra at some point after the contract was

18    performed and whether that is timely or not I believe would be

19    a matter that would be for the jury consideration, but there

20    was a finding that they were, in fact, made.

21         THE COURT:  I think we have a horse race as to

22    whether or not West Side was timely paid or not.  There is no

23    question they were.  Their position was it wasn't timely and

24    they signed the second agreement only in order to get paid.  I

25    think this is an appropriate instruction in this case.

1          161A is an instruction to which West Side also

2     objects.  Mr. Schultz?

3          MR. SCHULTZ:  Judge, incorporating our prior

4     objections, it is West Side's -- so we object to the

5     instruction because a submissible case was not made, but we

6     submit any of the subparagraphs other than the first one

7     should not be submitted because there was no evidence that

8     there was an agreement or understanding between ConAgra and

9     West Side that any of these other subparagraphs were part of a

10    contract.  Specifically the last one, there was no demand made

11    upon West Side to remedy a problem.  And so I just think all

12    of the other ones are not supported by the evidence.

13         THE COURT:  Mr. Orlet?

14         MR. ORLET:  These are terms that are all out of the

15    written contract that was forwarded to West Side in advance of

16    its performance and then subsequently in the second contract

17    was sent after the fact.  Both contracts were signed by

18    management personnel at West Side and so we believe that a

19    contract was formed by the performance of West Side without

20    controverting any of the terms of the contract that was sent

21    to it and signed by Mr. Langham, and additionally, even if

22    there was not a contract formed by the performance, that

23    Mr. Schwer's subsequent signing of the later contract acted as

24    ratification.

25         THE COURT:  These are elements that ConAgra must

1    prove in order to sustain its burden, that is one or more of

2    these, and then even if they prove this and prove there was an

3    offer and acceptance, they still have to prove the breach of

4    any one or more of these caused damages.  I believe these are

5    appropriate allegations given the state of the pleadings in

6    the case, so it will be given over objection of defendant West

7    Side.

8         Defendant West Side objects to 162A, which the Court

9    will give.

10        MR. SCHULTZ:  We want to incorporate at this time not

11   only the prior objections we made during the instruction

12   conference, but the record we made on the measure of damages.

13   It is West Side's position that the proper measure of damages

14   in this case is diminution and fair market value before and

15   after the explosion and the diminution in value by ConAgra's

16   expert was 3.8 million.  By our expert is 1.2 or 1.3 million,

17   both numbers being less than the cost of repair or replacement

18   being submitted.  So we think that we would object to not only

19   the fact there was no submissible case made on the

20   instruction, but also we contend it is not proper measure of

21   damages.

22        THE COURT:  This instruction doesn't distinguish

23   between the measure of damages, so I think this one is

24   appropriate.

25        MR. SCHULTZ:  I'll incorporate going forward with

49

1    that and not repeat them.

2            THE COURT:  Got you.  Overruled.

3            Now this one is 163, and in this one I did choose the

4    measure of damages proffered by ConAgra as opposed to West

5    Side Salvage.  West Side Salvage suggested diminution in

6    value.  ConAgra suggested reasonable expense of necessary

7    repairs.  I spent a significant amount of time researching

8    this and concluded that ConAgra was correct, the law is not

9    eminently clear, but I think this is the correct statement of

10   the law.  Mr. Orlet?

11           MR. ORLET:  I will just incorporate the arguments set

12   forth in our Motion for Summary Judgment, or I believe it was

13   bench brief we submitted to Your Honor on this point.  I would

14   also note that the comment to the instruction says that if the

15   property is repaired, then the value -- or the cost of that

16   repair is a proper measure of damage and the property in this

17   case was repaired.

18           THE COURT:  Then we have the verdict forms.  I need

19   to stamp this, but the verdict form is given over objection of

20   defendant West Side.

21           MR. SCHULTZ:  Just incorporating the prior

22   objections.

23           THE COURT:  Okay.

24           MR. ORLET:  I incorporate my prior responses.

25           THE COURT:  This is the detailed verdict form and I

1    think the first question bears some explanation, however, and

2    that is because at first flush it has nothing to do with the

3    case, but it really does.  The first question is important in

4    the Court's ultimate determination as to whether or not there

5    has been a waiver of the *Kotecki* safe harbor I'll call it,

6    that West Side would normally enjoy, and as a result question

7    one says, "The following question relates to Exhibit 93

8    attached to this question.  Did ConAgra prove the attached was

9    a contract in effect as of April 27th of 2010?"  We need an

10   answer to that with respect to the *Kotecki* issues.  The rest

11   of the questions go to offer acceptance and breach.  I think

12   they are appropriate and I don't think they are argumentative.

13   I don't think they are duplicative.  I am going to give this

14   over objection.

15        I believe that is all of the instructions.  We have

16   some refused now. The following instructions are refused, and

17   these are all common law indemnity instructions.  Let me state

18   why I am refusing them.  I am refusing them on the basis that

19   the jury, in what I call the underlying case, Jentz v.

20   ConAgra and West Side, Becker v. ConAgra, Schmidt v. ConAgra

21   and West Side and Amber Becker v. ConAgra, returned verdicts

22   assessing liability to ConAgra and a percentage columns.

23   Since they were assessed fault, my understanding of common law

24   indemnity is that they cannot then transfer any of their

25   liability to West Side.  As such, I think the common law

1    indemnity claim fails.

2         The following instructions are tendered by ConAgra

3    and I am going to refuse them and then give ConAgra an

4    opportunity if it wishes to make any argument.

5         ConAgra 171 is refused.

6         ConAgra 172 is refused.

7         ConAgra 173 is refused.

8         ConAgra 174 is refused.   The verdict form for

9    ConAgra A and B is refused.   Mr. Orlet, you wanted to make an

10   argument with respect to a rather esoteric point of law that

11   we discussed yesterday?   Is it a fair statement, esoteric?

12        MR. ORLET:   Well, it is.   Your Honor, the term that

13   is in certain Post Contribution Act cases including *Schulson* S

14   C H U L S O N.   It is a First District case from 2005, 821

15   N.E. 2d, 643, states that the standard for common law

16   indemnity post adoption of the Illinois Contribution Statute

17   is that there must be a pre-tort relationship in a

18   "qualitative distinction" between the conduct.   So qualitative

19   distinction is in quotes.   I believe that that accurately sets

20   forth the law, or may -- and also that the jury verdict on

21   percentages of liability in this case should be judged

22   separately as to the third party claim without the

23   consideration of the plaintiff's fault, as was done in the

24   underlying cases.

25        THE COURT:   Okay.   Again, I think if there is any

52

1    fault assessed to ConAgra, they can't then use common law

2    indemnity.  I point out that if this qualitative distinction

3    is correct, then in the Schmidt case, for example, where the

4    jury found 65 percent responsibility for ConAgra and

5    35 percent for West Side, they would be permitted, that is

6    ConAgra, would be permitted to pass on 35 percent of the

7    property damage claim to West Side and I don't think that ever

8    was the intention of common law indemnity, which was to

9    completely pass something on that originally was not your

10   fault to begin with.  Okay, anything else?

11          MR. ORLET:  Off the record.

12          (Whereupon a discussion was held off the record.

13   Court was adjourned.)

14

15

16

17

18

19

20

21       (Court is adjourned.)

22

23          I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.

24
     SS/Barbara Kniepmann                      June 6, 2012
25