1

1

2                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF ILLINOIS
3
JOHN W. JENTZ,                )      10-CV-474-MJR
4            Plaintiff,       )
             Vs.              )      Consolidated with:
5 CONAGRA FOODS, INC., et al)
             Defendants,      )
6 JUSTIN BECKER and AMBER     )
BECKER,                       )      10-CV-952-MJR
7            Plaintiffs,      )
          VS.                 )
8 CONAGRA FOODS, INC., et al)
             Defendants,      )
9                             )
ROBERT SCHMIDT,               )
10           Plaintiffs,      )
             Vs.              )      11-CV-391-MJR
11 CONAGRA FOODS, INC., et al)
             Defendants,      )      June 1, 2012
12
                  TRANSCRIPT OF TRIAL, VOLUME XVII,
13           BEFORE THE HONORABLE MICHAEL J. REAGAN,
             UNITED STATES DISTRICT JUDGE, and a jury.
14
APPEARANCES:
15
For the Plaintiffs:       Clifford Law Offices, P.C.,
16                        By:  Robert A. Clifford
                               Kevin P. Durkin
17                             Colin H. Dunn
                          120 North LaSalle Street
18                        Suite 3100
                          Chicago, IL  60602
19
For Plaintiffs            Anesi, Ozmon, Rodin, Novak & Kohen
20 Justin and Amber Becker  By:  Mark Taxman
                               Sean Murray
21                             Julie Levinson Pustilnik
                          161 N. Clark Street
22                        Chicago, IL  60601

23 For Defendant            Patton & Ryan
ConAgra Foods, Inc.,       By:  John Patton, Jr
24                             John Ouska
                          330 N. Wabash Avenue
25                        Suite 2900
                          Chicago, IL  60611

                                                                    2

1                                    Husch Blackwell, LLP
                                     By:   Joseph Orlet
2                                          Brandan Mueller
                                           Joseph Kilpatrick
3                                    190 Carondelet Plaza
                                     Suite 600
4                                    St. Louis, MO  63105

5    West Side Salvage, Inc.    Franke, Schultz & Mullen, P.C.
                                     By:   John Schultz
6                                          Jason Moore
                                     8900 Ward Parkway
7                                    Kansas City,  MO  64114

8    Court Reporter:            Barbara Kniepmann
                                     750 Missouri Avenue
9                                    East St. Louis, IL  62202

10

11

12

13

14

15

16

17   Proceedings recorded by mechanical stenography, transcript
     produced by computer.

18

19

20

21

22

23

24

25

3

1          THE COURT:  Good morning all.  We're in open Court

2     out of the presence of the jury.

3          Yesterday in what I refer to as the underlying case,

4     that is the personal injuries claims of Mr. Jentz, Mr and

5     Mrs. Becker and Mr. Schmidt, as well as the contribution

6     claims, the jury did return verdicts in those cases, however,

7     there were two inconsistencies in those verdicts that I

8     pointed out on the record yesterday out of the jury's

9     presence, gave the parties time to research what to do about

10    that overnight.  We have discussed the matter off the record

11    and I am ready to go on the record.

12         First of all with respect to Jentz, it is my

13    understanding that everybody agrees, and if you don't please

14    speak up, that there was merely a Scrivener's error with

15    respect to the math and that when I asked juror number 14 to

16    read the total amount of itemized damages prior to any

17    reduction for comparative fault, he couldn't read his own

18    handwriting and what he read was $41,385,000.  What he really

19    intended was, and the jury intended, was $41,835,000.

20         MR. CLIFFORD:  585,000.00.

21         THE COURT:  I'm sorry, $41,585,000.  If you look at

22    his handwriting, you can see it is hard to tell the three from

23    five.  If you add up the itemized damages in Jentz, the total

24    does equal $41,585,000, so I think the parties agree that I

25    can use the judicial eraser and change the verdict in this

4

1    case and, of course, I am going to file the verdict forms as

2    they were returned by the jury.  I won't change any of their

3    numbers, but when I enter judgment I will make the total

4    result prior to any reduction for comparative fault to be

5    $41,585,000.  I will not touch the itemization.  I will change

6    on page two the total damages from the figure of 40,970,150

7    to --

8            MR. DURKIN:  You said 970, but 971, Your Honor.

9            MR. CLIFFORD:  That is a repeat of the 41,585.

10           THE COURT:  So on page two it should be a repeat of

11   $41,585,000.  Then the total after reduction for comparative

12   fault reads $40,971,150.  That is also a math error.  What the

13   jury did was take the incorrect total from page one, which

14   incorrectly was 41,385,000, and multiplied it by 99 percent to

15   come up with $40,971,150.  Their math is correct, but the

16   starting point was wrong.  So using the correct starting point

17   of $41,585,000 times 99 percent, the final recoverable damages

18   for Mr. Jentz, and it includes a reduction for his comparative

19   fault, will be $41,169,150.  Does the plaintiff agree the

20   Court can make those changes?

21           MR. CLIFFORD:  Yes, sir.

22           THE COURT:  Does the defendant agree, without waiving

23   any objection as to the totals in this case or any position

24   they have taken, that I can make the mathematical changes in

25   this case?

5

1          MR. PATTON:  We do, Judge.

2          THE COURT:  With respect to Mr. Becker, I think we're

3    faced with a little different issue.  There the jury also came

4    up with a different total figure when you add up the

5    itemization versus what they claim the total to be.  They

6    claim the total prior to any reduction for comparative fault

7    for Mr. Becker was 34,390,000.  However, if you add up their

8    itemized damages, they total $35,390,000, or a difference of

9    $1,000,000.  I do not feel that I can make a change using the

10   judicial eraser because I don't know if they intended the

11   total damages to be $34,390,000 before comparative fault or

12   did they intend that one of the line items be $1,000,000 less.

13   In other words, unlike Jentz where we can glean very clearly

14   and confidently it was a mathematical error, in Becker I don't

15   know if they intended to give $1,000,000 less in itemization

16   or if they just added wrong and should have given $1,000,000

17   more in the total.  So my intention with respect to

18   Mr. Becker, unless there are any objections, is to point out

19   to the jury that their math does not add up, that the itemized

20   numbers do not add up to their total, that that they are

21   $1,000,000 off and ask them to review their verdict and make a

22   correction, whether it be mathematical or -- I don't know how

23   I am going to phrase it, but I will make it clear to them that

24   they are $1,000,000 off and they need to review their math and

25   make a change either on the itemization or the total.  Any

6

1    objection to that on behalf of the plaintiff?

