IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOHN W. JENTZ, JUSTIN BECKER, AMBER BECKER and ROBERT SCHMIDT,<br><br>           Plaintiffs,<br><br>v.<br><br>CONAGRA FOODS, INC., et al.,<br><br>           Defendants. | )<br>)<br>)<br>)<br>)<br>)   Case No. 10-cv-0474-MJR-PMF<br>)<br>)<br>)<br>)<br>)<br>) |

MEMORANDUM AND ORDER DENYING CONAGRA'S POST-TRIAL MOTION (Doc. 515)

REAGAN, District Judge:

I.     Introduction

This consolidated action arises from a grain bin explosion that occurred at Defendant ConAgra Foods, Inc.'s, facility in Chester, Illinois, on April 27, 2010. Plaintiff Justin Becker, an employee of Defendant West Side Salvage, Inc., and Plaintiffs John Jentz and Robert Schmidt, employees of A&J Bin Cleaning, Inc.,[1] were severely injured when the explosion occurred.  Plaintiff Amber Becker, Justin's wife, filed suit for loss of consortium.[2]   A jury found in favor of Plaintiffs and awarded compensatory and punitive damages.

Following the jury verdict, four post-trial motions were filed.  The Court now takes up the first of these, ConAgra's motion, brought pursuant to Rules 50(a),

---

[1] On May 8, 2012, the Court granted A&J's motion to dismiss (Doc. 316) and the Beckers' and A&J's joint motion for good-faith finding (Doc. 318), which resulted in dismissal with prejudice of all claims against A&J (Docs. 320, 321).
[2] Both West Side and A&J were subcontractors of ConAgra, retained to salvage from ConAgra's Bin C-15 a byproduct of the wheat milling process.

and 59(a) and (e) of the Federal Rules of Civil Procedure, which seeks the following relief:

> (a)   judgment in ConAgra's favor and against all plaintiffs as to plaintiffs' claims, or in the alternative, as to plaintiffs' claims for punitive damages;
>
> (b)   judgment in ConAgra's favor and against West Side as to ConAgra's claims and West Side's claims;
>
> (c)   alternatively, a new trial as to all issues of liability and/or damages in the case;
>
> (d)   in the further alternative, a remittitur of the verdicts to the following amounts: Justin Becker [$8 million compensatory (prior to adjustment) and $0 punitive]; John Jentz [$12 million compensatory (prior to adjustment) and $0 punitive]; and Robert Schmidt: [$750,000 compensatory (prior to adjustment) and $0 punitive]; and
>
> (e)   such other and further relief that this Court deems just.

II.   <u>Whether ConAgra is entitled to judgment as a matter of law on liability and punitive damages</u>

    A.   <u>Liability</u>

ConAgra asserts that there is no basis for a reasonable jury to find liability as a matter of law because (1) it owed no legal duty to persons hired to remediate dangerous conditions with respect to those very conditions, who assumed the risk of harm; (2) even if ConAgra did owe Plaintiffs an overarching duty to protect them from the very harm they were hired to remediate, ConAgra did not breach that duty; and (3) even if ConAgra owed Plaintiffs a duty and breached that duty, the breach was not the proximate cause of Plaintiffs' injuries. ConAgra contends that, for these same reasons, there is no basis for a reasonable

jury to find the heightened standard for punitive damages satisfied as a matter of law.

Rule 50 of the Federal Rules of Civil Procedure allows a district court to enter judgment against a party who has been fully heard on an issue during a jury trial if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." **Fed.R.Civ.P. 50(a) (motion for judgment as a matter of law), (b) (renewed motion for judgment as a matter of law)**. Under Rule 50(b) a court may "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law."

The contours of applicable law were defined by the Seventh Circuit Court of Appeals in *Passananti v. Cook County*, **689 F.3d 655 (7th Cir. 2012)**. Therein, the Court stated, "In deciding a Rule 50 motion, the court construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence." *Passananti*, **689 F.3d at 659 (citing *Tart v. Illinois Power Co.*, 366 F.3d 461, 464 (7th Cir. 2004), citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000))**. "The court does not make credibility determinations or weigh the evidence." *Id.* **(citing *Waite v. Bd. of Trs. of Illinois Comm. College Dist. No. 508*, 408 F.3d 339, 343 (7th Cir. 2005), citing *Reeves*, 530 U.S. at 150)**. The court reviews the entire record but "'must disregard all evidence favorable to the moving party that the jury [was] not required to believe.'" *Id.* **(quoting *Reeves*, 530 U.S. at 151)**. "Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion." *Id.*

(citing Fed.R.Civ.P. 50(b), comm. note (2006 amend.); see also *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 404-05 (2006) (party forfeited argument not presented in a Rule 50(a) motion and not renewed in a Rule 50(b) motion)).

### 1.   Duty of care – Waiver

On May 24, 2012, ConAgra filed a Rule 50(a) preverdict motion for judgment as a matter of law with supporting memorandum (Docs. 391, 392).  After hearing argument on the motion on May 25, 2012, the Court briefly took the motion under advisement, then denied it in its entirety (Doc. 407).  Plaintiffs contend that ConAgra did not raise the issue of duty of care in its Rule 50(a) motion and, consequently, the issue is forfeited.

ConAgra asserts that the issue is preserved because it argued in both its summary judgment memorandum and its Rule 50(a) motion and memorandum that it owed no duty to Plaintiffs.

The Court has reviewed the relevant documents and finds that, in ConAgra's memorandum in support of its Rule 50(a) motion, the company raised the following issues.  First, ConAgra argued that it was entitled to judgment as a matter of law on punitive damage counts because its conduct did not constitute "willful and wanton" behavior.  Second, ConAgra contended that its prior conduct should not be considered when determining the negligence and proximate causation of Plaintiffs' injuries by West Side.  There, ConAgra argued that, under Illinois case law, a service provider must deal with the conditions presented to it, and it is irrelevant that the conditions might have been different or the job easier if the company had retained

4

the provider earlier.   According to ConAgra, once West Side started the job, it became West Side's duty to exercise ordinary care in dealing with the situation. Finally, ConAgra asserted that West Side's actions were the sole proximate cause of Plaintiffs' injuries.   ConAgra maintained that the bin (Bin C-15) did not explode until the eighth day that West Side was on the job and after West Side had actual knowledge of the heat in the remaining pellets.

Leaving aside the question of whether ConAgra preserved this issue by raising it in its summary judgment motion, generally, under **Passananti**, only the above cited issues may be raised by ConAgra in its Rule 50(b) motion.   And this is sufficient.  Although not specifically styled "ConAgra did not owe a duty to Plaintiffs," the substance of ConAgra's Rule 50(a) argument, in part, goes to whether ConAgra owed a duty of care to Plaintiffs.   ConAgra asserted that it owed no duty at all because the conditions that existed before West Side started the job were irrelevant in determining negligence and proximate causation.   Citing **Bd. of Trs. of Cmty. Coll. Dist. No. 508 v. Coopers & Lybrand, 803 N.E.2d 460 (Ill. 2003),** ConAgra contended that "[w]hen a client hires a service provider to remedy a problem, the client's conduct prior the provider's start of work may not be considered in determining negligence" (Doc. 392, p. 14).  In other words, ConAgra argued that the duty owed to Plaintiffs did not rest with ConAgra but was squarely on the shoulders of West Side, and it was West Side only which owed a duty of care to Plaintiffs.  In sum, ConAgra did not waive the argument that it had no duty to Plaintiffs.

       2.    <u>ConAgra's duty of care:  assumption of risk, premises liability, open and obvious danger, deliberate encounter exception</u>

ConAgra correctly asserts that it is not an insurer of the safety of all invitees on its property.  In essence, ConAgra contends that it had no duty to protect Plaintiffs from the very harm that they were invited to the premises to remediate and that, even if it had such a duty, Plaintiffs would still be deemed to have assumed the risk of a grain-elevator fire.  ConAgra points out that courts have applied the long-established "firefighters rule" to contractors, *i.e.,* a landowner must exercise reasonable care to prevent injury that might result to the contractor from a cause independent of the work to be performed but has no duty to prevent injury from the very danger that was inherent in that work.  Moreover, ConAgra maintains that Plaintiffs continued to work in the presence of an open danger which amount to an implied agreement to assume the risk of the danger.