2              MR. TAXMAN:  No objection, Your Honor.

3              MR. PATTON:  No objection.

4              THE COURT:  Then what I will do is release the jury

5    for a few minutes so you can all get your information out of

6    the way and then we will start up with the closing arguments.

7              MR. SCHULTZ:  For the record, West Side has no

8    objections to any of the procedures in Jentz or Becker, so it

9    is clear.

10             THE COURT:  I am sorry, I should have addressed you

11   directly.  Thank you.  Anything else for the record?

12             (Whereupon a discussion was held off the record.  The

13   following proceedings were held in open Court, in the presence

14   of the jury.)

15             THE COURT:  Welcome.  My standard question, have any

16   of you discussed this matter with anyone other than

17   yourselves, anyone tried to discuss it with you, communicate

18   with you, done any independent research whatsoever?  Nobody,

19   okay.

20             Folks, yesterday you returned verdicts in this case

21   and there is one that needs reconsideration by you.  I want to

22   go over it with you.  What I have done, I have written at the

23   top of it, "Resubmitted to jury for further deliberation,"

24   with today's date and time.  This is in the Justin Becker

25   case.

1    Let me point out the issue to you.  When you take

2    these itemized damages that you have listed here on page one

3    and two, they don't total $34,390,000.  They total

4    $35,390,000.  If it were merely a math error, I could correct

5    it.  I can't tell if you intended this to be $34,390,000 and

6    intended one of the line items to be $1,000,000 less, or did

7    you intend the line items to remain the same and then just

8    merely misadded and came up with the $34,390,000, or did you

9    intend any of the line items to be different in the amount of

10   $1,000,000.  Since I can't tell, I am going to ask you to go

11   back to the jury room, redeliberate considering all of the

12   instructions as a whole, considering the arguments of counsel,

13   any stipulations or depositions in the case and then change

14   the verdict form to what you currently believe is correct

15   using the red pen.

16        For the sake of argument, let's say this was merely a

17   math error.  What I would like you to do is take the red pen,

18   strike out the 34,390,0000, and put in the correct number.

19   We'll send the calculator back with you.  If, on the other

20   hand, you think one of the other line numbers should have been

21   changed so the totals are correct, make the changes in red.  I

22   would like you to go back on page two and initial after your

23   names in red that you agree to this.  I'll bring you back into

24   Court and ask the same questions.

25        All right, let me give this back to you.  Juror 14,

8

1  if you want the instructions or any exhibits, please send out

2  a note.  Otherwise, I'll just send this back.

3          (Whereupon the jury retires to deliberate.  The

4  following proceedings were held in open Court, in the presence

5  of the jury.)

6          THE COURT:  Juror number 14, the foreperson, has the

7  jury reevaluated their original decision in the Becker case?

8          I just spilled coffee all over the verdict forms.

9  Could I have paper towels before I electrocute myself?

10          Okay, juror 14, has the jury redeliberated in the

11  Becker case?

12          JUROR 14:  Yes.

13          THE COURT:  Have you reached a unanimous decision

14  consistent with the Court's instructions?

15          JUROR 14:  Yes.

16          THE COURT:  Could you please hand the verdict form to

17  the CSO?

18          Okay, the jury has made changes to the verdict form

19  in red ink.  The total amount of damages prior to any

20  reduction of Justin Becker's negligence is $35,390,000.  They

21  have stricken out the earlier number of $34,390,000.  They

22  have not changed any of the itemized verdicts.  They have on

23  page two indicated plaintiff Justin Becker's total damages are

24  $35,390,000.  On page three they have calculated a final net

25  judgment to Justin Becker after reduction for comparative

9

1  fault in the amount of $33,620,500.  They have countersigned

2  by initialing the verdict form.  Let me publish this.

3         For the record, this is in red ink.  I don't know

4  that when we scan it, it will be red or not, but the changes

5  are clearly visible.  The Court takes judicial notice that

6  this form is mathematically correct.

7         Juror 14, is this your verdict now and was it when

8  you signed it?

9         JUROR 14:  Yes.

10         THE COURT:  Was it your intention to award a total

11  damage to Justin Becker prior to reduction for any comparative

12  fault in the amount of $35,390,000?

13         JUROR 14:  Yes.

14         THE COURT:  Are the line items of damages for

15  disfigurement all the way down and through the present cash

16  value of service reasonably certain to be required in the

17  future, your verdicts?

18         JUROR 14:  Yes.

19         THE COURT:  Was your intention to award a net verdict

20  to Justin Becker after reduction for comparative fault to a

21  total amount of $33,620,500?

22         JUROR 14:  Yes.

23         THE COURT:  Juror number 2, would your answer be the

24  same to those questions?

25         JUROR 2:  Yes.

10

1          THE COURT:  Juror number 3?

2          JUROR 3:  Yes.

3          THE COURT:  Juror number 5?

4          JUROR 5:  Yes.

5          THE COURT:  Juror number 9?

6          JUROR 9:  Yes.

7          THE COURT:  Juror number 12?

8          JUROR 12:  Yes.

9          THE COURT:  Juror number 14?

10          JUROR 14:  Yes.

11          THE COURT:  Juror number 16?

12          JUROR 16:  Yes.

13          THE COURT:  If nothing else, I am consistent.  Juror

14   number 18?

15          JUROR 18:  Yes.

16          THE COURT:  Juror number 24?

17          JUROR 24:  Yes.

18          THE COURT:  Juror number 26?

19          JUROR 26:  Yes.

20          THE COURT:  Do any of the parties request any further

21   polling of the jury in either Jentz, Becker, Schmidt?

22          MR. CLIFFORD:  No, Your Honor.

23          MR. ORLET:  No, Your Honor.

24          MR. SCHULTZ:  No, Your Honor.

25          MR. TAXMAN:  No, Your Honor.

1        THE COURT:  We will now turn to what I refer to as

2    the contract claim.