As to this latter contention, ConAgra impermissibly treats assumption of risk as if it were an element of duty of care.  But under Illinois law, assumption of risk is "an entirely distinct concept."  ***LaFever v. Kemlite Co., a Div. of Dyrotech Indus., Inc.,* 706 N.E.2d 441, 448 (Ill. 1998) (characterizing assumption of risk as a concept distinct from a determination of duty)**.  Consequently, whether ConAgra had a duty of care is not dependent on a determination of assumption of risk.

Furthermore, Plaintiffs did not assume the risk that the bin would explode and that they would suffer severe burns on this job.  As the Court previously found, since the deliberate encounter exception applies to Plaintiffs' conduct, ConAgra is not excused from its legal duty.  As reasonable persons, Plaintiffs made a deliberate choice to encounter the hazard because they could not otherwise do their jobs and that choice was reasonably foreseeable by ConAgra.  ***See Kleiber v.***

6

*Freeport Farm and Fleet, Inc.,* **942 N.E.2d 640, 648 (Ill.App.Ct. 2010) (citations omitted).**

Illinois has adopted the rules set forth in sections 343(a) and 343A of the Restatement (Second) of Torts regarding the duty of possessors of land to their invitees. *Rusch v. Leonard,* **927 N.E.2d 316, 324-25 (Ill.App.Ct. 2010) (citing Restatement (Second) of Torts §§ 343(a), 343A (1965)).** "[A] possessor of land owes its invitees a duty of reasonable care to maintain the premises in a reasonably safe condition. *Id.* **(citing Restatement (Second) of Torts § 343(a) (1965) (additional citation omitted)).** Under § 343A(1), a possessor of land cannot be liable for an invitee's injury if the condition that caused the injury was known or obvious to the invitee. *Id.* **(citing Restatement (Second) of Torts § 343A(1) (1965)).** Even if a danger is open and obvious, a landowner may still be liable if either the deliberate encounter or the distraction exception applies. *Rusch,* **927 N.E.2d at 324 (citation omitted).**

Here, ConAgra is the owner of the property and has conceded that a dangerous condition existed when West Side arrived at the job site. *See* Doc. 515, p. 2, ¶ 2. Evidence adduced at trial could lead a reasonable jury to conclude that ConAgra created the dangerous condition by, *inter alia,* not cleaning the grain bin for 17 years and by allowing pellets to be stored that were too hot and too wet. ConAgra's expert, Dr. Robert Schroeder, testified that prior to the discovery of the problem, ConAgra did a "less than exemplary job" of managing and understanding what was going on in its bins. Doc. 368, Schroeder Trans., 5/21/12 p.m., at 144:4-8. He testified that ConAgra failed to have monitoring equipment available that would

have assisted in evaluating the bin. According to Schroeder, ConAgra was aware that there were problems with the bin as early as December 2009 or January 2010. *Id*. at 109:2-19. Schroeder testified that he believed that "cold wall phenomena" caused the hot bin. But he also stated that prior to the explosion, ConAgra had concluded that to avoid a recurrence of the problem only pellets at the right temperature and moisture level should be placed in the bins, and bins should be cleaned more frequently. *Id*. at 109:5-14; 235:20-24.

Furthermore, the jury heard evidence that ConAgra's elevator operator, Sean Belcher, noticed a burning smell, saw smoke, was aware of elevated temperatures and referred to the bin as a "barbecue pit" weeks before West Side's arrival, but he did not inform West Side Salvage of his observations. Doc. 346, Belcher Trans., 74:5-77:11. Belcher also acknowledged that ConAgra's contractor work rules provided, "Contractor and its subcontractors shall be informed of the known or potential fire or explosion hazards that would be related to the contractor's work and work areas. ConAgra and its subcontractors will conduct their work in a manner that does not increase these hazards." *Id*. at 79:18-24.

Plaintiffs had no special training in firefighting or in dealing with hot bins. They were simply laborers hired to remove and salvage the pellets from Bin C-15. Plaintiffs Jentz and Schmidt were hired to remedy the condition in the bin only to the extent that they operated a bin whip. The jury could have believed that they had no knowledge of the risk of explosion encountered on this job, particularly since people who had authority over the condition of the bin and who were responsible for safety on the ConAgra site, *e.g*, Godfrey Friedt, ConAgra's director of elevator

operations, and Anthony Yount, ConAgra's director in charge of environment, health and safety measures, did not shut the site down, call for an evacuation or place a timely 911 call to the fire department before the explosion.

For these reasons, a jury could reasonably conclude that ConAgra knew for weeks before Plaintiffs arrived at the site that the bin was dangerous and could explode but did not warn its subcontractor West Side or Plaintiffs of that danger.  The jury could reasonably conclude that ConAgra, as landowner and as creator of the danger, did nothing to protect Plaintiffs from the danger, and, consequently, failed in its duty of care.

Illinois law does not require a different conclusion and does not hold, as ConAgra argues, that a landowner does not owe a duty to a contractor whose injuries stem from the work he is performing on the premises.  *See e.g.*, *LaFever*, **706 N.E.2d at 448 (finding landowner owed duty to contractor who was injured when he slipped on material he was hired to remove);** *Morrissey v. Arlington Park Racecourse*, *LLC*, **935 N.E.2d 644 (Ill.App.Ct. 2010) (landowner owed duty to horse trainer where it could have anticipated that the plaintiff would deliberately encounter the open and obvious condition in order to do his job);** *Cihon v. Cargill*, **Inc., 689 N.E.2d 153, 158 (Ill.App.Ct. 1997) (citation omitted) (landowner, which controlled the work area and knew workers used unsecured plank to access construction site, owed a duty to contractor because it had reason to expect that the plaintiff would proceed to encounter the known or obvious danger "because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk").**

The jury could then conclude that ConAgra violated its duty of care to maintain the premises in a reasonably safe condition.  First, the jury could conclude that the danger was not open and obvious.  Second, the jury could also conclude, or conclude in the alternative. that Plaintiffs could not do their jobs without working in and around the bin.

As set forth above, the jury could properly find that the danger was not open and obvious because of the conduct of men such as Friedt, who delayed calling the fire department and did not evacuate the site, and Mel Flitsch, West Side's foreman, who sent Jentz and Becker back into the tunnel to remove their equipment when the explosion was imminent.  If the danger were open and obvious, a reasonable jury could scarcely conclude that these men would have found such risks acceptable.

Even if the risk were open and obvious, Plaintiffs could not do their jobs without working in and around the bin, so the deliberate encounter exception applies. *LaFever* 706 N.E.2d at 448 **(the plaintiff was injured when he deliberately encountered a work area covered with very slick materials)**.  "Under the deliberate-encounter exception, the open and obvious danger rule will not apply if the possessor of land has reason to anticipate or expect that the invitee will proceed to encounter an open and obvious danger because to a reasonable person in the invitee's position the advantages of doing so outweigh the apparent risk." ***Kleiber v. Freeport Farm and Fleet, Inc.*, 942 N.E.2d 640, 648 (Ill.App.Ct. 2010) (citations omitted)**.  "The deliberate-encounter exception recognizes that individuals will make deliberate choices to encounter hazards when faced with employment concerns and that those encounters are reasonably foreseeable by possessors of property." ***Id***.

10

**(citations omitted)**.    The focus in this analysis is on what the landowner anticipates or should anticipate the invitee will do. *Id*. **(citations omitted)**.

ConAgra contends that it could not have foreseen Plaintiffs' injuries as a likely result of its conduct.  Notwithstanding any alleged fault on its part, ConAgra argues that Flitsch placed Jentz and Becker in a position of great danger after they had evacuated and were in a position of safety.  ConAgra also points out that it is common knowledge that one should never re-enter a burning building.

The evidence is that West Side was hired by ConAgra to salvage the pellets from Bin C-15.  Plaintiffs had no choice but to work in and around the bin in order to do that job.  ConAgra was aware of the hazard the bin presented and could anticipate that Plaintiffs would encounter it.   Ample evidence supports the jury's finding that ConAgra owed a duty of care to Plaintiffs.

### 3.    Breach of duty and proximate cause

ConAgra claims that even if it owed a duty of care to Plaintiffs, no reasonable jury could have found that it breached that duty.  ConAgra argues that Plaintiffs came to the danger of their own volition, as part of their employment for companies that engaged in this dangerous kind of work.  ConAgra asserts that it did not direct West Side's remediation operations and that the bin was safe for remediation when West Side began its work.  According to ConAgra, if additional safety precautions were needed, then West Side should have implemented them because West Side did not need ConAgra's permission to implement those precautions or to call the fire department.