3        What I am going to do is read the instructions to you

4    at the outset and then the attorneys are going to argue.

5        In this suit there is not only the complaint of John

6    Jentz, Justin Becker, Amber Becker and Robert Schmidt, but

7    also the complaint of cross claim plaintiff, third party

8    plaintiff, ConAgra, against cross defendant, third party

9    defendant, West Side Salvage.

10        ConAgra alleges a count of breach of contract against

11    West Side Salvage.

12        The first element of a contract claim ConAgra must

13    prove is the existence of a contract.  There is a contract if

14    ConAgra proves there was an offer by one party, acceptance by

15    the other party, and consideration between the parties.

16        ConAgra claims the parties entered into a contract

17    which had the following terms material to ConAgra's claims:

18    West Side Salvage shall remove all pellets from bin 15 using

19    vacuum, bin whip and entry as needed.

20        West Side Salvage shall be solely responsible for all

21    construction means, methods, techniques, sequences and

22    procedures and for coordinating all portions of the work under

23    this agreement.

24        West Side Salvage shall not employ on the work any

25    unfit person or anyone not skilled in the task assigned to

1    him.

2           West Side Salvage shall be responsible for the acts

3    and omissions of all its employees and all subcontractors,

4    their agents and employees, and all other persons performing

5    any of the work under a contract with West Side Salvage.

6           West Side Salvage shall be responsible for

7    initiating, maintaining and supervising all safety precautions

8    and programs in connection with the work and shall comply with

9    all applicable laws, ordinances, rules, regulations and orders

10   of any public authority having jurisdiction for the safety of

11   persons or property, or to protect them from damage, injury or

12   loss.

13          All damage or loss to any property caused in whole or

14   in part by West Side Salvage, any subcontractor or anyone

15   directly or indirectly employed by any of them, or by anyone

16   for whose acts any of them may be liable, shall be remedied by

17   West Side Salvage without any cost, charge or expense to

18   ConAgra.

19          To prove the existence of a contract between ConAgra

20   and West Side Salvage, ConAgra has the burden of proving each

21   of the following propositions:  First, ConAgra must make or

22   have made an offer to West Side Salvage.

23          An offer is a communication of a willingness to enter

24   into a contract.  The communication must satisfy four

25   conditions.  First, the communication must have included a

1    definite promise by the person making the communication

2    showing a willingness to make an agreement.  Second, the

3    important and necessary terms must be definite.  Third, the

4    terms must be communicated by words or conduct to the other

5    party.  Four, the communication must give the other party the

6    power to agree to its terms.

7         Second, West Side Salvage accepted the offer made by

8    ConAgra.

9         Acceptance of an offer is a communication of

10   agreement to the terms of the offer.  For the acceptance to be

11   valid, number one, West Side Salvage must agree to all of the

12   material terms in the offer, and number two, West Side Salvage

13   must have communicated the agreement to ConAgra by written,

14   spoken words, accepting benefits under the contract, actions,

15   or any other conduct that would indicate agreement to a

16   reasonable person, doing any distinct and decisive act clearly

17   showing an intention to affirm the contract, or performing the

18   acts specified in the offer.

19        Third, the agreement included an exchange of promises

20   or value which is known as consideration.  There is sufficient

21   consideration if ConAgra can prove that something of value was

22   bargained for by the parties and given by one party in

23   exchange for the other's promise.

24        Something of value may consist of a promise, an act,

25   a promise to act or not act, or any payment that was of

14

1    benefit to one party or a disadvantage to the other.  You will

2    address these issues in questions one and two on your verdict.

3         Under Counts 4 and 5 of it's cross complaint and

4    Count 4 of it's third party complaint against West Side

5    Salvage, ConAgra claims it is entitled to contract damages

6    from West Side Salvage for breach of contract.

7         ConAgra has the burden of proving, one, the existence

8    of a contract between ConAgra and West Side Salvage; two,

9    performance by ConAgra; three, West Side's failure to

10   adequately perform its obligation under the contract; and

11   four, resulting damage to ConAgra.  I will explain and define

12   these legal terms elsewhere in these instructions.

13        If you find from your consideration of all the

14   evidence that one or more of these elements has not been

15   proven, you must find in favor of West Side Salvage.  If you

16   find from your consideration of all the evidence that each of

17   the above elements has been proven, then you must find in

18   favor of ConAgra and consider the amount of damages to be

19   awarded.

20        A partly oral and partly written contract is as valid

21   and enforceable as a written contract.

22        A written contract may consist of more than one

23   document.

24        The defendant West Side Salvage is a corporation and

25   can act only through its officers and employees.  Any act or

1    omission of an officer or employee within the scope of his

2    employment is the action or omission of West Side Salvage.

3          One of the questions for you to determine is whether

4    or not Ken Langham was acting within the scope of his

5    employment in signing the work order contract.  An employee is

6    acting within the scope of his employment if each of the

7    following is shown by the evidence:  One, the employee's

8    conduct is of a kind he is employed to perform or reasonably

9    could be said to have been contemplated as part of his

10   employment.  Two, the employee's conduct occurs substantially

11   within the authorized time and space limits of his employment.

12   And three, the employee's conduct is motivated, at least in

13   part, by a purpose to serve the employer.

14         The second element of a contract claim, ConAgra must

15   prove it performed all obligations required of it under the

16   contract.  To recover on its claim, ConAgra must prove it did

17   what the contract required it to do as follows:  ConAgra

18   timely paid West Side Salvage for all work performed under the

19   contract.

20         You will address this issue in question three on your

21   verdict.  Generally, if a party fails to perform its

22   obligations according to the terms of the contract, the party

23   has breached the contract.  You must decide whether West Side

24   Salvage failed to do what it was required to do under the

25   contract.

1          The third element of a contract claim which ConAgra

2    must prove is West Side Salvage's breach of the contract.  To

3    recover on it's claim, ConAgra has the burden to prove that

4    West Side Salvage failed to do something the contract required

5    it to do.

6          ConAgra claims and has the burden of proving that

7    under the contract, West Side Salvage was obligated to do the

8    following:  West Side Salvage shall remove all pellets from

9    bin 15 using the vacuum, bin whip, and entry as needed.  West

10   Side Salvage shall be solely responsible for all construction

11   means, methods, techniques, sequences and procedures, and for

12   coordinating all portions of the work under this agreement.