The jury heard evidence, however, that the bin was *not* in a safe condition when West Side began its operations and that ConAgra's almost six-week delay in addressing the problem exacerbated the danger.  ConAgra was aware of a problem in the bin on March 12, 2010, six weeks before the explosion.  According to the testimony of Plaintiffs' expert, Dr. Russell Ogle, on that date, under its own rules, ConAgra should have gotten everyone out and called the fire department.  Doc. 339, 5/14/12 a.m., Ogle Trans., at 55:21–56:16.  He testified that ConAgra has a one-man, one-fire-extinguisher rule, which requires employees to get out if a fire cannot be extinguished at a low level.  *Id*.  Dr. Ogle testified that "nothing good ... can come from letting a fire continue to burn."  *Id*. at 50:9-10.  Dr. Ogle noted that the exhibit shown to the jury revealed soot lines around the tops of the bins, indicating that ConAgra's attempt to extinguish the fire by shutting off oxygen to it was ineffective since not all openings to Bin C-15 were blocked.  *Id*. at 50:10-14.  Dr. Ogle testified that waiting increased hazards because (1) it allowed continued growth of the fire; (2) smoldering tends to grow in different directions so that multiple smoldering areas – or nests – could occur; and (3) waiting causes the material to char and become harder, like concrete, so it becomes more difficult to get out, and workers are exposed to the potential for a fire and explosion for a longer period of time.  *Id*. at 50:14-51:3.

The evidence showed that Ronald Sumner, West Side's Executive Vice-President, was on the site in Chester on March 13 and could have mobilized immediately, but ConAgra made a business decision to seek a cheaper contractor than West Side.  This decision resulted in a delay of almost six weeks.  During this period,

ConAgra employees recorded high temperatures and other signs of fire in Bin C-15, but, according to Sumner, this information was not passed along to him.  Doc. 332, Sumner Trans. at 209:6-10.  Sumner further testified that Friedt told him in March to hold off mobilizing because the bin was cooling off and settling down, but, in the first part of April, Friedt asked him about the possibility of mobilizing because the bin was warming up again.  *Id.* at 210:21-211:25.  Additionally, Dr. Schroeder testified that ConAgra did not share with West Side and A&J the data it had collected prior to their arrival.  Doc. 368, Schroeder Trans. 225:4-226:5.  From this evidence, the jury could reasonably conclude that ConAgra was less than honest and forthcoming with West Side and A&J in describing the condition of the bin.  As a result, West Side and A&J may have been less prepared for the conditions its employees would face in attempting to salvage the pellets.  The jury may have also understood and believed that West Side and A&J came to the site to salvage pellets and not to fight a grain bin fire.  The jury may have reasoned that fire suppression and not grain salvage should have been the order of the day.

ConAgra relies on the audit inference doctrine to support its assertion that any negligent conduct attributed to it prior to West Side's work did not create an issue of fact as to breach of duty.  ConAgra asserts that a service provider must deal with the conditions presented to it and that it is irrelevant that conditions might have been different or the job easier, or that the client caused the condition the provider has come to remedy.

Under the audit inference doctrine, discussed by the Illinois Supreme Court in ***Coopers & Lybrand***, the Board of Trustees of Community College District No.

508 sued the defendants, the accounting firms of Coopers & Lybrand and Arthur Andersen, for failure to discover and report the inappropriate investments made by a treasurer and chief financial officer. **803 N.E.2d at 462**. Coopers claimed that the Board itself was negligent by failing to properly oversee a treasurer notwithstanding the Board's knowledge of possible investment policy violations. *Id*. **at 463.** The court determined that a client's poor business practices could not be asserted as a defense to an auditor's negligent failure to uncover inappropriate conduct. *Id*. **at 468**.

The court drew upon its reasoning in *Owens v. Stokoe*, **503 N.E.2d 251 (1986),** to clarify its analysis. In *Owens*, the court found that a patient with an abscessed tooth could fully recover against a dentist who commited malpractice. Although the patient created the condition, his conduct did not cause the malpractice. In other words, to reduce an award of damages, the patient's negligence must have been a proximate cause of his injuries. *Id*. **at 467**.

Casting ConAgra in the role of "plaintiff" in the above scenario, the Court observes that the audit inference doctrine does not prevent the jury from considering that a plaintiff's conduct was "a proximate cause of the injuries." *Id*. **at 467**. Consequently, under this doctrine, the jury could evaluate the evidence and decide that ConAgra's conduct was negligent and was a proximate cause of the explosion and the injuries Plaintiffs suffered.

Ample evidence supports the jury's finding that ConAgra proximately caused the injuries to Plaintiffs. The jury could reasonably believe that ConAgra had not cleaned the bin in 17 years and stored pellets that were too hot and too wet. Indeed ConAgra admits to creating the danger in its brief: "Where *ConAgra's conduct*

14

*merely created the condition* that service-provider West Side was retained to remedy" (Doc. 515, p. 8) (emphasis added).  Beyond creating the danger, ConAgra was aware of rising temperatures in the bin for approximately six weeks - from March 12 until April 27 -and failed to call the fire department in spite of clear signs that a fire was present.  The jury could have concluded that ConAgra's delay in addressing the problem allowed the smoldering in the bin to escalate to an extremely dangerous, volatile condition.  According to Dr. Ogle, "If ConAgra had cleaned Bin C-15 more frequently, removing caked pellets from the bin well, and properly controlled the temperature and moisture content of the pellets, the self-heating process and, ultimately, this accident would have been prevented."  Doc. 339, Ogle Trans., at 66:17-21.

Dr. Ogle explained that a fire was clearly present on March 12 when the first signs were observed:  a burnt odor, smoke and blackened pellets.  *Id.* at 18:23–19:6.  He testified that on March 13, in addition to these indicators of fire, a combustible gas indicator lowered into the bin showed that a combustion process was producing carbon monoxide and reducing levels of oxygen in the bin.  *Id.* at 19:10-21.  Furthermore, a temperature gun showed that the pellets were hot.  *Id.* at 19:21-25.  Lastly, on March 13, a ConAgra employee, Mr. Weibrecht, looked down into the bin and saw two patches of glowing embers.  *Id.* at 20:1-4.  Dr. Ogle summed up that by March 13, there were seven warning signs that combustion was occurring in Bin C-15. *Id.* at 20:4-5.

Dr. Ogle testified that because the carbon monoxide level was far below the explosive limit on March 13, the bin could not have exploded at that time and the

pellets could have been safely removed.  *Id*. at 20:17-21:5.  Consequently, the jury could have reasonably concluded that ConAgra ignored its own safety rules, favored finances over safety, and chose to allow the risk of fire and explosion to rise while it attempted to salvage the pellets and avoid damage to the bin.

The jury was entitled to believe Dr. Ogle's testimony over that of ConAgra's expert, Dr. Schroeder.  Dr. Schroeder opined that it was not ConAgra's continuing to operate the elevator – dumping grain trucks, running the dust collector or operating the legs - that caused West Side to lose control of the bin but rather West Side's actions and inactions on the afternoon of April 27 led to the explosion and injuries.  *Id*. at 74:18-23.  But Dr. Ogle disagreed, stating that running the dust collectors created an additional mechanical draft that caused more fresh air to turn into steam, essentially blowing air on the fire.  *Id*. at 75:7-12.

Moreover, evidence supported a finding that ConAgra maintained control of the situation, including whether to call the fire department or to evacuate.  While ConAgra asserts that West Side's employees, such as Flitsch, could have done these things, the jury could have concluded that everyone on the site deferred to ConAgra's Friedt to make those decisions and that it was he who was at all times in charge of the site.  Additionally, evidence was presented that Friedt was on the phone several times on April 27th prior to the explosion talking with Anthony Yount, ConAgra's safety director.  Dr. Schroeder testified that he would agree with an expert – and in fact was the expert – who said that "Yount had two lifetimes, … in the course of this thing on April 27, 2010, to shut this down, get everybody out so everybody would be safe."  Doc. 368, Schroeder Trans., at 203:16-204:1.  Dr. Schroeder agreed that there

16

was a chain of command at the elevator site and that ConAgra was at the top of that chain.  *Id.* at 211:3-6.  He also agreed that ConAgra was never relieved of its safety responsibilities, safety principles, dictates and authority at any time.  *Id.* at 213:7-12.