13   West Side Salvage shall not employee on the work any unfit

14   person or anyone not skilled in the task assigned to him.

15   West Side Salvage shall be responsible for the acts and

16   omissions of all it's employees and all subcontractors, their

17   agents and employees, and all other persons performing any of

18   the work under a contract with West Side Salvage.  West Side

19   Salvage shall be responsible for initiating, maintaining and

20   supervising all safety precautions and programs in connection

21   with the work and shall comply with all applicable laws,

22   ordinances, rules, regulations and orders of any public

23   authority having jurisdiction for the safety of persons or --

24   shouldn't that say property rather than properly -- or to

25   protect them from damage, injury or loss.  All damage or loss

17

1    to any property caused in whole or in part by West Side

2    Salvage, any subcontractor or anyone directly or indirectly

3    employed by any of them or by anyone for whose acts any of

4    them may be liable, shall be remedied by West Side Salvage

5    without any cost, charge or expense to ConAgra.

6              You will address these issues in question four on

7    your verdict.  You must decide whether ConAgra sustained

8    damages as a result of West Side's breach of the contract.

9              The fourth element of a contract claim is damages.

10   ConAgra must prove it sustained damage resulting from West

11   Side's breach.  To recover on its claim, ConAgra must prove

12   that because of West Side's failure to perform the contract,

13   it has been damaged.  West Side denies ConAgra sustained

14   damage to the extent claimed.  You will address this issue

15   with question six.

16             If you find in favor of ConAgra, you must then decide

17   how much money, if any, would fairly compensate ConAgra

18   against West Side Salvage's breach of contract.

19             ConAgra has the burden of proving each element of

20   damages claimed and that they occurred as a direct and natural

21   result of West Side Salvage's breach.

22             In calculating ConAgra's damages, you should

23   determine that sum of money that will put ConAgra in as good a

24   position as it would have been if both ConAgra and West Side

25   Salvage had performed all of their promises under the

18

1    contract.

2         ConAgra seeks an award of direct damages for the cost

3    of repair to Elevator C determined by the reasonable expense

4    of necessary repairs to the property which was damaged.  You

5    will address these issues in question seven on your verdict.

6         That concludes the instructions.  Now I want to go

7    over the verdict forms with you.  The verdict form has a

8    series of questions.  At the top it reads Verdict.  Question

9    number one.  The following question relates to Exhibit 93

10   attached to this question.  Did ConAgra prove the attached was

11   a contract in effect as of April 27, 2010?

12        When I send this back with you, I will have 93

13   attached, so the question was, was this in effect on

14   April 27th of 2010.

15        Then you go to question two.  Did ConAgra prove there

16   was a contract in effect at any time.  You would check yes or

17   no.  If you answer no, then your deliberations are complete

18   and you need go no further.  If you answer yes to either

19   question one or two, then you need to answer question three.

20        Question three.  Did ConAgra prove it performed its

21   obligations under the contract?  Yes or no.  If you answered

22   no, your deliberations are complete.  If your answer to

23   question three is yes, then you move on to question four.

24        Did ConAgra prove West Side Salvage was required to

25   do any one or more than one of the following under the

19

1    contract?  A, remove all pellets from bin 15 using vacuum, bin

2    whip and entry as needed.  You would check yes or no.  B,

3    employ on the work only workers skilled in the task assigned

4    to him.  Answer yes or no.  C, be solely responsible for all

5    construction means, methods, techniques, sequences and

6    procedures, and for coordinating all portions of the work.

7    Answer yes or no.  D, be responsible for the acts and

8    omissions of all his employees and all subcontractors, their

9    agents and employees and all other persons performing any of

10   the work under the contract with West Side Salvage.  You would

11   answer yes or no.  E, be responsible for initiating,

12   maintaining and supervising all safety precautions and

13   programs in connection with the work, comply with all

14   applicable laws, ordinances, rules, regulations and orders of

15   any public authority having jurisdiction for the safety of

16   persons or property or to protect them from damage, injury or

17   loss.  F, remedy without cost, charge or expense to ConAgra

18   all damage or loss to any property caused in whole or in part

19   by West Side Salvage, any subcontractor or anyone directly or

20   indirectly employed by any of them or by anyone for whose acts

21   any of them may be liable.  Again, yes or no for your response

22   on all of those.

23          Then we move on.  I am going to number these for you

24   so I don't get out of sequence on the bottom.  We move on to

25   page two.  If your answer to all of the subparts of question

1   four is no, then your deliberations are complete.  If your

2   answer to any one or more of the subparts of question four is

3   yes, you should then answer question five.

4        Question five.  Did ConAgra prove West Side Salvage

5   breached the contract by failing to:  A, remove all pellets

6   from bin 15 using a vacuum, bin whip and entry as needed?  You

7   would answer yes or no.  B, employ on the work only workers

8   skilled in the task assigned to him.  Check yes or no.  C, be

9   solely responsible for all construction, means, methods,

10  techniques, sequences and procedures, and for coordinating all

11  portions of the work.  Answer yes or no.  D, be responsible

12  for the acts and omissions of all his employees and all

13  subcontractors, their agents and employees and all other

14  persons performing any of the work under a contract with West

15  Side Salvage.  Answer yes or no.  E, be responsible for

16  initiating, maintaining and supervising all safety precautions

17  and programs in connection with the work, comply with all

18  applicable laws, ordinances, rules, regulations, and orders of

19  any public authority having jurisdiction for the safety of

20  persons or property or to protect them from damage, injury or

21  loss.  Answer yes or no.  F, remedy without cost, charge or

22  expense to ConAgra all damages or loss to any property caused

23  in whole or in part by West Side Salvage, any subcontractor or

24  anyone directly or indirectly employed by any of them or by

25  anyone for whose acts any of them may be liable.  You would

21

1   answer yes or no.

2        If your answer to all the subparts of question five

3   is no, then your deliberations are complete.  If your answer

4   to any one or more of the subparts of question five is yes,

5   then you should answer question six.