ConAgra asserts that it was not the cause of Jentz's and Becker's injuries because there was no reason for them to be in the tunnel after they had evacuated to a place of safety and no reason for ConAgra to anticipate that West Side would send them there.  According to ConAgra, the sole proximate cause of Plaintiffs' injuries was that West Side's Mel Flitsch sent them back into the tunnel.  However, as Dr. Ogle testified, there was no need for Plaintiffs to be in the tunnel at any time.  Dr. Ogle testified that there was controversy over exactly why the pellets were removed by way of the tunnel rather than from the outside.  *Id.* at 70:19-20.  But Dr. Ogle noted that Flitsch "said it was his understanding they were not allowed to remove pellets from the outside because that would interfere with the operation of the truck bin, which means [ConAgra] wouldn't be able to run the mill. And so they were asked to remove the pellets from inside the tunnel so [ConAgra] could continue to receive trucks at the truck scale."  *Id.* at 70:20-71:3.  Dr. Ogle testified that removing the pellets from outside the bin by punching a hole in the side of it and drawing out the pellets was a much safer practice, and no one would have ever had to go into the tunnel.  *Id.* at 68:12-16.  ConAgra's expert, Dr. Schroeder, agreed that it was ConAgra's preference that the grain be salvaged from the basement rather than outside.  Doc. 368, Schroeder Trans, at 174:17-21.  The jury could have reasonably concluded from this testimony that ConAgra, by not allowing Plaintiffs to remove the pellets in the least hazardous manner, prioritized money over safety.

In sum, ConAgra had a fair opportunity to convince the jury that some entity or individual other than the company itself was responsible for the explosion and resultant injuries.  The jury heard all of the evidence and apportioned the fault among ConAgra, West Side, Becker and Jentz.  The jury found that nothing exculpated ConAgra from its conduct leading up to the explosion.  The jury determined that ConAgra had proximately caused Plaintiffs' injuries, and this determination is consistent with evidence offered at trial.

      B.   <u>Punitive damages</u>

ConAgra asserts that the Illinois Supreme Court has set a high bar for obtaining punitive damages.  ConAgra quotes *Loitz v. Remington Arms Co., Inc.*, **563 N.E.2d 397 (Ill. 1990),** which provides that punitive damages may only be awarded if a tort is committed "with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others."  **563 N.E.2d at 402**.  ConAgra maintains that the evidence submitted to the jury was legally insufficient to support punitive damages.  ConAgra asserts that evidence that it failed to regularly clean the bin and prematurely loaded pellets into it is evidence of negligence at worst, particularly since the bin exploded while in the course of remediation by experts hired to address the issue.  ConAgra contends that it made a good-faith effort to seal the bin, as recommended by West Side's Ron Sumner.  ConAgra disputes that Sumner told its employees that the bin was a "ticking time bomb."  Moreover, ConAgra asserts that it was entitled to seek a lower bid and that any negligent delay in not immediately hiring West Side does not support punitive damages.  According to ConAgra, its

conduct prior to West Side's arrival – taking temperature readings, not reporting temperatures to West Side, the missing temperature records – are non-issues as to punitive damages.  ConAgra contends that Flitsch did not tell Friedt that West Side was fighting a fire in the bin, and that Flitsch could have called the fire department and had a duty to do so.  Finally, ConAgra argues that its safety interests and those of Plaintiffs were aligned since, from a purely business perspective, ConAgra had an incentive not to be reckless.

As ConAgra points out, under *Loitz***,** punitive damages are appropriate only for "conduct involving some element of outrage, similar to that usually found in crime."  **563 N.E.2d at 402**.  But *Loitz* also provides that punitive damages may be awarded if the defendant's conduct qualifies as "gross negligence" or "reckless indifference to the rights of others."  *Id*.  The conduct at issue must go beyond "mere inadvertence, mistake, errors of judgment and the like, which constitute ordinary negligence."  *Id*. **(citing Restatement (Second) of Torts § 908, comment *b*, at 465 (1979)).**  But "a reckless disregard for plaintiff's rights" is sufficient to support punitive damages, albeit at "the low end of the scale."  *Slovinski v. Elliot***, 927 N.E.2d 1221, 1228 (Ill. 2010).**

A reasonable jury could conclude, based on the evidence presented at trial, that ConAgra created the danger in the bin, delayed remediating the problem, failed to inform West Side and A&J of the seriousness of the bin's condition, and delayed calling the fire department and evacuating the area.  The jury could have also reasonably concluded that ConAgra was motivated to place money above safety where it searched for a cheaper salvage company, required Plaintiffs to use the

tunnel to remove the pellets rather than creating a hole in the bin and shutting down access to the site, delayed calling the fire department so that pellets could be salvaged rather than soaked, and continued to dump grain at the facility even though using the dust collector increased airflow to the fire.  A reasonable jury could – and did – find this conduct to be either grossly negligent or indicative of a wanton disregard for the rights of others, or both, such that the imposition of punitive damages was justified.

ConAgra next asserts that the standard of proof applicable to a claim for punitive damages in Illinois is clear and convincing evidence.  The Court need not tarry long over this issue, which was already vigorously argued and decisively ruled upon.  The Illinois Supreme Court, in *Best v. Taylor Machine Works*, **689 N.E.2d 1057 (1997)**, declared unconstitutional 735 ILCS 5/2-1115.05(b) (West 1996), which required plaintiffs to demonstrate by clear and convincing evidence that punitive damages were appropriate.  Furthermore, the Seventh Circuit Court of Appeals recently took note of "the Supreme Court's insistence on a presumption in favor of the less onerous standard of preponderance of the evidence in federal civil cases." *S.E.C. v. First Choice Management Services, Inc.*, **678 F.3d 538, 544 (7th Cir. 2012) (citing *Grogan v. Garner*, 498 U.S. 279, 286 (1991); and *Herman & MacLean v. Huddleston*, 459 U.S. 375, 387-391 (1983)).** The United States Supreme Court explained that exceptions to this general rule are uncommon and are ordinarily recognized only when taking unusual coercive action - action more dramatic than imposing an award of money damages or other conventional relief.  *Price Waterhouse v. Hopkins*, **490 U.S. 228, 253 (1989).** The imposition of punitive

20

damages is a conventional form of monetary relief.  Consequently, this Court properly applied the preponderance standard to the punitive damages claims presented to the jury.

C.     ConAgra/West Side's claims

ConAgra asserts that because it is entitled to judgment as a matter of law against Plaintiffs, it is also entitled to judgment as a matter of law as to West Side's contribution claims, its negligence claim for property damages and its indemnity claim against West Side.  ConAgra argues that a jury trial is not needed on these issues because the jury found West Side liable for breach of contract.  In consequence, according to ConAgra, only the amount of attorney's fees and costs to which ConAgra is entitled remains to be determined.

The Court is unaware of any precedent – nor, notably, has ConAgra provided any precedent – whereby the Court can enter judgment as a matter of law in a party's favor with respect to claims that were not actually submitted to, much less decided by, the jury.   In these circumstances, ConAgra cannot be entitled to judgment as a matter of law on its negligence and indemnity claims.

As set forth above, a legally sufficient evidentiary basis exists such that a reasonable jury could find for Plaintiffs and against ConAgra.  Moreover, ConAgra cannot succeed on claims it failed to pursue at trial.  Accordingly, ConAgra is not entitled to judgment as a matter of law on the bases here asserted.

III.    Whether ConAgra is entitled to a new trial on liability and damages

A.     Liability

FEDERAL RULE OF CIVIL PROCEDURE 59(a) provides that in any action where there has been a jury trial, a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court;…"  That language has been interpreted to mean that a district court may grant a new trial only if the jury's verdict is against the clear weight of the evidence or the trial was unfair to the moving party.  *Whitehead v. Bond*, 680 F.3d 919, 927-28 (7th Cir. 2012) (citing *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011)).  "A new trial should be granted … 'only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.'" *Id.* at 928 (quoting *Clarett*, 657 F.3d at 674).  "[A] court will set aside a verdict as contrary to the manifest weight of the evidence only if no rational jury could have rendered the verdict." *Id.* (quoting *Marcus & Millichap Inv. Servs. of Chi., Inc. v. Sekulovski*, 639 F.3d 301, 313-14 (7th Cir. 2011) (quotations omitted); *see also Galvan v. Norberg*, 678 F.3d 581, 589 (7th Cir. 2012)).

ConAgra contends that the judgment for Plaintiffs and against ConAgra as to liability for compensatory damages is against the manifest weight of the evidence because ConAgra did not owe a duty of care, was not at fault and was not a proximate cause of Plaintiffs' injuries.  As discussed above, ConAgra's arguments as to duty, breach of duty and proximate cause fail because a reasonable jury could have rendered the verdict for Plaintiffs and against ConAgra on these issues.