6        Question six.  Did ConAgra prove it sustained damages

7   as a result of West Side Salvage's breach of contract?  You

8   would answer yes or no.  If your answer to question six is no,

9   then your deliberations are complete.  If your answer to

10  question six is yes, then you should answer this next

11  question.

12       Number seven.  Did ConAgra present evidence of the

13  reasonable expense of necessary repairs to Elevator C?  You

14  would answer yes or no.  If you answered no, your

15  deliberations are complete.  If you answer yes, then you go to

16  question eight.

17       Number eight.  What is the value of the cost of

18  repairs proved by ConAgra as reasonably necessary to repair

19  ConAgra'S Elevator C?  Then you would fill in the amount there

20  if that is your position in deliberations.  The foreperson

21  would sign in this box and everybody else would sign here.

22  Okay.

23       So at this time the Court recognizes Mr. Orlet for

24  your closing argument.

25       MR. ORLET:  Thank you, Your Honor.

22

1          THE COURT:  Mr. Orlet?

2          MR. ORLET:  Thank you, Your Honor.  Mr. Schultz,

3    ladies and gentlemen of the jury.

4          I want to thank you for being here this morning and

5    we're here today to talk about an issue, a different issue

6    than what you decided yesterday, and that is to determine

7    whether, first, there was a contract in place between ConAgra

8    and West Side, and second, whether that contract was breached.

9          I think the best way to work through that issue is

10   just to look at the instructions.  I think that will guide

11   your deliberations and get you to the right answer.  The

12   elements of proving whether there is a breach of a contract

13   are set forth in this instruction and there are four elements.

14   They are first, is there a contract in place; second, did

15   ConAgra perform what it was supposed to do under the contract;

16   third, did West Side breach the contract; and fourth, was

17   there damage.  So let's look at those issues briefly.

18          The first issue is was there a contract.  What you

19   will have back in the jury room with you, you will have two

20   written contracts.  They are the same contract in all respects

21   except the one is signed by Ken Langham, the gentleman who

22   testified here, and then the other one was signed -- that was

23   signed on April 19th, the day that the crew left for Chester.

24   The other is a contract that was later signed by Mr. Schwers

25   and then signed by Mr. Hoerning who came here and testified

23

1    for ConAgra on the contract claim.  So there are two written

2    contracts and the various terms are set forth the same in each

3    one.

4            So let's look at whether, in fact, there was a

5    contract, and this instruction, which is the second

6    instruction that you will see, and it says down at the bottom

7    that the first thing that we have to prove is an existence of

8    a contract.

9            First thing that we have to do is we have to show

10   whether there was an offer made.  So first, was there an

11   offer?  In this case the offer was the act of sending this

12   contract to West Side.  It was an offer that they could then

13   accept so the terms were definite and they are set forth here

14   and if you look it says how an offer is made and it says

15   communication must be included in a definite promise by a

16   person making the communication, showing a willingness to make

17   the agreement.  The important and necessary terms must be

18   definite.  The terms must be communicated by words or conduct

19   to the other party and the communication must give the other

20   party the power to agree to the terms.  So in this case the

21   offer was made by sending the contract.

22           Then second to show a contract, you have to show

23   acceptance and I think that is going to be the issue that

24   Mr. Schultz will be talking with you about.  So I want to

25   address it in a little more detail.

24

1                Did West Side accept the terms of this agreement?  So

2       what we know is from Mr. Langham that he came in and he

3       testified that he signed the agreement, and then if you

4       remember he said he put it in the drawer.  He also testified

5       on a couple of occasions that he said that he did not have

6       authority to do that.  So there is an instruction that you

7       will see in there.  It addresses whether or not Mr. Langham

8       had authority, and if you look through there I think you will

9       find that he meets those factors to show that, yes, this is

10      part of his job.

11               If you remember, Mr. Sumner was asked about that

12      during his testimony here in Court.  Here is what he said

13      about that.  So Mr. Sumner testified, and this is from the

14      trial transcript.  He was asked,

15      Q.    "What are Mr. Langham's job responsibilities and duties

16      back in April of 2010?

17      A.    Kenny fields a lot of calls and questions from

18      customers that call and also does all the -- pretty much all

19      the billing.

20      Q.    Okay.  And he does contracting too, doesn't he?

21      A.    He's the only one who is consistently in the office.

22      Q.    Okay.  So your answer is Kenny Langham does sign

23      contracts on behalf of West Side.  True?

24      A.    Yes."

25               So there is Mr. Sumner saying that is part of his

25

1    job.  So that would show that he has that authority because

2    that is part of his job.

3          So then if you remember, he testified that he took

4    the contract and he put it in his desk drawer.  So is that --

5    did he intend to accept by doing that?  I would suggest that

6    he did, but if you look at the instruction, there are other

7    ways that a party can accept the terms of a contract besides

8    in writing.  The first one is in writing, which he did sign

9    that.  You can also do it by taking actions or other conduct

10   that would indicate agreement to a reasonable person, or by

11   performing the acts specified in the offer or doing anything

12   distinct and decisive clearly showing an intention to affirm

13   the contract.

14         So what that shows is that by performing the

15   contract, by actually just going out and starting the work,

16   that that would be sufficient acceptance.  So even if you

17   think that signing the contract and putting it in the drawer

18   wouldn't be sufficient, the act of going out, under this

19   instruction, tells you, yes, that is enough because they

20   accepted by performing.

21         Then the third thing that you have to see, that has

22   to be demonstrated before there is an agreement, is an

23   exchange of promises or consideration.  That is ConAgra has to

24   do something in exchange for this work and that is to pay

25   them.  In this case the testimony of Mr. Schwers, he testified

26

1    that ConAgra, in fact, did pay.

2    Q.      "And West Side was paid for their service and work out

3    there at Chester, true?

4    A.      Correct."

5            So in fact, ConAgra did give consideration for the

6    contract.  So I think the existence of a contract is

7    established and that is why I think that on question number

8    one, that will be the first question to you, is this the

9    contract between the parties, I think if you walk through that

10   instruction you will conclude that, in fact, this is the

11   contract between the parties.