ConAgra next contends that the judgment for Plaintiffs and against ConAgra as to liability for punitive damages is against the manifest weight of the

evidence.   ConAgra makes no fresh arguments but merely incorporates the contentions set forth in its motion for judgment as a matter of law.  The Court thoroughly analyzed this issue, *supra*, and will not revisit it.  *See* II.B., pp. 18-20. Rulings made by the Court on this issue are supported by case law and the facts; the finding by the jury that ConAgra's conduct was outrageous so that the imposition of punitive damages was justified is supported by legally sufficient evidence.

ConAgra next contends that the jury's findings of contributory negligence as to Schmidt (0%), Jentz (1%) and Becker (5%) are against the manifest weight of the evidence.  Specifically, ConAgra asserts that Schmidt was fighting a fire for hours without contacting ConAgra or calling the fire department. ConAgra submits that Becker and Jentz returned to the tunnel even after they were evacuated from the work area and that they were aware on the morning of April 27 that hot embers were corning out of the chute in the area under the bin Lastly, ConAgra submits that Becker admitted that he had been taught all of his life not to go into a building that is on fire.

The jury's verdict is not against the manifest weight of the evidence. Dr. Schroeder, ConAgra's retained expert, was not critical of Jentz or Becker for following Flitsch's order to return to the tunnel.  He stated that he was "[z]ero percent" critical of these Plaintiffs.  Doc. 368, Schroeder Trans., at 161:23-162:7. Schroeder also gave Schmidt "a lot of credit" for taking steps to get his co-workers out of danger.  *Id.* at 116:11-17.  Schroeder testified that Schmidt is a good guy who did the right thing.  *Id.* at 127:6-9.  Schroeder's review of the case and Schmidt's

actions led him to state, "I can't emphasize this enough:  I give him kudos for his actions of April 27th."  *Id.* at 127:10-14.  In sum, the testimony of ConAgra's own expert supports the jury's findings of contributory negligence as to Schmidt (0%), Jentz (1%) and Becker (5%).  The varying percentages are indicative of careful and deliberate review of each Plaintiff's actions.   This Court will not disturb that determination.

     ConAgra also contends that the allocations of fault between ConAgra and West Side (Becker: 51% ConAgra and 44% West Side; Jentz: 54% ConAgra and 45% West Side; Schmidt:  65% ConAgra and 35% West Side) are against the manifest weight of the evidence.   ConAgra submits that prior to West Side's arrival, the bin had not exploded, and for seven days West Side safely removed pellets. Furthermore, Flitsch testified that on April 20, he did not see fire in the bin. ConAgra further contends that the explosion occurred because for hours prior to the explosion West Side was fighting the fire without telling ConAgra and without contacting the fire department.  Lastly, ConAgra asserts that the injuries to Becker and Jentz occurred because Flitsch sent them into the tunnel after Schmidt had already called for an evacuation, and Becker and Jentz were in a position of safety.

     The allocations of fault made by the jury are not against the manifest weight of the evidence.   Based on the evidence adduced at trial, the jury could reasonably conclude that ConAgra disregarded the safety of workers on the site and placed money above safety because of delays in addressing the condition of the bin and in calling the fire department.  Even though the bin had not exploded, there was

evidence that before West Side arrived, *i.e.,* while the bin was indisputably in ConAgra's exclusive control, the bin had not been properly maintained; pellets were self-heating; the bin was smoldering; the carbon monoxide level had increased; pellets were charring, which made them more difficult to remove (like concrete); and product was stuck within the bin.  A rational jury could have concluded that had Bin C-15 been maintained in a reasonably safe condition, or if there had not been a six weeks' delay in hiring West Side, there would have been no explosion.  Furthermore, the jury could have reasonably concluded that ConAgra maintained control of the bin after West Side's arrival because witnesses' testimony showed that Friedt was at the top of the chain-of-command on the site and because ConAgra continued to operate the elevator, dumping grain trucks and using dust collectors which increased airflow to the fire.  A legally sufficient evidentiary basis supports the jury's finding that ConAgra was more culpable than West Side.

ConAgra contends that the Court erred by denying its request for a limiting instruction as to the evidence of ConAgra's conduct prior to the start of West Side's  work on April 19.  ConAgra asserts that, under Illinois law, in cases involving the negative rendition of service, a factfinder must not consider as negligent a plaintiff's conduct creating the condition for which a service provider is employed to remedy.  According to ConAgra, its conduct prior to April 19 merely set the stage for West Side's work.  Consequently, the Court's allowing this inadmissible evidence as to fault likely contributed to the finding of liability against ConAgra and to the inappropriate allocation of fault to ConAgra.

The Court thoroughly analyzed case law and the facts related to this issue above, § A-2, pages 6-11.  The rationale is clear, well-supported and need not be repeated here.  The Court did not err in denying this limiting instruction.

Next, ConAgra asserts that the Court erred in denying ConAgra's motion for judgment as a matter of law that there is a written and valid contract between ConAgra and West Side by which West Side waived its *Kotecki*[3] protection.  ConAgra also maintains that the Court erred in ruling that West Side did not waive its *Kotecki* protection.

ConAgra does not develop its argument beyond these assertions of error.  The *Kotecki* issue was first raised on January 20, 2012, when ConAgra moved for summary judgment on its third-party complaint against West Side on the basis that West Side had waived any protections limiting its liability for contribution under *Kotecki*.  Finding that a genuine issue of material fact existed as to whether the April 19, 2010, contract was fully executed and governed the parties' relationship, the Court denied ConAgra's motion as to whether the contract was enforceable and reserved as to the *Kotecki* waiver (Doc. 403). On June 1, 2012, the jury found that ConAgra had proven that the April 19, 2010 contract between ConAgra and West Side was valid and awarded ConAgra $3,000,000.00 in damages for property damage.

In its August 6, 2012 Memorandum and Order, based on the jury's verdict that the April 19 contract was valid, the Court determined that (1) the indemnification clause is valid and enforceable; (2) ConAgra waived or abandoned its claim for contractual indemnification; (3) Illinois, not Iowa, law

---

[3] ***Kotecki v. Cyclops Welding Corp.***, **585 N.E.2d 1023 (Ill. 1992)**

governed Becker's workers' compensation claim; (4) and West Side did not waive its *Kotecki* protection because the provision in the ConAgra/West Side contract did not contain sufficient specific contractual language to constitute a waiver; and (5) it was both unsound and unnecessary to add the term "joint and several liability" to the Judgment.

As above, the Court thoroughly analyzed case law and the facts related to this issue each time it was raised.  The Court's rationale is clear, well-supported and need not be repeated here.  The Court did not err in denying ConAgra's motion for judgment as a matter of law that there was a written and valid contract between ConAgra and West Side by which West Side waived its *Kotecki* protection or by ruling that West Side did not waive its *Kotecki* protection.

Next, ConAgra asserts that the Court erred in refusing its Instructions 24, 99 and 100.  These instructions evidence ConAgra's belief that punitive damages must be proven by clear and convincing evidence.

The Court refused ConAgra's instructions (*see* Doc. 412, Trans. 5/29/12 p.m., pp. 94-97) because they refer to a clear and convincing evidence burden of proof for an award of punitive damages.  The Court held that is not the correct burden of proof and that ConAgra's contention is not supported by case law.  *Id.* at 94:21-24; 97:16-19.  The Court's analysis of the law and the facts of this case are set forth above, § B, pp. 18-20.  The rationale is clear, well-supported and need not be repeated here.  The Court did not err in refusing ConAgra's Instructions 24, 99 and 100.

27

B.   Damages

    1.   Non-economic compensatory damages

ConAgra submits that it does not seek to minimize Plaintiffs' real and significant injuries, and does not take issue with the awards of past and future economic damages.   ConAgra does, however, contend that the awards of non-economic damages [disfigurement, loss of normal life (past and future), increased risk of harm, pain and suffering (past and future), emotional distress (past and future)] are excessive.