12           Now there was a subsequent contract that you will

13   also have back for your deliberations and that is this

14   subsequent contract that was signed by Mr. Schwers and

15   Mr. Hoerning.  That was signed after the fact, but again, once

16   again, if you look at the instruction it says did they do

17   something, did West Side do something that showed its assent

18   to the contract.  Once again, this is additional evidence that

19   they intended to enter into a contract.

20           I would say that the other contract was entered into

21   already, but if you remember, he put it in his drawer.  He

22   didn't send it back.  So in order for ConAgra to cut a check

23   to pay them, they, ConAgra, needed this in their file so they

24   sent this one back to them.

25           So I think that if you do the analysis of the

27

factors, I think you will find, in fact, there was a contract
in place as of the 19th when they went out to perform the
contract at the latest.

So then the next thing that we have to see, the next
element of proving breach of contract is if there was a
contract, was there a breach.

Now the contract terms are set forth in there and you
will have that back in your jury room for your deliberations,
but they are also set forth, some of the key terms, are set
forth in the instruction and that is where these factors come
from and on the verdict form you are asked if they agree to
all of these terms and, in fact, these all come right out of
the terms of the contract.

So in fact, then you will have to look to see, well,
did West Side do all of these things under the terms of the
contract.  So did it remove the pellets?  Was it responsible
for how it would do that by itself, solely by itself?  Did it
employ people who were skilled in the work that would be
assigned to them?

I think that is really where I think the testimony is
pretty clear that these gentlemen who were sent out there, by
their own testimony, were not trained to handle a hot bin.
For example, if you look at the testimony of Mr. Schmidt, he
was asked about his training and whether he had ever been
trained by A & J to do the kind of temperature monitoring on a

28

1   bin like in Chester, and was he ever trained how to diagnose

2   whether there was a fire in the bin and he indicated that he

3   had not been.

4        Then Mr. Becker also testified about his lack of

5   training, and again, his testimony was:

6   Q.   "Were you trained as to whether pellets that are

7   glowing embers is a sign that the bin may be on fire?

8   A.   I don't believe that was ever mentioned in my

9   training."

10       So consistently these gentlemen pointed out their

11  lack of training to handle a hot bin.

12       So when you look to see whether the contract was, in

13  fact, breached or not, I think the lack of training I think is

14  a clear breach of the contract.

15       Additionally it also says that there would be -- that

16  West Side would be responsible for supervising all safety

17  precautions and programs, and I think that they didn't

18  adequately provide the safety programs in place, the

19  monitoring, things like that.

20       Finally, they also agreed, West Side agreed in the

21  contract that it would remedy any damage out there without

22  cost to ConAgra and, of course, there was I guess over

23  $3 million in damage which it had not remedied.  So I would

24  say it is pretty clear that there was a breach of the

25  agreement.

29

1          So then the last issue that you have to address is

2    whether, in fact, ConAgra was damaged.  And Mr. Hoerning came

3    in and testified about those damages, that the work that was

4    done to repair the facility was about $3.8 million, and that

5    didn't include -- he set aside the work, the additional work

6    that was done.  He mentioned they put in a new scale and did

7    that work.  He said that is not part of that.  So the repairs

8    to the facility are $3.8 million.

9          So I think when you walk through the verdict form,

10   you will conclude that we, in fact, ConAgra, has proven the

11   reasonable expense of the repair and we would ask that, or I

12   would ask on behalf of ConAgra, that you find, in fact, that

13   there was a contract and that there was a breach of that

14   contract and award ConAgra its repair damages and the

15   paperwork for those repairs will be back with you in chambers

16   and or in your deliberations for you to review.

17          Thank you for your time this morning.

18          THE COURT:  Thank you, Mr. Orlet.

19          Mr. Schultz, on behalf of West Side Salvage?

20          MR. SCHULTZ:  May it please the Court, ladies and

21   gentlemen, Mr. Orlet.

22          Once again, thank you for a month of your life

23   figuring things out.  Your verdicts yesterday showed that you

24   were thoughtful, you gave analysis to each claim independently

25   and you sent a message with your verdict.  On behalf of West

30

1    Side, I am here to tell you that message was received.  We

2    appreciate your time in rendering the verdicts.

3         Here we are on day 18, ConAgra still trying to shift

4    the blame to West Side now by saying there was fine print in a

5    contract that was faxed out before we started work and was

6    never returned.  I'll tell you, this is an easy decision for

7    you to make, but it is an important one, very important one.

8    That is why I am still here on behalf of my client.  We need

9    an answer to this question.

10        This isn't a situation you approach chronologically.

11   Here is how it came about.  A month after the accident on May

12   25th, Cathy Rihanek, which is the contract administrator at

13   ConAgra -- you heard her testimony.  We read it at the very

14   end, first deposition we read last day of trial.  Here is what

15   she said a month after the explosion.  "I determined we didn't

16   have a contract with West Side and ConAgra was not going to

17   pay West Side without a contract signed by both parties."  So

18   she called West Side and said unless you sign this contract

19   and we sign it, we're not going to pay you.  So she faxed it

20   on May 25th.  Gene Schwers faxed it back on May 25th, and then

21   when both parties had signed the contract, ConAgra paid West

22   Side.

23        Here we're on day 18 of trial after discovery has

24   taken place and all of the documents were produced and West

25   Side produced all of its documents, all of them, and in their

31

1   file was this contract signed by Ken Langham sometime ago, but

2   never returned.  ConAgra takes the position, which I contend

3   is border line ridiculous, but oh, we see a contract in your

4   file.  Even though you never sent it back to us, we're going

5   to hold you to the fine print in that contract.  Does that

6   seem right?

7         When it is their turn to pay, when it is their turn

8   to perform under the contract, they say we need both parties

9   to sign it.  But now they are saying, well, we have a

10  partially signed contract with a bunch of fine print.  We want

11  to hold you to that and have this jury find you in breach of

12  contract.  That is not right.  That is not what the law is.

13        The Judge read you the instructions.  ConAgra has the

14  burden of proving to you -- it is their burden now, no longer

15  the plaintiff's burden, burden is with ConAgra -- was there a

16  contract in effect on the date of this explosion, and there

17  was not, by ConAgra's own admission by Kathy Rihanek, we did

18  not have a contract with West Side.  ConAgra takes a position

19  there is only a valid contract when it is signed by both

20  sides, yet you heard this now, here we are on the last day,

21  let's see if we can stick them with the fine print on the

22  thing faxed to Ken Langham.