Under Illinois law, "[a]n award of damages will be deemed excessive if it falls outside the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large that it shocks the judicial conscience." *Smart Marketing Group v. Publications Int'l, Ltd.*, 624 F.3d 824, 832 (7th Cir. 2010) (quoting *Best*, 689 N.E.2d at 1079 (internal quotation marks omitted)).   "Illinois courts have repeatedly held that the amount of damages to be assessed is peculiarly a question of fact for the jury to determine ... and that great weight must be given to the jury's decision.   *Snelson v. Kamm*, 787 N.E.2d 796, 816 (Ill. 2003) (collecting cases).   A judge may not substitute his judgment for that of the jury and should not interfere with the jury's assessment of damages "unless a proven element of damages was ignored, the verdict resulted from passion or prejudice, or the award bears no reasonable relationship to the loss suffered." *Id.* (citing *Gill v. Foster*, 626 N.E.2d 190 (1993)). "Illinois law makes clear that it is 'the jury's function to consider the credibility of witnesses and to determine an appropriate award of damages.'" *Naeem*

*v. McKesson Drug Co.*, 444 F.3d 593, 612 (7th Cir. 2006) (quoting *Richardson v. Chapman*, 676 N.E.2d 621, 628 (1997)).

ConAgra maintains that the evidence regarding Plaintiffs' injuries need not be repeated in order for the Court to assess whether the awards were excessive. But the severity of Plaintiffs' injuries forms the basis for determining whether the awards bear a reasonable relationship to the losses suffered. There is no question that all Plaintiffs suffered and will continue to suffer disfigurement, pain and suffering, and emotional distress. The jury also found that Becker and Jentz suffered and will in the future suffer loss of normal life and that Jentz suffers increased risk of harm. The following brief recitation of Plaintiffs' injuries, as appalling as it is, does not begin to encompass all of their injuries.

Dr. Dove testified that Becker suffered multisystemic injury and organ damage as a result of the explosion. Doc. 351, Dove Trans., at 127:22-25. Becker was severely burned with permanent scarring to his face, head, hands, parts of his back and other parts of his body. *Id.* at 127:15-21. Even though Becker had reached maximum medical improvement at the time of trial, he continues to suffer neurologic deficits, which are permanent. *Id.* at 128:1-9. He suffered a severe inhalation burn and respiratory failure, which required him to be on mechanical ventilation for 80 days. *Id.* at 130:23-131:15. He also suffered severe burns to both of his eyes and underwent multiple surgeries. *Id.* at 138:3-15.

At the time of trial, Jentz had yet to reach maximum medical improvement. He continues to receive treatment for his burns and is limited in what he can do. Dr. Yarkony testified that Jentz had loss of sensation in his feet; very

tight, sensitive, itching skin with temperature control problems; susceptibility to injury from the sun; and that there was "like a powder keg of problems that he's at risk for in the future."  Doc. 352, Yarkony Trans., at 161:20-162:21.

As to Schmidt, while his burns were not as extensive as those of Becker and Jentz, he was hospitalized, underwent surgery and required follow-up care.  His wife testified that he was subject to nightmares, panic attacks and got jumpy easily. Doc. 353, Alisa Schmidt Trans., at 138:15-18.   His hands were permanently compromised and are painful in cold weather, which is for much of the year in his Minnesota home.  He is also susceptible to developing skin cancer.  His treating doctor assessed his disability at 3-4%.

ConAgra contends that the damages awarded by the jury are excessive. According to ConAgra, the Court should compare the verdicts in this case to jury verdict reports in other recent burn cases.  ConAgra notes that Illinois courts disfavor a comparison of awards but asserts that in diversity cases, the Seventh Circuit applies a different rule.   ConAgra cites *Arpin v. United States*, **521 F.3d 769 (7th Cir. 2008),** and *Jutzi-Johnson v. United States*, **263 F.3d 753 (7th Cir. 2001),** in support of its argument that a comparison of awards is appropriate.

Both *Arpin* and *Jutzi-Johnson* were bench trials.  When a federal judge is the trier of fact, he, unlike a jury, must explain the grounds of his decision, *i.e.,* "indicate the reasoning process that connects the evidence to the conclusion." *Jutzi-Johnson***, 263 F.3d at 758**.  The policy of permitting comparison evidence is based on the requirement in Fed.R.Civ.P. 52(a), a rule of procedure, that judges explain their reasoning when awarding damages.  *Arpin***, 521 F.3d at 776**-77.  In consequence, a

judge *should* consider awards in similar cases even though Illinois law does not require or even encourage these comparisons.  *Id*. **(citing *Richardson*, 676 N.E.2d at 628)**.

However, Rule 52(a) is not implicated in this case.  Where there has been a jury verdict, the court must apply the Illinois standard for review of damages on a post-trial motion for judgment as a matter of law or for a new trial.  In ***Naeem***, the Seventh Circuit found that the district court erred when It compared the award to the plaintiff with awards to plaintiffs in other cases.  **444 F.3d at 611-12.** The Court explained that substantial differences between federal and state court damage awards could result if the federal court did not apply state standards. *Id*. **at 611**.  The United States Supreme Court mandates that Illinois law govern review of an award based on state-law claims.  *Id*. **(citing *Gasperini v*. *Center for Humanities*, *Inc*., 518 U.S. 415, 431 (1996))**.  In ***Gasperini***, the Supreme Court held that a federal district court must defer to state standards of review of damages for state law claims because *Erie Railroad Co. v. Tompkins,* 304 U.S. 64 (1938), "precludes a recovery in federal court significantly larger than the recovery that would have been tolerated in state court." *Id*. **(quoting *Gasperini*, 518 U.S. at 438**.

As a result, this Court will disregard comparison evidence offered by ConAgra in an effort to show that the awards here are excessive.  In any event, the utility of comparison cases is small since many personal injury cases are settled prior to trial, and the settlements are confidential.

ConAgra contends that the emotional distress awards should be vacated in their entirety because Illinois law recognizes that an award for pain and suffering includes physical and mental pain and suffering.  ConAgra asserts that this Court

approved an instruction for emotional distress over its objection (IPI 30.05.01). ConAgra contends that this instruction is intended for cases involving negligent infliction of emotional distress in the absence of physical impact.   According to ConAgra, since there is no way to determine the amount of overlap between the pain and suffering awards and the emotional distress awards, the latter should be vacated.

ConAgra is, quite simply, incorrect.   In *Babikian v. Mruz*, **956 N.E.2d 959 (Ill.App.Ct. 2011),** the Illinois Appeals Court rejected the defendant's contention that an instruction was improper that informed the jurors that they could award damages for pain and suffering and also for emotional distress, if they determined that such damages were proved to have resulted from the defendant's negligence. *Babikian*, **956 N.E.2d at 964.**  The appellate court stated, "In fact, the rule in Illinois is just the opposite." *Id*.

ConAgra next contends that certain awards were excessive or internally inconsistent:  disfigurement awards, Schmidt's overall damages and Amber Becker's loss of consortium award.

As stated above, under Illinois law, there are three grounds for deeming an award of damages excessive:  (1) if it falls outside the range of fair and reasonable compensation; (2) if it results from passion or prejudice; and (3) if it is so large that it shocks the judicial conscience.  *Smart Marketing*, **624 F.3d at 832 (quoting *Best*, 689 N.E.2d at 1079 (internal quotation marks omitted)).**  This undersigned Judge must give great weight to the jury's decision and may not substitute his judgment. *Snelson*, **787 N.E.2d at 816**.

32

Giving appropriate weight to the jury's decision, the Court concludes that the award of damages was neither excessive nor internally inconsistent.  Not only was evidence presented at trial showing that Jentz and Becker suffered extremely severe and disfiguring injuries, but also the jury was able to observe Plaintiffs directly and assess for themselves the severity of the injuries and disfigurement.   That Schmidt was less disfigured is reflected in a significantly lesser award, which, nonetheless, takes into account that the injury permanently affects the appearance of his hands and constitutes sufficient disfigurement to justify the jury's award.  And the award, while large, is not so excessive that it shocks the judicial conscience.

As to Amber's loss of consortium award, there is a rational connection between the evidence and the substantial award. *See Naeem*, **444 F.3d at 611**.  Both Justin and Amber testified that the marital relationship had suffered because of Justin's injuries, and that he was more irritable and more easily frustrated.  Amber testified that Justin was unable to work and provide for his family, unable to offer emotional support, physical companionship and intimacy, and that he could not help with household tasks or the children.  Justin testified that there was less intimacy, that he was harder on Amber than before and that he was physically unable to help out around the house.  In sum, Amber and Justin's marital relationship was forever changed for the worse.  Additionally, although the award is high, it is not "monstrous" when compared with other loss of consortium verdicts upheld by Illinois courts. ***Fox v. Hayes***, **600 F.3d 819, 845 (7th Cir. 2010) (citing *Velarde v. Ill. Central R.R. Co.*, 820 N.E.2d 37 (2004) (upholding $3.5 million loss of consortium claim);**

*DeYoung v. Alpha Constr*. *Co*., **542 N.E.2d 859 (1989) (upholding $3.6 million loss of society award for death of 75-year-old)).**

ConAgra's claim that the jury's verdict was the result of passion or corruption is meritless.  ConAgra first asserts that the Court's allowing the willful and wanton conduct claim permitted Plaintiffs to put ConAgra in a bad light, likely boosting the awards of compensatory damages.  Second, ConAgra contends that the unfair treatment was exacerbated during closing arguments when the following exchange occurred.