23        Ken Langham is a very nice fellow, but he had nothing

24  to do with the negotiations of this contract.  You heard how

25  this went down.  Ron Sumner went to the plant, Godfrey Friedt

1    wanted a quote.  Ron gave it to him on the phone and Godfrey

2    rejected it; oral, oral.  Then on the 3rd day of April, Ron is

3    out working at Cargill in the middle of Kansas, Godfrey calls

4    him up, orally, we want you to start.  Ron says we'll be out

5    in a couple of weeks, I'll send a crew; oral, oral.  That was

6    the only agreement these people had.  In fact, you heard Ron

7    Sumner say he even lowered the price at that time.  There was

8    no written agreement between Godfrey Friedt and Ron Sumner for

9    this work to start.  None.

10        The West Side crews mobilized, not in response to any

11   contract, but based on that oral discussion between Godfrey

12   Friedt and Ron Sumner, which contained no fine print trying to

13   shift the responsibility for what happened to West Side.  It

14   was an oral agreement.  There was not a contract.

15        So when you get to the questions that you need to

16   answer, the first two questions -- okay, let's look at the top

17   one.  The following question relates to Exhibit 93.  This is

18   the contract that was sent but never returned that has one

19   signature on it by a guy who wasn't even involved in the

20   negotiation of this contract.  They are trying to say this is

21   the binding document.  It isn't.

22        We're requesting, respectfully requesting of you, a

23   unanimous verdict in response to number one.  Did ConAgra

24   prove the attached was a contract in effect on April 27 of

25   2010?  We submit no.  That is a very important question that

1    we need you to answer.  All you have to do is remember what

2    Kathy Rihanek said.  ConAgra's position is there is only a

3    contract when both parties sign it.

4         Question two, did ConAgra prove there was a contract

5    in effect at any time?  Answer is no.  Very important question

6    for us.  If you answer no to both of those questions, your

7    deliberations are concluded.

8         I know you will give this due consideration and

9    thoughtful consideration, but it is really not a very

10   complicated issue to answer.  If you look at the position

11   Cathy Rihanek took in this case under oath, there was no

12   contract.  Now on the 25th she tells Gene Schwers, sign this

13   and send it back to get paid and he does it.  He doesn't agree

14   to any of the fine print in there.  That was never the

15   agreement between the parties on the day of the explosion or

16   after.  It was an oral agreement between Godfrey and Ron, send

17   a crew out, what's the price, and they did it.  If you answer

18   those two questions, your deliberations are over.

19        The other issue, and I have to address this.  I don't

20   think you will get this far in your deliberations, but it is

21   the last question.  If you find there was a contract, did

22   ConAgra present evidence of the reasonable expense of

23   necessary repairs to put them in the same condition they were

24   before the explosion?  They haven't.  That Dean Hoerning, who

25   took the stand, said we repaired the elevator, we put in an

34

1    improved, more efficient system, we even did different paths

2    and different routing.  That is their prerogative.  If, after

3    this explosion, they want to put in a better system that costs

4    4,000,000, so be it.  Don't blame us for it.  Under the law,

5    if you find there was a contract, all West Side had to do was

6    put it back in the condition it was before the explosion.

7           Interestingly, ConAgra is saying today West Side

8    should have remedied this problem and put us in the same

9    condition we were before the accident, but yet they never

10   asked.  They never asked us to.  Instead, they made the

11   decision to put in a new and improved, more efficient system,

12   that costs that much money.

13          So question seven, did they present evidence of the

14   reasonable cost of repair to put ConAgra in the position they

15   were before the explosion?  No, they put on evidence of a new

16   and improved system and it is not fair for them to come in

17   here and say now you got to pay for all of our improvements.

18   I think that is a basic common sense proposition.

19          On behalf of West Side, again, we want to thank you.

20   I will be here to receive your verdict and thank you for your

21   service regardless of what the verdict is.  Everyone in this

22   courtroom who is sitting here today is indebted to you and

23   much appreciated a month of your time.  Thank you very much.

24   We look forward to receiving your verdict.

25          THE COURT:  Thank you, Mr. Schultz.

1          Mr. Orlet, rebuttal?

2          MR. ORLET:  Just briefly, Your Honor.

3          Ladies and gentlemen, just a few follow ups to what

4     Mr. Schultz said.

5          Cathy Rihanek testified.  What she said, she said

6     that she didn't have a signed contract for purposes -- in her

7     file -- and for purposes of being able to cut a check, she

8     needed to have a signed contract so that they could, so that

9     she could pay them for their work.  She did not say we did not

10    have a contract.  She said she needed a signed contract.  If

11    you look at the instruction, and the answers to these

12    questions are in the instructions, and they say that both

13    parties do not have to sign a contract.  That is one of the

14    instructions you will see.  The other thing it says is that,

15    again, the performance, by doing acts requested in the

16    contract that you have received, that constitutes performance

17    or acceptance of the terms, and so I believe that the

18    evidence, which is what you have to look at, the evidence in

19    this case and the evidence establishes that, in fact, there

20    was an offer and there was acceptance either by signing the

21    contract or by going out and performing the work.

22          So I think that the question to -- the answer to

23    question number one is, in fact, yes, there was a contract,

24    and then you have to go through the rest of those.  I believe

25    the evidence establishes the remaining elements, that there

1   was a breach and there were damages.

2           I'll briefly address what Mr. Schultz said about

3   damages.  If you remember, Mr. Hoerning testified that, yes,

4   there were some -- there were, I believe he said that one of

5   the elevators was -- had a larger capacity.  He also testified

6   that the way that it was built today, rebuilt, was to bring it

7   up to codes.  They couldn't build it the way it had been built

8   back in the 60's.  They had to build it pursuant to the way

9   the codes were today.  That is the reason that there were some

10  changes made, but it was -- his testimony was it was

11  essentially the same, you know, served the same purpose.

12  Think about what Mr. Schultz is saying, that we should have

13  put -- we should have rebuilt it exactly the way it was.  Not

14  up to today's code, not using today's technology, that sort of

15  thing.