> MR. PATTON:  I think they just – call it overconfidence, call it stupidity, certainly call it negligence, but they thought that they could beat that fire, and they're telling you, all the lawyers, that they're not qualified to fight fires and this is why.  This is what happens when you're not qualified or competent to fight a fire.  You make it worse.

> MR. TAXMAN:  He called Justin Becker stupid in this courtroom. He called him stupid. I told you that the person at the bottom of the chain of command who has their head down and working when they have to do something dangerous, they are going to call that person stupid. I said it in an argument and it came true this afternoon. Stupidity. He said those words. It came out of his mouth. That is uncalled for, uncalled for.  How dare Justin Becker get burned at their facility. How dare he do that. That is rude calling him names at the level that he is at here, $15 an hour. It is rude.  That alone, calling him stupid, warrants your verdict for punitive damages. You tell them you can't do this. You can't make these decisions and call him stupid. It is not ….

> MR. PATTON: Your Honor, if Mr. Taxman wants to point his fingers at me, it is inappropriate in this courtroom.

> THE COURT: Please continue.

> MR. TAXMAN: Thank you, Your Honor.   (Doc. 413, 5/29/13, Taxman closing argument, at 241:13-242:5).

Mr. Taxman returned to the issue, reiterating that Mr. Patton had called his client stupid and, moreover, had demeaned Amber Becker when he talked about the Beckers' damages.  *Id.* at 242:24-243:1.

Third, ConAgra asserts that a Jentz/Schmidt attorney commented during rebuttal on the conduct of ConAgra's counsel.  According to ConAgra, these comments were "an attempt to rain unfair prejudice down on ConAgra" and resulted in excessive compensatory damages.

Fourth, ConAgra alleges that West Side's conduct wrongly added to the unfair passion and prejudice against ConAgra.  ConAgra maintains that Plaintiffs and West Side were closely aligned and that West Side did not challenge the compensatory damages claims made by Plaintiffs.

Finally, ConAgra submits that West Side suggested to the jury that ConAgra should be hit for punitive damages.  ConAgra asserts that West Side's counsel made unnecessary comments against ConAgra to fend off Jentz's and Schmidt's claims against West Side.  Specifically, ConAgra calls attention to counsel's statement, "one was trying to help, one was placing money over safety all the way until the very end…."  Doc. 413, West Side closing, at 240:1-5.  According to ConAgra, West Side wrongly added fuel to the fire, which resulted in excessive compensatory damages.

ConAgra's various assertions amount to a claim that a new trial should be granted because the trial was unfair.  "A new trial should be granted, however, 'only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our

35

conscience.'"  *Whitehead v. Bond*, 680 F.3d 919, 927-28 (7th Cir. 2012) (citation omitted).

After reviewing the record, the undersigned Judge is not persuaded by ConAgra's arguments that the trial was unfair or that the jury's verdict cries out to be overturned.  ConAgra's argument that allowing the willful and wanton conduct claim "likely" boosted the awards of compensatory damages is speculative on its face.  Furthermore, ample evidence supports the Court's decision to allow punitive damages to be submitted to the jury.  Even a very partial summary of evidence presented supports a finding that ConAgra evinced a conscious disregard for the safety and rights of others, in that ConAgra: failed to promptly address the hot bin while seeking a cheaper salvage company; claimed that the bin was improving and told West Side not to mobilize when the condition of the bin had not changed, and the smoke and burning smell remained the same; sought to salvage and sell the pellets instead of immediately abating a known safety issue; monitored the bin on a hit-or-miss basis instead of instituting a 24-hour fire watch and recording the temperature of the bin hourly; willfully withheld information from West Side about the worsening condition of the bin; and delayed evacuating the area and calling the fire department for five hours on the day of the explosion.  In sum, the Court properly submitted Plaintiffs' willful and wanton claim to the jury where ConAgra, with its specific knowledge of the great risk of fires and explosions in the grain handling business, disregarded safety and allowed an unconscionable length of time to pass without taking the steps necessary to secure the safety of the bin and the people working in and on it.

As to ConAgra's assertions that the jury was inflamed to passion or prejudice by comments made by counsel during closing arguments, those passages-at-arms constitute a minute part of the overall record of a 17-day trial.  The Court does not believe that the jury was substantially influenced by either counsel's remarks, given all of the evidence they had heard.  ***See Christmas v. City of Chicago*, 682 F.3d 632, 640 (7th Cir. 2012).**   In the exchange regarding "call it stupidity," ConAgra's counsel opened the door for the Beckers' counsel to remind the jury that he had presaged ConAgra's argument that Plaintiffs were "stupid" for keeping their heads down and doing dangerous work.  No rational jury would be impassioned by this brief exchange, where each attorney had his say and the Court did not emphasize the contretemps but simply told Plaintiffs' counsel, "Please continue."

The Court has also reviewed the remarks of counsel for Plaintiffs Jentz and Schmidt regarding the conduct of ConAgra's counsel and finds it nonsensical to suggest that these remarks resulted in excessive compensatory damages.  Essentially, Plaintiffs' counsel remarked that the practice of law has changed since he began practicing – and not for the better.  *See, generally,* Doc. 428, at 27:24-33:12.  He was critical of ConAgra's counsel for having "epiphanies" about who was at fault, whether West Side or Plaintiffs, and was "saddened and disappointed" by counsel's conduct. He criticized ConAgra's counsel for providing a third source of evidence, besides testimony from the witness stand and exhibits – "repetitive, boisterous, misdirected comments."  Counsel's speech was measured and not inflammatory.

Furthermore, ConAgra's counsel did not object to Plaintiffs' counsel's remarks.  Prompt objections to an attorney's remarks are necessary to allow the

Court to instruct the jury to disregard improper statements.  ***See Leggett v. Kumar*, 570 N.E.2d 1249, 1264-1265 (Ill.App.Ct. 1991).**  Otherwise, if counsel is allowed to sit on his hands and later challenge an unfavorable outcome, he could secure a new trial where the Court might have cured any prejudice arising from the improper argument if counsel had timely objected.  ConAgra's objection to Plaintiffs' counsel's closing argument was waived.

Lastly, ConAgra's complaints regarding West Side, the conduct of West Side's counsel and the alignment of West Side and Plaintiffs were thoroughly aired on the record in a juncture prior to rebuttal.  *See* Doc. 428, pp. 3-10.  ConAgra's counsel stated that West Side's counsel's closing argument led to either of two conclusions – that counsel "did not present a very competent defense of his client, though I don't think that is right because I know he is a good lawyer" *or* that West Side and Plaintiffs had made a deal that if there was a judgment against West Side, there was either an agreement on "high low" or Plaintiffs would not execute against West Side above its $12 million dollar insurance policy limit.  West Side's counsel responded that there was no deal and that he resented the implication that there was.  He stated that his conduct was a result of trial strategy.  The Court stated that it would not put anyone under oath without authority and that he accepted counsels' representations as officers of the court.  The Court then polled West Side's and Plaintiffs' attorneys, who confirmed that there was no deal.  The Court found no reason to believe that the attorneys' representations, which were subject to sanctions, including loss of license, were not credible.  The Court observed that West Side's counsel had represented his

client ably and zealously.  The Court will not disturb these conclusions on ConAgra's repeated, baseless speculation.