16          I was thinking about this.  The example would be I

17  have an older car it has dents in it and if somebody comes and

18  runs into me and my car is three years old and it has some

19  scratches and things, paint job is not perfect, I am entitled

20  to a new paint job I would think.  I wouldn't be entitled to

21  having, you know, when they make the repairs then they

22  wouldn't replace it exactly the way it was with the scrapes

23  and other things that were in there from the old paint job.  I

24  think that analogy works here.  You bring it up to -- you

25  bring the car up to date with a new paint job and that is

37

1   essentially what was done here.  I think that Mr. Hoerning's

2   testimony addressed that point, and I think that he did

3   establish the fair value of the cost of those repairs.

4        So once again, I want to thank you for your time here

5   this morning.

6        THE COURT:  Counsel, could I see you at side bar one

7   minute off the record?

8        (Whereupon a discussion was held off the record.  The

9   following proceedings were held in open Court.)

10       THE COURT:  Folks, if you give us a few minutes, I am

11  going to put together the exhibits for you, get the

12  instructions and verdict forms ready for you.  I will also

13  send back the green folder.  The attorneys agreed that I don't

14  have to read all of the instructions to you in the green

15  folder.  I can tell by the look on your faces you are relieved

16  I don't have to read to you anymore.  If you give me a few

17  minutes, go on back to the jury room and I'll be back.

18       (Whereupon the jury retires to deliberate.  The

19  following proceedings were held in open Court, in the presence

20  of the jury.)

21       THE COURT:  Okay, we're in open Court in the case

22  Jentz versus ConAgra, et al, and the subsection entitled

23  ConAgra versus West Side Salvage will be referred to as breach

24  of contract case.  I have been notified by the jury they

25  reached a verdict.  They are in open Court.

38

1          Juror number 14, has the jury reached a unanimous

2    verdict in this case consistent with the Court's instructions.

3          JUROR 14:  Yes.

4          THE COURT:  Please hand it to the Court security

5    officer.

6          Okay, the jury has answered to questions 1 and 2,

7    yes.  To question 3, yes.  To question 4A, yes.  Question 4B,

8    no.  Question 4C, D, E and F, yes.  Question 5A, no.  5B, yes.

9    5C, no.  5D, no.  5E, yes.  5F, yes.  Question 6, yes.

10   Question 7, yes.

11         Question 8; we, the jury, award ConAgra $3,000,000.

12   It is signed by the foreperson and the balance of the jurors.

13         Juror number 14, the foreperson, is this your verdict

14   now and was it when you signed it.

15         JUROR 14:  Yes.

16         THE COURT:  Juror number 2?

17         JUROR 2:  Yes.

18         THE COURT:  Number 3?

19         JUROR 3:  Yes.

20         THE COURT:  Number 5?

21         JUROR 5:  Yes.

22         THE COURT:  Juror 9?

23         JUROR 9:  Yes.

24         THE COURT:  Juror 12?

25         JUROR 12:  Yes.

39

```
 1              THE COURT:  Juror 16?

 2              JUROR 16:  Yes.

 3              THE COURT:  Juror 18?

 4              JUROR 18:  Yes.

 5              THE COURT:  Juror 24?

 6              JUROR 24:  Yes.

 7              THE COURT:  Juror number 26?

 8              JUROR 26:  Yes.

 9              THE COURT:  Counsel, if you would come to side bar I

10    will show you this.  I can't publish it that quickly.

11              Folks, your work is done.  On behalf of all of the

12    attorneys, the parties, my staff, I can't thank you enough.

13    You have given your time.  We have taken you from your fields,

14    factories, offices, but only in this country do we bring you

15    all together and have you decide a case as immensely important

16    as this one was to everybody.

17              I don't know if you ever thought in your life you

18    would ever get involved in making such an important decision.

19    I have to tell you I never thought I would be involved in

20    anything as important as happens here every single day.

21              We thank you, and I hope that by your deliberations

22    you know that if you are ever out here as a party, that the

23    jurors take this stuff real serious and the system, although

24    not perfect, does work and it is the envy of every country.

25    Counsel?
```

1          MR. CLIFFORD:  Yes, Your Honor, thank you.

2          Ladies and gentlemen, still good morning.

3          On behalf of the Jentz trial team and Mr. Jentz and

4    Mr. Schmidt, and I know Mr. Taxman and his colleagues are

5    here, we wanted to stick around.  We were going to stay until

6    you were done today out of pure respect and thanks to you for

7    your hard service.  All of those things we said during the

8    trial about the commitment to our democracy, the notion that

9    what you are doing is extraordinarily important to all of us,

10   I meant every single word of that.

11         The Renaissance Unity word of the day from my friend

12   who is trying to give me salvation is "steady", and staying

13   true to course.  It is really a very interesting thing to get

14   from him every day, but you were certainly steady and

15   committed to what you were doing.  And in the message it says,

16   "Stay steady and do not listen to words that deceive or

17   mislead and follow your own mind," and you certainly did that.

18   So these boys wanted to make sure that you knew that what you

19   did mattered and it did and we thank you.

20         THE COURT:  Mr. Taxman?

21         MR. TAXMAN:  If you have anyone on the jury that

22   doesn't want to talk, we respect that.  We're here if you have

23   any questions.  On behalf of Justin and Amber, Justin thanks

24   you from the bottom of his heart.  This took a lot out of him.

25   I think you guys know that.  He wanted to be here more to hear

41

1    the West Side and ConAgra testimony than to be here for the

2    verdict.  That was more important to him.  He finally went

3    back to Iowa.  He is home.  He thanks you.  Sean Murray, Julie

4    Levinson thanks you, and any questions you have, we're here.

5            THE COURT:  Here is what I would like to do, folks.

6    I know you have been given part of the tour early on.  Your

7    food is not here, but it will be shortly.  What I would like

8    to do is show you the rest of the tour which you have not

9    seen.  It will take a couple of minutes.  If any of you want

10   to stay and talk to the attorneys before your food -- I'll

11   give you the rest of the tour and anyone who wants to talk to

12   the attorneys, I'll bring you back out here.

13

14

15

16

17

18

19

20

21       (Court is adjourned.)

22

23        I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.

24

     SS/Barbara Kniepmann                    June 13, 2012

25