### 2.   Punitive Damages

ConAgra contends that whether considered singly or in combination, the punitive damages awards are excessive and violate the federal due process clause. ConAgra submits that to uphold the awards here, the Court must rule that compensatory damages of $77,560,650.00 are not sufficient to achieve punishment or deterrence.  Citing *State Farm Mut. Auto Ins. Co. v. Campbell*, **538 U.S. 408 (2003),** ConAgra maintains that its conduct did not rise to the degree of reprehensibility necessary to sustain such excessive awards because (1) ConAgra has no history of ignoring bin problems or engaging in the conduct involved here; (2) ConAgra was, at worst, guilty of errors in judgment; (3) ConAgra has work safety policies in place to protect its employees and invitees; (4) assuming that ConAgra personnel lost sight of those policies, its conduct did not amount to conscious and reckless disregard of a highly unreasonable risk of harm; and (5) ConAgra hired West Side, an acknowledged expert, to remove the pellets, and the explosion occurred because West Side fought a fire for hours without calling the fire department. ConAgra also asserts that Schmidt's punitive damages award (11.43/1 ratio) is constitutionally infirm.  Finally, ConAgra contends that the punitive damages awards are excessive because they are duplicative.  Specifically, the Court's procedure of allowing three separate punitive damage awards violated due process and provided a "windfall" rather than protecting ConAgra's property interests from arbitrary deprivation.

In *State Farm,* the Supreme Court instructed courts reviewing punitive damages to consider three guideposts:  "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  **538 U.S. at 418 (citation omitted)**.  Of these guideposts, the most important indicator of reasonableness is the degree of reprehensibility of the defendant's misconduct.  *Id*. **at 419**.  To determine the degree of reprehensibility, the court should consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id*.

The Court further instructed, "It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.  *Id*.

Factors one and three are easily met:  the harm was physical, and Plaintiffs were financially vulnerable.  As to factors two and four, legally sufficient evidence supports a finding that ConAgra's conduct evinced an indifference to or reckless disregard of Plaintiffs' health and safety and that the conduct involved was not an isolated incident.

ConAgra's conduct, which showed reckless disregard for Plaintiffs' health and safety, involved repeated actions or, perhaps, more accurately, inactions. How many times over the course of the six weeks prior to the explosion, how many times on the day of the explosion, did ConAgra have opportunities to avert tragedy? The first day that a burning smell was detected was an opportunity for ConAgra to take the steps necessary to extinguish the fire, given its sure knowledge that burning means fire, and a fire in a bin is dangerous. Every piece of evidence that piled up afterwards – smoke, blackened pellets, elevated temperature readings, elevated carbon monoxide readings, the vocal concerns of its own employees – should have been a call to action, an impetus to call the fire department. But ConAgra did not. These factors are met. Moreover, on this record, the harm to Plaintiffs was more than "mere accident," but a result of ConAgra's willful, wanton misconduct. In sum, the *State Farm* factors demonstrate that ConAgra's payment of compensatory damages is insufficient and that punitive damages are necessary to punish and deter future misconduct.

ConAgra cites no authority for its contention that the punitive damages awards are excessive because they are duplicative. ConAgra concedes that, in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), the Supreme Court declined to decide whether multiple punitive damages awards for the same conduct violate due process. The Seventh Circuit, reflecting on *Gore,* suggested that "it could be argued that a piling on of awards by different courts for the same act might result in excessive punishment for that act," but the Court considered that it did not need to decide whether that argument would ever succeed because "it is unlikely to succeed

to the point of converting entitlements to punitive damages from individual to collective entitlements." *In re Brand Name Prescription Drugs Antitrust Litig.*, **123 F.3d 599, 609 (7th Cir. 1997)**.

Each Plaintiff in this action had separate claims against ConAgra. Requiring Plaintiffs to waive individual punitive damage awards would certainly disserve judicial efficiency and economy since few plaintiffs would agree to consolidate cases if that were the outcome. This case was consolidated without objection. Moreover, it would be an extremely difficult undertaking for the Court to divide a lump sum among the Plaintiffs in a manner that comports with due process since their injuries and claims are disparate.

In *State Farm,* the Supreme Court noted its reluctance to "identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." **538 U.S. at 424-25 (citing *Gore*, 517 U.S. at 582) ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award") (emphasis in original) (additional citation omitted).** The Court declined to impose a bright-line ratio which a punitive damages award could not exceed. *Id*. **at 425**. The Court then stated that few awards that exceeded a single-digit ratio to a significant degree would satisfy due process. *Id*.

Viewing the compensatory-to-punitive damages ratios for each Plaintiff individually, the Court finds that they satisfy due process as to Jentz and Becker but not as to Schmidt. For Jentz, the ratio is less than 1 ($41,585,000.00 in compensatory

damages to $33,333,333.33 in punitive damages).  For Becker, the ratio is also less than 1 ($35,390,000.00 in compensatory damages to $33,333,333.33 in punitive damages).

As the Seventh Circuit recognized in *Mathias v. Accor Economy Lodging, Inc.,* **347 F.3d 672 (7th Cir. 2003)**, "[t]he Supreme Court did not, however, lay down a 4-to-1 or single-digit-ratio rule - it said merely that 'there is a presumption against an award that has a 145-to-1 ratio,' *State Farm,* 123 S.Ct. at 1524 – and it would be unreasonable to do so." **347 F.3d at 676 (affirming 37.2-to-1 ratio).**   The Court reasoned that "as there are no punitive-damages guidelines, corresponding to the federal and state sentencing guidelines, it is inevitable that the specific amount of punitive damages awarded whether by a judge or by a jury will be arbitrary….  The judicial function is to police a range, not a point." *Id*. **at 678 (citing *Gore*, 517 U.S. at 582-83 (additional citation omitted)).**   Based upon these principles, the Court rejects ConAgra's challenge to the punitive damages claims, except as to Schmidt who will be discussed next.

IV.   Remittitur

ConAgra argues that it is entitled, at the very least, to remittitur. ConAgra submits that remittitur of excessive damages awards is available under both Illinois and federal law.  Without waiving its liability arguments, ConAgra alternatively requests remittitur to the following amounts:  Becker, $8,000,000.000 compensatory and $0 punitive; Jentz, $12,000,000.00 compensatory and $0 punitive; Schmidt, $750,000 compensatory and $0 punitive.   ConAgra submits that Amber Becker has

already received a pretrial settlement from A&J in excess of the jury award and is entitled to no more.

Under Illinois law, the Court's consideration of remittitur is constrained: "the evidence need only tend to show a basis for the computation of damages with a fair degree of probability." **Naeem, 444 F.3d at 611 (quoting *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 106 F.3d 1388, 1398 (7th Cir. 1997) (citation omitted)).** "A damages award will not be subject to remittitur if it 'falls within the flexible range of conclusions which can be reasonably supported by facts because the assessment of damages is primarily an issue of fact for jury determination.'" *Id.* **(citation omitted).**

As exhaustively analyzed above, because none of the compensatory damages awards are excessive, ConAgra is not entitled to remittitur on compensatory damages awards.  Furthermore, because the punitive damages awards are justified and within a fair ratio as to Jentz and Becker, ConAgra is not entitled to remittitur on these awards either.

For Schmidt, the ratio is 11 to 1 ($2,915,000.00 in compensatory damages to $33,333,333.34 in punitive damages).[4]  This award takes into account that Schmidt was harmed and was exposed to the same potential harm as Jentz and Becker, as well as to the same degree of reprehensibility of ConAgra's conduct. Schmidt experienced the same 1,700 degree fireball as the other Plaintiffs, as he was trapped in an open one-man elevator lift on the side of the bin.  Only his quick action in covering as much of himself as he could with his jacket prevented his sustaining

---

[4] It cannot escape notice that the jury believed that ConAgra's conduct warranted punitive damages in the round amount of $100,000,000.00 and that the jury also believed that Plaintiffs' entitlement to that award was equal to within a penny.

more devastating injuries.   But the disparity between the actual harm suffered by Schmidt and the punitive damages award, which is the second prong of the *State Farm* review of punitive damages, leads the Court to conclude that they are excessive as to Schmidt, and a remittitur is appropriate.

Schmidt's injuries, while severe, do not approach those of Jentz and Becker.   While *State Farm* held that there is no bright-line rule for considering the ratio between punitive and compensatory damages, **538 U.S. at 421-425**, single digit multipliers are more likely to comport with due process.   Consequently, the Court remits Schmidt's punitive damages award from $33,333,333.34 to $26,235,000.00, thereby achieving a 9:1 ration, which comports with due process.

V.   Conclusion

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** ConAgra's post-trial motion (Doc. 515). The Court GRANTS ConAgra's motion as to remittitur of the punitive damages award to Robert Schmidt and remits the award from $33,333,333.34 to $26,235,000.00.   ConAgra's motion is **DENIED** in all other respects.   An amended judgment will be entered reflecting the remittitur.

IT IS SO ORDERED.

DATED this 8th day of February, 2013

s/Michael J. Reagan
MICHAEL J. REAGAN
United States District Judge